Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. No. 21-03005-sgj |
| | § | |
| vs. | § | Civ. Act. No. 3:21-cv-00880-C |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**APPENDIX IN SUPPORT OF OBJECTION OF NEXPOINT
ADVISORS, L.P. TO ORDER DENYING MOTIONS TO EXTEND
<u>EXPERT DISCLOSURE AND DISCOVERY DEADLINES</u>**

**APPENDIX**

| Docket No. | Document | App. Page |
|---|---|---|
| CA 10 | District Court Order (adopting Bankruptcy Court's report and recommendation) | 001 |
| AP 63 | Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty | 003 |
| AP 64 | Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint | 076 |
| AP 86 | Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 089 |
| AP 104 | Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 534 |
| AP 105 | Highland's Memorandum of Law in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 538 |
| AP 106 | Declaration of John A. Morris in Support of Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines | 561 |
| AP 109 | Memorandum Opinion and Order Denying Arbitration Request and Related Relief | 774 |
| AP 115 | Reply of Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines | 786 |
| AP 120 | Notice of Expert Report of Steven J. Pully | 830 |
| AP 124 | Transcript of Hearing Held on December 13, 2021 | 856 |
| AP 138 | Order Denying Motions to Extend Expert Disclosure and Discovery Deadlines | 894 |

U.S. Bankruptcy Court, Adversary Proceeding No. 21-03005 ("**AP**")
U.S. District Court, Civil Action No. 3:21-cv-0880-C ("**CA**")

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-34054-SGJ-11 |
| | ) | |
| Debtor(s). | ) | |

* * *

| | | |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | |
| | ) | Adversary No. 21-03005-SGJ |
| | ) | |
| NEXPOINT ADVISORS, L.P., | ) | |
| | ) | |
| Defendant(s). | ) | Civil Action No. 3:21-CV-0880-C |

## ORDER

CAME BEFORE THIS COURT FOR CONSIDERATION the Report and

Recommendation, signed by the Honorable Stacey G. C. Jernigan, United States Bankruptcy

Judge, therein recommending that the District Court: (1) grant Defendant's Motion to Withdraw

the Reference at such time as the Bankruptcy Court certifies that litigation is trial-ready; and

(2) defer to the Bankruptcy Court the handling of all pretrial matters.[1]

After due consideration and having conducted a *de novo* review, the Court finds that

Defendant's limited objections should be **OVERRULED**. Furthermore, after reviewing the

thorough and well-reasoned Report and Recommendation, the Court is of the opinion that the

---

[1] On July 22, 2021, Defendant Nexpoint Advisors, L.P. filed limited objections to the Report and Recommendation.

Report and Recommendation entered by the Bankruptcy Court should be **ADOPTED** as the findings and conclusions of this Court.

 **IT IS THEREFORE ORDERED** that Defendant's Motion to Withdraw Reference shall be granted, but only at such time as the Bankruptcy Court certifies to this Court that the litigation is trial-ready.

 **IT IS FURTHER ORDERED** that the Bankruptcy Court shall handle all pretrial matters, including discovery and the filing of reports and recommendations on dispositive motions, which shall in turn be considered by the undersigned Senior United States District Judge.

 **IT IS FURTHER ORDERED** that this civil action be **STAYED** pending further Order of the Court.[2]

 SO ORDERED.

 Dated July 28, 2021.

SAM R. CUMMINGS
SENIOR UNITED STATES DISTRICT JUDGE

---

[2] The stay imposed in this civil action shall be lifted upon the filing of a subsequent report and recommendation or at such time as the Bankruptcy Court certifies to this Court that the litigation is trial-ready.

2

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005 |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| Defendants. | | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**AMENDED COMPLAINT FOR (I) BREACH OF CONTRACT,
(II) TURNOVER OF PROPERTY, (III) FRAUDULENT TRANSFER, AND (IV)
BREACH OF FIDUCIARY DUTY**

Plaintiff, Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession (the "Debtor") in the above captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff (the "Plaintiff") in the above-captioned adversary proceeding (the "Adversary Proceeding") by its undersigned counsel, as and for its amended complaint (the "Complaint") against defendants NexPoint Advisors, L.P. ("NPA"), James Dondero ("Mr. Dondero"), Nancy Dondero ("Ms. Dondero"), and The Dugaboy Investment Trust ("Dugaboy" and together with NPA, Mr. Dondero, and Ms. Dondero, the "Defendants"), alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

**PRELIMINARY STATEMENT**

1.      The Debtor brings this action against Defendants in connection with NPA's default under a promissory note executed by NPA in favor of the Debtor in the original principal amount of $30,746,812.33, and payable in annual installments.  NPA has failed to pay amounts when due under the Note (as defined below), the Note is in default, and the amounts due under the Note have been accelerated pursuant to the terms of the Note.

2.      In paragraph 42 of NPA's *First Amended Answer* [Docket No. 34-3], NPA contends that the Debtor orally agreed to relieve it of the obligations under the notes upon fulfillment of "conditions subsequent" (the "Alleged Agreement").  NPA further contends that the Alleged Agreement was entered into between James Dondero, acting on behalf of NPA, and his sister, Nancy Dondero, as representative of a majority of the Class A shareholders of the Plaintiff, including Dugaboy (the "Representative"), acting on behalf of the Debtor.  At the time Mr.

2

APP 004

Dondero entered into the Alleged Agreement on behalf of NPA, he controlled both NPA and the Debtor and was the lifetime beneficiary of Dugaboy.

3. Based on its books and records, discovery to date, and other facts, the Debtor believes that the Alleged Agreement is a fiction created after the commencement of this Adversary Proceeding for the purpose of avoiding or at least delaying paying the obligations due under the Note.

4. Nevertheless, the Debtor amends its Complaint to add certain claims and name additional parties who would be liable to the Debtor if the Alleged Agreement were determined to exist and be enforceable. Specifically, in addition to pursuing claims against NPA for breach of its obligations under the Note and for turnover, the Debtor adds alternative claims (a) against NPA for actual fraudulent transfer and aiding and abetting Dugaboy in its breach of fiduciary duty, (b) against Dugaboy for declaratory relief and for breach of fiduciary duty, and (c) against Nancy Dondero for aiding and abetting Dugaboy in the breach of his fiduciary duties.

5. As remedies, the Debtor seeks (a) damages from NPA in an amount equal to (i) the outstanding principal due under the Note (as defined below), plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses, as provided for in the Note), for NPA's breach of its obligations under the Note, (b) turnover by NPA to the Debtor of the foregoing amounts; (c) avoidance of the Alleged Agreement and the transfers thereunder and recovery of the funds transferred from the Plaintiff to, or for the benefit of, NPA pursuant to the Note; (d) declaratory relief, and (e) damages arising from the Defendants' breach of fiduciary duties or aiding and abetting thereof.

APP 005

## JURISDICTION AND VENUE

6.      This adversary proceeding arises in and relates to the Debtor's case pending before the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") under chapter 11 of the Bankruptcy Code.

7.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Debtor consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

10.     The Debtor is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

11.     Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas, and organized under the laws of the state of Delaware.

12.     Upon information and belief, Mr. Dondero is an individual residing in Dallas, Texas.  He is the co-founder of the Debtor and was the Debtor's President and Chief Executive Officer until his resignation on January 9, 2020.  At all relevant times, Mr. Dondero controlled NPA; Mr. Dondero also controlled the Debtor until January 9, 2020.

13.     Upon information and belief, Dugaboy is (a) a limited partner of the Debtor, and (b) one of Mr. Dondero's family investment trusts for which is he a lifetime beneficiary.

4

14.     Upon information and belief, Nancy Dondero is an individual residing in the state of Florida and who is Mr. Dondero's sister, and a trustee of Dugaboy.

## CASE BACKGROUND

15.     On October 16, 2019, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

16.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members: (a) Redeemer Committee of Highland Crusader Fund ("Redeemer"), (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

17.     On June 25, 2021, the U.S. Trustee in this Court filed that certain *Notice of Amended Unsecured Creditors' Committee* [Docket No. 2485] notifying the Court that Acis and Redeemer had resigned from the Committee.

18.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

19.     The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

---

[2] All docket numbers refer to the main docket for the Debtor's Case maintained by this Court.

APP 007

## STATEMENT OF FACTS

**A.**      **The NPA Note**

20.      NPA is the maker under a promissory note in favor of the Debtor.

21.      Specifically, on May 31, 2017, NPA executed a promissory note in favor

of the Debtor, as payee, in the original principal amount of $30,746, 812.33 (the "Note").  A true

and correct copy of the Note is attached hereto as **Exhibit 1**.

22.      Section 2 of the Note provides: "**Payment of Principal and Interest**.

Principal and interest under this Note shall be due and payable as follows:

> **2.1      Annual Payment Dates.**  During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this note.

> **2.2      Final Payment Date**.    The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

23.      Section 3 of the Note provides:

**Prepayment Allowed: Renegotiation Discretionary**.    Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

24.      Section 4 of the Note provides:

**Acceleration Upon Default**.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of the Payee in exercising any right, power, or privilege hereunder shall operate as a waiver hereof.

6

25.     Section 6 of the Note provides:

**Attorneys' Fees**.   If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

**B.     NPA's Default Under the Note**

26.     NPA failed to make the payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

27.     By letter dated January 7, 2021, the Debtor made demand on NPA for immediate payment under the Note (the "Demand Letter").  A true and correct copy of the Demand Letter is attached hereto as **Exhibit 2**.  The Demand Letter provides:

Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.**

Demand Letter (emphasis in the original).

28.     On January 14, 2021, in an apparent attempt to cure its default, NPA paid the Debtor the $1,406,111.92 that was due on December 31, 2020 (the "Partial Payment").

29.     The Note does not contain a cure provision. Therefore, the Partial Payment did not cure NPA's default.  Accordingly, on January 15, 2021, the Debtor sent NPA a follow-up letter to its Demand Letter (the "Second Demand Letter"), a true and correct copy of which is attached hereto as **Exhibit 3**, stating:

[T]he Partial Payment will be applied as payment against the amounts due under the Note in accordance with Section 3 thereof.  **The Note remains in default, and all amounts due thereunder are due immediately**.

APP 009

> After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note).

Second Demand Letter (emphasis in original).

30.    Despite the Debtor's demands, NPA did not pay the amount demanded by the Debtor on January 7, 2021, or at any time thereafter.

31.    As of January 15, 2021, the total outstanding principal and accrued but unpaid interest due under the Note was $23,071,195.03

32.    Pursuant to Section 4 of the Note, the Note is in default, and is currently due and payable.

## C.    The Debtor Files the Original Complaint

33.    On January 22, 2021, the Debtor filed the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* [Docket No. 1] (the "Original Complaint").  In the Original Complaint, the Debtor brought claims for (i) breach of contract for NPA's breach of its obligations under the Note and (ii) turnover by NPA for the outstanding amounts under the Note, plus all accrued and unpaid interest until the date of payment plus the Debtor's costs of collection and reasonable attorney's fees.

## D.    NPA's Affirmative Defenses

34.    On March 1, 2021, NPA filed *Defendant's Original Answer* [Docket No. 6] (the "Original Answer").  In its Original Answer, NPA asserted three affirmative defenses: (i) the claims are barred because the Plaintiff caused NPA to default, (ii) the claims are barred because the Plaintiff caused NPA to delay in making payment, and (iii) waiver and estoppel. *See id.* ¶¶39-41.

35.    On June 9, 2021, NPA filed *Defendant's First Amended Answer* [Docket No. 35-3] (the "Amended Answer"), that asserted a new affirmative defense; namely, that the

8

Debtor previously agreed that it would not collect on the Notes "upon fulfillment of conditions subsequent" (*i.e.*, the Alleged Agreement) *id.* ¶42.

36.    According to NPA, the Alleged Agreement was orally entered into "sometime between December of the year each note was made and February of the following year."

37.    According to NPA, Mr. Dondero, acting on its behalf, entered into the Alleged Agreement with his sister, Nancy Dondero, acting as the Representative.

38.    Mr. Dondero controlled both NPA and the Debtor at the time he entered into the Alleged Agreement on behalf of NPA.

39.    Upon information and belief, the Debtor's books and records do not reflect the Alleged Agreement.

**E.    Dugaboy Lacked Authority to Act on Behalf of the Debtor**

40.    Under section 4.2 of the *Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P.* (the "Limited Partnership Agreement"), and attached hereto as **Exhibit 4**, Dugaboy was not authorized to enter into the Alleged Agreement on behalf of the Partnership, or otherwise bind the Partnership (as "Partnership" is defined in the Limited Partnership Agreement).

41.    Section 4.2(b) of the Limited Partnership Agreement states:

> Management of Business.  No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

**Exhibit 4**, § 4.2(b).

42.    No provision in the Limited Partnership Agreement authorizes any of the Partnership's limited partners to bind the Partnership.

APP 011

43.     Nancy Dondero also lacked authority to enter into the Alleged Agreement or to otherwise bind the Debtor

## FIRST CLAIM FOR RELIEF
### (Against NPA)

### (For Breach of Contract)

44.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

45.     The Note is a binding and enforceable contract.

46.     NPA breached the Note by failing to pay all amounts due to the Debtor upon NPA's default and acceleration.

47.     Pursuant to the Note, the Debtor is entitled to damages from NPA in an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

48.     As a direct and proximate cause of NPA's breach of the Note, the Debtor has suffered damages in the amount of at least $23,071,195.03, as of January 15, 2021, plus an amount equal to all accrued buy unpaid interest from that date, plus the Debtor's cost of collection.

## SECOND CLAIM FOR RELIEF
### (Against NPA)
### (Turnover by NPA Pursuant to 11 U.S.C. § 542(b))

49.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

50.     NPA owes the Debtor an amount equal to (i) the aggregate outstanding principal due under the Note, plus (ii) all accrued and unpaid interest thereon until the date of

payment, plus (iii) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for NPA's breach of its obligations under the Note.

51.     The Note is property of the Debtor's estate that is matured and payable upon default and acceleration.

52.     NPA has not paid the amount due under the Note to the Debtor.

53.     The Debtor has made demand for the turnover of the amount due under the Note.

54.     As of the date of filing of this Complaint, NPA has not turned over the amount due under the Note.

55.     The Debtor is entitled to the amount due under the Note.

## THIRD CLAIM FOR RELIEF
### (Against NPA)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

57.     The Debtor made the transfer pursuant to the Alleged Agreement within two years of the Petition Date.

58.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor, demonstrated by, *inter alia*:

(a) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(b) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(c) Mr. Dondero did not inform the Debtor's CFO or outside auditors about the Alleged Agreement.

APP 013

(d) The Debtor's books and record do not reflect the Alleged Agreement.

(e) The Alleged Agreement was not subject to negotiation.

(f) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

59.     The pattern of conduct, series of transactions, and general chronology of events under inquiry in connection with the debt NPA incurred under the Note demonstrates a scheme of fraud.

60.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfer made pursuant to the Alleged Agreement from NPA.

61.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Note.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**(Against NPA)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. §§ 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

</div>

62.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

63.     The Debtor made the transfers pursuant to the Alleged Agreement after, or within a reasonable time before, creditors' claims arose.

64.     Mr. Dondero entered into the Alleged Agreement on behalf of NPA with actual intent to hinder, delay, or defraud a present or future creditor of the Debtor, demonstrated by, *inter alia*:

(g) The transfer was made to, or for the benefit of, NPA, an insider of the Debtor.

(h) Mr. Dondero entered into the Alleged Agreement on behalf of NPA with his sister, Nancy Dondero.

(i) Mr. Dondero did not inform the Debtor's CFO or outside auditor's about the Alleged Agreement.

(j) Upon information and belief, the Debtor's books and record do not reflect the Alleged Agreement.

(k) The Alleged Agreement was not subject to negotiation.

(l) The value of the consideration received by the Debtor for the transfer was not reasonably equivalent in value.

65.     Pursuant to 11 U.S.C. § 550, the Debtor is entitled to recover for the benefit of the Debtor's estates the transfers made in exchange for the Alleged Agreement from NPA.

66.     Accordingly, the Debtor is entitled to a judgement: (i) avoiding the Alleged Agreement and the transfer made thereunder, and (ii) recovering from NPA an amount equal to all obligations remaining under the Notes.

<u>**FIFTH CLAIM FOR RELIEF**</u>
**(Against Dugaboy and Ms. Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

68.     A bona fide, actual, present dispute exists between the Debtor, on the one hand, and Dugaboy and Ms. Dondero on the other hand, concerning whether Dugaboy and/or Ms. Dondero, acting as the Representative, were authorized to enter into the Alleged Agreement on the Debtor's behalf.

13

69.    A judgment declaring the parties' respective rights and obligations will resolve their dispute.

70.    Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement,

- (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership,

- (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged Agreement on behalf of the Partnership, and

- (d) the Alleged Agreement is null and void.

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy and Ms. Dondero)**
**(Breach of Fiduciary Duty)**

71.    The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

72.    If Dugaboy, as a limited partner, or Ms. Dondero, as Representative, had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero would owe the Debtor a fiduciary duty.

APP 016

73.      If Dugaboy or Ms. Dondero (as Representative) had the authority to enter into the Alleged Agreement on behalf of the Debtor, then Dugaboy and/or Ms. Dondero breached their fiduciary duty of care to the Debtor by entering into and authorizing the purported Alleged Agreement on behalf of the Debtor.

74.      Accordingly, the Debtor is entitled to recover from Dugaboy and Ms. Dondero (a) actual damages that the Debtor suffered as a result of their breach of fiduciary duty, and (b) for punitive and exemplary damages.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

</div>

75.      The Debtor repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

76.      James Dondero and Nancy Dondero (together, the "Donderos") were aware that Dugaboy would have fiduciary duties to the Debtor if it acted to bind the Debtor.

77.      The Donderos aided and abetted Dugaboy's breach of its fiduciary duties to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

78.      The Donderos aided and abetted Dugaboy's breach of its fiduciary duty to the Debtor by knowingly participating in the authorization of the purported Alleged Agreement.

79.      Accordingly, the Donderos are jointly and severally liable (a) for the actual damages that the Debtor suffered as a result of aiding and abetting Dondero's breaches of fiduciary duties, and (b) for punitive and exemplary damages

WHEREFORE, the Debtor prays for judgment as follows:

(i)      On its First Claim for Relief, damages in an amount to be determined at trial but includes (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to

APP 017

the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii)     On its Second Claim for Relief, ordering turnover by NPA to the Debtor of an amount equal to (a) the outstanding principal due under the Note, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Debtor's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(iii)    On its Third Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement arising from actual fraudulent transfer under section 548 of the Bankruptcy Code;

(iv)    On its Fourth Claim for Relief, avoidance of the Alleged Agreement and the transfers thereunder pursuant to the Alleged Agreement of funds arising from actual fraudulent transfer under Tex. Bus. & C. Code § 24.005(a)(1);

(v)     On its Fifth Claim for Relief, a declaration that: (a) limited partners, including but not limited to Dugaboy, have no right or authority to take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically provided in the Limited Partnership Agreement, (b) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) was authorized under the Limited Partnership Agreement to enter into the Alleged Agreement on behalf of the Partnership, (c) neither Dugaboy nor Ms. Dondero (whether individually or as Representative) otherwise had any right or authority to enter into the Alleged

APP 018

Agreement on behalf of the Partnership, and (d) the Alleged Agreement is null and void;

(vi)     On its Sixth Claim for Relief, actual damages from Dugaboy and Ms. Dondero, in an amount to be determined at trial, that Debtor suffered as a result of their breach of fiduciary duty, and for punitive and exemplary damages;

(vii)     On its Seventh Claim for Relief, actual damages from the Donderos, jointly and severally, in an amount to be determined at trial, that Debtor suffered as a result of aiding and abetting Dugaboy's breaches of fiduciary duty, and for punitive and exemplary damages and

(iii)     Such other and further relief as this Court deems just and proper.

APP 019

Dated:  As of July 13, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
              ikharasch@pszjlaw.com
              jmorris@pszjlaw.com
              gdemo@pszjlaw.com
              hwinograd@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

APP 020

# EXHIBIT 1

# PROMISSORY NOTE

**$30,746,812.33**                                                                 **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.     <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1     <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2     <u>Final Payment Date</u>.       The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.    Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees.  If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements.  All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law.  The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law.  This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9.    Prior Notes.    The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By:_____
Name:
Title:

2

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|-----------|---------------------|---------------|-------------------------------------------------------|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

APP 024

# EXHIBIT 2

HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

      Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due <u>immediately</u>.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

**Appendix A**

ABA #:            322070381
Bank Name:        East West Bank
Account Name:     Highland Capital Management, LP
Account #:        5500014686

APP 028

# EXHIBIT 3

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

January 15, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

       Re: Partial Payment on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, ("Maker"), entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee"). A copy of the Note is attached hereto as **Appendix A**.

On January 7, 2021, Payee notified you that because of Maker's failure to make the payment due on December 31, 2020 (the "Default"), the Note was in default and that all principal, interest, and any other amounts due on the Note were immediately due and payable. The amount due and payable on the Note as of January 8, 2021, was $24,471,804.98; however, interest continues to accrue under the Note.

On January 14, 2021, Payee received a wire from Maker in the amount of $1,406,111.92 (the "Partial Payment"). To reiterate, the amount due under the Note as of January 8, 2021, was $24,471,804.98. The Partial Payment will be applied as payment against the amounts due under the Note pursuant to Section 3 thereof. **The Note remains in default, and all amounts due thereunder are due <ins>immediately.</ins>**

After adjusting for the Partial Payment and the continued accrual of interest, the amount due under the Note as of January 15, 2021, is $23,071,195.03 (which amount does not include expenses incurred to date in collecting the Note). Payment of such amount is due immediately. Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix B**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved, including the right to recover Payee's expenses incurred in collecting the Note. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter
       A.  Lee Hogewood III

# Appendix A

APP 032

# PROMISSORY NOTE

**$30,746,812.33**                                                   **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.    <u>Interest Rate</u>.   The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.    <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

2.1    <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

2.2    <u>Final Payment Date</u>.        The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.    <u>Prepayment Allowed; Renegotiation Discretionary</u>.   Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note. Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.    <u>Acceleration Upon Default</u>.   Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. _Waiver_. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. _Attorneys' Fees_. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. _Limitation on Agreements_. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. _Governing Law_. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. _Prior Notes_. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By:_____
Name:
Title:

2

APP 034

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

3

**Appendix B**

ABA #:              322070381
Bank Name:      East West Bank
Account Name:  Highland Capital Management, LP
Account #:        5500014686

# EXHIBIT 4

**FOURTH AMENDED AND RESTATED**

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS LIMITED PARTNERSHIP AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OP 1933 OR UNDER ANY STATE SECURITIES ACTS IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. THE SALE OR OTHER DISPOSITION OF THE PARTNERSHIP INTERESTS IS PROHIBITED UNLESS THAT SALE OR DISPOSITION IS MADE IN COMPLIANCE WITH ALL SUCH APPLICABLE ACTS. ADDITIONAL RESTRICTIONS ON TRANSFER OF THE PARTNERSHIP INTERESTS ARE SET FORTH IN THIS AGREEMENT.

**FOURTH AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

<u>TABLE OF CONTENTS</u>

| | | |
|---|---|---|
| ARTICLE 1 | GENERAL | 1 |
| 1.1. | Continuation | 1 |
| 1.2. | Name | 1 |
| 1.3. | Purpose | 1 |
| 1.4. | Term. | 1 |
| 1.5. | Partnership Offices; Addresses of Partners. | 1 |
| | | |
| ARTICLE 2 | DEFINITIONS | 2 |
| 2.1. | Definitions | 2 |
| 2.2. | Other Definitions | 6 |
| | | |
| ARTICLE 3 | FINANCIAL MATTERS | 6 |
| 3.1. | Capital Contributions | 6 |
| 3.2. | Allocations of Profits and Losses | 8 |
| 3.3. | Allocations on Transfers | 9 |
| 3.4. | Special Allocations | 9 |
| 3.5. | Curative Allocations | 10 |
| 3.6. | Code Section 704(c) Allocations | 10 |
| 3.7. | Capital Accounts | 11 |
| 3.8. | Distributive Share for Tax Purpose | 12 |
| 3.9. | Distributions. | 12 |
| 3.10. | Compensation and Reimbursement of General Partner | 14 |
| 3.11. | Books, Records, Accounting, and Reports | 14 |
| 3.12. | Tax Matters | 14 |
| | | |
| ARTICLE 4 | RIGHTS AND OBLIGATIONS OF PARTNERS | 15 |
| 4.1. | Rights and Obligations of the General Partner | 15 |
| 4.2. | Rights and Obligations of Limited Partners | 19 |
| 4.3. | Transfer of Partnership Interests | 19 |
| 4.4. | Issuances of Partnership Interests to New and Existing Partners | 21 |
| 4.5. | Withdrawal of General Partner | 21 |
| 4.6. | Admission of Substitute Limited Partners and Successor General Partner | 21 |
| | | |
| ARTICLE 5 | DISSOLUTION AND WINDING UP | 22 |
| 5.1. | Dissolution | 22 |
| 5.2. | Continuation of the Partnership | 23 |
| 5.3. | Liquidation | 23 |
| 5.4. | Distribution in Kind | 24 |
| 5.5. | Cancellation of Certificate of Limited Partnership | 24 |
| 5.6. | Return of Capital | 24 |
| 5.7. | Waiver of Partition. | 24 |
| | | |
| ARTICLE 6 | GENERAL PROVISIONS | 24 |
| 6.1. | Amendments to Agreement | 24 |

i

| | | |
|---|---|---|
| 6.2. | Addresses and Notices | 25 |
| 6.3. | Titles and Captions | 25 |
| 6.4. | Pronouns and Plurals | 25 |
| 6.5. | Further Action | 25 |
| 6.6. | Binding Effect | 25 |
| 6.7. | Integration | 25 |
| 6.8. | Creditors | 25 |
| 6.9. | Waiver | 25 |
| 6.10. | Counterparts | 25 |
| 6.11. | Applicable Law | 25 |
| 6.12. | Invalidity of Provisions | 25 |
| 6.13. | Mandatory Arbitration | 26 |

ii

### FOURTH AMENDED AND RESTATED
### AGREEMENT OF LIMITED PARTNERSHIP
### OF
### HIGHLAND CAPITAL MANAGEMENT, L.P.

THIS FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP is entered into on this 24th day of December, 2015, to be effective as of December 24, 2015, by and among Strand Advisors, Inc., a Delaware corporation (*"Strand"),* as General Partner, the Limited Partners party hereto, and any Person hereinafter admitted as a Limited Partner.

Certain terms used in this Agreement are defined in Article 2.

### ARTICLE 1

### GENERAL

**1.1.    Continuation**. Subject to the provisions of this Agreement, the Partners hereby continue the Partnership as a limited partnership pursuant to the provisions of the Delaware Act. Except as expressly provided herein, the rights and obligations of the Partners and the administration and termination of the Partnership shall be governed by the Delaware Act.

**1.2.    Name.** The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of Highland Capital Management, L.P. The General Partner, in its sole and unfettered discretion, may change the name of the Partnership at any time and from time to time and shall provide Limited Partners with written notice of such name change within twenty (20) days after such name change.

**1.3.    Purpose.** The purpose and business of the Partnership shall be the conduct of any business or activity that may lawfully be conducted by a limited partnership organized pursuant to the Delaware Act. Any or all of the foregoing activities may be conducted directly by the Partnership or indirectly through another partnership, joint venture, or other arrangement.

**1.4.    Term.** The Partnership was formed as a limited partnership on July 7, 1997, and shall continue until terminated pursuant to this Agreement.

**1.5.    Partnership Offices; Addresses of Partners**.

(a)    Partnership Offices. The registered office of the Partnership in the State of Delaware shall be 1013 Centre Road, Wilmington, Delaware 19805-1297, and its registered agent for service of process on the Partnership at that registered office shall be Corporation Service Company, or such other registered office or registered agent as the General Partner may from time to time designate. The principal office of the Partnership shall be 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other place as the General Partner may from time to time designate. The Partnership may maintain offices at such other place or places as the General Partner deems advisable.

(b)    Addresses of Partners. The address of the General Partner is 300 Crescent Court, Suite 700, Dallas, Texas 75201. The address of each Limited Partner shall be the address of that Limited Partner appearing on the books and records of the Partnership. Each Limited Partner agrees to provide the General Partner with prompt written notice of any change in his/her/its address.

# ARTICLE 2

## DEFINITIONS

**2.1.** **Definitions.** The following definitions shall apply to the terms used in this Agreement, unless otherwise clearly indicated to the contrary in this Agreement:

"*Additional Capital Contribution*" has the meaning set forth in <u>Section 3.1(b)</u> of this Agreement.

"*Adjusted Capital Account Deficit*" means, with respect *to* any Partner, the deficit balance, if any, in the Capital Account of that Partner as of the end of the relevant Fiscal Year, or other relevant period, giving effect to all adjustments previously made thereto pursuant to <u>Section 3.7</u> and further adjusted as follows: (i) credit to that Capital Account, any amounts which that Partner is obligated or deemed obligated to restore pursuant to any provision of this Agreement or pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c); (ii) debit to that Capital Account, the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6); and (iii) to the extent required under the Treasury Regulations, credit to that Capital Account (A) that Partner's share of "minimum gain" and (B) that Partner's share of "partner nonrecourse debt minimum gain." (Each Partner's share of the minimum gain and partner nonrecourse debt minimum gain shall be determined under Treasury Regulations Sections 1.704-2(g) and 1.704-2(i)(5), respectively.)

"*Affiliate*" means any Person that directly or indirectly controls, is controlled by, or is under common control with the Person in question. As used in this definition, the term "*control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting Securities, by contract or otherwise.

"*Agreement*" means this Fourth Amended and Restated Agreement of Limited Partnership, as it may be amended, supplemented, or restated from time to time.

"*Business Day*" means Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or the State of Texas shall not be regarded as a Business Day.

"*Capital Account*" means the capital account maintained for a Partner pursuant to <u>Section 3.7(a)</u>.

"*Capital Contribution*" means, with respect to any Partner, the amount of money or property contributed to the Partnership with respect to the interest in the Partnership held by that Person.

"*Certificate of Limited Partnership*" means the Certificate of Limited Partnership filed with the Secretary of State of Delaware by the General Partner, as that Certificate may be amended, supplemented or restated from time to time.

"*Class A Limited Partners*" means those Partners holding a Class A Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"*Class A Limited Partnership Interest*" means a Partnership Interest held by a Partner in its capacity as a Class A Limited Partner."

2

"***Class B Limited Partner***" means those Partners holding a Class B Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"***Class B Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class B Limited Partner."

"***Class B NAV Ratio Trigger Period***" means any period during which the Class B Limited Partner's aggregate capital contributions, including the original principal balance of the Contribution Note, and reduced by the aggregate amount of distributions to the Class B Limited Partner, exceed 75 percent of the product of the Class B Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class B NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class B NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class B NAV Ratio Trigger Period.

"***Class C Limited Partner***" means those Partners holding a Class C Limited Partnership Interest, as shown on <u>Exhibit A</u>.

"***Class C Limited Partnership Interest***" means a Partnership Interest held by a Partner in its capacity as a Class C Limited Partner."

"***Class C NAV Ratio Trigger Period***" means any period during which an amount equal to $93,000,000.00 reduced by the aggregate amount of distributions to the Class C Limited Partner after the Effective Date exceeds 75 percent of the product of the Class C Limited Partner's Percentage Interest multiplied by the total book value of the Partnership; provided, however, that the General Partner shall only be required to test for a Class C NAV Ratio Trigger Period annually, as of the last day of each calendar year; provided further the General Partner must complete the testing within 180 days of the end of each calendar year; provided further that if the test results in a Class C NAV Ratio Trigger Period, the General Partner may, at its own election, retest at any time to determine the end date of the Class C NAV Ratio Trigger Period.

"***Code***" means the Internal Revenue Code of 1986, as amended and in effect from time to time.

"***Contribution Note***" means that certain Secured Promissory Note dated December 21, 2015 by and among Hunter Mountain Investment Trust, as maker, and the Partnership as Payee.

"***Default Loan***" has the meaning set forth in <u>Section 3.1(c)(i)</u>.

"***Defaulting Partner***" has the meaning set forth in <u>Section 3.1(c)</u>.

"***Delaware Act***" means the Delaware Revised Uniform Limited Partnership Act, Part IV, Title C, Chapter 17 of the Delaware Corporation Law Annotated, as it may be amended, supplemented or restated from time to time, and any successor to that Act.

"***Effective Date***" means the date first recited above.

"***Fiscal Year***" has the meaning set forth in <u>Section 3.11(b)</u>.

APP 043

"*Founding Partner Group*" means, all partners holding partnership interests in the Partnership immediately before the Effective Date.

"*General Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a General Partner pursuant to the terms of this Agreement; and (ii) has not ceased to be a General Partner pursuant to the terms of this Agreement.

"*Limited Partner*" means any Person who (i) is referred to as such in the first paragraph of this Agreement, or has become a Limited Partner pursuant to the terms of this Agreement, and (ii) has not ceased to be a Limited Partner pursuant to the terms of this Agreement.

"*Liquidator*" has the meaning set forth in <u>Section 5.3</u>.

"*Losses*" means, for each Fiscal Year, the losses and deductions of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any expenditures described in Code Section 705(a)(2)(B).

"*Majority Interest*" means the owners of more than fifty percent (50%) of the Percentage Interests of Class A Limited Partners.

"*NAV Ratio Trigger Period*" means a Class B NAV Ratio Trigger Period or a Class C NAV Ratio Trigger Period.

"*Net Increase in Working Capital Accounts*" means the excess of (i) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the end of the period being measured over (ii) Restricted Cash plus Management and Incentive Fees Receivable plus Other Assets plus Deferred Incentive Fees Receivable less Accounts Payable less Accrued and Other Liabilities as of the beginning of the period being measured; <u>provided</u>, <u>however</u>, that amounts within each of the aforementioned categories shall be excluded from the calculation to the extent they are specifically identified as being derived from investing or financing activities. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership and appropriate adjustments may be made to the extent the Partnership adds new ledger accounts to its books and records that are current assets or current liabilities.

"*New Issues*" means Securities that are considered to be "new issues," as defined in the Conduct Rules of the National Association of Securities Dealers, Inc.

"*Nonrecourse Deduction*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1), as computed under Treasury Regulations Section 1.704-2(c).

"*Nonrecourse* **Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"*Operating Cash Flow*" means Total Revenue less Total Operating Expenses plus Depreciation & Amortization less Net Increase in Working Capital Accounts year over year. Each of the capitalized terms in this definition shall have the meaning given them in the books and records of the Partnership.

"*Partner*" means a General Partner or a Limited Partner.

"*Partner Nonrecourse Debt*" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(4).

"*Partner Nonrecourse Deductions*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(2).

"*Partner Nonrecourse Debt Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(i)(5).

"*Partnership*" means Highland Capital Management, L.P., the Delaware limited partnership established pursuant to this Agreement.

"*Partnership Capital*" means, as of any relevant date, the net book value of the Partnership's assets.

"*Partnership Interest*" means the interest acquired by a Partner in the Partnership including, without limitation, that Partner's right: (a) to an allocable share of the Profits, Losses, deductions, and credits of the Partnership; (b) to a distributive share of the assets of the Partnership; (c) if a Limited Partner, to vote on those matters described in this Agreement; and (d) if the General Partner, to manage and operate the Partnership.

"*Partnership Minimum Gain*" has the meaning set forth in Treasury Regulations Section 1.704-2(d).

"*Percentage Interest*" means the percentage set forth opposite each Partner's name on Exhibit A as such Exhibit may be amended from time to time in accordance with this Agreement.

"*Person*" means an individual or a corporation, partnership, trust, estate, unincorporated organization, association, or other entity.

"*Priority Distributions*" has the meaning set forth in Section 3.9(b).

"*Profits*" means, for each Fiscal Year, the income and gains of the Partnership determined in accordance with accounting principles consistently applied from year to year employed under the Partnership's method of accounting and as reported, separately or in the aggregate, as appropriate, on the Partnership's information tax return filed for federal income tax purposes, plus any income described in Code Section 705(a)(1)(B).

"*Profits Interest Partner*" means any Person who is issued a Partnership Interest that is treated as a "profits interest" for federal income tax purposes.

"*Purchase Notes*" means those certain Secured Promissory Notes of even date herewith by and among Hunter Mountain Investment Trust, as maker, and The Dugaboy Investment Trust, The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #1, and The Mark K. Okada, The Mark and Pamela Okada Family Trust – Exempt Trust #2, each as Payees of the respective Secured Promissory Notes.

APP 045

"***Record Date***" means the date established by the General Partner for determining the identity of Limited Partners entitled to vote or give consent to Partnership action or entitled to exercise rights in respect of any other lawful action of Limited Partners.

"***Second Amended Buy-Sell and Redemption Agreement***" means that certain Second Amended and Restated Buy-Sell and Redemption Agreement, dated December 21, 2015, to be effective as of December 21, 2015 by and between the Partnership and its Partners, as may be amended, supplemented, or restated from time to time.

"***Securities***" means the following: (i) securities of any kind (including, without limitation, "securities" as that term is defined in Section 2(a)(1) of the Securities Act; (ii) commodities of any kind (as that term is defined by the U.S. Securities Laws and the rules and regulations promulgated thereunder); (iii) any contracts for future or forward delivery of any security, commodity or currency; (iv) any contracts based on any securities or group of securities, commodities or currencies; (v) any options on any contracts referred to in clauses (iii) or (iv); or (vi) any evidences of indebtedness (including participations in or assignments of bank loans or trade credit claims). The items set forth in clauses (i) through (vi) herein include, but are not limited to, capital stock, common stock, preferred stock, convertible securities, reorganization certificates, subscriptions, warrants, rights, options, puts, calls, bonds, mutual fund interests, debentures, notes, certificates of deposit, letters of credit, bankers acceptances, trust receipts and other securities of any corporation or other entity, whether readily marketable or not, rights and options, whether granted or written by the Partnership or by others, treasury bills, bonds and notes, any securities or obligations issued or guaranteed by the United States or any foreign country or any state or possession of the United States or any foreign country or any political subdivision or agency or instrumentality of any of the foregoing, and derivatives of any of the foregoing.

"***Securities Act***" means the Securities Act of 1933, as amended, and any successor to such statute.

"***Substitute Limited Partner***" has the meaning set forth in <u>Section 4.6(a)</u>.

"***Transfer***" or derivations thereof, of a Partnership Interest means, as a noun, the transfer, sale, assignment, exchange, pledge, hypothecation or other disposition of a Partnership Interest, or any part thereof, directly or indirectly, and as a verb, voluntarily or involuntarily to transfer, sell, assign, exchange, pledge, hypothecate or otherwise dispose of.

"***Treasury Regulations***" means the Department of Treasury Regulations promulgated under the Code, as amended and in effect (including corresponding provisions of succeeding regulations).

**2.2.    Other Definitions**.  All terms used in this Agreement that are not defined in this <u>Article 2</u> have the meanings contained elsewhere in this Agreement.

## ARTICLE 3

## FINANCIAL MATTERS

**3.1.    Capital Contributions**.

(a)    <u>Initial Capital Contributions</u>.  The initial Capital Contribution of each Partner shall be set forth in the books and records of the Partnership.

(b)    <u>Additional Capital Contributions</u>.

APP 046

(i)     The General Partner, in its reasonable discretion and for a *bona fide* business purpose, may request in writing that the Founding Partner Group make additional Capital Contributions in proportion to their Percentage Interests (each, an "***Additional Capital Contribution***").

(ii)     Any failure by a Partner to make an Additional Capital Contribution requested under Section 3.1(b)(i) on or before the date on which that Additional Capital Contribution was due shall result in the Partner being in default.

(c)     Consequences to Defaulting Partners.  In the event a Partner is in default under Section 3.1(b) (a "***Defaulting Partner***"), the Defaulting Partner, in its sole and unfettered discretion, may elect to take either one of the option set forth below.

(i)     Default Loans.  If the Defaulting Partner so elects, the General Partner shall make a loan to the Defaulting Partner in an amount equal to that Defaulting Partner's additional capital contribution (a "***Default Loan***").  A Default Loan shall be deemed advanced on the date actually advanced.  Default Loans shall earn interest on the outstanding principal amount thereof at a rate equal to the Applicable Federal Mid-Term Rate (determined by the Internal Revenue Service for the month in which the loan is deemed made) from the date actually advanced until the same is repaid in full.  The term of any Default Loan shall be six (6) months, unless otherwise extended by the General Partner in its sole and unfettered discretion.  If the General Partner makes a Default Loan, the Defaulting Partner shall not receive any distributions pursuant to Section 3.9(a) or Section 5.3 or any proceeds from the Transfer of all or any part of its Partnership Interest while the Default Loan remains unpaid.  Instead, the Defaulting Partner's share of distributions or such other proceeds shall (until all Default Loans and interest thereon shall have been repaid in full) first be paid to the General Partner.  Such payments shall be applied first to the payment of interest on such Default Loans and then to the repayment of the principal amounts thereof, but shall be considered, for all other purposes of this Agreement, to have been distributed to the Defaulting Partner.  The Defaulting Partner shall be liable for the reasonable fees and expenses incurred by the General Partner (including, without limitation, reasonable attorneys' fees and disbursements) in connection with any enforcement or foreclosure upon any Default Loan and such costs shall, to the extent enforceable under applicable law, be added to the principal amount of the applicable Default Loan.  In addition, at any time during the term of such Default Loan, the Defaulting Partner shall have the right to repay, in full, the Default Loan (including interest and any other charges).  If the General Partner makes a Default Loan, the Defaulting Partner shall be deemed to have pledged to the General Partner and granted to the General Partner a continuing first priority security interest in, all of the Defaulting Partner's Partnership Interest to secure the payment of the principal of, and interest on, such Default Loan in accordance with the provisions hereof, and for such purpose this Agreement shall constitute a security agreement.  The Defaulting Partner shall promptly execute, acknowledge and deliver such financing statements, continuation statements or other documents and take such other actions as the General Partner shall request in writing in order to perfect or continue the perfection of such security interest; and, if the Defaulting Partner shall fail to do so within seven (7) days after the Defaulting Partner's receipt of a notice making demand therefor, the General Partner is hereby appointed the attorney-in-fact of, and is hereby authorized on behalf of, the Defaulting Partner, to execute, acknowledge and deliver all such documents and take all such other actions as may be required to perfect such security interest.  Such appointment and authorization are coupled with an interest and shall be irrevocable.  The General Partner shall, prior to exercising any right or remedy (whether at law, in equity or pursuant to the terms hereof) available to it in connection with such security interest, provide to the Defaulting Partner a notice, in reasonable detail, of the right or remedy to be exercised and the intended timing of such exercise which shall not be less than five (5) days following the date of such notice.

7

(ii)     Reduction of Percentage Interest.  If the Defaulting Partner does not elect to obtain a Default Loan pursuant to Section 3.1(c)(i), the General Partner shall reduce the Defaulting Partner's Percentage Interest in accordance with the following formula:

> The Defaulting Partner's new Percentage Interest shall equal the product of (1) the Defaulting Partner's current Percentage Interest, multiplied by (2) the quotient of (a) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), divided by (b) the sum of (i) the current Capital Account of the Defaulting Partner (with such Capital Account determined after taking into account a revaluation of the Capital Accounts immediately prior to such determination), plus (ii) the amount of the additional capital contribution that such Defaulting Partner failed to make when due.

To the extent any downward adjustment is made to the Percentage Interest of a Partner pursuant to this Section 3.1(c)(ii), any resulting benefit shall accrue to the Partners (other than the Defaulting Partner) in proportion to their respective Percentage Interests.

**3.2.**     **Allocations of Profits and Losses**.

(a)     Allocations of Profits.  Except as provided in Sections 3.4, 3.5, and 3.6, Profits for any Fiscal Year will be allocated to the Partners as follows:

(i)     First, to the Partners until cumulative Profits allocated under this Section 3.2(a)(i) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(iii) for all prior periods in the inverse order in which such Losses were allocated; and

(ii)     Next, to the Partners until cumulative Profits allocated under this Section 3.2(a)(ii) for all prior periods equal the cumulative Losses allocated to the Partners under Section 3.2(b)(ii) for all prior periods in the inverse order in which such Losses were allocated; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

(b)     Allocations of Losses.  Except as provided in Sections 3.4, 3.5, and 3.6, Losses for any Fiscal Year will be will be allocated as follows:

(i)     First, to the Partners until cumulative Losses allocated under this Section 3.2(b)(i) for all prior periods equal the cumulative Profits allocated to the Partners under Section 3.2(a)(iii) for all prior periods in the inverse order in which such Profits were allocated; and

(ii)     Next, to the Partners in proportion to their respective positive Capital Account balances until the aggregate Capital Account balances of the Partners (excluding any negative Capital Account balances) equal zero; *provided, however,* losses shall first be allocated to reduce amounts that were last allocated to the Capital Accounts of the Partners; and

(iii)     Then, to all Partners in proportion to their respective Percentage Interests.

APP 048

(c) <u>Limitation on Loss Allocations</u>. If any allocation of Losses would cause a Limited Partner to have an Adjusted Capital Account Deficit, those Losses instead shall be allocated to the General Partner.

3.3. **Allocations on Transfers**. Taxable items of the Partnership attributable to a Partnership Interest that has been Transferred (including the simultaneous decrease in the Partnership Interest of existing Partners resulting from the admission of a new Partner) shall be allocated in accordance with Section 4.3(d).

3.4. **Special Allocations.** If the requisite stated conditions or facts are present, the following special allocations shall be made in the following order:

(a) <u>Partnership Minimum Gain Chargeback</u>**.** Notwithstanding any other provision of this <u>Article 3</u>, if there is a net decrease in Partnership Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Partner shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to that Partner's share of the net decrease in Partnership Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g). This <u>Section 3.4(a)</u> is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and shall be subject to all exceptions provided therein.

(b) <u>Partner Nonrecourse Debt Minimum Gain Chargeback</u>**.** Notwithstanding any other provision of this <u>Article 3</u> (other than <u>Section 3.4(a)</u>), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain with respect to a Partner Nonrecourse Debt during any taxable year or other period for which allocations are made, any Partner with a share of such Partner Nonrecourse Debt Minimum Gain as of the beginning of the year shall be specially allocated items of Partnership income and gain for that period (and, if necessary, subsequent periods in an amount equal to that Partner's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain during that year determined in accordance with Treasury Regulations Section 1.704-2(g)(2). The items to be so allocated shall be determined in accordance with Treasury Regulations Section 1.704-2(g). This <u>Section 3.4(b)</u> is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations, shall be interpreted consistently with the Treasury Regulations and shall be subject to all exceptions provided therein.

(c) <u>Qualified Income Offset</u>**.** If a Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (d)(5) or (d)(6), then items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Partner as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(c)</u> shall be made if and only to the extent that the Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering this <u>Section 3.4(c)</u>.

(d) <u>Gross Income Allocation</u>. If a Partner has a deficit Capital Account at the end of any Fiscal Year of the Partnership that exceeds the sum of (i) the amount the Partner is obligated to restore, and (ii) the amount the Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), then each such Partner shall be specially allocated items of income and gain of the Partnership in the amount of the excess as quickly as possible; *provided, however,* an allocation pursuant to this <u>Section 3.4(d)</u> shall be made if and only to

9

the extent that the Partner would have a deficit Capital Account in excess of that sum after all other allocations provided for in this <u>Article 3</u> have been tentatively made without considering <u>Section 3.4(c)</u> or <u>3.4(d)</u>.

(e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any taxable year or other period for which allocations are made shall he allocated among the Partners in accordance with their Percentage interests.

(f)    <u>Partner Nonrecourse Deductions</u>.  Notwithstanding anything to the contrary in this Agreement, any Partner Nonrecourse Deductions for any taxable year or other period for which allocations are made will be allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which the Partner Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

(g)    <u>Section 754 Adjustments</u>.  To the extent an adjustment to the adjusted tax basis of any asset of the Partnership under Code Section 734(b) or Code Section 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) and that gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Treasury Regulations.

(h)    <u>Section 481 Adjustments</u>.  Any allocable items of income, gain, expense, deduction or credit required to be made by Section 481 of the Code as the result of the sale, transfer, exchange or issuance of a Partnership Interest will be specially allocated to the Partner receiving said Partnership Interest whether such items are positive or negative in amount.

**3.5.**    **Curative Allocations.**  The "***Basic Regulatory Allocations***" consist of (i) the allocations pursuant to <u>Section 3.2(c)</u>, and (ii) the allocations pursuant to <u>Sections 3.4</u>**.**  Notwithstanding any other provision of this Agreement, the Basic Regulatory Allocations shall be taken into account in allocating items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of the allocations of other items and the Basic Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Basic Regulatory Allocations had not occurred.  For purposes of applying the foregoing sentence, allocations pursuant to this <u>Section 3.5</u> shall be made with respect to allocations pursuant to <u>Section 3.4 (g) and (h)</u> only to the extent that it is reasonably determined that those allocations will otherwise be inconsistent with the economic agreement among the Partners. To the extent that a special allocation under Section 3.4 is determined not to comply with applicable Treasury Regulations, then the Partners intend that the items shall be allocated in accordance with the Partners' varying Percentage Interests throughout each tax year during which such items are recognized for tax purposes.

**3.6.**    **Code Section 704(c) Allocations.**  In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation at the time of the contribution between the tax basis of the property to the Partnership and the fair market value of that property.  Except as otherwise provided herein, any elections or other decisions relating to those allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intent of this Agreement.  Allocations of income, gain, loss and deduction pursuant to this <u>Section 3.6</u> are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, the Capital Account of any Partner or the share

APP 050

of Profits, Losses, other tax items or distributions of any Partner pursuant to any provision of this Agreement.

### 3.7. Capital Accounts.

(a) <u>Maintenance of Capital Accounts</u>. The Partnership shall establish and maintain a separate capital account *("Capital Account")* for each Partner in accordance with the rules of Treasury Regulations Section 1.704-1(b)(2)(iv), subject to and in accordance with the provisions set forth in this <u>Section 3.7</u>.

(i) The Capital Account balance of each Partner shall be credited (increased) by (A) the amount of cash contributed by that Partner to the capital of the Partnership, (B) the fair market value of property contributed by that Partner to the capital of the Partnership (net of liabilities secured by that contributed property that the Partnership assumes or takes subject to under Code Section 752), and (C) that Partner's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to <u>Sections 3.4</u> and <u>3.5</u>; and

(ii) The Capital Account balance of each Partner shall be debited (decreased) by (A) the amount of cash distributed to that Partner by the Partnership, (B) the fair market value of property distributed to that Partner by the Partnership (net of liabilities secured by that distributed property that such Partner assumes or takes subject to under Code Section 752), (C) that Partner's allocable share of expenditures of the Partnership described in Code Section 705(a)(2)(B), and (D) that Partner's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to <u>Sections 3.2</u>, <u>3.4</u> and <u>3.5</u>.

The provisions of this <u>Section 3.7</u> and the other provisions of this Agreement relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Code Section 704(b) and the Treasury Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions. The General Partner may modify the manner in which the Capital Accounts are maintained under this <u>Section 3.7</u> in order to comply with those provisions, as well as upon the occurrence of events that might otherwise cause this Agreement not to comply with those provisions.

(b) <u>Negative Capital Accounts</u>. If any Partner has a deficit balance in its Capital Account, that Partner shall have no obligation to restore that negative balance or to make any Capital Contribution by reason thereof, and that negative balance shall not be considered an asset of the Partnership or of any Partner.

(c) <u>Interest</u>. No interest shall be paid by the Partnership on Capital Contributions or on balances in Capital Accounts.

(d) <u>No Withdrawal</u>. No Partner shall be entitled to withdraw any part of his/her/its Capital Contribution or his/her/its Capital Account or to receive any distribution from the Partnership, except as provided in <u>Section 3.9</u> and <u>Article 5</u>.

(e) <u>Loans From Partners</u>. Loans by a Partner to the Partnership shall not be considered Capital Contributions.

(f) <u>Revaluations</u>. The Capital Accounts of the Partners shall not be "booked-up" or "booked-down" to their fair market values under Treasury Regulations Section 1.704(c)-1(b)(2)(iv)(f) or otherwise.

APP 051

    **3.8.**    **Distributive Share for Tax Purpose.**  All items of income, deduction, gain, loss or credit that are recognized for federal income tax purposes will be allocated among the Partners in accordance with the allocations of Profits and Losses hereunder as determined by the General Partner in its sole and unfettered discretion. Notwithstanding the foregoing, the General Partner may (i) as to each New Issue, specially allocate to the Partners who were allocated New Issue Profit from that New Issue any short-term capital gains realized during the Fiscal Year upon the disposition of such New Issue during that Fiscal Year, and (ii) specially allocate items of gain (or loss) to Partners who withdraw capital during any Fiscal Year in a manner designed to ensure that each withdrawing Partner is allocated gain (or loss) in an amount equal to the difference between that Partner's Capital Account balance (or portion thereof being withdrawn) at the time of the withdrawal and the tax basis for his/her/ its Partnership Interest at that time (or proportionate amount thereof); *provided, however,* that the General Partner may, without the consent of any other Partner, (a) alter the allocation of any item of taxable income, gain, loss, deduction or credit in any specific instance where the General Partner, in its sole and unfettered discretion, determines such alteration to be necessary or appropriate to avoid a materially inequitable result *(e.g.,* where the allocation would create an inappropriate tax liability); and/or (b) adopt whatever other method of allocating tax items as the General Partner determines is necessary or appropriate in order to be consistent with the spirit and intent of the Treasury Regulations under Code Sections 704(b) and 704(c).

    **3.9.**    **Distributions**.

        (a)    <u>General</u>.  The General Partner may make such pro rata or non-pro rata distributions as it may determine in its sole and unfettered discretion, without being limited to current or accumulated income or gains, but no such distribution shall be made out of funds required to make current payments on Partnership indebtedness; provided, however, that the General Partner may not make non-pro rata distributions under this Section 3.9(a) during an NAV Ratio Trigger Period without the consent of the Class B Limited Partner (in the case of a Class B NAV Ratio Trigger Period) and/or the Class C Limited Partner (in the case of a Class C NAV Ratio Trigger Period); provided, further this provision should not be interpreted to limit in any way the General Partner's ability to make non-pro rata tax distributions under Section 3.9(c) and Section 3.9(f). The Partnership has entered into one or more credit facilities with financial institutions that may limit the amount and timing of distributions to the Partners. Thus, the Partners acknowledge that distributions from the Partnership may be limited. Any distributions made to the Class B Limited Partner or the Class C Limited Partner pursuant to Section 3.9(b) shall reduce distributions otherwise allocable to such Partners under this Section 3.9(a) until such aggregate reductions are equal to the aggregate distributions made to the Class B Partners and the Class C Partners under Section 3.9(b).

        (b)    <u>Priority Distributions</u>.  Prior to the distribution of any amounts to Partners pursuant to Section 3.9(a), and notwithstanding any other provision in this Agreement to the contrary, the Partnership shall make the following distributions ("***Priority Distributions***") pro-rata among the Class B Limited Partner and the Class C Limited Partner in accordance with their relative Percentage Interests:

        (i)     No later than March 31st of each calendar year, commencing March 31, 2017, an amount equal to $1,600,000.00;

        (ii)     No later than March 31st of each year, commencing March 31, 2017, an amount equal to three percent (3%) of the Partnership's investment gain for the prior year, as reflected in the Partnership's books and records within ledger account number 90100 plus three percent (3%) of the gross realized investment gains for the prior year of Highland Select Equity Fund, as reflected in its books and records;

APP 052

(iii)    No later than March 31st of each year, commencing March 31, 2017, an amount equal to ten percent (10%) of the Partnership's Operating Cash Flow for the prior year; and

(iv)    No later than December 24th of each year, commencing December 24, 2016, an amount equal to the aggregate annual principal and interest payments on the Purchase Notes for the then current year.

(c)    <u>Tax Distributions</u>.  The General Partner may, in its sole discretion, declare and make cash distributions pursuant hereto to the Partners to allow the federal and state income tax attributable to the Partnership's taxable income that is passed through the Partnership to the Partners to be paid by such  Partners (a "***Tax Distribution***").  The General Partner may, in its discretion, make Tax Distributions to the Founding Partner Group without also making Tax Distributions to other Partners; provided, however, that if the General Partner makes Tax Distributions to the Founding Partner Group, Tax Distributions must also be made the Class B Limited Partner to the extent the Class B Limited Partner provides the Partnership with documentation showing it is subject to an entity-level federal income tax obligation.  Notwithstanding anything else in this Agreement, the General Partner may declare and pay Tax Distributions even if such Tax Distributions cause the Partnership to be unable to make Priority Distributions under <u>Section 3.9(b)</u>.

(d)    <u>Payments Not Deemed Distributions</u>.    Any amounts paid pursuant to <u>Sections 4.1(e)</u> or <u>4.1(h)</u> shall not be deemed to be distributions for purposes of this Agreement.

(e)    <u>Withheld Amounts</u>.  Notwithstanding any other provision of this <u>Section 3.9</u> to the contrary, each Partner hereby authorizes the Partnership to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Partnership with respect to that Partner as a result of that Partner's participation in the Partnership.  If and to the extent that the Partnership shall be required to withhold or pay any such taxes, that Partner shall be deemed for all purposes of this Agreement to have received a payment from the Partnership as of the time that withholding or tax is paid, which payment shall be deemed to be a distribution with respect to that Partner's Partnership Interest to the extent that the Partner (or any successor to that Partner's Partnership Interest) is then entitled to receive a distribution.  To the extent that the aggregate of such payments to a Partner for any period exceeds the distributions to which that Partner is entitled for that period, the amount of such excess shall be considered a loan from the Partnership to that Partner.  Such loan shall bear interest (which interest shall be treated as an item of income to the Partnership) at the "Applicable Federal Rate" (as defined in the Code), as determined hereunder from time to time, until discharged by that Partner by repayment, which may be made in the sole and unfettered discretion of the General Partner out of distributions to which that Partner would otherwise be subsequently entitled.  Any withholdings authorized by this <u>Section 3.9(d)</u> shall be made at the maximum applicable statutory rate under the applicable tax law unless the General Partner shall have received an opinion of counsel or other evidence satisfactory to the General Partner to the effect that a lower rate is applicable, or that no withholding is applicable.

(f)    <u>Special Tax Distributions</u>.  The Partnership shall, upon request of such Founding Partner, make distributions to the Founding Partners (or loans, at the election of the General Partner) in an amount necessary for each of them to pay their respective federal income tax obligations incurred through the effective date of the Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., the predecessor to this Agreement.

(g)    <u>Tolling of Priority Distributions</u>.  In the event of a "Honis Trigger Event," as defined in the Second Amended Buy-Sell and Redemption Agreement, the Partnership shall not make any distributions, including priority distributions under <u>Section 3.9(b)</u>, to the Class B Limited Partner or the Class C Limited Partner until such time as a replacement trust administrator, manager and general partner,

13

as applicable, acceptable to the Partnership in its sole discretion, as indicated by an affirmative vote of consent by a Majority Interest, shall be appointed to the Class B Limited Partner/Class C Limited Partner and any of its direct or indirect owners that have governing documents directly affected by a Honis Trigger Event.

### 3.10. Compensation and Reimbursement of General Partner.

(a)  Compensation.  The General Partner and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest; provided, however, that no compensation above five million dollars per year may be approved, even by a Majority Interest, during a NAV Ratio Trigger Period.

(b)  Reimbursement for Expenses.  In addition to amounts paid under other Sections of this Agreement, the General Partner and its Affiliates shall be reimbursed for all expenses, disbursements, and advances incurred or made, and all fees, deposits, and other sums paid in connection with the organization and operation of the Partnership, the qualification of the Partnership to do business, and all related matters.

### 3.11. Books, Records, Accounting, and Reports.

(a)  Records and Accounting.  The General Partner shall keep or cause to be kept appropriate books and records with respect to the Partnership's business, which shall at all times be kept at the principal office of the Partnership or such other office as the General Partner may designate for such purpose.  The books of the Partnership shall be maintained for financial reporting purposes on the accrual basis or on a cash basis, as the General Partner shall determine in its sole and unfettered discretion, in accordance with generally accepted accounting principles and applicable law. Upon reasonable request, the Class B Limited Partner or the Class C Limited Partner may inspect the books and records of the Partnership.

(b)  Fiscal Year.  The fiscal year of the Partnership shall be the calendar year unless otherwise determined by the General Partner in its sole and unfettered discretion.

(c)  Other Information.  The General Partner may release information concerning the operations of the Partnership to any financial institution or other Person that has loaned or may loan funds to the Partnership or the General Partner or any of its Affiliates, and may release such information to any other Person for reasons reasonably related to the business and operations of the Partnership or as required by law or regulation of any regulatory body.

(d)  Distribution Reporting to Class B Limited Partner and Class C Limited Partner.  Upon request, the Partnership shall provide the Class B Limited Partner and/or the Class C Limited Partner information on any non-pro rata distributions made under Section 3.9 to Partners other than the Partner requesting the information.

### 3.12. Tax Matters.

(a)  Tax Returns.  The General Partner shall arrange for the preparation and timely filing of all returns of Partnership income, gain, loss, deduction, credit and other items necessary for federal, state and local income tax purposes.  The General Partner shall deliver to each Partner as copy of his/her/its IRS Form K-1 as soon as practicable after the end of the Fiscal Year, but in no event later than October 1.  The classification, realization, and recognition of income, gain, loss, deduction, credit and

APP 054

other items shall be on the cash or accrual method of accounting for federal income tax purposes, as the General Partner shall determine in its sole and unfettered discretion. The General Partner in its sole and unfettered discretion may pay state and local income taxes attributable to operations of the Partnership and treat such taxes as an expense of the Partnership.

(b)  Tax Elections. Except as otherwise provided herein, the General Partner shall, in its sole and unfettered discretion, determine whether to make any available tax election.

(c)  Tax Controversies. Subject to the provisions hereof, the General Partner is designated the Tax Matters Partner (as defined in Code Section 6231), and is authorized and required to represent the Partnership, at the Partnership's expense, in connection with all examinations of the Partnership's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Partnership funds for professional services and costs associated therewith. Each Partner agrees to cooperate with the General Partner in connection with such proceedings.

(d)  Taxation as a Partnership. No election shall be made by the Partnership or any Partner for the Partnership to be excluded from the application of any of the provisions of Subchapter K, Chapter 1 of Subtitle A of the Code or from any similar provisions of any state tax laws.

## ARTICLE 4

## RIGHTS AND OBLIGATIONS OF PARTNERS

4.1.  **Rights and Obligations of the General Partner.** In addition to the rights and obligations set forth elsewhere in this Agreement, the General Partner shall have the following rights and obligations:

(a)  Management. The General Partner shall conduct, direct, and exercise full control of over all activities of the Partnership. Except as otherwise expressly provided in this Agreement, all management powers over the business and affairs of the Partnership shall be exclusively vested in the General Partner, and Limited Partners shall have no right of control over the business and affairs of the Partnership. In addition to the powers now or hereafter granted to a general partner of a limited partnership under applicable law or that are granted to the General Partner under any provision of this Agreement, the General Partner shall have full power and authority to do all things deemed necessary or desirable by it to conduct the business of the Partnership, including, without limitation: (i) the determination of the activities in which the Partnership will participate; (ii) the performance of any and all acts necessary or appropriate to the operation of any business of the Partnership (including, without limitation, purchasing and selling any asset, any debt instruments, any equity interests, any commercial paper, any note receivables and any other obligations); (iii) the procuring and maintaining of such insurance as may be available in such amounts and covering such risks as are deemed appropriate by the General Partner; (iv) the acquisition, disposition, sale, mortgage, pledge, encumbrance, hyphothecation, of exchange of any or all of the assets of the Partnership; (v) the execution and delivery on behalf of, and in the name of the Partnership, deeds, deeds of trust, notes, leases, subleases, mortgages, bills of sale and any and all other contracts or instruments necessary or incidental to the conduct of the Partnership's business; (vi) the making of any expenditures, the borrowing of money, the guaranteeing of indebtedness and other liabilities, the issuance of evidences of indebtedness, and the incurrence of any obligations it deems necessary or advisable for the conduct of the activities of the Partnership, including, without limitation, the payment of compensation and reimbursement to the General Partner and its Affiliates pursuant to Section 3.10; (vii) the use of the assets of the Partnership (including, without limitation, cash on hand) for any Partnership purpose on any terms it sees fit, including, without limitation, the financing of operations of the Partnership, the lending of funds to other Persons, and the repayment of obligations

15

of the Partnership; (viii) the negotiation, execution, and performance of any contracts that it considers desirable, useful, or necessary to the conduct of the business or operations of the Partnership or the implementation of the General Partner's powers under this Agreement; (ix) the distribution of Partnership cash or other assets; (x) the selection, hiring and dismissal of employees, attorneys, accountants, consultants, contractors, agents and representatives and the determination of their compensation and other teens of employment or hiring; (xi) the formation of any further limited or general partnerships, joint ventures, or other relationships that it deems desirable and the contribution to such partnerships, ventures, or relationships of assets and properties of the Partnership; and (xii) the control of any matters affecting the rights and obligations of the Partnership, including, without limitation, the conduct of any litigation, the incurring of legal expenses, and the settlement of claims and suits.

(b) <u>Certificate of Limited Partnership</u>. The General Partner caused the Certificate of Limited Partnership of the Partnership to be filed with the Secretary of State of Delaware as required by the Delaware Act and shall cause to be filed such other certificates or documents (including, without limitation, copies, amendments, or restatements of this Agreement) as may be determined by the General Partner to be reasonable and necessary or appropriate for the formation, qualification, or registration and operation of a limited partnership (or a partnership in which Limited Partners have limited liability) in the State of Delaware and in any other state where the Partnership may elect to do business.

(c) <u>Reliance by Third Parties</u>. Notwithstanding any other provision of this Agreement to the contrary, no lender or purchaser or other Person, including any purchaser of property from the Partnership or any other Person dealing with the Partnership, shall be required to verify any representation by the General Partner as to its authority to encumber, sell, or otherwise use any assess or properties of the Partnership, and any such lender, purchaser, or other Person shall be entitled to rely exclusively on such representations and shall be entitled to deal with the General Partner as if it were the sole party in interest therein, both legally and beneficially. Each Limited Partner hereby waives any and all defenses or other remedies that may be available against any such lender, purchaser, or other Person to contest, negate, or disaffirm any action of the General Partner in connection with any such sale or financing. In no event shall any Person dealing with the General Partner or the General Partner's representative with respect to any business or property of the Partnership be obligated to ascertain that the terms of this Agreement have been complied with, and each such Person shall be entitled to rely on the assumptions that the Partnership has been duly formed and is validly in existence. In no event shall any such Person be obligated to inquire into the necessity or expedience of any act or action of the General Partner or the General Partner's representative, and every contract, agreement, deed, mortgage, security agreement, promissory note, or other instrument or document executed by the General Partner or the General Partner's representative with respect to any business or property of the Partnership shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (i), at the time of the execution and delivery thereof, this Agreement was in full force and effect; (ii) such instrument or document was duly executed in accordance with the terms and provisions of this Agreement and is binding upon the Partnership; and (iii) the General Partner or the General Partner's representative was duly authorized and empowered to execute and deliver any and every such instrument or document for and on behalf of the Partnership.

(d) <u>Partnership Funds</u>. The funds of the Partnership shall be deposited in such account or accounts as are designated by the General Partner. The General Partner may, in its sole and unfettered discretion, deposit funds of the Partnership in a central disbursing account maintained by or in the name of the General Partner, the Partnership, or any other Person into which funds of the General Partner, the Partnership, on other Persons are also deposited; *provided, however,* at all times books of account are maintained that show the amount of funds of the Partnership on deposit in such account and interest accrued with respect to such funds as credited to the Partnership. The General Partner may use the funds of the Partnership as compensating balances for its benefit; *provided, however,* such funds do

16

not directly or indirectly secure, and are not otherwise at risk on account of, any indebtedness or other obligation of the General Partner or any director, officer, employee, agent, representative, or Affiliate thereof. Nothing in this <u>Section 4.1(d)</u> shall be deemed to prohibit or limit in any manner the right of the Partnership to lend funds to the General Partner or any Affiliate thereof pursuant to <u>Section 4.1(e)(i)</u>. All withdrawals from or charges against such accounts shall be made by the General Partner or by its representatives. Funds of the Partnership may be invested as determined by the General Partner in accordance with the terms and provisions of this Agreement.

    (e)   <u>Loans to or from General Partner; Contracts with Affiliates; Joint Ventures</u>.

    (i)   The General Partner or any Affiliate of the General Partner may lend to the Partnership funds needed by the Partnership for such periods of time as the General Partner may determine; *provided, however,* the General Partner or its Affiliate may not charge the Partnership interest at a rate greater than the rate (including points or other financing charges or fees) that would be charged the Partnership (without reference to the General Partner's financial abilities or guaranties) by unrelated lenders on comparable loans. The Partnership shall reimburse the General Partner or its Affiliate, as the case may be, for any costs incurred by the General Partner or that Affiliate in connection with the borrowing of funds obtained by the General Partner or that Affiliate and loaned to the Partnership. The Partnership may loan funds to the General Partner and any member of the Founding Partner Group at the General Partner's sole and exclusive discretion.

    (ii)   The General Partner or any of its Affiliates may enter into an agreement with the Partnership to render services, including management services, for the Partnership. Any service rendered for the Partnership by the General Partner or any Affiliate thereof shall be on terms that are fair and reasonable to the Partnership.

    (iii)   The Partnership may Transfer any assets to joint ventures or other partnerships in which it is or thereby becomes a participant upon terms and subject to such conditions consistent with applicable law as the General Partner deems appropriate; provided, however, that the Partnership may not transfer any asset to the General Partner or one of its Affiliates during any NAV Ratio Trigger Period for consideration less than such asset's fair market value.

    (f)   <u>Outside Activities' Conflicts of Interest</u>. The General Partner or any Affiliate thereof and any director, officer, employee, agent, or representative of the General Partner or any Affiliate thereof shall be entitled to and may have business interests and engage in business activities in addition to those relating to the Partnership, including, without limitation, business interests and activities in direct competition with the Partnership. Neither the Partnership nor any of the Partners shall have any rights by virtue of this Agreement or the partnership relationship created hereby in any business ventures of the General Partner, any Affiliate thereof, or any director, officer, employee, agent, or representative of either the General Partner or any Affiliate thereof.

    (g)   <u>Resolution of Conflicts of Interest</u>. Unless otherwise expressly provided in this Agreement or any other agreement contemplated herein, whenever a conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Limited Partner, on the other hand, any action taken by the General Partner, in the absence of bad faith by the General Partner, shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein or under the Delaware Act or any other applicable law, rule, or regulation.

    (h)   <u>Indemnification</u>. The Partnership shall indemnify and hold harmless the General Partner and any director, officer, employee, agent, or representative of the General Partner (collectively,

APP 057

the ("**GP Party**"), against all liabilities, losses, and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Partnership, or in connection with the Partnership's business, including, without limitation, attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses, or damages, to the fullest extent permitted by the Delaware Act; *provided, however,* the Partnership shall have no obligation to indemnify and hold harmless a GP Party for any action or inaction that constitutes gross negligence or willful or wanton misconduct. The Partnership, in the sole and unfettered discretion of the General Partner, may indemnify and hold harmless any Limited Partner, employee, agent, or representative of the Partnership, any Person who is or was serving at the request of the Partnership acting through the General Partner as a director, officer, partner, trustee, employee, agent, or representative of another corporation, partnership, joint venture, trust, or other enterprise, and any other Person to the extent determined by the General Partner in its sole and unfettered discretion, but in no event shall such indemnification exceed the indemnification permitted by the Delaware Act. Notwithstanding anything to the contrary in this <u>Section 4.1(h)</u> or elsewhere in this Agreement, no amendment to the Delaware Act after the date of this Agreement shall reduce or limit in any manner the indemnification provided for or permitted by this <u>Section 4.1(h)</u> unless such reduction or limitation is mandated by such amendment for limited partnerships formed prior to the enactment of such amendment. In no event shall Limited Partners be subject to personal liability by reason of the indemnification provisions of this Agreement.

(i)    <u>Liability of General Partner</u>.

(i)    Neither the General Partner nor its directors, officers, employees, agents, or representatives shall be liable to the Partnership or any Limited Partner for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful or wanton misconduct.

(ii)    The General Partner may exercise any of the powers granted to it by this Agreement and perform any of the duties imposed upon it hereunder either directly or by or through its directors, officers, employees, agents, or representatives, and the General Partner shall not be responsible for any misconduct or negligence on the part of any agent or representative appointed by the General Partner.

(j)    <u>Reliance by General Partner</u>.

(i)    The General Partner may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(ii)    The General Partner may consult with legal counsel, accountants, appraisers, management consultants, investment bankers, and other consultants and advisers selected by it, and any opinion of any such Person as to matters which the General Partner believes to be within such Person's professional or expert competence shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by the General Partner hereunder in good faith and in accordance with such opinion.

(k)    The General Partner may, from time to time, designate one or more Persons to be officers of the Partnership. No officer need be a Partner. Any officers so designated shall have such authority and perform such duties as the General Partner may, from time to time, delegate to them. The General Partner may assign titles to particular officers, including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer. Each officer shall hold office until such Person's successor shall be duly designated and shall qualify or until such Person's death or

APP 058

until such Person shall resign or shall have been removed in the manner hereinafter provided. Any number of offices may be held by the same Person. The salaries or other compensation, if any, of the officers and agents of the Partnership shall be fixed from time to time by the General Partner. Any officer may be removed as such, either with or without cause, by the General Partner whenever in the General Partner's judgment the best interests of the Partnership will be served thereby. Any vacancy occurring in any office of the Partnership may be filled by the General Partner.

  **4.2.** **Rights and Obligations of Limited Partners**. In addition to the rights and obligations of Limited Partners set forth elsewhere in this Agreement, Limited Partners shall have the following rights and obligations:

    (a) <u>Limitation of Liability</u>. Limited Partners shall have no liability under this Agreement except as provided herein or under the Delaware Act.

    (b) <u>Management of Business</u>. No Limited Partner shall take part in the control (within the meaning of the Delaware Act) of the Partnership's business, transact any business in the Partnership's name, or have the power to sign documents for or otherwise bind the Partnership other than as specifically set forth in this Agreement.

    (c) <u>Return of Capital</u>. No Limited Partner shall be entitled to the withdrawal or return of its Capital Contribution except to the extent, if any, that distributions made pursuant to this Agreement or upon termination of the Partnership may be considered as such by law and then only to the extent provided for in this Agreement.

    (d) <u>Second Amended Buy-Sell and Redemption Agreement</u>. Each Limited Partner shall comply with the terms and conditions of the Second Amended Buy-Sell and Redemption Agreement.

    (e) <u>Default on Priority Distributions</u>. If the Partnership fails to timely pay Priority Distributions pursuant to Section 3.9(b), and the Partnership does not subsequently make such Priority Distribution within ninety days of its due date, the Class B Limited Partner or the Class C Limited Partner may require the Partnership to liquidate publicly traded securities held by the Partnership or Highland Select Equity Master Fund, L.P., a Delaware limited partnership controlled by the Partnership; provided, however, that the General Partner may in its sole discretion elect instead to liquidate other non-publicly traded securities owned by the Partnership in order to satisfy the Partnership's obligations under <u>Section 3.9(b)</u> and this <u>Section 4.2(e)</u>. In either case, Affiliates of the General Partner shall have the right of first offer to purchase any securities liquidated under this <u>Section 4.2(e)</u>.

  **4.3.** **Transfer of Partnership Interests**.

    (a) <u>Transfer</u>. No Partnership Interest shall be Transferred, in whole or in part, except in accordance with the terms and conditions set forth in this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement. Any Transfer or purported Transfer of any Partnership Interest not made in accordance with this <u>Section 4.3</u> and the Second Amended Buy-Sell and Redemption Agreement shall be null and void. An alleged transferee shall have no right to require any information or account of the Partnership's transactions or to inspect the Partnership's books. The Partnership shall be entitled to treat the alleged transferor of a Partnership Interest as the absolute owner thereof in all respects, and shall incur no liability to any alleged transferee for distributions to the Partner owning that Partnership Interest of record or for allocations of Profits, Losses, deductions or credits or for transmittal of reports and notices required to be given to holders of Partnership Interests.

<div align="center">19</div>

(b)    <u>Transfers by General Partner</u>.  The General Partner may Transfer all, but not less than all, of its Partnership Interest to any Person only with the approval of a Majority Interest; provided, however, that the General Partner may not Transfer its Partnership Interest during any NAV Ratio Trigger Period except to the extent such Transfers are for estate planning purposes or resulting from the death of the individual owner of the General Partner.  Any Transfer by the General Partner of its Partnership Interest under this <u>Section 4.3(b)</u> to an Affiliate of the General Partner or any other Person shall not constitute a withdrawal of the General Partner under <u>Section 4.5(a)</u>, <u>Section 5.1(b)</u>, or any other provision of this Agreement.  If any such Transfer is deemed to constitute a withdrawal under such provisions or otherwise and results in the dissolution of the Partnership under this Agreement or the laws of any jurisdiction to which the Partnership of this Agreement is subject, the Partners hereby unanimously consent to the reconstitution and continuation of the Partnership immediately following such dissolution, pursuant to <u>Section 5.2</u>.

(c)    <u>Transfers by Limited Partners</u>.  The Partnership Interest of a Limited Partner may not be Transferred without the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), and in accordance with the Second Amended Buy-Sell and Redemption Agreement.

(d)    <u>Distributions and Allocations in Respect of Transferred Partnership Interests</u>.  If any Partnership Interest is Transferred during any Fiscal Year in compliance with the provisions of <u>Article 4</u> and the Second Amended Buy-Sell and Redemption Agreement, Profits, Losses, and all other items attributable to the transferred interest for that period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the General Partner; provided that no allocations shall be made under this Section 4.3(d) that would affect any special allocations made under <u>Section 3.4</u>.  All distributions declared on or before the date of that Transfer shall be made to the transferor.   Solely for purposes of making such allocations and distributions, the Partnership shall recognize that Transfer not later than the end of the calendar month during which it is given notice of that Transfer; ***provided, however,*** if the Partnership does not receive a notice stating the date that Partnership Interest was Transferred and such other information as the General Partner may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all of such items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the Partnership, on the last day of the Fiscal Year during which the Transfer occurs, was the owner of the Partnership Interest.  Neither the Partnership nor any Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 4.3(d)</u>, whether or not any Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership Interest.

(e)    <u>Forfeiture of Partnership Interests Pursuant to the Contribution Note</u>.  In the event any Class B Limited Partnership Interests are forfeited in favor of the Partnership as a result of any default on the Contribution Note, the Capital Accounts and Percentage Interests associated with such Class B Limited Partnership Interests shall be allocated pro rata among the Class A Partners.  The Priority Distributions in Section 3.9(b) made after the date of such forfeiture shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the Class B Limited Partnership Interest transferred pursuant to this <u>Section 4.3(e)</u> over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any forfeiture of such Class B Limited Partnership Interest.

(f)    <u>Transfers of Partnership Interests Pursuant to the Purchase Notes</u>.  Notwithstanding any other provision in this Agreement, the Partnership shall respect, and the General Partner hereby provides automatic consent for, any transfers (in whole or transfers of partial interests) of

APP 060

the Class C Limited Partnership Interests, or a portion thereof, if such transfer occurs as a result of a default on the Purchase Notes. Upon the transfer of any Class C Limited Partnership Interest to any member of the Founding Partner Group (or their assigns), such Class C Limited Partnership Interest shall automatically convert to a Class A Partnership Interest. The Priority Distributions in Section 3.9(b) shall each be reduced by an amount equal to the ratio of the Percentage Interest associated with the transferred Class C Limited Partnership Interest over the aggregate Percentage Interests of all Class B Limited Partnership Interests and Class C Limited Partnership Interests, calculated immediately prior to any transfer of such Class C Limited Partnership Interest.

### 4.4. Issuances of Partnership Interests to New and Existing Partners.

(a) Issuance of Partnership Interests to New Limited Partners. The General Partner may admit one or more additional Persons as Limited Partners ("Additional Limited Partners") to the Partnership at such times and upon such terms as it deems appropriate in its sole and unfettered discretion; provided, however, that the General Partner may only admit additional Persons as Limited Partners in relation to the issuance of equity incentives to key employees of the Partnership; provided, further that the General Partner may not issue such equity incentives to the extent they entitle the holders, in the aggregate, to a Percentage Interest in excess of twenty percent without the consent of the Class B Limited Partner and the Class C Limited Partner. All Class A Limited Partners, the Class B Limited Partner and the Class C Limited Partner shall be diluted proportionately by the issuance of such limited partnership interests. No Person may be admitted to the Partnership as a Limited Partner until he/she/it executes an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement.

(b) Issuance of an Additional Partnership Interest to an Existing Partner. The General Partner may issue an additional Partnership Interest to any existing Partner at such times and upon such terms as it deems appropriate in its sole and unfettered discretion. Upon the issuance of an additional Partnership Interest to an existing Partner, the Percentage Interests of the members of the Founding Partner Group shall be diluted proportionately. Any additional Partnership Interest shall be subject to all the terms and conditions of this Agreement and the Second Amended Buy-Sell and Redemption Agreement.

### 4.5. Withdrawal of General Partner.

(a) Option. In the event of the withdrawal of the General Partner from the Partnership, the departing General Partner (the "*Departing Partner*") shall, at the option of its successor (if any) exercisable prior to the effective date of the departure of that Departing Partner, promptly receive from its successor in exchange for its Partnership Interest as the General Partner, an amount in cash equal to its Capital Account balance, determined as of the effective date of its departure.

(b) Conversion. If the successor to a Departing Partner does not exercise the option described in Section 4.5(a), the Partnership Interest of the Departing Partner as the General Partner of the Partnership shall be converted into a Partnership Interest as a Limited Partner.

### 4.6. Admission of Substitute Limited Partners and Successor General Partner.

(a) Admission of Substitute Limited Partners. A transferee (which may be the heir or legatee of a Limited Partner) or assignee of a Limited Partner's Partnership Interest shall be entitled to receive only the distributive share of the Partnership's Profits, Losses, deductions, and credits attributable to that Partnership Interest. To become a substitute Limited Partner (a "*Substitute Limited Partner*"),

APP 061

that transferee or assignee shall (1) obtain the consent of the General Partner (which consent may be withheld in the sole and unfettered discretion of the General Partner), (ii) comply with all the requirements of this Agreement and the Second Amended Buy-Sell and Redemption Agreement with respect to the Transfer of the Partnership Interest at issue, and (iii) execute an Addendum to this Agreement in the form attached as Exhibit B (which may be modified by the General Partner in its sole and unfettered discretion) and an addendum to the Second Amended Buy-Sell and Redemption Agreement. Upon admission of a Substitute Limited Partner, that Limited Partner shall be subject to all of the restrictions applicable to, shall assume all of the obligations of, and shall attain the status of a Limited Partner under and pursuant to this Agreement with respect to the Partnership Interest held by that Limited Partner.

(b)  Admission of Successor General Partner. A successor General Partner selected pursuant to Section 5.2 or the transferee of or successor to all of the Partnership Interest of the General Partner pursuant to Section 4.3(b) shall be admitted to the Partnership as the General Partner, effective as of the date of the withdrawal or removal of the predecessor General Partner or the date of Transfer of that predecessor's Partnership Interest.

(c)  Action by General Partner. In connection with the admission of any substitute Limited Partner or successor General Partner or any additional Limited Partner, the General Partner shall have the authority to take all such actions as it deems necessary or advisable in connection therewith, including the amendment of Exhibit A and the execution and filing with appropriate authorities of any necessary documentation.

## ARTICLE 5

## DISSOLUTION AND WINDING UP

**5.1.  Dissolution.**  The Partnership shall be dissolved upon:

(a)  The withdrawal, bankruptcy, or dissolution of the General Partner, or any other event that results in its ceasing to be the General Partner (other than by reason of a Transfer pursuant to Section 4.3(b));

(b)  An election to dissolve the Partnership by the General Partner that is approved by the affirmative vote of a Majority Interest; *provided, however,* the General Partner may dissolve the Partnership without the approval of the Limited Partners in order to comply with Section 14 of the Second Amended Buy-Sell and Redemption Agreement; or

(c)  Any other event that, under the Delaware Act, would cause its dissolution.

For purposes of this Section 5.1, the bankruptcy of the General Partner shall be deemed to have occurred when the General Partner: (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceeding: (iv) files a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the General Partner in a proceeding of the type described in clauses (i) through (iv) of this paragraph; (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties; or (vii) one hundred twenty (120) days expire after the date of the commencement of a proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or

APP 062

similar relief under any law if the proceeding has not been previously dismissed, or ninety (90) days expire after the date of the appointment, without the General Partner's consent or acquiescence, of a trustee, receiver, or liquidator of the General Partner or of all or any substantial part of the General Partner's properties if the appointment has not previously been vacated or stayed, or ninety (90) days expire after the date of expiration of a stay, if the appointment has not previously been vacated.

**5.2. Continuation of the Partnership**. Upon the occurrence of an event described in <u>Section 5.1(a)</u>, the Partnership shall be deemed to be dissolved and reconstituted if a Majority Interest elect to continue the Partnership within ninety (90) days of that event. If no election to continue the Partnership is made within ninety (90) days of that event, the Partnership shall conduct only activities necessary to wind up its affairs. If an election to continue the Partnership is made upon the occurrence of an event described in <u>Section 5.1(a)</u>, then:

(a) Within that ninety (90)-day period a successor General Partner shall be selected by a Majority Interest;

(b) The Partnership shall be deemed to be reconstituted and shall continue until the end of the term for which it is formed unless earlier dissolved in accordance with this <u>Article 5</u>;

(c) The interest of the former General Partner shall be converted to an interest as a Limited Partner; and

(d) All necessary steps shall be taken to amend or restate this Agreement and the Certificate of Limited Partnership, and the successor General Partner may for this purpose amend this Agreement and the Certificate of Limited Partnership, as appropriate, without the consent of any Partner.

**5.3. Liquidation**. Upon dissolution of the Partnership, unless the Partnership is continued under <u>Section 5.2</u>, the General Partner or, in the event the General Partner has been dissolved, becomes bankrupt (as defined in <u>Section 5.1</u>), or withdraws from the Partnership, a liquidator or liquidating committee selected by a Majority Interest, shall be the Liquidator. The Liquidator (if other than the General Partner) shall be entitled to receive such compensation for its services as may be approved by a Majority Interest. The Liquidator shall agree not to resign at any time without fifteen (15) days' prior written notice and (if other than the General Partner) may be removed at any time, with or without cause, by notice of removal approved by a Majority Interest. Upon dissolution, removal, or resignation of the Liquidator, a successor and substitute Liquidator (who shall have and succeed to all rights, powers, and duties of the original Liquidator) shall within thirty (30) days thereafter be selected by a Majority Interest. The right to appoint a successor or substitute Liquidator in the manner provided herein shall be recurring and continuing for so long as the functions and services of the Liquidator are authorized to continue under the provisions hereof, and every reference herein to the Liquidator shall be deemed to refer also to any such successor or substitute Liquidator appointed in the manner provided herein. Except as expressly provided in this <u>Article 5</u>, the Liquidator appointed in the manner provided herein shall have and may exercise, without further authorization or consent of any of the parties hereto, all of the powers conferred upon the General Partner under the terms of this Agreement (but subject to all of the applicable limitations, contractual and otherwise, upon the exercise of such powers) to the extent necessary or desirable in the good faith judgment of the Liquidator to carry out the duties and functions of the Liquidator hereunder for and during such period of time as shall be reasonably required in the good faith judgment of the Liquidator to complete the winding up and liquidation of the Partnership as provided herein. The Liquidator shall liquidate the assets of the Partnership and apply and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of applicable law:

APP 063

(a)    To the payment of the expenses of the terminating transactions including, without limitation, brokerage commission, legal fees, accounting fees and closing costs;

(b)    To the payment of creditors of the Partnership, including Partners, in order of priority provided by law;

(c)    To the Partners and assignees to the extent of, and in proportion to, the positive balances in their respective Capital Accounts as provided in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(2); *provided, however,* the Liquidator may place in escrow a reserve of cash or other assets of the Partnership for contingent liabilities in an amount determined by the Liquidator to be appropriate for such purposes; and

(d)    To the Partners in proportion to their respective Percentage Interests.

5.4.    **Distribution in Kind.**    Notwithstanding the provisions of <u>Section 5.3</u> that require the liquidation of the assets of the Partnership, but subject to the order of priorities set forth therein, if on dissolution of the Partnership the Liquidator determines that an immediate sale of part or all of the Partnership's assets would be impractical or would cause undue loss to the Partners and assignees, the Liquidator may defer for a reasonable time the liquidation of any assets except those necessary to satisfy liabilities of the Partnership (other than those to Partners) and/or may distribute to the Partners and assignees, in lieu of cash, as tenants in common and in accordance with the provisions of <u>Section 5.3</u>, undivided interests in such Partnership assets as the Liquidator deems not suitable for liquidation**.** Any such distributions in kind shall be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any joint operating agreements or other agreements governing the operation of such properties at such time**.** The Liquidator shall determine the fair market value of any property distributed in kind using such reasonable method of valuation as it may adopt.

5.5.    **Cancellation of Certificate of Limited Partnership.**    Upon the completion of the distribution of Partnership property as provided in <u>Sections 5.3</u> and <u>5.4</u>, the Partnership shall be terminated, and the Liquidator (or the General Partner and Limited Partners if necessary) shall cause the cancellation of the Certificate of Limited Partnership in the State of Delaware and of all qualifications and registrations of the Partnership as a foreign limited partnership in jurisdictions other **than** the State of Delaware and shall take such other actions as may be necessary to terminate the Partnership.

5.6.    **Return of Capital.**    The General Partner shall not be personally liable for the return of the Capital Contributions of Limited Partners, or any portion thereof, it being expressly understood that any such return shall be **made** solely from Partnership assets.

5.7.    **Waiver of Partition.**    Each Partner hereby waives any rights to partition of the Partnership property.

## ARTICLE 6

## GENERAL PROVISIONS

6.1.    **Amendments to Agreement.**    The General Partner may amend this Agreement without the consent of any Partner if the General Partner reasonably determines that such amendment is necessary and appropriate; *provided, however, any* action taken by the General Partner shall be subject to its fiduciary duties to the Limited Partners under the Delaware Act; provided further that any amendments

24

that adversely affect the Class B Limited Partner or the Class C Limited Partner may only be made with the consent of such Partner adversely affected.

**6.2.    Addresses and Notices.**  Any notice, demand, request, or report required or permitted to be given or made to a Partner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by United States registered or certified mail to the Partner at his/her/its address as shown on the records of the Partnership, regardless of any claim of any Person who may have an interest in any Partnership Interest by reason of an assignment or otherwise.

**6.3.    Titles and Captions.**  All article and section titles and captions in the Agreement are for convenience only, shall not be deemed part of this Agreement, and in no way shall define, limit, extend, or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles," "Sections" and "Exhibits" are to "Articles," "Sections" and "Exhibits" of this Agreement.  All Exhibits hereto are incorporated herein by reference.

**6.4.    Pronouns and Plurals.**  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns, pronouns, and verbs shall include the plural and vice versa.

**6.5.    Further Action.**  The parties shall execute all documents, provide all information, and take or refrain from taking all actions as may be necessary or appropriate to achieve the purposes of this Agreement.

**6.6.    Binding Effect.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their heirs, executors, administrators, successors, legal representatives, and permitted assigns.

**6.7.    Integration.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**6.8.    Creditors.**  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Partnership.

**6.9.    Waiver.**  No failure by any party to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement, or condition.

**6.10.    Counterparts.**  This agreement may be executed in counterparts, all of which together shall constitute one agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

**6.11.    Applicable Law.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to the principles of conflicts of law.

**6.12.    Invalidity of Provisions.**  If any provision of this Agreement is declared or found to be illegal, unenforceable, or void, in whole or in part, then the parties shall be relieved of all obligations arising under that provision, but only to the extent that it is illegal, unenforceable, or void, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying that provision to the extent necessary to make it legal and enforceable while preserving its intent or, if that is

APP 065

not possible, by substituting therefor another provision that is legal and enforceable and achieves the same objectives.

**6.13. General Partner Discretion.** Whenever the General Partner may use its sole discretion, the General Partner may consider any items it deems relevant, including its own interest and that of its affiliates.

**6.14. Mandatory Arbitration.** In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and /or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decide and issue the final award. The arbitrators shall be duly licensed to practice law in the state of Texas. The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome based on error of state or federal law or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable arbitration services rules. All proceedings shall be conducted in Dallas, Texas or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and /or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

*Remainder of Page intentionally Left Blank.*
*Signature Page Follows.*

27

APP 067

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
James D. Dondero,
President

LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**

By: _____
Name: Nancy M. Dondero
Its:  Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:  Trustee

**THE MARK AND PAMELA OKADA FAMILY
TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:  Trustee

**MARK K. OKADA**

_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated
Agreement of Limited Partnership*

IN WITNESS WHEREOF, the parties hereto have entered into this Agreement as of the date and year first written above.

GENERAL PARTNER:

**STRAND ADVISORS, INC.,**
a Delaware corporation

By: _____
     James D. Dondero,
     President


LIMITED PARTNERS:

**THE DUGABOY INVESTMENT TRUST**


By: _____
Name: Nancy M. Dondero
Its:     Trustee

**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1**

By: _____
Name: Lawrence Tonomura
Its:     Trustee


**THE MARK AND PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2**

By: _____
Name: Lawrence Tonomura
Its:     Trustee


**MARK K. OKADA**


_____
Mark K. Okada

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

**HUNTER MOUNTAIN INVESTMENT TRUST**
By: Beacon Mountain LLC, Administrator

By: _____
Name: John Honis
Its:      President

*Signature Page to Fourth Amended and Restated*
*Agreement of Limited Partnership*

## EXHIBIT A

|  | Percentage Interest | |
|---|---|---|
| **CLASS A PARTNERS** | **By Class** | **Effective %** |
| GENERAL PARTNER: | | |
| Strand Advisors | 0.5573% | 0.2508% |
| LIMITED PARTNERS: | | |
| The Dugaboy Investment Trust | 74.4426% | 0.1866% |
| Mark K. Okada | 19.4268% | 0.0487% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #1 | 3.9013% | 0.0098% |
| The Mark and Pamela Okada Family Trust - Exempt Trust #2 | 1.6720% | 0.0042% |
| Total Class A Percentage Interest | 100.0000% | 0.500% |
| **CLASS B LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 55.0000% |
| **CLASS C LIMITED PARTNERS** | | |
| Hunter Mountain Investment Trust | 100.0000% | 44.500% |
| **PROFIT AND LOSS AMONG CLASSES** | | |
| Class A Partners | 0.5000% | |
| Class B Partners | 55.0000% | |
| Class C Partners | 44.5000% | |

**EXHIBIT B**

**ADDENDUM
TO THE
FOURTH AMENDED AND RESTATED AGREEMENT OF LIMITED PARTNERSHIP
OF
HIGHLAND CAPITAL MANAGEMENT, L.P.**

THIS ADDENDUM (this "**Addendum**") to that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, to be effective as of December 24, 2015, as amended from time to time (the "Agreement"), is made and entered into as of the ___ day of _____, 20_, by and between Strand Advisors, Inc., as the sole General Partner (the "**General Partner**") of Highland Capital Management, L.P. (the "**Partnership**") and _____ ("_____") (except as otherwise provided herein, all capitalized terms used herein shall have the meanings set forth in the Agreement).

RECITALS:

WHEREAS, the General Partner, in its sole and unfettered discretion, and without the consent of any Limited Partner, has the authority under (i) Section 4.4 of the Agreement to admit Additional Limited Partners, (ii) Section 4.6 of the Agreement to admit Substitute Limited Partners and (iii) Section 6.1 of the Agreement to amend the Agreement;

WHEREAS, the General Partner desires to admit _____ as a Class __ Limited Partner holding a __% Percentage Interest in the Partnership as of the date hereof;

WHEREAS, _____desires to become a Class __ Limited Partner and be bound by the terms and conditions of the Agreement; and

WHEREAS, the General Partner desires to amend the Agreement to add _____ as a party thereto.

AGREEMENT:

RESOLVED, as a condition to receiving a Partnership Interest in the Partnership, _____ acknowledges and agrees that he/she/it (i) has received and read a copy of the Agreement, (ii) shall be bound by the terms and conditions of the Agreement; and (iii) shall promptly execute an addendum to the Second Amended Buy-Sell and Redemption Agreement; and be it

FURTHER RESOLVED, the General Partner hereby amends the Agreement to add _____ as a Limited Partner, and the General Partner shall attach this Addendum to the Agreement and make it a part thereof; and be it

FURTHER RESOLVED, this Addendum may be executed in any number of counterparts, all of which together shall constitute one Addendum binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the day and year above written.

GENERAL PARTNER:

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Title: _____

NEW LIMITED PARTNER:

[_____]

AGREED AND ACCEPTED:

In consideration of the terms of this Addendum and the Agreement, in consideration of the Partnership's allowing the above signed Person to become a Limited Partner of the Partnership, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned shall be bound by the terms and conditions of the Agreement as though a party thereto.

SPOUSE OF NEW LIMITED PARTNER:

[_____]

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Highland Capital Management, L.P. | DEFENDANTS<br>NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Hayward PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231  Tel.: (972) 755-7100 | ATTORNEYS (If Known)<br>Munsch Hardt Kopf & Harr, P.C. (for NexPoint); Stinson LLP (for Nancy Dondero); Heller, Draper, & Horn, L.L.C. (for The Dugaboy Investment Trust) |
| PARTY (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor      ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Breach of Contract; Turnover Pursuant to 11 USC 542(b); Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 548(a)(1)(A) and 550; Avoidance and Recovery of Actual Fraudulent Transfer under 11 USC 544(b) and 550 and Tex. Bus. & C. Code 24.005(a)(1); Declaratory Relief; Breach of Fiduciary Duty; Aiding & Abetting Breach of Fiduciary Duty

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |

**FRBP 7001(1) – Recovery of Money/Property**
☑ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☑ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ Damages in an amount to be determined at trial |

| Other Relief Sought | Turnover of amounts due under note, avoidance of transfers to defendants, declaratory relief, punitive and exemplary damages, costs, attorneys' fees |
|---|---|

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Highland Capital Management, L.P. | BANKRUPTCY CASE NO.<br>19-34054-sgj11 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Northern District of Texas | DIVISION OFFICE<br>Dallas | NAME OF JUDGE<br>Stacey G. C. Jernigan |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>August 27, 2021 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Zachery Z. Annable | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NEXPOINT ADVISORS, L.P.'S
ANSWER TO AMENDED COMPLAINT**

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

## PRELIMINARY STATEMENT

1. The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2. Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3. Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4. Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5. Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response. To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6. Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7. Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.   To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.   To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.   To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.   To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.   To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.   The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34. Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35. Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36. Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself. To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37. Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself. To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38. Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required. To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39. Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40. Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41. Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself. To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied. To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42. Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43. Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

</div>

44. Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

45. Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

46. Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

47. Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

48. Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied. To the extent of any factual allegation, it is denied.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

</div>

49. Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

**FOURTH CLAIM FOR RELIEF**
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and**
**550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

**FIFTH CLAIM FOR RELIEF**
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<div align="center">

### SIXTH CLAIM FOR RELIEF
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

</div>

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

<div align="center">

### SEVENTH CLAIM FOR RELIEF
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

</div>

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## **AFFIRMATIVE DEFENSES**

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84. Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85. Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86. To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87. Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88. Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Julian P. Vasek, Esq.
    Texas Bar No. 24070790
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas  75201-6659
    Telephone: (214) 855-7500
    Facsimile: (214) 855-7584
    Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND
## EXPERT DISCLOSURE AND DISCOVERY DEADLINES

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Motion to Extend Expert Disclosure and Discovery*

*Deadlines* (the "Motion"), respectfully stating as follows:

## I. RELIEF REQUESTED

1.       By this Motion, NexPoint requests that the Court extend the deadline, in its *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [docket no. 70] (the "Scheduling Order"), for the designation of experts and service of expert reports, through December 13, 2021, with a corresponding extension of expert discovery. Specifically, NexPoint finds it appropriate and advisable to designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement (defined below) with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment. This request is necessitated by recent deposition testimony of key individuals on October 19 and 21, 2021, prior to which NexPoint did not know or reasonably believe that expert testimony on the duties of care would be advisable.

## II. PROCEDURAL BACKGROUND

2.       The Debtor initiated this Adversary Proceeding with the filing of its original complaint against NexPoint on January 22, 2021.

3.       By this Adversary Proceeding, the Debtor seeks to collect on a promissory note issued by NexPoint to the Debtor on May 31, 2017 in the original principal amount of $30,746,812.33 (the "Note"). The Note is a 30-year note and provides for an annual payment of principal and interest. After prior payments, the Debtor asserts that $23,071,195.03 remains due and owing on the Note.

4.       NexPoint has asserted various defenses and affirmative defenses to the Debtor's allegations and causes of action. This Motion concerns one such affirmative defense only, to the effect that the Debtor, through its employees, caused the alleged underlying default.

---

5.      On July 28, 2021, the District Court entered an order adopting this Court's report and recommendation and ordering that the reference for this Adversary Proceeding will be withdrawn once this Court certifies this Adversary Proceeding as being trial ready. As part of the same, the District Court necessarily agreed and ordered that NexPoint has a right to a trial by jury of this Adversary Proceeding.

## III.   **FACTS**

6.      This Motion is supported by the Declaration of Davor Rukavina, attached hereto as incorporated herein (the "Declaration").

7.      The Debtor alleges that the Note required NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been accelerated, and the Debtor demanded full and immediate payment.

8.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that certain *Amended and Restated Shared Services Agreement* (the "Shared Services Agreement") between the Debtor and NexPoint dated January 1, 2018. The Agreement was in place as of December 31, 2020, although the Debtor terminated it later, in 2021. Under the Agreement, the Debtor provided various services to NexPoint, including so-called "back office" services, including treasury, accounting, and payables services. NexPoint has alleged that, pursuant to the Shared Services Agreement, the Debtor was responsible for ensuring that NexPoint made the allegedly required December 31, 2020 payment, although such payment would be made from NexPoint's funds. Indeed, Waterhouse (defined below) testified that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note." *See* Declaration at Exhibit C, 337:22-338:8.

9. NexPoint asserts that the Debtor failed to do so and, therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's negligence, the Note would remain in place. NexPoint has always asserted this as an affirmative defense. *See* Docket No. 6. NexPoint's defense, however, was based on its belief that the Debtor and its employees, including Waterhouse, did nothing to facilitate or ensure the payment, as opposed to a conscious decision not to make the payment.

10. On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as did NexPoint, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020. To be clear, Waterhouse was the Debtor's employee, although he provided services to NexPoint as well pursuant to the Shared Services Agreement. Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note.

11. This changed the potential facts as NexPoint understood them to be from ones where the Debtor simply failed utterly to facilitate the payment, as it has always done, to one where the Debtor intentionally, allegedly upon the instructions of Dondero, decided not to facilitate the payment. Assuming the Dondero instruction to be true, this raises the question of whether the Debtor thereafter had any affirmative duty with respect to the alleged instruction.

12. NexPoint did not know that Waterhouse would provide this testimony. NexPoint understood that Dondero instructed Waterhouse to make no further payments on the Shared Services Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars

on the Shared Services Agreement. But NexPoint did not understand that Waterhouse would testify that Dondero instructed him also not to pay the Note.

13.    If Dondero told Waterhouse in early December, 2020 not to pay on the Note, then the question becomes whether Waterhouse or the Debtor thereafter "put their heads in the sand" in violation of any affirmative duty or obligation they may have had regarding the matter, such as: to ask Dondero whether they correctly understood him; to ask Dondero whether he meant NexPoint and the Note; to inform Dondero of the potential consequences of a default by potentially accelerating a 30-year promissory note; or to try to dissuade him from his decision. After all, the Debtor was responsible to facilitate the payment, the Debtor had various duties under the Shared Services Agreement, and it was in the Debtor's interest that NexPoint would default, thus creating a conflict of interest.

14.    Accordingly, on October 19, 2021, when NexPoint deposed James Seery, NexPoint asked Mr. Seery about section 6.01 of the Shared Services Agreement, labeled "standard of care," which provides that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims." Mr. Seery testified that he did not believe that this provision of the Shared Services Agreement obligated the Debtor or Waterhouse to do anything further after Dondero allegedly instructed Waterhouse not to pay on the Note.

15.    At that time, NexPoint determined that it was appropriate, and would assist the finder of fact, to retain an expert on the "standard of care" provided for in the Shared Services Agreement. This is especially important because this will be a jury trial in the District Court. NexPoint did not believe that it would need to retain such an expert, and it had no reasonable grounds to suspect that it would need such an expert, prior to these depositions.

16.     NexPoint moved as promptly as it could thereafter.  NexPoint decided to retain an expert on October 22, 2021 and began searching for one on that day.  NexPoint located a potential expert, Steven J. Pully, on October 26, 2021, and after conflicts were cleared and terms agreed to, Mr. Pully agreed to serve as NexPoint's expert on October 28, 2021.  NexPoint files this motion just one day later, and less than two weeks after Waterhouse's deposition triggered the issue.

17.     It goes without saying that neither Pully nor any reasonable expert can possibly review the issues, formulate an opinion, and prepare a report one day after they are retained. Among other things, Pully needs to review all underlying documents and deposition transcripts, some of which have yet to be returned by the court reporters.  Accordingly, NexPoint believes that approximately six (6) weeks will be sufficient for Pully to prepare a report.  NexPoint submits that the Debtor should have a period of time to then designate a potential rebuttal expert, and a period of time for expert discovery.  Such a procedure would be fair for all involved and would constitute a minimal delay to what has already been a rapidly advanced case.

## IV.    ARGUMENT AND AUTHORITIES

18.     It is appropriate for an expert to consider the issue of Waterhouse's and the Debtor's duties under the Shared Services Agreement—*i.e.*, "duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with like aims,"—as issues such as "prudent person" and "like capacity and familiar with like aims" are appropriate for expert analysis and will assist the finder of fact, especially a jury.

19.     Rule 16(b) provides that a deadline in a scheduling order may be modified "for good cause," although there is some uncertainty as to whether this standard applies only after a deadline has passed (which is not the case here).  *See* Fed. R. Civ. P. 16(b)(4); *Marathon Fin. Ins.*

*Inc. RRG v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009) ("Federal Rule of Civil Procedure 16(b) governs amendment of pleadings after a scheduling order's deadline to amend has expired").

20.     When the issue concerns an "untimely submission of expert reports," the Fifth Circuit has specified the following for factors as guiding the decision: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003). Again, this test applies to a deadline which has already expired. Logically, therefore, a lesser standard should apply when a party seeks relief prior to the expiration of a deadline, as NexPoint does here.

21.     Applying these or any factors:

(i)     this Adversary Proceeding is only some nine (9) months old and the parties have moved very quickly, with all discovery almost over;

(ii)     if this Motion is granted, all discovery in this Adversary Proceeding will have been completed by the end of 2021, still less than one (1) year after filing;

(iii)     the reason for the need to extend the deadline is the most logical reason that most frequently appears—that discovery has necessitated some previously unexpected action—which is one of the purposes of discovery;

(iv)     NexPoint's failure to previously designate an expert was due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony, and is not the result of any delay or lack of diligence, as evidenced by the fact that NexPoint did already and timely designate two other experts on other issues (*i.e.* NexPoint did not sit on its responsibility to consider retaining experts);

(v)     the matter is important because the duties of care as specified in the Shared Services Agreement are terms of art necessitating an expert analysis, especially before a jury, and the matter goes to the heart of NexPoint's affirmative defense, and is necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint;

(vi)     there is no prejudice to the Debtor, which will have sufficient time to retain a rebuttal expert and take expert discovery (*i.e.* no witnesses or documents have been lost); and

(vii)   a continuance is easily available to avoid any prejudice to the Debtor—indeed, there is no need for a continuance even as the Adversary Proceeding has yet to be certified as trial ready and it is likely that the District Court will not schedule the Adversary Proceeding for trial for some time.

22.     NexPoint submits that this Motion cannot come as a surprise to the Debtor. NexPoint has asserted its affirmative defense since the beginning. The only difference now is that, instead of a wholesale disregard of any duty to facilitate the Note payment, the issue has evolved to whether the Debtor or Waterhouse had any affirmative duty to act after the alleged instruction from Dondero. As it can be presumed that Waterhouse previously informed the Debtor or its counsel of this alleged instruction (as he apparently informed other employees at the Debtor), the Debtor likely knew what Waterhouse's testimony would be well before NexPoint learned of that testimony. It is reasonable to conclude that the Debtor knew or should have known that the "standard of care" under the Shared Services Agreement would then become a material issue.

23.     Accordingly, "good cause" to amend the Scheduling Order exists, if that higher standard even applies, and approving such amendment will not prejudice the Debtor and will instead serve the interests of justice.

## V.     **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court enter an order: (i) granting this Motion; (ii) modifying the Scheduling Order to extend the deadline to designate experts and serve expert reports through December 13, 2021; (iii) modifying the Scheduling Order accordingly for the potential designation of rebuttal experts and service of rebuttal expert reports, and extending expert discovery; and (iv) granting NexPoint such other and further relief as may be proper.

RESPECTFULLY SUBMITTED this 29th day of October, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email: drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on October 28, 2021, he conferred with counsel for the Debtor, John Morris, and the Debtor opposes the relief requested herein.

/s/ Davor Rukavina
Davor Rukavina

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on October 29, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served on the following recipients via the Court's CM/ECF system:

Zachery Z. Annable on behalf of Plaintiff Highland Capital Management, L.P.
zannable@haywardfirm.com

Bryan C. Assink on behalf of Defendant James Dondero
bryan.assink@bondsellis.com

Greta M. Brouphy on behalf of Defendant The Dugaboy Investment Trust
gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;vgamble@hellerdraper.com

Leslie A. Collins on behalf of Defendant The Dugaboy Investment Trust
lcollins@hellerdraper.com

Deborah Rose Deitsch-Perez on behalf of Defendant James Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Deborah Rose Deitsch-Perez on behalf of Defendant Nancy Dondero
deborah.deitschperez@stinson.com, patricia.tomasky@stinson.com;kinga.mccoy@stinson.com

Douglas S. Draper on behalf of Defendant The Dugaboy Investment Trust
ddraper@hellerdraper.com,
dhepting@hellerdraper.com;vgamble@hellerdraper.com;mlandis@hellerdraper.com;gbrouphy@hellerdraper.com

Melissa S. Hayward on behalf of Plaintiff Highland Capital Management, L.P.
MHayward@HaywardFirm.com, mholmes@HaywardFirm.com

Juliana Hoffman on behalf of Creditor Committee Official Committee of Unsecured Creditors
jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com

Paige Holden Montgomery on behalf of Creditor Committee Official Committee of Unsecured Creditors
pmontgomery@sidley.com, txefilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com;ebromagen@sidley.com;efilingnotice@sidley.com

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF DAVOR RUKAVINA

STATE OF TEXAS

COUNTY OF DALLAS

    I, Davor Rukavina, hereby state and testify to the following as being true and correct and under penalty of perjury pursuant to the laws of the United States of America:

    1.    My name is Davor Rukavina. I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise competent to execute this Declaration.

    2.    I am an attorney duly licensed to practice law in the State of Texas. I am a shareholder at Munsch Hardt Kopf & Harr, P.C. I am the lead attorney for NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in this Adversary Proceeding.

    3.    At issue in this Adversary Proceeding is a 30-year promissory note executed by NexPoint in the original principal amount of $30,746,812.33 (the "Note"), although the Note had been paid down significantly by the time of the filing of this Adversary Proceeding.

4.      Highland Capital Management, L.P. (the "Debtor") alleges that the Note required

NexPoint to make a payment of principal and interest on December 31, 2020, and that NexPoint

failed to make this payment. Thus, in January, 2021, the Debtor sent notice that the Note had been

accelerated and the Debtor demanded full and immediate payment.

5.      The parties agreed by written stipulation that they would disclose experts and

produce expert reports on or before October 29, 2021, and the Court's scheduling order so requires.

NexPoint requests an extension of this deadline. The following is the reason why.

6.      One of NexPoint's affirmative defenses in this Adversary Proceeding concerns that

certain *Amended and Restated Shared Services Agreement* (the "Agreement") between the Debtor

and NexPoint dated January 1, 2018, a copy of which is attached hereto as Exhibit "A." The

Agreement was in place as of December 31, 2020, although the Debtor terminated it later in 2021.

NexPoint alleges that, under the Agreement, the Debtor provided various services to NexPoint,

including so-called "back office" services, including treasury, accounting, and payables services.

NexPoint has alleged that, pursuant to the Agreement, the Debtor was responsible for ensuring that

NexPoint made the allegedly required December 31, 2020 payment, although such payment would

be made from NexPoint's funds. NexPoint therefore asserts that the Debtor failed to do so and,

therefore, caused the alleged default, which it now seeks to exploit, and that, but for the Debtor's

negligence, the Note would remain in place.

7.      The foregoing has always been an affirmative defense of NexPoint in this

Adversary Proceeding, including in its amended answer filed on September 1, 2021, a copy of

which is attached hereto as Exhibit "B."

8.      On October 19, 2021, the Debtor deposed Frank Waterhouse ("Waterhouse"), as

did I, in connection with this Adversary Proceeding. Waterhouse was the Debtor's chief financial

---

DECLARATION OF DAVOR RUKAVINA—Page 2

officer in December, 2020, and either the treasurer or chief financial officer (either way an officer) of NexPoint in December, 2020.

9.     Among other things, at this deposition, Waterhouse testified that, in early December, 2020, James Dondero ("Dondero"), who at that time controlled NexPoint but did not control the Debtor, instructed Waterhouse not to cause NexPoint to pay any more funds to the Debtor, including, expressly on the Note. A copy of this deposition transcript is attached as Exhibit "C."

10.     This testimony was not expected by me or by NexPoint. I had understood that Dondero instructed Waterhouse to make no further payments on the Agreement, because Dondero believed that NexPoint had overpaid by millions of dollars on the Agreement and because that was what Dondero and Waterhouse had been discussing. I had not understood that Waterhouse would testify that Dondero instructed him to also not pay the Note specifically.

11.     Prior to that deposition, I had never spoken to Waterhouse. Waterhouse presently serves as an officer of NexPoint; however, and unlike every other case I have been involved with, I have not been permitted to discuss with Waterhouse litigation matters. This is because Waterhouse is in litigation with the Debtor on other matters and has separate and independent counsel, Debra Dandeneau and Frances Smith, who would not permit me to speak directly to Waterhouse, which I understood to be a logical and appropriate instruction to protect their client. I did discuss with Ms. Dandeneau what Waterhouse may know about the litigation between the Debtor and my clients, but that primarily focused on defenses that another client of mine, Highland Capital Management Fund Advisors, L.P., has. And I did discuss with Ms. Dandeneau that Dondero told Waterhouse to not make payments, but I understood that to be limited to the Agreement and to not include the Note, since the topic under discussion (as it was told to me)

---

between Dondero and Waterhouse was the Agreement and overpayments on the Agreement, and not the Note.

12. In sum, prior to October 19, 2021, I did not know that Waterhouse would testify that Dondero told him to not pay on the Note, and I had no reasonable reason to suspect the same. My surprise is evident from the transcript of that deposition, where I asked Waterhouse multiple times whether he was sure that Dondero told him this—so much so that opposing counsel objected multiple times as "asked and answered," and even objected as having been asked and answered "four time." Exhibit "C" at 390-392.

13. Assuming that Waterhouse's testimony on this issue will be accepted by a trier of fact, the question is whether, from NexPoint's perspective, Waterhouse had no further duties to review, confirm, investigate, or to discuss the issue with Dondero. In that respect, section 6.01 of the Agreement, labeled "standard of care," states that the Debtor and Waterhouse "shall discharge its duties under this Agreement with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

14. I deposed Jim Seery on October 21, 2021, and asked him various questions about this provision of the Agreement. Mr. Seery testified to the effect that he did not believe that the Agreement obligated the Debtor or Waterhouse to do anything further after Dondero told Waterhouse to not pay the Note (again, assuming that this was true). I do not have a copy of Mr. Seer's deposition yet.

15. With Mr. Seery testifying that he did not believe that the Agreement required the Debtor or Waterhouse to do anything further if Dondero in fact gave the instruction Waterhouse testified that he did, NexPoint concluded that it needed to retain an expert to review whether the "standard of care" specified in the Agreement compelled the Debtor or Waterhouse to do anything

further after Dondero gave the alleged instruction, such as checking with him to see if they understood him correctly, advising him of the potential serious consequences of a default, trying to dissuade him, or at least asking him once again prior to December 31, 2020 whether the payment should be made.

16.     On October 22, 2021, I began searching for a potential expert. On October 26, 2021, I contacted Steven J. Pully about the potential engagement. After clearing conflicts and coming to an agreement, Mr. Pully agreed to the engagement on October 28, 2021. The engagement letter has yet to be finalized and executed, but I have every confidence that it will and the urgency of the matter necessitates this Declaration at this time. I have been extremely diligent in searching for an finding an expert once NexPoint determined that the retention of an expert was appropriate, which did not occur until the Seery deposition on October 21, 2021.

17.     Even though NexPoint has retained Mr. Pully as of October 28, 2021, it is not possible for Mr. Pully to formulate an opinion and prepare a report by October 29, 2021. Among other things, various deposition transcripts of important witnesses have yet to be received and reviewed by Mr. Pully, and Mr. Pully has yet to review the underlying documents. Assuming no undue delays with respect to deposition transcripts, Mr. Pully should be able to prepare a report by December 13, 2021.

18.     NexPoint therefore seeks an extension of the expert designation and report deadline through December 13, 2021, in order that justice may be done and not for delay or any improper purpose, NexPoint not having designated an expert before due solely to the lack of knowledge that Waterhouse would testify as he did on October 19, 2021 and that Mr. Seery would testify as to his view that the Agreement did not require Waterhouse to do anything thereafter.

I hereby swear under oath and penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

---

DECLARATION OF DAVOR RUKAVINA—Page 5

DAVOR RUKAVINA

## AMENDED AND RESTATED SHARED SERVICES AGREEMENT

This Amended and Restated Shared Services Agreement (as amended, modified, waived, supplemented or restated from time to time in accordance with the terms hereof, this "Agreement"), dated effective as of January 1, 2018, is entered into by and between NexPoint Advisors, L.P., a Delaware limited partnership, as the management company hereunder (in such capacity, the "Management Company"), and Highland Capital Management, L.P., a Delaware limited partnership ("Highland"), as the staff and services provider hereunder (in such capacity, the "Staff and Services Provider" and together with the Management Company, the "Parties").

<p align="center">R E C I T A L S</p>

WHEREAS, the Staff and Services Provider is a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act");

WHEREAS, the Staff and Services Provider and the Management Company are engaged in the business of providing investment management services;

WHEREAS, the Parties entered into that certain Shared Services Agreement, dated effective as of January 1, 2013 (the "Original Agreement");

WHEREAS, the Parties desire to amend and restated the Original Agreement and the Staff and Services Provider is hereby being retained to provide certain back- and middle-office services and administrative, infrastructure and other services to assist the Management Company in conducting its business, and the Staff and Services Provider is willing to make such services available to the Management Company, in each case, on the terms and conditions hereof;

WHEREAS, the Management Company may employ certain individuals to perform portfolio selection and asset management functions for the Management Company, and certain of these individuals may also be employed simultaneously by the Staff and Services Provider during their employment with the Management Company; and

WHEREAS, each Person employed by both the Management Company and the Staff and Services Provider as described above (each, a "Shared Employee"), if any, is and shall be identified on the books and records of each of the Management Company and the Staff and Services Provider (as amended, modified, supplemented or restated from time to time).

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree, and the Original Agreement is hereby amended, restated and replaced in its entirety as follows:

<p align="center">ARTICLE I</p>

<p align="center">DEFINITIONS</p>

Section 1.01   Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:



"Affiliate" shall mean with respect to a Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the first Person. The term "control" means (i) the legal or beneficial ownership of securities representing a majority of the voting power of any person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether by contract or otherwise.

"Applicable Asset Criteria and Concentrations" means any applicable eligibility criteria, portfolio concentration limits and other similar criteria or limits which the Management Company instructs in writing to the Staff and Services Provider in respect of the Portfolio or one or more Accounts, as such criteria or limits may be modified, amended or supplemented from time to time in writing by the Management Company;

"Applicable Law" shall mean, with respect to any Person or property of such Person, any action, code, consent decree, constitution, decree, directive, enactment, finding, guideline, law, injunction, interpretation, judgment, order, ordinance, policy statement, proclamation, formal guidance, promulgation, regulation, requirement, rule, rule of law, rule of public policy, settlement agreement, statute, writ, or any particular section, part or provision thereof of any Governmental Authority to which the Person in question is subject or by which it or any of its property is bound.

"Client or Account" shall mean any fund, client or account advised by the Management Company, as applicable.

"Covered Person" shall mean the Staff and Services Provider, any of its Affiliates, and any of their respective managers, members, principals, partners, directors, officers, shareholders, employees and agents (but shall not include the Management Company, its subsidiaries or member(s) and any managers, members, principals, partners, directors, officers, shareholders, employees and agents of the Management Company or its subsidiaries or member(s) (in their capacity as such)).

"Governmental Authority" shall mean (i) any government or quasi-governmental authority or political subdivision thereof, whether national, state, county, municipal or regional, whether U.S. or non-U.S.; (ii) any agency, regulator, arbitrator, board, body, branch, bureau, commission, corporation, department, master, mediator, panel, referee, system or instrumentality of any such government, political subdivision or other government or quasi-government entity, whether non-U.S. or U.S.; and (iii) any court, whether U.S. or non-U.S.

"Indebtedness" shall mean: (a) all indebtedness for borrowed money and all other obligations, contingent or otherwise, with respect to surety bonds, guarantees of borrowed money, letters of credit and bankers' acceptances whether or not matured, and hedges and other derivative contracts and financial instruments; (b) all obligations evidenced by notes, bonds, debentures, or similar instruments, or incurred under bank guaranty or letter of credit facilities or credit agreements; (c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property of the Management Company or any subsidiary; (d) all capital lease obligations; (e) all indebtedness guaranteed by such Person or any of its subsidiaries; and (f) all indebtedness guaranteed by such Person or any of its subsidiaries.

APP 106

"Operating Guidelines" means any operating guidelines attached to any portfolio management agreement, investment management agreement or similar agreement entered into between the Management Company and a Client or Account.

"Portfolio" means the portfolio of securities and other assets, including without limitation, financial instruments, equity investments, collateral loan obligations, debt securities, preferred return notes and other similar obligations held directly or indirectly by, or on behalf of, Clients and Accounts from time to time;

"Securities Act" shall mean the Securities Act of 1933, as amended.

Section 1.02    Interpretation.   The following rules apply to the use of defined terms and the interpretation of this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" is not exclusive (unless preceded by "either") and "include" and "including" are not limiting; (iii) unless the context otherwise requires, references to agreements shall be deemed to mean and include such agreements as the same may be amended, supplemented, waived and otherwise modified from time to time; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder or any law enacted in substitution or replacement therefor; (v) a reference to a Person includes its successors and assigns; (vi) a reference to a Section without further reference is to the relevant Section of this Agreement; (vii) the headings of the Sections and subsections are for convenience and shall not affect the meaning of this Agreement; (viii) "writing", "written" and comparable terms refer to printing, typing, lithography and other shall mean of reproducing words in a visible form (including telefacsimile and electronic mail); (ix) "hereof", "herein", "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; and (x) references to any gender include any other gender, masculine, feminine or neuter, as the context requires.

## ARTICLE II

## SERVICES

Section 2.01    General Authority.   Highland is hereby appointed as Staff and Services Provider for the purpose of providing such services and assistance as the Management Company may request from time to time to, and if applicable, to make available the Shared Employees to, the Management Company in accordance with and subject to the provisions of this Agreement and the Staff and Services Provider hereby accepts such appointment.  The Staff and Services Provider hereby agrees to such engagement during the term hereof and to render the services described herein for the compensation provided herein, subject to the limitations contained herein.

Section 2.02    Provision of Services.   Without limiting the generality of Section 2.01 and subject to Section 2.04 (Applicable Asset Criteria and Concentrations) below, the Staff and Services Provider hereby agrees, from the date hereof, to provide the following back- and middle-office services and administrative, infrastructure and other services to the Management Company.

(a)    *Back- and Middle-Office*: Assistance and advice with respect to back- and middle-office functions including, but not limited to, investment research, trade desk services,

including trade execution and settlement, finance and accounting, payments, operations, book keeping, cash management, cash forecasting, accounts payable, accounts receivable, expense reimbursement, vendor management, and information technology (including, without limitation, general support and maintenance (OMS, development, support), telecom (cellphones, telephones and broadband) and WSO);

(b)     *Legal/Compliance/Risk Analysis.*  Assistance and advice with respect to legal issues, litigation support, management of outside counsel, compliance support and implementation and general risk analysis;

(c)     *Tax.*  Assistance and advice with respect to tax audit support, tax planning and tax preparation and filing.

(d)     *Management of Clients and Accounts.*  Assistance and advice with respect to (i) the adherence to Operating Guidelines by the Management Company, and (ii) performing any obligations of the Management Company under or in connection with any back- and middle-office function set forth in any portfolio management agreement, investment management agreement or similar agreement in effect between the Management Company and any Client or Account from time to time.

(e)     *Valuation.*  Advice relating to the appointment of suitable third parties to provide valuations on assets comprising the Portfolio and including, but not limited to, such valuations required to facilitate the preparation of financial statements by the Management Company or the provision of valuations in connection with, or preparation of reports otherwise relating to, a Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity;

(f)     *Execution and Documentation.*  Assistance relating to the negotiation of the terms of, and the execution and delivery by the Management Company of, any and all documents which the Management Company considers to be necessary in connection with the acquisition and disposition of an asset in the Portfolio by the Management Company or a Client or Account managed by the Management Company, transactions involving the Management Company or a Client or Account managed by the Management Company, and any other rights and obligations of the Management Company or a Client or Account managed by the Management Company;

(g)     *Marketing.*  Provide access to marketing team representatives to assist with the marketing of the Management Company and any specified Clients or Accounts managed by the Management Company conditional on the Management Company's agreement that any incentive compensation related to such marketing shall be borne by the Management Company;

(h)     *Reporting.*  Assistance relating to any reporting the Management Company is required to make in relation to the Portfolio or any Client or Account, including reports relating to (i) credit facility reporting and purchases, sales, liquidations, acquisitions, disposals, substitutions and exchanges of assets in the Portfolio, (ii) the requirements of an applicable regulator, or (iii) other type of reporting which the Management Company and Staff and Services Provider may agree from time to time;

APP 108

       (i)    *Administrative Services.*  The provision of office space, information technology services and equipment, infrastructure, rent and parking and other related services requested or utilized by the Management Company from time to time;

       (j)    *Shared Employees.*  To the extent applicable, the provision of Shared Employees and such additional human capital as may be mutually agreed by the Management Company and the Staff and Services Provider in accordance with the provisions of Section 2.03 hereof;

       (k)    *Ancillary Services.*  Assistance and advice on all things ancillary or incidental to the foregoing; and

       (l)    *Other.*  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of the Management Company as the Management Company and the Staff and Services Provider may from time to time agree.

For the avoidance of doubt, none of the services contemplated hereunder shall constitute investment advisory services, and the Staff & Services Provider shall not provide any advice to the Management Company or perform any duties on behalf of the Management Company, other than the back- and middle-office services contemplated herein, with respect to (a) the general management of the Management Company, its business or activities, (b) the initiation or structuring of any Client or Account or similar securitization, (c) the substantive investment management decisions with respect to any Client or Account or any related collateral obligations or securitization, (d) the actual selection of any collateral obligation or assets by the Management Company, (e) binding recommendations as to any disposal of or amendment to any Collateral Obligation or (f) any similar functions.

Section 2.03   Shared Employees.

       (a)    The Staff and Services Provider hereby agrees and consents that each Shared Employee, if any, shall be employed by the Management Company, and the Management Company hereby agrees and consents that each Shared Employee shall be employed by the Staff and Services Provider.  Except as may otherwise separately be agreed in writing between the applicable Shared Employee and the Management Company and/or the Staff and Services Provider, in each of their discretion, each Shared Employee is an at-will employee and no guaranteed employment or other employment arrangement is agreed or implied by this Agreement with respect to any Shared Employee, and for avoidance of doubt this Agreement shall not amend, limit, constrain or modify in any way the employment arrangements as between any Shared Employee and the Staff and Services Provider or as between any Shared Employee and the Management Company, it being understood that the Management Company may enter into a short-form employment agreement with any Shared Employee memorializing such Shared Employee's status as an employee of the Management Company.  To the extent applicable, the Staff and Services Provider shall ensure that the Management Company has sufficient access to the Shared Employees so that the Shared Employees spend adequate time to provide the services required hereunder.  The Staff and Services Provider may also employ the services of persons other than the Specified Persons as it deems fit in its sole discretion

5

(b)     Notwithstanding that the Shared Employees, if any, shall be employed by both the Staff and Services Provider and the Management Company, the Parties acknowledge and agree that any and all salary and benefits of each Shared Employee shall be paid exclusively by the Staff and Services Provider and shall not be paid or borne by the Management Company and no additional amounts in connection therewith shall be due from the Management Company to the Staff and Services Provider.

(c)     To the extent that a Shared Employee participates in the rendering of services to the Management Company's clients, the Shared Employee shall be subject to the oversight and control of the Management Company and such services shall be provided by the Shared Employee exclusively in his or her capacity as a "supervised person", or "person associated with", the Management Company (as such terms are defined in Sections 202(a)(25) and 202(a)(17), respectively, of the Advisers Act).

(d)     Each Party may continue to oversee, supervise and manage the services of each Shared Employee in order to (1) ensure compliance with the Party's compliance policies and procedures, (2) ensure compliance with regulations applicable to the Party and (3) protect the interests of the Party and its clients; *provided* that Staff and Services Provider shall (A) cooperate with the Management Company's supervisory efforts and (B) make periodic reports to the Management Company regarding the adherence of Shared Employees to Applicable Law, including but not limited to the 1940 Act, the Advisers Act and the United States Commodity Exchange Act of 1936, as amended, in performing the services hereunder.

(e)     Where a Shared Employee provides services hereunder through both Parties, the Parties shall cooperate to ensure that all such services are performed consistently with Applicable Law and relevant compliance controls and procedures designed to prevent, among other things, breaches in information security or the communication of confidential, proprietary or material non-public information.

(f)     The Staff and Services Provider shall ensure that each Shared Employee has any registrations, qualifications and/or licenses necessary to provide the services hereunder.

(g)     The Parties will cooperate to ensure that information about the Shared Employees is adequately and appropriately disclosed to clients, investors (and potential investors), investment banks operating as initial purchaser or placement agent with respect to any Client or Account, and regulators, as applicable.  To facilitate such disclosure, the Staff and Services Provider agrees to provide, or cause to be provided, to the Management Company such information as is deemed by the Management Company to be necessary or appropriate with respect to the Staff and Services Provider and the Shared Employees (including, but not limited to, biographical information about each Shared Employee).

(h)     The Parties shall cooperate to ensure that, when so required, each has adopted a Code of Ethics meeting the requirements of the Advisers Act ("Code of Ethics") that is consistent with applicable law and which is substantially similar to the other Party's Code of Ethics.

APP 110

(i)     The Staff and Services Provider shall make reasonably available for use by the Management Company, including through Shared Employees providing services pursuant to this Agreement, any relevant intellectual property and systems necessary for the provision of the services hereunder.

(j)     The Staff and Services Provider shall require that each Shared Employee:

(i)     certify that he or she is subject to, and has been provided with, a copy of each Party's Code of Ethics and will make such reports, and seek prior clearance for such actions and activities, as may be required under the Codes of Ethics;

(ii)     be subject to the supervision and oversight of each Party's officers and directors, including without limitation its Chief Compliance Officer ("CCO"), which CCO may be the same Person, with respect to the services provided to that Party or its clients;

(iii)     provide services hereunder and take actions hereunder only as approved by the Management Company;

(iv)     provide any information requested by a Party, as necessary to comply with applicable disclosure or regulatory obligations;

(v)     to the extent authorized to transact on behalf of the Management Company or a Client or Account, take reasonable steps to ensure that any such transaction is consistent with any policies and procedures that may be established by the Parties and all Applicable Asset Criteria and Concentrations; and

(vi)     act, at all times, in a manner consistent with the fiduciary duties and standard of care owed by the Management Company to its members and direct or indirect investors or to a Client or Account as well as clients of Staff and Services Provider by seeking to ensure that, among other things, information about any investment advisory or trading activity applicable to a particular client or group of clients is not used to benefit the Shared Employee, any Party or any other client or group of clients in contravention of such fiduciary duties or standard of care.

(k)     Unless specifically authorized to do so, or appointed as an officer or authorized person of the Management Company with such authority, no Shared Employee may contract on behalf or in the name of the Management Company, acting as principal.

Section 2.04   Applicable Asset Criteria and Concentrations.  The Management Company will promptly inform the Staff and Services Provider in writing of any Applicable Asset Criteria and Concentrations to which it agrees from time to time and the Staff and Services Provider shall take such Applicable Asset Criteria and Concentrations into account when providing assistance and advice in accordance with Section 2.02 above and any other assistance or advice provided in accordance with this Agreement.

Section 2.05   Compliance with Management Company Policies and Procedures.  The Management Company will from time to time provide the Staff and Services Provider and the

APP 111

Shared Employees, if any, with any policy and procedure documentation which it establishes internally and to which it is bound to adhere in conducting its business pursuant to regulation, contract or otherwise. Subject to any other limitations in this Agreement, the Staff and Services Provider will use reasonable efforts to ensure any services it and the Shared Employees provide pursuant to this Agreement complies with or takes account of such internal policies and procedures.

Section 2.06   Authority. The Staff and Services Provider's scope of assistance and advice hereunder is limited to the services specifically provided for in this Agreement. The Staff and Services Provider shall not assume or be deemed to assume any rights or obligations of the Management Company under any other document or agreement to which the Management Company is a party. Notwithstanding any other express or implied provision to the contrary in this Agreement, the activities of the Staff and Services Provider pursuant to this Agreement shall be subject to the overall policies of the Management Company, as notified to the Staff and Services Provider from time to time. The Staff and Services Provider shall not have any duties or obligations to the Management Company unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which the Staff and Services Provider is a party).

Section 2.07   Third Parties.

(a)   The Staff and Services Provider may employ third parties, including its affiliates, to render advice, provide assistance and to perform any of its duties under this Agreement; *provided* that notwithstanding the employment of third parties for any such purpose, the Staff and Services Provider shall not be relieved of any of its obligations or liabilities under this Agreement.

(b)   In providing services hereunder, the Staff and Services Provider may rely in good faith upon and will incur no liability for relying upon advice of nationally recognized counsel (which may be counsel for the Management Company, a Client or Account or any Affiliate of the foregoing), accountants or other advisers as the Staff and Services Provider determines, in its sole discretion, is reasonably appropriate in connection with the services provided by the Staff and Services Provider under this Agreement.

Section 2.08   Management Company to Cooperate with the Staff and Services Provider. In furtherance of the Staff and Services Provider's obligations under this Agreement the Management Company shall cooperate with, provide to, and fully inform the Staff and Services Provider of, any and all documents and information the Staff and Services Provider reasonably requires to perform its obligations under this Agreement.

Section 2.09   Power of Attorney. If the Management Company considers it necessary for the provision by the Staff and Services Provider of the assistance and advice under this Agreement (after consultation with the Staff and Services Provider), it may appoint the Staff and Services Provider as its true and lawful agent and attorney, with full power and authority in its name to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents that the Staff and Services Provider reasonably deems appropriate or necessary in connection with the execution and settlement of acquisitions of assets as directed by the Management Company

8

and the Staff and Services Provider's powers and duties hereunder (which for the avoidance of doubt shall in no way involve the discretion and/or authority of the Management Company with respect to investments).   Any such power shall be revocable in the sole discretion of the Management Company.

## ARTICLE III

## CONSIDERATION AND EXPENSES

Section 3.01   Consideration. As compensation for its performance of its obligations as Staff and Services Provider under this Agreement, the Staff and Services Provider will be entitled to receive a flat fee of $168,000 per month (the "Staff and Services Fee"), payable monthly in advance on the first business day of each month.

Section 3.02   Costs and Expenses. Each party shall bear its own expenses; *provided* that the Management Company shall reimburse the Staff and Services Provider for any and all costs and expenses that may be borne properly by the Management Company.

Section 3.03   Deferral. Notwithstanding anything to the contrary contained herein, if on any date the Management Company determines that it would not have sufficient funds available to it to make a payment of Indebtedness, it shall have the right to defer any all and amounts payable to the Staff and Services Provider pursuant to this Agreement, including any fees and expenses; *provided* that the Management Company shall promptly pay all such amounts on the first date thereafter that sufficient amounts exist to make payment thereof.

## ARTICLE IV

## REPRESENTATIONS AND COVENANTS

Section 4.01   Representations. Each of the Parties hereto represents and warrants that:

(a)   It has full power and authority to execute and deliver, and to perform its obligations under, this Agreement;

(b)   this Agreement has been duly authorized, executed and delivered by it and constitutes its valid and binding, obligation, enforceable in accordance with its terms except as the enforceability hereof may be subject to (i) bankruptcy, insolvency, reorganization moratorium, receivership, conservatorship or other similar laws now or hereafter in effect relating to creditors' rights and (ii) general principles of equity (regardless of whether such enforcement is considered in a proceeding, in equity or at law);

(c)   no consent, approval, authorization or order of or declaration or filing with any Governmental Authority is required for the execution of this Agreement or the performance by it of its duties hereunder, except such as have been duly made or obtained; and

(d)   neither the execution and delivery of this Agreement nor the fulfillment of the terms hereof conflicts with or results in a breach or violation of any of the terms or provisions of, or constitutes a default under, (i) its constituting and organizational documents; or (ii) the terms

9

of any material indenture, contract, lease, mortgage, deed of trust, note, agreement or other evidence of indebtedness or other material agreement, obligation, condition, covenant or instrument to which it is a party or by which it is bound.

<div align="center">

**ARTICLE V**

**COVENANTS**

</div>

Section 5.01    Compliance; Advisory Restrictions.

      (a)    The Staff and Services Provider shall reasonably cooperate with the Management Company in connection with the Management Company's compliance with its policies and procedures relating to oversight of the Staff and Services Provider. Specifically, the Staff and Services Provider agrees that it will provide the Management Company with reasonable access to information relating to the performance of Staff and Services Provider's obligations under this Agreement.

      (b)    This Agreement is not intended to and shall not constitute an assignment, pledge or transfer of any portfolio management agreement or any part thereof. It is the express intention of the parties hereto that this Agreement and all services performed hereunder comply in all respects with all (a) applicable contractual provisions and restrictions contained in each portfolio management agreement, investment management agreement or similar agreement and each document contemplated thereby; and (b) Applicable Laws (collectively, the "Advisory Restrictions"). If any provision of this Agreement is determined to be in violation of any Advisory Restriction, then the services to be provided under this Agreement shall automatically be limited without action by any person or entity, reduced or modified to the extent necessary and appropriate to be enforceable to the maximum extent permitted by such Advisory Restriction.

Section 5.02    Records; Confidentiality.

      The Staff and Services Provider shall maintain or cause to be maintained appropriate books of account and records relating to its services performed hereunder, and such books of account and records shall be accessible for inspection by representatives of the Management Company and its accountants and other agents at any time during normal business hours and upon not less than three (3) Business Days' prior notice; *provided* that the Staff and Services Provider shall not be obligated to provide access to any non-public information if it in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement.

      The Staff and Services Provider shall follow its customary procedures to keep confidential any and all information obtained in connection with the services rendered hereunder that is either (a) of a type that would ordinarily be considered proprietary or confidential, such as information concerning the composition of assets, rates of return, credit quality, structure or ownership of securities, or (b) designated as confidential obtained in connection with the services rendered by the Staff and Services Provider hereunder and shall not disclose any such information to non-affiliated third parties, except (i) with the prior written consent of the Management Company, (ii) such information as a rating agency shall reasonably request in connection with its

<div align="center">10</div>

rating of notes issued by a CLO or supplying credit estimates on any obligation included in the Portfolio, (iii) in connection with establishing trading or investment accounts or otherwise in connection with effecting transactions on behalf of the Management Company or any Client or Account for which the Management Company serves as portfolio manager or investment manager or in a similar capacity, (iv) as required by (A) Applicable Law or (B) the rules or regulations of any self-regulating organization, body or official having jurisdiction over the Staff and Services Provider or any of its Affiliates, (v) to its professional advisors (including, without limitation, legal, tax and accounting advisors), (vi) such information as shall have been publicly disclosed other than in known violation of this Agreement or shall have been obtained by the Staff and Services Provider on a non-confidential basis, (vii) such information as is necessary or appropriate to disclose so that the Staff and Services Provider may perform its duties hereunder, (viii) as expressly permitted in the final offering memorandum or any definitive transaction documents relating to any Client or Account, (ix) information relating to performance of the Portfolio as may be used by the Staff and Services Provider in the ordinary course of its business or (xx) such information as is routinely disclosed to the trustee, custodian or collateral administrator of any Client or Account in connection with such trustee's, custodian's or collateral administrator's performance of its obligations under the transaction documents related to such Client or Account. Notwithstanding the foregoing, it is agreed that the Staff and Services Provider may disclose without the consent of any Person (1) that it is serving as staff and services provider to the Management Company, (2) the nature, aggregate principal amount and overall performance of the Portfolio, (3) the amount of earnings on the Portfolio, (4) such other information about the Management Company, the Portfolio and the Clients or Accounts as is customarily disclosed by staff and services providers to management vehicles similar to the Management Company, and (5) the United States federal income tax treatment and United States federal income tax structure of the transactions contemplated by this Agreement and the related documents and all materials of any kind (including opinions and other tax analyses) that are provided to them relating to such United States federal income tax treatment and United States income tax structure. This authorization to disclose the U.S. tax treatment and tax structure does not permit disclosure of information identifying the Staff and Services Provider, the Clients or Accounts or any other party to the transactions contemplated by this Agreement (except to the extent such information is relevant to U.S. tax structure or tax treatment of such transactions).

## ARTICLE VI

## EXCULPATION AND INDEMNIFICATION

Section 6.01 Standard of Care. Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. To the extent not inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies and procedures in performing its duties hereunder. No Covered Person shall deal with the income or assets of the Management Company in such Covered Person's own interest or for its own account. Each Covered Person in its respective sole and absolute discretion may separately engage or invest in any other business ventures, including those that may be in competition with the Management Company, and the Management Company will not have any rights in or to such ventures or the income or profits derived therefrom

11

Section 6.02   <u>Exculpation</u>.  To the fullest extent permitted by law, no Covered Person will be liable to the Management Company, any Member, or any shareholder, partner or member thereof, for (i) any acts or omissions by such Covered Person arising out of or in connection with the conduct of the business of the Management Company or its General Partner, or any investment made or held by the Management Company or its General Partner, unless it is determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, to be the result of gross negligence or to constitute fraud or willful misconduct (as interpreted under the laws of the State of Delaware) (each, a "<u>Disabling Conduct</u>") on the part of such Covered Person, (ii) any act or omission of any Investor, (iii) any mistake, gross negligence, misconduct or bad faith of any employee, broker, administrator or other agent or representative of such Covered Person, *provided* that such employee, broker, administrator or agent was selected, engaged or retained by or on behalf of such Covered Person with reasonable care, or (iv) any consequential (including loss of profit), indirect, special or punitive damages.  To the extent that, at law or in equity, any Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Management Company or any Member, no Covered Person acting under this Agreement shall be liable to the Management Company or to any such Member for its good-faith reliance on the provisions of this Agreement.  The exculpations set forth in this Section 6.02 shall exculpate any Covered Person regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

To the fullest extent permitted by law, no Covered Person shall have any personal liability to the Management Company or any Member solely by reason of any change in U.S. federal, state or local or foreign income tax laws, or in interpretations thereof, as they apply to the Management Company or the Members, whether the change occurs through legislative, judicial or administrative action.

Any Covered Person in its sole and absolute discretion may consult legal counsel, accountants or other advisers selected by it, and any act or omission taken, or made in good faith by such Person on behalf of the Management Company or in furtherance of the business of the Management Company in good-faith reliance on and in accordance with the advice of such counsel, accountants or other advisers shall be full justification for the act or omission, and to the fullest extent permitted by applicable law, no Covered Person shall be liable to the Management Company or any Member in so acting or omitting to act if such counsel, accountants or other advisers were selected, engaged or retained with reasonable care.

Section 6.03   <u>Indemnification by the Management Company</u>.   The Management Company shall and hereby does, to the fullest extent permitted by applicable law, indemnify and hold harmless any Covered Person from and against any and all claims, causes of action (including, but not limited to, strict liability, negligence, statutory violation, regulatory violation, breach of contract, and all other torts and claims arising under common law), demands, liabilities, costs, expenses, damages, losses, suits, proceedings, judgments, assessments, actions and other liabilities, whether judicial, administrative, investigative or otherwise, of whatever nature, known or unknown, liquidated or unliquidated ("<u>Claims</u>"), that may accrue to or be incurred by any Covered Person, or in which any Covered Person may become involved, as a party or otherwise, or with which any Covered Person may be threatened, relating to or arising out of the investment or other activities of the Management Company or its General Partner, or activities undertaken in connection with the Management Company or its General Partner, or otherwise relating to or

12

arising out of this Agreement, including amounts paid in satisfaction of judgments, in compromise or as fines or penalties, and attorneys' fees and expenses incurred in connection with the preparation for or defense or disposition of any investigation, action, suit, arbitration or other proceeding (a "Proceeding"), whether civil or criminal (all of such Claims, amounts and expenses referred to therein are referred to collectively as "Damages"), except to the extent that it shall have been determined ultimately by a court of competent jurisdiction, in a final nonappealable judgment, that such Damages arose primarily from Disabling Conduct of such Covered Person. The termination of any Proceeding by settlement, judgment, order, conviction or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that any Damages relating to such settlement, judgment, order, conviction or plea of nolo contendere or its equivalent or otherwise relating to such Proceeding arose primarily from Disabling Conduct of any Covered Persons. Any Covered Person shall be indemnified under the terms of this Section 6.03 regardless of such Covered Person's sole, comparative, joint, concurrent, or subsequent negligence.

Expenses (including attorneys' fees) incurred by a Covered Person in defense or settlement of any Claim that may be subject to a right of indemnification hereunder shall be advanced by the Management Company prior to the final disposition thereof upon receipt of a written undertaking by or on behalf of the Covered Person to repay the amount advanced to the extent that it shall be determined ultimately by a court of competent jurisdiction that the Covered Person is not entitled to be indemnified hereunder. The right of any Covered Persons to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Covered Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Covered Person's successors, assigns and legal representatives. Any judgments against the Management Company and/or any Covered Persons in respect of which such Covered Person is entitled to indemnification shall first be satisfied from the assets of the Management Company, including Drawdowns, before such Covered Person is responsible therefor.

Notwithstanding any provision of this Agreement to the contrary, the provisions of this Section 6.03 shall not be construed so as to provide for the indemnification of any Covered Person for any liability (including liability under Federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 6.03 to the fullest extent permitted by law.

Section 6.04    Other Sources of Recovery etc. The indemnification rights set forth in Section 6.03 are in addition to, and shall not exclude, limit or otherwise adversely affect, any other indemnification or similar rights to which any Covered Person may be entitled. If and to the extent that other sources of recovery (including proceeds of any applicable policies of insurance or indemnification from any Person in which any of the Clients or Accounts has an investment) are available to any Covered Person, such Covered Person shall use reasonable efforts to obtain recovery from such other sources before the Company shall be required to make any payment in respect of its indemnification obligations hereunder; *provided* that, if such other recovery is not available without delay, the Covered Person shall be entitled to such payment by the Management Company and the Management Company shall be entitled to reimbursement out of such other recovery when and if obtained.

APP 117

Section 6.05   <u>Rights of Heirs, Successors and Assigns</u>. The indemnification rights provided by <u>Section 6.03</u> shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

Section 6.06   <u>Reliance</u>. A Covered Person shall incur no liability to the Management Company or any Member in acting upon any signature or writing reasonably believed by him, her or it to be genuine, and may rely in good faith on a certificate signed by an officer of any Person in order to ascertain any fact with respect to such Person or within such Person's knowledge. Each Covered Person may act directly or through his, her or its agents or attorneys.

<div align="center">

## ARTICLE VII

## TERMINATION

</div>

Section 7.01   <u>Termination</u>. Either Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other.

<div align="center">

## ARTICLE VIII

## MISCELLANEOUS

</div>

Section 8.01   <u>Amendments</u>. This Agreement may not be amended or modified except by an instrument in writing signed by each Party.

Section 8.02   <u>Assignment and Delegation</u>.

(a)   Neither Party may assign, pledge, grant or otherwise encumber or transfer all or any part of its rights or responsibilities under this Agreement, in whole or in part, except (i) as provided in clauses (b) and (c) of this <u>Section 8.02</u>, without the prior written consent of the other Party and (ii) in accordance with Applicable Law.

(b)   Except as otherwise provided in this <u>Section 8.02</u>, the Staff and Services Provider may not assign its rights or responsibilities under this Agreement unless (i) the Management Company consents in writing thereto and (ii) such assignment is made in accordance with Applicable Law.

(c)   The Staff and Services Provider may, without satisfying any of the conditions of <u>Section 8.02(a)</u> other than clause (ii) thereof, (1) assign any of its rights or obligations under this Agreement to an Affiliate; *provided* that such Affiliate (i) has demonstrated ability, whether as an entity or by its principals and employees, to professionally and competently perform duties similar to those imposed upon the Staff and Services Provider pursuant to this Agreement and (ii) has the legal right and capacity to act as Staff and Services Provider under this Agreement, or (2) enter into (or have its parent enter into) any consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all of its assets to, another entity; *provided* that, at the time of such consolidation, merger, amalgamation or transfer the resulting, surviving or transferee entity assumes all the obligations of the Staff and Services Provider under this Agreement generally (whether by operation of law or by contract) and the other entity is a continuation of the Staff and Services Provider in another corporate or similar form and has

<div align="center">14</div>

substantially the same staff; *provided further* that the Staff and Services Provider shall deliver ten (10) Business Days' prior notice to the Management Company of any assignment or combination made pursuant to this sentence. Upon the execution and delivery of any such assignment by the assignee, the Staff and Services Provider will be released from further obligations pursuant to this Agreement except to the extent expressly provided herein.

Section 8.03    Non-Recourse; Non-Petition.

(a)    The Staff and Services Provider agrees that the payment of all amounts to which it is entitled pursuant to this Agreement shall be payable by the Management Company only to the extent of assets held in the Portfolio.

(b)    Notwithstanding anything to the contrary contained herein, the liability of the Management Company to the Staff and Services Provider hereunder is limited in recourse to the Portfolio, and if the proceeds of the Portfolio following the liquidation thereof are insufficient to meet the obligations of the Management Company hereunder in full, the Management Company shall have no further liability in respect of any such outstanding obligations, and such obligations and all claims of the Staff and Services Provider or any other Person against the Management Company hereunder shall thereupon extinguish and not thereafter revive. The Staff and Services Provider accepts that the obligations of the Management Company hereunder are the corporate obligations of the Management Company and are not the obligations of any employee, member, officer, director or administrator of the Management Company and no action may be taken against any such Person in relation to the obligations of the Management Company hereunder.

(c)    Notwithstanding anything to the contrary contained herein, any Staff and Services Provider agrees not to institute against, or join any other Person in instituting against, the Management Company any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under United States federal or state bankruptcy laws, or similar laws until at least one year and one day (or, if longer, the then applicable preference period plus one day) after the payment in full all amounts payable in respect of any Indebtedness incurred to finance any portion of the Portfolio; *provided* that nothing in this provision shall preclude, or be deemed to stop, the Staff and Services Provider from taking any action prior to the expiration of the aforementioned one year and one day period (or, if longer, the applicable preference period then in effect plus one day) in (i) any case or proceeding voluntarily filed or commenced by the Management Company, or (ii) any involuntary insolvency proceeding filed or commenced against the Management Company by a Person other than the Staff and Services Provider.

(d)    The Management Company hereby acknowledges and agrees that the Staff and Services Provider's obligations hereunder shall be solely the corporate obligations of the Staff and Services Provider, and are not the obligations of any employee, member, officer, director or administrator of the Staff and Services Provider and no action may be taken against any such Person in relation to the obligations of the Staff and Services Provider hereunder.

(e)    The provisions of this Section 8.03 shall survive termination of this Agreement for any reason whatsoever.

15

Section 8.04    <u>Governing Law</u>.

     (a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Texas. The Parties unconditionally and irrevocably consent to the exclusive jurisdiction of the courts located in the State of Texas and waive any objection with respect thereto, for the purpose of any action, suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

     (b)    The Parties irrevocably agree for the benefit of each other that the courts of the State of Texas and the United States District Court located in the Northern District of Texas in Dallas are to have exclusive jurisdiction to settle any disputes (whether contractual or non-contractual) which may arise out of or in connection with this Agreement and that accordingly any action arising out of or in connection therewith (together referred to as "<u>Proceedings</u>") may be brought in such courts. The Parties irrevocably submit to the jurisdiction of such courts and waive any objection which they may have now or hereafter to the laying of the venue of any Proceedings in any such court and any claim that any Proceedings have been brought in an inconvenient forum and further irrevocably agree that a judgment in any Proceedings brought in such courts shall be conclusive and binding upon the Parties and may be enforced in the courts of any other jurisdiction.

Section 8.05    <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR ITS ENTERING INTO THIS AGREEMENT.

Section 8.06    <u>Severability</u>. The provisions of this Agreement are independent of and severable from each other, and no provision shall be affected or rendered invalid or unenforceable by virtue of the fact that for any reason any other or others of them may be invalid or unenforceable in whole or in part. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties.

Section 8.07    <u>No Waiver</u>. The performance of any condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties. Such waiver shall be limited to the terms thereof and shall not constitute a waiver of any other condition or obligation of the other Party. Any failure by any Party to enforce any provision shall not constitute a waiver of that or any other provision or this Agreement.

Section 8.08    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts by facsimile or other written or electronic form of communication, each of which shall be deemed to be an original as against any Party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the Parties reflected hereon as the signatories.

APP 120

Section 8.09   Third Party Beneficiaries.   This Agreement is for the sole benefit of the Parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the Parties hereto and such permitted assigns, any legal or equitable rights hereunder. For avoidance of doubt, this Agreement is not for the benefit or and is not enforceable by any Shared Employee, Client or Account or any investor (directly or indirectly) in the Management Company.

Section 8.10   No Partnership or Joint Venture.   Nothing set forth in this Agreement shall constitute, or be construed to create, an employment relationship, a partnership or a joint venture between the Parties.   Except as expressly provided herein or in any other written agreement between the Parties, no Party has any authority, express or implied, to bind or to incur liabilities on behalf of, or in the name of, any other Party.

Section 8.11   Independent Contractor.   Notwithstanding anything to the contrary, the Staff and Services Provider shall be deemed to be an independent contractor and, except as expressly provided or authorized herein, shall have no authority to act for or represent the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity in any manner or otherwise be deemed an agent of the Management Company or any Client or Account in which the Management Company acts as portfolio manager or investment manager or in a similar capacity.

Section 8.12   Written Disclosure Statement.   The Management Company acknowledges receipt of Part 2 of the Staff and Services Provider's Form ADV, as required by Rule 204-3 under the Advisers Act, on or before the date of execution of this Agreement.

Section 8.13   Headings.   The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

Section 8.14   Entire Agreement.   This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, between the Parties with respect to such subject matter.

Section 8.15   Notices.   Any notice or demand to any Party to be given, made or served for any purposes under this Agreement shall be given, made or served by sending the same by overnight mail or email transmission or by delivering it by hand as follows:

(a)   If to the Management Company:

NexPoint Advisors, L.P.
200 Crescent Court
Suite 700
Dallas, TX 75201

    (b)    If to the Staff and Services Provider:

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, TX 75201

or to such other address or email address as shall have been notified to the other Parties.

*[The remainder of this page intentionally left blank.]*

APP 122

IN WITNESS WHEREOF, each Party has caused this Agreement to be executed as of the date hereof by its duly authorized representative.

**NEXPOINT ADVISORS, L.P.**

By: NexPoint Advisors GP, LLC, its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its General Partner

By: _____

Name: Frank Waterhouse
Title: Treasurer

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Defendant NexPoint Advisors, L.P.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-SGJ-11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| v. | § | |
| | § | Adversary No.: 21-03005-sgj |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANT NEXPOINT ADVISORS, L.P.'S
## ANSWER TO AMENDED COMPLAINT

Defendant NexPoint Advisors, L.P. ("NexPoint"), a defendant in the above-styled and

numbered adversary proceeding (the "Adversary Proceeding") filed by Highland Capital

Management, L.P. (the "Plaintiff"), hereby files this Answer (the "Answer") responding to the

*Amended Complaint for (I) Breach of Contract and (II) Turnover of Property (III) Fraudulent*

*Transfer, and (IV) Breach of Fiduciary Duty* [Adv. Dkt. 73] (the "Amended Complaint"). Where

an allegation in the Amended Complaint is not expressly admitted in this Answer, it is denied.

**Exhibit B**

## PRELIMINARY STATEMENT

1.     The first sentence of paragraph 1 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied. The second sentence contains a legal conclusion that does not require a response. To the extent it contains factual allegations, they are denied.

2.     Defendant NexPoint admits that NPA's First Amended Answer speaks for itself. To the extent paragraph 2 contradicts the First Amended Answer, it is denied.

3.     Defendant NexPoint denies the allegations in paragraph 3 of the Amended Complaint.

4.     Paragraph 4 of the Amended Complaint sets forth the Plaintiff's objective in bringing the Amended Complaint and does not require a response. To the extent it contains factual allegations, they are denied.

5.     Paragraph 5 of the Amended Complaint contains a summary of the relief the Plaintiff seeks and does not require a response.  To the extent it contains factual allegations, they are denied.

## JURISDICTION AND VENUE

6.     Defendant NexPoint admits that this Adversary Proceeding relates to the Plaintiff's bankruptcy case but denies any implication that this fact confers Constitutional authority on the Bankruptcy Court to adjudicate this dispute. Any allegations in paragraph 6 not expressly admitted are denied.

7.     Defendant NexPoint admits that the Court has statutory (but not Constitutional) jurisdiction to hear this Adversary Proceeding. Any allegations in paragraph 7 not expressly admitted are denied.

8.      Defendant NexPoint denies the allegations contained in paragraph 8 of the Amended Complaint.  Defendant NexPoint does not consent to any trial before, or final order entered by, the Bankruptcy Court.  Defendant NexPoint demands a trial by jury of all issues so triable.

9.      Defendant NexPoint admits the allegations in paragraph 9 of the Amended Complaint.

## THE PARTIES

10.      Defendant NexPoint admits the allegations in paragraph 10 of the Amended Complaint.

11.      Defendant NexPoint admits the allegations in paragraph 11 of the Amended Complaint.

12.      Defendant NexPoint admits the allegations in paragraph 12 of the Amended Complaint.

13.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 13 of the Amended Complaint and therefore denies the same.

14.      Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Amended Complaint and therefore denies the same.

## CASE BACKGROUND

15.      Defendant NexPoint admits the allegations in paragraph 15 of the Amended Complaint.

16.      Defendant NexPoint admits the allegations in paragraph 16 of the Amended Complaint.

17.     Defendant NexPoint admits the allegations in paragraph 17 of the Amended Complaint.

18.     Defendant NexPoint admits the allegations in paragraph 18 of the Amended Complaint.

19.     Defendant NexPoint admits the allegations in paragraph 19 of the Amended Complaint.

## STATEMENT OF FACTS

20.     Defendant NexPoint admits that it has executed at least one promissory note under which the Debtor is a payee.  Any allegations in paragraph 20 note expressly admitted are denied.

21.     Defendant NexPoint admits the allegations in paragraph 21 of the Amended Complaint.

22.     Defendant NexPoint denies paragraph 22 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 22 is not verbatim.

23.     Defendant NexPoint admits the allegations in paragraph 23 of the Amended Complaint.

24.     Defendant NexPoint denies paragraph 24 of the Complaint.  The document speaks for itself and the quote set forth in paragraph 24 is not verbatim.

25.     Defendant NexPoint admits the allegations in paragraph 25 of the Amended Complaint.

26.     Defendant NexPoint admits that it did not make a payment under the Note on December 31, 2020. Defendant NexPoint denies that any payment was due under the Note on December 31, 2020.  To the extent not expressly admitted, paragraph 26 of the Amended Complaint is denied.

27.     Defendant NexPoint admits that Exhibit 2 to the Amended Complaint (the "Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 27 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 27 of the Amended Complaint is denied.

28.     Defendant NexPoint admits that it paid the Debtor $1,406,111.92 on January 14, 2021, but denies that any payment was due on December 31, 2020 or that this was an attempt to cure a default.  To the extent not expressly admitted, paragraph 28 of the Amended Complaint is denied.

29.     Defendant NexPoint admits that Exhibit 3 to the Amended Complaint (the "Second Demand Letter") is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 29 of the Amended Complaint asserts a legal conclusion, no response is required, and it is denied.  To the extent not expressly admitted, paragraph 29 of the Amended Complaint is denied.

30.     To the extent paragraph 30 of the Amended Complaint asserts a legal conclusion, no response is necessary, and it is denied.  The Defendant otherwise admits paragraph 30 of the Amended Complaint.

31.     Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Amended Complaint and therefore denies the same.

32.     Defendant NexPoint denies the allegations in paragraph 32 of the Amended Complaint.

33.     Defendant NexPoint admits that the Debtor filed the Original Complaint in this action on January 22, 2021, as alleged in the first sentence of paragraph 33 of the Amended

Complaint. Defendant NexPoint denies it is liable for the relief requested in the Original Complaint. To the extent not expressly admitted, paragraph 33 of the Amended Complaint is denied.

34.    Defendant NexPoint admits the allegations in paragraph 34 of the Amended Complaint.

35.    Defendant NexPoint admits the allegations in paragraph 35 of the Amended Complaint.

36.    Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 36 contradicts the First Amended Answer, it is denied.

37.    Defendant NexPoint admits that NexPoint's First Amended Answer speaks for itself.  To the extent paragraph 37 contradicts the First Amended Answer, it is denied.

38.    Paragraph 38 of the Amended Complaint asserts a legal conclusion to which no answer is required.  To the extent of any factual allegation, Defendant NexPoint admits that Mr. Dondero controlled NPA and denies that he controlled the Debtor at the time of the Alleged Agreement.

39.    Defendant NexPoint lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Amended Complaint and therefore denies the same.

40.    Defendant NexPoint denies the allegations in paragraph 40 of the Amended Complaint.

41.    Defendant NexPoint admits that Exhibit 4 to the Amended Complaint is a true and correct copy of what it purports to be and that the document speaks for itself.  To the extent paragraph 41 of the Amended Complaint asserts a legal conclusion, no response is required, and

it is denied.  To the extent not expressly admitted, paragraph 41 of the Amended Complaint is denied.

42.     Paragraph 42 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

43.     Paragraph 43 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**(against NexPoint)**
**(for Breach of Contract)**

</div>

44.     Paragraph 44 of the Amended Complaint is a sentence of incorporation that does not require a response.  All prior responses are incorporated herein by reference.

45.     Paragraph 45 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

46.     Paragraph 46 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

47.     Paragraph 47 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

48.     Paragraph 48 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**(against NexPoint)**
**(Turnover by NexPoint Pursuant to 11 U.S.C. § 542(b))**

</div>

49.     Paragraph 49 of the Amended Complaint is a sentence of incorporation that does not require a response and is therefore denied. All prior responses are incorporated herein by reference.

50.     Paragraph 50 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

51.     Paragraph 51 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

52.     Paragraph 52 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

53.     Paragraph 53 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  Defendant NexPoint admits that the Plaintiff transmitted the Demand Letter and the Second Demand Letter, and those documents speak for themselves.

54.     Paragraph 54 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

55.     Paragraph 55 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

### THIRD CLAIM FOR RELIEF
**(Against NexPoint)**
**(Avoidance and Recovery of Actual Fraudulent Transfer under 11 U.S.C. §§ 548(a)(1)(A) and 550)**

56.     Paragraph 56 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

57.     Paragraph 57 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

58.     Paragraph 58 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

59.     Paragraph 59 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

60.     Paragraph 60 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

61.     Paragraph 61 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FOURTH CLAIM FOR RELIEF
### (Against NexPoint)
**(Avoidance and Recovery of Actual Fraudulent Transfer Under 11 U.S.C. § 544(b) and 550, and Tex. Bus. & C. Code § 24.005(a)(1))**

62.     Paragraph 62 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

63.     Paragraph 63 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

64.     Paragraph 64 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

65.     Paragraph 65 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

66.     Paragraph 66 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.  To the extent of any factual allegation, it is denied.

## FIFTH CLAIM FOR RELIEF
### (Against Dugaboy Investment Trust and Nancy Dondero)
**(For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)**

67.     Paragraph 67 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

68.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

69.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

70.     Paragraph 70 of the Amended Complaint states a legal conclusion that does not require a response and is therefore denied.

<u>**SIXTH CLAIM FOR RELIEF**</u>
**(Against Dugaboy Investment Trust and Nancy Dondero)**
**(Breach of Fiduciary Duty)**

71.     Paragraph 71 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

72.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

73.     This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

74.      This claim is only asserted against Defendants Dugaboy Investment Trust and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

<u>**SEVENTH CLAIM FOR RELIEF**</u>
**(Against James Dondero and Nancy Dondero)**
**(Aiding and Abetting a Breach of Fiduciary Duty)**

75.     Paragraph 75 of the Amended Complaint is a sentence of incorporation that does not require a response. All prior responses are incorporated herein by reference.

76.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

77.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

78.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

79.     This claim is only asserted against Defendants James Dondero and Nancy Dondero.  Therefore, Defendant NexPoint is not required to respond to this claim.

Defendant NexPoint denies that the Plaintiff is entitled to the relief requested in the prayer, including as to parts (i), (ii), (iii), (iv), (v), (vi), (vii) and (iii) [sic].

## **AFFIRMATIVE DEFENSES**

80.     Pursuant to that certain Shared Services Agreement, the Plaintiff was responsible for making payments on behalf of the Defendant under the note.  Any alleged default under the note was the result of the Plaintiff's own negligence, misconduct, breach of contract, etc.

81.     Delay in the performance of a contract is excused when the party who seeks to enforce the contract caused the delay.  It was therefore inappropriate for the Plaintiff to accelerate the note when the brief delay in payment was the Plaintiff's own fault.

82.     Furthermore, the Plaintiff has waived the right to accelerate the note and /or the Plaintiff is estopped to enforce the alleged acceleration by accepting payment after the same.

83.     Furthermore, the Plaintiff's claims are barred in whole or in part because, prior to any alleged breach or acceleration, the Plaintiff agreed that it would not collect on the note upon fulfilment of certain conditions subsequent. Specifically, sometime between December of the year in which each Note was made and February of the following year, Defendant Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost or on a basis outside of Defendant James Dondero's control. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant NexPoint believes there may be testimony or email correspondence that discusses the

existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

84.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because NexPoint acted in good faith, without knowledge of any alleged avoidability, and because reasonably equivalent value was provided for any alleged transfer or obligation.

85.     Defendant NexPoint asserts that any fraudulent transfer claim is barred because no transferor or transferee, or obligor or obligee, was insolvent.

86.     To the extent of any avoidance, NexPoint asserts a lien under 11 U.S.C. § 548(c) to the extent that NexPoint gave value, and a similar preference lien under any applicable provision of the Texas Uniform Fraudulent Transfer Act.

## JURY DEMAND

87.     Defendant NexPoint demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure and Rule 9015 of the Federal Rules of Bankruptcy Procedure.

88.     Defendant NexPoint does not consent to the Bankruptcy Court conducting a jury trial and therefore demands a jury trial in the District Court.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendant NexPoint respectfully requests that, following a trial on the merits, the Court enter a judgment that the Plaintiff take nothing on the Amended Complaint and provide Defendant NexPoint such other relief to which it is entitled.

RESPECTFULLY SUBMITTED this 1st day of September, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Email: drukavina@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on September 1, 2021, a true and correct copy of this document was served via the Court's CM/ECF system on counsel for the Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

Page 1

1              WATERHOUSE - 10-19-21

2        IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3                  DALLAS DIVISION
      -----------------------------
4    IN RE:

5                                 Chapter 11
     HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,            CASE NO.
                                  19-34054-SGI11
7
              Debtor.
8    -----------------------------
     HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
              Plaintiff,
10   vs.                          Adversary
                                  Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT   21-03000-SGI
     FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
     INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
     NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15            Defendants.
     -----------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18              FRANK WATERHOUSE

19             October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195

Exhibit C

1              WATERHOUSE - 10-19-21

2

3

4                    October 19, 2021

5                    9:30 a.m.

6

7

8

9      Remote Deposition of FRANK WATERHOUSE,

10  held before Susan S. Klinger, a Registered

11  Merit Reporter and Certified Realtime Reporter

12  of the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              WATERHOUSE - 10-19-21

 2   A P P E A R A N C E S:

 3   (All appearances via Zoom.)

 4   Attorneys for the Reorganized Highland Capital

 5   Management:

 6        John Morris, Esq.

 7        Hayley Winograd, Esq.

 8        PACHULSKI STANG ZIEHL & JONES

 9        780 Third Avenue

10        New York, New York  10017

11   Attorneys for the Witness:

12        Debra Dandeneau, Esq.

13        Michelle Hartmann, Esq.

14        BAKER McKENZIE

15        1900 North Pearl Street

16        Dallas, Texas  75201

17   Attorneys for NexPoint Advisors, LP and

18   Highland Capital Management Fund Advisors,

19   L.P.:

20        Davor Rukavina, Esq.

21        An Nguyen, Esq.

22        MUNSCH HARDT KOPF & HARDD

23        500 North Akard Street

24        Dallas, Texas  75201-6659

25
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 4 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 142 of 899 PageID 754

Page 4

```
 1                  WATERHOUSE - 10-19-21

 2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

 3   and HCMS:

 4        Deborah Deitsch-Perez, Esq.

 5        Michael Aigen, Esq.

 6        STINSON

 7        3102 Oak Lawn Avenue

 8        Dallas, Texas  75219

 9

10   Attorneys for Dugaboy Investment Trust:

11        Warren Horn, Esq.

12        HELLER, DRAPER & HORN

13        650 Poydras Street

14        New Orleans, Louisiana 70130

15

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18        Deborah Newman, Esq.

19        QUINN EMANUEL URQUHART & SULLIVAN

20        51 Madison Avenue

21        New York, New York  10010

22

23   Also Present:

24        Ms. La Asia Canty

25
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 5 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 143 of 899 PageID 755

Page 5

```
 1            WATERHOUSE - 10-19-21

 2                  I N D E X

 3

 4   WITNESS                          PAGE

 5   FRANK WATERHOUSE

 6   EXAMINATION BY MR. MORRIS            10

 7   EXAMINATION BY MR. RUKAVINA         256

 8   EXAMINATION BY MS. DEITSCH-PEREZ    352

 9   EXAMINATION BY MR. MORRIS          377

10   EXAMINATION BY MR. RUKAVINA        387

11   EXAMINATION BY MS. DEITSCH-PEREZ    393

12

13              E X H I B I T S

14   No.                              Page

15   Exhibit 2  NPA et al Amended Complaint   142

16   Exhibit 33 6/3/19 Management         91

17              Representation

18   Exhibit 34 HCMLP Consolidated Financial  94

19              Statements

20   Exhibit 35 HCMFA Incumbency Certificate  151

21   Exhibit 36 Email string re 15(c)      170

22   Exhibit 39 HCMLP Operating Results 2/18  226

23   Exhibit 40 Summary of Assets and      236

24              Liabilities

25   Exhibit 41 12/19 Monthly Operating Report  258
```

Page 6

```
 1                    WATERHOUSE - 10-19-21

 2   Exhibit 45 HCMFA Consolidated Financial    135

 3              Statements

 4   Exhibit 46 NexPoint 2019 Audited           218

 5              Financials

 6

 7   Exhibit A1 Emails 11/25                     328

 8   Exhibit A2 Emails 12/31                     338

 9   Exhibit A6 Emails 1/12                      341

10   Exhibit A7 Promissory Notes                 297

11   Exhibit A9 Email, 8/31                      307

12   Exhibit A10 Acknowledgment from HCMLP       302

13   Exhibit A11 HCMLP Schedule 71A              309

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            WATERHOUSE - 10-19-21

 2            P R O C E E D I N G S

 3            VIDEOGRAPHER:  Good morning,

 4  Counselors.  My name is Scott Hatch.  I'm a

 5  certified legal videographer in association

 6  with TSG Reporting, Inc.

 7            Due to the severity of COVID-19 and

 8  following the practice of social

 9  distancing, I will not be in the same room

10  with the witness.  Instead, I will record

11  this videotaped deposition remotely.  The

12  reporter, Susan Klinger, also will not be

13  in the same room and will swear the witness

14  remotely.

15            Do all parties stipulate to the

16  validity of this video recording and remote

17  swearing, and that it will be admissible in

18  the courtroom as if it had been taken

19  following Rule 30 of the Federal Rules of

20  Civil Procedures and the state's rules

21  where this case is pending?

22            MR. HORN:  Yes.

23            MS. DANDENEAU:  Yes.

24            MR. MORRIS:  Yes.  John Morris.  I

25  would just try to do a negative notice
```

```
 1              WATERHOUSE - 10-19-21

 2   here, as we did yesterday.  If anybody has

 3   a problem with what was just stated, can

 4   you state your objection now?

 5         Okay.  No response, so everybody

 6   accepts the stipulation and the instruction

 7   that was just given.

 8         VIDEOGRAPHER:  Thank you.  This is

 9   the start of media labeled Number 1 of the

10   video recorded deposition of Frank

11   Waterhouse In Re: Highland Capital

12   Management, L.P., in the United States

13   Bankruptcy Court for the Northern District

14   of Texas, Dallas Division, Case Number

15   21-03000-SGI.

16         This deposition is being held via

17   video conference with participants

18   appearing remotely due to COVID-19

19   restrictions on Tuesday, October 19th, 2021

20   at approximately 9:32 a.m.  My name is

21   Scott Hatch, legal video specialist with

22   TSG Reporting, Inc. headquartered at 228

23   East 45th Street, New York, New York.  The

24   court reporter is Susan Klinger in

25   association with TSG Reporting.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 9 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 147 of 899 PageID 759

Page 9

```
 1          WATERHOUSE - 10-19-21

 2          Counsel, please introduce

 3    yourselves.

 4          MR. MORRIS:  John Morris, Pachulski

 5    Stang Ziehl & Jones for the reorganized

 6    Highland Capital Management, L.P., the

 7    plaintiff in these actions.

 8          MS. DANDENEAU:  Deborah Dandeneau

 9    from Baker McKenzie.  My partner, Michelle

10    Hartmann, is also in the room with me,

11    representing Frank Waterhouse individually.

12          MS. DEITSCH-PEREZ:  Deborah

13    Deitsch-Perez from Stinson, LLP,

14    representing Jim Dondero, Nancy Dondero,

15    HCRA, and HCMS.

16          MR. HORN:  Warren Horn with Heller,

17    Draper & Horn in New Orleans representing

18    Dugaboy Investment Trust.

19          MR. RUKAVINA:  Davor Rukavina with

20    Munsch Hardt Kopf & Harr in Dallas

21    representing NexPoint Advisors, LP and

22    Highland Capital Management Fund Advisors,

23    L.P.

24          MR. AIGEN:  Michael Aigen from

25    Stinson, and I represent the same parties
```

Page 10

```
 1                 WATERHOUSE - 10-19-21

 2         as Deborah Deitsch-Perez.

 3                 MS. NEWMAN:  This is Deborah Newman

 4         from Quinn Emanuel.  We represent the

 5         litigation -- Marc Kirschner as the trustee

 6         for the litigation SunTrust.

 7                 MR. MORRIS:  I think that is

 8         everybody.

 9                 VIDEOGRAPHER:  Thank you.  Will the

10         court reporter please swear in the witness.

11                     FRANK WATERHOUSE,

12    having been first duly sworn, testified as

13    follows:

14                     EXAMINATION

15    BY MR. MORRIS:

16         Q.    Please state your name for the

17    record.

18         A.    My name is Frank Waterhouse.

19         Q.    Good morning, Mr. Waterhouse.  I'm

20    John Morris, as you know, from Pachulski Stang

21    Ziehl & Jones.  You understand that my firm and

22    I represent Highland Capital Management, L.P.;

23    is that right?

24         A.    Yes.

25         Q.    Okay.  And do you understand that
```

```
 1                WATERHOUSE - 10-19-21
 2   we're here today for your deposition in your
 3   individual capacity?
 4        A.    Yes.
 5        Q.    Did you review and -- did you
 6   receive and review a subpoena that Highland
 7   Capital Management, L.P., served upon you?
 8        A.    Yes.
 9        Q.    You have been deposed before; right?
10        A.    Yes.
11        Q.    How many times have you been
12   deposed?
13        A.    About three or four times.
14        Q.    Okay.  And I defended you in one
15   deposition; isn't that right?
16        A.    That is correct.
17        Q.    So the general ground rules for this
18   deposition are largely the same as the
19   depositions you have given before.  And that is
20   I will ask you a series of questions, and it is
21   important that you allow me to finish my
22   question before you begin your answer; is that
23   fair?
24        A.    Yes.
25        Q.    And it is important that I allow you
```

Page 12

1          WATERHOUSE - 10-19-21

2  to finish your answers before I begin a

3  question, but if I fail to do that, will you

4  let me know?

5          A.    I can certainly do that.

6          Q.    Okay.  Do you understand that this

7  deposition is being videotaped?

8          A.    Yes.

9          Q.    You understand that I may seek to

10  use portions of the videotape in a court of

11  law?

12          A.    I did not know that, until you just

13  said that.

14          Q.    Okay.  And you are aware of that now

15  before the deposition begins substantively; is

16  that right?

17          A.    Yes.

18          Q.    So unlike I think the other

19  depositions that you have given, this one is

20  being given remotely.  So that presents some

21  unique challenges, at least as compared to a

22  deposition that is taken in-person.

23              From time to time we're going to put

24  documents up on the screen, Mr. Waterhouse.

25  And it is important that I give you the

Page 13

1              WATERHOUSE - 10-19-21

2    opportunity to review any portion of the

3    document that you think you need in order to

4    fully and completely answer the question.

5              So I would ask you to let me know if

6    there is a portion of a document that you need

7    to see in order to fully and completely answer

8    the question.  Can you do that for me?

9         A.   Yes.

10             MS. DANDENEAU:  Mr. Morris, I would

11        just note that we do have hard copies of

12        the documents that you sent, so if you can

13        just refer to the exhibit number as

14        reflected in the documents that you sent,

15        Mr. Waterhouse will be able to look at the

16        hard copies of those documents.

17             MR. MORRIS:  I appreciate that,

18        and -- and I will encourage him to do so.

19        There will be other documents that we did

20        not send to you that we'll be using today

21        though.

22        Q.   Okay.  With that as background, if

23    there is anything that I ask you, sir, that you

24    don't understand, will you let me know?

25        A.   Yes.

```
 1                    WATERHOUSE - 10-19-21

 2          Q.    Okay.  Are you currently employed?

 3          A.    Yes.

 4          Q.    By whom?

 5          A.    The Skyview Group.

 6          Q.    When did you become employed by the

 7     Skyview Group?

 8          A.    I believe March 1st of 2021.

 9          Q.    Do you have a title at Skyview?

10          A.    Yes.

11          Q.    What is your title?

12          A.    My title is chief financial officer.

13          Q.    Do you report to anybody in your

14     role as CFO?

15          A.    I don't, no.

16          Q.    No.  Is there a president or a CEO

17     of Skyview?

18          A.    Yes.

19          Q.    Who is that?

20          A.    That is Scott Ellington.

21          Q.    But you don't report to

22     Mr. Ellington; is that right?

23          A.    I don't think so.

24          Q.    Does Skyview Group --

25                MS. DANDENEAU:  Excuse me, we --
```

Page 15

```
 1                 WATERHOUSE - 10-19-21

 2        A.    I -- I -- I might.  I just -- I

 3   don't recall.

 4        Q.    Okay.  Does Skyview Group provide

 5   any services to any entity directly or

 6   indirectly owned or controlled by Jim Dondero?

 7        A.    Yes.

 8        Q.    Can you name -- is that pursuant to

 9   written contracts?

10        A.    Yes.

11        Q.    And do you know how many contracts

12   exist?

13        A.    Approximately six or so.

14        Q.    And is the Skyview Group made up of

15   individuals who were formerly employees of

16   Highland Capital Management, L.P.?

17        A.    No.

18        Q.    Do you know how many -- how many --

19   how many employees does Skyview have?

20        A.    Approximately 35.

21        Q.    And can you tell me how many of

22   those 35 are former officers, directors, or

23   employees of Highland Capital Management, L.P.?

24        A.    I don't know the exact number.

25        Q.    Is it more than 20?
```

```
 1                   WATERHOUSE - 10-19-21
 2        A.    Yes.
 3        Q.    Is it more than 30?
 4        A.    I don't know.
 5        Q.    Can you tell me what portion of
 6   Skyview -- Skyview's revenue is derived from
 7   entities that are directly or indirectly owned
 8   or controlled by Jim Dondero?
 9              MS. DANDENEAU:  Mr. Morris, I mean,
10        you called Mr. Waterhouse here individually
11        for purposes of his testimony in connection
12        with the noticed litigation.  I have given
13        you some leeway to ask him some background
14        information about Skyview Group, but this
15        is not a substitute for a deposition in
16        connection with any other pending disputes
17        that exist.  And -- and we agreed to accept
18        the subpoena on the basis of he -- this is
19        testimony that he is giving in connection
20        with the noticed litigation.
21              I really think that you are now
22        going a little bit far afield from the
23        purpose of this deposition.
24              MR. MORRIS:  Okay.  It is -- I'm not
25        intending to use these -- the answers to
```

Page 17

```
 1                    WATERHOUSE - 10-19-21
 2          these questions for any purpose other than
 3          this litigation.  I think you understand
 4          fully why I'm asking the questions, and I
 5          just have a couple more, if you will bear
 6          with me.
 7                  MS. DANDENEAU:  Okay.
 8                  MS. DEITSCH-PEREZ:  Can we have an
 9          agreement that an objection by one is an
10          objection for any other party here?
11                  MR. MORRIS:  Sure.  I would -- I
12          would encourage that, sure.
13                  MS. DEITSCH-PEREZ:  Thank you.
14                  MR. MORRIS:  It can't be sustained
15          or overruled more than one time, so...
16          Q.    Mr. Waterhouse, can you answer my
17     question, please.
18                  MS. DANDENEAU:  Do you want to
19          repeat it, Mr. Morris, for his benefit?
20                  MR. MORRIS:  Sure.
21          Q.    Can you -- can you tell me the
22     approximate portion of Skyview's revenue that
23     is derived from entities that are directly or
24     indirectly owned or controlled by Mr. Dondero?
25          A.    I don't know the exact number.
```

Page 18

```
 1                WATERHOUSE - 10-19-21

 2       Q.    Is it more than 75 percent?

 3       A.    Yes.

 4       Q.    Is it more than 90 percent?

 5       A.    I don't know.

 6       Q.    Okay.  Can I refer to Highland

 7  Capital Management, L.P., as Highland?

 8       A.    Yes.

 9       Q.    All right.  And you previously

10  served as Highland's CFO; correct?

11       A.    Yes.

12       Q.    When did you join Highland?

13       A.    I don't recall the exact date.

14       Q.    Can you tell me what year?

15       A.    2006.

16       Q.    When did you -- in what year did you

17  become Highland's CFO?

18       A.    I don't recall the exact date.

19       Q.    I'm not asking you for the exact

20  date.  I'm asking you if you recall the year in

21  which you were appointed CFO.

22       A.    I don't recall the exact year.

23       Q.    Can you tell me which years it is

24  possible that you were appointed to CFO of

25  Highland?
```

Page 19

1                    WATERHOUSE - 10-19-21

2       A.    2011 or 2012.

3       Q.    Did you serve as Highland's CFO on a

4  continuous basis from in or around 2011 or 2012

5  until early 2021?

6       A.    Yes.

7       Q.    During that entire time you reported

8  directly to Jim Dondero; correct?

9       A.    I -- I don't know.

10       Q.    Is there anybody else you reported

11  to -- withdrawn.

12             Did you report to Mr. Dondero for

13  some portion of the time that you served as

14  CFO?

15       A.    Yes.

16       Q.    Is there a portion of time that you

17  don't recall who you reported to?

18       A.    Yes.

19       Q.    What portion of time do you have in

20  your mind when you can't recall who you

21  reported to?

22       A.    From the 2011 to -- for

23  approximately a year or two.

24       Q.    Okay.  So is it fair to say that you

25  reported to Mr. Dondero in your capacity as CFO

Page 20

1          WATERHOUSE - 10-19-21

2    from at least 2014 until the time you left

3    Highland?

4              MS. DANDENEAU:  Objection to form.

5         A.    I don't want to speculate the exact

6    or what year that changed or -- so I would like

7    to stick with my testimony.

8         Q.    Can you recall when you began

9    reporting to Mr. Dondero?

10         A.    I don't recall.

11         Q.    Can you -- can you give me an

12    estimate of what year you think you might have

13    began reporting to Mr. Dondero?

14         A.    I will go back to my prior

15    testimony.

16         Q.    Okay.  There is no -- you have no

17    ability to tell me when you began reporting to

18    Mr. Dondero.

19              Do I have that right?

20              MS. DANDENEAU:  Objection to form.

21         A.    I don't recall.

22         Q.    Okay.  Do you recall who you might

23    have reported to before you began reporting to

24    Mr. Dondero?

25         A.    Yes.

Case 21-03005-sgj Doc 86-4 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 21 of 397
Case 3:21-cv-00880-X   Document 23   Filed 01/05/22   Page 159 of 899   PageID 771

Page 21

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Who might you have reported to in

 3   your capacity as CFO before you started

 4   reporting to Mr. Dondero?

 5        A.    That would have been Patrick Boyce.

 6        Q.    Are you aware that Highland filed

 7   for bankruptcy on October 19th, 2019?

 8        A.    Yes.

 9        Q.    And we refer to that as the petition

10   date?

11        A.    Yes.

12        Q.    Okay.  Do you hold any professional

13   licenses, sir?

14        A.    Yes.

15        Q.    Can you tell me what professional

16   licenses you hold?

17        A.    I'm a certified public accountant.

18        Q.    Okay.  Anything else?

19        A.    No.

20        Q.    Do you have any other professional

21   licenses or certificates?

22        A.    When you say "professional license,"

23   that is not education?

24        Q.    Tell me -- sure.  Anything other

25   than a driver's license.
```

Page 22

```
 1                WATERHOUSE - 10-19-21

 2              Do you have any other license or

 3   certificate or certification?

 4       A.   Are you asking, like, where I went

 5   to school and the --

 6       Q.   I am not.  I am not.  I didn't say

 7   education.  I didn't ask about degrees.

 8              Do you know what a license is?

 9       A.   Well, yeah, I mean, a license is

10   something you get after you receive a certain

11   level of proficiency.

12       Q.   Do you have any licenses or

13   certifications other than your CPA?

14              MS. DANDENEAU:  Objection, form.

15              I assume you mean professional

16       licenses, Mr. Morris; correct?

17       Q.   Can you answer my question, sir?

18       A.   Mr. Morris, I'm thinking.  I

19   don't -- I don't think I have any others.

20       Q.   Are you familiar with an entity

21   called Highland Capital Management Fund

22   Advisors?

23       A.   Yes.

24       Q.   Were you ever -- can we refer to

25   that entity as HCMFA?
```

Page 23

```
 1              WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Were you ever employed by HCMFA?

 4       A.    Not that I recall.

 5       Q.    Were you ever -- did you ever hold

 6  the title of an officer or director of HCMFA?

 7       A.    Yes.

 8       Q.    What title did you hold?

 9       A.    Treasurer.

10       Q.    When did you become the treasurer of

11  HCMFA?

12       A.    I don't recall.

13       Q.    Can you tell me the year?

14       A.    I don't -- I don't know the year.

15       Q.    Can you approximate the year in

16  which you became the treasurer of HCMFA?

17       A.    I don't know.

18       Q.    Can you tell me if it was before or

19  after 2016?

20       A.    I don't recall.

21       Q.    Are you still the -- do you know if

22  you're still the treasurer of HCMFA today?

23       A.    Today, I am the acting treasurer for

24  HCMFA.

25       Q.    Is there a distinction between
```

Page 24

1                    WATERHOUSE - 10-19-21

2    treasurer and acting treasurer?

3         A.    I said "acting treasurer" as I am an

4    employee of Skyview, as you previously

5    stated -- or asked.

6         Q.    But you are the treasurer of HCMFA

7    today; correct?

8         A.    I am -- I am the acting treasurer

9    for HCMFA.

10        Q.    How did you become the treasurer of

11   HCMFA?

12        A.    Are you asking how I became the

13   treasurer of HCMFA today?

14        Q.    How did you become appointed to

15   serve as the treasurer of HCMFA?

16        A.    Well, in -- in -- in what time

17   capacity?

18        Q.    The first time that you were

19   appointed.

20        A.    First time.  I believe I was asked

21   to serve as treasurer for HCMFA the first time.

22        Q.    By who?  Who asked you to do that?

23        A.    I don't recall.

24        Q.    Is there anything that would refresh

25   your recollection as to who appointed you as

Page 25

```
 1                  WATERHOUSE - 10-19-21

 2    the treasurer of CF- -- HCMFA for the first

 3    time?

 4         A.    I don't -- I mean, there would be

 5    some documents, some legal documents.  I don't

 6    know where those are.

 7         Q.    How many times have you been

 8    appointed the treasurer of HCMFA?

 9         A.    I don't know.

10         Q.    Was it more than once?

11         A.    I don't know.

12         Q.    Can you tell me any period of time

13    since 2016 that you did not hold the title of

14    treasurer of HCMFA?

15              MS. DANDENEAU:  Objection to form.

16         A.    I don't recall.

17         Q.    What are your duties and

18    responsibilities as the treasurer of HCMFA?

19         A.    My duties are to do the best job

20    that I can as the -- as an accountant and

21    finance guy.

22         Q.    What specific duties and

23    responsibilities do you have as the treasurer

24    of HCMFA?

25         A.    My duties are to do the best job
```

```
 1                  WATERHOUSE - 10-19-21

 2    that I can as the accounting and finance person

 3    for HCMFA.

 4        Q.    As the accounting and finance person

 5    for HCMFA, do you have any particular areas of

 6    responsibility?

 7        A.    Yeah, it is to manage the accounting

 8    and finance function for HCMFA.

 9        Q.    Would that include -- do you have

10    responsibility for overseeing HCMFA's annual

11    audit?

12        A.    Can I please elaborate on my prior

13    question?

14        Q.    Of course.  You -- you are giving

15    answers.  I'm asking questions.

16        A.    Okay.  Yes, so the -- it -- like I

17    said, it is to manage the accounting finance

18    aspect, but I am, as we discussed, the

19    treasurer.  That is -- being treasurer is what

20    gives me that -- that management function.

21        Q.    Does anybody report to you in your

22    capacity as treasurer of HCMFA?

23        A.    I don't believe so.

24        Q.    Does HCMFA have a chief financial

25    officer?
```

Page 27

```
 1                 WATERHOUSE - 10-19-21

 2       A.     I don't -- I don't know.

 3       Q.     You don't know?

 4              You're the treasurer of HCMFA but

 5  you don't know if HCMFA has a chief financial

 6  officer.

 7              Do I have that right?

 8       A.     That's right.

 9       Q.     Okay.  Have you heard of a company

10  called NexPoint Advisors?

11       A.     Yes.

12       Q.     We will refer to that as NexPoint.

13  Okay?

14       A.     Okay.

15       Q.     Were you ever employed by NexPoint?

16       A.     I don't recall.

17       Q.     Did you ever hold any title with

18  respect to the entity known as NexPoint?

19       A.     Yes.

20       Q.     What titles have you held in

21  relation to NexPoint?

22       A.     Treasurer.  I think it was only

23  treasurer.

24       Q.     Can you tell me the approximate year

25  you became the treasurer of NexPoint?
```

Page 28

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    Are you still the treasurer of

 4   NexPoint today?

 5        A.    I am the acting treasurer for

 6   NexPoint.

 7        Q.    When did your title change from

 8   treasurer to acting treasurer?

 9        A.    I don't know.

10        Q.    Did your duties and responsibilities

11   change at all when your title was changed from

12   treasurer to acting treasurer?

13        A.    I don't -- I don't believe so.

14        Q.    Why did --

15        A.    I still manage the finance and

16   accounting function for NexPoint.

17        Q.    Why did your title change from

18   treasurer to acting treasurer?

19        A.    I don't -- I'm using the term

20   "acting treasurer" as I'm a Skyview employee.

21   I don't -- I don't know -- again, I am a -- as

22   I am the Skyview employee.

23        Q.    Okay.

24        A.    And we -- we provide officer

25   services.
```

Page 29

```
1              WATERHOUSE - 10-19-21

2       Q.    And you serve as an officer of

3   HCMFA; correct?

4       A.    I think we went over that with my

5   testimony.  Yes, I'm the acting treasurer for

6   HCMFA.

7       Q.    And you are an officer of NexPoint;

8   correct?

9       A.    I think -- I am the acting treasurer

10  for NexPoint Advisors.

11      Q.    And -- and who appointed you acting

12  treasurer of NexPoint Advisors?

13      A.    I don't recall specifically.

14      Q.    Do you have any recollection of who

15  might have appointed you the treasurer of

16  NexPoint?

17      A.    I mean, it -- it -- I don't recall

18  exactly who it was.

19      Q.    Who were the possibilities?

20            MS. DEITSCH-PEREZ:  Object to the

21      form.

22      Q.    You can answer.

23      A.    Someone in the legal group for

24  NexPoint.  The other officers as well.

25      Q.    Have you heard of a company called
```

Page 30

```
 1              WATERHOUSE - 10-19-21
 2   Highland Capital Management Services, Inc.?
 3        A.    Yes.
 4        Q.    We will refer to that as HCMS.
 5   Okay?
 6        A.    HCMS.  Okay.
 7        Q.    Were you ever employed by HCMS?
 8        A.    No.
 9        Q.    Have you ever held any titles in
10   relation to HCMF -- I apologize -- HCMS?
11        A.    Yes.
12        Q.    What titles have you held in
13   relation to HCMS?
14        A.    Treasurer and acting treasurer.
15        Q.    When did you first become treasurer
16   or acting treasurer of HCMS?
17        A.    I don't recall the exact dates.
18        Q.    Can you recall -- can you
19   approximate the year that you became the
20   treasurer of HCMS?
21        A.    I don't -- I don't know.
22        Q.    Are you still the treasurer of HCMS
23   today?
24        A.    I am the acting treasurer for HCMS.
25        Q.    And are your duties and
```

Page 31

 1                    WATERHOUSE - 10-19-21

 2    responsibilities as the acting treasurer for

 3    HCMS and the acting treasurer for NexPoint the

 4    same as your duties and responsibilities in

 5    your role as the acting treasurer of HCMFA?

 6          A.    More or less.

 7          Q.    Have you ever heard of a company

 8    called HCRE Partners, LLC?

 9          A.    Yes.

10          Q.    And do you understand that that

11    entity is now known today as NexPoint Real

12    Estate Partners?

13          A.    I did not know that.

14          Q.    All right.  Can we refer to HCRE

15    Partners as HCRE?

16                MS. DANDENEAU:  Objection to form.

17                Did you mean NexPoint Real Estate

18          Partners, Mr. Morris?

19                MR. MORRIS:  No.

20                MS. DANDENEAU:  Oh.

21                MR. MORRIS:  He said he wasn't

22          familiar that it was succeeded by that

23          entity.  So --

24                MS. DANDENEAU:  Okay.

25                MR. MORRIS:  -- let's go with what

Page 32

```
1                    WATERHOUSE - 10-19-21

2          the witness knows.

3          Q.    You're familiar with an entity

4     called HCRE Partners, LLC; correct?

5          A.    Yes.

6          Q.    Okay.  So that is the entity that we

7     will refer to as HCRE.  If you're aware of any

8     successor, that is great.  If not, let's just

9     define it as such.

10              Have you ever been employed by HCRE

11    or any entity that you know to have succeeded

12    HCRE?

13         A.    No.

14         Q.    Did you ever serve as an officer or

15    director of HCRE or any successor?

16         A.    Not that I recall.

17         Q.    Okay.  Can we refer to NexPoint and

18    HCMFA as the advisors?

19         A.    Yes.

20         Q.    In general, the advisors provided

21    investment advisory services to certain retail

22    funds; correct?

23         A.    Yes.

24         Q.    And we will refer to the retail

25    funds that are served by the advisors
```

Page 33

 1                    WATERHOUSE - 10-19-21

 2    collectively as the retail funds; is that okay?

 3         A.    Okay.

 4         Q.    Each of the retail funds is governed

 5    by a board; correct?

 6         A.    Yes.

 7         Q.    And do you know the people who serve

 8    on the boards of the retail funds?

 9                    MS. DANDENEAU:  Objection to form.

10         A.    I don't know all of them.

11         Q.    Do you know whether the same people

12    serve on the board of each of the retail funds

13    as we've defined that term?

14         A.    Which -- so when you say "retail

15    funds" -- again, I want to be -- what retail

16    funds are you referring to, because there are

17    -- there are several distinctions?

18                    What retail funds are you using when

19    you refer to them?

20         Q.    That is why -- that is why I tried

21    to define the terms.  So let me do it again.

22                    Retail funds for the purposes of

23    this deposition means any retail fund to which

24    either of the advisors provides advisory

25    services.  Okay?

Page 34

1                    WATERHOUSE - 10-19-21

2          A.    Okay.

3          Q.    Okay.  So do you know whether the

4    same people serve on the board of each of the

5    retail funds?

6          A.    I don't know.

7          Q.    Were you ever employed by any of the

8    retail funds?

9          A.    No.

10         Q.    No?

11         A.    No.

12         Q.    Okay.  Do you have any title with

13   respect to any of the retail funds?

14         A.    Yes.

15         Q.    What titles do you hold --

16   withdrawn.

17               Do you have the same titles with

18   respect to all of the retail funds or do

19   they -- or just something else?

20               MS. DANDENEAU:  Objection to form.

21         Q.    Withdrawn.

22               Do you have the same title with

23   respect to each of the retail funds?

24         A.    No.

25         Q.    Tell me which title you have with

```
 1                    WATERHOUSE - 10-19-21

 2    respect to each retail fund.

 3              Actually, let's do it a different

 4    way.  I withdraw the question.

 5              Can you give me one title you have

 6    in relation to any retail fund?

 7         A.    Yes.

 8         Q.    What title -- what title can you

 9    give me?

10         A.    Principal executive officer.

11         Q.    Do you serve as principal executive

12    officer for each of the retail funds?

13         A.    No.

14         Q.    Can you identify for me the retail

15    funds in which you serve as the principal

16    executive officer?

17         A.    Yes.  Highland Funds 1, Highland

18    Funds 2, Highland Income Fund, Highland Global

19    Allocation Fund.

20         Q.    I'm sorry, you said "Global

21    Allocation Fund"?

22         A.    Yes.

23              VIDEOGRAPHER:  Excuse me,

24    Mr. Morris.  This is the videographer.  I'm

25    concerned about the lighting in the
```

```
1                      WATERHOUSE - 10-19-21

2          witness' camera.

3                    Do you want to go off the record and

4          make some adjustments?

5                    MR. MORRIS:  Sure, but just for this

6          purpose.  I don't want to take a break.  We

7          just started.

8                    MS. DANDENEAU:  Yeah, that is fine.

9          That is fine.  We're going to put you on

10         mute.

11                   MR. MORRIS:  All right.

12                   MS. DANDENEAU:  I'm going to try to

13         open up some of the shades.

14                   VIDEOGRAPHER:  We're going off the

15         record at 10:08 a.m.

16         (Recess taken 10:08 a.m. to 10:11 a.m.)

17                   VIDEOGRAPHER:  We are back on the

18         record at 10:11 a.m.

19         Q.    Mr. Waterhouse, when did you become

20    the principal executive officer of the four

21    retail funds that you just identified?

22         A.    I don't recall.

23         Q.    Do you recall the approximate year

24    that you became the principal executive officer

25    of the four funds?
```

Page 37

```
 1              WATERHOUSE - 10-19-21

 2       A.    2021.

 3       Q.    Did you ever hold any title with

 4  respect to any of the four funds you have just

 5  identified other than principal executive

 6  officer?

 7       A.    I don't recall.

 8       Q.    Is it possible that you held a

 9  position or a title with the four funds you

10  just identified prior to 2021?

11       A.    Yes.

12       Q.    But you don't recall if you did or

13  not; do I have that right?

14       A.    No.  You -- I thought you asked, did

15  I hold other titles.

16       Q.    Did you hold any title at the four

17  retail funds for which you now serve as

18  principal executive officer at any time prior

19  to 2021?

20       A.    Yes.

21       Q.    What titles did you hold?

22       A.    I don't recall all the titles.

23       Q.    Do you recall any of the titles?

24       A.    Yes.

25       Q.    What titles do you recall holding at
```

```
 1                WATERHOUSE - 10-19-21

 2    those four retail funds before 2021?

 3         A.    Principal executive officer.

 4         Q.    Were you the principal executive

 5    officer of the four retail funds that you have

 6    identified?

 7         A.    Sorry, could you repeat the

 8    question?

 9         Q.    Were you the principal executive

10    officer for each of the four retail funds that

11    you have identified?

12         A.    Yes.

13         Q.    When did you become the principal

14    executive -- withdrawn.

15              Can you give me the approximate year

16    that you became the principal executive officer

17    for each of the four retail funds you've

18    identified?

19         A.    I don't recall.

20         Q.    What are your duties and

21    responsibilities as the principal executive

22    officer of these four retail funds?

23         A.    It is to manage the finance and

24    accounting positions.

25         Q.    So at the same time you serve as the
```

Page 39

                    WATERHOUSE - 10-19-21
1
2    treasurer of the advisors, you also serve as
3    the principal executive officer of these four
4    retail funds; correct?
5         A.    Yes.
6         Q.    Did you ever hold any title with
7    respect to any other retail fund?
8         A.    Not that I recall.
9         Q.    During the period that you served as
10   Highland's CFO, from time to time Highland
11   loaned money to certain of its officers and
12   employees; correct?
13        A.    Yes.
14        Q.    During the period that you served as
15   Highland's CFO, from time to time Highland
16   loaned money to certain --
17        A.    Let me -- let me retract that,
18   sorry, that -- you asked during the time I was
19   CFO, Highland loaned moneys to employees.  I
20   don't -- I don't recall that during my tenure
21   of CFO.
22        Q.    You have no recollection during the
23   time that you were the CFO of Highland of
24   Highland ever loaning any money to any officer
25   or director of Highland?

Page 40

```
 1               WATERHOUSE - 10-19-21

 2       A.    I don't recall during my tenure of

 3  Highland or my -- as CFO of Highland -- yeah,

 4  if there are any loans as CFO of Highland.

 5       Q.    I'm just talking about officers and

 6  employees right now.  You have no recollection

 7  of Highland ever making a loan to any of its

 8  officers or employees during the time that you

 9  served as CFO.  Do I have that right?

10            MS. DANDENEAU:  Objection to form.

11       A.    So I thought you were saying

12  officers and employees as CFO, right, so there

13  were -- I mean, okay, yes.

14       Q.    I would ask you to listen carefully

15  to my question.  If I -- if I'm not clear, let

16  me know, but I'm really trying to be as clear

17  as I can.

18       A.    I'm listening as carefully as I can,

19  and you are asking very specific questions in a

20  timeline.  And I'm trying to answer your

21  questions as specifically as I can, and I

22  apologize if -- if I'm going back.  I am -- you

23  are asking very specific questions.  Thank you.

24       Q.    During the period that you served as

25  Highland's CFO, from time to time Highland
```

Page 41

```
 1                WATERHOUSE - 10-19-21

 2   loaned money to certain corporate affiliates;

 3   correct?

 4             MS. DANDENEAU:  Objection to form.

 5      A.    What are corporate affiliates?

 6      Q.    How about the ones that are in

 7   Highland's audited financial statements under

 8   the section entitled Loans to Affiliates.  Why

 9   don't we start with those.  Do you have any

10   understanding of what the phrase "affiliates"

11   means?

12             MS. DANDENEAU:  Objection to form.

13      A.    I understand what affiliates are,

14   yet affiliates can have different meanings in

15   different contexts, so...

16      Q.    Why don't you -- why don't you tell

17   me what your understanding of the term

18   "affiliate" is in relation to Highland Capital

19   Management, L.P.

20      A.    Is that a -- it depends on the

21   context.

22      Q.    How about the context of making

23   loans?

24             MS. DANDENEAU:  Objection to form.

25      A.    I didn't make the determination of
```

Page 42

```
 1                    WATERHOUSE - 10-19-21
 2    who an affiliate was or is at the time those --
 3    I didn't -- that wasn't my job to make a
 4    determination of who an affiliate is.
 5        Q.   All right.  So as the CFO of
 6    Highland, do you have any ability right now to
 7    tell me which companies that were directly or
 8    indirectly owned and/or controlled by
 9    Mr. Dondero in whole or in part received loans
10    from Highland Capital Management, L.P.?
11             MS. DANDENEAU:  Objection to form.
12             MS. DEITSCH-PEREZ:  Objection, form.
13        A.   Yes.
14        Q.   Okay.  Identify every entity that
15    you can think of that was directly or
16    indirectly owned and/or controlled by
17    Mr. Dondero in whole or in part that received a
18    loan from Highland Capital Management, L.P.
19             MR. RUKAVINA:  Objection, legal
20        conclusion.
21        A.   NexPoint Advisors, Highland Capital
22    Management Fund Advisors, HCM Services,
23    Dugaboy.  Sorry, I don't think -- Dugaboy
24    doesn't fit that definition.  You said owned
25    and controlled.  I don't think that that
```

Page 43

```
 1                  WATERHOUSE - 10-19-21

 2   definition --

 3        Q.    I said owned and/or controlled.

 4        A.    I don't -- again, I'm not -- I'm not

 5   the legal expert.  I don't think it controls --

 6   he controls Dugaboy, so again, I'm not the

 7   legal person.

 8        Q.    I'm not asking you for a legal

 9   conclusion, sir.  I'm asking you for your

10   knowledge, okay, as the CFO -- the former CFO

11   of Highland Capital Management, other than

12   NexPoint, HCMFA, and HCMF -- HCMS, can you

13   think of any other entities that were owned

14   and/or controlled directly or indirectly in

15   whole or in part by Jim Dondero who received a

16   loan from Highland Capital Management, L.P.?

17              MS. DANDENEAU:  Objection to form.

18        A.    HCRE.

19        Q.    Any others?

20        A.    That is -- that is all I can think

21   of.

22        Q.    And you're aware that from time to

23   time while you were the CFO, Highland loaned

24   money to Jim Dondero; correct?

25        A.    Yes.
```

Page 44

```
1              WATERHOUSE - 10-19-21

2       Q.    Okay.  Can we refer to the four

3  entities that you just named and Mr. Dondero as

4  the affiliates?

5       A.    So that would be Jim Dondero,

6  NexPoint Advisors, Highland Capital Management

7  Fund Advisors, and HCRE.

8       Q.    And HCMS?

9       A.    And HCMS, okay.

10      Q.    And can we refer to the loans that

11  were given to each of those affiliates as the

12  affiliate loans?

13      A.    Yes.

14      Q.    And is it fair to say that each of

15  the affiliates were the borrowers under the

16  affiliate loans as we're defining the term?

17            MR. RUKAVINA:  Objection, legal

18       conclusion.

19      A.    The borrowers are whoever were on

20  the notes.  I don't -- I don't know.  I'm not

21  the legal person.

22      Q.    But you --

23      A.    I don't know.

24      Q.    You do know, as Highland's former

25  CFO, that each of the affiliates that you have
```

Page 45

```
 1                    WATERHOUSE - 10-19-21

 2    identified tendered notes to Highland; correct?

 3              MR. RUKAVINA:  Hey, John, will you

 4         just give me a running objection to legal

 5         conclusion to HCM --

 6              MR. MORRIS:  No.  No, if you want to

 7         object --

 8              MR. RUKAVINA:  I will object every

 9         time.  Object to legal conclusion.

10              MR. MORRIS:  That is fine.

11    A.    Sorry, can you repeat the question?

12    Q.    Are you aware that each of the --

13    that each of the affiliates, as we have defined

14    the term, gave to Highland a promissory note in

15    exchange for the loans?

16              MR. RUKAVINA:  Objection to the

17         extent that calls for a legal conclusion.

18    A.    I don't.

19    Q.    No, you don't know that?

20    A.    No, they didn't -- you said they

21    exchanged a promissory note for a loan.  I

22    don't -- I don't understand that question, so I

23    said no.

24    Q.    At the time of the bankruptcy

25    filing, did Highland have in its possession
```

Page 46

1                  WATERHOUSE - 10-19-21

2    promissory notes that were signed by each of

3    the affiliates?

4         A.    Yes.

5         Q.    To the best of your knowledge,

6    during the time that you served as Highland's

7    CFO, did Highland disclose to its outside

8    auditors all of the loans that were made to

9    affiliates?

10              MR. RUKAVINA:  Objection, that calls

11         for a legal conclusion.

12              MS. DEITSCH-PEREZ:  I also couldn't

13         hear you, John, because there was some

14         garbling on -- on the -- on the call.

15              MR. MORRIS:  Folks, I've got to tell

16         you this is not going well, and I'm

17         reserving my right --

18              MS. DANDENEAU:  John, it was just

19         the end of that question.  It was just the

20         end of that question.  I couldn't hear it

21         either.  Sorry, if you could repeat it,

22         please.

23              MR. MORRIS:  That is less than an

24         hour into this, but folks are trying to run

25         out the clock, and so I'm just going to

```
 1                    WATERHOUSE - 10-19-21

 2          state that now.

 3                    MS. DANDENEAU:  You know, and,

 4          Mr. Morris, I really object to that.  I

 5          mean --

 6                    MR. MORRIS:  Okay.

 7                    MS. DANDENEAU:  -- Mr. Waterhouse

 8          just told you he's trying to listen to your

 9          questions and answer them carefully, and

10          you have no basis for saying that.

11                    MR. MORRIS:  Okay.

12                    MS. DANDENEAU:  This does not --

13          this is not an experienced witness, so he's

14          trying to do the best he can.

15          Q.    Mr. Waterhouse, during the time that

16     you served as Highland's CFO, did Highland

17     disclose to its outside auditors all of the

18     loans that it made to each of the affiliates

19     that you have identified?

20                    MR. RUKAVINA:  Objection, legal

21          conclusion.

22          A.    Yes.

23          Q.    To the best of your knowledge, while

24     you were Highland's CFO, were all of the

25     affiliate loans described in Highland's audited
```

```
 1                    WATERHOUSE - 10-19-21

 2      financial statements?

 3                    MR. RUKAVINA:  Objection, legal

 4           conclusion.

 5           A.    When an audit was performed, any

 6      loans that were made by Highland to the

 7      affiliates were disclosed to auditors.

 8           Q.    Are you aware of any loan that was

 9      made to any affiliate that was not disclosed to

10      the auditors?

11           A.    I'm not aware.

12           Q.    To the best of your knowledge, did

13      each of the affiliates who were --

14      (inaudible) -- loaned from Highland execute a

15      promissory note in connection with that loan?

16                    MR. RUKAVINA:  Objection, legal

17           conclusion.

18           A.    Sorry, you -- halfway through the

19      question it got muffled.

20                    Can you repeat that again?

21           Q.    To the best of your knowledge, did

22      every affiliate execute a promissory note in

23      connection with each loan that it obtained from

24      Highland?

25                    MR. RUKAVINA:  Objection, legal
```

Page 49

1                    WATERHOUSE - 10-19-21

2          conclusion.

3          A.    Yes.

4          Q.    You are not aware of any loan that

5    any affiliate ever obtained from Highland where

6    the affiliate did not give a promissory note in

7    return; is that fair?

8          A.    Yes, I'm not aware.

9          Q.    And to the best of your knowledge,

10   did Highland loan to each affiliate an amount

11   of money equal to the principal amount of each

12   promissory note?

13               MR. RUKAVINA:  Objection, legal

14         conclusion.

15         A.    Yes.

16         Q.    During the time that you served as

17   CFO, did Highland ever loan money to

18   Mark Okada?

19         A.    I -- I don't recall.

20         Q.    Did you ever see any promissory

21   notes executed by Mark Okada?

22         A.    I don't recall.

23         Q.    Do you know if Highland ever forgave

24   any loan that it ever made to Mr. Okada?

25         A.    I don't recall.

Page 50

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    Do you recall if Mr. Okada paid back

 3   all principal and interest due and owing under

 4   any loan he obtained from Highland?

 5            MS. DEITSCH-PEREZ:  Objection to

 6       form.

 7            MS. DANDENEAU:  Objection to form.

 8       A.    I don't recall.

 9       Q.    Do you recall whether -- during your

10   time as CFO, whether Highland ever loaned money

11   to Jim Dondero?

12       A.    Yes.

13       Q.    To the best of your knowledge, did

14   Mr. Dondero sign and deliver to Highland a

15   promissory note in connection with each loan

16   that he obtained from Highland?

17       A.    If you are referring to the

18   promissory notes that, you know, part of

19   Highland's records, yes.

20       Q.    Okay.  You're not aware of any loan

21   that Mr. Dondero took from Highland that wasn't

22   backed up by -- by a promissory note with a

23   face -- with a principal amount equal to the

24   amount of the loan; correct?

25       A.    Am I aware that Jim Dondero took a
```

Page 51

1              WATERHOUSE - 10-19-21

2    loan?

3         Q.    Without giving a -- let me ask a

4    better question.  I'm sorry, Mr. Waterhouse.

5              Are you aware of any loan that

6    Mr. Dondero obtained from Highland where he

7    didn't give a promissory note in return?

8         A.    I'm not aware.

9         Q.    During the time that you served as

10   Highland's CFO, did Highland ever forgive any

11   loans, in whole or in part, that it made to

12   Mr. Dondero?

13        A.    Not that I'm aware.

14        Q.    At the time that you served as

15   Highland's CFO, did Highland ever forgive any

16   loan, in whole or in part, that it made to any

17   affiliate as we've defined the term today?

18        A.    Not that I'm aware.

19        Q.    During the time that you served as

20   Highland's CFO, did Highland ever forgive, in

21   whole or in part, any loan that it ever made to

22   any officer or employee?

23        A.    Highland forgave loans to officers

24   and employees.  It may not have been at the

25   time when my title was CFO.

Page 52

```
1              WATERHOUSE - 10-19-21

2        Q.     Okay.  And so I appreciate the

3   distinction.

4              Is it fair to say that, to the best

5   of your knowledge, Highland did not forgive a

6   loan that it made to an officer or employee

7   after 2013?

8              MS. DANDENEAU:  Objection to form.

9        A.     I don't recall.

10       Q.     To the best of your knowledge, did

11  Highland disclose to its auditors every

12  instance where it forgave, in whole or in part,

13  a loan that it had made to one of its officers

14  or employees?

15       A.     No.

16       Q.     Can you think of -- can you -- can

17  you identify any loan to an officer or employee

18  that was forgiven by Highland, in whole or in

19  part, that was not disclosed to Highland's

20  outside auditors?

21       A.     Look, I don't recall all of the

22  loans and the loan forgiveness.  I just know as

23  part of the audit process there is a

24  materiality concept.

25              So if there were loans to employees
```

```
                                                        Page 53
 1                  WATERHOUSE - 10-19-21

 2    that were of -- you know, that were deemed

 3    immaterial, those items may not have been

 4    disclosed by the team to the auditors.

 5         Q.    I appreciate that.

 6               Do you have an understanding as to

 7    what the level of materiality was?

 8         A.    I don't recall.

 9         Q.    As the CFO of Highland, to the best

10    of your knowledge, did Highland disclose to its

11    outside auditors every loan that was forgiven,

12    in whole or in part, that was material as that

13    term was defined by the outside auditors?

14         A.    Yes.

15         Q.    And do you recall where -- do you

16    recall where the definition of materiality can

17    be found for -- for this particular purpose?

18               MS. DANDENEAU:  Objection to form.

19         A.    No.  You -- I don't determine

20    materiality.

21         Q.    Okay.  I'm just asking you if you

22    can help me understand where it is, but I think

23    we will find it in a few minutes.

24               You are aware that Highland has

25    commenced lawsuits against each of the
```

Page 54

1                    WATERHOUSE - 10-19-21

2    affiliates, as we've defined the term, to

3    collect under certain promissory notes; is that

4    right?

5         A.    Yes.

6         Q.    And are you familiar with the notes

7    that are issue -- at issue in the lawsuits?

8              MS. DANDENEAU:  Objection to form.

9         A.    Generally familiar.

10        Q.    Can we refer to the lawsuits that

11   Highland has commenced against the affiliates

12   collectively as the lawsuits?

13        A.    Yes.  And, again, the affiliates are

14   NexPoint, HCMFA, HCMS, and HCRE.

15        Q.    And Mr. Dondero?

16        A.    Okay.  See, that is a new -- and now

17   Mr. Dondero is included in your affiliate

18   definition.

19        Q.    I just --

20        A.    I thought affiliates -- I thought

21   affiliates were just the four prior entities,

22   so I just want to be clear.

23        Q.    I appreciate that.  So let's --

24   let's keep them separate and let's refer to the

25   four corporate entities as the affiliates, and

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 55 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 193 of 899 PageID 805

Page 55

```
 1              WATERHOUSE - 10-19-21

 2   Mr. Dondero we will call Mr. Dondero.  Okay?

 3        A.    Okay.  Thank you.  As you can see,

 4   Mr. Morris, there is a lot of entities -- a lot

 5   here.  I just want to be clear.

 6        Q.    Okay.  Now, the affiliates of

 7   Mr. Dondero signed promissory notes that are

 8   not subject to the lawsuit.

 9              Do you understand that?

10              MS. DANDENEAU:  Objection to form.

11        A.    The affiliates and Mr. Dondero

12   signed --

13        Q.    You know what?  I will skip it.

14   That is okay.  Okay.

15              From time to time while you were

16   Highland's CFO, payments were applied against

17   principal and interests that were due under the

18   notes that were tendered by the affiliates and

19   Mr. Dondero; correct?

20              MR. RUKAVINA:  Objection to the

21         extent that calls for a legal conclusion.

22        A.    Yes.

23        Q.    Did Highland have a process where --

24   whereby payments would be applied against

25   principal and interest against the notes that
```

```
 1                   WATERHOUSE - 10-19-21

 2    were given by the affiliates and Mr. Dondero?

 3         A.    Yes.

 4         Q.    Can you describe the process for me?

 5         A.    The process, payment should be

 6    applied as laid out in the -- in the promissory

 7    note.

 8         Q.    From time to time were payments made

 9    that were not required under the promissory

10    notes?

11              MS. DANDENEAU:  Objection to form.

12         A.    Yes.

13         Q.    Who was responsible for deciding

14    when and how much the payments would be made

15    with respect to each of the notes that were

16    issued by the affiliates and Mr. Dondero?

17         A.    Who was responsible for deciding how

18    much was paid prior to the due date?

19         Q.    Yes.

20         A.    I don't know.

21         Q.    Did you approve of each payment that

22    was made against principal and interest on the

23    notes that were given by the affiliates and

24    Mr. Dondero?

25              MS. DANDENEAU:  Objection to form.
```

Page 57

```
 1                    WATERHOUSE - 10-19-21

 2         A.    Did I approve the payments?  I

 3  approve -- I approve -- if there was cash -- if

 4  there was cash being repaid on a note payment,

 5  yes, I approved in the general sense of being

 6  made aware of the payment and the amount.

 7         Q.    And are you the person who

 8  authorized Highland's employees to effectuate

 9  those payments?

10         A.    Yes.

11         Q.    When you gave the instruction to

12  effectuate the payment, did you obtain

13  Mr. Dondero's prior approval?

14         A.    I mean, it -- I mean, it -- it

15  depends.

16         Q.    Can you think of any instance where

17  you directed Highland's employees to make a

18  payment of principal or interest against any

19  note that was tendered by an affiliate or

20  Mr. Dondero that Mr. Dondero did not approve of

21  in advance?

22         A.    I can't recall specifically.

23         Q.    Can you identify -- withdrawn.

24               Did Mr. Dondero ever tell you that a

25  payment that was made against principal and
```

Page 58

```
 1                 WATERHOUSE - 10-19-21

 2     interest due under one of the notes that was

 3     tendered by an affiliate or himself should not

 4     have been made?

 5          A.    Yes.

 6          Q.    Can you identify the payment for me?

 7          A.    It would be for -- for NexPoint

 8     Advisors.

 9          Q.    Okay.  And when did Mr. Dondero tell

10     you that a payment that you had initiated on

11     behalf of NexPoint should not have been made?

12          A.    I wasn't initiating payment.  It was

13     in the context of the -- I think you used this

14     term, "the advisors," so NexPoint Advisors and

15     Highland Capital Management Fund Advisors had

16     overpaid on certain agreements with Highland

17     Capital Management, L.P.  And as a part of that

18     process, the advisors -- what I was told at the

19     time were in talks and negotiations and

20     discussions with Highland Capital Management,

21     L.P., on offsets in relation to those

22     overpayments.

23          Q.    When did this conversation take

24     place?

25                MS. DANDENEAU:  Objection to form.
```

Page 59

1                    WATERHOUSE - 10-19-21

2        A.    I don't recall specifically.

3        Q.    Do you recall what year it was?

4        A.    Yes.

5        Q.    What year did the conversation with

6    Mr. Dondero take place that you just described?

7        A.    2020.

8        Q.    Okay.  Do you remember if it was

9    December 2020?

10       A.    It -- it -- I don't -- I don't

11   recall what month specifically, but it would

12   have been November or December.

13       Q.    And we're talking here about a

14   payment of principal and/or interest that was

15   due -- withdrawn.

16             We're talking here about a payment

17   of principal and interest that was applied

18   against NexPoint's note; correct?

19             MS. DANDENEAU:  Objection to form.

20       A.    I don't recall what that payment

21   consisted of.

22       Q.    Is it possible that the payment you

23   have in mind related to the shared services

24   agreement?

25             MS. DANDENEAU:  Objection to form.

Page 60

```
 1                 WATERHOUSE - 10-19-21

 2        A.    No.

 3        Q.    Are you certain that the payment --

 4   that the payment that you have in mind related

 5   to the promissory note that NexPoint issued in

 6   favor of Highland?

 7              MS. DANDENEAU:  Objection to form.

 8        A.    Yes.

 9        Q.    Okay.  Other than that one payment,

10   can you identify any other instance where

11   Mr. Dondero told you that a payment should not

12   have been applied against principal and

13   interest under any promissory note tendered by

14   any affiliate or Mr. Dondero?

15              MS. DANDENEAU:  Objection to form.

16              MS. DEITSCH-PEREZ:  Objection to

17         form.

18        A.    Not that I recall.

19        Q.    Thank you very much.

20              Do you know if Mr. Dondero approved

21   in advance of each loan made to each affiliate

22   and himself during the time that you were the

23   CFO?

24              MS. DEITSCH-PEREZ:  Object to the

25         form.
```

```
                                                    Page 61
 1                   WATERHOUSE - 10-19-21

 2          A.    Yes, generally.

 3          Q.    Can you identify any loan that was

 4   ever made to an affiliate or to Mr. Dondero

 5   that Mr. Dondero did not approve of in advance?

 6          A.    Other than the ones that are in

 7   dispute, I'm not aware.

 8          Q.    Do you believe that Mr. Dondero did

 9   not approve of each of the loans that are in

10   dispute in advance of the time that the loan

11   was made?

12                MS. DANDENEAU:  Objection to form.

13          A.    Given what is in the dispute, you

14   know, and -- and -- and the way things might --

15   yeah, I mean...

16          Q.    I am not asking about the dispute,

17   and it was probably my mistake to follow you

18   there.

19                Were you aware of every loan made by

20   Highland to each of its affiliates and

21   Mr. Dondero while you were the CFO at the time

22   each loan was made?

23          A.    Was I aware of every loan, yes.

24          Q.    Okay.  And if you put yourself back

25   in time, do you recall that any of the loans
```

Page 62

1                    WATERHOUSE - 10-19-21

2      that were made to one of the affiliates or

3      Mr. Dondero during the time that you were the

4      CFO was made without Mr. Dondero's prior

5      knowledge and approval?

6          A.    Not that I recall.

7          Q.    Thank you.  In fact, do you -- as

8      the CFO, would you have allowed Highland to

9      loan money to an affiliate or to Mr. Dondero

10     without obtaining Mr. Dondero's prior approval?

11                MS. DANDENEAU:  Objection to form.

12         A.    I can't -- there was so many times

13     over the years, I can't speak for every single

14     one, but generally, yes, I -- I spoke to him.

15         Q.    You -- you never -- you never --

16     withdrawn.  I will just take that.

17                Can you recall any payment that was

18     ever made against principal and interest on a

19     note that was issued in favor of Highland by an

20     affiliate or Mr. Dondero that you personally

21     did not know about in advance?

22         A.    There are so many through the years,

23     I don't -- I don't -- I don't recall every

24     single one.

25         Q.    Okay.  Can you identify any payment

Page 63

```
 1                    WATERHOUSE - 10-19-21

 2     that was made against principal and interest on

 3     any note tendered by any affiliate or

 4     Mr. Dondero that you didn't know about in

 5     advance?

 6          A.    I don't recall.

 7          Q.    Other than Mr. Dondero -- withdrawn.

 8                Did anybody at Highland have the

 9     authority to make a payment against principal

10     and interest due under a loan given to the

11     affiliates and Mr. Dondero without your

12     knowledge and approval?

13                MS. DANDENEAU:  Objection to form.

14          A.    Sorry, there was -- to make a

15     payment on an affiliate loan, what you are

16     saying would it require my knowledge and

17     approval, yes.

18          Q.    Okay.  I appreciate that.  Thank

19     you.

20                Did anybody at Highland have the

21     authority, to the best of your knowledge, to

22     effectuate a loan to an affiliate without

23     Mr. Dondero's prior knowledge and approval?

24                MS. DANDENEAU:  Objection to form.

25          A.    I can't speak for all, but
```

Page 64

```
 1                    WATERHOUSE - 10-19-21
 2   generally, yes.
 3        Q.    Did you personally communicate with
 4   Mr. Dondero to let him know each time a payment
 5   of principal or interest was being made against
 6   any note that was tendered by an affiliate or
 7   Mr. Dondero to Highland?
 8        A.    I don't -- are you saying, did I let
 9   Mr. Dondero know if a payment was made on any
10   affiliate or loan to Mr. Dondero?  I mean,
11   not -- not every -- no.
12        Q.    Let me ask it this way:  Did you
13   have a practice of informing Mr. Dondero when
14   payments were made against principal and
15   interest on any note that was tendered by an
16   affiliate or Mr. Dondero?
17              MS. DEITSCH-PEREZ:  Objection to
18        form.
19              MS. DANDENEAU:  Objection to form.
20        A.    No, I did not.
21        Q.    Did Mr. Dondero ever tell you that a
22   payment of principal or interest had been made
23   against a note that was tendered by an
24   affiliate or himself that he had been unaware
25   of?
```

Page 65

```
 1                WATERHOUSE - 10-19-21

 2       A.    Not that I recall.

 3       Q.    Are you aware that Mr. Dondero and

 4   the affiliates -- withdrawn.

 5             Are you aware that Mr. Dondero

 6   NexPoint, HCRE, and HCMS all contend that they

 7   do not have to pay on any of the notes they

 8   issued because they are subject to an oral

 9   agreement between Mr. Dondero and Nancy

10   Dondero, in her capacity as the trustee of the

11   Dugaboy Investment Trust?

12             MS. DANDENEAU:  Objection to form.

13       A.    I didn't -- I didn't -- I didn't

14   know that it was all notes.

15       Q.    Okay.  Are you -- did you ever learn

16   that there was an oral agreement between Jim

17   Dondero and Nancy Dondero pertaining to any

18   notes issued by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20       form.

21       A.    Yes.

22       Q.    Do you have any understanding as to

23   the terms of that agreement?

24       A.    Yes.

25       Q.    What is your understanding of the
```

Page 66

```
 1                WATERHOUSE - 10-19-21

 2    terms of the agreement?

 3        A.    That there were certain milestones

 4    that had to be reached.

 5        Q.    Do you have any understanding of the

 6    terms of the agreement between Mr. Dondero and

 7    Nancy Dondero concerning any of the notes

 8    issued by the affiliates or Mr. Dondero other

 9    than that there have to be milestones reached?

10            MS. DEITSCH-PEREZ:  Object to the

11        form.

12        A.    There are milestones, I found out

13    yesterday, or there was some --

14            MS. DANDENEAU:  Okay.  I'm just

15        going to object to the extent that you

16        learned anything in conversations with

17        counsel, please don't reveal -- that is

18        privileged, and don't reveal any privileged

19        communications.

20            THE WITNESS:  Okay.

21        A.    So I'm not aware of anything else.

22        Q.    Do you know what the milestones

23    were?

24            MS. DANDENEAU:  Objection to form.

25        A.    I don't.
```

Page 67

```
 1                  WATERHOUSE - 10-19-21
 2      Q.    Do you know anything about -- do you
 3  know what promissory notes the agreement
 4  covered?
 5      A.    I don't.
 6      Q.    Do you know if -- if Jim and Nancy
 7  Dondero entered into one agreement or more than
 8  one agreement?
 9            MS. DEITSCH-PEREZ:  Object to the
10        form.
11      A.    I don't know.
12      Q.    Do you know if the agreement is in
13  writing?
14      A.    I don't know.
15      Q.    How did you learn of the existence
16  of the agreement?
17            MS. DANDENEAU:  Objection to form.
18        Again --
19      A.    I don't -- I don't recall who told
20  me.
21      Q.    You have no recollection of who told
22  you about this agreement between Jim and Nancy
23  Dondero?
24            MS. DEITSCH-PEREZ:  Object to the
25        form.
```

Page 68

```
 1              WATERHOUSE - 10-19-21

 2      A.    I don't recall.

 3      Q.    Do you recall how you learned of the

 4   agreement?

 5            Was it in a meeting?  Was it in a

 6   phone call?  Was it in an email?

 7      A.    I don't recall.

 8      Q.    Do you recall when you learned of

 9   the agreement?

10      A.    Not specifically.

11      Q.    Do you recall what year you learned

12   of the agreement?

13      A.    In -- look, I mean, there are so

14   many notes.  I may be getting -- I believe it

15   was 2020.

16      Q.    All right.  I'm not asking about

17   notes, sir.  I'm asking about the agreement

18   that you testified you knew about between Jim

19   and Don- -- Nancy Dondero.  Okay.

20            Do you understand my question now?

21   Should I ask my question again?

22      A.    Yeah, sure.  Go ahead.

23      Q.    I'm going to use the word

24   "agreement" to refer to the agreement that

25   Mr. Dondero and Nancy Dondero entered into
```

Page 69

```
 1                    WATERHOUSE - 10-19-21

 2    where you understood that certain milestones

 3    had to be reached.  Okay?

 4         A.    Uh-huh.

 5              MS. DANDENEAU:  Objection.

 6              MS. DEITSCH-PEREZ:  Object to the

 7         form.

 8              MR. MORRIS:  Just defining a term,

 9         what is the objection.

10              MS. DEITSCH-PEREZ:  The objection --

11              MR. MORRIS:  I will move on.  I will

12         move on.

13              MS. DEITSCH-PEREZ:  John --

14         Q.    Sir, are you okay with that

15    definition of agreement?

16         A.    Okay.

17         Q.    Okay.  So you don't recall who --

18    who informed you of the existence of the

19    agreement; is that right?

20         A.    I don't recall.

21         Q.    You don't recall who told you the

22    terms of the agreement.

23              Do I have that right?

24         A.    Correct.

25         Q.    And you don't recall if you learned
```

Page 70

```
 1                 WATERHOUSE - 10-19-21

 2    about the agreement in a meeting, through an

 3    email, or through a phone call.

 4               Do I have that right?

 5        A.    I don't recall.

 6        Q.    Can you tell me when you learned of

 7    the agreement?

 8        A.    I don't -- I don't -- I don't

 9    remember specifically.

10        Q.    Can you tell me if you learned of

11    the agreement before or after the petition

12    date?

13        A.    It would have been -- it would have

14    been after.

15        Q.    Can you tell me if you learned of

16    the agreement before or after January 9th,

17    2020?

18        A.    It would have been after.

19        Q.    Can you tell me if you learned of

20    the agreement before or after you left Highland

21    Capital Management in February of 2021?

22        A.    I don't -- I don't -- I don't know.

23        Q.    It is possible that you learned of

24    it while you were a Highland employee.

25               Do I have that right?
```

```
1              WATERHOUSE - 10-19-21

2        A.    I don't remember the -- I mean, it

3   was sometime in 2021.  I don't remember when.

4        Q.    All right.  So to the best of your

5   recollection, it was in 2021 but you don't

6   recall if it was before or after you ceased to

7   be a Highland employee.

8              Do I have that right?

9        A.    Yeah, I mean, it was -- it was

10  likely after I was -- after I left Highland

11  because, if I put myself back into the last

12  days of -- of 2021, it was -- you know, the

13  communications with Mr. Dondero were -- were --

14  were -- there weren't as many communications

15  because of the circumstances.

16       Q.    And so based on that you believe

17  that it is most likely that you learned of this

18  agreement sometime after you left Highland

19  employment?

20       A.    I wouldn't use the term "most

21  likely."  I don't recall specifically.  I don't

22  recall.

23       Q.    Do you recall ever telling Jim Seery

24  about this agreement?

25       A.    No, I don't -- I didn't tell
```

Page 72

```
 1               WATERHOUSE - 10-19-21

 2    Jim Seery.

 3         Q.    Did you tell anybody at DSI about

 4    this agreement?

 5         A.    No.

 6         Q.    Did you tell any of Highland's

 7    independent directors about this agreement?

 8         A.    No.

 9         Q.    Did you tell anybody at Pachulski

10    Stang Ziehl & Jones about this agreement?

11         A.    No.

12         Q.    Did you tell any employee of

13    Highland about this agreement?

14         A.    No.

15              MS. DANDENEAU:  Mr. Morris, it has

16         been an hour and a half.  Is this a good

17         time for a break?

18              MR. MORRIS:  Sure.

19         Q.    Mr. Waterhouse, I will just remind

20    you that during the break please don't speak

21    with anybody about the deposition, the

22    substance of your testimony or anything else

23    concerning the deposition.  Okay?

24         A.    Yes.

25              MR. MORRIS:  So it is 11:02.  We're
```

Page 73

```
 1                WATERHOUSE - 10-19-21

 2       at 11:02 your time.  Let's come back, I

 3       guess, at 15 -- at 11:15 your time.

 4             VIDEOGRAPHER:  We're going off the

 5       record at 11:02 a.m.

 6       (Recess taken 11:02 a.m. to 11:20 a.m.)

 7             VIDEOGRAPHER:  We are back on the

 8       record at 11:20 a.m.

 9       Q.    Mr. Waterhouse, did you speak with

10   anybody during the break about this deposition?

11       A.    No.

12             MS. DANDENEAU:  Other than -- other

13       than his counsel.

14       Q.    Did you speak to your counsel about

15   the substance of your deposition today?

16       A.    No, I didn't bring it up.

17       Q.    I didn't ask you if you brought it

18   up.  I asked you if you had any conversation

19   with your lawyer about the substance of your

20   deposition.

21             MS. DANDENEAU:  Yes, he did.

22       Q.    Can you tell me what the -- you

23   discussed?

24             MS. DANDENEAU:  No, I object to

25       that.  He's not going to answer.  That is a
```

Page 74

 1          WATERHOUSE - 10-19-21

 2   privileged conversation.

 3          MR. MORRIS:  So I just want to make

 4   sure that I understand.  During the break

 5   you spoke with your client about the

 6   substance of this deposition; is that

 7   right?

 8          MS. DANDENEAU:  Yes, John.

 9          MR. MORRIS:  And you refuse -- you

10   refuse to let your client tell me what was

11   discussed; is that right?

12          MS. DANDENEAU:  That's correct.

13          MR. MORRIS:  You know, I had given

14   the instruction prior to the break not to

15   speak with counsel.  I would have

16   appreciated --

17          MS. DANDENEAU:  No, you didn't --

18   actually, that is not true, Mr. Morris.

19   You said not to speak with anyone.  We

20   never have interpreted that to mean

21   conversations with counsel.  That's never

22   been -- I have never, ever heard that

23   instruction.

24          MR. MORRIS:  Okay.  We will -- we

25   will -- we will deal with it when and if we

Page 75

```
 1                   WATERHOUSE - 10-19-21

 2        have to.

 3        Q.    Mr. Waterhouse, after learning about

 4   the agreement, did you ask anybody if the

 5   agreement was reflected in a writing?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    No.

 8        Q.    Did you ask anybody if the terms of

 9   the agreement were memorialized anywhere?

10              MS. DANDENEAU:  Objection to form.

11              MR. MORRIS:  What is the --

12        A.    No.

13              MS. DANDENEAU:  Well, because you

14         keep talking about this agreement and I --

15         I -- I think, Mr. Morris, that is really

16         not clear what you mean by "the agreement."

17         And maybe you can just go back and restate

18         what that is.

19              MR. MORRIS:  Okay.  Your client has

20         agreed with me twice on the definition, but

21         I will try one more time.

22        Q.    Mr. Waterhouse, do you understand

23   that when I use the term "agreement," I'm

24   referring to the agreement between Jim and

25   Nancy Dondero concerning certain promissory
```

Page 76

```
 1              WATERHOUSE - 10-19-21
 2    notes where you learned that one of the terms
 3    of the agreement was milestones reached?
 4         A.    Okay.
 5         Q.    And did you understand that that was
 6    the -- the agreement that we were referring to
 7    every time we used the word "agreement" in this
 8    deposition?
 9         A.    I don't know anything about this
10    agreement.  So, look, I do -- it -- I don't
11    know whether --
12         Q.    Let's -- let's try this again.
13         A.    Yeah.  Look, I don't know what this
14    agreement relates.
15              MS. DEITSCH-PEREZ:  John, John --
16         Q.    Let me try --
17              MS. DEITSCH-PEREZ:  John, please let
18         the witness finish.
19              MR. MORRIS:  Please stop.  Please
20         stop.  Please stop talking.
21              MS. DEITSCH-PEREZ:  No, you stop.
22         Let the witness --
23              MR. MORRIS:  Stop talking.
24              MS. DEITSCH-PEREZ:  -- finish -- you
25         interrupted him.
```

Page 77

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  You know what, you

 3         guys, this is really wrong.  It is really,

 4         really wrong.  Okay?

 5              I had the witness agree not once,

 6         but twice to the definition of agreement.

 7         Okay?  I'm going to try and do it a third

 8         time.

 9              MS. DANDENEAU:  No, but, please,

10         John, really --

11              MR. MORRIS:  No, please stop

12         talking.  Please.  It is my deposition.

13         Object to questions.

14              MS. DANDENEAU:  No, but also you

15         instructed him that -- that if you were

16         going -- if you were interrupting him, that

17         he should remind you that you're

18         interrupting him and -- and --

19              MR. MORRIS:  Let him do that.  Let

20         him do that.

21              MS. DANDENEAU:  Okay.  Well, you --

22              MR. MORRIS:  Please stop talking.

23         A.   Okay.  I don't know any of the

24    details of these agreements.  I don't know

25    anything about them.  I heard -- someone -- I
```

```
                                                      Page 78
 1                WATERHOUSE - 10-19-21

 2   don't know who, I don't know when, as you

 3   asked, sometime in '21, someone told me about

 4   this -- or I don't honestly know -- I don't

 5   even recall exactly how I was made aware of

 6   this, but I was.  I don't know -- I don't know

 7   any of these details, and I'm getting -- again,

 8   there is, you know, I -- I -- I had a passing

 9   conversation with -- with Jim at some point

10   on -- on some -- on the executive comp, and I'm

11   getting confused of what is what, because

12   again, I don't know any of these details.

13        Q.    Okay.  Let me try again,

14   Mr. Waterhouse, and I apologize.

15             Are you aware of any agreement

16   between Jim Dondero and Nancy Dondero

17   concerning any promissory note that was given

18   to Highland by any affiliate or Mr. Dondero?

19             MS. DEITSCH-PEREZ:  Object to the

20        form.

21        A.    I've heard of an agreement.  That

22   is -- that is -- I mean, if you are using aware

23   as heard, sure.

24        Q.    And you understand that one of the

25   terms of the agreement is that it was based on
```

Page 79

```
 1                    WATERHOUSE - 10-19-21

 2   milestones that had to be reached; is that

 3   right?

 4              MS. DANDENEAU:  Objection to form.

 5        A.    That was one of the words that was

 6   used when I heard about it, yes.

 7        Q.    And when you heard about this

 8   agreement that had a term in it concerning

 9   milestones reached, did you ask the person who

10   was telling you about the agreement whether or

11   not it was in writing?

12        A.    I did not.

13        Q.    Did you ask any questions at all?

14              MS. DANDENEAU:  Objection to form.

15        A.    Not that I recall.

16        Q.    But do you understand that going

17   forward, we're going to refer to the agreement

18   as the agreement that you just described that

19   you were --

20              MS. DANDENEAU:  Object to the form.

21        A.    Yes.

22        Q.    Okay.  You don't have any personal

23   knowledge concerning the terms of the

24   agreement; correct?

25              MS. DEITSCH-PEREZ:  Object to the
```

Page 80

1                    WATERHOUSE - 10-19-21

2         form.

3         Q.    You can answer.

4         A.    I don't -- I heard about the

5    agreement.  I don't know anything -- I heard

6    there was an agreement.  That is -- again, as I

7    testified before -- I said before, heard about

8    it, don't know the details.  I believe it was

9    sometime this year.

10        Q.    Do you have any personal knowledge

11   about the terms of the agreement, sir?

12             MS. DANDENEAU:  Objection to form.

13        A.    Other than what I have previously

14   discussed, I don't -- I don't know.

15        Q.    Did -- did Mr. Dondero tell you

16   about the existence of the agreement?

17        A.    I don't recall.

18        Q.    Do you recall the source of your

19   information when you learned about the

20   agreement?

21        A.    No, I don't -- I don't recall.  I

22   don't remember.  I just -- I heard about it

23   generally.  I don't remember -- I don't

24   remember who, how, if, how.  I don't remember.

25        Q.    You know, Mr. Waterhouse, I just

Page 81

```
 1              WATERHOUSE - 10-19-21

 2   want to be clear that I never would have asked

 3   you to appear at this deposition if your name

 4   hadn't been included in responses to discovery

 5   as to somebody with knowledge about the -- who

 6   was told about the existence of the agreement.

 7              That is what prompted me do this,

 8   and I really do feel compelled to tell you that

 9   I otherwise would never have called you as a

10   witness.  So I regret that you're being put

11   through this today.  I had no intention of

12   burdening you or taking your time, but that is

13   the reason that we issued the subpoena is

14   because certain of the defendants identified

15   you as somebody --

16              MS. DEITSCH-PEREZ:  Mr. Morris, you

17       are here to ask questions, not to have --

18              MR. MORRIS:  I feel badly for the

19       guy.  I really do.

20              MS. DEITSCH-PEREZ:  I'm sure you do.

21              MR. MORRIS:  I do.  Stop.

22              MS. DEITSCH-PEREZ:  You stop.

23              MR. MORRIS:  I'm allowed.

24              MS. DEITSCH-PEREZ:  No, you're not

25       allowed to have a chat with the witness.
```

Page 82

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Okay.  Well, I hope that you

 3   appreciate what I'm saying here,

 4   Mr. Waterhouse.

 5              MS. DANDENEAU:  All right.  Let's go

 6        ahead and ask questions, and again, you're

 7        entitled to probe his -- his knowledge

 8        of -- whatever knowledge he has about

 9        this -- this agreement and --

10              MR. MORRIS:  That is what I'm doing.

11              MS. DANDENEAU:  -- he will answer

12        the questions to the best that he can.

13              MR. MORRIS:  That is what I'm doing.

14      Q.    Mr. Waterhouse, I take it you do not

15   know which promissory notes issued by which

16   affiliates or Mr. Dondero are the subject of

17   this agreement; do I have that right?

18      A.    Yes, I don't -- I don't know.

19      Q.    Do you know of any way to determine

20   which promissory notes issued by the affiliates

21   and Mr. Dondero are the subject of this

22   agreement other than asking Jim or Nancy

23   Dondero?

24              MS. DANDENEAU:  Objection to form.

25      A.    I don't know.
```

Page 83

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Did you ever make --

 3        A.    I don't know anything about these

 4   agreements.

 5        Q.    Did you ever make any effort to

 6   determine which promissory notes are subject to

 7   this agreement?

 8        A.    No.

 9        Q.    Did you ever ask anybody which

10   promissory notes are subject to this agreement?

11        A.    No.

12        Q.    Do you know if there is a list

13   anywhere of the promissory notes that are

14   subject to this agreement?

15        A.    I'm not aware.

16        Q.    Have you ever seen the terms of the

17   agreement written down anywhere?

18        A.    No.

19        Q.    Have you ever asked anybody whether

20   the terms of the agreement were written down

21   anywhere?

22        A.    I have not.

23        Q.    Did learning about the agreement

24   cause you to do anything in response?

25              MS. DANDENEAU:  Objection to form.
```

Page 84

```
 1              WATERHOUSE - 10-19-21

 2      A.    No.

 3      Q.    Did anybody ever describe to you the

 4  nature of the milestones that you referred to

 5  earlier?

 6      A.    No, I don't -- I don't have any

 7  details of this.

 8      Q.    That is fine.

 9            PricewaterhouseCoopers served as

10  Highland's outside auditors prior to the

11  petition date; correct?

12      A.    Yes.

13      Q.    You refer to PricewaterhouseCoopers

14  as PwC?

15      A.    Yes.

16      Q.    PricewaterhouseCoopers audited

17  Highland's financial statements on an annual

18  basis; correct?

19      A.    During my -- during my time as -- as

20  CFO, yes, PricewaterhouseCoopers was the

21  auditor.

22      Q.    Do you know why Highland had its

23  annual financial statements audited each year?

24      A.    Generally.

25      Q.    Tell me your general understanding
```

Page 85

```
 1                 WATERHOUSE - 10-19-21
 2   as to the reason why Highland had its annual
 3   financial statements audited each year.
 4        A.    From -- from time to time, they were
 5   used -- or asked for, as part of diligence or
 6   transactions or -- or things of that nature.
 7        Q.    And were they given to third parties
 8   for purposes of diligence or transactions from
 9   time to time?
10        A.    As far as I'm aware, yes.
11        Q.    And was it your understanding as the
12   CFO that the third parties who received the
13   financial statements in diligence or
14   transactions was going to rely on those?
15             MS. DANDENEAU:  Objection to form.
16        A.    I don't know -- I don't know gen --
17   I don't know specifically what they were going
18   to rely on.  You know, we would get requests
19   for audited financial statements.  I don't know
20   what they were relying on.
21        Q.    And --
22        A.    You would have to ask them.
23        Q.    Did you personally play a role in
24   PwC's annual audit and the conduct of the
25   audit?
```

Page 86

```
 1                    WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  Objection to form.

 3         A.    During my tenure as CFO, I played a

 4    very minimal role.

 5         Q.    What was the minimal role that you

 6    played?

 7         A.    You know, again, it was -- it was to

 8    check in with the team, to make sure that, you

 9    know, audit -- the deadlines were being hit,

10    information was being presented to the auditors

11    in a -- in a timely fashion, but, you know,

12    other than that, it was a very capable team

13    that are still current employees of Highland

14    and, you know, they -- they conducted 99

15    percent of -- look, I don't want to give

16    percentages.  I mean, this is -- but I -- I --

17    I played a minimal role towards the end.

18              Before during my earlier years as

19    CFO, I did more, and then as time went on, I

20    did less in it.

21         Q.    Okay.  Was there a person at

22    Highland who was responsible for overseeing

23    Highland's participation in PwC's audit during

24    the time that you were the CFO?

25         A.    Yeah.  I mean, there was -- there
```

Page 87

```
 1                WATERHOUSE - 10-19-21
 2   was a -- there was a point -- it varies.  It
 3   varies by year, in function, in time and, you
 4   know, depending on the request, but yes, I
 5   mean, there is -- there is -- there is
 6   generally a point person of communication.
 7        Q.   And who was the point person from
 8   2016 until the time you left Highland?
 9        A.   I don't -- I don't know
10   specifically, but it would have been, you
11   know -- you know, someone on the corporate
12   accounting team.
13        Q.   And was there a head of the
14   corporate accounting team?
15        A.   Yes, so -- yes.
16        Q.   Who was the head of corporate
17   accounting for the five years prior to the time
18   you left Highland?
19        A.   I don't -- if you're asking from
20   2016 on, I don't -- it was Dave Klos, but,
21   again, there was -- there was changes to the
22   team and the reporting structure.  I don't
23   remember exactly when that happened during --
24   you know, over the last -- since 2016.
25        Q.   Did the folks who participated and
```

Page 88

```
 1                      WATERHOUSE - 10-19-21
 2    ran the audit all report to you, directly or
 3    indirectly?
 4         A.    Yes.
 5         Q.    And did you have any responsibility
 6    for making sure that the audit report was
 7    accurate before it was finalized?
 8         A.    Yeah.  I mean, you know, that --
 9    that is -- my responsibility to the auditors
10    was -- again, is -- and the CFO is to -- we are
11    providing accurate financial statements; right?
12              And -- and -- and as part of any
13    audit, we disclose all relevant information as
14    part of any audit.
15         Q.    Okay.  And as the CFO, did you take
16    steps to make sure that the audit report was
17    accurate?
18         A.    I mean, I would say in a general
19    sense, yes.  But, again, I mean, I had a
20    very -- I had a very capable and competent
21    team.  I wasn't managing them.
22              You know, part of what I do is I let
23    the team -- I want managers to grow.  I want
24    managers to have rope.  And that is -- you
25    know, I'm not a stand-behind-you type of guy.
```

Page 89

1              WATERHOUSE - 10-19-21

2    If you -- if you talk to my team members, I'm

3    not micromanaging people.  I want people to

4    learn and grow in their function so they can go

5    on and do bigger and better things with their

6    careers.

7              And so, yes, generally I was

8    responsible for it, but I wanted the team to

9    learn and grow and be responsible for the bulk

10   of the audit.

11        Q.    Did you personally review each audit

12   report before it was finalized to satisfy

13   yourself that it was accurate?

14        A.    I don't -- I don't recall, you know,

15   for every single -- we're talking 2016, there

16   would have been three years, 2016 to '17, '18.

17   I don't -- we're -- we're going back

18   five years-plus.  I don't -- you know, I don't

19   recall.

20        Q.    Did you have a practice that you

21   employed to make sure that you were satisfied

22   that Highland's audit reports were true and

23   accurate to the best of your knowledge?

24        A.    I mean, our -- the practice was set

25   up with our -- the -- the practice to put

Page 90

1          WATERHOUSE - 10-19-21

2    together accurate audited or accurate financial

3    statements is to your control environment.

4              So, you know, the -- so the practice

5    was to maintain a stable control environment

6    which then the output is -- is accurate

7    financial statements.

8              So -- so, you know, if I was

9    comfortable that the control environment was

10   operating, then, you know, that would dictate

11   how I would -- you know, what I might or might

12   not do in a given year.

13        Q.   Okay.  Do you recall ever being

14   uncomfortable with the control environment

15   during the period that you served as CFO?

16        A.   Yeah.  I mean, look, yes, there are

17   times -- you know, nothing is perfect.  So

18   there were -- there were times when, yes, you

19   know -- there are times I learned I was

20   uncomfortable with the control environment, and

21   that is part of the management of the process

22   and having, you know -- and -- and working

23   through whatever obstacles present themselves.

24        Q.   Okay.  Were you ever uncomfortable

25   with the control process as it related to

Page 91

```
 1                WATERHOUSE - 10-19-21

 2    reporting and disclosures of loans to

 3    affiliates and Mr. Dondero?

 4              MS. DANDENEAU:  Objection to form.

 5       A.    I don't -- I don't recall --

 6       Q.    So you don't recall --

 7       A.    -- the --

 8              MS. DANDENEAU:  Mr. Morris --

 9       A.    I don't recall being uncomfortable.

10    But, again, we're going back several years.  I

11    don't -- you know, the practice in an audit is

12    to disclose all information to the auditors.

13    And I don't -- I don't recall.

14       Q.    As part of the process of the audit,

15    did you sign what is sometimes referred to as a

16    management representation letter?

17       A.    Yes.

18              MR. MORRIS:  Can we put up on the

19         screen a document that we have premarked as

20         Exhibit 33.

21              (Exhibit 33 marked.)

22              MS. DANDENEAU:  Mr. Morris, that is

23         not in the binder; correct?

24              MR. MORRIS:  Correct.

25       Q.    So you will see, Mr. Waterhouse,
```

Page 92

```
 1              WATERHOUSE - 10-19-21

 2    this is a letter dated June 3rd.  And if we

 3    could go to the signature page.

 4              And do you see that you and

 5    Mr. Dondero signed this document?

 6        A.    Yes.

 7        Q.    That is your signature; right?

 8        A.    Yes.

 9              MR. MORRIS:  Okay.  Can you go back

10         to the top.

11              MS. DANDENEAU:  Mr. Morris, can you

12         have somebody post this in the chat so that

13         we have can have a copy of this, please.

14              MR. MORRIS:  Yeah, sure.  Asia, can

15         you do that, please.

16        Q.    Okay.  Do you see at the bottom of

17    the second paragraph there is a reference to

18    materiality?

19        A.    Yes.

20        Q.    Okay.  It says, Materiality used for

21    purposes of these representations is

22    $1.7 million.

23              Do you see that?

24        A.    I do.

25        Q.    And did PwC set that level of
```

Page 93

```
 1                WATERHOUSE - 10-19-21

 2   materiality?

 3        A.    Yes.

 4        Q.    And for purposes of the audit, did

 5   PwC set the level of materiality each year?

 6        A.    Yes.

 7        Q.    Did that number change over time?

 8        A.    I'm not aware of what materiality is

 9   every single year, so -- but, you know, this

10   number would likely fluctuate.

11        Q.    Okay.  I'm going to go back to a

12   question I asked you earlier today.  And that

13   is in connection -- this letter is issued in

14   connection with the audit for the period ending

15   12/31/2018; correct?

16        A.    Yes.

17        Q.    Okay.  And is it fair to say that if

18   any -- actually, withdrawn.  I'm going to take

19   it outside of this.

20              If Highland ever forgave the loan to

21   any affiliate or any of its officers or

22   employees, in whole or in part, to the best of

23   your knowledge, would that forgiveness have

24   been disclosed in the audited financial

25   statements if it exceeded the level of
```

Page 94

1              WATERHOUSE - 10-19-21

2  materiality that PwC established?

3              MS. DANDENEAU:  Objection to form.

4      A.    So, again, during my tenure as CFO,

5  and -- Highland -- it was -- it is required to

6  disclose any affiliate loans that are in excess

7  of materiality.

8              Now, the forgiveness of those loans

9  may or may not -- I mean, since materiality

10 fluctuates every year, a -- you know, if a loan

11 was forgiven, it may or may not, you know --

12 and, look, I would want to consult the guidance

13 around this.

14             It is not something we do -- you

15 know, it is not -- you know, GAAP can be and

16 disclosures can be very specialized so, again,

17 we want to consult the guidance.  But we would

18 see if and what would need to be disclosed if

19 it were deemed immaterial.

20     Q.    Did you and Mr. Dondero sign

21 management representation letters of this type

22 in each year in which you served as Highland's

23 CFO?

24     A.    I -- I -- I will speak for myself.

25 I signed them.  There may have been others that

```
 1              WATERHOUSE - 10-19-21

 2   signed as well.  I don't -- I don't recall.

 3       Q.    But to the best of your knowledge,

 4   you, personally, signed a management

 5   representation letter in connection with

 6   Highland's audit each year that you served as

 7   the CFO; correct?

 8       A.    I would say generally speaking,

 9   Mr. Morris.  I don't recall for every single

10   year, you know, generally, but I would want to

11   refer to all the rep letters and see who signed

12   them.

13       Q.    Do you recall Highland having its

14   financial statements audited in any year during

15   the period that you were a CFO where you didn't

16   sign the management representation letter?

17       A.    I don't recall.  But, John, we're

18   going back five, six, seven, eight, nine,

19   decade.  I don't -- I don't remember.

20       Q.    I don't want to go back that many

21   decades, but I'm just asking you if you recall

22   that there was you didn't sign it?

23       A.    I -- I -- I don't, but my memory

24   is -- again, I -- I -- I can't tell you what I

25   did in 2012.  I mean, I think generally, yes,
```

Page 96

```
 1                  WATERHOUSE - 10-19-21
 2   but I don't -- I don't know for sure, and I
 3   would want to rely on the document.
 4        Q.    Let me ask the question a little bit
 5   differently then.
 6             Do you have any reason to believe
 7   that Highland had its annual financial audit
 8   and you did not sign a management
 9   representation letter in connection with that
10   audit?
11             MS. DANDENEAU:  Objection to form.
12        A.    I don't believe it would, but,
13   again, I would want to -- I don't recall and I
14   would want to confirm it to -- to make, you
15   know, an affirmative -- to give an affirmative
16   answer.
17        Q.    Do you know whether PwC required
18   management to sign management representation
19   letters?
20             MS. DANDENEAU:  Objection to form.
21        A.    Yes.  I mean, it -- management
22   representation letters are signed by
23   management.
24        Q.    Okay.  And do you know -- do you
25   have any understanding as to why PwC requires
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 97 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 235 of 899 PageID 847

Page 97

```
1                    WATERHOUSE - 10-19-21

2    management to sign management representation

3    letters?

4             MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    I don't know why PwC's -- what PwC's

7    specific practice is.  I know generally what

8    management representation letters are.

9        Q.    Okay.  Do you personally -- I'm not

10   asking about PwC.  I'm asking for you -- I'm

11   asking about you, do you have an understanding

12   as to why the auditor asks for management

13   representation letters?

14       A.    Okay.  So you're asking me in my

15   personal capacity, yes, I have a general

16   understanding of why.

17       Q.    Can you give me the general

18   understanding that you have as to why

19   management representation letters are required?

20       A.    They are -- they are required to --

21   they are -- they are one of the items required

22   in an audit to help verify completeness.

23       Q.    Do you have any -- any other

24   understanding as to why management

25   representation letters are required?
```

1           WATERHOUSE - 10-19-21

2      A.    That is -- that is -- other than

3  what I said, it is -- it is -- it is required

4  so -- to ensure that the -- you know, there

5  is -- there is completeness in what is being

6  audited.

7      Q.    Did you -- did you have a practice

8  whereby you and Mr. Dondero conferred about the

9  management representation letters before you

10  signed them?

11      A.    No.

12      Q.    Did you have a practice --

13  withdrawn.

14          Do you see just the next sentence

15  after the materiality, there is a sentence that

16  states:  We confirm, to the best of our

17  knowledge and belief, as of June 3rd, 2019, the

18  date of your report, the following

19  representations made to you during your audit.

20          Do you see that sentence?

21      A.    Yes.

22      Q.    Okay.  Did you understand when you

23  signed this letter that you were confirming the

24  representations that followed?

25      A.    When I signed this management

Page 99

1                    WATERHOUSE - 10-19-21

2      letter -- representation letter, yes.

3           Q.    Okay.  Did you discuss this letter

4      with Mr. Dondero before you signed it?

5           A.    I don't recall.

6           Q.    Do you recall if Mr. Dondero asked

7      you any questions before he signed the letter?

8           A.    I don't recall.

9           Q.    Do you recall if you asked

10     Mr. Dondero any questions before you signed

11     this letter?

12          A.    I don't recall.

13          Q.    Is it fair to say that Mr. Dondero

14     did not disclose to you the existence of the

15     agreement that we have -- as we've defined that

16     term prior to the time you signed this letter?

17               MS. DANDENEAU:  Objection to form.

18          A.    I don't think I understand the

19     question.  So, again, you are saying, did

20     Mr. Dondero not disclose to me the existence of

21     this letter?

22          Q.    No, I apologize.

23               Did Mr. Dondero disclose to you the

24     existence of the agreement prior to the time

25     you signed this letter on June 3rd, 2019?

```
 1                 WATERHOUSE - 10-19-21

 2        A.    The agreement -- the agreement that

 3   we talked about earlier?

 4        Q.    Correct.

 5        A.    Look, as I said earlier, the first

 6   time I heard of this agreement was sometime

 7   this year.

 8        Q.    Okay.  Can we turn -- let's just

 9   look at a couple of items on the list.  If we

10   can go to page 33416.  Do you see in Number 35

11   it talks about the proper recording or

12   disclosure in the financial statements of ND

13   relationships and transactions with related

14   parties.

15             Do you see that?

16        A.    I do.

17        Q.    As the CFO, do you have any

18   understanding as to whether Dugaboy is a

19   related party?

20        A.    I don't recall.

21        Q.    Do you know whether any of the

22   affiliates are related parties?

23        A.    If -- if it was NexPoint, HCMFA,

24   HCMS, HCRE, yeah, if -- if that is the

25   affiliate definition, and there.  In ASC 850 --
```

Page 101

```
 1                    WATERHOUSE - 10-19-21

 2   again, I mean, I haven't looked at ASC 850 in

 3   quite some time, but, you know, if -- if there

 4   is a control language, you know, ASC 850, would

 5   that -- that section in GAAP would -- would

 6   pick up and define what are related parties.

 7              So, you know, like I said, if -- one

 8   of the four entities I just described, if -- if

 9   they are in that control definition of ASC 850,

10   they would be picked up in 35D.

11       Q.    Do you -- do you have any reason to

12   believe that they would be picked up in that

13   definition, based on your knowledge and

14   experience?

15       A.    I -- I believe that entities

16   controlled under GAAP are -- are affiliates.

17       Q.    Okay.  Would Mr. Dondero also

18   qualify as a related party for purposes of

19   Section 35D, to the best of your knowledge?

20       A.    Yeah, I don't -- I don't know.  I

21   would think -- I would have to read the code

22   section to see if someone personally -- is it

23   talking about related parties.  So, look, if

24   your own in control, yeah, I mean, I would have

25   to read the section.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 102 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 240 of 899 PageID 852

Page 102

```
 1                WATERHOUSE - 10-19-21

 2        Q.    To the best of your knowledge, was

 3    the existence of the agreement ever disclosed

 4    to PwC?

 5        A.    I'm not -- I'm not aware.

 6        Q.    Do you recall if the agreement was

 7    ever disclosed in Highland's audited financial

 8    statements?

 9        A.    I don't -- I don't remember if it

10    was in every Highland's audited financial

11    statements during my tenure.  We would have to

12    read the financial statements to see what was

13    disclosed, but I'm not -- I mean, as I sit here

14    today, I'm not aware.

15        Q.    That is all I'm asking for.

16        A.    I'm not aware.

17        Q.    Can we go to the next page, please,

18    and look at 36.  36 says, we have disclosed to

19    you the identity of the partnership's related

20    party relationships and all the related party

21    relationships and transactions of which we are

22    aware.

23              Do you see that?

24        A.    Yes.

25        Q.    To the best of your knowledge, as of
```

Page 103

1                 WATERHOUSE - 10-19-21

2    June 3rd, 2019, did Highland disclose to PwC

3    the identity of the partnership's related

4    parties and all the related party relationships

5    and transactions of which it was aware?

6         A.    I mean, I can speak for myself as

7    signer of this representation letter.  I

8    disclosed what -- what, you know, what --

9    what -- what I knew.  Sorry, look, yes, so I --

10   I disclosed what I knew.

11        Q.    Okay.  Can we go to page 419.  Do

12   you see at the end there is a reference to

13   events that occurred since the end of the

14   fiscal year and the date of the letter?

15        A.    Yes.

16        Q.    And were you aware of that -- of

17   that provision of the management representation

18   letter before you signed the document?

19        A.    Yes.

20        Q.    Do you have an understanding as to

21   why PwC asked for that confirmation of that

22   particular part of the management

23   representation letter?

24        A.    It is -- it is -- it is just -- it

25   is a typical audit request.

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 104 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 242 of 899 PageID 854

Page 104

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    And do you understand -- do you have

 3   an understanding that PwC wanted to know that

 4   as of the date of the audit whether any

 5   material changes had occurred since the end of

 6   the fiscal year, using the definition of

 7   materiality that is in this particular

 8   management representation letter?

 9        A.    It -- it is -- it is -- it is a --

10   it is as described.  It is just a poorly worded

11   question, so it is hard for me to say yes.

12        Q.    If I asked you this, I apologize,

13   but did you ever learn when the agreement was

14   entered into?

15        A.    I don't -- I don't -- like I said

16   before, I don't know or have any details of the

17   agreement.

18        Q.    Okay.  Did you ever ask anybody when

19   the agreement was entered into?

20        A.    I did not.

21        Q.    Let's look at the audited financial

22   statements.  We will put up on the screen a

23   document that has been premarked as Exhibit 34.

24              (Exhibit 34 marked.)

25              MS. DANDENEAU:  And again, if Ms. La
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 105 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 243 of 899 PageID 855

Page 105

```
 1                    WATERHOUSE - 10-19-21

 2          Canty could please put that in the chat

 3          room, that would be great.

 4                    MR. MORRIS:  I will assure you we

 5          will put every document in the chat room.

 6          Q.    Now, I'm just going to ask you

 7    questions that are related to the provisions of

 8    this report that concern the affiliate loans,

 9    but again, Mr. Waterhouse, if there is any part

10    of the document that you need to see or that

11    you think you might need to see in order to

12    refresh your recollection to answer any of my

13    questions, will you let me know that?

14          A.    Yes.

15          Q.    Because this is a pretty lengthy

16    document, but do you see that the cover page

17    here is the Highland consolidated financial

18    statements for the period ending December 31st,

19    2018?

20          A.    Yes.

21          Q.    If we can go to -- I think it is the

22    next one, looking for PwC's signature line.

23                    MS. CANTY:  I'm sorry, John, did you

24    say something?

25                    MR. MORRIS:  Yes, can we turn the
```

Page 106

```
 1              WATERHOUSE - 10-19-21

 2         page.  I think it is 215.  Yes, stop right

 3         there, just above -- I'm sorry, I want to

 4         see just the date of the report.

 5         Q.    Okay.  Do you see at the bottom of

 6    that page there, Mr. Waterhouse,

 7    PricewaterhouseCoopers has signed this audit

 8    report?

 9         A.    Yes, I see their signature.

10         Q.    Okay.  And it is the dated same day

11    as your management representation letter; is

12    that right?

13         A.    It is -- yes, it is the same day.

14         Q.    Was that the practice to sign the

15    management representation letter on the same

16    day that the audit report was signed?

17         A.    Yes, that is typical in every audit.

18         Q.    Can we just scroll down to the

19    balance sheet on the next page.

20              Do you see that there is a line

21    there that says, Notes and Other Amounts Due

22    from Affiliates?

23         A.    Yes.

24         Q.    Does that line, to the best of your

25    knowledge, include the amounts that were due
```

Page 107

```
1                    WATERHOUSE - 10-19-21
2     under the affiliate under the notes signed by
3     the affiliates and Mr. Dondero?
4              MR. RUKAVINA:  Objection to the
5          extent that calls for a legal conclusion.
6          A.    I mean, I would want to see the
7     detail and the build to this $173,398,000, but,
8     yes, I mean, if -- if -- given what we
9     discussed before, you know, it -- it should
10    capture that.
11         Q.    And -- and while you were the CFO of
12    Highland, were all notes held by Highland that
13    were issued by an affiliate or Mr. Dondero
14    carried as assets on Highland's balance sheets?
15             MS. DANDENEAU:  Objection to form.
16             MS. DEITSCH-PEREZ:  Object to form.
17         A.    I don't -- I don't know how else
18    they would be carried.
19         Q.    Okay.  Can you think of any -- are
20    you aware of any promissory note issued by an
21    affiliate or Mr. Dondero that was not carried
22    on Highland's audited financial balance sheets?
23         A.    I'm -- I'm -- I'm not aware.
24         Q.    Okay.  Are you aware of any category
25    of asset on Highland's balance sheet in which
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 108 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 246 of 899 PageID 858

Page 108

```
 1                    WATERHOUSE - 10-19-21

 2    any of the promissory notes issued by an

 3    affiliate or Mr. Dondero would have been

 4    included?

 5              MS. DANDENEAU:  Objection to form.

 6        A.    Sorry, am I aware of any asset of an

 7    affiliate being included --

 8        Q.    That -- let me -- let me try again.

 9              Do you see there is a number of

10    different assets that are described on this

11    balance sheet?

12        A.    Yes.

13        Q.    One of the assets that is described

14    is Notes and Other Amounts Due from Affiliates;

15    right?

16        A.    Yes.

17        Q.    And it is reasonable to conclude

18    that the notes from the affiliates and

19    Mr. Dondero are included in that line item;

20    right?

21        A.    Yes, based on this description.

22    Again, I would want to see a build of this to

23    100 percent confirm, but based on the

24    description, the asset description, it is -- it

25    is likely.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 109 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 247 of 899 PageID 859

Page 109

1              WATERHOUSE - 10-19-21

2              Now, does that mean absolute?  I

3    don't know.

4         Q.    Do you have any reason to believe

5    that the promissory notes would have been

6    carried on the balance sheet in a category

7    other than Notes and Other Amounts Due from

8    Affiliates?

9         A.    If they were deemed -- no.  If they

10   were deemed an affiliate, you know, under GAAP,

11   they should be carried in that line.

12   Otherwise, it would go into another line.

13        Q.    Okay.  And do you see the total

14   asset base as of December 31st, 2018, was

15   approximately $1.04 billion?

16        A.    Yes.

17        Q.    Is my math correct that the Notes

18   and Other Amounts Due from Affiliates

19   constituted approximately 17 percent of

20   Highland's assets as of the end of 2018?

21        A.    Well, so how are you defining

22   Highland?

23        Q.    Highland Capital Management, L.P.,

24   the entity that this audit is subject to -- or

25   the subject of.

Page 110

```
 1                   WATERHOUSE - 10-19-21

 2          A.    On a consolidated or unconsolidated

 3    basis?

 4          Q.    I'm looking at the balance sheet.

 5    It is a consolidated balance sheet.  Okay?

 6                Does the Notes and Other Amounts Due

 7    from Affiliates constitute approximately

 8    17 percent of the total assets of Highland

 9    Capital Management, L.P., on a consolidated

10    basis?

11                MS. DANDENEAU:  Objection to form.

12          A.    I don't have a calculator in front

13    of me but I will take your math, if you are

14    taking the 173 divided by the billion.

15          Q.    Okay.

16          A.    If that is accurate, yes.  But,

17    again, on a consolidated basis.

18          Q.    And on an unconsolidated basis the

19    percentage would be higher; correct?

20          A.    I -- no.  I don't know.

21          Q.    Well, okay.  That is fair.

22                MR. MORRIS:  Can we turn to

23          page 241, please.

24          Q.    Do you see that this is a section of

25    the audit report that is entitled Notes and
```

Page 111

```
 1                    WATERHOUSE - 10-19-21
 2   Other Amounts Due from Affiliates?
 3          A.    Sorry, I can't see the -- the --
 4          Q.    It is at the top.
 5          A.    Notes and Other Amounts Due from
 6   Affiliates, yes, I see that.  I don't -- I
 7   don't have a page number, but I'm on a page
 8   that says at the top:  Notes and Other Amounts
 9   Due from Affiliates.
10          Q.    Okay.  And that is the same title of
11   the line item on the balance sheet that we just
12   looked at; right?  Notes and Other Amounts Due
13   from Affiliates?
14          A.    Yes.
15          Q.    And is it your understanding, based
16   on your experience and knowledge as the CFO,
17   that this is the section of the narrative that
18   ties into the line item that we just looked at?
19          A.    Yes.
20          Q.    And is this section of the audit
21   report intended to describe and disclose all of
22   the material facts concerning the Notes and
23   Other Amounts Due from Affiliates?
24                MS. DANDENEAU:  Objection, form.
25          A.    This -- these notes -- these notes
```

Page 112

1                  WATERHOUSE - 10-19-21

2     of the financial statements are -- the purpose

3     is to disclose any material items in relation

4     to that balance sheet line item.

5          Q.    Okay.  And all of the information,

6     to the best of your knowledge, that is set

7     forth in this section of the audit report was

8     provided by Highland; correct?

9          A.    Yes, it would have been provided by

10    the corporate accounting team.

11         Q.    Okay.  And the corporate accounting

12    team, did that team report to you in the

13    organizational structure?

14         A.    Yes.

15         Q.    And did you have any concerns about

16    the controls that were in place to make sure

17    that the information provided with respect to

18    Notes and Other Amounts Due from Affiliates was

19    accurate and complete?

20              MS. DANDENEAU:  Objection to form.

21         A.    Not that I recall.

22         Q.    Okay.  Do you recall ever being

23    concerned that any portion of the Notes and

24    Other Amounts Due from Affiliates in any audit

25    report was inaccurate, incomplete, or not

Case 21-03005-sgj Doc 86-4 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 113 of 397
Case 3:21-cv-00880-X   Document 23   Filed 01/05/22   Page 251 of 899   PageID 863

Page 113

1                    WATERHOUSE - 10-19-21

2    reliable?

3         A.    I didn't -- I had concerns about,

4    you know, like I talked about before, of there

5    were -- there were potentially issues in the

6    control environment.  But as far as it relates

7    to the audited financial statements, any -- the

8    team would work with the auditors to disclose

9    all -- all notes in Highland's possession.

10              And any -- any notes that were

11   deemed material by the auditor, right, these

12   were disclosed in these -- in this section, you

13   know, in -- in the notes to the consolidated

14   financial statements as you presented.

15        Q.    Do you recall ever having a

16   conversation with anybody at any time

17   concerning the accuracy of the section of audit

18   reports that relates to Notes and Other Amounts

19   Due from Affiliates?

20              MS. DANDENEAU:  Objection to form.

21        A.    You know, as -- as -- I didn't have

22   direct conversations with

23   PricewaterhouseCoopers as I had, you know --

24   I -- I had the team that managed this.

25              Again, I wasn't anywhere chose to

Page 114

```
 1                  WATERHOUSE - 10-19-21

 2  being the point person of this audit.  And I

 3  can't recall, you know, when -- you know, I

 4  don't even know if I was ever the point person

 5  during my tenure as CFO.

 6            I don't know if PwC had any concerns

 7  when they were performing those audit

 8  procedures.  They may have and they may have --

 9  and it may not have been communicated to me.  I

10  don't know.

11            MR. MORRIS:  All right.  I move to

12       strike.

13       Q.   And I'm going to ask you to listen

14  carefully to my question.

15            Did you -- do you recall ever having

16  a conversation with anybody at any time

17  concerning the accuracy of the reporting

18  provided in the audited financial statement on

19  the topic of Notes and Other Amounts Due?

20            MS. DANDENEAU:  Objection to form.

21       A.   I don't recall for this, but that

22  doesn't mean that it didn't exist.

23       Q.   Okay.  But you have no reason to

24  believe, as you sit here right now, that you

25  ever discussed with anybody concerns over the
```

```
 1                 WATERHOUSE - 10-19-21

 2    accuracy of the section of the audit reports

 3    called Notes and Other Amounts Due from

 4    Affiliates; correct?

 5              MS. DANDENEAU:  Object to the form.

 6              MS. DEITSCH-PEREZ:  Objection to

 7        form.

 8        A.    I don't recall having any

 9    conversations.  But, again, I mean, this is --

10    this is two years ago.

11        Q.    I'm just asking for your

12    recollection, sir.

13        A.    Yes.

14        Q.    If you don't recall, this will --

15        A.    Yeah.

16        Q.    (Overspeak) -- if you don't

17    recall --

18        A.    Yeah, I don't -- I don't recall.

19        Q.    Do you know who was responsible for

20    drafting the audit report?

21        A.    Are you asking the actual Highland

22    employee responsible?  I mean, it was

23    Highland's responsibility, so, I mean, that

24    is --

25        Q.    Right.
```

```
 1                    WATERHOUSE - 10-19-21

 2        A.    -- Highland's responsibility.

 3   Highland's responsibility.

 4        Q.    Who, at Highland, was responsible

 5   for drafting this section of the audit report?

 6        A.    I -- I don't know the answer to

 7   that.  Again, there was a team who worked on

 8   this.  And I don't know, you know, whether it

 9   was the staff or the manager.

10             Again, this is where I let the teams

11   manage.  And, you know, there may be a

12   corporate accountant who worked on this.  I

13   just -- you know, I wasn't part of that process

14   to give that person experience.  I don't know.

15        Q.    Do you recall having any

16   communications with anybody at any time

17   concerning this section of the report?

18        A.    Yeah, I don't recall.

19        Q.    Do you recall whether you ever told

20   anybody at any time that any aspect of this

21   section of the report was inaccurate or

22   incomplete?

23        A.    I don't recall.

24        Q.    As you sit here today, do you have

25   any reason to believe that this section of the
```

```
 1                  WATERHOUSE - 10-19-21

 2    audit report is incomplete or inaccurate in any

 3    way?

 4              And I'm happy to give you a moment

 5    to -- to look at it, if you would like.

 6              MS. DANDENEAU:  Objection to form.

 7              MS. DEITSCH-PEREZ:  Same.

 8         A.   I mean, I would have to look at -- I

 9    would have to look at the bill to the note

10    schedule to make sure I know you presented me

11    with materiality, but again, there might be a

12    note as of 12/31/18 that somehow was -- was

13    under materiality not disclosed.  I don't -- I

14    don't know.  I would need more information.

15         Q.   Okay.  But without more information,

16    you have no reason to believe anything this

17    section is inaccurate; correct?

18              MS. DANDENEAU:  Objection to form.

19         A.   I don't.  I mean, you know, this was

20    part of the audit.

21         Q.   Thank you.  Now, you will see if we

22    could scroll just a little bit more that each

23    of the first five paragraphs concerns

24    specifically the four affiliates that we've

25    been discussing and Mr. Dondero.
```

Page 118

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  If we could go the

 3        other way, La Asia.  We don't need Okada.

 4        We're going to have to thread the needle.

 5        Okay.  Good, perfect.

 6        Q.    Do you see those five paragraphs

 7   certain the four affiliates and Mr. Dondero as

 8   we've been referring to today?

 9        A.    Yes.

10        Q.    Okay.  And do you see at the end of

11   every paragraph it states, quote:  A fair value

12   of a partnership's outstanding notes receivable

13   approximates the carrying value of the notes

14   receivable?

15        A.    Yes, I see that.

16        Q.    Do you have an understanding of what

17   that means?

18        A.    Yes.

19        Q.    What is your understanding of that

20   sentence?

21        A.    It is the -- again, the -- the fair

22   value, right, which is -- which is what the --

23   what Highland could sell that asset for.  This

24   statement is comparing the fair value of the

25   notes to the carrying value, so the carrying
```

Page 119

```
 1                  WATERHOUSE - 10-19-21
 2    value is the line item that you showed me
 3    earlier that is in Notes and Other Amounts Due
 4    from Affiliates.
 5        Q.    Okay.  Is another way to say this is
 6    that the fair market value of the notes equals
 7    the principal amount and -- withdrawn.
 8              Is the fair way to interpret this
 9    that the fair market value of the notes equals
10    all remaining unpaid principal and interest due
11    under the notes?
12              MS. DANDENEAU:  Object to the form.
13              MS. DEITSCH-PEREZ:  Objection, form.
14        A.    I don't know the answer to that,
15    because I don't recall where -- where any --
16    where -- in what line item was the interest
17    component reported.
18        Q.    All right.  Well, if we look in this
19    audit report, you will see in the middle of the
20    first paragraph, for example, it states that as
21    of December 31st, 2018, total interest and
22    principal due on outstanding promissory notes
23    was approximately $5.3 million.
24              Do you see that?
25        A.    I do.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 120 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 258 of 899 PageID 870

Page 120

1              WATERHOUSE - 10-19-21

2        Q.    Is that the carrying value or the

3   fair value?

4        A.    That would be the carrying value --

5        Q.    And is the last --

6        A.    -- in my opinion.

7        Q.    Okay.  And it is in your opinion as

8   the chief financial officer of Highland during

9   the period of time that you described; right?

10  It is an educated opinion?

11       A.    I'm reading this at face value.  I'm

12  taking that as that is carrying value.

13       Q.    Okay.  And does the last sentence

14  say that the carrying value is roughly

15  approximate to the fair market value?

16              MS. DANDENEAU:  Objection to form.

17              MS. DEITSCH-PEREZ:  Objection, form.

18       A.    Again, this note to the financial

19  statement is specific to notes and other

20  amounts due from affiliates.

21       Q.    Correct.

22       A.    If the interest component is

23  reported elsewhere on the balance sheet, you

24  know, it -- it -- it could be off.  Again, I

25  don't have the detail.  I don't know, but yes,

Page 121

```
 1                  WATERHOUSE - 10-19-21

 2     look, I mean, if you -- I mean, if you are

 3     saying the 5.3 million is in the notes and

 4     other amounts due from affiliates, then the

 5     last statement is saying the fair value

 6     approximates 5.3 million.  That is what that

 7     last sentence is saying.

 8          Q.   Do you see in the middle of the

 9     first paragraph -- not in the middle, the next

10     to last sentence there is a statement that the

11     partnership will not demand payment on amounts

12     that exceed HCMFA's excess cash availability

13     prior to May 31st, 2021.

14               Do you see that?

15          A.   I do.

16          Q.   Do you know when Highland agreed not

17     to demand payment as described in that

18     sentence?

19          A.   I don't know specifically.

20          Q.   Do you know why Highland agreed not

21     to demand payment on HCMFA's notes until May

22     2021?

23          A.   Yes.

24          Q.   Why was that decision made?

25          A.   You know, well, it -- it -- that
```

Page 122

```
 1              WATERHOUSE - 10-19-21
 2    decision was made as to not put HCMFA into a
 3    position where it didn't have sufficient assets
 4    to pay for the demand note.
 5         Q.    And at the time the agreement was
 6    entered into, pursuant to which the partnership
 7    wouldn't demand payment, did HCMFA have
 8    insufficient assets to satisfy the notes if a
 9    demand had been made?
10              MS. DANDENEAU:  Objection to form.
11         A.    I don't have HCMFA's financial
12    statements in front of me as of 12/31/18.
13         Q.    Was there a concern that HCMFA would
14    be unable to satisfy its demands under the
15    notes if demand was made?
16              MS. DANDENEAU:  Objection to form.
17         A.    Well, there is -- I don't recall --
18    I mean, there is something, right, in place to
19    basically not demand payment until May 31, 2021
20    as detailed here.
21         Q.    And who made the decision to enter
22    into -- who made the decision on behalf of
23    Highland not to demand payment until May 31st,
24    2021?
25         A.    I'm trying to remember.  I don't
```

1           WATERHOUSE - 10-19-21

2    remember exactly -- I don't remember if it was

3    myself or -- or Jim Dondero who -- who -- there

4    was -- there was something signed, from what I

5    recall, that -- that -- that backed up this

6    line item in the -- in the notes I'm -- look,

7    I'm, I'm --

8         Q.    We will get to that.

9         A.    You --

10        Q.    I'm just --

11        A.    You have -- I mean --

12        Q.    We're going to give that to you.

13   I'm going to give that to you.

14        A.    You -- you -- you have all the

15   documents.  I don't have the documents, and

16   that is what makes it so hard.  I don't have

17   any documents to prepare for this deposition;

18   right?  You have all -- I don't -- I don't -- I

19   don't remember, but, you know, again, it would

20   probably be myself or Jim.

21        Q.    Do you know if Highland received

22   anything in return for its agreement not to

23   make a demand for two years?

24        A.    I don't -- I don't think it referred

25   anything.

Page 124

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    And did you and Mr. Dondero discuss

 3    HCMFA's ability to satisfy the notes if a

 4    demand was made at the time this agreement was

 5    entered into?

 6              MS. DANDENEAU:  Objection to form.

 7        A.    I don't -- I don't -- I don't recall

 8    having a specific conversation, if I did, or --

 9    or David Klos.

10        Q.    Okay.  I'm just asking if you recall

11    any conversations that you had.

12        A.    I don't recall.

13        Q.    Okay.  Do you know why Highland

14    loaned the money to HCMFA that is the subject

15    of the notes described in this paragraph?

16        A.    I don't remember specifically why

17    5.3 million was loaned.  I mean, I -- it would

18    have to be put in the context.

19        Q.    Do you have any recollection at all

20    as to why Highland ever loaned any money to

21    HCMFA?

22        A.    Yes.

23              MS. DANDENEAU:  Objection to form.

24        Q.    What do you remember about that?

25        A.    There was a Highland Global
```

Page 125

```
 1              WATERHOUSE - 10-19-21

 2    Allocation Fund, which was a -- a fund managed

 3    by Highland Capital Management Fund Advisors.

 4    There was a -- we -- I'm just telling you,

 5    there was -- there was -- there was a -- a

 6    ultimately a NAV error found in this fund while

 7    it was an open-ended fund and, you know, there

 8    were amounts owed by the advisor in -- in

 9    relation to that NAV error.

10              There were also, for the same fund,

11    that same fund was ongoing an

12    open-end-to-close-end conversion, and as part

13    of that proposal, shareholders who voted for

14    the conversion received compensation from the

15    advisor.

16         Q.    All right.  Now, the events that

17    you're describing occurred in the spring of

18    2019; right?

19         A.    These started back -- I think, I

20    mean --

21         Q.    I apologize.

22         A.    -- that -- I mean, the answer to

23    that is no.

24         Q.    I apologize, the loans that were

25    made in connection with the events that you're
```

Page 126

1          WATERHOUSE - 10-19-21

2    describing occurred in May 2019; right?

3              MR. RUKAVINA:  Objection to the

4         extent that calls for a legal conclusion.

5         A.    I don't recall specifically what

6    amounts of money were moved when, for what

7    purpose.

8         Q.    Okay.  Fair enough.  Going to the

9    next paragraph, do you recall that NexPoint

10   Advisors had obtained a number of loans from

11   Highland, and they rolled up those loans into

12   one note in approximately 2017?

13        A.    This is for NexPoint Advisors?

14        Q.    Yes.

15        A.    I -- I mean, I don't -- I don't

16   recall the NexPoint Advisors loan being a

17   roll-up loan, but --

18        Q.    Do you know why?

19        A.    But, look, if you have documents

20   that show -- I mean, look, I just don't recall.

21        Q.    Okay.  That is fair.  Do you know

22   why -- do you have any recollection as to why

23   Highland loaned money to NexPoint?

24        A.    Yes.

25        Q.    Why did High -- why do you recall --

Page 127

```
 1              WATERHOUSE - 10-19-21
 2    what is the reason you recall Highland lending
 3    money to NexPoint?
 4         A.    I mean, I was just -- I just -- I
 5    just recall.  I mean, I just -- I don't
 6    remember why.
 7         Q.    I understand.  And I'm asking you if
 8    you recall --
 9         A.    Oh, why -- I thought you say --
10    NexPoint Advisors was launching a fund which
11    is -- I believe that the legal name is NexPoint
12    Capital, Inc.  And it -- it provided a
13    co-invest into that fund.
14              And, from what I remember, the --
15    the -- that NexPoint borrowed money from
16    Highland at the time to make that co-invest.
17         Q.    So this was an investment that
18    NexPoint was required to make; is that right?
19              MS. DANDENEAU:  Objection to form.
20         A.    I don't know if it was required to
21    make, I don't recall that, or if it just made
22    it.
23         Q.    Okay.  But your recollection is that
24    NexPoint made an investment and they borrowed
25    money from Highland to finance the investment.
```

```
 1                WATERHOUSE - 10-19-21

 2           Do I have that right?

 3      A.   Yes.

 4      Q.   How about HCRE?  Do you know why

 5 HCRE borrowed money from Highland?

 6      A.   I don't remember specifically.

 7      Q.   Do you remember generally?

 8      A.   Generally, yeah -- I mean, yes.

 9      Q.   Can you tell me your general

10 recollection as to why Highland loaned money to

11 HCRE?

12      A.   For -- for -- for investment

13 purposes.

14      Q.   So HCRE made the investment and it

15 obtained a loan, or loans, from Highland in

16 order to finance that investment or those

17 investments.

18           Do I have that right?

19      A.   I mean, I -- you know, generally.

20      Q.   Okay.  How about Highland Management

21 Services, Inc.?

22           Do you have any recollection as to

23 why HCMS borrowed money from Highland?

24      A.   Generally.

25      Q.   What is your general recollection as
```

Page 129

```
 1              WATERHOUSE - 10-19-21

 2   to why HCMS borrowed money from Highland?

 3        A.    For -- for investment purposes.

 4        Q.    So it is the same thing, HCMS wanted

 5   to make investments and it borrowed money from

 6   Highland in order to finance those investments;

 7   is that right?

 8        A.    I mean, yes, generally.  I mean, I

 9   can't -- I don't -- on the services, there --

10   there are several loans in these schedules.

11   You know, I can't remember why every single one

12   of these were made, but I would say, yeah, I

13   mean, generally.

14        Q.    Okay.  I appreciate that.

15             MR. MORRIS:  Let's go to the page

16        with Bates No. 251.  La Asia, are you

17        there?

18             MS. CANTY:  Sorry, John.  It went

19        out for a minute.  Can you say that again.

20        I don't know what is going on.

21             MR. MORRIS:  The page with Bates

22        No. 251, can we go to that.

23             MS. CANTY:  Yes, sorry.

24             MR. MORRIS:  Keep going to the

25        bottom.  Yeah, there you go.
```

Page 130

```
 1                  WATERHOUSE - 10-19-21

 2         Q.    Do you see, Mr. Waterhouse, that

 3    there is a section there called Subsequent

 4    Events?

 5         A.    I do.

 6         Q.    And does this relate to the last

 7    sentence above the signature line on the

 8    management representation letter that we talked

 9    about earlier where you made the representation

10    that you disclosed subsequent events?

11         A.    I mean, it relates to it, but not in

12    its entirety.

13         Q.    Okay.

14              MR. MORRIS:  If we can scroll up to

15         capture the entirety of this section right

16         here.

17         Q.    And what do you mean by that, sir?

18              MR. MORRIS:  Yeah, right there.

19         Perfect.

20         A.    There are -- there are different

21    subsequent events in -- under GAAP.  So there

22    are -- and -- and -- so what we see in the

23    notes to the financial statements are one type

24    of subevent.

25         Q.    Okay.  And -- and would the type of
```

1                    WATERHOUSE - 10-19-21

2      subsequent event relating to affiliate loans be

3      captured in this section if they were -- if

4      they were made after the end of the fiscal year

5      and prior to the issuance of the audit report?

6           A.    Yes, if they were deemed material or

7      disclosable.

8           Q.    Okay.  I appreciate that.

9                 Do you see the next to the last

10     entry there?  It says, Over the course of 2019

11     through the report date, HCMFA issued

12     promissory notes to the partnership in the

13     aggregate amount of $7.4 million?

14          A.    Yes.

15          Q.    And does that refresh your

16     recollection that those are the notes that

17     related to the NAV error that you mentioned

18     earlier?

19          A.    I don't -- I don't remember the

20     exact.  Again, there are -- I mentioned two

21     line items; right?

22          Q.    Yes.

23          A.    I mean, it was the GAAP conversion

24     process plus the -- the NAV error.  I don't

25     have the details.  I don't recall specifically

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 132 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 270 of 899 PageID 882

Page 132

```
 1                    WATERHOUSE - 10-19-21

 2    if -- you know, what -- if that 7.4 million was

 3    solely attributable to the NAV error.

 4         Q.    Okay.  But there is no question that

 5    Highland told PricewaterhouseCoopers that over

 6    the course of 2019 HCMFA issued promissory

 7    notes to the partnership in the aggregate

 8    amount of $7.4 million; correct?

 9         A.    In the course of the audit, we would

10    have produced all promissory notes in our

11    possession, including the ones that are

12    detailed here.

13         Q.    Do you recall that you signed the

14    two promissory notes that are referenced in

15    that provision?

16              MS. DANDENEAU:  Objection to form.

17         A.    I didn't recall initially but I've

18    been reminded.

19         Q.    Okay.  And -- and do you recall that

20    those notes are dated May 2nd and May 3rd,

21    2019?

22         A.    Yes.

23         Q.    So that was just a month before the

24    audit was completed; correct?

25         A.    Yes.  I think we had a June 3rd
```

```
 1                 WATERHOUSE - 10-19-21

 2    date, right, if -- if my memory serves me

 3    right.

 4         Q.    Yes, I will represent to you that

 5    your memory is accurate in that regard.

 6               Did anybody ever instruct you as the

 7    CFO to correct this statement that we're

 8    looking at in subsequent events?

 9         A.    So let me understand.  You're saying

10    when I was CFO at Highland Capital did anyone

11    ever ask me to correct the -- over the course

12    of 2019 through the report date HCMFA issued

13    promissory notes, this statement?

14         Q.    Right.

15         A.    Not that I'm aware.

16         Q.    While you were the CFO of Highland,

17    did anybody ever tell you that that sentence

18    was wrong?

19         A.    Not that I'm aware.

20         Q.    Highland -- withdrawn.

21               HCMFA disclosed these notes in its

22    own audited financial statements; right?

23               MR. RUKAVINA:  Objection, form.

24         A.    I assume that these would be

25    material -- if these are material financial
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 134 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 272 of 899 PageID 884

Page 134

```
1              WATERHOUSE - 10-19-21

2    statements, yes, they -- they -- they should be

3    and they were likely disclosed.

4        Q.    Now, there is no statement

5    concerning the 2019 notes about the forbearance

6    that we looked at in the affiliated note

7    section of the report; right?

8            MS. DANDENEAU:  Objection to form.

9        Q.    I'll withdraw.  That was bad.

10           Do you recall when we were looking

11   at the paragraph concerning HCMFA earlier it

12   had that disclosure about the agreement whereby

13   Highland wouldn't ask for demand on the -- on

14   the HCMFA notes?

15       A.    Yes.

16       Q.    That forbearance disclosure is not

17   made with respect to the 2019 notes; right?

18       A.    Not -- look, not that I can recall,

19   unless -- unless it was done at a subsequent

20   day.

21       Q.    Right.  And it is not in the

22   subsequent event section that we're looking at

23   right now where the 2019 notes are described;

24   right?

25       A.    Right.  But this is through
```

```
 1                WATERHOUSE - 10-19-21

 2    June 3rd.  It could have been done on June 4th.

 3    I don't -- I don't -- I don't recall.

 4         Q.    Okay.

 5               MR. MORRIS:  Can we put up on the

 6         screen the HCMFA audit report.  And while

 7         we're --

 8               MS. DANDENEAU:  What exhibit is

 9         this?

10               MR. MORRIS:  La Asia, what number is

11         that?

12               MS. CANTY:  45.

13               MR. MORRIS:  So this will be marked

14         as Exhibit 45.

15               (Exhibit 45 marked.)

16               MS. CANTY:  Yeah, and I will put it

17         in the chat.

18               MS. DANDENEAU:  Thank you.

19         Q.    Okay.  All right.  Do you see that

20    this is the consolidated financial statements

21    for HCMFA for the period ending 12/31/18?

22         A.    Yes.

23         Q.    As the treasurer of HCMFA at the

24    time, did you have to sign a management

25    representation letter similar to the one that
```

Page 136

```
 1                    WATERHOUSE - 10-19-21

 2   we looked at earlier for Highland?

 3        A.    I would imagine I would have been

 4   asked to.  I don't recall if I did.

 5        Q.    Do you recall ever being asked by an

 6   auditor to sign a management representation

 7   letter and then not doing it?

 8        A.    No.

 9             MR. MORRIS:  Can we just scroll down

10        again.  I just want to see the date of the

11        document.

12        A.    I mean, let me -- you know, there

13   are different versions to management

14   representation letters I will qualify.

15             Yes, there are certain -- from time

16   to time auditors can make representations

17   that -- in the rep letter that is being

18   proposed that are inaccurate or out of scope or

19   things like that and they've asked for

20   signature.

21             In that context, yes.  I mean, you

22   know -- I mean, if I have been asked to sign

23   and make those representations and those

24   representations are invalid, yes, I would not,

25   I mean, I -- I wouldn't sign that.
```

Page 137

```
 1              WATERHOUSE - 10-19-21
 2       Q.    Okay.  PricewaterhouseCoopers served
 3  as HCMFA's outside auditors as well; correct?
 4       A.    Yes.
 5       Q.    Do you see that this audit report is
 6  signed on June 3rd, 2019, just like the
 7  Highland audit report?
 8       A.    That is correct.
 9       Q.    And did the process of -- of
10  preparing HCMFA's audit report, was that the
11  same process that Highland followed when it did
12  its audit report at this time?
13       A.    I mean, it is a different entity.
14  There are different assets.  You know, it --
15  it -- it is -- as you saw, Highland's
16  financials are on a consolidated basis.  This
17  is different, so it is under the same control
18  environment and team.
19       Q.    Okay.  I appreciate that.  So the
20  same control environment and team participated
21  in the preparation of the audit for Highland
22  and for HCMFA at around the same time; correct?
23       A.    Yes.
24             MR. MORRIS:  Can we go to page 17 of
25       the report.  I don't have the Bates number.
```

Page 138

```
 1                 WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you see that just like

 3   Highland's audited financial report, HCMFA's

 4   audited financial report also has a section

 5   related to subsequent events?

 6        A.    Yes.

 7        Q.    And am I reading this correctly that

 8   just as Highland had done, HCMFA disclosed in

 9   its audited financial report a subsequent event

10   that related to the issuance of promissory

11   notes to Highland in the aggregate amount of

12   $7.4 million in 2019?

13        A.    That is what I see in the report.

14        Q.    And you were the treasurer of HCMFA

15   at the time; right?

16        A.    Yes, to the best of my knowledge.

17        Q.    And did anybody ever tell you prior

18   to the time of the issuance of this audit

19   report that that sentence relating to HCMFA's

20   2019 notes was inaccurate or wrong in any way?

21        A.    Not that I recall.

22        Q.    As you sit here right now, has

23   anybody ever told you that that sentence is

24   inaccurate or wrong in any way?

25        A.    Not that I recall.
```

Page 139

```
 1              WATERHOUSE - 10-19-21

 2         Q.    I apologize if I asked you this

 3    already, but has anybody ever told you at any

 4    time that you are not authorized to sign the

 5    promissory notes that are the subject of the

 6    sentence we're looking at?

 7         A.    Not that I recall.

 8         Q.    Did anybody ever tell you at any

 9    time that you had made a mistake when you

10    signed the promissory notes that are the

11    subject of this sentence?

12         A.    Say that again.  Did anyone ever say

13    that I made a mistake?

14         Q.    Let me ask the question again.

15              Did anybody ever tell you at any

16    time that you made a mistake when you signed

17    the two promissory notes in Highland's favor on

18    behalf of HCMFA in 2019?

19         A.    Not that I recall.

20              MR. MORRIS:  Let's just look at the

21         promissory notes quickly.  Can we please

22         put up Document Number 1, and so this is in

23         the pile that y'all have.  We'll just go

24         for a few more minutes and we can take our

25         lunch break.
```

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    All right.  So I don't know if you

 3   have seen this before, sir.  Do you see that

 4   this is a complaint against HCMFA?

 5        A.    Yes, I am looking at it on the

 6   screen.

 7        Q.    Okay.  And have you ever seen this

 8   document before?

 9        A.    I went through some of these

10   documents with my counsel here yesterday.

11             MR. MORRIS:  All right.  Can we go

12        to Exhibit 1 of this document.

13        Q.    Do you see Exhibit 1 is a

14   $2.4 million promissory note back in 2019?

15        A.    Yeah, I found it in the book.  Yes,

16   I have it here in front of me.

17        Q.    And this is a demand note, right, if

18   you look at Paragraph 2?

19        A.    Yes.

20        Q.    And this is a note where the maker

21   is HCMFA, and Highland is the payee; right?

22        A.    Yes.

23             MR. MORRIS:  And if we can scroll

24        down, can we just see Mr. Waterhouse's

25        signature.
```

Page 141

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Is that your signature, sir?

 3        A.    Yes, it is.

 4        Q.    And did you sign this document on or

 5   around May 2nd, 2019?

 6        A.    I don't recall specifically signing

 7   this, but this is my signature.

 8        Q.    Okay.  And do you recall that

 9   Highland transferred $2.4 million to HCMFA at

10   or around the time you signed this document?

11        A.    I don't recall specifically.  I

12   would want to, as I sit here today, go back and

13   confirm that, but again, presumably that --

14   that -- that did happen.

15        Q.    You wouldn't have signed this

16   document if you didn't believe that HCMFA

17   either received or was going to receive

18   $2.4 million from Highland; is that fair?

19        A.    I mean, it -- if -- if -- if there

20   wasn't a transfer of value, yeah, I mean, you

21   know, I would have no reason to -- to sign a

22   note.

23        Q.    And -- and Highland wouldn't have

24   given this note to PricewaterhouseCoopers if --

25   withdrawn.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 142 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 280 of 899 PageID 892

Page 142

1          WATERHOUSE - 10-19-21

2          HCMFA wouldn't have given this note

3    to PricewaterhouseCoopers if it hadn't received

4    the principal value of -- of the note in the

5    form of a loan; correct?

6          MR. RUKAVINA:  Objection, legal

7          conclusion, speculation and form.

8     A.    Again, we -- what we provided to PwC

9    were, as part of the audit, any promissory

10   notes executed and outstanding.  You know, as a

11   part of the audit, they, you know, they -- they

12   have copies of all the bank statements,

13   things -- things of that sort.

14          MR. MORRIS:  Okay.  Can we go to

15          Exhibit 2.

16          (Exhibit 2 marked.)

17    Q.    Do you see that this is a promissory

18   note dated May 3rd, 2019 in the amount of

19   $5 million?

20    A.    Yes.

21    Q.    Do you believe this is also a demand

22   note if you look at Paragraph 2?

23    A.    Yes.

24    Q.    And do you see that HCMFA is the

25   maker, and Highland is the payee?

Page 143

```
 1                   WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    And if we go to the bottom, can we

 4  just confirm that that is your signature?

 5       A.    Yes.

 6       Q.    And together these notes are the

 7  notes that are referred to both in Highland and

 8  HCMFA's audited financial reports in the

 9  subsequent event sections; correct?

10            MS. DANDENEAU:  Objection to form.

11       A.    They -- they -- they totaled

12  $7.4 million, so presumably, yes.

13       Q.    Okay.  And you were authorized to

14  sign these two notes; correct?

15            MR. RUKAVINA:  Objection, legal

16       conclusion.

17       A.    Yeah.  I mean, I'm -- I was the

18  officer of -- of HCMFA.  You know, I -- I'm not

19  the legal expert on -- on what that -- what

20  that confers to me or what it doesn't.  I mean,

21  that is my signature on the notes.

22       Q.    And you believed you were authorized

23  to sign the notes; is that fair?

24       A.    I signed a lot of documents in my

25  capacity, just because it is operational in
```

Page 144

```
 1                   WATERHOUSE - 10-19-21

 2    nature.  So, you know, to me this was just

 3    another document, to be perfectly honest.

 4         Q.    Sir, would you have signed

 5    promissory notes with the principal amount of

 6    $7.4 million if you didn't believe you were

 7    authorized to do so?

 8                MS. DANDENEAU:  Objection to form.

 9         Q.    Are you frozen?

10         A.    No.  I'm just -- you know, it is --

11    you know, again, I typically don't sign

12    promissory notes, and I don't recall why I

13    signed these, but -- you know, but I did.

14         Q.    All right.  So listen carefully to

15    my question.  Would you have ever signed

16    promissory notes with a face amount of

17    $7.4 million without believing that you were

18    authorized to do so?

19         A.    No.  I mean, I'm -- I'm putting my

20    signature on there, so no.

21         Q.    Okay.  And would you have signed two

22    promissory notes obligating HCMFA to pay

23    Highland $7.4 million without Mr. Dondero's

24    prior knowledge and approval?

25                MS. DEITSCH-PEREZ:  Object to the
```

Page 145

1                    WATERHOUSE - 10-19-21

2        form.

3        A.    You know, from -- from what I recall

4    around these notes, you know, I don't recall

5    specifically Mr. -- Mr. Dondero saying to -- to

6    make this a loan.

7              So my conversation with Mr. Dondero

8    around the culmination of the NAV error as

9    related to TerreStar which was a -- a -- I

10   think it was a year and a half process.  I

11   don't know, it was a multi-month process, very

12   laborious, very difficult.

13             When we got to the end, I had a

14   conversation with Mr. Dondero on where to, you

15   know, basically get the funds to reimburse the

16   fund, and I recall him saying, get the money

17   from Highland.

18        Q.    And so he told you to get the money

19   from Highland; is that right?

20        A.    That is what I recall -- in my

21   conversation with him, that is -- that is what

22   I can recall.

23        Q.    Do you know who drafted these notes?

24        A.    I don't.

25        Q.    Did you ask somebody to draft the

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 146 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 284 of 899 PageID 896

Page 146

1                    WATERHOUSE - 10-19-21

2    notes?

3         A.    I didn't ask -- I don't specifically

4    ask people to draft notes really.  I mean,

5    again, you know, the legal group at Highland is

6    responsible and has always been responsible for

7    drafting promissory notes.

8         Q.    So based on your -- based on the

9    practice, you believe that somebody from the

10   Highland's legal department would have drafted

11   these notes.  Do I have that right?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  John, I also asked you for the Word

14         versions of these notes so we could look at

15         the properties, and you have not provided

16         them.  Are you intending to?

17              MR. MORRIS:  No.

18        Q.    Can you answer my question, sir?

19        A.    Again, I --

20              MS. DANDENEAU:  Do you want him to

21         repeat it?

22        A.    Yeah, why don't you repeat it?

23        Q.    Sure.  Mr. Waterhouse, based on the

24   practice that you have described in your

25   understanding, do you believe that these notes

Page 147

```
 1                WATERHOUSE - 10-19-21

 2   would have been drafted by somebody in the

 3   legal department?

 4             MS. DEITSCH-PEREZ:  Object to the

 5        form.

 6        A.   Yes.

 7        Q.   Okay.  And do you know who would

 8   have instructed -- do you have any knowledge as

 9   to who would have instructed the legal

10   department to draft these notes?

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13        A.   It was whoever was working -- I

14   mean, it was likely someone on the team.  I

15   mean, I don't remember exactly on every note or

16   every document, but, again, a lot of these

17   things of this nature -- they're operational in

18   nature -- were handled by the team.

19             The team knows to -- I mean, we

20   don't draft documents.  We're not lawyers.

21   We're not attorneys.  It is not what I do or

22   accountants do.

23             So they are always instructed to go

24   and -- and go to the legal team to get

25   documents like this drafted.  Also, when you go
```

```
 1                   WATERHOUSE - 10-19-21

 2    to the legal team, the -- you know, we always

 3    loop in compliance.  And compliance -- when you

 4    go to the legal team, compliance is part of

 5    legal team.  They're made aware of -- of -- of

 6    these types of transactions.

 7         Q.    And do you believe that you had

 8    the -- withdrawn.

 9              Did you ever tell Mr. Dondero --

10    (inaudible) -- did you see those?

11         A.    Sorry.

12              MS. DEITSCH-PEREZ:  I did not hear

13         the end of that question.

14         Q.    Did you ever tell Mr. Dondero that

15    you signed these two notes?

16         A.    I don't recall ever -- no, I don't

17    recall having a conversation with him.

18         Q.    Did you ever discuss these two notes

19    with him at any time?

20         A.    The conversation, I recall, was what

21    I described earlier.  And that is the only time

22    I recall ever discussing this.

23         Q.    Okay.  But the corporate accounting

24    group had a copy of this -- of these two notes.

25    And pursuant to the audit process, the
```

Page 149

```
 1                   WATERHOUSE - 10-19-21

 2   corporate accounting group gave the two notes

 3   to PricewaterhouseCoopers in connection with

 4   the audit; correct?

 5             MS. DANDENEAU:  Objection to form.

 6        A.   Yes.  I mean, that is -- yeah, I

 7   mean, they -- unless the legal team can also

 8   retain copies of items like this.  I mean, I

 9   don't know everything that they would retain as

10   well.

11             The legal team would also, if they

12   had documents as part of audits, turn that over

13   to the auditors as well.  So it could have been

14   the corporate accounting team.  It could be

15   someone on the legal team.

16        Q.   All right.  So you didn't -- you

17   didn't draft this note; right?

18        A.   I -- I -- I did not.

19        Q.   But somebody at Highland did; is

20   that fair?

21             MS. DEITSCH-PEREZ:  Object to the

22        form.

23        A.   I don't know.  I mean, we can go to

24   the legal team.  I don't -- I'm not sitting

25   behind someone in legal.  Maybe they went to
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 150 of 397
Case 3:21-cv-00880-X   Document 23   Filed 01/05/22   Page 288 of 899   PageID 900

Page 150

```
 1                    WATERHOUSE - 10-19-21

 2    outside counsel.  I have no idea.

 3        Q.    Did you have any reason to believe

 4    you weren't authorized to sign this note,

 5    either of these two notes?

 6        A.    I think I have already answered that

 7    question.

 8        Q.    Okay.  You didn't give these notes

 9    to PricewaterhouseCoopers; correct?

10            MS. DANDENEAU:  Objection to form.

11        A.    I don't recall giving these to

12    PricewaterhouseCoopers.

13        Q.    And in the practice that you have

14    described, somebody in the corporate accounting

15    group would have given these two notes to

16    PricewaterhouseCoopers; correct?

17            MS. DANDENEAU:  Objection to form.

18        A.    I think I've answered that.  I said

19    either the corporate accounting team or maybe

20    the legal team.

21            MR. MORRIS:  Okay.  Why don't we

22        take our lunch break here.

23            VIDEOGRAPHER:  We're going off the

24        record at 1:04 p.m.

25        (Recess taken 1:04 p.m. to 1:49 p.m.)
```

Page 151

```
 1              WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  We are back on the

 3        record at 1:49 p.m.

 4        Q.    Mr. Waterhouse, did you speak with

 5   anybody during the break about the substance of

 6   this deposition?

 7        A.    I spoke to -- to Deb and Michelle.

 8        Q.    About the substance of the

 9   deposition?

10        A.    Yes.

11        Q.    Can you tell me what you talked

12   about?

13              MS. DANDENEAU:  No.  We object on

14        the basis of privilege.

15        Q.    Okay.  You are going to follow your

16   counsel's objection here?

17        A.    Yes.

18        Q.    Okay.

19              MR. MORRIS:  Can we put up on the

20        screen Exhibit 35.

21              (Exhibit 35 marked.)

22        Q.    Are you able to see that document,

23   sir?

24        A.    Yes.

25        Q.    Have you ever seen an incumbency
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 152 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 290 of 899 PageID 902

Page 152

```
 1              WATERHOUSE - 10-19-21

 2   certificate before?

 3        A.    I have.

 4        Q.    Do you have a general understanding

 5   of what an incumbency certificate is?

 6        A.    I have a general understanding.

 7        Q.    What is your general understanding?

 8        A.    You know, those -- my general

 9   understanding is that the incumbency

10   certificate basically lists folks that can --

11   are like authorized signers.

12        Q.    Okay.  And do you see that this is

13   an incumbency certificate for Highland Capital

14   Management Fund Advisors, L.P.?

15        A.    Yes.

16        Q.    Okay.  And if we could scroll down

17   just a little bit, do you see that it's dated

18   effective as of April 11th, 2019?

19        A.    Yes, I see that.

20        Q.    Okay.  And is that your signature in

21   the middle of the signature block?

22        A.    Yes, it is.

23        Q.    And by signing it, did you accept

24   appointment as the treasurer of HCMFA effective

25   as of April 11th, 2019?
```

Page 153

```
 1                  WATERHOUSE - 10-19-21

 2       A.    Again, I'm not the legal -- I don't

 3   know if this makes me the treasurer or the

 4   appointment.  I don't know -- I don't know

 5   that, so I don't -- I don't know if that

 6   document -- again, I think -- again, I'm not

 7   the legal expert.  I think isn't there --

 8   aren't there other legal documents that detail

 9   who the officers are that could be incorporated

10   or things like that?  Again, I don't want to

11   play armchair attorney here.

12       Q.    I'm not asking you for a legal

13   conclusion.  I'm asking you for your knowledge

14   and understanding.  When you signed this

15   document, did you understand that you were

16   accepting an appointment as the treasurer of

17   HCMFA?

18              MS. DANDENEAU:  Objection to form.

19              MS. DEITSCH-PEREZ:  Objection, form.

20       A.    Again, I don't think this -- that

21   wasn't my understanding.  I don't think this

22   makes -- this document makes me the treasurer.

23       Q.    What do you think this document --

24   why did you sign this document?

25              MS. DEITSCH-PEREZ:  Objection to
```

Page 154

```
1                    WATERHOUSE - 10-19-21

2         form.

3               MR. MORRIS:  You're objecting to the

4         form of the question when I asked him why

5         did you sign the document?  What is the

6         basis for the objection?

7               MS. DEITSCH-PEREZ:  Because, John, I

8         think that it does call for a legal

9         conclusion other than -- with him saying

10        because somebody told me to sign this

11        document.  But if you want to go there,

12        that is fine.

13              MR. MORRIS:  Okay.

14              MS. DANDENEAU:  I don't think --

15        he's already said he's not a lawyer.

16              MR. MORRIS:  I'll allow the witness

17        to answer this question.

18        Q.    Why did you sign this document, sir?

19        A.    I mean, our -- our legal group would

20   bring by these incumbency certificates from

21   time to time.  I have no idea why they're being

22   updated, and I was asked to sign.

23        Q.    Did you ask anybody, what is this

24   document?

25        A.    No.
```

Page 155

1                    WATERHOUSE - 10-19-21

2        Q.    Did anybody tell you why they needed

3   you to sign the document?

4        A.    Not that I can recall.

5        Q.    You testified earlier that you

6   understood that you served as the acting

7   treasurer for HCMFA; correct?

8        A.    Yes.

9        Q.    How did you become the acting

10  treasurer of HCMFA?

11            MS. DANDENEAU:  Objection to form.

12       A.    I don't -- I don't know the legal --

13  I don't know the legal mechanic of how I became

14  the acting treasurer.

15       Q.    I'm not asking for the legal

16  mechanic.  I'm asking you as the person who

17  is --

18            MS. DANDENEAU:  John, you said --

19            MR. MORRIS:  Stop.

20            MS. DANDENEAU:  -- how did you

21       become the treasurer.  That is --

22            MR. MORRIS:  Please stop.

23            MS. DANDENEAU:  That is a legal

24       question.

25            MR. MORRIS:  I am not asking any

Page 156

```
 1                  WATERHOUSE - 10-19-21

 2          legal questions, to be clear.  I'm asking

 3          for this witness' understanding as to how

 4          he became the acting treasurer of HCMFA.

 5          If he doesn't know, he can say he doesn't

 6          know, but this legal stuff is nonsense, and

 7          I really object to it.

 8          Q.    Sir, I'm asking you a very simple

 9    question.

10                  MS. DANDENEAU:  Argumentative.

11          Q.    You testified -- you testified that

12    you became the acting treasurer of HCM --

13    HCMFA; correct?

14          A.    Yes.

15          Q.    How did that happen?

16                  MS. DANDENEAU:  Again, object to

17          form.

18                  MR. MORRIS:  I can't wait to do this

19          in a courtroom.  Good God.

20          Q.    Go ahead, sir.

21          A.    I don't know the exact process of

22    how that happened.

23          Q.    Do you have any idea whether signing

24    this document was part of the process?

25                  MR. MORRIS:  You know what --
```

Page 157

```
1            WATERHOUSE - 10-19-21

2        MS. DANDENEAU:  Objection.

3        MR. MORRIS:  -- withdrawn.  You guys

4   want to do this, I can't wait.  I can't

5   wait.  This is the craziest stuff ever.

6        MS. DANDENEAU:  John, he said he's

7   not a lawyer, and you are asking him for a

8   legal conclusion, and he says he doesn't

9   know, and you persist.

10       MR. MORRIS:  Okay.

11       MS. DANDENEAU:  So you can ask these

12  questions --

13       MR. MORRIS:  Did anyone -- please

14  stop talking.

15       MS. DANDENEAU:  -- at another

16  point -- no, no, no, I'm entitled to talk,

17  too; right?  If you're going to make these

18  accusations as if we're trying to stonewall

19  you, this is not the witness to ask that

20  question.

21       MR. MORRIS:  I can't -- I can't

22  wait -- I can't wait to do this in a

23  courtroom.  I will just leave it at that.

24       MS. DANDENEAU:  That's right, I'm

25  sure you can't.
```

```
 1              WATERHOUSE - 10-19-21

 2       Q.    Did anyone ever tell you, sir, that

 3  even though you were the acting treasurer of

 4  HCMFA, that you were not authorized to sign the

 5  two promissory notes that we looked at before

 6  lunch?

 7       A.    I'm not sure I understand the

 8  question.  I wasn't -- I mean, I'm -- I'm the

 9  current acting treasurer.

10       Q.    Did anybody ever tell you at any

11  time that even though you were the acting

12  treasurer of HCMFA, that you were not

13  authorized to sign the two promissory notes

14  that we looked at before lunch?

15            MS. DANDENEAU:  Objection to form.

16       A.    Not that I recall.

17       Q.    Did anybody ever tell you at any

18  time that you were not authorized to sign the

19  two promissory notes that we looked at before

20  lunch?

21       A.    Not that I recall.

22       Q.    Did anybody ever tell you at any

23  time that you should not have signed the two

24  promissory notes that we looked at before

25  lunch?
```

Page 159

```
 1                    WATERHOUSE - 10-19-21

 2        A.    Not that I recall.

 3        Q.    Did you ever tell anybody at any

 4   time that you weren't authorized to sign the

 5   two promissory notes that we looked at before

 6   lunch?

 7        A.    Not that I recall.

 8        Q.    Did you ever tell anybody at any

 9   time that you made a mistake when you signed

10   the two promissory notes that we looked at

11   before lunch?

12        A.    Not that I recall.

13        Q.    As you sit here right now, do you

14   have any reason to believe that you were not

15   authorized to sign the two documents that we

16   looked at before lunch?

17              MS. DANDENEAU:  Objection to form.

18        A.    If -- if this is the -- the valid

19   incumbency certificate, I mean, this does --

20   this does detail who the signers are.

21        Q.    Okay.  And looking at that document,

22   does that give you comfort that you were

23   authorized to sign the two promissory notes

24   that we looked at before lunch?

25              MS. DEITSCH-PEREZ:  Object to the
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 160 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 298 of 899 PageID 910

Page 160

1                    WATERHOUSE - 10-19-21

2        form.

3                    MS. DANDENEAU:  Objection, form.

4        A.    Yes.

5        Q.    As of October 20th -- withdrawn.

6              I'm trying to take your mind back to

7    a year ago, October 2020.  Do you recall at

8    that time that the boards of the retail funds

9    were making inquiries about obligations that

10   were owed by the advisors to Highland in

11   connection with their 15(c) review?

12                   MS. DANDENEAU:  Objection to form.

13       A.    I don't -- I don't recall.

14       Q.    As of October 2020, you had no

15   reason to believe you weren't authorized to

16   sign the two promissory notes that we just

17   looked at; correct?

18                   MS. DANDENEAU:  Objection, form.

19                   MS. DEITSCH-PEREZ:  Objection to

20       form.

21       A.    I didn't think about it in October

22   of 2020, but I mean --

23       Q.    Did you have any reason to believe

24   at that time that you weren't authorized to

25   sign the two notes that we just looked at?

```
 1                   WATERHOUSE - 10-19-21

 2        A.    Not that I'm aware, no.

 3        Q.    Did you have any reason to believe a

 4   year ago that you made a mistake when you

 5   signed those two notes?

 6        A.    Not that I'm aware.

 7        Q.    A year ago you believed that HCMFA

 8   owed Highland the unpaid principal amounts that

 9   were due under those two notes; correct?

10        A.    They're -- they're promissory notes

11   that were -- as you presented, that were --

12   that were executed.  Whether they're valid or

13   if there's other reasons, I didn't -- I don't

14   know.

15        Q.    I'm not asking you whether they're

16   valid or not.  I'm asking you for your state of

17   mind.  A year ago you believed that HCMFA

18   was -- was obligated to pay the unpaid

19   principal amount under the two notes that you

20   signed; correct?

21        A.    Yeah, I'm -- I'm -- yes.

22        Q.    Thank you.  Are you aware -- you're

23   aware that -- that in 2017, NexPoint issued a

24   note in favor of Highland in the approximate

25   amount of $30 million; correct?
```

Page 162

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I'm -- I'm -- I'm generally aware.

 3        Q.    Okay.  And are you generally aware

 4   that from time to time, after the note was

 5   issued by NexPoint, that moneys were applied to

 6   principal and interest that were due under the

 7   NexPoint note?

 8        A.    Yes, I'm generally aware.

 9        Q.    Okay.  And did anybody ever tell you

10   that the payments that were made against the

11   NexPoint notes were made by mistake?

12        A.    Yes.

13        Q.    And is it the one payment that we

14   talked about earlier today?

15        A.    We talked about a lot of things

16   today.  What payment are we talking about?

17        Q.    Okay.  Who told you that any payment

18   made against the NexPoint note was made by

19   mistake?

20        A.    D.C. Sauter.

21        Q.    When did Mr. Sauter tell you that?

22        A.    I don't -- I don't remember

23   specifically.

24        Q.    Do you remember what payments --

25        A.    Sometime -- sometime this year.
```

Page 163

                    WATERHOUSE - 10-19-21

1

2       Q.      Sometime in 2021?

3       A.      Yes.

4       Q.      Do you remember what payment he was

5    referring to?

6       A.      It was the -- the payment made in

7    January of 2021 or -- yeah, January of -- of

8    this -- January of 2021.

9       Q.      Okay.  So did anybody ever tell you

10   at any time that any payment that was made

11   against principal --

12      A.      And -- and -- and -- hold on, and it

13   may have been other -- again, it may have been

14   that payment or -- or there may have been what

15   he was explaining, a misapplication of prior

16   payments as well.

17      Q.      Can you -- can you give me any

18   specificity -- withdrawn.

19              Withdrawn.  Can you tell me

20   everything that Mr. Sauter told you about --

21   about errors in relation to payments made

22   against principal and interest due under the

23   NexPoint note?

24              MS. DANDENEAU:  Can I just --

25              MR. RUKAVINA:  Hold on.  Hold on.

Page 164

```
 1              WATERHOUSE - 10-19-21

 2         I'm going to object here, and I'm going to

 3         instruct the witness not to answer

 4         depending on the discussion that you had --

 5         Mr. Waterhouse, I'm the lawyer for

 6         NexPoint, and as everyone here knows, D.C.

 7         Sauter is in-house counsel.

 8              So if you and Mr. Sauter were having

 9         a factual discussion and him preparing his

10         affidavit, et cetera, then go ahead and

11         answer that.  But if you were having a

12         discussion as to our legal strategy in this

13         lawsuit, or anything having to do with

14         that, then do not answer that.

15              And if you need to talk to either

16         your counsel or me about that, then we need

17         to have that discussion now.

18    A.    Okay.  Yeah, I don't -- I don't

19  really know how to make that distinction, so

20  maybe I need to talk to counsel before I

21  answer, or if I can answer.

22    Q.    Let me just ask you this question:

23  Did -- did you have any conversation with

24  Mr. Sauter about any payment of principal and

25  interest prior to the time that you left
```

Page 165

```
 1                  WATERHOUSE - 10-19-21

 2    Highland's employment, or did it happen after

 3    you left Highland's employment?

 4          A.    I don't -- I don't recall if -- I

 5    don't recall.  I mean, it was sometime in 2021.

 6    I don't remember if it was before or after I

 7    was let go from Highland.

 8          Q.    Okay.  So -- so nobody told you

 9    prior to 2021 that any error or mistake was

10    made in the application of payments against

11    principal and interest due on the NexPoint

12    note.  Do I have that right?

13          A.    Yeah, I don't -- I don't recall this

14    being in 2020.

15          Q.    Okay.  And it didn't happen in 2019;

16    correct?

17          A.    I don't recall that happened.

18          Q.    And it didn't happen in 2018;

19    correct?

20          A.    I don't -- I don't recall that

21    happening.

22          Q.    And it didn't happen in 2017;

23    correct?

24          A.    I don't recall.

25          Q.    But -- but you believe the
```

Page 166

```
 1              WATERHOUSE - 10-19-21

 2   conversation took place in 2021.  You just

 3   don't remember if it was before or after you

 4   left Highland's employment.  Do I have that

 5   right?

 6        A.    It was sometime this year.  I

 7   don't -- I don't remember.

 8        Q.    Okay.  Did you report this

 9   conversation to Mr. Seery at any point?

10        A.    I don't believe so.

11        Q.    Did you report this conversation to

12   anybody at DSI at any time?

13        A.    I don't recall.

14        Q.    Do you have -- you don't have a

15   recollection of ever doing that; correct?

16        A.    Yeah, that's right.  I don't recall

17   doing that.

18        Q.    Do you recall telling anybody at

19   Pachulski Stang about the conversation you

20   recall with Mr. Sauter?

21        A.    No, I don't -- I don't recall.

22        Q.    Did you tell any of the independent

23   board members about your conversation with

24   Mr. Sauter?

25        A.    I don't recall.
```

Page 167

```
 1              WATERHOUSE - 10-19-21

 2      Q.    Did you tell any of the employees at

 3  Highland before you left Highland's employment

 4  about this call that you had with Mr. Sauter?

 5              MS. DANDENEAU:  Objection to form.

 6      A.    No, I don't -- no, I don't recall.

 7      Q.    NexPoint -- to the best of your

 8  knowledge, did NexPoint ever file a proof of

 9  claim against Highland to try to recover moneys

10  that were mistakenly paid against the principal

11  and interest due under the note?

12      A.    Okay.  Hold on.  You are saying did

13  NexPoint Advisors file a proof of claim to

14  Highland for errors related to payments under

15  the NexPoint note to Highland?

16      Q.    Correct.

17      A.    I'm -- I'm -- I'm not -- I'm not

18  aware.

19      Q.    Are you aware --

20      A.    I'm not the legal person here, I

21  don't know.

22      Q.    I'm just asking for your knowledge,

23  sir.

24      A.    Yeah, I don't know.  I'm not aware.

25      Q.    Are you aware of any claim of any
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 168 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 306 of 899 PageID 918

Page 168

1                    WATERHOUSE - 10-19-21

2    kind that NexPoint has ever made to try to

3    recover the amounts that it contends were -- or

4    that Mr. Sauter contend were mistakenly applied

5    against principal and interest due under the

6    NexPoint note?

7         A.    I'm not aware.

8              MS. DANDENEAU:   Objection to form.

9         Q.    Okay.  The advisors' agreements with

10   the retail funds are subject to annual renewal;

11   correct?

12        A.    Yes.

13        Q.    And do you participate in the

14   renewal process each year?

15        A.    Yes.

16        Q.    What role do you play in the renewal

17   process?

18        A.    I'm -- I'm asked by the retail board

19   to walk-through the advisors financials.

20        Q.    And do you do that in the context of

21   a board meeting?

22        A.    Yes, it is -- yes, it is typically

23   done in a board meeting.

24        Q.    And do you recall the time --

25   does -- does the renewal process happen around

1               WATERHOUSE - 10-19-21

2    the same time each year?

3         A.    Yes, it is -- it is around the same

4    time every year.

5         Q.    And what -- what time period of the

6    year does the renewal process occur?

7         A.    Approximately the September

8    timeframe.

9         Q.    During that process, in your

10   experience, does the board typically conduct

11   its own diligence and ask for information?

12        A.    Does the board ask for lots of -- I

13   mean, just -- I mean, lots of information as a

14   part of that -- that -- as part of that board

15   meeting and that process.

16        Q.    Okay.  And do you recall that the

17   process in 2020 spilled into October?

18        A.    Yes.  Yes.

19        Q.    Okay.  And as part of the process in

20   2020, the retail board asked -- asked what are

21   referred to as 15(c) questions; right?

22        A.    I guess I don't want to be -- they

23   asked 15(c) -- are you saying they asked 15(c)

24   questions and this is why it went into October

25   or --

Page 170

```
1                    WATERHOUSE - 10-19-21

2          Q.    No, I apologize.

3                Do you have an understanding of

4     what -- of what 15(c) refers to in the context

5     of the annual renewal process?

6          A.    Yes, generally.

7          Q.    All right.  What is your general

8     understanding of the term "15(c)" in the

9     context of the annual renewal process?

10         A.    I -- I think 15(c) is the section

11    that -- that -- you know, that -- that the

12    board has to evaluate every year, the retail

13    board.  They have to, you know, go through,

14    evaluate, and go through that approval process

15    on a yearly basis.

16         Q.    Okay.

17                MR. MORRIS:  Can we put up on the

18         screen Exhibit 36, please.

19                (Exhibit 36 marked.)

20                MR. MORRIS:  I guess let's just

21         start at the bottom so Mr. Waterhouse can

22         see what is here.

23         Q.    You see this begins with an email

24    from Blank Rome to a number of people.

25                MR. MORRIS:  And if we can scroll
```

Page 171

```
1                   WATERHOUSE - 10-19-21

2          up -- keep going just a little bit.

3          Q.    You will see that there is an email

4     from Lauren Thedford to Thomas Surgent and

5     others where she reports that she was attaching

6     and reproducing below additional 15(c)

7     follow-up questions from the board.

8                Do you see that?

9          A.    Yes.

10         Q.    And do you see Question No. 2 asks

11    whether there are any material outstanding

12    amounts currently payable or due in the future

13    (e.g., notes) to HCMLP by HCMFA or NexPoint

14    Advisors or any other affiliate that provides

15    services to the funds?

16               Do you see that?

17         A.    Yes.

18         Q.    And -- and did you -- do you recall

19    that in -- in October of 2020 the retail boards

20    were asking for that information?

21         A.    I don't recall it, but there --

22    they're obviously asking in this email.

23         Q.    Okay.

24               MR. MORRIS:  Can we scroll up a

25         little bit, please.
```

Page 172

1                   WATERHOUSE - 10-19-21

2          Q.    And then do you see that

3    Ms. Thedford includes you on the email string

4    on Tuesday, October 6th, at 5:52?

5          A.    Yes.

6          Q.    And she asks you and Dave Klos and

7    Kristin Hendrix for advice on that particular

8    Request No. 2 that I have just read; right?

9          A.    Yes.

10         Q.    Okay.  Can you tell me who

11   Ms. Thedford is?

12         A.    She was an attorney that was in the

13   legal group.

14         Q.    At Highland Capital Management,

15   L.P.?

16         A.    I'm -- I'm -- I'm -- I don't

17   remember if she was an employee of Highland or

18   any of the advisors.

19         Q.    Okay.  Do you know if she served as

20   the corporate secretary for both HCMFA and

21   NexPoint?

22         A.    Yes.

23         Q.    And -- okay.

24               Do you know whether Ms. Thedford

25   held any positions in relation to the retail

```
 1                    WATERHOUSE - 10-19-21
 2    funds as we defined that term?
 3         A.    Yes.
 4         Q.    What is your understanding of the
 5    positions that Ms. Thedford held at the retail
 6    funds?
 7         A.    I -- I recall her being an officer.
 8    I don't recall her title.
 9         Q.    Okay.  Is she still an officer at
10    any of the retail funds today?
11         A.    No.
12         Q.    Do you know when she ceased to be an
13    officer of the retail funds?
14         A.    Approximately.
15         Q.    And when did she approximately cease
16    to be an officer of the retail funds?
17         A.    It was in -- it was in early of
18    2021.
19         Q.    Okay.  Do you know when she became
20    an officer of the retail funds?
21         A.    I don't recall.
22         Q.    To the best of your recollection,
23    was she an officer of the retail funds in
24    October of 2020?
25         A.    I believe so.
```

Page 174

1                  WATERHOUSE - 10-19-21

2       Q.    Okay.  Do you know what title she

3    held in her capacity as an officer, if any?

4       A.    I told you I don't remember.

5       Q.    Okay.  So she sends this email to

6    you at 5:52 p.m. on October 6th.

7             And if we can scroll up to the

8    response, you responded a minute later with a

9    one-word answer:  Yes.

10             Do you see that?

11       A.    Yes.

12       Q.    And -- and yes is -- yes was in

13    response to the retail board's Question No. 2,

14    right, whether there are any material

15    outstanding amounts currently payable or due in

16    the future?

17       A.    Yes.

18             MR. MORRIS:  And can we scroll up to

19        see what happened next.

20       Q.    So Ms. Thedford writes back to you a

21    few minutes later and she asks whether you

22    could provide the amounts.

23             Do you see that?

24       A.    Yes.

25       Q.    And then you respond further and you

Page 175

 1                    WATERHOUSE - 10-19-21

 2    refer her to the balance sheet that was

 3    provided to the board as part of the 15(c)

 4    materials.

 5              Do you see that?

 6         A.   Yes.

 7         Q.   And -- and did the advisors provide

 8    to the board certain balance sheets in 2020 in

 9    connection with the 15(c) review?

10         A.   Yes, they did.

11         Q.   Okay.  And were the amounts that

12    were outstanding or that were to be due in the

13    future by the advisors to Highland included in

14    the liability section of the balance sheet that

15    was given to the retail board?

16         A.   Yes.  Notes would be reflected as

17    liabilities.

18         Q.   Okay.  And --

19         A.   If I'm understanding your question

20    correctly.

21         Q.   You are.  And -- and -- and those

22    liabilities you -- you were -- you believed

23    were responsive to the retail board's question;

24    correct?

25         A.   Yes.

```
 1                  WATERHOUSE - 10-19-21

 2       Q.    Okay.  And then if we can scroll up,

 3  you see Ms. Thedford responds to you

 4  nine minutes later with a draft response.

 5             Do you see that?

 6       A.    Yes.

 7       Q.    And she says that she is taking from

 8  the 6/30 financials certain information about

 9  amounts that were due to HCMLP and affiliates

10  as of June 30th, 2020.

11             Do you see that?

12       A.    I do.

13       Q.    Okay.  And did you believe, as the

14  treasurer of NexPoint and HCMFA and as the CFO

15  of Highland, that the information that

16  Ms. Thedford obtained from the 6/30 financials

17  was accurate and responsive in relation to the

18  retail fund board's question?

19       A.    I just want to make sure I

20  understand the question.

21             Are you saying that the financial

22  information provided to the retail board as

23  part of the 15(c) process, which included

24  financial statements as of June 30th of 2021,

25  did I feel like those were responsive to their
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 177 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 315 of 899 PageID 927

Page 177

```
 1                 WATERHOUSE - 10-19-21

 2   questions?

 3        Q.    Yes.

 4        A.    Yes.

 5        Q.    Thank you.

 6             MS. DEITSCH-PEREZ:  John, it is not

 7        in the chat yet.  Can you just make sure it

 8        gets put in there.

 9             MR. MORRIS:  Sure.

10             MS. CANTY:  I put it in there.  I

11        think maybe I just sent it directly, so let

12        me make sure it says to everyone.  But I

13        did put it in there.  I will try again.

14             MR. MORRIS:  Thank you, La Asia.

15             MS. DANDENEAU:  What number is it.

16             MR. MORRIS:  What, the Bates number?

17             MS. DEITSCH-PEREZ:  No, the --

18        this -- yeah, 36 is not in the chat.

19             MR. MORRIS:  Okay.  We'll get it.

20             MS. DANDENEAU:  I think that

21        Ms. Canty just sent it to me originally.

22        Sorry.

23             MR. MORRIS:  Okay.  We will get it

24        there.

25             MS. CANTY:  Okay.  It is there now
```

```
 1                    WATERHOUSE - 10-19-21

 2         for everyone.

 3              MS. DEITSCH-PEREZ:  Got it.  Thank

 4         you.

 5         Q.    Do you recall if the proposed

 6    response that Ms. Thedford crafted was

 7    delivered to the retail board with the -- with

 8    the yellow dates having been completed?

 9         A.    I don't know.

10              MR. MORRIS:  Davor, I'm going to ask

11         that the advisors and -- the advisors of

12         both HCMFA and NexPoint produce to me any

13         report that was given to the retail board

14         concerning the promissory notes at issue,

15         including the obligations under the notes.

16         Q.    Do you know -- do you know if

17    ultimately NexPoint informed the retail board

18    in response to its question that NexPoint owed

19    Highland approximately 23 or $24 million?

20              MS. DANDENEAU:  Objection to the

21         form.

22         A.    Sorry, are you asking, did NexPoint

23    tell the retail board that it owed Highland?

24         Q.    Let me ask a better question,

25    Mr. Waterhouse.
```

```
 1                    WATERHOUSE - 10-19-21

 2              Did -- do you know if anybody ever

 3    answered the retail board's question that was

 4    Number 2?

 5         A.    I don't -- I can't say for sure.

 6         Q.    Okay.  Do you recall -- I think you

 7    testified earlier that you walked through the

 8    advisors' financials with the retail board;

 9    correct?

10         A.    Yes.

11         Q.    And as part of that process, did you

12    disclose to the retail board the obligations

13    that NexPoint and HCMFA had to Highland under

14    promissory notes?

15         A.    The retail board, as I stated

16    earlier, receives financial information,

17    balance sheet, income statement information

18    from the advisors.  That information is

19    provided to the retail board in connection with

20    the 15(c) process.

21              So any notes between the advisors

22    and the Highland would be -- anything would be

23    detailed in those financial statements.

24         Q.    Do you recall in 2020 ever speaking

25    with the retail board about the advisors'
```

```
1                    WATERHOUSE - 10-19-21

2   obligations under the notes to Highland?

3              MS. DANDENEAU:  Objection to form.

4              MS. DEITSCH-PEREZ:  Object to the

5        form.

6        A.    I don't recall specifically.

7        Q.    Do you have any general recollection

8   of discussing with the retail board the

9   advisors' obligations to Highland under the

10  notes that they issued?

11             MS. DANDENEAU:  Object to the form.

12             MS. DEITSCH-PEREZ:  Object to the

13       form.

14       A.    I just recall generally just -- it

15  is just -- I present the financial statements,

16  and if they have questions, I answer their

17  questions and walk them through.

18             I don't recall what they asked.  I

19  don't recall where the discussion went.  I

20  don't recall anything of that nature.

21       Q.    Okay.  Do you know if anybody on

22  behalf of HCMF -- HCMFA ever told the retail

23  board that HCMFA had no obligations under the

24  two 2019 notes that you signed?  Withdrawn.

25             Do you know whether anybody on
```

Page 181

```
 1                    WATERHOUSE - 10-19-21

 2    behalf of HCMFA ever told the retail boards

 3    that you weren't authorized to sign either of

 4    the two 2019 notes?

 5                    MS. DANDENEAU:  Objection to form.

 6         A.    I'm not aware.

 7         Q.    Are you aware of anybody on behalf

 8    of HCMFA ever telling the retail boards that

 9    your execution of the two 2019 notes was a

10    mistake?

11                    MS. DANDENEAU:  Objection to form.

12         A.    I'm not aware.

13         Q.    Are you aware of anybody on behalf

14    of HCMFA ever telling the retail boards that

15    HCMFA did not have to pay the amounts reflected

16    in the two notes that you signed in 2019?

17         A.    I'm not aware.

18         Q.    Do you know whether anybody ever

19    told the retail boards -- withdrawn.

20                    Do you know whether anybody ever

21    told the retail boards that Highland has

22    commenced a lawsuit to recover on the two notes

23    that you signed in 2019?

24         A.    I'm not aware.

25         Q.    Are you aware of anybody informing
```

Page 182

1                    WATERHOUSE - 10-19-21

2     the retail boards that Highland has sued to

3     recover on the NexPoint note?

4          A.    I'm not aware.

5          Q.    Do you know whether anybody ever

6     told the retail board that Highland had

7     declared a default with respect to the two

8     HCMFA notes that you signed in 2019?

9          A.    I'm not aware.

10         Q.    Are you aware of anybody ever

11    informing the retail boards that Highland had

12    declared a default under the NexPoint note?

13         A.    I'm not aware.

14         Q.    Are you aware of anybody telling the

15    retail board that Highland made a demand for

16    payment under the 2019 notes that you signed on

17    behalf of HCMFA?

18         A.    I'm not aware.

19         Q.    Let's -- let's see if there is a

20    response to Ms. Thedford's email, if we can

21    scroll up.

22              Do you see you responded to

23    Ms. Thedford five minutes after she provided

24    the draft response to you?

25         A.    Yes.

Page 183

```
1                 WATERHOUSE - 10-19-21

2        Q.    Okay.  And do you see that Dustin

3   Norris is copied on this email?

4        A.    Yes, he is.

5        Q.    Great.  Do you know whether

6   Mr. Norris held any positions at either of the

7   advisors as of October 6, 2020?

8        A.    I will go back to -- I'm not the

9   legal expert of what appoints you or how or

10  why, but you did see Dustin's name on the

11  incumbency certificate that you produced

12  earlier.

13       Q.    Do you know what his title was in

14  October of 2020?

15             MS. DANDENEAU:  Objection to form.

16       A.    I don't -- I don't recall.

17       Q.    Was he -- did he have a title with

18  each of the advisors, to the best of your

19  recollection?

20       A.    I don't recall.

21       Q.    Do you know why he is included on

22  this email string?

23       A.    I didn't add Dustin.  It looks like

24  Lauren did.  I don't know why she added him or

25  not.  You would have to ask her.
```

Page 184

```
 1                WATERHOUSE - 10-19-21

 2       Q.    Does Mr. Norris play a role in

 3  formulating the advisors' responses to the

 4  questions asked by the retail board in

 5  connection with the 15(c) annual review?

 6             MS. DANDENEAU:  Objection to form.

 7       A.    He -- Dustin Norris is there in the

 8  board meetings.  But -- so he has a role, yes.

 9       Q.    Okay.  And does Mr. Norris hold any

10  positions, to the best of your knowledge, in

11  relation to any of the retail funds?

12       A.    I don't -- I don't believe he does.

13       Q.    How about Mr. Post, do you know

14  whether Mr. Post holds any position in either

15  of the advisors?

16       A.    I mean, he -- he -- yes.

17       Q.    What is your understanding of the

18  positions that Mr. Post holds in relation to

19  the advisors?

20             MS. DANDENEAU:  Objection to form.

21       A.    He is an employee of NexPoint

22  Advisors.  He is also the chief compliance

23  officer for -- for NexPoint.

24       Q.    Who is the chief compliance officer

25  for HCMFA, if you know?
```

1                WATERHOUSE - 10-19-21

2          MS. DANDENEAU:  Objection to form.

3     A.    That would be Jason as well.

4     Q.    Okay.  Now, looking at your

5 response, you noted initially that nothing was

6 owed under shared services.  Do I have that

7 right in substance?

8     A.    Yeah.  I think I'm being responsive

9 to Lauren's question here, whether any of the

10 shared service invoices are outstanding.

11    Q.    Right.

12    A.    Yes.

13    Q.    And that is because -- and that is

14 because the retail the retail board has asked

15 for the disclosure of all material obligations

16 that were owed to HCMLP either then or in the

17 future; isn't that right?

18         MS. DANDENEAU:  Objection to form.

19    Q.    We can go back down and look.

20    A.    Look, I don't know if that's a

21 material item, I mean, again, but sure.

22    Q.    Okay.  But there were no shared

23 services outstanding; correct?

24         MS. DANDENEAU:  Objection to form.

25    A.    That is what this email seems to

Page 186

1                    WATERHOUSE - 10-19-21

2    indicate.

3         Q.    And you wouldn't have written it if

4    you didn't believe it to be true at the time;

5    correct?

6         A.    Correct.

7         Q.    And when you referred to shared

8    services outstanding, what you meant there was

9    that neither NexPoint nor HCMFA owed Highland

10   any money under the shared services agreements

11   that they had with Highland as of October 6th,

12   2020; right?

13        A.    I don't know if it is as of October

14   6, 2020 or if it was from -- like through the

15   financials -- through the date of the

16   financials as of June 30.

17        Q.    Okay.  And then you noted that

18   HCMA -- the HCMFA note is a demand note; right?

19        A.    Yes.

20        Q.    And then you referred Ms. Thedford

21   to Kristin Hendrix for the term of the NexPoint

22   note.  Do I have that right?

23        A.    Yes.

24        Q.    And then you refer to that agreement

25   that is referenced in the 2018 audited

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 187 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 325 of 899 PageID 937

Page 187

```
 1              WATERHOUSE - 10-19-21

 2    financials about Highland's agreement not to

 3    make demand upon HCMFA until May 2021; correct?

 4         A.    Correct.

 5         Q.    And then -- and then the next thing

 6    you write is that the attorneys think that BK

 7    doesn't change that, but don't know for sure at

 8    the end of the day.

 9              Do you see that sentence?

10         A.    Yes.

11         Q.    Which attorneys were you referring

12    to?

13         A.    I don't remember.

14         Q.    Did you have a conversation with

15    attorneys concerning whether the bankruptcy

16    would change or alter in any way the agreement

17    not to make a demand under the HCMFA note?

18         A.    Look, yeah, I mean, I don't

19    specifically remember, but generally, I mean,

20    it is in this email.  I don't -- I don't -- I

21    don't -- I don't remember who I talked to or,

22    you know, was it inside counsel, outside

23    counsel, but obviously I talked to somebody.

24         Q.    Do you have any recollection --

25         A.    Well, I don't even know if it's --
```

Page 188

```
 1                    WATERHOUSE - 10-19-21

 2      actually, it may not even have been me.  I say

 3      the attorneys in, you know, a lot of -- like I

 4      talked about the team.

 5               It could have been someone on the

 6      team, like, hey, we need to run this down, and

 7      maybe they talked to attorneys again and

 8      relayed that information to me.

 9               So I really don't know if I spoke or

10      someone else did or -- or, I mean, and maybe it

11      wasn't even from corporate accounting.  Maybe

12      it was, you know, other -- I'm kind of

13      summarizing, you know, again, so I don't really

14      know -- I can't really say for sure.  I don't

15      remember how I came about of this knowledge.

16         Q.    I appreciate your efforts,

17      Mr. Waterhouse, but I will just tell you that

18      if I ask a question and you don't know the

19      answer or you don't recall, I'm happy to accept

20      that.  I don't -- I don't want you to

21      speculate, so I want to be clear about that.

22      So I appreciate it.

23               Let me just ask you simply:  Do you

24      know what attorneys -- can you identify any of

25      the attorneys who thought that the bankruptcy
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 189 of 397
Case 3:21-cv-00880-X   Document 23   Filed 01/05/22   Page 327 of 899   PageID 939

Page 189

```
 1                WATERHOUSE - 10-19-21

 2    process didn't change the agreement?

 3         A.    I don't recall.

 4         Q.    Okay.  Perfect.

 5               And then let's look at the last

 6    sentence.  It says, quote:  The response should

 7    include, as I covered in the board meeting,

 8    that both entities have the full faith and

 9    backing from Jim Dondero, and to my knowledge

10    that hasn't changed.

11               Do you see that?

12         A.    Yes.

13         Q.    Okay.  Prior to October 6th, 2020,

14    had you told the retail board that HCMFA and

15    NexPoint have the full faith and backing from

16    Jim Dondero?

17         A.    Yes.

18         Q.    Do you remember in the context in

19    which you told the retail board that?

20         A.    I mean, generally, yes.

21         Q.    Tell me what you recall.

22         A.    So we were walking through the

23    financials from the advisors; right?  So as I

24    described to you, you have got HCMFA and NPA.

25    And these -- the financials, you know, show
```

```
 1                    WATERHOUSE - 10-19-21

 2    they have liabilities on them that exceed

 3    assets.

 4               So the retail board has asked, okay,

 5    you know, how -- you know, if -- if these

 6    liabilities come due or they're payable, you

 7    know, how does that come about?

 8               And, you know, the response is,

 9    well, the advisors have the -- the full faith

10    and backing from -- from Jim Dondero.

11        Q.    And how did you know that the

12    advisors had the full faith and backing from

13    Jim Dondero?  What was the basis for that

14    statement that you made to the retail board?

15        A.    I talked to Jim about it at some

16    point in the past.

17        Q.    And did you tell Mr. Dondero that

18    you were going to inform the retail board that

19    the advisors had his full faith and backing

20    before you actually told that to the retail

21    board?

22        A.    I don't recall having that

23    conversation.

24        Q.    Do you recall if you ever informed

25    Mr. Dondero that you had disclosed or told the
```

Page 191

1                    WATERHOUSE - 10-19-21

2    retail board that the advisors had the full

3    faith and backing of Mr. -- Mr. Dondero?

4              MS. DEITSCH-PEREZ:  Object to the

5         form.

6         A.    I don't recall discussing that with

7    him at the time.

8         Q.    When you told this to the board, was

9    Mr. Dondero participating in the discussion?

10        A.    Not that I recall.

11        Q.    Withdrawn.  Was it not -- withdrawn.

12              Do you recall whether -- when you

13   covered this issue with the board, was that in

14   a -- a Zoom call or a Webex call?  Was it a

15   telephone call?  Was it in-person?  Like where

16   were you physically in relation to the board?

17        A.    I believe I was at home.

18        Q.    Okay.  Can you identify every person

19   that you recall who was present for this

20   disclosure other than -- other than the board

21   members themselves?

22              MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't recall everyone on the call.

25        Q.    Can you identify anybody who was on

1                    WATERHOUSE - 10-19-21

2    the call?

3         A.    Other than the board members?

4         Q.    Yes.

5         A.    Lauren Thedford.  I mean, there

6    are -- there are many -- my section is just one

7    of many sections that are just -- you know, as

8    you can appreciate, this is a long board

9    meeting.

10              I can't recall specifically, really

11   even generally, or who was on when this was

12   discussed.  But Lauren was typically on for the

13   entire time.

14        Q.    I apologize if I asked you this, but

15   do either of Mr. Norris or Mr. Post hold any

16   positions relative to the retail funds?

17        A.    I think you asked me this already,

18   John.

19        Q.    Okay.  I just don't recall.  Can you

20   just refresh my recollection if I did, in fact,

21   ask you the question?

22        A.    I don't believe -- if we can go

23   back.  I don't believe Mr. Norris has a title

24   at the retail funds.  Mr. -- and Mr. Post is

25   the CCO of the advisor, the advisors.

Page 193

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Do you know if either of them

 3   have a position with the retail board -- with

 4   the retail funds?

 5        A.    I don't believe Mr. Norris has a

 6   position with the retail funds.

 7        Q.    All right.  What about Mr. Post?

 8        A.    Mr. Post is the CCO of the advisors.

 9        Q.    Okay.  Does he hold any position --

10        A.    I don't believe so.

11        Q.    -- with the retail funds?

12        A.    I don't believe so.

13        Q.    Okay.

14        A.    I don't know if being the CCO for

15   the advisor conveys something for the retail

16   funds.  Again, I am not -- that is the legal

17   compliance part of it.  I don't know.

18        Q.    Why did you tell the retail board

19   that the advisors have the full faith and

20   backing from Mr. Dondero?

21              MS. DANDENEAU:  Objection to form.

22        A.    It is -- it is -- it is what has

23   been discussed with them prior.

24        Q.    And were you -- were you trying to

25   give them comfort that even though the
```

Page 194

```
 1                   WATERHOUSE - 10-19-21

 2    liabilities exceeded the assets that the

 3    advisors would still be able to meet their

 4    obligations as they become due?

 5              MS. DANDENEAU:  Objection to form.

 6              MS. DEITSCH-PEREZ:  Object form.

 7        A.    I -- I can't -- I don't remember

 8    specifically the conversation, but generally --

 9    you know, generally, yes.  And that is why --

10    but, you know, again, in this email saying, you

11    know, I am sure I qualified it with the retail

12    board, you know, as I said I like -- you know,

13    to my knowledge, that hasn't changed.  But,

14    again, generally -- generally that is what I

15    remember.

16        Q.    Okay.  Do you recall if in the

17    advisors' response to the retail board's

18    question if the response included any statement

19    concerning Mr. Dondero and -- and the full

20    faith and backing that he was giving to the

21    advisors?

22              MS. DEITSCH-PEREZ:  Object to the

23        form.

24        A.    I don't -- I don't remember

25    specifically what was provided.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 195 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 333 of 899 PageID 945

Page 195

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Okay.

 3        A.    And I don't really -- I don't really

 4   remember generally either.

 5        Q.    Okay.

 6              MR. MORRIS:  So -- so, again, I'm

 7        just going to ask Mr. Rukavina if your

 8        clients can produce as soon as possible the

 9        15(c) response, the written response that

10        the advisors made, if any, to the board's

11        Question No. 2.

12              I'm not looking for the whole

13        response, but I certainly want the response

14        to Question No. 2.

15        Q.    Do you have a general understanding

16   as to the amount by which -- withdrawn.

17              Did -- did the assets of --

18   withdrawn.

19              Did the liabilities of HCMFA exceed

20   its assets in 2020?

21              MS. DANDENEAU:  Objection to form.

22              MS. DEITSCH-PEREZ:  Objection, form.

23        A.    I believe I have already answered

24   that question earlier, I think.  I believe I

25   said yes.
```

1                    WATERHOUSE - 10-19-21

2        Q.    Okay.  And did the liabilities of

3    NexPoint exceed its assets in 2020?

4              MS. DEITSCH-PEREZ:  Objection to

5         form.

6        A.    I don't believe so.

7        Q.    Okay.  So -- so it was only one of

8    the two advisors who had liabilities that

9    exceeded the value of the assets.

10             Do I have that right?

11             MS. DEITSCH-PEREZ:  Objection to

12        form.

13             MS. DANDENEAU:  Form.

14       A.    Yes.

15       Q.    And do you know, ballpark, the

16   amount by which the value of HCMFA's

17   liabilities exceeded their assets in 2020?

18             MS. DANDENEAU:  Objection to form.

19       A.    I don't -- I don't recall.

20             MR. MORRIS:  I had specifically

21        requested in discovery the audited

22        financial reports for both advisors and

23        NexPoint.  I think I may have gotten one

24        for NexPoint but I'm still waiting for the

25        balance.  And I'm going to renew my request

Page 197

1                    WATERHOUSE - 10-19-21

2           for those documents too.

3           Q.    Let's go to the next exhibit, which

4    is Number 10.  So I think it is in your stack,

5    Mr. Waterhouse.

6                 MR. MORRIS:  And we can take the one

7           down from the screen and put up Number 10

8           for everybody.

9                 (Exhibit 10 marked.)

10          Q.    And I don't know if you have ever

11   seen this before, but I'm really putting it up

12   on the screen for purposes of turning to the

13   very last page of the document.

14                So this is a document that we have

15   been -- that we premarked as Exhibit 10.  And

16   we're turning to the last page of the document,

17   which is a document that was filed in the

18   adversary proceeding 21-3004.  And -- no, I

19   apologize, I think we -- right there.  Perfect.

20                And it is page 31 of 31.

21                MR. MORRIS:  I think there may have

22          been some something erroneously stapled to

23          the hard copy that I gave you folks, but

24          I'm looking for page 31 of 31 in the

25          document that begins with the first page of

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 198 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 336 of 899 PageID 948

Page 198

1          WATERHOUSE - 10-19-21

2     Exhibit 10.

3     Q.   Do you have that, Mr. Waterhouse?

4     A.   I don't have it yet.  I'm looking.

5     Q.   All right.  If you look at the top

6     right-hand corner, you will see it says page

7     hopefully something of 31?

8     A.   Yes, I've got it now.

9     Q.   Okay.  You have got 31 of 31.  You

10    can take a moment to read that, if you would

11    like.

12    A.   (Reviewing document.)  Okay.

13    Q.   Have you ever seen this before?

14    A.   I don't know if I have seen this

15    specific document, but, you know, I've --

16    I'm -- I'm aware of it.

17    Q.   And is this the document that you

18    had in mind when you sent that email to

19    Ms. Thedford that we just looked at where you

20    said that Highland had agreed not to make a

21    demand upon HCMFA until May 2021?

22    A.   Honestly, I don't -- it wasn't this

23    document.  I mean, it's something like this,

24    yes.  I mean, yes.

25    Q.   Well --

Page 199

1                    WATERHOUSE - 10-19-21

2         A.    It is something like this, but I

3    don't think it was this specific document.

4         Q.    Well, but this document does say in

5    the last sentence that Highland agreed not to

6    seek -- not to demand payment from HCMFA prior

7    to May 31, 2021; right?

8         A.    Yes.

9         Q.    And are you aware of any other

10   document that was ever created pursuant to

11   which Highland agreed not to demand payment on

12   amounts owed by HCMFA before May 31, 2021?

13        A.    Hold on.  Are you asking, am I aware

14   of a document that by HCMFA that basically says

15   otherwise?

16        Q.    No.  Let me try again.

17             Are you aware of any other document

18   pursuant to which -- pursuant to which Highland

19   agreed not to make a demand on HCMFA until May

20   31st, 2021?

21        A.    I'm -- I think there was something

22   in connection with -- with the -- with the

23   audit that basically says the same thing.

24        Q.    Okay.  And do you think that the

25   audit is referring to this particular document?

Page 200

```
 1              WATERHOUSE - 10-19-21

 2        A.    I don't know.

 3        Q.    All right.  This document is dated

 4   April 15, 2019.  Do you see that?

 5        A.    I do.

 6        Q.    And do you remember that the audit

 7   was completed on June 3rd, 2019?

 8        A.    Yes.

 9        Q.    And do you recall that the audited

10   financials -- and I'm happy to pull them up if

11   you would like, but do you recall that the

12   audited financials included a reference to the

13   agreement pursuant to which Highland agreed not

14   to make a demand until May 31st, 2021?

15        A.    Yes, I remember.

16        Q.    And as part of the process, would

17   you have expected the corporate accounting team

18   to have provided a copy of this document to

19   PwC?

20              MS. DANDENEAU:  Objection to form.

21        A.    Yes, I would have expected something

22   like this, or again, you know, some document

23   that basically states -- states the deferral

24   till May 31 of 2020.

25        Q.    Okay.
```

1                      WATERHOUSE - 10-19-21

2          A.    May 31 of 2021, excuse me.

3          Q.    And this document states the

4    deferral that you just described; correct?

5          A.    It does.

6          Q.    And this document states the

7    deferral that was described in the audited

8    financial statements that we looked at before;

9    correct?

10         A.    It does.

11               MR. MORRIS:   Okay.  Can we scroll

12         down just a little bit to see who signed on

13         behalf of the acknowledgment there.

14         Q.    Okay.  So Mr. Dondero signed this

15   document on behalf of both HCMFA and Highland;

16   do you see that?

17         A.    I do.

18         Q.    Okay.  Did you discuss this document

19   or the -- withdrawn.

20               Did you discuss the concept of the

21   deferral with Mr. Dondero in the spring of

22   2019?

23         A.    I think I testified I don't recall.

24         Q.    Okay.  Do you know whose idea it was

25   to issue the acknowledgment in this form?

Page 202

```
 1                   WATERHOUSE - 10-19-21

 2       A.    I don't recall.

 3             MR. MORRIS:  Can we scroll back up

 4       to the document, please.

 5       Q.    Do you see in the beginning it says,

 6  reference is made to certain outstanding

 7  amounts loaned from Highland to HCMFA for

 8  funding ongoing operations.

 9             Do you see that?

10       A.    Yes.

11       Q.    And were you aware as the CFO of

12  Highland and as the treasurer of HCMFA that as

13  of April 15, 2019, Highland had made certain

14  loans to HCMFA to fund HCMFA's ongoing

15  operations?

16       A.    Yes.

17       Q.    And were you aware that those loans

18  were payable on demand and remained outstanding

19  as of December 31st, 2018?

20       A.    Yes.

21       Q.    And were you aware that those

22  amounts were payable on demand, and they

23  remained outstanding as of April 15, 2019?

24             MS. DEITSCH-PEREZ:  Object to the

25       form.
```

Page 203

```
 1               WATERHOUSE - 10-19-21

 2        A.     Well, this -- this document dated

 3    April 15, 2019 says they have been deferred to

 4    May 31, 2021.

 5        Q.     Right.  But I'm just sticking to the

 6    first paragraph where they refer to the

 7    outstanding amounts.  And in the end it says

 8    the -- it remained outstanding on December

 9    31st, 2018, and I think you told me that you

10    understood that, and then I'm just trying to

11    capture the last piece of it.

12               Did you understand that there were

13    amounts outstanding from the loan that Highland

14    made to HCMFA to fund ongoing operations as of

15    April 15th, 2019?

16        A.     Yes.

17        Q.     Thank you.  Let's look at the next

18    sentence.  HCMFA expects that it may be unable

19    to repay such amounts should they become due

20    for the period commencing today and continuing

21    through May 31st, 2021.

22               Do you see that?

23               MS. DANDENEAU:  Objection to form.

24        A.     I do.

25        Q.     As the CFO -- withdrawn.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 204 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 342 of 899 PageID 954

Page 204

```
 1                    WATERHOUSE - 10-19-21

 2                    As the treasurer of HCMFA, did you

 3     believe that -- do you believe that statement

 4     was true and accurate at the time it was

 5     rendered?

 6          A.    I mean, it -- it -- the answer to

 7     that is I really didn't have any -- I didn't

 8     have an opinion really.

 9          Q.    Did you do anything to educate

10     yourself in April of 2019 on the issue of

11     whether HCMFA could repay the amounts that it

12     owed to Highland should they become due?

13          A.    I don't believe so.

14          Q.    Did you at any time form any

15     opinions as to HCMFA's ability to repay all

16     amounts due to Highland should they become due?

17          A.    Not really.  I guess I don't...

18          Q.    Well, you told the retail board that

19     HCMFA's liabilities exceeded their assets in

20     2020; correct?

21          A.    Yes.

22          Q.    Based on the work that you did to

23     prepare for the retail board, did you form any

24     view as to whether HCMFA would be unable to

25     repay the amounts that it owed to Highland
```

```
 1                    WATERHOUSE - 10-19-21
 2    should they become due?
 3             MS. DANDENEAU:  Objection to form.
 4        A.    I mean, I -- when you look at that,
 5    to answer you, completely, you know, again,
 6    if -- the response I gave the retail board was,
 7    you know, the -- the advice -- HCMFA advisors
 8    have the -- have the full faith and backing of
 9    Jim Dondero.  So I didn't form an opinion of
10    whether the advisor could pay it or not.
11        Q.    Did you form any view as to whether
12    the advisors could repay the amounts that it
13    owed to Highland should they become due without
14    the full faith and backing of Mr. Dondero?
15             MS. DANDENEAU:  Objection to form.
16             MS. DEITSCH-PEREZ:  Form.
17        A.    I mean, if you -- if you -- if you
18    take that last statement out, I mean, it would
19    be difficult for HCMFA to pay back demand notes
20    at that time.
21        Q.    And it was precisely for that reason
22    that you told the retail board that -- that the
23    retail -- that the advisors had the full faith
24    and backing of Mr. Dondero; correct?
25             MS. DANDENEAU:  Objection to form.
```

Page 206

```
 1                   WATERHOUSE - 10-19-21

 2        A.    I mean, yes, as the mouthpiece, I

 3   was relaying information.

 4        Q.    Okay.  And you relayed that

 5   information with the knowledge and approval of

 6   Mr. Dondero; correct?

 7              MS. DEITSCH-PEREZ:  Object to the

 8        form.

 9        A.    As I stated in the email, I don't

10   believe, and I think I testified I don't

11   believe I had conversations with Mr. Dondero at

12   the time of that board meeting.

13        Q.    Did you tell the retail board that

14   the advisors had the full faith and backing of

15   Mr. Dondero without Mr. Dondero's prior

16   approval?

17        A.    Yeah, I -- I -- yes, I'm -- like I

18   said, I think I testified earlier, I'm sure I

19   qualified it as well.

20        Q.    What do you mean by that?

21              MS. DANDENEAU:  Objection to form.

22        A.    Again -- again, like I said in the

23   email, it has the full faith and backing of Jim

24   Dondero unless that has changed.

25        Q.    Actually that is not what you said,
```

Page 207

```
 1              WATERHOUSE - 10-19-21
```

2    so let's put the email back up.

3         A.    It is -- it is -- it is in the

4    email.

5         Q.    Let's put the email back up.  You

6    didn't say unless it has changed.  You said you

7    believe it hasn't changed; right?

8         A.    Okay.  And to my knowledge that

9    hasn't changed, that is what it says.

10        Q.    That's right.

11        A.    But, again, I mean, that is -- I

12   don't know everything.  And I'm not in every

13   conversation.  I'm not -- to presume that I am,

14   is -- and you have to put myself -- as you

15   started this out, Mr. Morris, I was at home in

16   October of 2020 with COVID -- or, you know,

17   under these COVID times that we described is

18   very difficult.

19             We have all been working at home for

20   really the first time ever, undergoing

21   processes, procedures, control environments

22   that have been untested, and there is poor

23   communication.

24             So I am relaying, as I'm telling you

25   now, what is in the email.  And unless

Page 208

 1                    WATERHOUSE - 10-19-21

 2   something has changed -- to my knowledge, it

 3   hasn't changed, but it could have changed.

 4        Q.    When you say that the advisors have

 5   the full faith and backing from Mr. Dondero,

 6   did you intend to convey that, to the extent

 7   the advisors were unable to satisfy their

 8   obligations as they become due, Mr. Dondero

 9   would do it for them?

10             MS. DANDENEAU:  Object to the form.

11             MS. DEITSCH-PEREZ:  Object to the

12        form.

13             And, John, we have given you a lot

14        of leeway here but this does not seem

15        relevant to this case.  You seem sort of

16        taking a complete sort of diversion into

17        the allegations and the complaint just

18        filed on Friday, and so I would ask you to

19        move on because --

20             MR. MORRIS:  And I will tell you --

21        I will tell you that I have never read that

22        complaint cover-to-cover.  I have nothing

23        to do with the prosecution of those claims.

24        And this issue that we're talking about

25        right now is related solely to the

Page 209

```
 1                    WATERHOUSE - 10-19-21

 2        promissory notes that your clients refuse

 3        to pay.

 4              So I'm going to continue to ask my

 5        questions, and I would ask the court

 6        reporter to read back my last question.

 7                        (Record read.)

 8              MS. DEITSCH-PEREZ:  And then I

 9        believe there were objections to form.

10        Q.    You can answer the question.

11        A.    Yes.

12        Q.    Thank you very much, sir.

13              MR. MORRIS:  Can we go back to the

14        other document, please?

15        Q.    Mr. Waterhouse, do you know if this

16   document was ever shared with the retail board?

17        A.    I don't recall.

18        Q.    Did you ever share it with the

19   retail board?

20        A.    I don't recall.

21        Q.    Did you ever tell the retail board

22   about the substance of this document?

23        A.    I don't recall.

24        Q.    Did you ever tell the retail board

25   that Highland had agreed not to make a demand
```

Page 210

1                     WATERHOUSE - 10-19-21

2     against HCMFA until May 2021?

3          A.    I don't recall.

4          Q.    Do you know whether anybody on

5     behalf of the advisors ever informed the retail

6     board that Highland had agreed on April 15,

7     2019, not to make a demand against HCMFA under

8     the promissory notes?

9          A.    I don't recall.

10         Q.    Did you instruct Ms. Thedford or

11    anybody else responding to the retail board's

12    15(c) inquiry to disclose this document?

13         A.    Did I instruct Ms. Thedford or

14    anyone else to -- to -- to produce this, to

15    disclose this document?  Is that what you -- I

16    just want to make sure.

17         Q.    Uh-huh.

18         A.    Yeah, I don't -- I don't recall.

19         Q.    Did you instruct anybody to inform

20    the retail board, in response to their question

21    as part of the 15(c) process, to -- to tell the

22    retail board about Highland's agreement not to

23    make a demand until 2021?

24              MS. DANDENEAU:  Objection to form.

25         A.    I don't recall.

Page 211

```
1                    WATERHOUSE - 10-19-21

2         Q.    Did you ever inform PwC that HCMFA's

3    liabilities exceeded its assets?

4              MS. DANDENEAU:  Object to the form.

5         A.    I don't -- I don't think I told

6    them.  I mean, they -- they audited the

7    financial statements.

8         Q.    Did -- do you know if anybody on

9    behalf of Highland ever informed

10   PricewaterhouseCoopers that HCMFA may be unable

11   to repay amounts owing to Highland, should they

12   become due?

13             MS. DANDENEAU:  Objection to form.

14        A.    Yes.  Again, I think I testified

15   earlier that -- that this was communicated to

16   the auditors.

17        Q.    Ideally --

18        A.    I don't know who exactly did that.

19   I don't recall doing it, but, yeah, it was --

20   it was communicated.  And that is why -- I

21   mean, there is a disclosure in the financial

22   statements; right?

23        Q.    There is, and that disclosure

24   relates to the last sentence of this document;

25   correct?
```

1                    WATERHOUSE - 10-19-21

2          A.    Yes.

3          Q.    Do you recall looking in the

4     document and seeing anything that was disclosed

5     with respect to the sentence above that?

6          A.    No.

7          Q.    Do you know whether anybody on

8     behalf of Highland ever informed

9     PricewaterhouseCoopers that HCMFA expects that

10    it may be unable to repay amounts due and owing

11    to Highland should they become due?

12              MS. DEITSCH-PEREZ:  Object to the

13         form.  I think that is the third time.

14         A.    I don't recall.  Again, as I said,

15    we -- all of this was given to the auditors.

16         Q.    Do you know if Highland received

17    anything of value in exchange for its agreement

18    not to demand payment on amounts owed by HCMFA

19    prior to May 31st, 2021?

20              MS. DEITSCH-PEREZ:  Object to the

21         form.  That is the second time.

22              MS. DANDENEAU:  Object to the form.

23         A.    I have answered this question.

24              MR. RUKAVINA:  Hold on.  Object to

25         legal conclusion.  Go ahead.

Page 213

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I have answered this question

 3   before.

 4        Q.    And the answer was no?

 5        A.    I'm not aware.

 6        Q.    Now, this acknowledgment can't

 7   possibly apply to the two notes that you signed

 8   on behalf of HCMFA because those notes were

 9   signed on May 2nd and May 3rd, 2019; is that

10   right?

11              MS. DANDENEAU:  Objection to form.

12        A.    Unless there is a drafting error.

13        Q.    Okay.  Are you aware of a drafting

14   error?

15        A.    I'm not aware.  I didn't -- I wasn't

16   part of -- I didn't sign this note or this

17   acknowledgment.  I didn't draft it.

18        Q.    But you do see it is dated April 15,

19   2019; right?

20        A.    Yes.

21        Q.    And this was a document that was

22   actually included by the advisors in a pleading

23   they filed with the Court; right?

24              MR. RUKAVINA:  Well, I don't know

25        that so I object to form.
```

Page 214

```
 1                  WATERHOUSE - 10-19-21
 2       Q.    Okay.  Let's go to the first page of
 3   the document and just confirm that.
 4            MR. AIGEN:  Mr. Morris, I just note
 5       that you already said there was some error
 6       with the document that is listed as
 7       exhibit --
 8            MR. MORRIS:  No.  No, no, no.
 9            MS. DEITSCH-PEREZ:  Oh, okay.
10            MR. MORRIS:  What I said is that
11       there is a few pages that were mistakenly
12       stapled to the end of the document.
13            MS. DEITSCH-PEREZ:  Okay.
14            MR. MORRIS:  There is no problem
15       with this document.
16            MS. DEITSCH-PEREZ:  And just so
17       we're clear that the document -- the pages
18       that start with defendant's amended answer
19       are not intended to be part of this
20       document?
21            MR. MORRIS:  That's correct.
22            MS. DEITSCH-PEREZ:  And that the --
23       but it is your representation that the rest
24       of the document is -- is -- is correct
25       because we don't -- we don't have any way
```

Page 215

```
 1                   WATERHOUSE - 10-19-21

 2          of verifying that, we're just --

 3                MR. MORRIS:  You do, actually.  You

 4          could just go to Docket No. 21-3004.

 5                MS. DEITSCH-PEREZ:  If you want to

 6          stop this deposition so we can go and pull

 7          that document up, we're happy to do it.  So

 8          I am just asking you for your

 9          representation.

10                MR. MORRIS:  Sure.  I gave that.

11                MS. DEITSCH-PEREZ:  Okay.

12          Q.    So do you see that this is a

13   document that was actually filed with the Court

14   by Highland Capital Management Fund Advisors?

15          A.    No.  I get with the first page in

16   the section.  Maybe I'm looking at the wrong

17   thing.  It says, Highland Capital Management.

18          Q.    Don't worry about it.  Don't worry

19   about it.

20          A.    Maybe I went back -- okay.

21                MR. MORRIS:  All right.  Can we put

22          up on the screen Exhibit 2.

23                (Exhibit 2 marked.)

24                MR. MORRIS:  I think it is

25          Exhibit 1.
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 216 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 354 of 899 PageID 966

Page 216

```
 1              WATERHOUSE - 10-19-21

 2              MS. DANDENEAU:  I'm sorry, John, did

 3         you say Exhibit 2 or Exhibit 1?

 4              MR. MORRIS:  It is Exhibit 2 in the

 5         binders so it is premarked Exhibit 2.  And

 6         now I'm asking -- right there -- going to

 7         Exhibit 1 to the document that was marked

 8         as Exhibit 2.

 9              MS. DANDENEAU:  Got it.  In the

10         binder there is no --

11              MS. DEITSCH-PEREZ:  There is no

12         Exhibit 1.

13              MR. MORRIS:  All right.  So look at

14         the one on the screen.

15         Q.   Do you see, Mr. Waterhouse, that

16    this is a promissory note dated May 31st, 2017,

17    in the approximate amount of $30.7 million?

18         A.   Yes.

19         Q.   And do you see that the maker of the

20    note is NexPoint?

21         A.   Yes.

22         Q.   And that Highland is the payee; is

23    that right?

24         A.   Yes.

25         Q.   Okay.  And do you see in Paragraph 2
```

Page 217

1                    WATERHOUSE - 10-19-21

2     this is an annual installment note?

3          A.    Can you scroll down.

4          Q.    Sure.

5                MR. MORRIS:  Can we scroll down --

6          yeah, there you go.

7          A.    Right there, yeah.  Yes.

8                MR. MORRIS:  And can we scroll down

9          to the signature line.

10         Q.    And do you recognize that as

11    Mr. Dondero's signature?

12         A.    Yes.

13         Q.    And is this the promissory note that

14    we talked about earlier where NexPoint had made

15    certain payments in the aggregate amount of

16    about 6 to $7 million against principal and

17    interest?

18         A.    I don't recall discussing the

19    aggregate principal amounts of 6 to $7 million,

20    but -- so I don't -- I don't recall that prior

21    discussion with those amounts.

22         Q.    All right.  Let's take a look.

23    NexPoint always included this promissory note

24    as a liability on its audited financial

25    statements; right?

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 218 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 356 of 899 PageID 968

Page 218

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And NexPoint had its financial

4   statements audited; isn't that correct?

5        A.    Yes.

6        Q.    And was the process of NexPoint's

7   audit similar to the process you described

8   earlier for Highland and HCMFA?

9        A.    Yes, it is similar.

10       Q.    Okay.

11             MR. MORRIS:  Can we put up

12        NexPoint's audited financials and let

13        everybody know what exhibit number it is,

14        La Asia?

15             MS. CANTY:  It is going to be

16        Exhibit 46.

17             (Exhibit 46 marked.)

18       Q.    And do you see, sir, that we've put

19   up NexPoint Advisors' consolidated financial

20   statements and supplemental information for the

21   period ending December 31st, 2019?

22       A.    Yes.

23       Q.    Did you participate in the process

24   whereby these audited financial statements were

25   issued?

Page 219

```
 1                  WATERHOUSE - 10-19-21

 2          A.     I didn't participate directly, as

 3     I've described before, about the -- the team

 4     performing the audit.

 5          Q.     Do you recall when the audit of

 6     NexPoint's financial statements for the period

 7     ending December 31st, 2019 was completed?

 8          A.     Yes.

 9          Q.     And when do you recall it being

10     completed?

11          A.     In January of 2021.

12          Q.     Do you know why the 2019 audit

13     report wasn't completed until January of 2021?

14          A.     Yes.

15          Q.     Why was the NexPoint audit report

16     for the period ending 12/31/19 not completed

17     until January 2021?

18          A.     Because we had to deal with working

19     from home from -- with COVID, and on top of all

20     of our daily responsibilities and job duties

21     at -- at providing -- at Highland providing

22     services to NexPoint, we had to do all of this

23     extra work for a bankruptcy that was filed in

24     October of 2019.

25                  MR. MORRIS:  Can we go to the
```

```
 1                WATERHOUSE - 10-19-21

 2        balance sheet on page 3?  Okay.  Stop right

 3        there.

 4        Q.    Do you see under the liabilities

 5   section, the last item is note payable to

 6   affiliate?

 7        A.    Yes.

 8        Q.    And is that the note that we just

 9   looked at?

10             MS. DANDENEAU:  Objection to form.

11        Q.    Withdrawn.

12             Is that the approximately

13   $30 million note that we just looked at that

14   was dated from 2017?

15             MS. DANDENEAU:  Objection to form.

16        A.    I believe no.

17        Q.    Okay.  You're not aware of any other

18   note that was outstanding from NexPoint to

19   Highland as of the end of the year 2019, other

20   than that one $30 million note; right?

21        A.    I don't recall.

22        Q.    And as of the end of 2019, the

23   principal amount that was due on the note was

24   approximately $23 million; right?

25             MS. DEITSCH-PEREZ:  Object to the
```

Page 221

```
 1                WATERHOUSE - 10-19-21
 2      form.
 3      A.    Approximately.
 4      Q.    And does that refresh your
 5 recollection that between the time the note was
 6 executed and the end of 2019, that NexPoint had
 7 paid down approximately $7 million?
 8      A.    Yes.  If we are just doing the math,
 9 yes.
10      Q.    Okay.  Did NexPoint complete its
11 audit from 2020?
12      A.    Sorry, you kind of broke up.  Do
13 NexPoint complete?
14      Q.    The audit of its financial
15 statements for the period ending December 31st,
16 2020?
17      A.    No.
18      Q.    No, it's not complete?
19      A.    No, it is not complete.
20      Q.    Did HCMFA complete its audit for the
21 year ending December 31st, 2020?
22      A.    No.
23            MR. MORRIS:  Can we go to page 15,
24      please, the paragraph at the bottom.
25      Q.    Do you see that NexPoint has
```

Page 222

```
 1              WATERHOUSE - 10-19-21

 2   included under notes payable to Highland a

 3   reference to the amounts that were outstanding

 4   as of the year-end 2019 under the note that we

 5   looked at just a moment ago?

 6        A.    Yes.  Are you talking about the

 7   second paragraph?

 8        Q.    I'm actually talking about first

 9   paragraph.  Do you understand that the first

10   paragraph is a reference to the 2017 note, and

11   the amounts that were -- the principal amount

12   that was outstanding as of the end of 2019?

13             MS. DANDENEAU:  Objection to form.

14        John, do you mean the first paragraph of

15        that page?

16             MR. MORRIS:  No, the first paragraph

17        under notes payable to Highland.

18        A.    Yeah, I see the paragraph, and

19   again, this is what I answered earlier.  I

20   believe so, just because I don't -- again, this

21   is a number in a balance sheet, and without

22   matching it up and seeing the detail with the

23   schedule like I kind of talked about for

24   Highland's financial statements, it is a little

25   bit more difficult to tie everything in
```

Page 223

1              WATERHOUSE - 10-19-21

2    perfectly together.

3          Q.    Okay.  But you're not aware of any

4    note that was outstanding at the end of 2019

5    from NexPoint to Highland other than whatever

6    principal was still due and owing under the

7    $30 million note issued in 2017; correct?

8          A.    Well, it -- I don't -- there is

9    reference in the second paragraph.  I don't --

10   I don't -- I don't recall what that is

11   referring to, so I don't -- I don't know.

12         Q.    Well, if you listen carefully to my

13   question, right, I'm asking about notes that

14   were outstanding at the end of 2019, and if we

15   look at the paragraph you just referred to, it

16   says that during the year there were new notes

17   issued totaling $1.5 million, but by the end of

18   the year, no principal or interest was

19   outstanding on the notes.

20              Do you see that?

21         A.    Oh, I do, yes.

22         Q.    So does that refresh your

23   recollection that there were no notes

24   outstanding from NexPoint to Highland other

25   than the principal remaining under the original

Page 224

```
 1                    WATERHOUSE - 10-19-21

 2    $30 million 2017 note that we looked at a

 3    moment ago?

 4         A.    Well, we're at the bottom of the

 5    page.  Is there anything on page 16?

 6         Q.    That is a fair question, sure.  That

 7    is it.

 8         A.    Okay.  So it appears that that is

 9    the only note that is detailed in the notes in

10    the financial statement.

11         Q.    And you don't have any memory of any

12    other note other than the 2017 note, right,

13    being outstanding as of the end of the year?

14         A.    I deal with thousands of

15    transactions every year.  I don't really have a

16    very specific memory for what exactly was

17    outstanding.

18              MR. MORRIS:  Why don't we take a

19         break now.  We've been going for a little

20         while.  It's 3:26.  Let's come back at

21         3:40.

22              VIDEOGRAPHER:  We're going off the

23         record at 3:26 p.m.

24         (Recess taken 3:26 p.m. to 3:39 p.m.)

25              VIDEOGRAPHER:  We are going back on
```

```
 1                  WATERHOUSE - 10-19-21

 2        the record at 3:39 p.m.

 3        Q.    All right.  Mr. Waterhouse, we -- I

 4   don't think we have a lot more here.

 5             To the best of your knowledge and

 6   recollection, were all affiliate loans and all

 7   loans made to Mr. Dondero recorded on

 8   Highland's books and records as assets of

 9   Highland?

10             MS. DANDENEAU:  Object to the form,

11        asked and answered.

12        A.    To my knowledge, yes.

13        Q.    Okay.  Can you recall any loan to

14   any affiliate or Mr. Dondero that was not

15   recorded on Highland's books and records as an

16   asset?

17        A.    Like during my time as CFO?  I don't

18   recall.

19        Q.    How about after the time that you

20   were CFO?  Did you recall that there was a loan

21   by Highland to an affiliate or to Mr. Dondero

22   that hadn't been previously recorded on

23   Highland's books as an asset?

24             MS. DANDENEAU:  Objection to form.

25        A.    I guess I don't understand the
```

Page 226

```
 1                    WATERHOUSE - 10-19-21

 2     question.  I left Highland as of -- I'm not

 3     aware of -- I left Highland in February --

 4     probably the last day of February of 2021.

 5          Q.    Okay.

 6          A.    I'm not -- I'm not aware of any --

 7     I'm not aware of anything past that date.

 8          Q.    Okay.  While you were the CFO at

 9     Highland, did Highland prepare in the ordinary

10     course of business a document that reported

11     operating results on a monthly basis?

12          A.    Yes.

13          Q.    And are you generally familiar with

14     the monthly operating reports?

15          A.    Yeah.  You are referring to the

16     reports that we filed to the Court every month?

17          Q.    I apologize, I'm not.  I'm taking

18     you back to the pre-petition period.  There was

19     a report that I have seen that I'm going to

20     show you, but I'm just asking for your

21     knowledge.

22                MR. MORRIS:  Let's put it up on the

23          screen, Exhibit 39.

24                (Exhibit 39 marked.)

25          Q.    Do you see this is a document that
```

Page 227

```
 1                    WATERHOUSE - 10-19-21

 2    is called operating results?

 3          A.    Yeah, that's the title of it.

 4          Q.    Okay.  And was a report of operating

 5    results prepared by Highland on a monthly basis

 6    during the time that you served as CFO?

 7          A.    No.

 8          Q.    Are you familiar with a document of

 9    this type?  And we can certainly look at the

10    next page or two to refresh your recollection.

11          A.    I'm just looking at the title.  I

12    don't really -- again, as I discussed before, I

13    don't have any records or documents or emails

14    or appointments or anything that I was able to

15    use prior to -- prior to this deposition, so

16    I'm doing the best I can.

17          Q.    Okay.  You don't need to apologize.

18    I'm just asking you if you are familiar with

19    the document called Operating Results that was

20    prepared on a monthly basis at Highland?

21                MS. DEITSCH-PEREZ:  Object to the

22          form.

23          Q.    If you're not, you're not.

24          A.    I don't believe this was prepared on

25    a monthly basis.
```

```
 1                 WATERHOUSE - 10-19-21

 2      Q.    Okay.  Do you see that this one

 3   is -- is dated February 2018?

 4      A.    Yes.

 5      Q.    Do you have -- do you believe --

 6   have you ever seen a document that was

 7   purporting to report operating results for

 8   Highland?

 9            MS. DANDENEAU:  Objection to form.

10      A.    Yes.

11      Q.    Okay.  And when you say that you

12   don't believe it was produced on a monthly

13   basis, was it produced on any periodic bases to

14   the best of your recollection?

15      A.    I believe it was -- it was prepared

16   on an annual basis.

17      Q.    Okay.

18            MR. MORRIS:  Can we look at the next

19      page.

20      Q.    Do you see that there is a statement

21   here called:  Significant items impacting

22   HCMLP's balance sheet?

23            And it is dated February 2018.

24      A.    Yes.

25      Q.    Do you recall that there was a
```

Page 229

1                    WATERHOUSE - 10-19-21

2    report that Highland prepared that identified

3    significant items impacting the balance sheet?

4         A.    A report that was prepared.

5         Q.    Let me ask a better question:  Did

6    Highland prepare reports to the best of your

7    recollection that identified significant items

8    that impacted its balance sheet?

9         A.    Well, so Highland prepared a -- a

10   monthly close package.  And maybe I'm

11   getting -- and -- and maybe change names at one

12   time or maybe I'm just -- again, just

13   misremembering -- but in that, yes, there is a

14   page that would detail just changes in -- you

15   know, just changes month over month on the

16   balance sheet.

17        Q.    Okay.  And maybe it is my fault.

18   Maybe I didn't know the proper name for it.

19   But let's use the phrase "monthly close

20   package."

21             Did Highland prepare a monthly close

22   package in the ordinary course of business

23   during the time that you served as CFO?

24             MS. DANDENEAU:  Objection to form.

25        A.    Yes.

Page 230

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    And did the monthly close package

 3   that Highland prepared include information

 4   concerning significant items that impacted

 5   Highland's balance sheet?

 6        A.    Yes, it had a page like that is --

 7   that is on the screen that detailed items

 8   like -- of that nature.

 9        Q.    And do you know who -- was there

10   anybody at Highland who was responsible for

11   overseeing the preparation of the monthly

12   reporting package?

13        A.    That would have been -- again, it

14   varies over time during my tenure as CFO.

15   It -- it varied over -- over time, but -- but

16   typically a -- a corporate accounting manager.

17        Q.    And who were the corporate

18   accounting managers during your tenure as CFO?

19        A.    It would have been Dave Klos and

20   Kristin Hendrix.

21        Q.    And did the corporate accounting

22   manager deliver to you drafts of the monthly

23   close package before it was finalized?

24        A.    Sometimes.

25        Q.    Was that the practice even if there
```

Page 231

1                    WATERHOUSE - 10-19-21

2      were exceptions to the practice?

3           A.    The practice meaning that they

4      sometimes lured them to me?

5           Q.    That that was the expectation even

6      if circumstances prevented that from happening

7      from time to time.

8                    MS. DEITSCH-PEREZ:  Object to the

9           form.

10          A.    I -- I would say it started out that

11     way but over the years it -- it was not

12     enforced.

13          Q.    Okay.  So you were -- you reviewed

14     and approved monthly -- monthly reporting

15     packages for a certain period of time and then

16     over time you stopped doing that.

17                    Do I have that right?

18                    MS. DANDENEAU:  Objection to form.

19          A.    Yes, I mean, if you're talking about

20     a formal meeting where we sit down and go

21     through and approve it.  I would say that was

22     standard practice a decade -- you know, early

23     on.  And as time went on that -- that -- that

24     practice wasn't followed.

25          Q.    Okay.

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 232 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 370 of 899 PageID 982

Page 232

1                    WATERHOUSE - 10-19-21

2          A.     And, quite frankly, I don't even

3    know if these were -- these were sent to me

4    even in any capacity.

5          Q.     What was the purpose of preparing

6    the monthly reporting package -- withdrawn.

7                 What was the purpose of preparing

8    the monthly close package?

9                 MS. DEITSCH-PEREZ:  Object to the

10          form.

11         A.     The -- the original purpose was so

12   that it would just -- it would be a report that

13   was reviewed monthly with senior management.

14         Q.     Who was included in the idea of

15   senior management?

16         A.     You know, I think originally when

17   this was conceived that would have been like

18   Jim Dondero and Mark Okada.

19         Q.     Were monthly reporting -- withdrawn.

20                Were monthly close packages prepared

21   to the best of your knowledge until the time

22   you left Highland?

23         A.     To my knowledge -- I don't know,

24   actually.  I mean, to my knowledge, I believe

25   it was being -- that was still being done.  I

Page 233

```
 1                    WATERHOUSE - 10-19-21
 2     don't know because, again, I wasn't reviewing
 3     them.  I hadn't reviewed a close package for --
 4     for a long time.  But I believe the standard
 5     practice that was still being carried out.
 6          Q.    Did you ever have any discussions
 7     with the debtor's independent board concerning
 8     any promissory notes that were issued by any of
 9     the affiliates or Mr. Dondero?
10          A.    I can't -- I can't -- I can't recall
11     specifically.
12          Q.    Did you speak with the independent
13     board from time to time?
14          A.    Yes, from -- from -- from time to
15     time I had discussions with the independent
16     board members, you know, either -- either, you
17     know, by themselves or wholly, you know, as --
18     as a -- as a combined work.
19          Q.    Okay.  Before we talk about
20     Mr. Seery, do you recall ever having a
21     conversation with Mr. Nelms or Mr. Dubel
22     concerning any promissory note that was
23     rendered by one of the affiliates or
24     Mr. Dondero to Highland?
25          A.    I don't recall any conversations
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 234 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 372 of 899 PageID 984

Page 234

1                  WATERHOUSE - 10-19-21

2    specifically.

3         Q.    Do you know if the topic was ever

4    discussed, even if you don't remember it

5    specifically?

6              MS. DANDENEAU:  Objection to form.

7         A.    It -- it -- it may have.  I don't

8    know.  I don't recall.

9         Q.    Do you recall ever discussing any

10   promissory note issued by any of the affiliates

11   or Mr. Dondero with James Seery?

12        A.    I don't -- I don't recall

13   specifically.

14        Q.    Do you recall generally ever

15   discussing the topic of promissory notes issued

16   by any of the affiliates or Mr. Dondero to

17   Highland with Mr. Seery?

18        A.    Nothing -- nothing is really jumping

19   out at me.

20        Q.    Do you recall if you ever told

21   Mr. Seery that any of the affiliates or

22   Mr. Dondero didn't have an obligation to pay

23   all amounts due and owing under their notes?

24        A.    I don't recall having that

25   conversation.

Page 235

```
 1                 WATERHOUSE - 10-19-21

 2       Q.    Did you ever tell Mr. Seery that you

 3   had any reason to believe that the amounts

 4   reflected in the notes issued by the affiliates

 5   and Mr. Dondero were invalid for any reason?

 6       A.    I don't -- I don't recall.

 7       Q.    Did you tell Mr. Dondero -- did you

 8   tell Mr. Seery that you thought the promissory

 9   notes issued by the advisors and Mr. Dondero

10   that were outstanding as of the petition date

11   were assets of the estate?

12       A.    I don't recall having a specific

13   conversation about those -- you know, those

14   notes outstanding as -- as of the petition date

15   being assets on the estate.  I mean, we put

16   together -- you know, they're in the books and

17   records of the financial statements.  I don't

18   recall having a specific conversation.

19       Q.    Did you ever prepare any documents

20   that were delivered to Mr. Seery that concerned

21   the promissory notes issued by any of the

22   affiliates or Mr. Dondero?

23             MS. DANDENEAU:  Objection to form.

24       A.    Did I produce any that concerned --

25   you mean did I just -- did I give Mr. Seery
```

Page 236

```
 1                    WATERHOUSE - 10-19-21

 2   anything that -- that said I have concerns over

 3   these notes?

 4        Q.    No.  Let me try again.  Maybe it was

 5   my question.

 6             Did you ever give Mr. Seery any

 7   information concerning any of the notes that

 8   were issued by any of the affiliates or

 9   Mr. Dondero?

10             MS. DANDENEAU:  Objection to form.

11        A.    I don't recall if I did or not.  I

12   don't -- I don't remember.  I mean, you have my

13   emails.  You may have asked.  Again, I don't --

14   I don't know.

15             MR. MORRIS:  Can we put up the

16        document that has been premarked as Exhibit

17        39?

18             MS. DANDENEAU:  John, that is this

19        document, isn't it?

20             MR. MORRIS:  Oh, yeah, it might be,

21        as a matter of fact.  Let's go to Number

22        40.

23             (Exhibit 40 marked.)

24        Q.    During the bankruptcy,

25   Mr. Waterhouse, did you prepare documents that
```

```
 1                    WATERHOUSE - 10-19-21

 2    were filed with the bankruptcy court?

 3         A.    I didn't -- I didn't prepare them

 4    personally.

 5         Q.    Did people prepare them under your

 6    direction?

 7         A.    Yes.  There were members of the team

 8    that prepared them, and they worked in -- you

 9    know, there were members of DSI that were

10    involved in the process as well.

11         Q.    To the best of your knowledge, did

12    DSI rely on the employees of Highland for the

13    information that they used to prepare the

14    bankruptcy filings?

15         A.    Yes.  The books and records were

16    with the Highland personnel.

17         Q.    Okay.  And do you see on the screen

18    here, there is a document that we have marked

19    as Exhibit 40 that is -- that is titled Summary

20    of Assets and Liabilities?

21         A.    Uh-huh.

22         Q.    Okay.  And do you recall reviewing

23    any summary of assets and liabilities before it

24    was filed with the bankruptcy court?

25         A.    Yes, I recall reviewing this at a
```

Page 238

```
 1                  WATERHOUSE - 10-19-21

 2   high level.

 3        Q.    And did you believe that it was

 4   accurate at the time it was filed?

 5        A.    I didn't have any other reason to

 6   believe otherwise.

 7        Q.    Okay.  Do you see that the total

 8   value of all properties listed in Part 1 is

 9   approximately $410 million?

10             MS. DEITSCH-PEREZ:  Objection to

11        form.

12        A.    Yes, it is in 1c.

13        Q.    Yes.

14        A.    Yes, I see that.

15        Q.    Okay.  If we go to the second page,

16   now I think I may just have excerpts here, just

17   so everybody is clear, but if we scroll down to

18   the second page, you will see that there is

19   a -- a little further.  There you go.  You will

20   see there is a reference to Item 71, notes

21   receivable.

22             Do you see that?

23        A.    I do.

24        Q.    And that was a reference to the

25   notes receivable from the affiliates and
```

```
1                WATERHOUSE - 10-19-21

2    Mr. Dondero, among others; is that right?

3               MS. DANDENEAU:  Objection to form.

4        A.    Yes.  The affiliate notes and the

5    Dondero notes were in this amount, but they

6    weren't -- again, like you said, and among

7    others.

8        Q.    Okay.  We will look at the

9    specificity because I'm not playing gaming

10   here, but do you know if the $150 million of

11   notes receivable was included within the

12   $410 million of total value of the debtor's

13   assets?

14              MS. DANDENEAU:  Objection to form.

15       A.    I -- I -- I believe so.

16       Q.    Right.  And so is it fair to say

17   that as of the date this document was prepared,

18   the notes receivable were more than one-third

19   of the value of the debtor's assets?

20              MS. DEITSCH-PEREZ:  Object to the

21        form.

22              MS. DANDENEAU:  Object to the form.

23       A.    Again, if you are just taking the

24   math, 150 divided by whatever the $400 million

25   number is above, then yes, you get there.
```

Page 240

```
 1                WATERHOUSE - 10-19-21

 2        Q.     Okay.

 3        A.     You know, but as of the time of this

 4    filing, that is what was put in this filing,

 5    right, but, you know, I mean, numbers --

 6    numbers change, facts and circumstances change.

 7        Q.     But as the CFO of Highland, the

 8    debtor in bankruptcy, did you believe that this

 9    number accurately reflected the total amount

10    due under the notes receivable?

11        A.     That is what we had in our books and

12    records.

13        Q.     Okay.  And did you believe as the

14    CFO that the books and records accurately

15    reported the then value of the debtor's assets?

16               MS. DANDENEAU:  Objection to form.

17        A.     We didn't -- as part of this filing,

18    there was no fair value measurement or

19    anything.  These were just accounting entries

20    for the promissory notes.  There is no analysis

21    for impairment or fair market value adjustments

22    or anything of that nature.  This is purely

23    taking numbers and putting them in our form.

24        Q.     Did you do any impairment analysis

25    at any time while you were employed by
```

1                    WATERHOUSE - 10-19-21

2    Highland?

3         A.    Yes, we did do impairment analysis

4    on -- on assets.

5         Q.    Okay.  Did you ever do an impairment

6    analysis on any of the promissory notes that

7    were given to Highland by any of the affiliates

8    or Mr. Dondero?

9         A.    Not that I recall.

10        Q.    Under what circumstances do you

11   prepare impairment analyses?

12        A.    As -- as -- if you're preparing

13   financials in accordance with GAAP, generally

14   accepted accounting principles, if you're

15   preparing full GAAP financials, you should be

16   preparing -- you should be undergoing on a

17   periodic basis any fair market value

18   adjustments to assets.

19             As I was instructed at the time of

20   the petition date, we weren't producing GAAP

21   financials.  So this wasn't something I was

22   worried about nor concerned about.

23        Q.    Okay.  Were NexPoint and HCMFA and

24   Highland's audited financial statements

25   prepared in accordance with GAAP?

Page 242

1                     WATERHOUSE - 10-19-21

2        A.      The audited financials -- yes,

3    audited financial statements are prepared in

4    accordance with GAAP.

5        Q.      Do you recall whether any of

6    Highland or HCMFA or NexPoint ever made a fair

7    market value adjustment to any of the notes

8    issued by any of the affiliates or Mr. Dondero

9    to Highland?

10       A.      I do not recall that happening, but

11   the -- it is because under -- under GAAP,

12   the -- the treatment of liabilities is

13   different than assets.

14       Q.      Okay.  So then let's just focus on

15   Highland's audited financial statements.

16               The last audited financial

17   statements were for the period ending December

18   31st, 2018; correct?

19       A.      That is my understanding.

20       Q.      And you had -- you had an obligation

21   to disclose anything to PricewaterhouseCoopers

22   concerning any subsequent events between the

23   end of 2018 and June 3rd, 2019; correct?

24               MS. DANDENEAU:  Objection to form.

25               MS. DEITSCH-PEREZ:  Form.

Page 243

1                    WATERHOUSE - 10-19-21

2         A.    Correct.

3         Q.    Okay.  To the best of your

4    knowledge, as Highland's CFO, did Highland ever

5    make any fair market value adjustments to any

6    of the promissory notes that were carried on

7    its balance sheet and that were issued by any

8    of the affiliates or Mr. Dondero?

9         A.    I think I answered that question

10   earlier.  I don't recall doing that for any of

11   the -- those -- those notes.  So it would have

12   included the audit for the -- for the 2018

13   period.

14        Q.    Okay.

15              MR. MORRIS:  Can we go to the next

16        page.

17        Q.    Do you see this is a note a list of

18   notes receivable?  Do you see that?

19        A.    Yes, I do.

20        Q.    And do you see that this ties into

21   the page that we were just looking?

22        A.    I'm sorry, can we go back to the

23   prior page?  I mean, it was at 150,331,222.  It

24   was on the prior page.  Next page.  Yes, it

25   agrees.

Page 244

```
 1                 WATERHOUSE - 10-19-21

 2      Q.    Okay.  So now let's look at that

 3   schedule.  So this was the face amount of all

 4   of the promissory notes that Highland held at

 5   the time this document was filed with the

 6   bankruptcy court; right?

 7      A.    Yes.

 8      Q.    There is a footnote there that says,

 9   doubtful or uncollectible accounts are

10   evaluated at year-end.

11            Do you see that?

12      A.    I do.

13      Q.    Okay.  And is it fair to say that as

14   of the year-end 2018, the year before this,

15   that to the extent any of these notes were

16   outstanding at that time, they weren't deemed

17   to be doubtful or uncollectible?

18      A.    Yeah.  For the 2018 audit, there

19   weren't any -- there weren't any adjustments to

20   fair value.

21      Q.    Okay.  And during the bankruptcy, do

22   you recall that Highland subsequently reserved

23   for the Hunter Mountain Investment Trust note?

24      A.    Yes.

25      Q.    Why did Highland -- were you
```

Page 245

```
1                   WATERHOUSE - 10-19-21
2      involved in the decision to reserve the Hunter
3      Mountain Investment Trust note?
4           A.    I was not.
5           Q.    Do you know why Highland decided to
6      reserve for the Hunter Mountain Investment
7      Trust note?
8           A.    I don't know yet decision was made.
9      I believe it was made by someone at DSI.
10          Q.    Okay.  I'm just asking if you know
11     why.
12                Did you ever ask anyone why they
13     reserved for that particular note?
14          A.    I don't recall.
15          Q.    Do you know whether the debtor
16     reserved for any other note on this list during
17     the bankruptcy?
18          A.    Again, I don't recall.  I wasn't
19     part of any process of -- again, like any fair
20     value adjustments or anything to that degree.
21     Like I said, a lot of that was done by DSI and
22     it was kind of out of our court.
23          Q.    Okay.  Do you know if any note
24     receivable on this list was ever deemed by the
25     debtor to be doubtful or uncollectible?
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 246 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 384 of 899 PageID 996

Page 246

```
1                  WATERHOUSE - 10-19-21

2        A.    I don't -- I don't have a

3   recollection of every filing, so I don't know.

4        Q.    Did you ever have a discussion with

5   anybody at any time about whether any of the

6   notes receivable on this list should be deemed

7   to be doubtful or uncollectible?

8        A.    No.  As I previously stated, we were

9   told we didn't have to keep GAAP financials.

10  We weren't having -- you know, there is no

11  underlying audits being performed, so I mean,

12  it wasn't something I worried about.

13             MR. MORRIS:  I move to strike.

14       Q.    Did you ever have a conversation

15  with anybody about any of the notes receivable

16  and whether they should be deemed to be

17  doubtful or uncollectible?  Did you have the

18  conversation, yes or no?

19             MS. DANDENEAU:  Objection to form.

20       A.    I don't recall.

21       Q.    Do you recall ever telling anybody

22  that you believed any of the notes receivable

23  on this list should be doubtful -- should be

24  deemed to be doubtful or uncollectible?

25             MS. DANDENEAU:  Objection to form.
```

Page 247

```
 1                  WATERHOUSE - 10-19-21

 2        A.    I don't recall.  I mean, it may have

 3   happened, you know, again, when we initially

 4   getting DSI up to speed and going through

 5   financials, it may have happened, but I don't

 6   recall specifically.

 7        Q.    While you were the CFO of Highland

 8   during the time that the company was in

 9   bankruptcy, did you have any reason to believe

10   that any of the notes receivable on this list

11   other than Hunter Mountain Investment Trust

12   should have been characterized as doubtful or

13   uncollectible?

14             MS. DANDENEAU:  Objection to form.

15             MS. DEITSCH-PEREZ:  Form.

16        A.    I didn't know.  I didn't form an

17   opinion.  Bankruptcy was new to me.  It still

18   is new to me, even after going through this.

19   So I really didn't know what to expect nor

20   really -- you know, I didn't know.

21             MR. MORRIS:  I move to strike.

22        Q.    During the period of Highland's

23   bankruptcy when you were serving as CFO, did

24   you have any reason to believe any of the notes

25   on this list were doubtful or uncollectible?
```

Page 248

```
 1                    WATERHOUSE - 10-19-21

 2              MS. DEITSCH-PEREZ:  This is like the

 3         fifth time you've asked it.  Object to the

 4         form.

 5              MR. MORRIS:  I'm moving to strike,

 6         if you haven't noticed, because he's not

 7         answering the question.

 8              MS. DEITSCH-PEREZ:  He was answering

 9         the question, you just didn't like it, like

10         the answer.

11              MR. MORRIS:  Good Lord.

12    Q.    Go ahead, Mr. Waterhouse.

13    A.    Again, I don't -- we brought up a

14    myriad of issues at the start of the bankruptcy

15    case.  I don't recall if this was one of them,

16    but, again, there are a lot of things we

17    couldn't change.  Even, you know, I was told

18    status quo, blah, blah, blah, right, there is a

19    stay, you can't -- you know, I don't recall

20    specifically, but that doesn't mean it didn't

21    happen.

22              MR. MORRIS:  I move to strike.

23    Q.    During the time that Highland was in

24    bankruptcy and you served as CFO, did you have

25    any reason to believe that any of the notes
```

Page 249

```
 1              WATERHOUSE - 10-19-21

 2    receivable on this list were doubtful or

 3    uncollectible?

 4              MS. DEITSCH-PEREZ:  Object to the

 5         form.

 6         A.    Potentially.

 7         Q.    Did you ever tell anybody that?

 8         A.    As I just stated like five times,

 9    yes, we -- at the beginning after filing and we

10    were getting DSI and others up to speed, you

11    know, we had a myriad of discussions of a lot

12    of things and this was likely one of them.  I

13    don't -- but I don't recall specifically we

14    talked --

15         Q.    I don't want to know -- I don't want

16    to know what was --

17              MS. DEITSCH-PEREZ:  Wait, wait.

18         Excuse me.  Mr. Morris, you did not let him

19         finish his answer.

20         A.    I spoke -- we had -- we were

21    bringing Fred Karesa and Brad Sharp (phonetic)

22    up to speed on all of these items, contracts,

23    and investments and going through -- we had

24    hours and hours and hours of discussion.  And

25    then not only do I have to repeat this not
```

Page 250

```
 1                 WATERHOUSE - 10-19-21

 2    once, twice, three, four times with -- you

 3    know, I mean, we -- I don't -- I don't remember

 4    the sum culmination of all these discussions.

 5    They all kind of blend together.

 6               MR. MORRIS:  Okay.  I move to strike

 7         and I will try one more time.

 8         Q.    Did you ever tell anybody at DSI

 9    that you believed any of the notes receivable

10    on this list were doubtful or uncollectible?

11               MS. DANDENEAU:  Object to form.

12         A.    Potentially.

13         Q.    Potentially you told them or

14    potentially they were doubtful or

15    uncollectible?

16         A.    Potentially I told them that we

17    needed to look at the value of these -- of

18    these assets.

19         Q.    Okay.  Did you -- okay.  It is

20    potential that you told them and it is

21    potentially that you didn't; right?

22               MS. DANDENEAU:  Objection to form.

23         A.    I've gone through that.  I don't

24    recall specifically.

25         Q.    So you should just -- I don't want
```

Page 251

```
 1                   WATERHOUSE - 10-19-21

 2   to tell what you to do.  Do you have --

 3              MS. DANDENEAU:  Good.

 4        Q.    Other than -- other than telling

 5   them that they should look at the values, do

 6   you have any recollection whatsoever of ever

 7   having told anybody at DSI that any of the

 8   notes receivable on this page were doubtful or

 9   uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13        A.    I recall having general discussions

14   about everything on our balance sheet which

15   would have included these -- these notes

16   receivable.

17        Q.    Okay.

18        A.    I don't recall specifically where

19   those discussions delved into.

20        Q.    Do you recall any discussion at all

21   on the topic of whether any of these notes on

22   this list were doubtful or uncollectible?

23              MR. AIGEN:  Mr. Morris, how on earth

24         is that question different from the

25         question that you just asked for the last
```

1            WATERHOUSE - 10-19-21

2    five times?  I mean, really I thought you

3    were -- (overspeak.)

4           MR. MORRIS:  Because he never

5    answered it.

6           MS. DEITSCH-PEREZ:  Are you

7    listening to him?

8           MR. MORRIS:  You know --

9           MS. DEITSCH-PEREZ:  He basically

10   said that he had a conversation with DSI

11   that went over all of this stuff and that

12   conversation could have included the notes

13   but he doesn't recall specifically.

14          What more do you want him -- to ask

15   of him?

16          MR. MORRIS:  I want him -- I would

17   love him to say -- I would like him to

18   testify to the truth, and that is he has no

19   recollection.

20          MS. DEITSCH-PEREZ:  Well, the truth

21   as you would like to see it, but -- but he

22   is testifying truthfully.  And I -- and, by

23   the way, I move to strike that comment --

24          MR. MORRIS:  Okay.

25          MS. DEITSCH-PEREZ:  -- because it

Page 253

```
1                    WATERHOUSE - 10-19-21

2          suggests that he has not testified

3          truthfully.

4               MR. MORRIS:  I will ask my question

5          again.  And if at any time you want to

6          direct him not to answer, that is your

7          prerogative.

8          Q.    Mr. Waterhouse, do you have any

9    recollection at all of ever telling anybody

10   from DSI that any of these notes were doubtful

11   or uncollectible?

12              MS. DANDENEAU:  Object to form.

13         A.    I don't remember specifically.

14         Q.    Do you remember generally that

15   specific topic?

16         A.    We generally talked about assets,

17   values.  If -- we had discussions of that and

18   collectability in nature.  I mean, of Highland,

19   the funds, the CLOs, the entire complex.  We

20   had discussions like that, which is, you know,

21   as you look at a billion dollar consolidated

22   balance sheet.

23              So I generally remember -- this is

24   billions of dollars, including these assets --

25   having discussions of this -- of this type.
```

Page 254

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Do you believe that an affiliate

 3   loan on this list was doubtful or

 4   uncollectible?  Would you have told that to

 5   DSI?

 6               MS. DANDENEAU:  Objection to form.

 7               MS. DEITSCH-PEREZ:  Object to form.

 8        A.    If we had, like -- again, if we --

 9   if -- if we weren't preparing financial

10   statements in accordance with GAAP, and -- you

11   know, if DSI at that point -- they were --

12   again, I was new to bankruptcy.

13               The CRO is -- we are delegating

14   everything to the CRO.  All the decisionmaking.

15   Remember -- remember when you and I went into

16   Delaware Court and we were saying DSI basically

17   does everything, remember this, Mr. Morris?

18               You were my counsel at the time, and

19   basically we're running everything through DSI.

20   That was what this was like in the early part.

21               Everything was communicated through

22   DSI.  So DSI says this.  DSI says that.  That

23   is what we're doing, and we're pointing out

24   things to them.

25               Now, they decide what direction this
```

Page 255

```
 1                  WATERHOUSE - 10-19-21

 2    goes.

 3         Q.    Did you point out that any of

 4    these --

 5         A.    I don't recall specifically.

 6         Q.    Okay.  At any time that you served

 7    as Highland's CFO, did you ever point out to

 8    DSI that any of these loans were doubtful or

 9    uncollectible?

10              MS. DEITSCH-PEREZ:  Object to the

11         form.

12              MS. DANDENEAU:  Objection.

13         A.    If you're asking me if I had a

14    conversation with DSI, if any of these loans

15    were doubtful or uncollectible, I don't recall

16    specifically.

17         Q.    Do you recall that the debtor filed

18    on the docket monthly operating reports?

19         A.    Yes.

20         Q.    You prepared those personally,

21    didn't you?

22              MS. DEITSCH-PEREZ:  Objection to

23         form.

24         A.    I didn't personally prepare them,

25    the team did with DSI.
```

Page 256

```
 1                WATERHOUSE - 10-19-21

 2      Q.    But you signed them; correct?

 3      A.    My signature is on the MORs.

 4      Q.    And you signed them as the preparer

 5   of the document; correct?

 6      A.    Yes, I did this pursuant to DSI's

 7   instructions.

 8      Q.    Okay.  You wouldn't have signed the

 9   document if you didn't believe it to be

10   accurate; correct?

11      A.    If I had reason to believe it

12   wasn't, presumably I wouldn't have signed it.

13      Q.    Okay.  And do you have any reason to

14   believe right now that any monthly operating

15   report that has your signature on it was

16   inaccurate in any way?

17            MS. DEITSCH-PEREZ:  Object to the

18      form.

19      A.    My understanding of the monthly

20   operating reports is we were filing them in

21   accordance with the standards set by the Court.

22   It wasn't -- you know, again, I don't -- you

23   know, it wasn't GAAP.  It wasn't these other

24   standards, so I testified I didn't have

25   experience in this.  The CRO was running the
```

```
 1                 WATERHOUSE - 10-19-21

 2    show.  I followed their advice.

 3         Q.    But you assured yourself that

 4    everything in the report was accurate before

 5    you signed them; correct?

 6               MS. DANDENEAU:  Objection to form.

 7         A.    I trusted the guidance from the CRO

 8    and their team and their experience and their

 9    guidance for doing this for many, many, many

10    years to -- to -- to categorize and put things

11    in ways on the form.

12               You know, my team had -- had not

13    filled out these forms before and needed all of

14    this guidance.  I'm not an expert in this.  I

15    have oversight of it.  I signed the form.  DSI

16    told me to.

17         Q.    And you and your team are the source

18    of the information that DSI used to create the

19    reports; correct?

20               MS. DANDENEAU:  Objection to form.

21         A.    The books and records reside with

22    the -- with -- with the corporate accounting

23    team.

24         Q.    Okay.  And the corporate accounting

25    team was the corporate accounting team that was
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 258 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 396 of 899 PageID 1008

Page 258

```
 1                    WATERHOUSE - 10-19-21

 2   under your direction; correct?

 3        A.    Yes.

 4        Q.    So -- so your team was responsible

 5   for maintaining Highland's books and records;

 6   correct?

 7        A.    I'm sorry, my team was responsible?

 8        Q.    Correct.

 9        A.    Yes.  They -- they -- they were

10   the -- the -- the general ledger of Highland,

11   that responsibility was with the corporate

12   accounting team.

13        Q.    The corporate accounting group

14   reported to you; correct?

15        A.    Yes.

16              MR. MORRIS:  Can we put up 41,

17        please.

18              (Exhibit 41 marked.)

19        Q.    All right.  You will see that this

20   is a report that is dated January 31st, 2020,

21   but it is for the month ending December 2019.

22              Do you see that?

23        A.    I do.

24        Q.    And you signed this report in your

25   capacity as the chief financial officer of
```

Page 259

```
 1                  WATERHOUSE - 10-19-21

 2   Highland; correct?

 3        A.    Yes.

 4        Q.    And you're the preparer -- you're

 5   identified as the preparer of the report;

 6   correct?

 7        A.    That is correct.

 8        Q.    Do you recall participating in the

 9   preparation of monthly operating reports?

10        A.    As I testified earlier, it was put

11   together, you know, with the team.  The team

12   worked with DSI to put these monthly operating

13   reports together.  We had no experience at this

14   time of the monthly operating reports or things

15   of this nature.

16             MR. MORRIS:  Can you turn to the

17        next page, please.

18        Q.    Do you see a line item under assets

19   due from affiliates?

20        A.    Yes, I do.

21        Q.    Okay.  And to the best of your

22   knowledge and understanding, as the person who

23   is identified as the preparer of this report,

24   does that line item include the affiliate loans

25   that we've been talking about?
```

Page 260

1                    WATERHOUSE - 10-19-21

2          A.    Again, I would have to see, just

3    like we did with the financial statements of

4    Highland and NexPoint, I would have to see a

5    detailed build, but, you know, if you look at

6    the other line items, you know, the only other

7    place it could be would be in -- in other

8    assets.

9          Q.    Okay.  And as a matter of

10   arithmetic, is it fair to say that is the value

11   of the assets due from affiliates was more than

12   25 percent of the value of Highland's total

13   assets as of 12/31/2019?

14               MS. DANDENEAU:  Objection to form.

15         A.    I'm really not doing the mental math

16   right now, so I've been going at this depo for

17   hours, so I'm really not -- you know --

18         Q.    All right.  No problem.

19         A.    -- these are millions of dollars.

20         Q.    Let's look at the Footnote 1,

21   please.  Do you see there is a reference to the

22   Hunter Mountain note?

23         A.    Yes, I see that in Footnote 1.

24         Q.    Okay.  And that's the reserve that

25   was taken against that note?

Page 261

```
 1              WATERHOUSE - 10-19-21

 2        A.    Yes, that is what this indicates.

 3        Q.    Okay.  And were you aware that the

 4   reserve was being taken on that it was?

 5        A.    I was -- I was aware, yeah, at some

 6   point, yes.

 7        Q.    Okay.  And are you aware of any

 8   reserve being taken with respect to any other

 9   note that was issued in favor of Highland?

10        A.    Again, as I testified, we didn't go

11   through an analysis on -- on -- on the other

12   notes.

13        Q.    Can we turn --

14        A.    I believe -- I believe it says that

15   in Footnote 1, fair value has not been

16   determined with respect to any of the notes.

17              So this footnote -- footnotes, look,

18   there has been no determination.

19        Q.    Okay.  The determination was made in

20   the audited financial statements just six

21   months earlier; right?  We saw that earlier?

22        A.    That was as of 12/31/18.  I mean,

23   things -- circumstances -- there's a bank --

24   circumstances change, things change -- things

25   change over time, you know, facts and
```

Page 262

```
 1                 WATERHOUSE - 10-19-21

 2   circumstances change.  Again, you have to do an

 3   analysis.

 4       Q.    Okay.  And you do recall that in

 5   Highland's 2018 financial statement, all of the

 6   notes issued by affiliates and Mr. Dondero that

 7   were due at year-end had a fair value equal to

 8   the carrying value; correct?  We looked at

 9   that?

10       A.    Yes.  That was in the -- in the

11   disclosure for the -- for the affiliate notes,

12   yes.

13       Q.    And -- and you were obligated to

14   share with PwC any subsequent events between

15   the end of 2018 and the date that you signed

16   your management representation letter on June

17   3rd, 2019; correct?

18            MS. DEITSCH-PEREZ:  Object to the

19       form.

20       A.    Yes.  I -- I -- I signed the

21   management, you know, my signature is in the

22   management representation letter -- I hope I'm

23   answering your question -- that is dated in

24   June with the representations made in that

25   management representation letter.
```

Page 263

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Okay.  And there was nothing that

 3   caused PricewaterhouseCoopers to include in

 4   subsequent events any adjustment to the

 5   conclusion that the fair value of the affiliate

 6   notes and the notes issued by Mr. Dondero

 7   equaled the carrying value; correct?

 8              MS. DANDENEAU:  Objection to the

 9        form.

10        A.    That is correct.  That is what was

11   in the -- in the -- in the footnotes.

12        Q.    Okay.  So are you aware of anything

13   that occurred between June 3rd, 2019 and

14   December 31st, 2019 that would have caused the

15   fair value of the notes to differ from the

16   carrying value?

17        A.    Yeah.  Highland filed for

18   bankruptcy, things changed -- I mean, there was

19   a bankruptcy filed in October of -- of -- of

20   2019, right, the petition date that we've

21   described earlier.

22              I mean, I had a -- I guess looking

23   back naively, I thought we were going to get an

24   audit from PwC for year-ended 2019, and when we

25   had discussions with PwC, they were like, are
```

Page 264

```
 1                    WATERHOUSE - 10-19-21

 2     you crazy, we're not auditing this.  Values

 3     change, all these things change, bankruptcy

 4     changes the entire scenario.  I mean -- and

 5     they're like, we're not -- we're not touching

 6     this.

 7              And so, you know, I was like, okay,

 8     sorry, I get it, okay, no an audit.

 9              I mean, it is -- you know, and --

10     you know, and we weren't preparing GAAP

11     financial statements.

12              Again, I didn't know what we were

13     doing in relation to our financial statements,

14     but these were the discussions I was having at

15     the time.  And yeah, I mean, filing bankruptcy

16     from what I got from outside auditors and

17     others involved changed things dramatically.

18          Q.    Okay.  Highland wasn't the obligor

19     under any of the notes that we're talking

20     about; correct?

21          A.    No.

22          Q.    So --

23          A.    That's right.

24          Q.    So can you identify any fact that

25     would cause the fair value to deviate from the
```

Page 265

```
1                    WATERHOUSE - 10-19-21

2      carrying value during the seven-month period

3      between June 3rd and the end of the year, 2019?

4                MS. DANDENEAU:  Objection to form.

5           A.    No.  I mean, I'm putting myself back

6      at that time, right.  Hindsight is 2020, but we

7      didn't do an analysis, but we would have done a

8      fulsome analysis and looked at all of the facts

9      and circumstances at the time, but asset values

10     change.  You know, there could have been a

11     market crash in hindsight in 2020, which --

12     which affected entities' abilities.

13                There could have been all of these

14     things, right, that -- that happen.  It is --

15     it is easy to look back in hindsight, but when

16     you are looking at this in -- in realtime, the

17     analysis is different, and again, we didn't do

18     an analysis.

19          Q.    Okay.  You didn't do an analysis.

20                Do I have that right?

21          A.    I don't -- I don't recall doing one

22     or maybe -- you know, I don't recall doing one.

23                MR. MORRIS:  Okay.  I'm going to

24           take a break.  I may be done, so the time

25           now is -- is 4:30 your time.  Let's just
```

Page 266

```
 1                   WATERHOUSE - 10-19-21

 2        take a short break until 4:40 your time.

 3              MS. DANDENEAU:  Okay.

 4              VIDEOGRAPHER:  We're going off the

 5        record, 4:31 p.m.

 6        (Recess taken 4:31 p.m. to 4:43 p.m.)

 7              VIDEOGRAPHER:  We are back on the

 8        record at 4:43 p.m.

 9              MR. MORRIS:  I have no further

10        questions.

11              MR. RUKAVINA:  Okay.

12        Mr. Waterhouse, I will go next.

13                      EXAMINATION

14   BY MR. RUKAVINA:

15        Q.    Sir, my name is Davor Rukavina.  I'm

16   the lawyer for --

17              MR. MORRIS:  Hey, Davor, just before

18        you begin, I just want to put on the record

19        Highland's objection to documents that were

20        produced to me 10 minutes before the

21        deposition began.

22              MR. RUKAVINA:  What the basis of

23        your objection?

24              MR. MORRIS:  That they were due

25        quite some time ago, and the fact that you
```

Page 267

```
1                    WATERHOUSE - 10-19-21

2          had -- I just think it's appropriate to --

3          to dump documents on somebody 10 minutes

4          before the deposition.  I just think

5          that's --

6                    MR. RUKAVINA:  Well, these are

7          documents Highland produced.  I'm not aware

8          of any rule I have to give you advance

9          documents when I know for the record that

10         other than the exhibits that you sent to us

11         last week, most of the exhibits you used

12         today you did not provide to me prior to

13         this deposition.

14                   MR. MORRIS:  No, but the documents

15         were produced by me in -- in litigation,

16         right?

17                   MR. RUKAVINA:  I'm going to use

18         primarily, John, the documents that you

19         produced to me today, but you may.

20                   MR. MORRIS:  Primarily.  I've got --

21         I've got my objection.  You have got your

22         response.  Proceed.

23         Q.    Mr. Waterhouse, again, I represent

24    the advisors, HCMFA and NexPoint Advisors.

25                   Do you understand that?
```

Page 268

```
 1              WATERHOUSE - 10-19-21

 2      A.    Yes.

 3      Q.    You and I have never met or talked

 4   before today, have we?

 5      A.    No, I have -- I have heard your

 6   voice on calls before.

 7      Q.    Okay.

 8            MR. RUKAVINA:  Madam Court Reporter,

 9      I will use a few exhibits today.  My

10      associate, Mr. Nguyen, will find some way

11      to get them to you.  I don't know how to do

12      that, but it looks like you guys do.

13            I am going to use numbers as well.

14      But to differentiate them from Mr. Morris

15      we're going to mark mine with the prefix A

16      for advisors.

17            Do you understand?

18            COURT REPORTER:  Yes.

19            MR. RUKAVINA:  Okay.  Perfect.

20      Q.    Okay.  So, Mr. Waterhouse, let's

21   start with those two HCMFA notes that you were

22   asked about, one for 5 million and one for

23   2.4 million.

24            Do you recall those notes?

25      A.    Yes.
```

Page 269

```
1                    WATERHOUSE - 10-19-21

2       Q.    Were you ever the CFO of HCMFA?

3       A.    I don't recall.

4       Q.    So to the best of your recollection,

5  you were still an officer of HCMFA in 2019,

6  just that your title was treasurer?

7             MR. MORRIS:  Object to the form of

8        the question.  There is no leading here.

9        He works for your client.

10            MS. DANDENEAU:  That is not -- that

11       is not true.

12            MR. MORRIS:  He's the treasurer --

13       he is the treasurer of your client.  I

14       don't -- I'm going to object every time you

15       try to lead, so...

16            MR. RUKAVINA:  Totally fine to

17       object.

18            MR. MORRIS:  Okay.

19       Q.    Please answer my question,

20  Mr. Waterhouse.

21       A.    I'm sorry, could you repeat?  There

22  was...

23       Q.    Yes.  You were -- you testified

24  earlier that in 2019 you were an officer of

25  HCMFA; correct?
```

1                    WATERHOUSE - 10-19-21

2        A.     Yes, I testified that I was the

3    treasurer and I didn't know if that incumbency

4    certificate, you know, was one that appointed

5    me as a treasurer, but yes.

6        Q.     I'm just trying to confirm that

7    sitting here today, to the best of your

8    recollection, at that time you were -- your

9    title was treasurer.  It was not chief

10   financial officer.

11       A.     I don't recall that being my title.

12       Q.     Okay.  And in May of 2019, however,

13   I think you testified you were the chief

14   financial officer of the debtor; correct?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.     Yes, I was -- yes.

18       Q.     Okay.  As such, in May of 2019, did

19   you have the authority, to your understanding,

20   to unilaterally loan $5 million or $2.4 million

21   to anyone on behalf of the debtor?

22            MR. MORRIS:  Objection to the form

23       of the question.

24       A.     Sorry, can you repeat that?

25       Q.     Yes.  So in your capacity as the

Page 271

```
 1                 WATERHOUSE - 10-19-21

 2    chief financial officer of the debtor, Highland

 3    Capital Management, L.P., in May of 2019, did

 4    you believe that you unilaterally, just Frank

 5    Waterhouse, had the authority to loan on behalf

 6    of the debtor to anyone $5 million and

 7    $2.4 million?

 8                 MR. MORRIS:  Objection to the form

 9         of the question.

10    A.    No.

11    Q.    Is it because loans of that amount

12    would have had to be approved by someone else?

13    A.    Yes.

14    Q.    Who in '20 -- in May of 2019, if

15    Highland wanted to loan 5 million or

16    $2.4 million to someone, what would have been

17    the internal approval procedure?

18                 MR. MORRIS:  Objection to the form

19         of the question.

20    A.    If -- if we had loans of that nature

21    that needed to be made due to their size, we

22    would have gotten approval from the -- the

23    president of Highland.

24    Q.    And who that was individual?

25    A.    It was James Dondero.
```

Page 272

```
 1                  WATERHOUSE - 10-19-21
 2       Q.    Okay.  Now, I'm going to ask you a
 3   similar question but for a different entity.
 4             In May of 2019, as the treasurer of
 5   HCMFA, did you believe that you unilaterally
 6   had the ability to cause HCMFA to become the
 7   borrower of a $5 million loan and a
 8   $2.4 million loan?
 9             MR. MORRIS:  Objection to the form
10       of the question.
11       A.    No.
12       Q.    What would -- what would the
13   approval have taken place -- strike that.
14             What would the approval process have
15   been like in May of 2019 at HCMFA for HCMFA to
16   take out a $7.4 million loan?
17             MR. MORRIS:  Objection to the form
18       of the question.
19       A.    The process would have been similar
20   to what we just discussed on -- for Highland to
21   make a loan to others.  So, again, you know,
22   we -- we would have -- either myself or someone
23   on the team would have discussed this with
24   the -- the president and owner of -- of HCMFA.
25       Q.    And who was that individual?
```

1                    WATERHOUSE - 10-19-21

2        A.    That was James -- Jim Dondero.

3        Q.    So do I understand that in May of

4   2019, on behalf of both the lender, Highland,

5   and the borrower, HCMFA, Mr. Dondero would have

6   had to approve $7.4 million in loans?

7              MR. MORRIS:  Objection to the form

8        of the question.

9        A.    Yes.

10       Q.    You mentioned when Mr. Morris was

11  asking you the NAV error, N-A-V error, with

12  respect to TerreStar, without writing us a

13  novel, unless you feel like you have to, can

14  you summarize what that NAV error was?  What

15  happened?

16       A.    There was a -- in the Highland

17  Global Allocation Fund, it owned at the time an

18  equity interest in a company called TerreStar.

19  And TerreStar is -- at the time was a private

20  company, and it may still be today.  Again, I'm

21  putting myself back then as a private company.

22             We had -- sorry, I don't mean we --

23  the fund and the advisor used Houlihan Lokey

24  to -- to value that investment.  And during

25  that time there was some trades that were

1          WATERHOUSE - 10-19-21

2    executed at market levels that were much lower

3    than the Houlihan Lokey model.

4              And based on information and

5    discussions with the portfolio managers and,

6    you know, principals that were very familiar

7    with TerreStar, it was determined that those

8    trades were non-orderly and they were not

9    considered in the valuation as consulted with

10   Houlihan Lokey and PricewaterhouseCoopers at

11   the time.

12             Subsequent to a -- I can't remember

13   the exact circumstances of why the SEC got

14   involved.  I think it was due to this -- this

15   investment became a material position in the

16   fund.  It triggered an SEC, kind of, inquiry.

17   And as part of that inquiry, they questioned

18   the valuation methodology.  "They" meaning the

19   SEC.

20             And at the culmination of that

21   process -- this is all summarized -- the value

22   that was -- that ultimately had to be used in

23   the fund's NAV was different than -- materially

24   different than what the original valuation at

25   Houlihan Lokey provided.

Page 275

```
 1              WATERHOUSE - 10-19-21

 2              And given that there was this fund

 3   was, as we discussed -- I don't know if we

 4   discussed it, but it was an open-ended fund

 5   that was going -- that was converting to a

 6   close-end fund.

 7              Due to the fact that it was an

 8   open-ended fund, you had to recalculate NAV and

 9   see what the impact was on people -- on

10   investors coming in and out of the fund and if

11   there is a detrimental impact and to calculate

12   what that -- what that impact was and if there

13   was any amounts owed to the fund pursuant to

14   the error.

15        Q.   Were you personally involved

16   internally at either Highland or HCMFA with

17   these investigations and discussions with the

18   SEC?

19        A.   I was.

20        Q.   Which other key people or senior

21   people at Highland were involved, to your

22   recollection?

23        A.   Myself, Thomas Surgent, David Klos,

24   Lauren Thedford, Jason Post.

25        Q.   Mr. Dondero, was he --
```

Page 276

```
 1              WATERHOUSE - 10-19-21

 2       A.    I believe Cliff Stoops.  I'm trying

 3  to think.  And maybe that is -- that is -- that

 4  is -- that is all kind I can recall at the

 5  moment.

 6       Q.    Do you recall whether it was

 7  determined that the fund suffered losses as a

 8  result of this error?

 9       A.    The -- the fund -- the -- the --

10  because the open-ended nature of the fund,

11  there were losses that were attributable to

12  investors.  Meaning they -- they would have

13  redeemed and got a less money or -- or they

14  subscribed in and maybe because they didn't get

15  enough shares and then they later sold and then

16  they were harmed in that fashion.

17              And there is -- there is -- there

18  were very -- there were very detailed

19  calculations and, you know, all these different

20  scenarios that we had to -- I'm sorry, I keep

21  saying "we" -- that the individuals involved

22  had to calculate and quantify.

23       Q.    Well, do you recall whether HCMFA

24  admitted certain fault and liability for this

25  error?
```

Page 277

1                    WATERHOUSE - 10-19-21

2         A.    I don't recall specifically.

3         Q.    Do you recall whether HCMFA caused

4    any funds to be paid to the investors and the

5    fund the subject of the NAV error?

6         A.    Yes.

7         Q.    Do you recall the approximate amount

8    of funds, moneys paid to the investors and the

9    fund?

10        A.    It was -- it was approximately

11   $7 million.

12        Q.    If I was to suggest 7.8 million,

13   would that ring more true or are you sticking

14   with your original answer?

15        A.    It was -- it was approximately 7 --

16   7 to $8 million.  Again, I don't remember the

17   exact number, but it was in that ballpark.

18        Q.    So regardless of whether HCMFA

19   accepted fault or liability, it caused some

20   $7 million or more to be paid out to affected

21   investors in the fund?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    And I want to make sure I'm

25   understanding your question because there is a

Page 278

1                  WATERHOUSE - 10-19-21

2    lot of different entities that are going on to

3    my head.

4            I think what you are saying is based

5    on this error, shareholders were harmed by this

6    approximately $7.8 million -- by approximately

7    $7.8 million.  Is that what you are asking?

8        Q.    Yes, sir.

9        A.    Yes, that was -- again, I don't have

10   the exact numbers.  If I take -- it was -- it

11   was in that ballpark, and there is a detail

12   calculation and write-up that could, that --

13   that exists someplace.

14       Q.    Now, at that time, at the time that

15   the NAV error occurred, was there a contract in

16   place between HCMFA and the debtor pursuant to

17   which the debtor was providing services to

18   HCMFA?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    Yes.

22       Q.    Was that contract generally called a

23   shared services agreement?

24       A.    It was generally called that, but

25   there were -- there were -- I mean, it -- it --

Page 279

```
 1                    WATERHOUSE - 10-19-21

 2    it depends on who you talk to, but yes,

 3    generally, there were -- there are multiple

 4    agreements.

 5        Q.    Pursuant to one or more of those

 6    agreements, was the debtor providing certain

 7    services to HCMFA?

 8              MR. MORRIS:  Objection to the form

 9        of the question.

10        A.    Yes.

11        Q.    And can you at a very high level

12    summarize in 2018 and 2019 what those services

13    were?

14        A.    Yes, there was a -- yes.

15        Q.    Okay.  Please -- please go -- go

16    through a short summary.

17        A.    There was a -- a cost reimbursement

18    agreement between Highland Capital Management

19    Fund Advisors and Highland Capital Management,

20    L.P.  That agreement was for what we referred

21    to as front office services, so investment

22    management, things of that nature.

23              There was I think what most people

24    refer to as the shared services agreement that

25    was -- that agreement was between Highland
```

Page 280

1                   WATERHOUSE - 10-19-21

2    Capital Management Fund Advisors and Highland

3    Capital Management for back office services.

4         Q.    And can you summarize what you mean

5    by back office services?

6         A.    Those services were for accounting,

7    finance, tax, valuation, HR, IT, you know,

8    legal compliance, things of -- things of those

9    nature -- or things of that nature, excuse me.

10        Q.    So in the spring of 2019, do you

11   recall whether HCMFA took the position that it

12   was actually Highland that caused the NAV error

13   to occur pursuant to the valuation services

14   that Highland was providing?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I do not recall.

18        Q.    Did you ever have any discussions

19   with anyone, Jim Dondero or anyone in the first

20   half of 2019 as to whether Highland, the

21   debtor, that is, had any liability to HCMFA

22   related to the NAV error?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.    I do not recall.

Page 281

1                  WATERHOUSE - 10-19-21

2       Q.    And then you mentioned that the fund

3   was being closed and some compensation related

4   to that.  Can you -- can you elaborate?  What

5   were you referring to?

6       A.    Right.  So the advisor, pursuant to

7   board approval, put a proposal in front of the

8   shareholders of the Highland Global Allocation

9   Fund to convert it from an open-ended fund to a

10  closed-end fund.

11             So an open-ended fund, when

12  shareholders subscribe to the fund or redeem

13  into the fund, they do it at NAV.

14             When it is -- when you have a

15  closed-end fund, closed-end funds are -- are

16  publicly-traded, like on the New York Stock

17  Exchange, exchanges like that, and -- and

18  shareholders or investors, they're not --

19  they're -- they're not subscribing and

20  redeeming with the fund.  They are like shares

21  of Apple.

22             Those shares of the Highland Global

23  Allocation Fund trade on an exchange, and that

24  is how you, you know, that is how, you know,

25  you become an equity owner in the fund or you

Page 282

1                   WATERHOUSE - 10-19-21

2      sell your shares and you are no longer an

3      equity owner.

4                   As part of that proposal, the

5      advisor told shareholders if you -- if you vote

6      for this proposal to -- to convert it from an

7      open-ended fund to a closed-end fund, we will

8      pay you some amounts of money.  I forgot -- a

9      certain number of points.  I think it was

10     like -- it was like two to three points or

11     something -- something like that.

12          Q.    Okay.  You mentioned when Mr. Morris

13     was asking you, going back to those two

14     promissory notes, you will recall the 5 million

15     and 2.4 million, you mentioned something to the

16     effect that Mr. Dondero told -- told you to pay

17     some moneys out of Highland.  Do you remember

18     that discussion with Mr. Morris?

19          A.    I do.

20          Q.    So, to the best of your

21     recollection, did you have a discussion with

22     Mr. Dondero about making some payments in May

23     of 2019 out of Highland?

24          A.    I recall, as I testified earlier,

25     that I had a conversation with Mr. Dondero

Page 283

```
 1                    WATERHOUSE - 10-19-21

 2    for -- for these amounts attributable to -- it

 3    was either the error -- you know, the error,

 4    and in that conversation he said, go get the

 5    money from Highland.  I believe that is what I

 6    testified earlier, and that -- that is my

 7    recollection.

 8         Q.    Do you recall if that was an

 9    in-person meeting or some other mode for the

10    meeting?

11         A.    I -- I -- I recall that being

12    in-person.

13         Q.    Do you recall if anyone else was

14    present, or was it just you and Mr. Dondero?

15         A.    I recall just he and I.

16         Q.    And the moneys that he told you to

17    find from -- or get from Highland, was that in

18    the amount of $5 million and $2.4 million?

19              MR. MORRIS:  Objection to the form

20         of the question.

21         A.    I believe so, but I would have to go

22    back and look and see when those moneys were

23    actually paid into the -- into the fund and,

24    you know, when those transfers were done.  If

25    they were all done around that same time, then
```

Page 284

```
 1                 WATERHOUSE - 10-19-21

 2    yes, I would say it was -- it was all related

 3    to that.

 4         Q.    Did Mr. Dondero tell you that those

 5    funds would be a loan from Highland to HCMFA?

 6         A.    I don't recall.

 7               MR. MORRIS:  Objection to the form

 8         of the question.

 9         Q.    Now, and forgive me, I'm probably

10    the only non-American born here, but I speak

11    reasonably well in English.  I don't recall,

12    does that mean you don't remember or does that

13    mean it didn't happen?

14               MR. MORRIS:  Objection to the form

15         of the question.

16         A.    It -- it means I don't -- I don't

17    remember.

18         Q.    Did Mr. Dondero tell you to have

19    those two promissory notes prepared?

20         A.    I don't recall.

21         Q.    When you -- again, when you say, I

22    don't recall today, that means that sitting

23    here today, you just don't remember one way or

24    the other.  Is that accurate?

25         A.    Yes.
```

Page 285

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    Is it possible that you, having

 3   heard what Mr. Dondero said and seeing funds

 4   being transferred, assumed that that would be a

 5   loan without him actually telling you that

 6   would be a loan?

 7              MR. MORRIS:  Objection to the form

 8        of the question.

 9        A.    Sorry, I want to make sure -- did I

10   ask the amounts that were transferred that I --

11   that -- that I assumed that that was a loan?

12        Q.    Well, let me -- let me take -- let

13   me try again.

14              So you have established already that

15   there were quite a number of promissory notes

16   back and forth -- I'm sorry, quite a number of

17   promissory notes with affiliated companies and

18   individuals owing Highland money; right?

19        A.    Yes.

20        Q.    And you have established that there

21   were many transactions and transfers going back

22   and forth over the years; right?

23              MS. DANDENEAU:  Objection to form.

24        A.    In -- yes, in my capacity as CFO and

25   my employment, yes, that is -- yes.
```

Page 286

1              WATERHOUSE - 10-19-21

2     Q.    And that's part of the reason why

3  you just can't remember some of the details

4  today because this -- this happened years ago,

5  and there were a number of transactions.  Is

6  that accurate?

7             MS. DANDENEAU:  Objection to the

8      form.

9             MR. MORRIS:  Objection to the form

10     of the question.

11     A.    I mean, I deal with thousands of --

12  of -- of -- of transactions, you know, whether

13  it has -- the processing of transactions, you

14  know, if it has got, you know, more -- more

15  zeros, you know, behind it than others.

16             When you look at thousands of

17  transactions over the years for funds and

18  advisors and -- and, you know, financial

19  statements, I mean, it is -- it is very hard

20  going back in -- in -- in my -- you know,

21  14-ish year career at -- at Highland to

22  remember a lot of those details, especially

23  when I don't have any records or books or

24  anything like that, and -- and going back many

25  years.

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    And that is fine.  That -- that --

 3   that is why I asked the question.

 4              Is it possible in May of 2019 when

 5   Mr. Dondero told you to transfer the funds from

 6   Highland, you just assumed on your own that

 7   those would be loans without him actually

 8   telling you that those would be loans?

 9              MR. MORRIS:  Objection to the form

10        of the question.

11        A.    I don't know.

12        Q.    I'm sorry, you --

13        A.    I said I don't know.

14        Q.    Okay.  Well, as the -- as the CFO

15   for Highland, if you saw $7.4 million going

16   out, you would feel some responsibility to

17   account for that, wouldn't you?

18              MR. MORRIS:  Objection to the form

19        of the question.

20        A.    Yes.

21        Q.    Is it fair to say that those would

22   be in the range large enough to rise up to your

23   level?

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Page 288

```
 1                  WATERHOUSE - 10-19-21

 2       A.    If -- I don't know if I understand

 3   your question.  Those amounts would arise to my

 4   level where I would be involved or...

 5       Q.    You would want to know what a

 6   transfer for that amount, $7.4 million, was all

 7   about, as the CFO of Highland, wouldn't you?

 8             MR. MORRIS:  Objection to the form

 9       of the question.

10       A.    Yes, I make it -- I mean, I -- I

11   review all sorts of payments, I mean, even

12   smaller dollar payments on a periodic basis,

13   you know, to -- to -- to understand and to make

14   sure that we are paying things in a -- you

15   know, in -- in -- in an informed way.  And, you

16   know -- and we're -- and we're paying things

17   pursuant to vendor contracts and things like

18   that.

19       Q.    So as part of that, is it possible

20   that seeing $7.4 million go out you would have

21   promissory notes made in order to keep a paper

22   trail, assuming that those were loans, when

23   perhaps they were never intended to be loans by

24   Mr. Dondero?

25             MR. MORRIS:  Objection to the form
```

Page 289

```
 1                   WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    I don't know.  As I testified

 4   earlier, I had conversations with Mr. Dondero

 5   about -- about the -- the -- the moneys that

 6   were needed for the NAV error.  And I recall

 7   him saying go get it from Highland -- or get it

 8   from Highland.

 9        Q.    Well, why did you sign those

10   promissory notes and why didn't you have him

11   sign them?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  I don't know.

15        Q.    You mentioned earlier that you

16   typically don't sign promissory notes.  Am I

17   remembering your testimony correctly?

18              I mean, promissory notes on behalf

19   of the entities.  Not yourself, obviously.

20        A.    Yes, that is what I said earlier.

21        Q.    Do you recall any other promissory

22   notes in the million-plus range that you had

23   ever signed before on behalf of any entity?

24        A.    There is -- there has been a lot of

25   transactions over the years.  I don't -- I
```

Page 290

```
 1                  WATERHOUSE - 10-19-21

 2    don't -- I don't recall generally.  I don't --

 3    I don't recall.

 4         Q.    So -- but to the best of your

 5    recollection, it was on your initiative,

 6    following your discussion with Mr. Dondero,

 7    that you had someone draft those two promissory

 8    notes; is that correct?

 9              MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Yes, we would have -- the team, as I

12    stated earlier, we don't draft promissory

13    notes.  "The team" meaning the accounting and

14    finance team.

15              So the team would have worked with

16    the legal group at Highland to draft any notes.

17         Q.    Do you believe or do you have any

18    recollection as to whether you would have done

19    that pursuant to an email or telephone call or

20    in-person meeting?

21              MR. MORRIS:  Objection to the form

22         of the question.

23         A.    Are you asking if I would have -- if

24    those notes would have been drafted pursuant to

25    an email or phone call?
```

Page 291

```
 1                    WATERHOUSE - 10-19-21
```

2      Q.     Strike that.

3             Do you recall whether you sent an

4    email to anyone asking them to draft those two

5    promissory notes?

6      A.     I don't recall because, again,

7    once -- I would have instructed -- likely

8    instructed the team to -- to work with the

9    legal group to draft these documents.

10            I -- I -- I -- yeah, I didn't -- I

11   mean, that is more an operational-type

12   procedure.  So, you know, a manager or a

13   controller or working with legal.  You know,

14   they -- they can certainly handle that task to

15   get that -- you know, to request that from

16   legal.

17     Q.     And who on your team do you think

18   you would have asked to do that?

19            MR. MORRIS:  Objection --

20     Q.     Who would have been the logical

21   person or people, if you don't remember their

22   name today?

23            MR. MORRIS:  Objection to the form

24     of the question.

25     A.     It -- it -- there is only two

Page 292

```
1                    WATERHOUSE - 10-19-21

2     managers of the group.  That would have been

3     Dave Klos or Kristin Hendrix.

4              Dave was the -- one of his duties

5     was managing the valuation team, and so he was

6     intimately involved with this process.  So, you

7     know...

8         Q.    Okay.

9         A.    I don't recall specifically but, I

10    mean, my general -- you know, I -- I -- I

11    likely would have talked to Dave first about it

12    versus someone like Kristin who hadn't been

13    intimately involved.

14        Q.    And -- and do you have a view as to

15    whether it is most likely that you would have

16    done that by email or in-person or how would

17    you believe you would have communicated that to

18    Mr. Klos?

19             MR. MORRIS:  Objection to the form

20        of the question.

21        A.    I likely would have done that in

22    person.  Again, if things of this nature

23    that -- again, you have to put ourselves back

24    to, we have been working on this very stressful

25    project for many, many months.  And once the
```

Page 293

1             WATERHOUSE - 10-19-21

2    go-ahead was to -- you know, we see the light

3    at the end of the tunnel with wrapping this up

4    and making shareholders whole -- sorry to say

5    "we" -- you know, the -- so the folks that are

6    involved in it.

7             I like to talk to people

8    face-to-face and -- and -- and go to -- and go

9    to their desk, because that shows if I'm going

10   to their desk that -- that is something that I

11   want done, you know.

12        Q.   And do you remember, Mr. Waterhouse,

13   getting those two promissory notes in paper

14   format or by email before they were executed?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.   I don't recall.

18        Q.   For whatever was the ordinary course

19   back then in May 2019, would you expect to have

20   received them only on paper or would you have

21   expected to have received them in Word document

22   or PDF document by email?

23             MR. MORRIS:  Objection to the form

24        of the question.

25        A.   I -- I didn't sign -- I signed very

Page 294

1                    WATERHOUSE - 10-19-21

2    few documents via email.  I can't say that it

3    never happened, but people either stopped by my

4    office and physically walked in documents for

5    signature that we discussed face-to-face.

6                    Or documents were -- if -- if --

7    if -- if -- let's say I wasn't there or I

8    wasn't available, documents were dropped off.

9    I had -- I had some in- and outboxes in front

10   of my -- my office there at the Crescent.

11                   Documents would be dropped off for

12   signature.  There would be a cover sheet that

13   would be -- have been applied to those

14   documents detailing, you know, who dropped it

15   off, the purpose, why, what time.

16                   And then, you know, as I stated, I

17   don't draft documents and I always go to the

18   legal group and the compliance group to make

19   sure that they're in the loop.  And there is

20   a -- a box or section that says, Has legal

21   reviewed or approved, or something to that

22   nature.

23                   Again, I don't -- I don't have

24   access to that cover sheet anymore, but it

25   was -- it was something to that effect.

Page 295

```
 1                    WATERHOUSE - 10-19-21

 2                    And my assistant, you know, if she

 3     was there, she would review that -- you know,

 4     whatever was being dropped off.  And if that

 5     has legal, you know, reviewed or -- reviewed or

 6     approved it, if that wasn't -- if that stuff

 7     hadn't been done, it was like she would just

 8     tell them like, go -- go -- go to the legal

 9     group, because --

10          Q.    Let me -- let me pause --

11                MS. DANDENEAU:  Let him finish.

12                MR. MORRIS:  Thank you.  Go ahead.

13          A.    I take -- go to the legal group

14     because that -- that was my -- you know, I

15     didn't -- I didn't review anything that -- that

16     they weren't -- you know, or there wasn't some

17     representation made to me that they had

18     reviewed, approved in some capacity.

19                    Again, my -- my -- my goal, as CFO,

20     is to provide transparency and make sure that

21     groups like compliance and other things -- and

22     the other group in legal are -- are in -- you

23     know, their -- they're made aware of

24     transactions of -- you know, that are crossing

25     my desk.
```

Page 296

1                   WATERHOUSE - 10-19-21

2                   Because I'm not in every

3       conversation.  They're not in every

4       conversation -- meaning legal compliance -- and

5       I just want to make sure that -- that everyone

6       is in sync to, you know, to -- to the extent

7       possible.

8           Q.    So if we summarize, you don't

9       specifically remember signing these two notes,

10      but most likely it would have been that they

11      would have presented -- been presented to you

12      physically on paper?

13                  MR. MORRIS:  Objection to the form

14          of the question.

15          A.    They would -- they would have been

16      presented physically on paper most likely or

17      someone would have left it.  But, I mean,

18      again, I don't -- I don't recall.

19          Q.    I understand.  Understand.

20                  When you signed -- when you signed

21      documents, when you personally signed

22      documents, did you typically use a ink pen or

23      did you use a stamp?

24          A.    No, I -- I -- I use a -- an -- an

25      ink pen.

Page 297

```
 1                    WATERHOUSE - 10-19-21

 2      Q.    Do you know -- was there a file at

 3   Highland kept anywhere with ink-signed

 4   originals of a promissory notes in general or

 5   these two promissory notes specifically?

 6               MR. MORRIS:  Objection to the form

 7        of the question.

 8      A.    Sorry, I just want to make sure I

 9   understand your question.  Are you saying is

10   there a file somewhere that has ink-signed

11   originals of these two promissory notes?

12      Q.    Yes.

13      A.    I would -- I would assume they're

14   some place.  I mean --

15      Q.    Well, was there a -- was there a

16   place where Highland generally kept originals

17   of promissory notes owed to it?

18      A.    I wouldn't -- no.

19               MR. RUKAVINA:  Mr. Nguyen, would you

20   please pull up my A7, alpha 7.

21      Q.    These are the two promissory notes,

22   Mr. Waterhouse.

23               (Exhibit A7 marked.)

24      Q.    And please -- Mr. Waterhouse, please

25   command my associate to scroll down as you need
```

Page 298

1                    WATERHOUSE - 10-19-21

2    to, but I want you to take a very close look at

3    your two signatures here and tell me whether

4    you believe, in fact, that you ink signed them

5    or whether you --

6                    MS. DANDENEAU:  Mr. Rukavina,

7         Mr. Waterhouse has the copies.

8                    MR. RUKAVINA:  Perfect.  Then you

9         can take this down, Mr. Nguyen.

10        A.    These -- these -- these signatures

11   are identical, now that I stare at them, and I

12   mean, they are so close -- I mean, they're

13   identical that, I mean, even with my chicken

14   scratch signature, I don't know if I can -- you

15   know, I do this 100 times, could I do that

16   as -- as precisely as I see between the two

17   notes.

18        Q.    Well, that is why I ask.

19   Mr. Waterhouse, now that you have examined

20   them, does it seem like it is more likely that

21   you actually electronically signed these?

22                    MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Is -- I don't -- I don't recall

25   specifically.  As I said before, my assistant

Page 299

1              WATERHOUSE - 10-19-21

2    did have a -- an electronic signature, and that

3    was used from time to time.  It wasn't as

4    common practice back in 2019.  It definitely

5    was more common practice when we had to work

6    from home and remotely for COVID because it

7    that made it almost impossible to, right,

8    provide wet signatures since we're all working

9    from home remotely.

10        Q.    Well, going just for these two

11   promissory notes, Mr. Waterhouse, in light of

12   your inability to remember any details, are you

13   sure you actually signed either or both of

14   those notes?

15             MS. DANDENEAU:  Objection to form.

16        A.    I don't recall specifically

17   signing -- actually physically signing these

18   notes.  As I said before, I don't recall doing

19   that.  This -- this looks like my signature,

20   but yet these two signatures are identical.

21        Q.    So you don't recall physically

22   signing them, and I take it you don't recall

23   electronically signing them either?

24        A.    I don't recall.  You know, Highland

25   has all my emails.  If that occurred, you know,

1                    WATERHOUSE - 10-19-21

2    you know, I don't have any of these records is

3    what I'm saying.  I don't have any of those

4    records.

5         Q.    That is why I'm asking you these

6    questions in great detail because I don't have

7    those emails.  I'm trying to -- I'm hoping that

8    you will give me some names or some details so

9    I can go look for more emails, but again, you

10   don't remember any -- any individual, other

11   than Mr. Dondero that we've discussed, you

12   don't remember any individual with whom you

13   discussed these promissory notes prior to their

14   execution?

15              MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I don't recall discussing it with

18   anybody else.

19        Q.    Okay.

20        A.    I mean, prior --

21        Q.    I understand.

22        A.    You know, there was no one else --

23   there was no one else in that meeting that I

24   recall with Mr. Dondero.

25        Q.    Now, when you established that by

1                    WATERHOUSE - 10-19-21

2    May of 2019 --

3         A.    And -- and from what I recall, and

4    the reason why I was by myself is -- is, you

5    know, I don't -- I don't want to speculate, I'm

6    sorry.

7         Q.    Okay.  We have established that by

8    May of 2019, in your view, the liabilities of

9    HCMFA exceeded its assets; correct?

10        A.    Yeah.  I mean, again, I don't have

11   financial statements in front of me, but I

12   think, if I recall, we'd have to go through the

13   testimony with Mr. Morris, I believe that was

14   the case.

15        Q.    In fact, you will recall that in

16   April of 2019, Mr. Dondero signed a document

17   that extended the demand feature of two prior

18   notes to May 31, 2019.  Do you recall that?

19             MS. DEITSCH-PEREZ:  I think you

20        might -- maybe have the court reporter read

21        that back.  You might have misspoke.

22             (Record read.)

23             MR. RUKAVINA:  And I did misspeak.

24        Q.    I meant to say to May 31, 2021.  Do

25   you recall that, sir?

Page 302

```
 1                    WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3       of the question.

 4       A.   Yes.

 5              MR. RUKAVINA:  And, Mr. Nguyen, just

 6    so that the record is clear, will you please

 7    pull up my Exhibit Alpha 10, A10.

 8              (Exhibit A10 marked.)

 9       Q.   You don't have this one in front of

10    you, Mr. Waterhouse?  This is the one that

11    Mr. Morris used earlier.  Do you see that

12    document, sir?

13       A.   Yes, I do.

14       Q.   And this is what you were testifying

15    about before when Mr. Morris was asking you.

16    Do you remember that?

17       A.   Yes.

18       Q.   So here is my question for you,

19    Mr. Waterhouse:  As the chief financial officer

20    of Highland, was it prudent for Highland less

21    than three weeks later to be lending

22    $7.2 million to an insolvent entity that

23    couldn't even then pay its debts back to

24    Highland?

25              MS. DANDENEAU:  Objection to form.
```

```
 1              WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3         of the question.

 4         A.    Sorry, I just want to make sure --

 5    are you asking me, did you say, was it prudent

 6    for Highland to loan $7.4 million to HCMFA a

 7    few weeks after this document was executed?

 8         Q.    Yes, and at a time when HCMFA's

 9    liabilities exceeded its assets.

10              MR. MORRIS:  Objection to the form

11         of the question.

12         A.    I don't -- it is odd.  I don't know.

13              MR. RUKAVINA:  You can take this

14    exhibit down, Mr. Nguyen.

15         Q.    Do you recall asking anyone,

16    Mr. Dondero or -- or anyone outside as to

17    whether Highland ought to be lending

18    $7.4 million to HCMF regarding HCMF's

19    creditworthiness?

20              MR. MORRIS:  Objection to the form

21         of the question.

22         A.    I don't recall.

23         Q.    Did you receive personally any of

24    that $7.4 million?

25         A.    No.
```

Page 304

```
 1                 WATERHOUSE - 10-19-21

 2       Q.    Did you even --

 3             MR. MORRIS:  I didn't hear that

 4       question, sir.

 5             MR. RUKAVINA:  The one that he

 6       answered, John, or my new one?

 7             MR. MORRIS:  No, no, your question,

 8       Davor.

 9             MR. RUKAVINA:  I had asked him

10       whether he received any of the

11       $7.4 million.  He said no.

12             MR. MORRIS:  Yeah.  I thought there

13       was a question after that.  Maybe I was

14       mistaken.  I apologize.

15             MR. RUKAVINA:  I had started a new

16       question, so here, let me start the new

17       question again.

18       Q.    Did you personally receive any

19   direct benefit from those two notes for

20   $7.4 million?

21       A.    No.

22       Q.    Did you ever personally consider

23   yourself obligated to repay either or both of

24   those notes?

25       A.    No.
```

 1                    WATERHOUSE - 10-19-21

 2                    MR. RUKAVINA:  Pull up those notes

 3     again, Mr. Nguyen.

 4          Q.    You can have them in front of you,

 5     Exhibit 7, Mr. Waterhouse, whatever is easier

 6     for you.  If you go to your signature page, my

 7     question to you is, why did you not include

 8     your title as treasurer by your name, Frank

 9     Waterhouse?

10                    MS. DANDENEAU:  Objection to form.

11          A.    I didn't -- I didn't draft this

12     document.

13          Q.    So you relied on whoever drafted it

14     to draft it correctly?

15          A.    Yes.

16          Q.    Okay.  But back then when you signed

17     this, did it ever cross your mind that you were

18     the maker on these notes?

19          A.    No.

20          Q.    Back then when you signed this

21     document, did it ever cross your mind that you

22     could be a co-obligor on these notes?

23          A.    No.  I didn't receive $7.4 million,

24     I mean...

25          Q.    But can you say that HCMFA received

Page 306

1                    WATERHOUSE - 10-19-21

2    $7.4 million?

3          A.    I would have to go back and look and

4    check in, you know, the -- the financial

5    records and the bank statements.

6                MR. RUKAVINA:  You can take this

7    exhibit down, Mr. Nguyen.

8          Q.    Mr. Waterhouse, I'm not trying to be

9    a smart-ass, but if the law says that because

10   of the way that you signed this promissory

11   note, if that is what the law says, that that

12   made you personally -- personally liable, then

13   you would agree with me that that was never

14   your intent?

15               MR. MORRIS:  Objection to the form

16        of the question.

17         A.    That was never -- I wouldn't sign a

18   note and not get consideration in return.

19         Q.    So putting all other issues aside,

20   if the law -- if the law says that you were

21   liable for those notes because of how you

22   signed them, then would you agree with me that

23   these notes are a mistake?

24               MR. MORRIS:  Objection to the form

25        of the question.

Page 307

1                    WATERHOUSE - 10-19-21

2              MS. DANDENEAU:  Objection to the

3         form.

4    A.    Yes.

5    Q.    So do you agree with me that it's

6    odd -- I think that is the word you used --

7    that Highland would be loaning $7.4 million a

8    few weeks after that extension to an entity

9    whose liabilities exceeded its assets, and you

10   would agree with me that it was never your

11   intention to be in any way liable for these two

12   promissory notes; correct?

13             MR. MORRIS:  Objection to the form

14        of the question.

15   A.    Sorry, you -- you asked a lot there.

16             MR. RUKAVINA:  I will strike it and

17   I will move on.

18             Let's go to -- pull up Exhibit 9,

19   please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha

20   9, A9.

21             (Exhibit A9 marked.)

22   Q.    Sir, take a moment to look at this,

23   but this is an email, and you will see attached

24   July 31, 2020 affiliate notes.

25             Do you see that attachment?

Case 21-03005-sgj Doc 86-4 Filed 10/29/21   Entered 10/29/21 17:22:38   Page 308 of 397
Case 3:21-cv-00880-X   Document 23   Filed 01/05/22   Page 446 of 899   PageID 1058

Page 308

```
1              WATERHOUSE - 10-19-21

2     A.   Yes.

3     Q.   Okay.  And do you see an entry for

4   Highland Capital Management Fund Advisors?

5          MR. MORRIS:  I'm sorry, hold on.

6     Where are you looking?

7          MR. RUKAVINA:  Last page, John.

8          MR. MORRIS:  Is it the page on the

9     screen?

10         MR. RUKAVINA:  Oh, I'm sorry.

11    Mr. Nguyen just did it.  Yes, the last page

12    there.

13         MR. MORRIS:  Thank you.

14    Q.   Do you see an entry there for HCMFA?

15    A.   Yes.

16    Q.   About $10.5 million.

17         Do you see that?

18    A.   I do.

19    Q.   And, now, do you have any

20   explanation for why if HCMFA owed $7.4 million,

21   plus the 5.3 million that had been extended,

22   why that amount was only 10.5 million?

23    A.   I don't know.  Okay.

24         MR. RUKAVINA:  Close this one and

25    pull up, Mr. Nguyen, the schedules,
```

```
 1              WATERHOUSE - 10-19-21
 2         schedule of assets.  What exhibit is this
 3         of ours, Mr. Nguyen?
 4              MR. NGUYEN:  This is A11.
 5              MR. RUKAVINA:  Oh, this will be A11.
 6              (Exhibit A11 marked.)
 7         Q.    You don't have this in front of you,
 8    Mr. Waterhouse?
 9         A.    Okay.
10         Q.    This is what Mr. Morris used
11    earlier.  Do you remember looking at this with
12    Mr. Morris?
13         A.    Yes.
14              MR. RUKAVINA:  You might have to
15         zoom in a little.  Okay.
16         Q.    Now, I see Affiliate Note A, B, and
17    C.
18              Do you have any recollection as to
19    why the names of the affiliates are omitted?
20         A.    I don't.  I testified earlier that,
21    you know, the team worked with DSI in providing
22    these.  I -- I don't -- I don't know.
23         Q.    Can we deduce -- is it logical to
24    deduce that Affiliate Note A would be NexPoint
25    given its size of $24.5 million?
```

```
                                                          Page 310
 1                    WATERHOUSE - 10-19-21

 2              MR. MORRIS:  Objection to the form

 3        of the question.

 4        A.    I mean, it -- it is a -- it is -- it

 5   is approximate.

 6        Q.    Well, can we -- can we deduce -- or,

 7   I'm sorry, strike that.

 8              Can you, sitting here today,

 9   logically conclude that Affiliate Note B or C

10   represents HCMFA?

11              MR. MORRIS:  Objection to the form

12        of the question.

13        A.    I don't know.  I don't know.  I

14   can't.

15        Q.    Okay.  As of the petition date, we

16   have established that HCMFA, under promissory

17   notes, owed $7.4 million and $5.3 million to

18   the debtor; correct?

19              MR. MORRIS:  Objection to the form

20        of the question.

21        A.    Yes.

22        Q.    Okay.  And by my reckoning, that

23   would be somewhere approaching $13 million.

24              MR. MORRIS:  Objection to the form

25        of the question.
```

Page 311

```
 1                    WATERHOUSE - 10-19-21

 2        Q.    It would be $12.7 million.  Is that

 3   generally correct?

 4        A.    Sorry, the amounts were 7.4, 5.3.

 5        Q.    Yes.

 6        A.    Okay.  Yeah, that -- that -- I can

 7   do that math, yes.

 8        Q.    Do you have any explanation or any

 9   understanding of why there is no similar entry

10   listed here on the schedule of assets filed

11   with the bankruptcy court?

12              MR. MORRIS:  Objection to the form

13        of the question.

14        A.    I don't know.  We have to look at

15   the supporting schedules, like I talked about

16   other -- presumably there is -- there is a

17   build to the schedule that would provide the

18   detail.

19        Q.    Well, that was going to be my next

20   question.  You anticipated it.

21              MR. RUKAVINA:  You can -- you can

22        take this down, Mr. Nguyen.

23        Q.    Do you believe that whenever you and

24   your team provided the underlying data to the

25   financial advisor that the actual names of the
```

Page 312

```
 1                  WATERHOUSE - 10-19-21

 2    affiliates for Affiliate Note A, B, and C would

 3    have been listed there?

 4         A.    Are you asking we provided the names

 5    to the financial advisor?  I don't -- I don't

 6    understand who the financial advisor is.

 7         Q.    I'm sorry, DSI.

 8               Let me ask the question this way,

 9    Mr. Waterhouse.

10               Whenever you provided information

11    about the affiliate notes to DSI, do you

12    believe that you would have included the actual

13    names of the affiliates, you or your team, or

14    that you would have done the Affiliate Note A,

15    Note B, Note C?

16               MR. MORRIS:  Objection to the form

17         of the question.

18               MS. DANDENEAU:  Objection to the

19         form.

20         A.    We -- like I testified earlier, when

21    we were -- we gave everything to -- to DSI.  We

22    were giving all of our records, all of our

23    files, everything to DSI.  We weren't redacting

24    information or saying, hey, here is a note,

25    here is Affiliate Note A or B.
```

Page 313

```
 1                    WATERHOUSE - 10-19-21

 2               I mean, it was -- our job and our

 3    focus -- and I testified in court back in 2019;

 4    right -- was -- was to be transparent and, you

 5    know, get DSI up to speed on -- on the matters

 6    at Highland.  So I can't see us redacting at

 7    that point.

 8               MR. RUKAVINA:  Mr. Nguyen, will you

 9         please pull up Mr. Morris' Exhibit 36.

10         Just the very first page, the very top

11         email.  You might zoom in a little bit.

12         Q.    Now, you recall being asked about

13    this by Mr. Morris?

14         A.    Yes, I do.

15         Q.    And you wrote:  The HCMFA note is a

16    demand note.

17               You wrote that; right?

18         A.    Yes.

19         Q.    And, in fact, weren't there by that

20    point in time several notes?

21         A.    Yes, there were.  Again, I don't --

22    I don't remember everything specifically.  I

23    mean --

24         Q.    I understand.  I understand.

25               So this is an example where -- where
```

```
 1                WATERHOUSE - 10-19-21
 2   you might have made a mistake by referring to a
 3   singular instead of a plural; right?
 4        A.   Yes.
 5        Q.   Okay.  And you -- you wrote -- a
 6   couple of sentences later, you wrote:  There
 7   was an agreement between HCMLP and HCMFA the
 8   earliest they could demand is May 2021.
 9             You wrote that; right?
10        A.   Yes.
11        Q.   But I think you -- you agreed with
12   Mr. Morris that that can't possibly apply to
13   the May 2019 notes, can it?
14             MR. MORRIS:  Objection to the form
15        of the question.  That is not what he
16        testified to.
17        Q.   Let me ask -- let me ask a different
18   question.
19             Sitting here today -- or if you can
20   answer me from your memory on October 6,
21   2020 -- did the April acknowledgment that
22   extended the maturity date apply to the
23   May 2019 notes also?
24        A.   I don't recall specifically.
25        Q.   Well, you recall that the notes that
```

Page 315

1              WATERHOUSE - 10-19-21

2     you signed were demand notes; right?

3          A.    Yes.

4          Q.    Do you find it logical, based on

5     your experience, that had they intended to have

6     a different or a set maturity date, you would

7     have instructed that that set maturity date be

8     included instead of a demand feature?

9               MR. MORRIS:  Objection to the form

10         of the question.

11         A.    Sorry, just want to make sure I

12    understand.  You are saying that -- that the

13    $5 million note, the $2.4 million note, if

14    those were supposed to be a term note, that I

15    would have made sure that those were a term

16    note?

17         Q.    I'm saying -- I'm saying,

18    Mr. Waterhouse, that on May the 2nd and May the

19    3rd, 2019, if you intended that those two

20    promissory notes could not be called until May

21    2021, would you have included such language in

22    those two promissory notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I guess -- I'm sorry, I don't recall

```
 1                    WATERHOUSE - 10-19-21

 2     putting language in those May notes.  I don't

 3     remember what language you are referring to.

 4          Q.    Well, let's read this again.

 5                There was an agreement between HCMLP

 6     and HCMFA the earliest they could demand is May

 7     2021.

 8                Do you recall that agreement?

 9          A.    Yes, that was the agreement we

10     looked at earlier; correct?

11          Q.    Okay.  Yes.

12                Do you -- do you understand now that

13     that agreement that we looked at earlier also

14     applied to the May 2019 notes that you signed?

15          A.    I don't -- I don't know.

16          Q.    But as of October 6, 2020, you're

17     writing that there is one demand note and

18     you're categorizing that demand note as not

19     being demandable on May 2021; correct?

20          A.    Yes.

21          Q.    And you know now that you made at

22     least one mistake in this email; correct?

23                MR. MORRIS:  Objection to the form

24          of the question.

25          A.    Yes.
```

```
 1                WATERHOUSE - 10-19-21

 2            MR. RUKAVINA:  You can pull this

 3       down, Mr. Nguyen.

 4       Q.     So, Mr. Waterhouse, you don't

 5   remember Mr. Dondero telling you to make these

 6   loans or not.  HCMLP was loaning $7.4 million

 7   to someone that their assets were less than

 8   their liabilities.

 9            We don't see on the July list of

10   notes, where there is $12.7 million of notes,

11   we don't see that on the bankruptcy schedules,

12   and we have this Exhibit 36 where you are

13   confused.

14            Are you prepared to tell me, sir,

15   today that you might have made a mistake in

16   executing those two promissory notes?

17            MR. MORRIS:  Objection to the form

18       of the question.

19       A.     I -- I don't know.

20       Q.     And if it turns out that you're

21   personally liable for those promissory notes,

22   it would certainly be a mistake, wouldn't it?

23            MS. DANDENEAU:  Objection to the

24       form.

25            MR. MORRIS:  Join.
```

Page 318

                    WATERHOUSE - 10-19-21

1

2      A.    Yes.

3      Q.    If Mr. Dondero testifies that he

4  never told you to make these loans, would you

5  disagree with his testimony?

6            MR. MORRIS:  Objection to the form

7       of the question.

8      A.    Like I testified earlier with my

9  conversation with Mr. Dondero, all I recall is

10  he said, get the money from Highland.

11     Q.    And if Mr. Dondero testifies that

12  he, in consultation with other senior personnel

13  at Highland, decided that Highland needed to

14  pay HCMFA $7.4 million as compensation for the

15  NAV error and not a loan, would you have any

16  reason to disagree with Mr. Dondero?

17           MR. MORRIS:  Objection to the form

18       of the question.

19     A.    If that was -- if that was his

20  intent, yes, it would -- I would --

21     Q.    Do you have any reason to disagree

22  with him?

23           MR. MORRIS:  Objection to the form

24       of the question.

25     A.    If that was his intent, I don't

Page 319

```
 1                  WATERHOUSE - 10-19-21

 2    know.  I don't know how I disagree with that.

 3         Q.    And just to confirm, you don't

 4    remember ever asking Mr. Dondero whether you

 5    should have two promissory notes prepared?

 6         A.    No.

 7         Q.    And you don't remember discussing

 8    with Mr. Dondero what the terms of those two

 9    promissory notes should be?

10         A.    I don't recall -- I testified all I

11    recall is he said, get the money from Highland.

12    I don't -- the -- the terms of the note, I

13    don't recall ever having a discussion around

14    the terms of the note, but since I don't draft

15    the notes, that -- there could have been a

16    conversation with other people later.

17         Q.    Do you have any memory of whether

18    after the notes were drafted, but before you

19    signed them, that you communicated with

20    Mr. Dondero in any way to just confirm or -- or

21    get his blessing or ratification to signing

22    those notes?

23              MR. MORRIS:  Objection to the form

24         of the question.

25         A.    I don't recall.
```

Page 320

1                     WATERHOUSE - 10-19-21

2      Q.    Again, the only thing you remember,

3   sitting here today, was Mr. Dondero said, get

4   the money from Highland, and that is it, that

5   is all you remember?

6             MR. MORRIS:  Objection to the form

7        of the question.

8      A.    I testified to that several times.

9   This was over two years ago.  A lot has

10  happened.  That is all I recall.

11     Q.    And help me here.  I'm not very

12  technologically astute.  When you -- and I -- I

13  recognize that you do it rarely, but when you

14  sign a document electronically, do you believe

15  that there is an electronic record of you

16  having authorized or signed a document

17  electronically?

18            MR. MORRIS:  Objection to the form

19       of the question.

20     A.    I -- I don't know the tech answer to

21  that, but, you know, since I don't have -- I

22  don't ever attach my signature block

23  electronically, my assistant would have done

24  that, and if that is done over email like we

25  did several times -- you know, multiple,

1                    WATERHOUSE - 10-19-21

2     multiple times over COVID, she would attach my

3     signature block and then email it out to

4     whatever party.

5          Q.    What was your assistant's name in

6     May 2019?

7          A.    It was Naomi Chisum.

8          Q.    Is she the only one?  I'm sorry, was

9     she your only assistant that would have maybe

10    facilitated logistically something like you

11    just described?

12         A.    You know, she was out on maternity

13    leave at some point.  I don't -- I don't recall

14    those dates where she was out for maternity

15    leave.  There was -- there were folks backing

16    her up.  I don't recall specifically who

17    those -- who those, you know, administrative

18    assistants were, and I don't recall

19    specifically if she was out during this time on

20    maternity leave.

21               I do know that that she was out for

22    a period of time, or who knows, or she could

23    have been on vacation that day or, you know, I

24    don't know.

25         Q.    Switching gears now, the two

1              WATERHOUSE - 10-19-21

2    complaints that have been filed that is against

3    HCMFA and NexPoint, did you see any drafts of

4    those complaints before they were filed?

5              MR. MORRIS:  Objection to the form

6         of the question, and to the extent that you

7         had any communications with counsel or you

8         were shown drafts of the complaints by

9         counsel while you were employed by

10        Highland, I direct you not to answer.

11   A.    I -- I reviewed documents yesterday

12   with counsel here.  I believe that is the first

13   time I have ever seen those.

14   Q.    Okay.  Did you ever discuss with

15   Mr. Seery these two lawsuits before or after

16   they were filed?

17   A.    I don't recall.

18   Q.    Were you ever interviewed by legal

19   counsel, to your knowledge, about these

20   promissory notes before the complaints were

21   filed?  Without going into what was said, were

22   you ever interviewed by legal counsel?

23             MR. MORRIS:  Objection to the form

24        of the question.

25   A.    I don't recall.

Page 323

```
 1                  WATERHOUSE - 10-19-21

 2        Q.    Obviously with COVID, it changed,

 3   but -- but before COVID, did you used to meet

 4   with Mr. Seery from time to time in-person?

 5        A.    Yeah, I mean, so before COVID -- so

 6   we're talking kind of late March, early April,

 7   right, there was about -- I don't remember the

 8   specific date when the board for Highland was

 9   appointed.  I believe it was around February of

10   2020, so maybe there was a month-and-a-half,

11   two-month window where we were meeting

12   in-person or, you know, like we were actually

13   in the office, excuse me, we were in the

14   office.

15             And, you know, when they were first

16   appointed, the board members and Mr. Seery

17   were -- were definitely down here more

18   in-person.

19        Q.    Did you ever see Mr. Seery taking

20   written notes of -- of his meetings with you or

21   others?

22        A.    I don't recall.

23        Q.    Do you recall on any Zoom or video

24   conference with Mr. Seery, seeing him take

25   notes, written notes?
```

```
1                   WATERHOUSE - 10-19-21

2        A.     The Zoom calls we had, I don't

3   recall having seen video or, you know, or if it

4   was on Zoom, I just remember it being -- well,

5   no, you know what, there were some -- you know,

6   I take that back.

7               So there were -- there were some

8   times that I did remember seeing Mr. Seery

9   on -- on some of the Zoom calls.

10       Q.     Well, let me --

11       A.     I don't -- sorry, I'm thinking.  I'm

12  thinking -- I'm going back.  I'm trying to

13  process this.

14       Q.     I can make it much quicker,

15  Mr. Waterhouse.  I have heard -- I have heard

16  that Mr. Seery is a copious note taker.

17               Do you have any knowledge about

18  that?

19       A.     No.

20       Q.     Okay.  Switching gears yet again,

21  and this will be last theme.  Do you need a

22  restroom break, or are you good to go for

23  another half an hour?

24               MS. DEITSCH-PEREZ:  I need a

25          restroom break.
```

Page 325

```
 1                    WATERHOUSE - 10-19-21

 2              MR. RUKAVINA:  Can we make it five

 3         minutes?

 4              THE WITNESS:  Five minutes would be

 5         great.

 6              VIDEOGRAPHER:  We're going off the

 7         record at 5:53 p.m.

 8         (Recess taken 5:53 p.m. to 5:59 p.m.)

 9              VIDEOGRAPHER:  We are back on the

10         record at 5:59 p.m.

11         Q.    Mr. Waterhouse, I had asked you

12    earlier about contracts between HCMFA and the

13    debtor, and now I'm going to talk about

14    contracts between the debtor and NexPoint

15    Advisors.  Okay?

16         A.    Okay.

17         Q.    Now, were there contracts similar to

18    the ones with HCMFA that NexPoint had in the

19    nature of employee reimbursement and shared

20    services?

21         A.    Yes, they -- NexPoint Advisors and

22    Highland Capital Management Fund Advisors had

23    cost reimbursement and shared services

24    agreements with Highland Capital Management,

25    L.P.
```

                         WATERHOUSE - 10-19-21

1

2        Q.    And was that shared services

3   agreement, to the best of your understanding,

4   in place as of December 31, 2020?

5        A.    It was -- it was terminated at some

6   point, and I remember the contracts had

7   different termination dates, but I think the --

8   the date of termination was January 31st of

9   2021, after the termination was put in.

10            So yeah, it would be in place at the

11   end of the year of December -- it would be in

12   place at December 31st, 2020.

13       Q.    And pursuant to that agreement as of

14   December 31st, 2020, was the debtor providing

15   what you would describe as back office services

16   to NexPoint?

17       A.    Yes.

18       Q.    Would those have included accounting

19   services?

20       A.    Yes.

21       Q.    And as part of those accounting

22   services, would the debtor have assisted

23   NexPoint with paying its bills?

24            MR. MORRIS:  Objection to the form

25       of the question.

1                  WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    So let's break that up.  You were a

4   treasurer of NexPoint as well in December of

5   2020?

6              MR. MORRIS:  Objection to the form

7         of the question.

8        A.    Yes.

9        Q.    Okay.  And in December of 2020, did

10  NexPoint have its own bank accounts?

11       A.    Yes.

12       Q.    And did it use those bank accounts

13  to pay various of its obligations?

14       A.    Yes.

15       Q.    Did employees of the debtor have the

16  ability to cause transfers to be made from

17  those bank accounts on behalf of NexPoint?

18       A.    Yes.

19       Q.    And is that one of services that the

20  debtor provided NexPoint, basically ensuring

21  that accounts payable and other obligations

22  would be paid?

23       A.    Yes.

24              MR. MORRIS:  Objection to the form

25         of the question.

Page 328

1                    WATERHOUSE - 10-19-21

2        Q.     You answered yes?

3        A.     Yes.

4        Q.     And the payments, though, whose

5    funds would they be made from?

6        A.     From the bank account of NexPoint

7    Advisors.  If they were NexPoint advisor

8    obligations, it would be made from NexPoint

9    Advisors' bank account.

10       Q.     So let's pull up Exhibit Alpha 1.

11   You should have that -- it is my Tab 1 or my

12   Exhibit 1.

13              (Exhibit A1 marked.)

14       Q.     So this is a -- this is a series of

15   emails, Mr. Waterhouse.  Let's look at the

16   first page here, November 25, 2020, between

17   Kristin Hendrix and yourself.

18              Do you see that, sir?

19       A.     I do.

20       Q.     And do you see where Ms. Hendrix

21   writes:  NPA.

22              Do you know what NPA stood for?

23       A.     Yes.

24       Q.     And what does it stand for?

25       A.     NexPoint Advisors.

1                    WATERHOUSE - 10-19-21

2        Q.    And was that how you-all internally

3    at Highland refer to NexPoint Advisors, L.P.?

4        A.    I mean, yes, amongst other things.

5        Q.    And she writes at the bottom of her

6    email:  Okay to release?

7              Do you see that?

8        A.    Yes, I do.

9        Q.    So what --

10             MR. MORRIS:  Hold on one second.

11             Okay.  Go ahead.

12             MR. RUKAVINA:  Yeah.

13       Q.    So what is -- what is Ms. Hendrix

14   here on November 25 asking of you?

15       A.    She is asking me -- so she -- these

16   are -- these are payments -- typically we would

17   do an accounts payable run every week at the

18   end of every Friday.  But looking at this date,

19   it is Wednesday, November 25th, which means, to

20   me, it is likely Thanksgiving weekend.

21             So this is the day before

22   Thanksgiving, so this is the last kind of --

23   kind of day before the holidays and vacation

24   and things of that nature.  So it is

25   effectively the Friday of that week.

Page 330

```
 1              WATERHOUSE - 10-19-21

 2              So she is -- she is putting in all

 3    the payments for the week because we batch

 4    payments weekly.  And these are the payments

 5    that go out that week, and she is informing me

 6    of the payments and -- you know, again, at the

 7    bottom of the email, she is asking for my okay

 8    to -- to release these payments in the wire

 9    system.

10        Q.    So these would be accounts payable

11    of NexPoint?

12        A.    I mean, it would be accounts payable

13    for all of these entities listed on this email.

14        Q.    And who was Ms. Hendrix employed by

15    in November and December of 2020?

16        A.    Highland Capital Management.

17        Q.    Okay.  So -- so part of the services

18    that NexPoint had contracted with was for

19    Highland to ensure that NexPoint timely paid

20    its accounts payable; is that accurate?

21              MR. MORRIS:  Objection to the form

22        of the question.  You have got to be

23        kidding me.

24        Q.    Is that accurate?

25        A.    Yes.
```

                     WATERHOUSE - 10-19-21

1

2      Q.    And did NexPoint rely on employees

3  of the debtor to ensure that NexPoint's

4  accounts payable were timely paid?

5           MR. MORRIS:  Objection to the form

6      of the question.

7      A.    Yes.

8           MR. RUKAVINA:  Let's flip to the

9      next page, Mr. Nguyen, if you will please

10     scroll to the next page.

11     Q.    So this is an email similar to the

12 prior one, November 30th.

13          Do you see where it says, NPA HCMFA,

14 USD $325,000 one-day loan?

15          Do you see that, sir?

16     A.    I do.

17     Q.    Do you have any memory of what that

18 was?

19     A.    I don't recall what that -- what

20 that payment was for.

21     Q.    Did it sometimes occur that one

22 advisor would, on very short-terms, make loans

23 to another advisor?

24     A.    Yes.  This -- this -- this occurred

25 from -- from -- from time to time.  It actually

Page 332

```
 1                  WATERHOUSE - 10-19-21

 2   looking at -- I'm -- I'm looking at the date of

 3   this email.  It is November 30th.  It is the

 4   last day of the month.

 5                  HCMFA has obligations it needs to

 6   pay to its broker-dealer, which is HCFD.  And

 7   it likely was short funds to make those

 8   obligations under that -- under its agreement,

 9   and so it provided a one-day loan because on

10   the next business day on 12/1 -- or the next

11   business day in December, it would receive

12   management fees from the underlying funds that

13   it managed and it would be able to pay back

14   that loan to NexPoint Advisors.

15        Q.    So -- so here Ms. Hendrix was

16   seeking your approval to transfer $325,000 from

17   NexPoint to HCMFA for a one-day loan; is that

18   correct?

19        A.    That is correct.

20        Q.    Let's flip to the next page, sir.

21                  MR. RUKAVINA:  And, Mr. Nguyen, if

22        you will please scroll down.

23        Q.    Now we have as an entry for

24   $325,000, 11/30 loan payment.

25                  Do you see that, sir?
```

Page 333

1                    WATERHOUSE - 10-19-21

2        A.    Yes.

3        Q.    And that is probably the loan that

4   was approved on the prior page?

5        A.    Yes, most likely.

6        Q.    So is it also true, sir, that in

7   addition to accounts payable debtor employees

8   would be assisting NexPoint with respect to

9   paying back its debt?

10              MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I mean, yes, for loans of this

13   nature, yes.

14        Q.    Well, what about long term loans?

15   Was it reasonable for NexPoint to expect debtor

16   employees to ensure that NexPoint timely paid

17   its obligations under long-term notes?

18              MR. MORRIS:  Objection to the form

19        of the question.

20              MS. DANDENEAU:  Objection to form.

21        A.    I mean, that is one of the things

22   that the Highland personnel did provide to the

23   advisors.  Yes, we would -- we would -- over

24   the years, yes, we -- we -- we -- we did do

25   that generally.  Again, I don't remember

Page 334

1                    WATERHOUSE - 10-19-21

2    specifically but, yes, generally we -- you

3    know, we did do that.

4         Q.    So do you recall -- and we can pull

5    it up, if need be -- that under the NexPoint

6    note that Mr. Morris asked you about earlier,

7    the one for more than $30 million, that

8    NexPoint was obligated to make an annual

9    payment of principal and interest?

10              MR. MORRIS:  Objection to the form

11         of the question.

12        A.    Yes, it was -- yes, it -- it was an

13   amortizing note.  It was -- you know, from what

14   we reviewed earlier, it was payable by

15   December 31st of each year.  So -- but are --

16   are you asking me --

17        Q.    I'm just asking you, sir, if you

18   recall the note.

19        A.    Yes, the $30 million note, yes, we

20   reviewed it earlier, yes.

21        Q.    And do you recall Mr. Morris had you

22   go through the fact that NexPoint had made

23   payments in years prior to 2020 on that note?

24        A.    I do.

25        Q.    And do you believe that employees of

Page 335

1              WATERHOUSE - 10-19-21

2    the debtor would have played any role in

3    NexPoint having made those prior payments?

4              MR. MORRIS:  Objection to the form

5         of the question.

6    A.    Yes.

7    Q.    And what role in years prior to 2020

8    would employees of the debtor have had with

9    respect to NexPoint making that annual payment?

10   A.    We -- we -- we would have -- I keep

11   saying "we."  The team would have calculated

12   any amounts due under that loan and other

13   loans, as -- as standard course.

14              We would -- since we provided

15   treasury services to the advisors, we would

16   inform the -- the -- the -- we informed

17   Mr. Dondero of any cash obligations that are

18   forthcoming, whether we do cash projections.

19              If, you know, any of these payments

20   would have -- or, you know, the sum total of

21   all of these payments, including any note

22   payments, if there were any cash shortfalls, we

23   would have informed Mr. Dondero of any cash

24   shortfalls.  We could adequately plan, you

25   know, in instances like that.

Page 336

1                    WATERHOUSE - 10-19-21

2              Or, sorry, we -- I say "we" -- I

3    keep saying "we" -- I keep wearing my -- again,

4    my -- my treasurer hat.

5              But, yes, it is to -- it is to

6    inform Mr. Dondero of the obligations of the

7    advisors in terms of cash and obligations that

8    are -- are upcoming and that -- and that are --

9    are scheduled to be paid.

10        Q.    And would those obligations that are

11   upcoming and scheduled to be paid prior to 2020

12   have incurred the annual payment on that

13   NexPoint $30 million note?

14             MS. DANDENEAU:  Objection to form.

15             MS. DEITSCH-PEREZ:  Davor, I think

16        you misspoke.  You might want to just

17        repeat the question.

18        Q.    Okay.  Let me repeat the question,

19   sir.

20             Prior to 2020, those services that

21   you just described, would that -- on behalf of

22   the debtor, would that have included NexPoint's

23   payments on the $30 million note?

24        A.    Yes.

25        Q.    So someone at the debtor in treasury

Page 337

1                    WATERHOUSE - 10-19-21

2    or accounting would have sent some schedule or

3    a reminder that a payment would be coming due

4    in the future.  Is that generally the practice?

5         A.    Yes, we would -- you know, again, I

6    didn't -- I didn't micromanage the teams, but

7    we had a -- a corporate accounting calendar

8    that we use as kind of a tickler file to keep

9    track of payments.

10               I actually, you know, don't know how

11   actively they're using that in -- in prior to

12   2020, but it was actively used at some point.

13               We did look at NexPoint cash

14   periodically and cash for the other advisors as

15   well and payments.  You know, we -- payments

16   like this would have appeared in our cash

17   projections, in the advisor's cash projections.

18               And, again, as like I said earlier,

19   they would have appeared there, so there would

20   be time to plan for making any of these

21   payments.

22        Q.    And based on your experience, would

23   it have been reasonable for NexPoint to rely on

24   the debtors' employees to inform NexPoint of an

25   upcoming payment due on the $30 million

 1                 WATERHOUSE - 10-19-21

 2    promissory note?

 3                 MR. MORRIS:  Objection to form of

 4         the question.

 5                 MS. DANDENEAU:  Objection to form.

 6         A.    Yes.  Yes, they did.  I mean, but I

 7    mean, but I don't think these -- these notes

 8    were any secret to anybody.

 9         Q.    I understand, and I'm not suggesting

10    otherwise.

11                 MR. RUKAVINA:  Please pull up Alpha

12    2, Mr. Nguyen.

13                 (Exhibit A2 marked.)

14         Q.    Now, this document is similar to the

15    ones we've seen before as of December 31, 2020,

16    and I don't see under NTA anything there for

17    paying the promissory note to Highland.

18                 Do you see anything like that?

19         A.    I do not.

20                 MR. RUKAVINA:  You can pull that --

21    that exhibit down, Mr. Nguyen.

22         Q.    You are aware, of course, by now

23    that, in fact, NexPoint failed to make the

24    payment due December 31, 2020, are you not?

25         A.    I am aware, and yes, I do understand

Page 339

1                  WATERHOUSE - 10-19-21

2    it.

3         Q.    Were you aware that Highland

4    accelerated that $30 million promissory note?

5         A.    I am aware.

6         Q.    Were you aware of that acceleration

7    at the time that it occurred?

8         A.    I don't remember specifically.

9         Q.    Do you recall whether anyone asked

10   you -- prior to the acceleration, anyone asked

11   you at Highland, what Highland should do with

12   respect to the missed payment?

13        A.    Did anyone ask me what Highland

14   should do about the missed payment?

15        Q.    Yes, before acceleration.

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    I mean, what -- what I recall is

19   there was the -- sorry, are you asking me --

20             MS. DANDENEAU:  Why don't you just

21        repeat the question, Mr. Rukavina.

22        Q.    Let me try again, Mr. Waterhouse,

23   let me try again.

24             I am saying you're the CFO of

25   someone, in this case, Highland, and the

Page 340

```
 1                 WATERHOUSE - 10-19-21
```

2   borrower failed to make the required payment.

3   Are you with me so far?

4       A.    I am.

5       Q.    Did anyone then ask you, what should

6   we do with respect to our rights against the

7   borrower that missed the payment?

8       A.    Not that I recall.

9       Q.    Did you play a role in the decision

10  to accelerate that $30 million promissory note?

11      A.    I did not.

12      Q.    Do you recall whether Mr. Seery ever

13  asked you before the acceleration as to whether

14  he should accelerate the note?

15      A.    I don't recall.

16      Q.    And you don't recall when you

17  learned of the acceleration itself?

18            MR. MORRIS:  Objection to the form

19      of that question.

20      A.    It was -- it was sometime in

21  early -- in early 2021.  I don't remember

22  specifically.

23      Q.    But do you recall whether it was

24  after the acceleration had already been

25  transmitted?

Page 341

1                    WATERHOUSE - 10-19-21

2                    MS. DANDENEAU:  Objection to the

3         form of the question.

4         A.    I don't recall.

5         Q.    Do you recall in early to mid

6    January of 2021, after the default, discussing

7    the default with Mr. Dondero?

8         A.    I do recall discussing with

9    Mr. Dondero after December 31, 2020?

10        Q.    Yes, the fact of the default.

11        A.    I don't recall.

12                   MR. RUKAVINA:  Let's pull up my

13   Exhibit 6, Alpha 6.

14                   (Exhibit A6 marked.)

15                   MR. RUKAVINA:  And, Mr. Nguyen, if

16        you will please scroll down.

17        Q.    This email chain begins with you

18   writing to Ms. Hendrix on January the 12th:

19   NexPoint note to HCMLP.

20                   Do you see that, sir?

21        A.    I do.

22        Q.    Were you discussing this same

23   $30 million note we're talking about right now

24   with Ms. Hendrix?

25        A.    Yes.

```
 1                   WATERHOUSE - 10-19-21

 2       Q.    Okay.  Do you recall what prompted

 3   you to send that email to her?

 4       A.    Yes, I had -- I had a conversation

 5   with Jim.

 6       Q.    Okay.  And what -- what did you

 7   discuss with Jim that led to this email chain?

 8       A.    He -- he called me and he said he

 9   wanted to make payment on the NexPoint note,

10   and I didn't -- I didn't know the -- the amount

11   offhand, so I reached out to Kristin and got

12   the details and relayed that to him.

13       Q.    And you see you sent that email to

14   her at 11:15 a.m.  Does that help you remember

15   when you had this discussion with Mr. Dondero?

16   In other words, was it that morning or the day

17   before, or can you -- can you --

18       A.    No, it was -- it was that morning.

19       Q.    And do you recall how you had that

20   conversation with him?

21             MR. MORRIS:  Objection to the form

22       of the question.

23       Q.    By telephone, by email, in-person?

24       A.    Yeah, he -- he called me.  I was at

25   home.  We were working from home here in
```

```
1              WATERHOUSE - 10-19-21
```

2    December of 2020.  He called me from home.  He

3    said he was in court.  He wanted to -- he asked

4    about, you know, making payment on the note and

5    the amount, and so I didn't have those numbers

6    in front of me, so I said I would get back to

7    him.  I wanted all the details, so here is

8    this -- so I reached out to Kristin.

9         Q.    And then she gave you that

10   $1,406,000 figure?

11              MR. RUKAVINA:  Mr. Nguyen, if you

12   will scroll up, please.

13        A.    Yes.  Yeah, she -- the $1,406,112.

14        Q.    And do you recall whether you

15   conveyed that amount to Mr. Dondero?

16        A.    Yes.  I -- I called him back and

17   gave him -- gave him this amount.

18        Q.    Are you aware of whether NexPoint,

19   in fact, then made that 1 million 406 and

20   change payment?

21        A.    Yes, they did.

22        Q.    Did you discuss with Mr. Dondero at

23   that time, either the first conference or the

24   second conference that day -- strike that.

25              When you conveyed the number to

Page 344

```
 1              WATERHOUSE - 10-19-21

 2   Mr. Dondero, was -- was it also on January

 3   12th?

 4        A.   Sorry, when I conveyed the

 5   $1.4 million number?

 6        Q.   Yes.

 7        A.   Yes, yes, it was that -- it was --

 8        Q.   So you had --

 9        A.   It was that point.

10        Q.   Well, to the best of your

11   recollection, you had a conference with

12   Mr. Dondero by the telephone in the morning,

13   and then another conference with him by

14   telephone after 11:40 a.m. that morning?

15        A.   Yeah, I can't remember -- yeah, it

16   was either that morning or it could have been,

17   you know, early afternoon, but again, I

18   remember calling him back, relaying this

19   information to him, and he said, okay, pay --

20   you know, make -- make this payment.

21        Q.   And during either of those two

22   calls, did you tell Mr. Dondero anything to the

23   effect that making those -- I'm sorry, making

24   that payment would not de-accelerate the

25   promissory note?
```

Page 345

```
 1                  WATERHOUSE - 10-19-21

 2       A.    No.

 3       Q.    Did you tell him anything to the

 4  effect that making that payment would not cure

 5  the default?

 6       A.    No.

 7       Q.    Did you discuss that in any way with

 8  him?

 9       A.    No, I did not.

10       Q.    Did he say why he wanted to have

11  that $1.4 million payment made?

12             MR. MORRIS:  Objection to the form

13       of the question.

14       A.    He -- he -- he didn't go into

15  specifics.

16       Q.    Did he say anything to you to the

17  effect that if NexPoint makes that payment,

18  then the note will be de-accelerated?

19             MR. MORRIS:  Objection to the form

20       of the question.

21       A.    I don't recall.

22             MR. RUKAVINA:  You can put this one

23       down, Mr. Nguyen.

24       Q.    And, again, when you say you don't

25  recall, you mean you don't remember right now
```

```
 1                 WATERHOUSE - 10-19-21

 2    either way; correct?

 3         A.    Yeah, I don't remember.  I don't

 4    remember us discussing that.

 5         Q.    Now -- and we're almost done, I

 6    promise.  I'm just going to -- I don't know how

 7    to ask this question, so I'm just going to try

 8    to do my best.

 9               Prior to the default on December 31,

10    2020, did Mr. Seery ever tell you any words to

11    the effect that you or someone at Highland

12    should ensure that NexPoint doesn't make its

13    payment?

14         A.    No.

15         Q.    Did you have any hint or any belief

16    that anyone at NexPoint -- I'm sorry, strike

17    that.

18               Did you have any reason to believe

19    that anyone with Highland was actively trying

20    to get NexPoint to make that default by not

21    paying on December 31?

22               MR. MORRIS:  Objection to the form

23         of the question.

24         A.    Are you asking, did any Highland

25    employees actively work to make -- to
```

Page 347

1            WATERHOUSE - 10-19-21

2   somehow --

3        Q.    Yes.  Let me take a step back.  Let

4   me take a step back.

5              So you are aware now that as a

6   result of that default, what was still some

7   25-year note was accelerated and became

8   immediately due.  You are aware of that now;

9   right?

10       A.    Yes.

11       Q.    And can you see how someone at

12  Highland might actually have been pleased with

13  that development?

14             MR. MORRIS:  Objection to the form.

15       Q.    Not that they were --- not that they

16  were pleased, but you can see how someone at

17  Highland might have been pleased with that

18  development?

19             MR. MORRIS:  Objection to the form

20       of the question.

21             MS. DANDENEAU:  Object to form.

22       A.    I don't know how they would have

23  reacted to that.

24       Q.    Okay.  But you're not -- you're not

25  aware of any instructions or any actions being

Page 348

```
 1                    WATERHOUSE - 10-19-21

 2    given or taken at Highland by Mr. Seery, the

 3    independent board, DSI, that -- that would have

 4    basically led Highland to ensure that NexPoint

 5    would fail to make that payment?

 6         A.    I'm not aware.

 7         Q.    In other words, there wasn't a trick

 8    or a settlement; right?

 9              MS. DEITSCH-PEREZ:  Objection to

10         form.

11              MS. DANDENEAU:  Object to form.

12              MR. MORRIS:  Object to form.

13         A.    I'm not aware.

14              Look, I'm not aware.  I'm not in

15    every conversation.  I mean, and I'm just --

16    again, I'm sitting at home.  It is the end of

17    the year.  Again, I'm not aware.

18         Q.    That is a perfectly legitimate

19    answer.  I don't know why -- why you think

20    otherwise.

21              Okay.  Just give me one second to

22    compose my thoughts.

23              MS. DEITSCH-PEREZ:  While you're

24         taking your one second, why don't we take

25         three minutes.  I will be right back.
```

```
 1                    WATERHOUSE - 10-19-21

 2              VIDEOGRAPHER:  Do we want to go off

 3       the record?

 4              MR. RUKAVINA:  Yes.

 5              VIDEOGRAPHER:  All right.  We're

 6       going off the record at 6:27 p.m.

 7       (Recess taken 6:27 p.m. to 6:30 p.m.)

 8              VIDEOGRAPHER:  We are back on the

 9       record at 6:30 p.m.

10              MR. HORN:  Is Deb back?

11              MS. DANDENEAU:  Are you asking about

12       me?  I'm here.

13              MR. HORN:  Oh, okay.  I don't see

14       you, sorry.

15       Q.    Actually, yeah, Mr. Waterhouse, so

16    when you had --

17              MS. DANDENEAU:  Are you asking about

18       Deb Dandeneau or Deborah?  I mean, there

19       are a lot -- as we talked about, a lot of

20       Debs.  I'm here.

21              MS. DEITSCH-PEREZ:  I'm here.

22              MR. HORN:  Yes, I was asking about

23       DDP.

24              MS. DEITSCH-PEREZ:  Oh, DDP is here.

25              MR. HORN:  Okay.  Here we go.  I'm
```

Page 350

```
 1              WATERHOUSE - 10-19-21

 2        going back on mute.

 3              MS. DANDENEAU:  Get the right

 4        nomenclature.

 5        Q.    Mr. Waterhouse, on January 12th,

 6   2021, when you had those talks with Mr. Dondero

 7   about the $1.4 million payment, did you have a

 8   communication or a conversation with Mr. Seery

 9   about that payment after January 12th, 2021?

10        A.    I don't recall.

11        Q.    Well, in response to Mr. Dondero

12   reaching out to you, do you recall on that day,

13   January 12th, talking to Mr. Seery or anyone at

14   Highland other than the email chain we just saw

15   about Mr. Dondero's call with you?

16        A.    Did I talk to -- I spoke with

17   Kristin -- I don't know if I spoke to her.  I

18   likely spoke to Kristin Hendrix because we had

19   to get the wire on NexPoint's behalf to make

20   the payment to Highland.

21        Q.    So it is true, then, that -- that

22   employees of the debtor did actually cause that

23   payment to be made when it was made after

24   January 12th?

25        A.    Yes, I mean, we -- we -- as I
```

Page 351

                    WATERHOUSE - 10-19-21

1

2    testified earlier, we provided that accounting

3    finance treasury function as -- under the

4    shared services agreement.  And so once I

5    got the -- I talked to Jim, got the approval to

6    make this payment, we have to then make the

7    payment, or the team does, and so the payment

8    was made.

9         Q.    Okay.  But -- okay.  And -- and

10   sitting here right now, after Jim called you,

11   you don't remember talking to anyone other than

12   the -- the couple of people you mentioned,

13   talking to anyone about something to the effect

14   that, hey, Jim wants to make this payment now?

15            MR. MORRIS:  Objection to the form

16       of the question.

17       A.    I don't -- I don't recall.

18       Q.    And does that include legal counsel?

19            Without going into any detail, on

20   January 12th or before that payment was made,

21   did you consult with legal counsel about

22   anything having to do with the $1.4 million

23   payment?

24       A.    I don't recall.

25       Q.    Okay.  Thank you, sir, for your

Page 352

```
 1                   WATERHOUSE - 10-19-21

 2   time.

 3              MR. RUKAVINA:  Pass the witness.

 4              MR. MORRIS:  I just have a few

 5         questions, if I may.

 6              MS. DEITSCH-PEREZ:  Don't you go at

 7         the end?

 8              MR. MORRIS:  Oh, I apologize.  He is

 9         your witness.  I'm surprised you want to

10         ask him questions, but go right ahead.

11              MS. DEITSCH-PEREZ:  Just have a

12         couple of things.

13              MR. RUKAVINA:  And I will just

14         object to that, that he's our witness.

15         That's not --

16              MR. MORRIS:  I'm not talking to you.

17         I'm not talking to you.

18              MS. DANDENEAU:  Also, Mr. Morris, it

19         is -- it is --

20              MS. DEITSCH-PEREZ:  He is not my

21         witness.  He's been subpoenaed by you.

22         Okay?

23              That is no offense, Mr. Waterhouse,

24         I'm -- I'm not -- okay.  Anyway.

25                        EXAMINATION
```

Page 353

```
 1                WATERHOUSE - 10-19-21

 2   BY MS. DEITSCH-PEREZ:

 3        Q.    Good evening.  I'm very sorry to be

 4   going last and I know you have had a long and

 5   taxing day, so I thank you for indulging me.

 6             The kinds of services that you

 7   describe that the -- that Highland provided for

 8   NexPoint, did Highland also provide similar

 9   services to that to HCRE and HCMS?

10        A.    Yes.

11             MR. MORRIS:  Objection to the form

12        of the question.

13        Q.    What kind of services did Highland

14   provide to HCRE and HCMS?

15             MR. MORRIS:  Objection to the form

16        of the question.

17             MS. DEITSCH-PEREZ:  What is your

18        objection, John?

19             MR. MORRIS:  It is vague and

20        ambiguous.  Unlike the advisors and

21        NexPoint, they actually had shared services

22        agreements.

23             MS. DEITSCH-PEREZ:  I got -- I

24        understand your objection.  That is fine.

25        Q.    Let's take them one at a time.
```

Page 354

```
 1                    WATERHOUSE - 10-19-21

 2              What kinds of services did Highland

 3    provide to HCRE?

 4              MR. MORRIS:  Objection to the form

 5        of the question.

 6        A.    HCMS, Highland employees provided

 7    accounting services, treasury management

 8    services, potentially legal services.  I

 9    don't -- but I wouldn't have been directly

10    involved in that.  But as far as the teams that

11    I manage, it was accounting, treasury, things

12    of that nature.

13        Q.    Okay.  And that was for HCM, LLP --

14        A.    And -- and, sorry, it would also be

15    any asset valuation if needed as well.

16        Q.    Okay.  We went back and forth on

17    each other and I apologize, so just to clarify.

18              You were talking about the services

19    that Highland Capital Management provided to

20    HCMS; is that right?

21        A.    HCMS.  So, again, yes.  And

22    accounting, treasury, valuation, and also tax

23    services too.

24        Q.    Okay.

25        A.    Tax services.  Look, I'm expanding
```

```
 1                WATERHOUSE - 10-19-21

 2   this, their HR services as well.

 3        Q.    Okay.  And did that include bill

 4   paying?

 5             MR. MORRIS:  Objection to the form

 6        of the question.

 7        Q.    Did the services that HCM provided

 8   to HCMS include bill paying?

 9             MR. MORRIS:  Objection to the form

10        of the question.

11        A.    Yes.

12        Q.    And did the services that HCMLP

13   provided to HCMS include scheduling upcoming

14   bills?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    Yes.

18        Q.    And did HCMLP regularly pay -- cause

19   to be paid the payments on loans HCMS had from

20   HCMLP?

21             MR. MORRIS:  Objection to the form

22        of the question.

23        A.    Yes.

24        Q.    Typically -- if there is a

25   typically, how far in advance of due dates did
```

Page 356

                    WATERHOUSE - 10-19-21

1

2    HCMLP cause HCMS to pay its bills?

3              MR. MORRIS:  Objection to the form

4        of the question.

5        A.    I mean, it -- it -- it depend -- it

6    depended on the nature of the payment and the

7    vendor, but, you know, if there were -- if

8    there were larger scheduled payments, you know,

9    I would like to give at least 30 days notice.

10             And that is -- that is kind of my

11   rule of thumb so no one is surprised.

12       Q.    Okay.  And was it generally HCMLP's

13   practice to timely pay HCMS' bills?

14             MR. MORRIS:  Objection to the form

15       of the question.

16       A.    It -- it -- it -- that depended on

17   the nature of the payment.

18       Q.    Okay.  And can you explain what you

19   mean by that?

20       A.    Yeah, I mean if -- if it was -- I

21   mean -- if there was some professional fees

22   that weren't -- you know, they were due but

23   they weren't urgent, those fees may not be paid

24   as timely as others that have a due date or --

25   or things like that.

```
 1                WATERHOUSE - 10-19-21

 2        Q.    Okay.  Are loan payments the kinds

 3    of thing that HCMLP would pay on time because

 4    of potential consequences of not paying on

 5    time?

 6              MR. MORRIS:  Objection to the form

 7         of the question.

 8        A.    Yes.  As I testified earlier, we

 9    would want to give, you know, notice on -- on

10    -- on larger payments and -- and things of that

11    nature so we didn't miss due dates.

12        Q.    Okay.  And over the course of time,

13    did HCMLP generally pay HCMS' loan payments in

14    a timely fashion?

15              MR. MORRIS:  Objection to the form

16         of the question.

17        A.    I can't remember specifically, but

18    generally, yes.

19        Q.    Okay.  Now, did HCMLP provide

20    similar services to HCRE that you have

21    described it provided to HCMS?

22              MR. MORRIS:  Objection to the form

23         of the question.

24        A.    Yes, but I don't think it -- it

25    provided -- I don't think it provided HR
```

1                    WATERHOUSE - 10-19-21

2    services.

3         Q.    Can you describe the accounting and

4    treasury services that HCMLP provided for HCRE?

5         A.    Yeah, it -- it would provide

6    bookkeeping services on a -- on a periodic

7    basis.  It would make payments, you know, as

8    needed.

9         Q.    Okay.  So did it provide --

10        A.    And -- and I believe it -- it -- it

11   provided tax services as well.

12        Q.    Okay.  And so did it provide the

13   same kind of bill -- did HCMLP provide the same

14   kind of bill-paying services for HCRE that it

15   provided for HCMS and NexPoint?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Yes.

19        Q.    And over the course of time, did

20   HCMLP generally cause to be made the loan

21   payments that HCRE owed to HCMLP?

22             MR. MORRIS:  Objection to the form

23        of the question.

24        A.    Yes.

25        Q.    Did HCMLP make loan payment -- the

Page 359

```
1                    WATERHOUSE - 10-19-21

2    loan payment that was due from HCMS to HCMLP in

3    December of 2020?

4                MR. MORRIS:  Objection to the form

5        of the question.

6        A.    I don't believe that payment --

7    payment was made.

8        Q.    Okay.  And when HCMLP caused HCMS in

9    the past to make loan payments, whose money did

10   it use to make those payments?

11               MR. MORRIS:  Objection to the form

12       of the question.

13       A.    It was the -- the money in HCMS's

14   operating account would be made to that --

15   those moneys would be used to make payment to

16   Highland Capital Management.

17       Q.    Okay.  And Highland -- is it correct

18   that Highland Capital Management personnel had

19   the access to HCMS's accounts to be able to

20   cause such payments to be made?

21       A.    Yes, Highland personnel had access

22   to those accounts.

23       Q.    Okay.  And so now for HCRE, whose

24   money was used when HCMLP caused HCRE

25   payments -- loan payments to Highland to be
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 360 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 498 of 899 PageID 1110

Page 360

1                 WATERHOUSE - 10-19-21

2    made?

3                 MR. MORRIS:  Objection to the form

4         of the question.

5         A.    It was -- it was cash in HCRE's bank

6    account that would be used to make payments to

7    Highland Capital Management.

8         Q.    Okay.  And so did Highland Capital

9    Management have access to HCRE's funds in order

10   to be able to make such payments?

11                MR. MORRIS:  Objection to the form

12        of the question.

13        A.    Personnel at Highland Capital

14   Management had access to HCRE's bank account to

15   effectuate the payments.

16        Q.    Okay.  And was the payment due from

17   HCRE to HCMLP due in December of 2020 made?

18        A.    It --

19        Q.    In December of 2020.

20        A.    It was not.

21        Q.    Okay.  And was there money in HCRE's

22   account that would have enabled the payment to

23   be made had HCM personnel attempted to make the

24   payment?

25                MR. MORRIS:  Objection to the form

Page 361

```
 1                 WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    I -- I don't recall.

 4        Q.    Do you have any reason to believe

 5   that either HCRE or HCMS simply didn't have the

 6   funds on hand to make the December 2020

 7   payments?

 8        A.    I don't know.

 9        Q.    I guess I'm asking, do you have any

10   reason to believe that they didn't have the

11   funds?

12        A.    We managed cash for so many

13   different entities and funds, and I don't

14   recall, you know, where the cash position was

15   for HCRE and HCMS at 12/31/2020.

16        Q.    Okay.

17        A.    I just don't recall, and I don't --

18   and I don't remember what the loan payment

19   obligations were from HCRE to Highland, and

20   from HCMS to Highland.  I don't recall.  I

21   don't recall, I mean...

22        Q.    Let me come at it a different way.

23   Were the -- were the payments that would

24   otherwise have been due in December of 2020

25   made in January of 2021 for HCMS and HCRE?
```

Page 362

1                    WATERHOUSE - 10-19-21

2        A.    I believe the HCRE payment was made

3    in January of 2021.  I don't recall any

4    payments being made from HCMS to Highland.

5        Q.    If it -- how is it the HCRE payment

6    came to be made?  Why did you make it -- why

7    did HCM make the payment in January of 2021?

8        A.    Jim -- Jim called me and instructed

9    me to -- to make the payment on behalf of HCRE,

10   Jim Dondero -- Jim Dondero.

11       Q.    Did he seem upset that -- that the

12   payment had not been made?

13       A.    Yeah.  On the note that was, you

14   know, that was the term note, yes, he -- he was

15   displeased that the -- that the payment had not

16   been made by year-end.

17       Q.    Okay.  And did you make the -- cause

18   the payment to be made as -- as requested?

19       A.    Yes.

20       Q.    And did anyone else from HCM

21   participate with you in causing the payment to

22   be made to -- on the HCRE loan?

23       A.    Yes.  It would have been Kristin

24   Hendrix.  I -- again, I don't -- as I testified

25   earlier, I'm not an officer of HCRE.  I don't

Page 363

```
 1              WATERHOUSE - 10-19-21

 2   believe I'm an authorized signer.  So I

 3   can't -- other personnel have to make payment

 4   from HCRE to -- to -- to -- to Highland.

 5        Q.    Okay.  And in the conversation

 6   that -- that you had with Mr. Dondero when he

 7   requested the payment to be made, did you say

 8   to him words to the effect, Jim, this loan is

 9   going to stay in default, what are you making

10   the payment for, anything like that?

11        A.    No.

12        Q.    In fact, did you have the impression

13   from him that he thought that the loan would

14   be -- the default would be cured by making the

15   payment?

16              MR. MORRIS:  Objection to the form

17        of the question.

18        A.    Did I get the impression from Jim

19   Dondero that the loan would be cured if the

20   payment from HCRE --

21        Q.    Yeah, if that is what he thought.

22              MR. MORRIS:  Objection to the form

23        of the question.

24        A.    I didn't get any impression from him

25   on that at the time.
```

Page 364

```
 1                   WATERHOUSE - 10-19-21

 2        Q.    Do you know whether there was an

 3   HCMS term loan that had a payment due in

 4   December of 2020?

 5        A.    I don't recall.

 6        Q.    Okay.  And so the reason you don't

 7   recall whether or not there was a payment in

 8   January of 2021 is because you just don't

 9   remember whether there was such a loan at all?

10             MR. MORRIS:  Objection to the form

11        of the question.

12        A.    I don't remember.  There is -- there

13   is so many notes, and I mean, demands, and I

14   don't -- I don't remember.  It's a lot to keep

15   track in your head.

16        Q.    I understand, and -- and I hear your

17   frustration when you have explained that the

18   debtor has your documents and you don't, and so

19   I fully appreciate it, and this is no knock on

20   you.  It's a knock on somebody else on this

21   call.

22             MR. MORRIS:  I move to strike.  That

23        was pretty obnoxious, but go ahead.

24        Q.    Okay.  But so, Mr. Waterhouse, if --

25   if a payment on the HCMS loan was made in
```

Page 365

```
1                    WATERHOUSE - 10-19-21

2      January of 2021, do you think it was part of

3      the same conversation where Jim Dondero said,

4      hey, why didn't that get paid, please make

5      that -- get that payment done?

6                    MR. MORRIS:  I object to the form of

7          the question.

8          A.    Yes.  Likely it would have been -- I

9      mean, again, I don't recall a payment being

10     made, but, you know, again, I don't remember

11     everything.

12         Q.    Okay.  Did -- at the time you were

13     communicating with Kristin Hendrix about the

14     payment being made, whichever payments were

15     made in January, did she say anything to you

16     about the payments not curing the loan

17     defaults?

18         A.    No.

19         Q.    Okay.  All right.  So I'm going to

20     take you back to very early in the deposition

21     when Mr. Morris was asking you about the --

22     the -- the -- the agreement with respect to

23     the -- the forgiveness element of the loans, so

24     that is just to orient you.

25                    Do you remember that there was a
```

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 366 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 504 of 899 PageID 1116

Page 366

```
 1              WATERHOUSE - 10-19-21

 2   time that you and Mr. Dondero were

 3   communicating about potential means of

 4   resolving the Highland bankruptcy by what was

 5   colloquially referred to as a pot plan?

 6        A.   Yes.

 7        Q.   Okay.  And can you tell me generally

 8   when that was?

 9        A.   Like mid -- mid 2020, sometime in

10   2020, mid 2020.

11        Q.   Okay.  And did the process of trying

12   to figure out what the numbers should be

13   involve looking at what one should pay for the

14   Highland assets?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.   Yes.

18        Q.   Okay.  And did there come a time

19   when you were proposing some potential numbers

20   and Mr. Dondero said something to you like,

21   well, why are you including payment for the

22   related party notes, those, you know, were

23   likely to be forgiven as part of my deferred

24   executive compensation?

25             MR. MORRIS:  Objection to the form
```

Page 367

```
 1                    WATERHOUSE - 10-19-21

 2        of the question.

 3        A.    Yes, we did have that conversation.

 4        Q.    Okay.  Was that conversation in

 5   connection with trying to figure out the right

 6   numbers for a pot plan?

 7        A.    Yeah.  I mean, it was -- it was -- I

 8   mean, Jim -- Jim would ask for, you know,

 9   most -- most recent asset values, you know, for

10   Highland, and -- and myself and the team

11   provided those to him, so it was in that

12   context.

13        Q.    Okay.  And does that refresh your

14   recollection that these communications were in

15   2020 rather than 2021?

16             MR. MORRIS:  Objection to the form

17        of the question.

18        A.    The -- the -- the executive

19   compensation discussions were definitely in

20   2020.

21        Q.    Okay.  Now, did you ever make

22   proposals that took into account Jim's comment

23   that the notes were likely to end up forgiven

24   as part of his compensation?

25             MR. MORRIS:  Objection to the form
```

```
1                     WATERHOUSE - 10-19-21

2          of the question.

3          A.    Yes, we -- the team and myself put

4     together, you know, asset summaries of Highland

5     at various times for all the assets of

6     Highland, and not including the notes.

7          Q.    Okay.  And were those presentations

8     communicated to -- to Mr. Seery?

9          A.    No.  Well, look, I didn't tell -- I

10    didn't tell Mr. Seery.  I don't know what

11    Mr. Dondero did with the information.

12         Q.    Okay.

13         A.    I did not have conversations with

14    Mr. Seery.

15         Q.    Okay.  Do you know who saw the

16    presentations that you put together that didn't

17    include the value of the related party notes?

18         A.    We're talking presentations -- these

19    are -- these are Excel spreadsheets?

20         Q.    Uh-huh.

21         A.    I don't know who -- these were given

22    to -- to Jim Dondero.  I don't know what was

23    done with them after that.

24         Q.    Okay.  You also mentioned earlier

25    that sometime during your tenure at Highland
```

Page 369

1                    WATERHOUSE - 10-19-21

2    you knew of the practice of giving forgivable

3    loans to executives.

4              MR. MORRIS:  Objection to the form

5         of the question.

6         Q.    Can you -- can you tell me what you

7    recall about that practice?

8              MR. MORRIS:  Objection to the form

9         of the question.

10        A.    Yes, so there were -- there were --

11   during my tenure at Highland, there were loans

12   or -- given to employees that were later

13   forgiven at a future date and time.

14        Q.    Okay.  And when the loans were

15   given, did the notes, to your recollection, say

16   anything about the potential forgiveness term?

17             MR. MORRIS:  Objection to the form

18        of the question.

19        A.    When you say "did the notes," did

20   the promissory notes detail the forgiveness?

21        Q.    Yes.

22        A.    Not that I recall.

23        Q.    And until such time as whatever was

24   to trigger the forgiveness occurred, were the

25   notes bona fide notes as far as you were

Page 370

1                    WATERHOUSE - 10-19-21

2     concerned?

3                    MR. MORRIS:  Objection to the form

4          of the question.

5          A.    Yes, similar to -- yes.

6          Q.    Okay.  You were going to say similar

7     to what?

8          A.    Mr. Morris earlier today showed

9     notes of the financial statements about various

10    affiliate loans.  I -- I -- I do recall these

11    notes because I -- at that time personally

12    worked on the -- the financial statements of

13    Highland.  That was, you know, in my role as a

14    corporate accountant.

15                   And there were -- those loans

16    were -- to the partners were detailed in the

17    notes to the financial statements, similar to

18    what we went through earlier today in the prior

19    testimony about what we saw with Highland

20    and -- and -- and the -- and HCMFA.

21         Q.    Is it fair to say that on Highland's

22    balance sheet there were any number of assets

23    that the value of which could be affected by

24    subsequent events?

25                   MR. MORRIS:  Objection to the form

Page 371

1                    WATERHOUSE - 10-19-21

2         of the question.

3         A.    Yes.  I mean, yes, that -- there

4    are.  And that is -- yes.

5         Q.    Okay.  And is it typical accounting

6    practice that until there is some certainty

7    about those potential future events, that asset

8    value listed on -- on the books doesn't take

9    into account those potential future events?

10              MR. MORRIS:  Objection to the form

11        of the question.

12        A.    Yeah, if those -- yes.  If -- if

13   those future events, you know, at the time of

14   issuance are not known or knowable, like I

15   discussed earlier with, like, market practice,

16   asset dislocation, or, you know, I mean, things

17   like that, you -- I mean, it -- it could affect

18   its fair value --

19        Q.    Okay.

20        A.    -- in the future.

21        Q.    And am I correct you wouldn't feel

22   compelled to footnote in every possible change

23   in -- in an asset when those possibilities are

24   still remote?

25              MR. MORRIS:  Objection to the form

Page 372

1                    WATERHOUSE - 10-19-21

2          of the question.

3          A.    The accounting standard is you have

4     to estimate to the best -- you know, to -- to

5     the best of your ability, the fair value of an

6     asset as of the balance sheet date under --

7     under GAAP.

8          Q.    Did -- strike that.

9                Okay.  Give me a minute.  I'm

10    close -- I'm close to done.  Let me just go off

11    and look at my notes for a second.  So take two

12    minutes.

13               VIDEOGRAPHER:  We're going off the

14          record at 7:02 p.m.

15          (Recess taken 7:02 p.m. to 7:03 p.m.)

16               VIDEOGRAPHER:  We are back on the

17          record at 7:03 p.m.

18          Q.    Mr. Waterhouse, is it generally your

19    understanding that people you work with now

20    have been asking the debtor for full and

21    unfettered access to their own former files?

22               MR. MORRIS:  Objection to the form

23          of the question.

24          A.    Yes, I am -- I am generally aware.

25          Q.    Okay.  And do you think you could

1                    WATERHOUSE - 10-19-21

2    have been better prepared for this deposition

3    if the debtor had complied with those requests?

4            MR. MORRIS:  Objection to the form

5        of the question.

6        A.    I -- I -- I most certainly -- yes.

7    I mean, again, these are multiple years,

8    multiple years ago, lots and lots of

9    transactions.

10           You know, we asked about NAV errors

11   and, you know, things like that and these

12   are -- it would make this process a lot more --

13   a lot easier and if we had -- if we had access

14   to that.

15       Q.    Okay.  And has the debtor -- is the

16   debtor suing you right now?

17       A.    Yes.

18       Q.    And is the debtor trying to renege

19   on deals that it had previously made with you?

20           MR. MORRIS:  Objection to the form

21       of the question.

22       A.    Sorry, I need to -- it is my

23   understanding that the litigation trust is

24   suing me.  And not being a lawyer, I don't

25   know -- is that the debtor?

Page 374

```
 1                    WATERHOUSE - 10-19-21

 2              Is that -- I don't know the

 3    relationship.  So, again, I'm not the lawyers.

 4    I've said many times.  But my understanding is

 5    the litigation trust is suing me.  I could be

 6    wrong there.  I don't know.

 7         Q.    Okay.  I understand.

 8              Someone with some connection to the

 9    Highland debtor has brought a claim against

10    you; is that fair?

11              MR. MORRIS:  Objection to the form

12         of the question.

13         A.    Yes.

14         Q.    Okay.  And is there also some motion

15    practice in the bankruptcy where the debtor or

16    someone associated with the debtor is

17    attempting to undo something that was

18    previously resolved with you?

19         A.    Yes.

20         Q.    And so in one action somebody is

21    associated with the debtors trying to --

22    threatening you with trying to take money from

23    you, and then in the other -- and trying to --

24    and in the other they are threatening not to

25    pay you things that had previously been agreed;
```

```
 1                   WATERHOUSE - 10-19-21

 2    is that correct?

 3              MR. MORRIS:   Objection to the form

 4         of the question.

 5         A.    I want to be -- yes, I -- there

 6    is -- I'm being sued, again, on -- on something

 7    that was agreed to with Mr. Seery and myself.

 8    I don't -- I don't -- I don't own that claim.

 9         Q.    Okay.

10         A.    To be transparent, I don't own that

11    claim.  So it is not my personal property.

12         Q.    Okay.

13         A.    And -- and being the nonlawyer, I

14    don't know how I can get sued for something

15    that I don't owe or, like, I don't own

16    anything.  I'm not the lawyer.  But, I mean, if

17    that is -- if I'm understanding the facts

18    correctly.

19         Q.    Okay.  And the lawsuit that was

20    filed that names you, that was just filed

21    this -- this past week; is that right?

22              MS. DANDENEAU:   Ms. Deitsch-Perez, I

23         do want to interrupt at this point because

24         just as I told Mr. Morris, that this is a

25         deposition about the noticed litigation.
```

Page 376

```
 1                    WATERHOUSE - 10-19-21

 2              I really don't want to go -- go

 3        afield --

 4              MS. DEITSCH-PEREZ:  Yeah.

 5              MS. DANDENEAU:  -- and open up a

 6        whole new line of inquiry about the lawsuit

 7        or the -- the motion and the bankruptcy

 8        court.  We will be here all night.

 9              MS. DEITSCH-PEREZ:  And I

10        understand.

11        Q.    My -- my point is:  Do you feel

12   like -- like there is some effort by these

13   parties related to the debtor to intimidate

14   you -- not that you -- I'm not saying you are

15   or you aren't.

16              But do you feel like there is some

17   effort to intimidate you and maybe an effort to

18   deter you from being as prepared as you might

19   be in this deposition?

20              MR. MORRIS:  Objection to the form

21        of the question.

22        A.    I was -- I was surprised by the

23   lawsuit, by me being named, because, again, I

24   don't own the asset and things like that.

25   Yeah, I just -- I want to move forward with my
```

1                      WATERHOUSE - 10-19-21

2    life at Skyview.

3              MS. DEITSCH-PEREZ:  Thank you.

4              THE WITNESS:  Thank you.

5                   FURTHER EXAMINATION

6    BY MR. MORRIS:

7         Q.    If I may, I just have a few

8    questions.

9              Mr. Waterhouse, we saw a number of

10   documents that Mr. Rukavina put up on the

11   screen where Ms. Hendrix would send you a

12   schedule of payments that were due on behalf of

13   certain Highland affiliates.

14             Do you remember that?

15        A.    Yes.

16        Q.    And in each instance she asked for

17   your approval to make the payments; is that

18   right?

19        A.    Yes, she did.

20        Q.    And was that the -- was that the

21   practice in the second half of 2020 whereby

22   Ms. Hendrix would prepare a list of payments

23   that were due on behalf of Highland associates

24   and ask for approval?

25        A.    Yes.

Page 378

1                     WATERHOUSE - 10-19-21

2          Q.    And I think you said that there was

3    a -- a --

4          A.    It was -- I think I testified to

5    this earlier when we talked about procedures

6    and policy, you know, again, I want to be

7    informed of -- of -- of -- of -- of any

8    payments that are going out.  I want to be made

9    aware of these payments, and that was just a

10   general policy, not just for 2020.

11         Q.    Okay.  So it went beyond 2020?

12         A.    Yes.

13         Q.    Is that right?

14         A.    Yes.

15         Q.    Okay.  And the corporate accounting

16   group would prepare a calendar that would set

17   forth all of the payments that were anticipated

18   in the -- in the three weeks ahead; is that

19   right?

20         A.    I -- like I testified earlier, we

21   had a corporate calendar that was set up, you

22   know, to -- to provide reminders or, you know,

23   of anything of any nature, whether it is

24   payments or -- or financial statements or, you

25   know, whatever it is, you know, to meet

1                    WATERHOUSE - 10-19-21

2     deadlines.

3               I don't know how, as I testified

4     earlier, how much they were using that

5     calendar.

6         Q.    Okay.  But -- but you did get notice

7     and a request to approve the payments that were

8     coming due on behalf of Highland's affiliates.

9     Do I have that right?

10              MS. DANDENEAU:  Objection to form.

11        A.    I mean, generally, yes.  I mean, you

12    know, as we saw with these emails, generally, I

13    mean, did that encompass everything, no.

14        Q.    Okay.  Do you know why the

15    payment -- do you know why there was no payment

16    made by NexPoint at the end of 2020?

17        A.    Yes.  There was -- there was -- we

18    talked about these agreements between the

19    advisors and Highland, the shared services and

20    the cost reimbursement agreement.

21              And in late 2020, there were

22    overpayments, large overpayments that had been

23    made over the years on these agreements, and it

24    was my understanding that the advisors were --

25    were talking with -- like Jim Seery and others

Page 380

```
 1              WATERHOUSE - 10-19-21
 2    to offset any obligations that the advisors
 3    owed to Highland as offset to the overpayments
 4    on these agreements.
 5         Q.    Okay.  Did you participate in any of
 6    those conversations?
 7         A.    I did not.
 8         Q.    Okay.  Do you know -- do you recall
 9    that the -- at the end of November, the debtor
10    did notice to the advisors of their intent to
11    terminate the shared services agreements?
12         A.    Like I testified earlier, there
13    was -- the agreements weren't identical, from
14    what I recall, and there is one that had a
15    longer notice period, which I think had a
16    60-day notice period.  I don't recall which one
17    that was, so not all of them were -- notice
18    hadn't been given as of November 30th, for all
19    of the agreements.
20         Q.    Upon the receipt of the -- the
21    termination notices that you recall, do you
22    know if the advisors decided at that point not
23    to make any further payments of any kind to
24    Highland?
25              MR. RUKAVINA:  Objection, form.
```

Page 381

```
 1                  WATERHOUSE - 10-19-21

 2        A.    No.  The advisors -- the advisors

 3   had stopped making payments prior to that

 4   notice.

 5        Q.    Okay.  And how do you know that the

 6   advisors stopped making -- making payments

 7   prior to the notice?

 8        A.    I had -- I had a conversation

 9   with -- with Jim Dondero.

10        Q.    And did Mr. Dondero tell you that

11   the advisors would no longer make payments to

12   Highland?

13            MS. DEITSCH-PEREZ:  Object to the

14        form.

15        A.    Yes, he -- he -- again, he said

16   they -- they -- the advisors have overpaid on

17   these agreements, to not make any future

18   payments, and that there needs to be offsets,

19   and they're working on getting offsets to these

20   overpayment.

21        Q.    Do you know if anybody ever

22   instructed Highland's employees to make the

23   payment that was due by NexPoint at the end of

24   the year?

25        A.    Did anyone instruct Highland's
```

Page 382

```
 1                   WATERHOUSE - 10-19-21

 2   employees to make that payment?

 3         Q.     Correct.

 4         A.     Anyone -- not that I'm aware.

 5         Q.     Were any of Highland's employees

 6   authorized to make the payments on behalf of

 7   its affiliates -- withdrawn.

 8                Was any of Highland's employees

 9   authorized to effectuate the payment on behalf

10   of NexPoint that was due at the end of the year

11   without getting approval from either you or

12   Mr. Dondero?

13         A.     They had the -- they had the ability

14   to make the payment, but they didn't -- you

15   know, that -- that payment needed to be

16   approved.

17         Q.     Okay.  And it needed to be approved

18   by you or Mr. Dondero; is that right?

19         A.     I mean, I'm not going to make the

20   unilateral decision.

21         Q.     Is that a decision that you

22   understood had to be made by Mr. Dondero?

23         A.     Yes.  Sitting back in December of

24   2020, the -- that -- there was this off --

25   offset negotiation that -- that was happening,
```

```
1              WATERHOUSE - 10-19-21
```

2   so I mean, until those negotiations were

3   resolved, you know, there wasn't any

4   payments -- there weren't any payments.

5        Q.    And -- and there were no payments

6   until the negotiations were resolved because

7   that was the directive that you received from

8   Mr. Dondero; correct?

9        A.    I don't think he said -- I mean, I

10  think -- yeah, I mean -- I'm trying to recall

11  the conversation.  It was -- you know, there

12  is -- there is these negotiations.  There's --

13  there needs to be these offsets.  They're

14  talking with the debtor.  So, you know, until

15  this is resolved, right, I mean, depending on

16  how, whatever that resolution was, were we to

17  take any action.

18       Q.    Okay.  How about with respect to

19  HCMS, did HCMS have a term payment due at the

20  end of the year?

21       A.    Again, I don't -- I don't recall.

22       Q.    Okay.  You discussed briefly two

23  payments that were made in January of 2021, one

24  on behalf of NexPoint, and one on behalf of

25  HCMS.  Do I have that right?

1              WATERHOUSE - 10-19-21

2        A.    No.  The two payments I recall were

3   NexPoint and HCRE.

4        Q.    Okay.  And those two payments --

5   thank you for the correction.  And those two

6   payments were made because Mr. Dondero

7   authorized those payments to be made; correct?

8        A.    Yes.

9        Q.    And they hadn't been made before

10  that because Mr. Dondero had not authorized

11  them to be made?

12             MS. DEITSCH-PEREZ:  Object to the

13        form.

14        A.    Yes, because of these negotiations.

15        Q.    Okay.  Just a couple of more

16  questions.

17             Did anybody, to the best of your

18  knowledge, on behalf of HCMFA, ever tell the

19  SEC that HCMLP was responsible for the mistakes

20  that were made on the TerreStar valuation?

21        A.    Did anyone from Highland on HCMFA's

22  behalf tell the SEC that Highland -- that

23  Highland was responsible for there -- I just

24  want to make sure --

25        Q.    It was a little bit different, so

```
 1                    WATERHOUSE - 10-19-21

 2    let me try again.

 3         A.    These are very long questions, John.

 4    I'm not trying to be --

 5         Q.    That is good.  Do you know whether

 6    anybody -- do you know whether anybody on

 7    behalf of HCMS -- HCMFA ever told the SEC that

 8    Highland was the responsible party for the

 9    TerreStar valuation error?

10         A.    Not that I'm aware.

11         Q.    Okay.  Did anybody on behalf of

12    the -- on behalf of HCMFA ever tell the retail

13    board that Highland was responsible for the

14    TerreStar valuation error?

15         A.    Not that I'm aware.

16         Q.    Do you know if HCMFA made an

17    insurance claim with respect to the damages

18    that were incurred in relation to the TerreStar

19    valuation error?

20         A.    Yes.

21         Q.    And do you know why they made that

22    insurance claim?

23         A.    Because there was an error.  I

24    mean --

25         Q.    Was the insured's claim made -- was
```

1              WATERHOUSE - 10-19-21

2    the insurance claim made under HCMFA's policy?

3        A.    Yes.

4        Q.    Did HCMFA at any time prior to the

5    petition date -- withdrawn.

6              You were asked a couple of questions

7    where -- where you said that Mr. Dondero told

8    you that he was ascribing zero value to the

9    notes as part of a pot plan because he believed

10   that the notes were part of executive

11   compensation.

12             Do I have that right?

13             MS. DEITSCH-PEREZ:  Object to the

14        form.

15       A.    Yes.

16       Q.    Okay.  Have you ever heard that

17   before the time that Mr. Dondero told you that

18   in the conversation about the pot plan?

19       A.    Had I heard that prior to my

20   conversation with Mr. Dondero?

21       Q.    Yes.

22       A.    No, I had not heard that prior.

23       Q.    Okay.  And that was in the context

24   of his formulation of the settlement proposal;

25   is that right?

```
 1                    WATERHOUSE - 10-19-21

 2        A.    I mean, generally, yes.  You know,

 3   we were asked to provide asset values, right,

 4   and he was having settlement discussions.

 5   Again, I don't know who those went to

 6   ultimately.  I don't recall.

 7             MR. MORRIS:  I have no further

 8        questions.  Thank you very much for your

 9        patience.  I apologize for the late hour.

10             MS. DEITSCH-PEREZ:  John, you stay

11        on about your email when --

12             MR. RUKAVINA:  Hold on, I'm not

13        done.

14             MS. DEITSCH-PEREZ:  Oh, okay.  Davor

15        still has questions.  Sorry.  I was going

16        to say both John and Davor, could you stay

17        on afterwards just to talk about the

18        requests.

19                    FURTHER EXAMINATION

20   BY MR. RUKAVINA:

21        Q.    Mr. Waterhouse, you were just now

22   testifying about a discussion you had with

23   Mr. Dondero where he said something like no

24   more payments.

25             Do you remember that testimony?
```

Page 388

```
 1                  WATERHOUSE - 10-19-21

 2       A.    Yes.

 3       Q.    Okay.  And was that late November or

 4   early December of 2020?

 5       A.    It was, I would say, first or second

 6   week of November.

 7       Q.    Okay.  Do you recall whether --

 8   whenever you had that discussion, whether

 9   Mr. Dondero had already been fired by the

10   debtor?

11       A.    Yes, I -- I believe he was not an

12   employee of the debtor anymore at that time.

13       Q.    And when you were discussing this

14   with Mr. Dondero and he said no more payments,

15   you were discussing the two shared services

16   agreements and employee reimbursement

17   agreements we testified -- you testified about

18   before; is that correct?

19            MR. MORRIS:  Objection to the form

20       of the question.

21       A.    That is correct.

22       Q.    And had your office or you -- and we

23   will talk at a future deposition about the

24   administrative claim.

25            But had -- by that time that you
```

Page 389

1                    WATERHOUSE - 10-19-21

2    talked to Mr. Dondero, had your office or you

3    done any estimate of what the alleged

4    overpayments were?

5              MR. MORRIS:  Objection to the form

6         of the question.

7         A.    Yes, we had -- there was a -- there

8    was a detailed analysis that was put together

9    by David Klos at the time.

10        Q.    And do you recall just generally

11   what the total amount for both advisors of the

12   overpayments was?

13        A.    It was in excess of $10 million.

14        Q.    Was it in excess of $14 million?

15             MR. MORRIS:  Objection to the form

16        of the question.

17        A.    I -- I remember it was an

18   eight-figure number.  I don't remember

19   specifically.

20        Q.    Okay.  And did you convey that

21   number to Mr. Dondero when you had that

22   conversation?

23        A.    Yes.

24        Q.    What was his reaction?

25        A.    I mean, he wasn't happy.

```
 1                 WATERHOUSE - 10-19-21

 2        Q.     Is it fair to say he was upset?

 3        A.     Yes.

 4        Q.     Did Mr. Dondero ever expressly tell

 5   you to not have NexPoint make the required

 6   December 31, 2020, payment?

 7        A.     Yes, I recall him saying don't make

 8   the payment because it was being negotiated, as

 9   I discussed with Mr. Morris, this offset

10   concept.  So there were obligations due by the

11   advisors to Highland, they should be offset

12   that -- you know, those obligations should be

13   offset by this -- by this overpayment.

14        Q.     And when did he tell you that?

15        A.     I would say -- I would say around --

16   probably December -- December-ish.

17        Q.     Early December, late December?

18        A.     I don't recall with as much

19   specificity as -- as -- as -- as stopping the

20   shared services payments, because we had

21   actually made one shared services payment in

22   November.  So that is why I need to remember

23   that one more clearly.  I don't remember where

24   exactly in December that conversation occurred.

25        Q.     Did Mr. Dondero expressly use the
```

1        WATERHOUSE - 10-19-21

2    word "NexPoint" when he was saying don't make

3    these payments?

4            MR. MORRIS:  Objection to the form

5        of the question, asked and answered.

6        A.    Yeah, we were -- we were discussing

7    advisor obligations.  So it was -- you know, it

8    was just obligations from the advisors.

9            And -- and he specifically talked

10   about the NexPoint payment as well.

11       Q.    Okay.  And it is your testimony that

12   he expressly told you not to make that NexPoint

13   December 31 payment?

14           MR. MORRIS:  Objection, asked and

15       answered twice.

16       A.    Yes, he -- he did, during that

17   conversation.

18       Q.    And did you ever follow up with him

19   after that about whether NexPoint should or

20   shouldn't make that payment?

21       A.    I did not.

22       Q.    Did you ever, on or about

23   December 31, 2020, remind him and say, hey,

24   this payment is due, what shall I -- what

25   should I do?

1                    WATERHOUSE - 10-19-21

2          A.    I did not.

3          Q.    So sitting here today, you -- you

4     remember distinctly that Dondero in December of

5     2020 expressly told you not to have NexPoint

6     make that payment?

7                 MR. MORRIS:  Objection, asked and

8          answered three times.

9          A.    Yes.

10         Q.    Can you say categorically it wasn't

11    just some general discussion where he told you

12    not to make payments?

13                MR. MORRIS:  Objection, asked and

14         answer four times.

15                MR. HORN:  Four times now.  Go for

16         five.

17         A.    Yes.

18         Q.    Did you tell Mr. Seery that?

19         A.    I don't believe I did.  I don't

20    recall.

21         Q.    And was this an in-person discussion

22    or telephone or email?  Do you remember?

23         A.    This was a phone -- a phone

24    conversation.

25         Q.    Okay.  Would you have a record of --

Page 393

1               WATERHOUSE - 10-19-21

2    on your cell phone of when that conversation

3    might have taken place?

4               I'm sorry, strike that.

5               Was that by cell phone?

6        A.    I believe -- yes, because we -- I

7    was at home.  I mean, I don't have a landline.

8    All I have is my cell phone.

9        Q.    Do you know whether your cell phone

10   still has records of conversations from

11   December 2020 on it?

12       A.    My call log doesn't go back that

13   far.

14       Q.    Okay.  Thank you.

15              MR. RUKAVINA:  I will pass the

16   witness.

17              MS. DEITSCH-PEREZ:  Just a couple

18       quick questions.

19                  FURTHER EXAMINATION

20   BY MS. DEITSCH-PEREZ:

21       Q.    With respect to HCRE and HCMS, am I

22   correct there was -- there was no direction not

23   to pay those loan payments?

24              MR. MORRIS:  Objection to the form

25       of the question.

```
                                                              Page 394
1                    WATERHOUSE - 10-19-21

2        A.    Yes, I don't recall having

3   conversations about, you know, those -- those

4   entities.

5        Q.    And, in fact, what was the tone that

6   Mr. Dondero had when he talked to you about the

7   fact that HCRE and HCMS payments hadn't been

8   made when he found out that they hadn't been

9   paid?

10             MS. DANDENEAU:  Objection to form.

11             MR. MORRIS:  Objection to form.

12       Q.    What was the tone he took with you?

13       A.    Oh, it was -- it was -- it was -- it

14   was very negative.  I mean, I think he cursed

15   at me and he doesn't usually curse.

16       Q.    Okay.  And in your mind, is that

17   consistent with the fact that he was surprised

18   that those payments hadn't been made?

19             MR. MORRIS:  Objection to the form

20       of the question.

21       A.    Yes.

22       Q.    Okay.  Thank you.

23             MR. MORRIS:  I have nothing further.

24       Thank you so much, Mr. Waterhouse.

25             MR. HORN:  I have no questions.
```

Page 395

1                    WATERHOUSE - 10-19-21

2          Thank you, Mr. Waterhouse.  We appreciate

3          your time.  I am logging off the discussion

4          and I will talk to y'all tomorrow.

5               MR. MORRIS:  Super.

6               VIDEOGRAPHER:  If there are no

7          further questions, this ends the

8          deposition -- excuse me.  This ends the

9          deposition, and we are going off the record

10         at 7:30 p.m.

11         (Deposition concluded at 7:30 p.m.)

12

13                    _____

14                    FRANK WATERHOUSE

15

16    Subscribed and sworn to before me

17    this      day of            2021.

18

19    ---------------------------------

20

21

22

23

24

25

Case 21-03005-sgj Doc 86-4 Filed 10/29/21 Entered 10/29/21 17:22:38 Page 396 of 397
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 534 of 899 PageID 1146

Page 396

1          WATERHOUSE - 10-19-21

2               C E R T I F I C A T E

3

4      I, SUSAN S. KLINGER, a certified shorthand

5  reporter within and for the State of Texas, do

6  hereby certify:

7      That FRANK WATERHOUSE, the witness whose

8  deposition is hereinbefore set forth, was duly

9  sworn by me and that such deposition is a true

10  record of the testimony given by such witness.

11      I further certify that I am not related to

12  any of the parties to this action by blood or

13  marriage; and that I am in no way interested in

14  the outcome of this matter.

15      IN WITNESS WHEREOF, I have hereunto set my

16  hand this 19th of October, 2021.

17

18  _____

19      Susan S. Klinger, RMR-CRR, CSR

20      Texas CSR# 6531

21

22

23

24

25

```
                                                          Page 397
 1                  WATERHOUSE - 10-19-21

 2    NAME OF CASE:  In re:  Highland Capital

 3    DATE OF DEPOSITION:  October 19, 2021

 4    NAME OF WITNESS:  Frank Waterhouse

 5    Reason Codes:

 6          1.  To clarify the record.

 7          2.  To conform to the facts.

 8          3.  To correct transcription errors.

 9    Page____Line_____Reason_____

10    From_____to_____

11    Page____Line_____Reason_____

12    From_____to_____

13    Page____Line_____Reason_____

14    From_____to_____

15    Page____Line_____Reason_____

16    From_____to_____

17    Page____Line_____Reason_____

18    From_____to_____

19    Page____Line_____Reason_____

20    From_____to_____

21    Page____Line_____Reason_____

22    From_____to_____

23    Page____Line_____Reason_____

24    From_____to_____

25
```

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| | § |
| | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03006-sgj |
| | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

APP 534

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § § | 21-03007-sgj |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § |
| Defendants. | § |

### HIGHLAND'S OBJECTION TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings. Highland fully incorporates by reference its contemporaneously filed brief (the "Brief")[3] in opposition to the Motions and would show unto the Court as follows:

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] Capitalized terms used but not defined herein shall take on the meaning scribed thereto in the Brief.

2

## RELIEF REQUESTED

1.      By this Objection, Highland respectfully requests that the Court enter an order denying the Motions seeking to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order.

2.      Pursuant to Rules 7.1(d) and (h) of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), the Brief is being filed contemporaneously with this Objection and is incorporated by reference.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Highland respectfully requests that the Court enter an order (i) denying in whole the relief requested in the Motions, and (ii) granting Highland such further and additional relief as the Court deems just and proper.

APP 536

Dated: December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:      MHayward@HaywardFirm.com
             ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

4

APP 537

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03006-sgj |
| | § | |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

|  |  |  |
|---|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | |
| Defendants. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § § | |
| Plaintiff, | § § | Adversary Proceeding No. |
| vs. | § § | 21-03007-sgj |
| HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, | § § § § § | |
| Defendants. | § | |

APP 539

## **TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT .................................................................... 1

II.    STATEMENT OF FACTS ............................................................................. 4

  A.  The Note ................................................................................................... 4

  B.  NexPoint Defaults under the Note and Highland Sues to Collect ...................................... 5

  C.  NexPoint Blames Highland for Its Default ................................................ 6

  D.  The Court Enters the Scheduling Order .................................................... 6

  E.  Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to Make Any Payments to Highland ......................................................... 7

  F.  Highland's Obligations under the Shared Services Agreement Were Limited to Those "Specifically" Identified Therein .............................. 8

  G.  The Instant Motion .................................................................................. 9

III.   ARGUMENT ................................................................................................ 9

  A.  NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law ................... 9

  B.  NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling Order ........................................................................... 10

    1.  NexPoint's Explanation for Failing to Timely Designate an Expert Is Deficient .................................................... 12

    2.  NexPoint's Suggested "Expert" Testimony Is Irrelevant ........................... 13

    3.  Allowing the Testimony Would Prejudice Highland ................................ 15

  C.  HCRE's and HCMS's Joinders Have Even Less Merit than the Motion and Should Be Denied ................................................................ 17

CONCLUSION ..................................................................................................... 17

i

APP 540

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Askanase v. Fatjo*,
130 F.3d 657 (5th Cir. 1997) ................................................... 10

*Binh Hoa Le v. Exeter Fin. Corp.*,
3:15-CV-3839-L, 2019 WL 1436375 (N.D. Tex. Mar. 31, 2019)......................... 12, 13, 17, 18

*Charalambopoulos v. Grammer*,
3:14-CV-2424-D, 2017 WL 930819 (N.D. Tex. Mar. 8, 2017) ............................... 14

*Flax v. Quitman County Hosp.,*
*LLC*, 2:09-CV-101-M-D, 2011 WL 3585870 (N.D. Miss. Aug. 16, 2011)............................ 10

*Geiserman v. MacDonald*,
893 F.2d 787 (5th Cir.1990) ................................................. passim

*Grand Time Corp. v. Watch Factory, Inc.*,
3:08-CV-1770-K, 2009 WL 10678210 (N.D. Tex. Nov. 18, 2009) .................................. 11, 12

*Hanspard v. Otis Elevator Co.*,
CIV.A. 05-1292, 2007 WL 839994 (W.D. La. Jan. 12, 2007) ................................. 10

*Henderson v. Atmos Energy*,
496 F. Supp. 3d 1011 (E.D. La. 2020)....................................... 16

*Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*,
CV 12-1026, 2014 WL 12721924 (E.D. La. Nov. 7, 2014) .................................... 15

*Panhandle Advert., LLC v. United Rentals Realty,*
*LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901 (N.D. Tex. Feb. 12, 2021)......................... 9, 10

*Pipitone v. Biomatrix, Inc.*,
288 F.3d 239 (5th Cir. 2002) ................................................. 14

*Reliance Ins. Co. v. Louisiana Land & Expl. Co.*,
110 F.3d 253 (5th Cir. 1997) .............................................. 12, 13, 17

*Rolls-Royce Corp. v. Heros, Inc.*,
CIV.A. 307-CV-0739-D, 2010 WL 184313 (N.D. Tex. Jan. 14, 2010) ................................. 15

*S&W Enters., L.L.C. v. SouthTrust Bank of Alabama, NA*,
315 F.3d 533 (5th Cir. 2003) ............................................... 12, 17

*Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*,
438 F. Supp. 2d 696 (E.D. Tex. 2006).................................... 10

**Rules**

Fed. R. Civ. P. 16(b)(4)...................................................................................................... 11

APP 542

**HIGHLAND'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO
MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES**

Highland Capital Management, L.P., the reorganized debtor ("Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case") and the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), hereby objects (the "Objection") to the *Motion of NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [AP Docket No. 86][2] (the "Motion") filed by defendant NexPoint Advisors, L.P. ("NexPoint") and joined by certain defendants in other related adversary proceedings.[3]  In support of its Objection, Highland respectfully states as follows:

## I.      PRELIMINARY STATEMENT[4]

1.      NexPoint's Motion to modify the Scheduling Order is without merit and should be denied.

2.      This Adversary Proceeding arises from NexPoint's default under its Note in the original principal amount of $30.7 million.  The Note required NexPoint to make Annual Installment payments to Highland on December 31 of each year.

3.      NexPoint blames Highland for its failure to timely make the Annual Installment payment.  Initially, NexPoint contended that Highland breached its obligations by negligently failing to make the payment on NexPoint's behalf.  Then, Frank Waterhouse, an officer of NexPoint, a current employee of Skyview (the entity that services numerous of Mr. Dondero's

---

[2] Unless specified otherwise, references to "AP Docket No. __" are to the docket entries in NexPoint's Adversary Proceeding, 21-03005.

[3] *See Motion of Highland Capital Management Services, Inc. to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 91 in Adversary Proceeding 21-03006 ("HCMS's Joinder") (incorporating NexPoint's Motion), and *Motion of HCRE Partners, LLC to Extend Expert Disclosure and Discovery Deadlines*, filed at Docket No. 86 in Adversary Proceeding 21-03007 ("HCRE's Joinder", and together with HCMS's Joinder, the "Joinders," collectively with the Motion, the "Motions") (incorporating NexPoint's Motion).

[4] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed thereto below.

1

businesses), and Highland's former Chief Financial Officer, testified in his deposition that

NexPoint failed to make the Annual Installment payment because Mr. Dondero instructed him in

December 2020 not to make *any* payments to Highland from *any* of the entities that Mr. Dondero

controlled.

4.      NexPoint contends that, in light of this testimony, an expert is necessary to testify

regarding whether Highland violated an "affirmative duty or obligation" it owed to NexPoint under

Section 6.01 of the Shared Services Agreement to effectuate the payment on behalf of NexPoint,

despite Mr. Dondero's instructions to the contrary.   According to NexPoint:

> [T]he question becomes whether Waterhouse or the Debtor 'put their head in the
> sand' in violation of any affirmative duty or obligation they may have had regarding
> the matter, such as; to ask Dondero whether they correctly understood him; to ask
> Dondero whether he meant NexPoint or the Note; to inform Dondero of the
> potential consequences of a default by potentially accelerating a 30-year
> promissory note; or to try to dissuade him from his decision.

Motion ¶ 13.

5.      NexPoint's Motion to extend the expert disclosure and discovery deadlines in order

to retain a testifying expert on Highland's duties of care under the Shared Services Agreement is

without merit.

6.      NexPoint's suggested expert testimony is improper because it concerns "the

standards and duties of care under the parties' Shared Services Agreement" and otherwise seeks

to interpret that Agreement for the Court.  It is black-letter law that the determination of the

existence and scope of contractual and other legal duties are improper subjects of expert opinion

because they constitute legal conclusions that fall within the exclusive province of the Court.

7.      Even if that were not the case (and it is), NexPoint fails to satisfy its burden of

demonstrating "good cause" to modify the Scheduling Order under Rule 16(b) for three

independent reasons. *First*, as set forth below, the Motion is untimely. *Second*, the suggested

expert testimony is irrelevant because it would not assist a factfinder in determining any technical

or complex issues in this case. By its plain terms, the Shared Services Agreement does not impose an affirmative duty on—or even authorize—Highland to effectuate payments on behalf of NexPoint without authorization from a NexPoint Representative. NexPoint's reliance on Section 6.01 as the source of Highland's alleged duties is thus misguided, as that provision applies only to duties specifically set forth under the Agreement.[5] **Finally**, allowance of the expert testimony at this late juncture would substantially prejudice Highland, with such prejudice being exacerbated (and not cured) by a continuance. If the Motion is granted, Highland will be forced to expend significant resources addressing NexPoint's latest theories of its defense, including through additional discovery and motion practice. It will also cause a further delay of the trial on the merits, thereby impeding Highland's ultimate recovery under the Note, all at the expense of Highland's creditors.

8.      Separately, as ill-conceived as the Motion is, the Joinders raise considerable questions of good faith, because neither Highland Management Services, Inc. ("HCMS") nor HCRE Partners, LLC ("HCRE") even alleges that it is a party to a shared services agreement (let alone the Shared Services Agreement submitted with the Motion), nor can it. The Motion seeks to "designate a testifying expert on the standards and duties of care under the parties' Shared Services Agreement," but the Joinders offer no explanation for why such expert testimony would have any relevance to them since they are not parties to **any** shared services agreement.

9.      For the reasons set forth herein, Highland respectfully requests that the Court deny the Motion in all respects.

---

[5] NexPoint offers no explanation for why Highland's alleged obligations under the Shared Services Agreement supersede Mr. Waterhouse's fiduciary duties to NexPoint. If anyone had a duty to ask Mr. Dondero "Are you sure?" or "Do you know what you're doing" (an absurd concept on its own), it was surely Mr. Waterhouse—not in his capacity as a Highland employee—but in his capacity as an officer of, and a fiduciary to, NexPoint.

APP 545

## II.  STATEMENT OF FACTS

### A.  The Note

10.     On May 31, 2017, James Dondero ("Mr. Dondero") signed a 30-year term note on behalf of NexPoint and in favor of Highland (the "Note").  Morris Dec.[6] Exhibit 1.

11.     The Note consolidated NexPoint's obligations under five Prior Notes (as that term is defined in the Note) and was for an original principal amount of $30,746,812.33.  *See* Morris Dec. Exhibit 1, Ex. A.  Highland received no consideration for consolidating the five demand notes into a single 30-year term note.

12.     NexPoint and Mr. Dondero knew that NexPoint was required to pay Highland in Annual Installments, because it was spelled out plainly in the Note:

> 2.1     Annual Payment Dates.  During the term of this Note, [NexPoint] shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each payment) in thirty (30) equal annual payments (the "Annual Installments") until the Note is paid in full.  ***[NexPoint] shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note***, commencing on the first such date to occur after the date of execution of this Note.

Morris Dec. Exhibit 1 § 2.1 (emphasis added).

13.     NexPoint and Mr. Dondero also knew the consequences of failing to timely make the required Annual Installment payments, because they were also spelled out plainly in the Note:

> 4.     Acceleration Upon Default.  ***Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof [i.e., Highland]***, without notice, demand presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, ***mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable*** and subject to those remedies of the holder hereof [i.e., Highland].

*Id.* § 4 (emphases added).

---

[6] References to "Morris Dec. __" are to the *Declaration of John Morris in Support of Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* being filed concurrently herewith.

APP 546

14.    Finally, Mr. Dondero expressly agreed on behalf of NexPoint to waive any notice of default or acceleration:

> 5.    <u>Waiver</u>.  [NexPoint] hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration, and all other notices of any kind hereunder.

*Id*. § 5.

15.    Thus, based on the plain terms of the Note executed by Mr. Dondero on NexPoint's behalf at a time when Mr. Dondero indisputably controlled both entities, NexPoint agreed (a) to make Annual Installment payments to Highland on December 31 of each year; (b) that Highland would have the unilateral right upon a default to accelerate all unpaid principal and interest due under the Note without notice or demand; and (c) to waive, among other things, a grace period, notice of nonpayment, notice of intent to accelerate, and "all other notices of any kind hereunder."

**B.    <u>NexPoint Defaults under the Note and Highland Sues to Collect</u>**

16.    NexPoint does not dispute that it failed to make the Annual Installment payment due under the Note on December 31, 2020 in the amount of $1,406,111.92.

17.    By letter dated January 7, 2021, in an exercise of its unambiguous and unconditional rights under the Note, Highland demanded that NexPoint immediately pay all unpaid principal and interest then due under the Note (the "<u>Demand Letter</u>").  Morris Dec. Exhibit 2.  The Demand Letter stated:

> Because of Maker's failure to pay, the Note is in default.  Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable.  The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

> The Note is in default, and payment is due immediately.

*Id*.

18.     On January 22, 2021, after NexPoint failed to meet its obligations under the Note, Highland commenced this Adversary Proceeding. [AP Docket No. 1].

**C.     <u>NexPoint Blames Highland for Its Default</u>**

19.     On March 1, 2021, NexPoint filed its *Original Answer* asserting, among other things, that "[p]ursuant to that certain Shared Services Agreement, [Highland] was responsible for making payments on behalf of [NexPoint] under the note" such that any "alleged default" was caused by Highland's own negligence and breach of contract (the "<u>Original Defense</u>"). *Defendant's Original Answer* [AP Docket No. 6] (the "<u>Original Answer</u>") ¶¶ 39-41.

20.     On August 9, 2021, NexPoint filed its *First Amended Answer*, which did not substantively alter its Original Defense. [AP Docket No. 50] (the "<u>Amended Answer</u>") ¶¶ 39-41.

21.     On September 1, 2021, after Highland amended its Complaint, NexPoint filed its *Answer to Amended Complaint* [AP Docket No. 64] (the "<u>Final Answer</u>"). The Final Answer did not substantively alter NexPoint's Original Defense. *See id.* ¶¶ 80-82.

22.     Thus, at all times prior to filing the Motion, NexPoint contended that its failure to timely make the Annual Installment due on December 31, 2020 was caused by Highland's own alleged negligence and breach of the Shared Services Agreement.

**D.     <u>The Court Enters the Scheduling Order</u>**

23.     On September 6, 2021, the Court entered the *Order Approving Stipulation and Agreed Order Governing Discovery and Other Pre-Trial Issues* [AP Docket No. 70] (the "<u>Scheduling Order</u>").

24.     The Scheduling Order provides, in pertinent part, that "expert designations and disclosures of all opinions, and the bases therefor, will be made by October 29, 2021, and experts will be deposed between October 29, 2021 and November 8, 2021." Scheduling Order ¶ 3.

6

E.   **Mr. Waterhouse Testifies that Mr. Dondero Instructed Him Not to
Make Any Payments to Highland**

25.     In December 2020, Frank Waterhouse ("Mr. Waterhouse") wore multiple hats that

Mr. Dondero gave to him, including: (a) Chief Financial Officer of Highland; (b) Treasurer of

NexPoint; (c) Treasurer of HCMS; (d) Treasurer of Highland Capital Management Fund Advisors,

L.P. ("HCMFA", and together with NexPoint, the "Advisors"); and (e) Principal Executive Officer

of certain funds managed by the Advisors.  *See* Morris Dec. Exhibit 3 at 24:2-25; 35:8-22; 120:7-

12; 327:3-8.

26.     At a recent deposition, Mr. Waterhouse testified that NexPoint did not make the

Annual Installment payment due on December 31, 2020 because Mr. Dondero had instructed him

in December 2020 not to cause any payments to be made to Highland.  Mr. Waterhouse also

testified that he never followed up with Mr. Dondero or reminded him that the payment was

coming due at the end of the month.  *See* Morris Dec. Exhibit 3 at 390:4-392:17.

27.     Mr. Dondero testified that he was unaware of anyone ever instructing or authorizing

Highland to make the Annual Installment payment due under the Note on NexPoint's behalf.

Morris Dec. Exhibit 4 at 462:16-463:9.  Mr. Waterhouse concurred and confirmed that Highland's

employees were not authorized to make the Annual Installment payment due at the end of the year

without prior approval:

> Q:  Do you know if anybody ever instructed Highland's employees to make the
> payment that was due by NexPoint at the end of the year?
>
> A:  Did anyone instruct Highland's employees to make that payment?
>
> Q:  Correct.
>
> A:  Anyone – not that I'm aware.
>
> Q:  . . . [Were] any of Highland's employees authorized to effectuate the payment
> on behalf of NexPoint that was due at the end of the year without getting approval
> from either you or Mr. Dondero?

A:  They had the – they had the ability to make the payment, but they didn't – you know, that – that payment needed to be approved.

Morris Dec. Exhibit 3 at 381:21-382:16.

**F.**     **Highland's Obligations under the Shared Services Agreement Were Limited to Those "Specifically" Identified Therein**

28.     NexPoint and Highland entered into that certain *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 (the "SSA").  Rukavina Dec., Exhibit A.[7]

29.     Article II of the SSA required Highland to provide "assistance and advice" with respect to certain specified services.  Highland is unaware of any provision in the SSA—and NexPoint cites to none—that authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving instruction or direction from an authorized representative of NexPoint.

30.     In fact, Article II of the SSA expressly provided that "for the avoidance of doubt . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ."  SSA at § 2.02 (emphasis added).

31.     To emphasize the point further, the SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

Section 2.06  Authority.  [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement.  [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which NexPoint is a party***. . . . [Highland] shall not have any duties or obligations to [NexPoint] unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which [NexPoint] is a party.

---

[7]  References to "Rukavina Dec. __" are to the *Declaration of Davor Rukavina* [AP Docket No. 86-1] attached to the Motion.

*Id.* § 2.06 (emphasis added).

32.     There can be no credible dispute that (a) the Note is a "document or agreement to which NexPoint is a party," and that (b) the making of the Annual Installment payments were "obligations of" NexPoint under the Note.

**G.     The Instant Motion**

33.     Apparently stunned by Mr. Waterhouse's testimony, NexPoint now seeks to extend the expert disclosure and discovery deadlines set forth in the Scheduling Order so it can obtain expert testimony regarding Highland's legal duties under Section 6.01 of the Shared Services Agreement.  Specifically, NexPoint proposes to retain an expert to testify "on the standards and duties of care under the parties' Shared Services Agreement . . . with respect to Highland's role in NexPoint's alleged failure to make a December 21, 2020 payment on the Note (defined below); specifically, that Highland was responsible for ensuring that NexPoint made this payment." Motion ¶ 1.

### III.     ARGUMENT

**A.     NexPoint's Suggested "Expert Testimony" Is Improper as a Matter of Law**

34.     NexPoint's suggested expert testimony is improper as a matter of law because it amounts to a legal conclusion.

35.     A party may not offer an expert opinion on the scope of a party's "legal duty" because such testimony amounts to a legal conclusion.  *See Panhandle Adver., LLC v. United Rentals Realty, LLC*, 2:19-CV-189-Z-BR, 2021 WL 1112901, at *5 (N.D. Tex. Feb. 12, 2021); *Flax v. Quitman County Hosp., LLC*, 2:09-CV-101-M-D, 2011 WL 3585870, at *5 (N.D. Miss. Aug. 16, 2011).

36.     NexPoint's suggested expert testimony relates to Highland's "duties of care under the parties' [SSA]" and, specifically, whether "Highland was responsible" under the SSA for

"ensuring that NexPoint made" its Annual Installment payment under its Note. Motion ¶¶ 1, 18. This is precisely the type of expert testimony that courts preclude because it constitutes a legal conclusion. *See Panhandle*, 2021 WL 1112901 at *5 (granting plaintiff's motion to exclude expert testimony "as to his opinions regarding the legal duties Defendant owed Plaintiff under the lease at issue" because "opinions on the duties owed by the defendants and whether they fulfilled those duties were legal conclusions and not the proper subject for expert testimony"); *Flax*, 2011 WL 3585870 at *5 (prohibiting expert testimony "on the issue of *law* of whether a duty of care was owed") (emphasis in original); *Hanspard v. Otis Elevator Co.*, CIV.A. 05-1292, 2007 WL 839994, at *2 (W.D. La. Jan. 12, 2007) (granting plaintiff's motion *in limine* to exclude expert testimony where "an opinion as to the scope of [party's] contractual duties" constitutes a legal conclusion); *Taylor Pipeline Const., Inc. v. Directional Rd. Boring, Inc.*, 438 F. Supp. 2d 696, 706 (E.D. Tex. 2006) (finding expert testimony improper where it "opines as to the duties" owed by parties because "they amount to conclusions of law").

37. The question of whether Highland owed or breached any legal duties is an issue for the trier of fact to decide. *See Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir. 1997) (affirming lower court's preclusion of expert testimony regarding whether officers and directors "fulfilled their fiduciary duties to the Company … is a legal opinion and inadmissible. Whether the officers and directors breached their fiduciary duties is an issue for the trier of fact to decide. It is not for [the expert] to tell the trier of fact what to decide").

38. Accordingly, NexPoint's suggested expert testimony on Highland's duties under the SSA is improper as a matter of law, and the Motion should be denied on this basis alone.

**B.      NexPoint Fails to Establish that Good Cause Exists to Modify the Scheduling Order**

39. NexPoint fails to satisfy its burden of demonstrating good cause to modify the Scheduling Order.

10

40.    Under Rule 16(b) of the Federal Rules of Civil Procedure, a scheduling order may be modified only for "good cause." FED. R. CIV. P. 16(b)(4).  Courts consider four factors in determining whether "good cause" is shown: "(1) the explanation for the failure to identify the witness; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir.1990).  These are the same four factors used to determine whether to exclude expert testimony under Rule 37(c)(1) of the Federal Rules of Civil Procedure.  *See Grand Time Corp. v. Watch Factory, Inc.*, 3:08-CV-1770-K, 2009 WL 10678210, at *2 (N.D. Tex. Nov. 18, 2009).  Ultimately, "the good cause standard requires the 'party seeking relief to show that the deadlines [could not] reasonably [have been] met despite the diligence of the party needing the extension.'" *Binh Hoa Le v. Exeter Fin. Corp.*, 3:15-CV-3839-L, 2019 WL 1436375, at *14 (N.D. Tex. Mar. 31, 2019) (quoting *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)).

41.    "Under Rule 16(b), the movant has the burden of showing good cause to modify a scheduling order." *Grand Time*, 2009 WL 10678210 at *3.  Whether to modify a scheduling order is within the court's broad discretion.  *See Geiserman*, 893 F.2d at 790 ("[O]ur court gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order") (internal quotations omitted); *Reliance Ins. Co. v. La. Land & Expl. Co.*, 110 F.3d 253, 257 (5th Cir. 1997). Moreover, "a trial court's decision to exclude evidence as a means of enforcing a pretrial order must not be disturbed absent a clear abuse of discretion." *Geiserman*, 893 F.2d at 790.

42.    Each of the four factors weighs in favor of denying modification of the Scheduling Order.

1. **NexPoint's Explanation for Failing to Timely Designate an Expert Is Deficient**

43. NexPoint's explanation for its failure to timely designate an expert is disingenuous. NexPoint contends that, *inter alia*, its failure to previously designate an expert was "due solely to not having the benefit of Waterhouse's and Seery's recent deposition testimony," and that expert testimony is now "necessitated by Waterhouse's testimony and not any prior action or inaction of NexPoint Motion." Motion ¶ 21. NexPoint seeks to modify the Scheduling Order simply because the deposition of one of its witnesses did not go well. This is plainly improper under Rule 16(b). *See Reliance*, 110 F.3d at 257 (affirming lower court's denial of party's request to supplement expert report where "[movant] asked for an opportunity to avoid the deadline for its expert report merely because the deposition of its expert witness did not go well," noting that "[d]istrict judges have the power to control their dockets by refusing to give ineffective litigants a second chance to develop their case").

44. Moreover, NexPoint filed its Original Answer nine (9) months ago and its Original Defense was expressly based on the SSA. [AP Docket No. 6 ¶¶ 39-41]. Given the testimony of Mr. Dondero (which could not have been unexpected) and Mr. Waterhouse that NexPoint never authorized or instructed Highland to make the Annual Installment payment due on December 31, 2020, *see* Section II.E, *supra*, NexPoint has always had the burden of proving that Highland owed a duty under the SSA, yet it never offered expert opinions on the topic. If NexPoint wanted to offer "expert testimony" concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that. *See Geiserman*, 893 F.2d at 792 (finding party failed to provide a "valid reason that would justify excusing him from the deadlines imposed by the lower court," noting "[t]he claimed importance of expert testimony underscores the need for [party] to have timely designated his expert witness," and "[t]he importance of such proposed testimony cannot singularly override the enforcement of local rules

12

and scheduling orders"). NexPoint's conclusory statements regarding the need for expert testimony are insufficient under Rule 16(b). *See Binh Hoa*, 2019 WL 1436375 at *20 (finding "vague and conclusory statements regarding the need for additional information or facts do not adequately explain [party's] failure to meet the expert deadline in the Scheduling Order").

45. Accordingly, the first factor strongly favors denial of the Motion.

## 2. **NexPoint's Suggested "Expert" Testimony Is Irrelevant**

46. The second factor—the importance of the suggested expert testimony— weighs heavily in favor of denying modification of the Scheduling Order.

47. In addition to being improper, the suggested expert testimony is also irrelevant. To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Charalambopoulos v. Grammer*, 3:14-CV-2424-D, 2017 WL 930819, at *9 (N.D. Tex. Mar. 8, 2017) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002)).

48. NexPoint contends that its suggested expert testimony is "important because the duties of care as specified in the [SSA] are terms of art necessitating an expert analysis." Motion ¶ 21. NexPoint's reliance on Section 6.01 in support of its Motion is misplaced.

49. By its express terms, Section 6.01 does not impose a duty on Highland to make or effectuate Annual Installment payments on NexPoint's behalf without authorization from a representative of NexPoint. Rather, Section 6.01 sets forth a "standard of care" that applies ***only*** with respect to the discharge of "duties under this Agreement."[8] In fact, to remove all doubt, the

---

[8] Notably, and notwithstanding the "standard of care" set forth in Section 6.01, the SSA provides Highland with considerable exculpation and indemnification protections that alone defeat NexPoint's Original Defense. For example, NexPoint agreed not to hold Highland liable for any acts or omissions unless it is determined by a court of competent jurisdiction to "be the result of gross negligence or to constitute fraud or willful misconduct." Rukavina Dec., Exhibit A § 6.02. NexPoint also agreed to indemnify Highland "from and against any and all claims and causes of action" for, among other things, "negligence." *Id.* § 6.03.

SSA emphasizes multiple times that Highland had *no* duties or obligations except with respect to those "specifically" identified therein. *See* Rukavina Dec., Exhibit A §§ 2.02, 2.06. NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative. *See* Original Answer ¶¶ 39-41 (no SSA provision cited); Amended Answer ¶¶ 39-41 (no SSA provision cited); Final Answer ¶¶ 80-82 (no SSA provision cited); Motion, generally (citing only to Section 6.01).

50. Thus, based on the plain terms of the SSA and NexPoint's own pleadings, expert testimony regarding Highland's alleged "duties" is irrelevant. *See Geiserman*, 893 F.2d at 791 (affirming lower court's refusal to modify scheduling order, noting that expert testimony "is not critical" if the issue at hand is "obvious to a layperson or established as a matter of law"); *Rolls-Royce Corp. v. Heros, Inc.*, CIV.A. 307-CV-0739-D, 2010 WL 184313, at *6 (N.D. Tex. Jan. 14, 2010) ("Testimony is irrelevant [] when an expert offers a conclusion based on assumptions unsupported by the facts of the case").

51. Moreover, the suggested expert testimony will not help the factfinder understand a complex fact in issue. Contrary to NexPoint's representations, this Adversary Proceeding does not involve complicated or technical issues. The issues in this Adversary proceeding are whether NexPoint defaulted on its Note and whether NexPoint can prove that Highland's alleged "negligence" or "breach of contract" caused such default. Final Answer ¶¶ 80-82. These issues are well within a fact-finder's understanding and are not the type which would necessitate an expert. *See Nola Ventures, LLC v. Upshaw Ins. Agency, Inc.*, CV 12-1026, 2014 WL 12721924, at *10 (E.D. La. Nov. 7, 2014), *on reconsideration,* CIV.A. 12-1026, 2014 WL 6090584 (E.D. La. Nov. 13, 2014) (excluding expert testimony where, "[d]espite Plaintiffs' arguments to the contrary, this case is not about the complicated inner workings of the insurance industry. It is about whether

APP 556

an insurance agent misrepresented the type of coverage that Plaintiffs believed they were purchasing, and whether Defendants owed a heightened duty of care to Plaintiffs. Nothing in [expert's] report or proposed testimony will help the jury to understand a fact in issue that is not within the common understanding of a lay juror"); *Henderson v. Atmos Energy*, 496 F. Supp. 3d 1011, 1017 (E.D. La. 2020) (excluding expert testimony as irrelevant and unnecessary where "it is one based in common sense").

52.     At all relevant times, Mr. Waterhouse was an officer and a fiduciary of NexPoint, serving as its Treasurer.  If anyone had an obligation to ask Mr. Dondero if he wanted to reconsider his instructions, it was Mr. Waterhouse in the first instance—not in his capacity as an employee of Highland, but as an officer and fiduciary of the obligor, NexPoint.  Whether Mr. Dondero or Mr. Waterhouse is telling the truth is an interesting issue, but the Court need not resolve their dispute because it would only be relevant if the SSA imposed a duty on Highland to effectuate the Annual Installment payment without ever receiving any direction or instruction from a duly authorized representative of NexPoint.  And, as Mr. Waterhouse testified, the SSA imposes no such duty.

53.     Accordingly, the suggested expert testimony is irrelevant, and the Motion should be denied on this basis.

### 3.     Allowing the Testimony Would Prejudice Highland

54.     The third and fourth factors also weigh in favor of denying the Motion.

55.     Allowing the suggested expert testimony would prejudice Highland because Highland would need to expend additional resources responding to NexPoint's latest theory of its defense by way of: (i) retaining a rebuttal expert; (ii) deposing NexPoint's expert; or (iii) moving to strike the expert testimony.  *See Geiserman*, 893 F.2d at 791 (affirming lower court's striking of untimely witness designation and preclusion of expert testimony where delay of "a couple

15

weeks in designating the expert witness" would have "disrupted the court's discovery scheduling and the opponent's preparation," and resulted in "expense that would result from an extended discovery schedule for [movant's] failure to adhere to deadlines," noting that "the trial court has latitude to control discovery abuses and cure prejudice by excluding improperly designated evidence"); *Binh Hoa*, 2019 WL 1436375 at *20 ("It would [] be patently unfair to allow Plaintiff to supplement and amend his expert report this late in the case without: (1) allowing Defendants to amend their expert designations and provide an expert report to address the matters in Plaintiff's amended and supplemental expert reports, (2) giving Defendants an opportunity to depose Plaintiff's expert regarding his most recent opinion . . .").

56.     A continuance would not cure this prejudice because the trial on the merits of the underlying action would be unnecessarily delayed.  This would ultimately delay Highland's potential recovery under the Note and distributions to creditors under Highland's Plan.  *See S&W Enters.*, 315 F.3d at 537 (affirming lower court's denial of untimely submission of expert report where defendant would be forced to conduct additional discovery in response to movant's new materials, noting that "while a continuance could be granted for additional discovery . . . a continuance would unnecessarily delay the trial"); *Reliance*, 110 F.3d at 257-58 (affirming lower court's denial to modify scheduling order to add expert testimony where court found "[t]o allow plaintiff to add more material now and create essentially a new report would prejudice the defendants, who would then have to get an expert to address these last-minute conclusions, and thus disrupt the trial date in this case") (internal quotations omitted); *Geiserman*, 893 F.2d at 791 (finding that while attorney "could have conducted new discovery and redeposed witnesses under a continuance in response to the untimely designation, this would have resulted in additional delay and increased the expense of defending the lawsuit"); *Binh Hoa*, 2019 WL 1436375 at *20 ("Ordering another continuance would only serve to reward Plaintiff for his dilatory conduct and

failure to comply with court-ordered deadlines and this district's Local Civil Rules and result in additional delay and expense. Regardless, it is not incumbent on the court to award litigants for failing to develop their cases"). A simple collection action like the Adversary Proceeding should not be continually extended simply because the defendant is unsatisfied with its defenses and the evidence adduced in discovery.

57.    For these additional reasons, NexPoint fails to demonstrate good cause to excuse it from the deadlines set forth in the Scheduling Order. Accordingly, the Motion should be denied.

## C.    HCRE's and HCMS's Joinders Have Even Less Merit than the Motion and Should Be Denied

58.    The Joinders are even more frivolous than the Motion. In addition to the reasons set forth above, neither HCMS nor HCRE was ever a party to any shared services agreement with Highland, let alone the SSA that is the foundation of the Motion. Accordingly, the Joinders are without merit and should be summarily denied by the Court.

## CONCLUSION

For the foregoing reasons, Highland respectfully requests that the Court (i) deny the Motions and (ii) grant such other and further relief as the Court deems just and proper.

APP 559

Dated:  December 1, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
               jmorris@pszjlaw.com
               gdemo@pszjlaw.com
               hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
E-mail:    MHayward@HaywardFirm.com
               ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P.*

18

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § |
| | § Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § |
| | § Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| | § |
| | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03006-sgj |
| | § |

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§ |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§   Adversary Proceeding No.<br>§<br>§   21-03007-sgj<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

### DECLARATION OF JOHN A. MORRIS IN SUPPORT OF HIGHLAND'S OBJECTION TO MOTION OF DEFENDANT NEXPOINT ADVISORS, L.P. TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a) and under penalty of perjury, declare as follows:

1. I am an attorney in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Reorganized Debtor, and I submit this Declaration in support of *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* (the "Objection") being filed concurrently with this Declaration. I submit this Declaration based on my personal knowledge and review of the documents listed below.

2. Attached as **Exhibit 1** is a true and correct copy of a 30-year term note on behalf of NexPoint Advisors, L.P. and in favor of Highland Capital Management, L.P. for an original principal amount of $30,746,812.33, dated May 31, 2017.

3.      Attached as **Exhibit 2** is a true and correct copy of a Demand Letter dated January 7, 2021.

4.      Attached as **Exhibit 3** is a true and correct copy of the October 19, 2021 deposition transcript of Frank Waterhouse.

5.       Attached as **Exhibit 4** is a true and correct copy of the October 29, 2021 deposition transcript of James Dondero.

Dated: December 1, 2021.                            */s/ John A. Morris*
                                                                        John A. Morris

# EXHIBIT 1

## PROMISSORY NOTE

**$30,746,812.33**                                                                 **May 31, 2017**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and supersedes in their entirety each of those certain promissory notes described in <u>Exhibit A</u> hereto, from NexPoint Advisors, L.P., as Maker, and Highland Capital Management, L.P. as Payee (collectively, the "**Prior Notes**"), together with the aggregate outstanding principal and accrued and unpaid interested represented thereby.

FOR VALUE RECEIVED, NEXPOINT ADVISORS, L.P. ("**Maker**") promises to pay to the order of HIGHLAND CAPITAL MANAGEMENT, L.P. ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of THIRTY MILLION, SEVEN HUNDRED FORTY SIX THOUSAND, EIGHT HUNDRED TWELVE AND 33/100 DOLLARS ($30,746,812.33), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.     <u>Interest Rate</u>.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at the rate of six percent (6.00%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.     <u>Payment of Principal and Interest</u>. Principal and interest under this Note shall be payable as follows:

    2.1     <u>Annual Payment Dates</u>. During the term of this Note, Borrower shall pay the outstanding principal amount of the Note (and all unpaid accrued interest through the date of each such payment) in thirty (30) equal annual payments (the "**Annual Installment**") until the Note is paid in full. Borrower shall pay the Annual Installment on the 31st day of December of each calendar year during the term of this Note, commencing on the first such date to occur after the date of execution of this Note.

    2.2     <u>Final Payment Date</u>.     The final payment in the aggregate amount of the then outstanding and unpaid Note, together with all accrued and unpaid interest thereon, shall become immediately due and payable in full on December 31, 2047 (the "**Maturity Date**").

3.     <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.     <u>Acceleration Upon Default</u>.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same

shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5. <u>Waiver</u>. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6. <u>Attorneys' Fees</u>. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7. <u>Limitation on Agreements</u>. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8. <u>Governing Law</u>. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

9. <u>Prior Notes</u>. The original of each of the Prior Notes superseded hereby shall be marked "VOID" by Payee.

**MAKER:**

NEXPOINT ADVISORS, L.P.
By: NexPoint Advisors GP, LLC, its general partner

By: _____
Name:
Title:

2

## EXHIBIT A

## PRIOR NOTES

| Loan Date | Initial Note Amount | Interest Rate | Principal and Interest Outstanding as of May 31, 2017 |
|---|---|---|---|
| 8/21/14 | $4,000,000 | 6.00% | $4,616,739.73 |
| 10/1/14 | $6,000,000 | 6.00% | $6,959,671.23 |
| 11/14/14 | $2,500,000 | 6.00% | $2,881,780.82 |
| 1/29/15 | $3,100,000 | 6.00% | $3,534,679.45 |
| 7/22/15 | $12,075,000 | 6.00% | $12,753,941.10 |
| | $27,675,000 | | $30,746,812.33 |

APP 567

# EXHIBIT 2

HIGHLAND CAPITAL MANAGEMENT, L.P.

January 7, 2021

NexPoint Advisors, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James Dondero

Re: Demand on Promissory Note

Dear Mr. Dondero,

On May 31, 2017, NexPoint Advisors, L.P, entered into that certain promissory note in the original principal amount of $30,746,812.33 (the "Note") in favor of Highland Capital Management, L.P. ("Payee").

As set forth in Section 2 of the Note, accrued interest and principal on the Note is due and payable in thirty equal annual payments with each payment due on December 31 of each calendar year. Maker failed to make the payment due on December 31, 2020.

Because of Maker's failure to pay, the Note is in default. Pursuant to Section 4 of the Note, all principal, interest, and any other amounts due on the Note are immediately due and payable. The amount due and payable on the Note as of January 8, 2021 is $24,471,804.98; however, interest continues to accrue under the Note.

**The Note is in default, and payment is due immediately.** Payments on the Note must be made in immediately available funds. Payee's wire information is attached hereto as **Appendix A**.

Nothing contained herein constitutes a waiver of any rights or remedies of Payee under the Note or otherwise and all such rights and remedies, whether at law, equity, contract, or otherwise, are expressly reserved. Interest, including default interest if applicable, on the Note will continue to accrue until the Note is paid in full. Any such interest will remain the obligation of Maker.

Sincerely,

/s/ James P. Seery, Jr.

James P. Seery, Jr.
Highland Capital Management, L.P.
Chief Executive Officer/Chief Restructuring Officer

cc:    Fred Caruso
       James Romey
       Jeffrey Pomerantz
       Ira Kharasch
       Gregory Demo
       DC Sauter

**Appendix A**

ABA #:          322070381
Bank Name:      East West Bank
Account Name:   Highland Capital Management, LP
Account #:      5500014686

# EXHIBIT 3

1           WATERHOUSE - 10-19-21

2       IN THE UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
3               DALLAS DIVISION
    -----------------------------
4    IN RE:

5                       Chapter 11
    HIGHLAND CAPITAL
6    MANAGEMENT, L.P.,        CASE NO.
                    19-34054-SGI11
7
          Debtor.
8    -----------------------------
    HIGHLAND CAPITAL MANAGEMENT, L.P.,
9
          Plaintiff,
10   vs.                     Adversary
                        Proceeding No.
11   HIGHLAND CAPITAL MANAGEMENT       21-03000-SGI
    FUND ADVISORS, L.P.; NEXPOINT
12   ADVISORS, L.P.; HIGHLAND
    INCOME FUND; NEXPOINT
13   STRATEGIC OPPORTUNITIES FUND;
    NEXPOINT CAPITAL, INC.; and
14   CLO HOLDCO, LTD.,

15        Defendants.
    -----------------------------
16

17        REMOTE VIDEOTAPED DEPOSITION OF

18            FRANK WATERHOUSE

19            October 19, 2021

20

21

22

23

24   Reported by:  Susan S. Klinger, RMR-CRR, CSR

25   Job No: 201195

Page 2

```
1        WATERHOUSE - 10-19-21
2
3
4           October 19, 2021
5           9:30 a.m.
6
7
8
9      Remote Deposition of FRANK WATERHOUSE,
10   held before Susan S. Klinger, a Registered
11   Merit Reporter and Certified Realtime Reporter
12   of the State of Texas.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1            WATERHOUSE - 10-19-21
2    A P P E A R A N C E S :
3    (All appearances via Zoom.)
4    Attorneys for the Reorganized Highland Capital
5    Management:
6        John Morris, Esq.
7        Hayley Winograd, Esq.
8        PACHULSKI STANG ZIEHL & JONES
9        780 Third Avenue
10       New York, New York  10017
11   Attorneys for the Witness:
12       Debra Dandeneau, Esq.
13       Michelle Hartmann, Esq.
14       BAKER McKENZIE
15       1900 North Pearl Street
16       Dallas, Texas  75201
17   Attorneys for NexPoint Advisors, LP and
18   Highland Capital Management Fund Advisors,
19   L.P.:
20       Davor Rukavina, Esq.
21       An Nguyen, Esq.
22       MUNSCH HARDT KOPF & HARDD
23       500 North Akard Street
24       Dallas, Texas  75201-6659
25
```

Page 4

```
1            WATERHOUSE - 10-19-21
2    Attorneys for Jim Dondero, Nancy Dondero, HCRA,
3    and HCMS:
4        Deborah Deitsch-Perez, Esq.
5        Michael Aigen, Esq.
6        STINSON
7        3102 Oak Lawn Avenue
8        Dallas, Texas  75219
9
10   Attorneys for Dugaboy Investment Trust:
11       Warren Horn, Esq.
12       HELLER, DRAPER & HORN
13       650 Poydras Street
14       New Orleans, Louisiana 70130
15
16   Attorneys for Marc Kirschner as the trustee for
17   the litigation SunTrust:
18       Deborah Newman, Esq.
19       QUINN EMANUEL URQUHART & SULLIVAN
20       51 Madison Avenue
21       New York, New York  10010
22
23   Also Present:
24       Ms. La Asia Canty
25
```

Page 5

```
1            WATERHOUSE - 10-19-21
2                I N D E X
3
4    WITNESS                        PAGE
5    FRANK WATERHOUSE
6    EXAMINATION BY MR. MORRIS          10
7    EXAMINATION BY MR. RUKAVINA       256
8    EXAMINATION BY MS. DEITSCH-PEREZ  352
9    EXAMINATION BY MR. MORRIS         377
10   EXAMINATION BY MR. RUKAVINA       387
11   EXAMINATION BY MS. DEITSCH-PEREZ  393
12
13           E X H I B I T S
14   No.                        Page
15   Exhibit 2  NPA et al Amended Complaint   142
16   Exhibit 33 6/3/19 Management         91
17       Representation
18   Exhibit 34 HCMLP Consolidated Financial  94
19       Statements
20   Exhibit 35 HCMFA Incumbency Certificate  151
21   Exhibit 36 Email string re 15(c)        170
22   Exhibit 39 HCMLP Operating Results 2/18  226
23   Exhibit 40 Summary of Assets and        236
24       Liabilities
25   Exhibit 41 12/19 Monthly Operating Report 258
```

Page 6

| | | |
|---|---|---|
| 1 | WATERHOUSE - 10-19-21 | |
| 2 | Exhibit 45 HCMFA Consolidated Financial | 135 |
| 3 | Statements | |
| 4 | Exhibit 46 NexPoint 2019 Audited | 218 |
| 5 | Financials | |
| 6 | | |
| 7 | Exhibit A1 Emails 11/25 | 328 |
| 8 | Exhibit A2 Emails 12/31 | 338 |
| 9 | Exhibit A6 Emails 1/12 | 341 |
| 10 | Exhibit A7 Promissory Notes | 297 |
| 11 | Exhibit A9 Email, 8/31 | 307 |
| 12 | Exhibit A10 Acknowledgment from HCMLP | 302 |
| 13 | Exhibit A11 HCMLP Schedule 71A | 309 |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 7

1    WATERHOUSE - 10-19-21
2       P R O C E E D I N G S
3       VIDEOGRAPHER: Good morning,
4    Counselors. My name is Scott Hatch. I'm a
5    certified legal videographer in association
6    with TSG Reporting, Inc.
7       Due to the severity of COVID-19 and
8    following the practice of social
9    distancing, I will not be in the same room
10   with the witness. Instead, I will record
11   this videotaped deposition remotely. The
12   reporter, Susan Klinger, also will not be
13   in the same room and will swear the witness
14   remotely.
15      Do all parties stipulate to the
16   validity of this video recording and remote
17   swearing, and that it will be admissible in
18   the courtroom as if it had been taken
19   following Rule 30 of the Federal Rules of
20   Civil Procedures and the state's rules
21   where this case is pending?
22      MR. HORN: Yes.
23      MS. DANDENEAU: Yes.
24      MR. MORRIS: Yes. John Morris. I
25   would just try to do a negative notice

Page 8

1    WATERHOUSE - 10-19-21
2    here, as we did yesterday. If anybody has
3    a problem with what was just stated, can
4    you state your objection now?
5       Okay. No response, so everybody
6    accepts the stipulation and the instruction
7    that was just given.
8       VIDEOGRAPHER: Thank you. This is
9    the start of media labeled Number 1 of the
10   video recorded deposition of Frank
11   Waterhouse In Re: Highland Capital
12   Management, L.P., in the United States
13   Bankruptcy Court for the Northern District
14   of Texas, Dallas Division, Case Number
15   21-03000-SGI.
16      This deposition is being held via
17   video conference with participants
18   appearing remotely due to COVID-19
19   restrictions on Tuesday, October 19th, 2021
20   at approximately 9:32 a.m. My name is
21   Scott Hatch, legal video specialist with
22   TSG Reporting, Inc. headquartered at 228
23   East 45th Street, New York, New York. The
24   court reporter is Susan Klinger in
25   association with TSG Reporting.

Page 9

1    WATERHOUSE - 10-19-21
2    Counsel, please introduce
3    yourselves.
4       MR. MORRIS: John Morris, Pachulski
5    Stang Ziehl & Jones for the reorganized
6    Highland Capital Management, L.P., the
7    plaintiff in these actions.
8       MS. DANDENEAU: Deborah Dandeneau
9    from Baker McKenzie. My partner, Michelle
10   Hartmann, is also in the room with me,
11   representing Frank Waterhouse individually.
12      MS. DEITSCH-PEREZ: Deborah
13   Deitsch-Perez from Stinson, LLP,
14   representing Jim Dondero, Nancy Dondero,
15   HCRA, and HCMS.
16      MR. HORN: Warren Horn with Heller,
17   Draper & Horn in New Orleans representing
18   Dugaboy Investment Trust.
19      MR. RUKAVINA: Davor Rukavina with
20   Munsch Hardt Kopf & Harr in Dallas
21   representing NexPoint Advisors, LP and
22   Highland Capital Management Fund Advisors,
23   L.P.
24      MR. AIGEN: Michael Aigen from
25   Stinson, and I represent the same parties

Page 10

WATERHOUSE - 10-19-21

1  
2  as Deborah Deitsch-Perez.
3      MS. NEWMAN: This is Deborah Newman
4  from Quinn Emanuel. We represent the
5  litigation -- Marc Kirschner as the trustee
6  for the litigation SunTrust.
7      MR. MORRIS: I think that is
8  everybody.
9      VIDEOGRAPHER: Thank you. Will the
10  court reporter please swear in the witness.
11      FRANK WATERHOUSE,
12  having been first duly sworn, testified as
13  follows:
14      EXAMINATION
15  BY MR. MORRIS:
16      Q.  Please state your name for the
17  record.
18      A.  My name is Frank Waterhouse.
19      Q.  Good morning, Mr. Waterhouse. I'm
20  John Morris, as you know, from Pachulski Stang
21  Ziehl & Jones. You understand that my firm and
22  I represent Highland Capital Management, L.P.;
23  is that right?
24      A.  Yes.
25      Q.  Okay. And do you understand that

Page 11

WATERHOUSE - 10-19-21

1  
2  we're here today for your deposition in your
3  individual capacity?
4      A.  Yes.
5      Q.  Did you review and -- did you
6  receive and review a subpoena that Highland
7  Capital Management, L.P., served upon you?
8      A.  Yes.
9      Q.  You have been deposed before; right?
10      A.  Yes.
11      Q.  How many times have you been
12  deposed?
13      A.  About three or four times.
14      Q.  Okay. And I defended you in one
15  deposition; isn't that right?
16      A.  That is correct.
17      Q.  So the general ground rules for this
18  deposition are largely the same as the
19  depositions you have given before. And that is
20  I will ask you a series of questions, and it is
21  important that you allow me to finish my
22  question before you begin your answer; is that
23  fair?
24      A.  Yes.
25      Q.  And it is important that I allow you

Page 12

WATERHOUSE - 10-19-21

1  
2  to finish your answers before I begin a
3  question, but if I fail to do that, will you
4  let me know?
5      A.  I can certainly do that.
6      Q.  Okay. Do you understand that this
7  deposition is being videotaped?
8      A.  Yes.
9      Q.  You understand that I may seek to
10  use portions of the videotape in a court of
11  law?
12      A.  I did not know that, until you just
13  said that.
14      Q.  Okay. And you are aware of that now
15  before the deposition begins substantively; is
16  that right?
17      A.  Yes.
18      Q.  So unlike I think the other
19  depositions that you have given, this one is
20  being given remotely. So that presents some
21  unique challenges, at least as compared to a
22  deposition that is taken in-person.
23      From time to time we're going to put
24  documents up on the screen, Mr. Waterhouse.
25  And it is important that I give you the

Page 13

WATERHOUSE - 10-19-21

1  
2  opportunity to review any portion of the
3  document that you think you need in order to
4  fully and completely answer the question.
5      So I would ask you to let me know if
6  there is a portion of a document that you need
7  to see in order to fully and completely answer
8  the question. Can you do that for me?
9      A.  Yes.
10      MS. DANDENEAU: Mr. Morris, I would
11  just note that we do have hard copies of
12  the documents that you sent, so if you can
13  just refer to the exhibit number as
14  reflected in the documents that you sent,
15  Mr. Waterhouse will be able to look at the
16  hard copies of those documents.
17      MR. MORRIS: I appreciate that,
18  and -- and I will encourage him to do so.
19  There will be other documents that we did
20  not send to you that we'll be using today
21  though.
22      Q.  Okay. With that as background, if
23  there is anything that I ask you, sir, that you
24  don't understand, will you let me know?
25      A.  Yes.

Page 14

WATERHOUSE - 10-19-21

1
2   Q.   Okay.  Are you currently employed?
3   A.   Yes.
4   Q.   By whom?
5   A.   The Skyview Group.
6   Q.   When did you become employed by the
7   Skyview Group?
8   A.   I believe March 1st of 2021.
9   Q.   Do you have a title at Skyview?
10  A.   Yes.
11  Q.   What is your title?
12  A.   My title is chief financial officer.
13  Q.   Do you report to anybody in your
14  role as CFO?
15  A.   I don't, no.
16  Q.   No.  Is there a president or a CEO
17  of Skyview?
18  A.   Yes.
19  Q.   Who is that?
20  A.   That is Scott Ellington.
21  Q.   But you don't report to
22  Mr. Ellington; is that right?
23  A.   I don't think so.
24  Q.   Does Skyview Group --
25       MS. DANDENEAU:  Excuse me, we --

Page 15

WATERHOUSE - 10-19-21

1
2   A.   I -- I -- I might.  I just -- I
3   don't recall.
4   Q.   Okay.  Does Skyview Group provide
5   any services to any entity directly or
6   indirectly owned or controlled by Jim Dondero?
7   A.   Yes.
8   Q.   Can you name -- is that pursuant to
9   written contracts?
10  A.   Yes.
11  Q.   And do you know how many contracts
12  exist?
13  A.   Approximately six or so.
14  Q.   And is the Skyview Group made up of
15  individuals who were formerly employees of
16  Highland Capital Management, L.P.?
17  A.   No.
18  Q.   Do you know how many -- how many --
19  how many employees does Skyview have?
20  A.   Approximately 35.
21  Q.   And can you tell me how many of
22  those 35 are former officers, directors, or
23  employees of Highland Capital Management, L.P.?
24  A.   I don't know the exact number.
25  Q.   Is it more than 20?

Page 16

WATERHOUSE - 10-19-21

1
2   A.   Yes.
3   Q.   Is it more than 30?
4   A.   I don't know.
5   Q.   Can you tell me what portion of
6   Skyview -- Skyview's revenue is derived from
7   entities that are directly or indirectly owned
8   or controlled by Jim Dondero?
9       MS. DANDENEAU:  Mr. Morris, I mean,
10  you called Mr. Waterhouse here individually
11  for purposes of his testimony in connection
12  with the noticed litigation.  I have given
13  you some leeway to ask him some background
14  information about Skyview Group, but this
15  is not a substitute for a deposition in
16  connection with any other pending disputes
17  that exist.  And -- and we agreed to accept
18  the subpoena on the basis of he -- this is
19  testimony that he is giving in connection
20  with the noticed litigation.
21       I really think that you are now
22  going a little bit far afield from the
23  purpose of this deposition.
24       MR. MORRIS:  Okay.  It is -- I'm not
25  intending to use these -- the answers to

Page 17

WATERHOUSE - 10-19-21

1
2   these questions for any purpose other than
3   this litigation.  I think you understand
4   fully why I'm asking the questions, and I
5   just have a couple more, if you will bear
6   with me.
7       MS. DANDENEAU:  Okay.
8       MS. DEITSCH-PEREZ:  Can we have an
9   agreement that an objection by one is an
10  objection for any other party here?
11      MR. MORRIS:  Sure.  I would -- I
12  would encourage that, sure.
13      MS. DEITSCH-PEREZ:  Thank you.
14      MR. MORRIS:  It can't be sustained
15  or overruled more than one time, so...
16  Q.   Mr. Waterhouse, can you answer my
17  question, please.
18      MS. DANDENEAU:  Do you want to
19  repeat it, Mr. Morris, for his benefit?
20      MR. MORRIS:  Sure.
21  Q.   Can you -- can you tell me the
22  approximate portion of Skyview's revenue that
23  is derived from entities that are directly or
24  indirectly owned or controlled by Mr. Dondero?
25  A.   I don't know the exact number.

Page 18

WATERHOUSE - 10-19-21

1
2  Q.  Is it more than 75 percent?
3  A.  Yes.
4  Q.  Is it more than 90 percent?
5  A.  I don't know.
6  Q.  Okay.  Can I refer to Highland
7  Capital Management, L.P., as Highland?
8  A.  Yes.
9  Q.  All right.  And you previously
10  served as Highland's CFO; correct?
11  A.  Yes.
12  Q.  When did you join Highland?
13  A.  I don't recall the exact date.
14  Q.  Can you tell me what year?
15  A.  2006.
16  Q.  When did you -- in what year did you
17  become Highland's CFO?
18  A.  I don't recall the exact date.
19  Q.  I'm not asking you for the exact
20  date.  I'm asking you if you recall the year in
21  which you were appointed CFO.
22  A.  I don't recall the exact year.
23  Q.  Can you tell me which years it is
24  possible that you were appointed to CFO of
25  Highland?

Page 19

WATERHOUSE - 10-19-21

1
2  A.  2011 or 2012.
3  Q.  Did you serve as Highland's CFO on a
4  continuous basis from in or around 2011 or 2012
5  until early 2021?
6  A.  Yes.
7  Q.  During that entire time you reported
8  directly to Jim Dondero; correct?
9  A.  I -- I don't know.
10  Q.  Is there anybody else you reported
11  to -- withdrawn.
12  Did you report to Mr. Dondero for
13  some portion of the time that you served as
14  CFO?
15  A.  Yes.
16  Q.  Is there a portion of time that you
17  don't recall who you reported to?
18  A.  Yes.
19  Q.  What portion of time do you have in
20  your mind when you can't recall who you
21  reported to?
22  A.  From the 2011 to -- for
23  approximately a year or two.
24  Q.  Okay.  So is it fair to say that you
25  reported to Mr. Dondero in your capacity as CFO

Page 20

WATERHOUSE - 10-19-21

1
2  from at least 2014 until the time you left
3  Highland?
4  MS. DANDENEAU:  Objection to form.
5  A.  I don't want to speculate the exact
6  or what year that changed or -- so I would like
7  to stick with my testimony.
8  Q.  Can you recall when you began
9  reporting to Mr. Dondero?
10  A.  I don't recall.
11  Q.  Can you -- can you give me an
12  estimate of what year you think you might have
13  began reporting to Mr. Dondero?
14  A.  I will go back to my prior
15  testimony.
16  Q.  Okay.  There is no -- you have no
17  ability to tell me when you began reporting to
18  Mr. Dondero.
19  Do I have that right?
20  MS. DANDENEAU:  Objection to form.
21  A.  I don't recall.
22  Q.  Okay.  Do you recall who you might
23  have reported to before you began reporting to
24  Mr. Dondero?
25  A.  Yes.

Page 21

WATERHOUSE - 10-19-21

1
2  Q.  Who might you have reported to in
3  your capacity as CFO before you started
4  reporting to Mr. Dondero?
5  A.  That would have been Patrick Boyce.
6  Q.  Are you aware that Highland filed
7  for bankruptcy on October 19th, 2019?
8  A.  Yes.
9  Q.  And we refer to that as the petition
10  date?
11  A.  Yes.
12  Q.  Okay.  Do you hold any professional
13  licenses, sir?
14  A.  Yes.
15  Q.  Can you tell me what professional
16  licenses you hold?
17  A.  I'm a certified public accountant.
18  Q.  Okay.  Anything else?
19  A.  No.
20  Q.  Do you have any other professional
21  licenses or certificates?
22  A.  When you say "professional license,"
23  that is not education?
24  Q.  Tell me -- sure.  Anything other
25  than a driver's license.

Page 22

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  Do you have any other license or
3  certificate or certification?
4  A.  Are you asking, like, where I went
5  to school and the --
6  Q.  I am not.  I am not.  I didn't say
7  education.  I didn't ask about degrees.
8  Do you know what a license is?
9  A.  Well, yeah, I mean, a license is
10 something you get after you receive a certain
11 level of proficiency.
12 Q.  Do you have any licenses or
13 certifications other than your CPA?
14 MS. DANDENEAU:  Objection, form.
15 I assume you mean professional
16 licenses, Mr. Morris; correct?
17 Q.  Can you answer my question, sir?
18 A.  Mr. Morris, I'm thinking.  I
19 don't -- I don't think I have any others.
20 Q.  Are you familiar with an entity
21 called Highland Capital Management Fund
22 Advisors?
23 A.  Yes.
24 Q.  Were you ever -- can we refer to
25 that entity as HCMFA?

Page 23

1  WATERHOUSE - 10-19-21
2  A.  Yes.
3  Q.  Were you ever employed by HCMFA?
4  A.  Not that I recall.
5  Q.  Were you ever -- did you ever hold
6  the title of an officer or director of HCMFA?
7  A.  Yes.
8  Q.  What title did you hold?
9  A.  Treasurer.
10 Q.  When did you become the treasurer of
11 HCMFA?
12 A.  I don't recall.
13 Q.  Can you tell me the year?
14 A.  I don't -- I don't know the year.
15 Q.  Can you approximate the year in
16 which you became the treasurer of HCMFA?
17 A.  I don't know.
18 Q.  Can you tell me if it was before or
19 after 2016?
20 A.  I don't recall.
21 Q.  Are you still the -- do you know if
22 you're still the treasurer of HCMFA today?
23 A.  Today, I am the acting treasurer for
24 HCMFA.
25 Q.  Is there a distinction between

Page 24

1  WATERHOUSE - 10-19-21
2  treasurer and acting treasurer?
3  A.  I said "acting treasurer" as I am an
4  employee of Skyview, as you previously
5  stated -- or asked.
6  Q.  But you are the treasurer of HCMFA
7  today; correct?
8  A.  I am -- I am the acting treasurer
9  for HCMFA.
10 Q.  How did you become the treasurer of
11 HCMFA?
12 A.  Are you asking how I became the
13 treasurer of HCMFA today?
14 Q.  How did you become appointed to
15 serve as the treasurer of HCMFA?
16 A.  Well, in -- in -- in what time
17 capacity?
18 Q.  The first time that you were
19 appointed.
20 A.  First time.  I believe I was asked
21 to serve as treasurer for HCMFA the first time.
22 Q.  By who?  Who asked you to do that?
23 A.  I don't recall.
24 Q.  Is there anything that would refresh
25 your recollection as to who appointed you as

Page 25

1  WATERHOUSE - 10-19-21
2  the treasurer of CF- -- HCMFA for the first
3  time?
4  A.  I don't -- I mean, there would be
5  some documents, some legal documents.  I don't
6  know where those are.
7  Q.  How many times have you been
8  appointed the treasurer of HCMFA?
9  A.  I don't know.
10 Q.  Was it more than once?
11 A.  I don't know.
12 Q.  Can you tell me any period of time
13 since 2016 that you did not hold the title of
14 treasurer of HCMFA?
15 MS. DANDENEAU:  Objection to form.
16 A.  I don't recall.
17 Q.  What are your duties and
18 responsibilities as the treasurer of HCMFA?
19 A.  My duties are to do the best job
20 that I can as the -- as an accountant and
21 finance guy.
22 Q.  What specific duties and
23 responsibilities do you have as the treasurer
24 of HCMFA?
25 A.  My duties are to do the best job

Page 26

WATERHOUSE - 10-19-21

1 that I can as the accounting and finance person
2 for HCMFA.
3
4   Q.   As the accounting and finance person
5 for HCMFA, do you have any particular areas of
6 responsibility?
7   A.   Yeah, it is to manage the accounting
8 and finance function for HCMFA.
9   Q.   Would that include – do you have
10 responsibility for overseeing HCMFA's annual
11 audit?
12   A.   Can I please elaborate on my prior
13 question?
14   Q.   Of course. You – you are giving
15 answers. I'm asking questions.
16   A.   Okay. Yes, so the – it – like I
17 said, it is to manage the accounting finance
18 aspect, but I am, as we discussed, the
19 treasurer. That is – being treasurer is what
20 gives me that – that management function.
21   Q.   Does anybody report to you in your
22 capacity as treasurer of HCMFA?
23   A.   I don't believe so.
24   Q.   Does HCMFA have a chief financial
25 officer?

Page 27

WATERHOUSE - 10-19-21

1
2   A.   I don't – I don't know.
3   Q.   You don't know?
4       You're the treasurer of HCMFA but
5 you don't know if HCMFA has a chief financial
6 officer.
7       Do I have that right?
8   A.   That's right.
9   Q.   Okay. Have you heard of a company
10 called NexPoint Advisors?
11   A.   Yes.
12   Q.   We will refer to that as NexPoint.
13 Okay?
14   A.   Okay.
15   Q.   Were you ever employed by NexPoint?
16   A.   I don't recall.
17   Q.   Did you ever hold any title with
18 respect to the entity known as NexPoint?
19   A.   Yes.
20   Q.   What titles have you held in
21 relation to NexPoint?
22   A.   Treasurer. I think it was only
23 treasurer.
24   Q.   Can you tell me the approximate year
25 you became the treasurer of NexPoint?

Page 28

WATERHOUSE - 10-19-21

1
2   A.   I don't know.
3   Q.   Are you still the treasurer of
4 NexPoint today?
5   A.   I am the acting treasurer for
6 NexPoint.
7   Q.   When did your title change from
8 treasurer to acting treasurer?
9   A.   I don't know.
10   Q.   Did your duties and responsibilities
11 change at all when your title was changed from
12 treasurer to acting treasurer?
13   A.   I don't – I don't believe so.
14   Q.   Why did –
15   A.   I still manage the finance and
16 accounting function for NexPoint.
17   Q.   Why did your title change from
18 treasurer to acting treasurer?
19   A.   I don't – I'm using the term
20 "acting treasurer" as I'm a Skyview employee.
21 I don't – I don't know – again, I am a – as
22 I am the Skyview employee.
23   Q.   Okay.
24   A.   And we – we provide officer
25 services.

Page 29

WATERHOUSE - 10-19-21

1
2   Q.   And you serve as an officer of
3 HCMFA; correct?
4   A.   I think we went over that with my
5 testimony. Yes, I'm the acting treasurer for
6 HCMFA.
7   Q.   And you are an officer of NexPoint;
8 correct?
9   A.   I think – I am the acting treasurer
10 for NexPoint Advisors.
11   Q.   And – and who appointed you acting
12 treasurer of NexPoint Advisors?
13   A.   I don't recall specifically.
14   Q.   Do you have any recollection of who
15 might have appointed you the treasurer of
16 NexPoint?
17   A.   I mean, it – it – I don't recall
18 exactly who it was.
19   Q.   Who were the possibilities?
20       MS. DEITSCH-PEREZ: Object to the
21 form.
22   Q.   You can answer.
23   A.   Someone in the legal group for
24 NexPoint. The other officers as well.
25   Q.   Have you heard of a company called

Page 30

WATERHOUSE - 10-19-21

1
2 Highland Capital Management Services, Inc.?
3    A.    Yes.
4    Q.    We will refer to that as HCMS.
5 Okay?
6    A.    HCMS.  Okay.
7    Q.    Were you ever employed by HCMS?
8    A.    No.
9    Q.    Have you ever held any titles in
10 relation to HCMF -- I apologize -- HCMS?
11    A.    Yes.
12    Q.    What titles have you held in
13 relation to HCMS?
14    A.    Treasurer and acting treasurer.
15    Q.    When did you first become treasurer
16 or acting treasurer of HCMS?
17    A.    I don't recall the exact dates.
18    Q.    Can you recall -- can you
19 approximate the year that you became the
20 treasurer of HCMS?
21    A.    I don't -- I don't know.
22    Q.    Are you still the treasurer of HCMS
23 today?
24    A.    I am the acting treasurer for HCMS.
25    Q.    And are your duties and

Page 31

WATERHOUSE - 10-19-21

1
2 responsibilities as the acting treasurer for
3 HCMS and the acting treasurer for NexPoint the
4 same as your duties and responsibilities in
5 your role as the acting treasurer of HCMFA?
6    A.    More or less.
7    Q.    Have you ever heard of a company
8 called HCRE Partners, LLC?
9    A.    Yes.
10    Q.    And do you understand that that
11 entity is now known today as NexPoint Real
12 Estate Partners?
13    A.    I did not know that.
14    Q.    All right.  Can we refer to HCRE
15 Partners as HCRE?
16        MS. DANDENEAU:  Objection to form.
17    Did you mean NexPoint Real Estate
18    Partners, Mr. Morris?
19        MR. MORRIS:  No.
20        MS. DANDENEAU:  Oh.
21        MR. MORRIS:  He said he wasn't
22    familiar that it was succeeded by that
23    entity.  So --
24        MS. DANDENEAU:  Okay.
25        MR. MORRIS:  -- let's go with what

Page 32

WATERHOUSE - 10-19-21

1
2 the witness knows.
3    Q.    You're familiar with an entity
4 called HCRE Partners, LLC; correct?
5    A.    Yes.
6    Q.    Okay.  So that is the entity that we
7 will refer to as HCRE.  If you're aware of any
8 successor, that is great.  If not, let's just
9 define it as such.
10        Have you ever been employed by HCRE
11 or any entity that you know to have succeeded
12 HCRE?
13    A.    No.
14    Q.    Did you ever serve as an officer or
15 director of HCRE or any successor?
16    A.    Not that I recall.
17    Q.    Okay.  Can we refer to NexPoint and
18 HCMFA as the advisors?
19    A.    Yes.
20    Q.    In general, the advisors provided
21 investment advisory services to certain retail
22 funds; correct?
23    A.    Yes.
24    Q.    And we will refer to the retail
25 funds that are served by the advisors

Page 33

WATERHOUSE - 10-19-21

1
2 collectively as the retail funds; is that okay?
3    A.    Okay.
4    Q.    Each of the retail funds is governed
5 by a board; correct?
6    A.    Yes.
7    Q.    And do you know the people who serve
8 on the boards of the retail funds?
9        MS. DANDENEAU:  Objection to form.
10    A.    I don't know all of them.
11    Q.    Do you know whether the same people
12 serve on the board of each of the retail funds
13 as we've defined that term?
14    A.    Which -- so when you say "retail
15 funds" -- again, I want to be -- what retail
16 funds are you referring to, because there are
17 -- there are several distinctions?
18        What retail funds are you using when
19 you refer to them?
20    Q.    That is why -- that is why I tried
21 to define the terms.  So let me do it again.
22        Retail funds for the purposes of
23 this deposition means any retail fund to which
24 either of the advisors provides advisory
25 services.  Okay?

Page 34

WATERHOUSE - 10-19-21

1    A.    Okay.
2    Q.    Okay.  So do you know whether the
3 same people serve on the board of each of the
4 retail funds?
5    A.    I don't know.
6    Q.    Were you ever employed by any of the
7 retail funds?
8    A.    No.
9    Q.    No?
10    A.    No.
11    Q.    Okay.  Do you have any title with
12 respect to any of the retail funds?
13    A.    Yes.
14    Q.    What titles do you hold --
15 withdrawn.
16    Do you have the same titles with
17 respect to all of the retail funds or do
18 they -- or just something else?
19    MS. DANDENEAU:  Objection to form.
20    Q.    Withdrawn.
21    Do you have the same title with
22 respect to each of the retail funds?
23    A.    No.
24    Q.    Tell me which title you have with

Page 35

WATERHOUSE - 10-19-21

1 respect to each retail fund.
2    Actually, let's do it a different
3 way.  I withdraw the question.
4    Can you give me one title you have
5 in relation to any retail fund?
6    A.    Yes.
7    Q.    What title -- what title can you
8 give me?
9    A.    Principal executive officer.
10    Q.    Do you serve as principal executive
11 officer for each of the retail funds?
12    A.    No.
13    Q.    Can you identify for me the retail
14 funds in which you serve as the principal
15 executive officer?
16    A.    Yes.  Highland Funds 1, Highland
17 Funds 2, Highland Income Fund, Highland Global
18 Allocation Fund.
19    Q.    I'm sorry, you said "Global
20 Allocation Fund"?
21    A.    Yes.
22    VIDEOGRAPHER:  Excuse me,
23 Mr. Morris.  This is the videographer.  I'm
24 concerned about the lighting in the

Page 36

WATERHOUSE - 10-19-21

1 witness' camera.
2    Do you want to go off the record and
3 make some adjustments?
4    MR. MORRIS:  Sure, but just for this
5 purpose.  I don't want to take a break.  We
6 just started.
7    MS. DANDENEAU:  Yeah, that is fine.
8 That is fine.  We're going to put you on
9 mute.
10    MR. MORRIS:  All right.
11    MS. DANDENEAU:  I'm going to try to
12 open up some of the shades.
13    VIDEOGRAPHER:  We're going off the
14 record at 10:08 a.m.
15    (Recess taken 10:08 a.m. to 10:11 a.m.)
16    VIDEOGRAPHER:  We are back on the
17 record at 10:11 a.m.
18    Q.    Mr. Waterhouse, when did you become
19 the principal executive officer of the four
20 retail funds that you just identified?
21    A.    I don't recall.
22    Q.    Do you recall the approximate year
23 that you became the principal executive officer
24 of the four funds?

Page 37

WATERHOUSE - 10-19-21

1    A.    2021.
2    Q.    Did you ever hold any title with
3 respect to any of the four funds you have just
4 identified other than principal executive
5 officer?
6    A.    I don't recall.
7    Q.    Is it possible that you held a
8 position or a title with the four funds you
9 just identified prior to 2021?
10    A.    Yes.
11    Q.    But you don't recall if you did or
12 not; do I have that right?
13    A.    No.  You -- I thought you asked, did
14 I hold other titles.
15    Q.    Did you hold any title at the four
16 retail funds for which you now serve as
17 principal executive officer at any time prior
18 to 2021?
19    A.    Yes.
20    Q.    What titles did you hold?
21    A.    I don't recall all the titles.
22    Q.    Do you recall any of the titles?
23    A.    Yes.
24    Q.    What titles do you recall holding at

Page 38

WATERHOUSE - 10-19-21

1 those four retail funds before 2021?
2    A.   Principal executive officer.
3    Q.   Were you the principal executive
4 officer of the four retail funds that you have
5 identified?
6    A.   Sorry, could you repeat the
7 question?
8    Q.   Were you the principal executive
9 officer for each of the four retail funds that
10 you have identified?
11    A.   Yes.
12    Q.   When did you become the principal
13 executive -- withdrawn.
14      Can you give me the approximate year
15 that you became the principal executive officer
16 for each of the four retail funds you've
17 identified?
18    A.   I don't recall.
19    Q.   What are your duties and
20 responsibilities as the principal executive
21 officer of these four retail funds?
22    A.   It is to manage the finance and
23 accounting positions.
24    Q.   So at the same time you serve as the

Page 39

WATERHOUSE - 10-19-21

1 treasurer of the advisors, you also serve as
2 the principal executive officer of these four
3 retail funds; correct?
4    A.   Yes.
5    Q.   Did you ever hold any title with
6 respect to any other retail fund?
7    A.   Not that I recall.
8    Q.   During the period that you served as
9 Highland's CFO, from time to time Highland
10 loaned money to certain of its officers and
11 employees; correct?
12    A.   Yes.
13    Q.   During the period that you served as
14 Highland's CFO, from time to time Highland
15 loaned money to certain --
16    A.   Let me -- let me retract that,
17 sorry, that -- you asked during the time I was
18 CFO, Highland loaned moneys to employees. I
19 don't -- I don't recall that during my tenure
20 of CFO.
21    Q.   You have no recollection during the
22 time that you were the CFO of Highland of
23 Highland ever loaning any money to any officer
24 or director of Highland?

Page 40

WATERHOUSE - 10-19-21

1    A.   I don't recall during my tenure of
2 Highland or my -- as CFO of Highland -- yeah,
3 if there are any loans as CFO of Highland.
4    Q.   I'm just talking about officers and
5 employees right now. You have no recollection
6 of Highland ever making a loan to any of its
7 officers or employees during the time that you
8 served as CFO. Do I have that right?
9      MS. DANDENEAU: Objection to form.
10    A.   So I thought you were saying
11 officers and employees as CFO, right, so there
12 were -- I mean, okay, yes.
13    Q.   I would ask you to listen carefully
14 to my question. If I -- if I'm not clear, let
15 me know, but I'm really trying to be as clear
16 as I can.
17    A.   I'm listening as carefully as I can,
18 and you are asking very specific questions in a
19 timeline. And I'm trying to answer your
20 questions as specifically as I can, and I
21 apologize if -- if I'm going back. I am -- you
22 are asking very specific questions. Thank you.
23    Q.   During the period that you served as
24 Highland's CFO, from time to time Highland

Page 41

WATERHOUSE - 10-19-21

1 loaned money to certain corporate affiliates;
2 correct?
3      MS. DANDENEAU: Objection to form.
4    A.   What are corporate affiliates?
5    Q.   How about the ones that are in
6 Highland's audited financial statements under
7 the section entitled Loans to Affiliates. Why
8 don't we start with those. Do you have any
9 understanding of what the phrase "affiliates"
10 means?
11      MS. DANDENEAU: Objection to form.
12    A.   I understand what affiliates are,
13 yet affiliates can have different meanings in
14 different contexts, so...
15    Q.   Why don't you -- why don't you tell
16 me what your understanding of the term
17 "affiliate" is in relation to Highland Capital
18 Management, L.P.
19    A.   Is that a -- it depends on the
20 context.
21    Q.   How about the context of making
22 loans?
23      MS. DANDENEAU: Objection to form.
24    A.   I didn't make the determination of

Page 42

WATERHOUSE - 10-19-21

1 WATERHOUSE - 10-19-21
2 who an affiliate was or is at the time those --
3 I didn't -- that wasn't my job to make a
4 determination of who an affiliate is.
5     Q.   All right.  So as the CFO of
6 Highland, do you have any ability right now to
7 tell me which companies that were directly or
8 indirectly owned and/or controlled by
9 Mr. Dondero in whole or in part received loans
10 from Highland Capital Management, L.P.?
11     MS. DANDENEAU:  Objection to form.
12     MS. DEITSCH-PEREZ:  Objection, form.
13     A.   Yes.
14     Q.   Okay.  Identify every entity that
15 you can think of that was directly or
16 indirectly owned and/or controlled by
17 Mr. Dondero in whole or in part that received a
18 loan from Highland Capital Management, L.P.
19     MR. RUKAVINA:  Objection, legal
20     conclusion.
21     A.   NexPoint Advisors, Highland Capital
22 Management Fund Advisors, HCM Services,
23 Dugaboy.  Sorry, I don't think -- Dugaboy
24 doesn't fit that definition.  You said owned
25 and controlled.  I don't think that that

Page 43

1 WATERHOUSE - 10-19-21
2 definition --
3     Q.   I said owned and/or controlled.
4     A.   I don't -- again, I'm not -- I'm not
5 the legal expert.  I don't think it controls --
6 he controls Dugaboy, so again, I'm not the
7 legal person.
8     Q.   I'm not asking you for a legal
9 conclusion, sir.  I'm asking you for your
10 knowledge, okay, as the CFO -- the former CFO
11 of Highland Capital Management, other than
12 NexPoint, HCMFA, and HCMF -- HCMS, can you
13 think of any other entities that were owned
14 and/or controlled directly or indirectly in
15 whole or in part by Jim Dondero who received a
16 loan from Highland Capital Management, L.P.?
17     MS. DANDENEAU:  Objection to form.
18     A.   HCRE.
19     Q.   Any others?
20     A.   That is -- that is all I can think
21 of.
22     Q.   And you're aware that from time to
23 time while you were the CFO, Highland loaned
24 money to Jim Dondero; correct?
25     A.   Yes.

Page 44

1 WATERHOUSE - 10-19-21
2     Q.   Okay.  Can we refer to the four
3 entities that you just named and Mr. Dondero as
4 the affiliates?
5     A.   So that would be Jim Dondero,
6 NexPoint Advisors, Highland Capital Management
7 Fund Advisors, and HCRE.
8     Q.   And HCMS?
9     A.   And HCMS, okay.
10     Q.   And can we refer to the loans that
11 were given to each of those affiliates as the
12 affiliate loans?
13     A.   Yes.
14     Q.   And is it fair to say that each of
15 the affiliates were the borrowers under the
16 affiliate loans as we're defining the term?
17     MR. RUKAVINA:  Objection, legal
18     conclusion.
19     A.   The borrowers are whoever were on
20 the notes.  I don't -- I don't know.  I'm not
21 the legal person.
22     Q.   But you --
23     A.   I don't know.
24     Q.   You do know, as Highland's former
25 CFO, that each of the affiliates that you have

Page 45

1 WATERHOUSE - 10-19-21
2 identified tendered notes to Highland; correct?
3     MR. RUKAVINA:  Hey, John, will you
4     just give me a running objection to legal
5     conclusion to HCM --
6     MR. MORRIS:  No.  No, if you want to
7     object --
8     MR. RUKAVINA:  I will object every
9     time.  Object to legal conclusion.
10     MR. MORRIS:  That is fine.
11     A.   Sorry, can you repeat the question?
12     Q.   Are you aware that each of the --
13 that each of the affiliates, as we have defined
14 the term, gave to Highland a promissory note in
15 exchange for the loans?
16     MR. RUKAVINA:  Objection to the
17     extent that calls for a legal conclusion.
18     A.   I don't.
19     Q.   No, you don't know that?
20     A.   No, they didn't -- you said they
21 exchanged a promissory note for a loan.  I
22 don't -- I don't understand that question, so I
23 said no.
24     Q.   At the time of the bankruptcy
25 filing, did Highland have in its possession

Page 46

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    promissory notes that were signed by each of
3    the affiliates?
4        A.   Yes.
5        Q.   To the best of your knowledge,
6    during the time that you served as Highland's
7    CFO, did Highland disclose to its outside
8    auditors all of the loans that were made to
9    affiliates?
10        MR. RUKAVINA:  Objection, that calls
11   for a legal conclusion.
12        MS. DEITSCH-PEREZ:  I also couldn't
13   hear you, John, because there was some
14   garbling on -- on the -- on the call.
15        MR. MORRIS:  Folks, I've got to tell
16   you this is not going well, and I'm
17   reserving my right --
18        MS. DANDENEAU:  John, it was just
19   the end of that question.  It was just the
20   end of that question.  I couldn't hear it
21   either.  Sorry, if you could repeat it,
22   please.
23        MR. MORRIS:  That is less than an
24   hour into this, but folks are trying to run
25   out the clock, and so I'm just going to

Page 47

1    WATERHOUSE - 10-19-21
2    state that now.
3        MS. DANDENEAU:  You know, and,
4    Mr. Morris, I really object to that.  I
5    mean --
6        MR. MORRIS:  Okay.
7        MS. DANDENEAU:  -- Mr. Waterhouse
8    just told you he's trying to listen to your
9    questions and answer them carefully, and
10   you have no basis for saying that.
11        MR. MORRIS:  Okay.
12        MS. DANDENEAU:  This does not --
13   this is not an experienced witness, so he's
14   trying to do the best he can.
15        Q.   Mr. Waterhouse, during the time that
16   you served as Highland's CFO, did Highland
17   disclose to its outside auditors all of the
18   loans that it made to each of the affiliates
19   that you have identified?
20        MR. RUKAVINA:  Objection, legal
21   conclusion.
22        A.   Yes.
23        Q.   To the best of your knowledge, while
24   you were Highland's CFO, were all of the
25   affiliate loans described in Highland's audited

Page 48

1    WATERHOUSE - 10-19-21
2    financial statements?
3        MR. RUKAVINA:  Objection, legal
4    conclusion.
5        A.   When an audit was performed, any
6    loans that were made by Highland to the
7    affiliates were disclosed to auditors.
8        Q.   Are you aware of any loan that was
9    made to any affiliate that was not disclosed to
10   the auditors?
11        A.   I'm not aware.
12        Q.   To the best of your knowledge, did
13   each of the affiliates who were --
14   (inaudible) -- loaned from Highland execute a
15   promissory note in connection with that loan?
16        MR. RUKAVINA:  Objection, legal
17   conclusion.
18        A.   Sorry, you -- halfway through the
19   question it got muffled.
20        Can you repeat that again?
21        Q.   To the best of your knowledge, did
22   every affiliate execute a promissory note in
23   connection with each loan that it obtained from
24   Highland?
25        MR. RUKAVINA:  Objection, legal

Page 49

1    WATERHOUSE - 10-19-21
2    conclusion.
3        A.   Yes.
4        Q.   You are not aware of any loan that
5    any affiliate ever obtained from Highland where
6    the affiliate did not give a promissory note in
7    return; is that fair?
8        A.   Yes, I'm not aware.
9        Q.   And to the best of your knowledge,
10   did Highland loan to each affiliate an amount
11   of money equal to the principal amount of each
12   promissory note?
13        MR. RUKAVINA:  Objection, legal
14   conclusion.
15        A.   Yes.
16        Q.   During the time that you served as
17   CFO, did Highland ever loan money to
18   Mark Okada?
19        A.   I -- I don't recall.
20        Q.   Did you ever see any promissory
21   notes executed by Mark Okada?
22        A.   I don't recall.
23        Q.   Do you know if Highland ever forgave
24   any loan that it ever made to Mr. Okada?
25        A.   I don't recall.

Page 50

WATERHOUSE - 10-19-21

1    Q.    Do you recall if Mr. Okada paid back
2    all principal and interest due and owing under
3    any loan he obtained from Highland?
4         MS. DEITSCH-PEREZ:  Objection to
5    form.
6         MS. DANDENEAU:  Objection to form.
7    A.    I don't recall.
8    Q.    Do you recall whether -- during your
9    time as CFO, whether Highland ever loaned money
10   to Jim Dondero?
11   A.    Yes.
12   Q.    To the best of your knowledge, did
13   Mr. Dondero sign and deliver to Highland a
14   promissory note in connection with each loan
15   that he obtained from Highland?
16   A.    If you are referring to the
17   promissory notes that, you know, part of
18   Highland's records, yes.
19   Q.    Okay.  You're not aware of any loan
20   that Mr. Dondero took from Highland that wasn't
21   backed up by -- by a promissory note with a
22   face -- with a principal amount equal to the
23   amount of the loan; correct?
24   A.    Am I aware that Jim Dondero took a

Page 51

WATERHOUSE - 10-19-21

1    loan?
2    Q.    Without giving a -- let me ask a
3    better question.  I'm sorry, Mr. Waterhouse.
4         Are you aware of any loan that
5    Mr. Dondero obtained from Highland where he
6    didn't give a promissory note in return?
7    A.    I'm not aware.
8    Q.    During the time that you served as
9    Highland's CFO, did Highland ever forgive any
10   loans, in whole or in part, that it made to
11   Mr. Dondero?
12   A.    Not that I'm aware.
13   Q.    At the time that you served as
14   Highland's CFO, did Highland ever forgive any
15   loan, in whole or in part, that it made to any
16   affiliate as we've defined the term today?
17   A.    Not that I'm aware.
18   Q.    During the time that you served as
19   Highland's CFO, did Highland ever forgive, in
20   whole or in part, any loan that it ever made to
21   any officer or employee?
22   A.    Highland forgave loans to officers
23   and employees.  It may not have been at the
24   time when my title was CFO.

Page 52

WATERHOUSE - 10-19-21

1    Q.    Okay.  And so I appreciate the
2    distinction.
3         Is it fair to say that, to the best
4    of your knowledge, Highland did not forgive a
5    loan that it made to an officer or employee
6    after 2013?
7         MS. DANDENEAU:  Objection to form.
8    A.    I don't recall.
9    Q.    To the best of your knowledge, did
10   Highland disclose to its auditors every
11   instance where it forgave, in whole or in part,
12   a loan that it had made to one of its officers
13   or employees?
14   A.    No.
15   Q.    Can you think of -- can you -- can
16   you identify any loan to an officer or employee
17   that was forgiven by Highland, in whole or in
18   part, that was not disclosed to Highland's
19   outside auditors?
20   A.    Look, I don't recall all of the
21   loans and the loan forgiveness.  I just know as
22   part of the audit process there is a
23   materiality concept.
24         So if there were loans to employees

Page 53

WATERHOUSE - 10-19-21

1    that were of -- you know, that were deemed
2    immaterial, those items may not have been
3    disclosed by the team to the auditors.
4    Q.    I appreciate that.
5         Do you have an understanding as to
6    what the level of materiality was?
7    A.    I don't recall.
8    Q.    As the CFO of Highland, to the best
9    of your knowledge, did Highland disclose to its
10   outside auditors every loan that was forgiven,
11   in whole or in part, that was material as that
12   term was defined by the outside auditors?
13   A.    Yes.
14   Q.    And do you recall where -- do you
15   recall where the definition of materiality can
16   be found for -- for this particular purpose?
17        MS. DANDENEAU:  Objection to form.
18   A.    No.  You -- I don't determine
19   materiality.
20   Q.    Okay.  I'm just asking you if you
21   can help me understand where it is, but I think
22   we will find it in a few minutes.
23        You are aware that Highland has
24   commenced lawsuits against each of the

Page 54

WATERHOUSE - 10-19-21

1
2 affiliates, as we've defined the term, to
3 collect under certain promissory notes; is that
4 right?
5     A.   Yes.
6     Q.   And are you familiar with the notes
7 that are issue -- at issue in the lawsuits?
8         MS. DANDENEAU:  Objection to form.
9     A.   Generally familiar.
10     Q.   Can we refer to the lawsuits that
11 Highland has commenced against the affiliates
12 collectively as the lawsuits?
13     A.   Yes.  And, again, the affiliates are
14 NexPoint, HCMFA, HCMS, and HCRE.
15     Q.   And Mr. Dondero?
16     A.   Okay.  See, that is a new -- and now
17 Mr. Dondero is included in your affiliate
18 definition.
19     Q.   I just --
20     A.   I thought affiliates -- I thought
21 affiliates were just the four prior entities,
22 so I just want to be clear.
23     Q.   I appreciate that.  So let's --
24 let's keep them separate and let's refer to the
25 four corporate entities as the affiliates, and

Page 55

WATERHOUSE - 10-19-21

1
2 Mr. Dondero we will call Mr. Dondero.  Okay?
3     A.   Okay.  Thank you.  As you can see,
4 Mr. Morris, there is a lot of entities -- a lot
5 here.  I just want to be clear.
6     Q.   Okay.  Now, the affiliates of
7 Mr. Dondero signed promissory notes that are
8 not subject to the lawsuit.
9         Do you understand that?
10         MS. DANDENEAU:  Objection to form.
11     A.   The affiliates and Mr. Dondero
12 signed --
13     Q.   You know what?  I will skip it.
14 That is okay.  Okay.
15         From time to time while you were
16 Highland's CFO, payments were applied against
17 principal and interests that were due under the
18 notes that were tendered by the affiliates and
19 Mr. Dondero; correct?
20         MR. RUKAVINA:  Objection to the
21         extent that calls for a legal conclusion.
22     A.   Yes.
23     Q.   Did Highland have a process where --
24 whereby payments would be applied against
25 principal and interest against the notes that

Page 56

WATERHOUSE - 10-19-21

1
2 were given by the affiliates and Mr. Dondero?
3     A.   Yes.
4     Q.   Can you describe the process for me?
5     A.   The process, payment should be
6 applied as laid out in the -- in the promissory
7 note.
8     Q.   From time to time were payments made
9 that were not required under the promissory
10 notes?
11         MS. DANDENEAU:  Objection to form.
12     A.   Yes.
13     Q.   Who was responsible for deciding
14 when and how much the payments would be made
15 with respect to each of the notes that were
16 issued by the affiliates and Mr. Dondero?
17     A.   Who was responsible for deciding how
18 much was paid prior to the due date?
19     Q.   Yes.
20     A.   I don't know.
21     Q.   Did you approve of each payment that
22 was made against principal and interest on the
23 notes that were given by the affiliates and
24 Mr. Dondero?
25         MS. DANDENEAU:  Objection to form.

Page 57

WATERHOUSE - 10-19-21

1
2     A.   Did I approve the payments?  I
3 approve -- I approve -- if there was cash -- if
4 there was cash being repaid on a note payment,
5 yes, I approved in the general sense of being
6 made aware of the payment and the amount.
7     Q.   And are you the person who
8 authorized Highland's employees to effectuate
9 those payments?
10     A.   Yes.
11     Q.   When you gave the instruction to
12 effectuate the payment, did you obtain
13 Mr. Dondero's prior approval?
14     A.   I mean, it -- I mean, it -- it
15 depends.
16     Q.   Can you think of any instance where
17 you directed Highland's employees to make a
18 payment of principal or interest against any
19 note that was tendered by an affiliate or
20 Mr. Dondero that Mr. Dondero did not approve of
21 in advance?
22     A.   I can't recall specifically.
23     Q.   Can you identify -- withdrawn.
24         Did Mr. Dondero ever tell you that a
25 payment that was made against principal and

Page 58

WATERHOUSE - 10-19-21

1 interest due under one of the notes that was
2 tendered by an affiliate or himself should not
3 have been made?
4   A.   Yes.
5   Q.   Can you identify the payment for me?
6   A.   It would be for -- for NexPoint
7 Advisors.
8   Q.   Okay.  And when did Mr. Dondero tell
9 you that a payment that you had initiated on
10 behalf of NexPoint should not have been made?
11   A.   I wasn't initiating payment.  It was
12 in the context of the -- I think you used this
13 term, "the advisors," so NexPoint Advisors and
14 Highland Capital Management Fund Advisors had
15 overpaid on certain agreements with Highland
16 Capital Management, L.P.  And as a part of that
17 process, the advisors -- what I was told at the
18 time were in talks and negotiations and
19 discussions with Highland Capital Management,
20 L.P., on offsets in relation to those
21 overpayments.
22   Q.   When did this conversation take
23 place?
24       MS. DANDENEAU:  Objection to form.

Page 59

WATERHOUSE - 10-19-21

1   A.   I don't recall specifically.
2   Q.   Do you recall what year it was?
3   A.   Yes.
4   Q.   What year did the conversation with
5 Mr. Dondero take place that you just described?
6   A.   2020.
7   Q.   Okay.  Do you remember if it was
8 December 2020?
9   A.   It -- it -- I don't -- I don't
10 recall what month specifically, but it would
11 have been November or December.
12       Q.   And we're talking here about a
13 payment of principal and/or interest that was
14 due -- withdrawn.
15       We're talking here about a payment
16 of principal and interest that was applied
17 against NexPoint's note; correct?
18       MS. DANDENEAU:  Objection to form.
19   A.   I don't recall what that payment
20 consisted of.
21   Q.   Is it possible that the payment you
22 have in mind related to the shared services
23 agreement?
24       MS. DANDENEAU:  Objection to form.

Page 60

WATERHOUSE - 10-19-21

1   A.   No.
2   Q.   Are you certain that the payment --
3 that the payment that you have in mind related
4 to the promissory note that NexPoint issued in
5 favor of Highland?
6       MS. DANDENEAU:  Objection to form.
7   A.   Yes.
8   Q.   Okay.  Other than that one payment,
9 can you identify any other instance where
10 Mr. Dondero told you that a payment should not
11 have been applied against principal and
12 interest under any promissory note tendered by
13 any affiliate or Mr. Dondero?
14       MS. DANDENEAU:  Objection to form.
15       MS. DEITSCH-PEREZ:  Objection to
16 form.
17   A.   Not that I recall.
18   Q.   Thank you very much.
19       Do you know if Mr. Dondero approved
20 in advance of each loan made to each affiliate
21 and himself during the time that you were the
22 CFO?
23       MS. DEITSCH-PEREZ:  Object to the
24 form.

Page 61

WATERHOUSE - 10-19-21

1   A.   Yes, generally.
2   Q.   Can you identify any loan that was
3 ever made to an affiliate or to Mr. Dondero
4 that Mr. Dondero did not approve of in advance?
5   A.   Other than the ones that are in
6 dispute, I'm not aware.
7   Q.   Do you believe that Mr. Dondero did
8 not approve of each of the loans that are in
9 dispute in advance of the time that the loan
10 was made?
11       MS. DANDENEAU:  Objection to form.
12   A.   Given what is in the dispute, you
13 know, and -- and -- and the way things might --
14 yeah, I mean...
15   Q.   I am not asking about the dispute,
16 and it was probably my mistake to follow you
17 there.
18       Were you aware of every loan made by
19 Highland to each of its affiliates and
20 Mr. Dondero while you were the CFO at the time
21 each loan was made?
22   A.   Was I aware of every loan, yes.
23   Q.   Okay.  And if you put yourself back
24 in time, do you recall that any of the loans

Page 62

WATERHOUSE - 10-19-21

1    that were made to one of the affiliates or
2    Mr. Dondero during the time that you were the
3    CFO was made without Mr. Dondero's prior
4    knowledge and approval?
5        A.   Not that I recall.
6        Q.   Thank you.  In fact, do you -- as
7    the CFO, would you have allowed Highland to
8    loan money to an affiliate or to Mr. Dondero
9    without obtaining Mr. Dondero's prior approval?
10       MS. DANDENEAU:  Objection to form.
11       A.   I can't -- there was so many times
12   over the years, I can't speak for every single
13   one, but generally, yes, I -- I spoke to him.
14       Q.   You -- you never -- you never --
15   withdrawn.  I will just take that.
16       Can you recall any payment that was
17   ever made against principal and interest on a
18   note that was issued in favor of Highland by an
19   affiliate or Mr. Dondero that you personally
20   did not know about in advance?
21       A.   There are so many through the years,
22   I don't -- I don't -- I don't recall every
23   single one.
24       Q.   Okay.  Can you identify any payment

Page 63

WATERHOUSE - 10-19-21

1    that was made against principal and interest on
2    any note tendered by any affiliate or
3    Mr. Dondero that you didn't know about in
4    advance?
5        A.   I don't recall.
6        Q.   Other than Mr. Dondero -- withdrawn.
7        Did anybody at Highland have the
8    authority to make a payment against principal
9    and interest due under a loan given to the
10   affiliates and Mr. Dondero without your
11   knowledge and approval?
12       MS. DANDENEAU:  Objection to form.
13       A.   Sorry, there was -- to make a
14   payment on an affiliate loan, what you are
15   saying would it require my knowledge and
16   approval, yes.
17       Q.   Okay.  I appreciate that.  Thank
18   you.
19       Did anybody at Highland have the
20   authority, to the best of your knowledge, to
21   effectuate a loan to an affiliate without
22   Mr. Dondero's prior knowledge and approval?
23       MS. DANDENEAU:  Objection to form.
24       A.   I can't speak for all, but

Page 64

WATERHOUSE - 10-19-21

1    generally, yes.
2        Q.   Did you personally communicate with
3    Mr. Dondero to let him know each time a payment
4    of principal or interest was being made against
5    any note that was tendered by an affiliate or
6    Mr. Dondero to Highland?
7        A.   I don't -- are you saying, did I let
8    Mr. Dondero know if a payment was made on any
9    affiliate or loan to Mr. Dondero?  I mean,
10   not -- not every -- no.
11       Q.   Let me ask it this way:  Did you
12   have a practice of informing Mr. Dondero when
13   payments were made against principal and
14   interest on any note that was tendered by an
15   affiliate or Mr. Dondero?
16       MS. DEITSCH-PEREZ:  Objection to
17   form.
18       MS. DANDENEAU:  Objection to form.
19       A.   No, I did not.
20       Q.   Did Mr. Dondero ever tell you that a
21   payment of principal or interest had been made
22   against a note that was tendered by an
23   affiliate or himself that he had been unaware
24   of?

Page 65

WATERHOUSE - 10-19-21

1        A.   Not that I recall.
2        Q.   Are you aware that Mr. Dondero and
3    the affiliates -- withdrawn.
4        Are you aware that Mr. Dondero
5    NexPoint, HCRE, and HCMS all contend that they
6    do not have to pay on any of the notes they
7    issued because they are subject to an oral
8    agreement between Mr. Dondero and Nancy
9    Dondero, in her capacity as the trustee of the
10   Dugaboy Investment Trust?
11       MS. DANDENEAU:  Objection to form.
12       A.   I didn't -- I didn't -- I didn't
13   know that it was all notes.
14       Q.   Okay.  Are you -- did you ever learn
15   that there was an oral agreement between Jim
16   Dondero and Nancy Dondero pertaining to any
17   notes issued by any affiliate or Mr. Dondero?
18       MS. DEITSCH-PEREZ:  Object to the
19   form.
20       A.   Yes.
21       Q.   Do you have any understanding as to
22   the terms of that agreement?
23       A.   Yes.
24       Q.   What is your understanding of the

Page 66

WATERHOUSE - 10-19-21

1  terms of the agreement?
2      A.   That there were certain milestones
3  that had to be reached.
4      Q.   Do you have any understanding of the
5  terms of the agreement between Mr. Dondero and
6  Nancy Dondero concerning any of the notes
7  issued by the affiliates or Mr. Dondero other
8  than that there have to be milestones reached?
9         MS. DEITSCH-PEREZ:  Object to the
10     form.
11     A.   There are milestones, I found out
12  yesterday, or there was some --
13        MS. DANDENEAU:  Okay.  I'm just
14     going to object to the extent that you
15     learned anything in conversations with
16     counsel, please don't reveal -- that is
17     privileged, and don't reveal any privileged
18     communications.
19        THE WITNESS:  Okay.
20     A.   So I'm not aware of anything else.
21     Q.   Do you know what the milestones
22  were?
23        MS. DANDENEAU:  Objection to form.
24     A.   I don't.

Page 67

WATERHOUSE - 10-19-21

1      Q.   Do you know anything about -- do you
2  know what promissory notes the agreement
3  covered?
4      A.   I don't.
5      Q.   Do you know if -- if Jim and Nancy
6  Dondero entered into one agreement or more than
7  one agreement?
8         MS. DEITSCH-PEREZ:  Object to the
9      form.
10     A.   I don't know.
11     Q.   Do you know if the agreement is in
12  writing?
13     A.   I don't know.
14     Q.   How did you learn the existence
15  of the agreement?
16        MS. DANDENEAU:  Objection form.
17     Again --
18     A.   I don't -- I don't recall who told
19  me.
20     Q.   You have no recollection of who told
21  you about this agreement between Jim and Nancy
22  Dondero?
23        MS. DEITSCH-PEREZ:  Object to the
24     form.

Page 68

WATERHOUSE - 10-19-21

1      A.   I don't recall.
2      Q.   Do you recall how you learned of the
3  agreement?
4         Was it in a meeting?  Was it in a
5  phone call?  Was it in an email?
6      A.   I don't recall.
7      Q.   Do you recall when you learned of
8  the agreement?
9      A.   Not specifically.
10     Q.   Do you recall what year you learned
11  of the agreement?
12     A.   In -- look, I mean, there are so
13  many notes.  I may be getting -- I believe it
14  was 2020.
15     Q.   All right.  I'm not asking about
16  notes, sir.  I'm asking about the agreement
17  that you testified you knew about between Jim
18  and Don- -- Nancy Dondero.  Okay.
19        Do you understand my question now?
20  Should I ask my question again?
21     A.   Yeah, sure.  Go ahead.
22     Q.   I'm going to use the word
23  "agreement" to refer to the agreement that
24  Mr. Dondero and Nancy Dondero entered into

Page 69

WATERHOUSE - 10-19-21

1  where you understood that certain milestones
2  had to be reached.  Okay?
3      A.   Uh-huh.
4         MS. DANDENEAU:  Objection.
5         MS. DEITSCH-PEREZ:  Object to the
6      form.
7         MR. MORRIS:  Just defining a term,
8      what is the objection.
9         MS. DEITSCH-PEREZ:  The objection --
10        MR. MORRIS:  I will move on.  I will
11     move on.
12        MS. DEITSCH-PEREZ:  John --
13     Q.   Sir, are you okay with that
14  definition of agreement?
15     A.   Okay.
16     Q.   Okay.  So you don't recall who --
17  who informed you of the existence of the
18  agreement; is that right?
19     A.   I don't recall.
20     Q.   You don't recall who told you the
21  terms of the agreement.
22        Do I have that right?
23     A.   Correct.
24     Q.   And you don't recall if you learned

Page 70

WATERHOUSE - 10-19-21

1 about the agreement in a meeting, through an
2 email, or through a phone call.
3 Do I have that right?
4 A. I don't recall.
5 Q. Can you tell me when you learned of
6 the agreement?
7 A. I don't -- I don't -- I don't
8 remember specifically.
9 Q. Can you tell me if you learned of
10 the agreement before or after the petition
11 date?
12 A. It would have been -- it would have
13 been after.
14 Q. Can you tell me if you learned of
15 the agreement before or after January 9th,
16 2020?
17 A. It would have been after.
18 Q. Can you tell me if you learned of
19 the agreement before or after you left Highland
20 Capital Management in February of 2021?
21 A. I don't -- I don't -- I don't know.
22 Q. It is possible that you learned of
23 it while you were a Highland employee.
24 Do I have that right?
25

Page 71

WATERHOUSE - 10-19-21

1 A. I don't remember the -- I mean, it
2 was sometime in 2021. I don't remember when.
3 Q. All right. So to the best of your
4 recollection, it was in 2021 but you don't
5 recall if it was before or after you ceased to
6 be a Highland employee.
7 Do I have that right?
8 A. Yeah, I mean, it was -- it was
9 likely after I was -- after I left Highland
10 because, if I put myself back into the last
11 days of -- of 2021, it was -- you know, the
12 communications with Mr. Dondero were -- were --
13 were -- there weren't as many communications
14 because of the circumstances.
15 Q. And so based on that you believe
16 that it is most likely that you learned of this
17 agreement sometime after you left Highland
18 employment?
19 A. I wouldn't use the term "most
20 likely." I don't recall specifically. I don't
21 recall.
22 Q. Do you recall ever telling Jim Seery
23 about this agreement?
24 A. No, I don't -- I didn't tell

Page 72

WATERHOUSE - 10-19-21

1 Jim Seery.
2 Q. Did you tell anybody at DSI about
3 this agreement?
4 A. No.
5 Q. Did you tell any of Highland's
6 independent directors about this agreement?
7 A. No.
8 Q. Did you tell anybody at Pachulski
9 Stang Ziehl & Jones about this agreement?
10 A. No.
11 Q. Did you tell any employee of
12 Highland about this agreement?
13 A. No.
14 MS. DANDENEAU: Mr. Morris, it has
15 been an hour and a half. Is this a good
16 time for a break?
17 MR. MORRIS: Sure.
18 Q. Mr. Waterhouse, I will just remind
19 you that during the break please don't speak
20 with anybody about the deposition, the
21 substance of your testimony or anything else
22 concerning the deposition. Okay?
23 A. Yes.
24 MR. MORRIS: So it is 11:02. We're

Page 73

WATERHOUSE - 10-19-21

1 at 11:02 your time. Let's come back, I
2 guess, at 15 -- at 11:15 your time.
3 VIDEOGRAPHER: We're going off the
4 record at 11:02 a.m.
5 (Recess taken 11:02 a.m. to 11:20 a.m.)
6 VIDEOGRAPHER: We are back on the
7 record at 11:20 a.m.
8 Q. Mr. Waterhouse, did you speak with
9 anybody during the break about this deposition?
10 A. No.
11 MS. DANDENEAU: Other than -- other
12 than his counsel.
13 Q. Did you speak to your counsel about
14 the substance of your deposition today?
15 A. No, I didn't bring it up.
16 Q. I didn't ask you if you brought it
17 up. I asked you if you had any conversation
18 with your lawyer about the substance of your
19 deposition.
20 MS. DANDENEAU: Yes, he did.
21 Q. Can you tell me what the -- you
22 discussed?
23 MS. DANDENEAU: No, I object to
24 that. He's not going to answer. That is a

Page 74

WATERHOUSE - 10-19-21

1 privileged conversation.

2 MR. MORRIS: So I just want to make

3 sure that I understand. During the break

4 you spoke with your client about the

5 substance of this deposition; is that

6 right?

7 MS. DANDENEAU: Yes, John.

8 MR. MORRIS: And you refuse -- you

9 refuse to let your client tell me what was

10 discussed; is that right?

11 MS. DANDENEAU: That's correct.

12 MR. MORRIS: You know, I had given

13 the instruction prior to the break not to

14 speak with counsel. I would have

15 appreciated --

16 MS. DANDENEAU: No, you didn't --

17 actually, that is not true, Mr. Morris.

18 You said not to speak with anyone. We

19 never have interpreted that to mean

20 conversations with counsel. That's never

21 been -- I have never, ever heard that

22 instruction.

23 MR. MORRIS: Okay. We will -- we

24 will -- we will deal with it when and if we

Page 75

WATERHOUSE - 10-19-21

1 have to.

2 Q. Mr. Waterhouse, after learning about

3 the agreement, did you ask anybody if the

4 agreement was reflected in a writing?

5 MS. DANDENEAU: Objection to form.

6 A. No.

7 Q. Did you ask anybody if the terms of

8 the agreement were memorialized anywhere?

9 MS. DANDENEAU: Objection to form.

10 MR. MORRIS: What is the --

11 A. No.

12 MS. DANDENEAU: Well, because you

13 keep talking about this agreement and I --

14 I -- I think, Mr. Morris, that is really

15 not clear what you mean by "the agreement."

16 And maybe you can just go back and restate

17 what that is.

18 MR. MORRIS: Okay. Your client has

19 agreed with me twice on the definition, but

20 I will try one more time.

21 Q. Mr. Waterhouse, do you understand

22 that when I use the term "agreement," I'm

23 referring to the agreement between Jim and

24 Nancy Dondero concerning certain promissory

Page 76

WATERHOUSE - 10-19-21

1 notes where you learned that one of the terms

2 of the agreement was milestones reached?

3 A. Okay.

4 Q. And did you understand that that was

5 the -- the agreement that we were referring to

6 every time we used the word "agreement" in this

7 deposition?

8 A. I don't know anything about this

9 agreement. So, look, I do -- it -- I don't

10 know whether --

11 Q. Let's -- let's try this again.

12 A. Yeah. Look, I don't know what this

13 agreement relates.

14 MS. DEITSCH-PEREZ: John, John --

15 Q. Let me try --

16 MS. DEITSCH-PEREZ: John, please let

17 the witness finish.

18 MR. MORRIS: Please stop. Please

19 stop. Please stop talking.

20 MS. DEITSCH-PEREZ: No, you stop.

21 Let the witness --

22 MR. MORRIS: Stop talking.

23 MS. DEITSCH-PEREZ: -- finish -- you

24 interrupted him.

Page 77

WATERHOUSE - 10-19-21

1 MR. MORRIS: You know what, you

2 guys, this is really wrong. It is really,

3 really wrong. Okay?

4 I had the witness agree not once,

5 but twice to the definition of agreement.

6 Okay? I'm going to try and do it a third

7 time.

8 MS. DANDENEAU: No, but, please,

9 John, really --

10 MR. MORRIS: No, please stop

11 talking. Please. It is my deposition.

12 Object to questions.

13 MS. DANDENEAU: No, but also you

14 instructed him that -- that if you were

15 going -- if you were interrupting him, that

16 he should remind you that you're

17 interrupting him -- and --

18 MR. MORRIS: Let him do that. Let

19 him do that.

20 MS. DANDENEAU: Okay. Well, you --

21 MR. MORRIS: Please stop talking.

22 A. Okay. I don't know any of the

23 details of these agreements. I don't know

24 anything about them. I heard -- someone -- I

Page 78

WATERHOUSE - 10-19-21

1
2 don't know who, I don't know when, as you
3 asked, sometime in '21, someone told me about
4 this -- or I don't honestly know -- I don't
5 even recall exactly how I was made aware of
6 this, but I was. I don't know -- I don't know
7 any of these details, and I'm getting -- again,
8 there is, you know, I -- I -- I had a passing
9 conversation with -- with Jim at some point
10 on -- on some -- on the executive comp, and I'm
11 getting confused of what is what, because
12 again, I don't know any of these details.
13      Q.   Okay. Let me try again,
14 Mr. Waterhouse, and I apologize.
15          Are you aware of any agreement
16 between Jim Dondero and Nancy Dondero
17 concerning any promissory note that was given
18 to Highland by any affiliate or Mr. Dondero?
19          MS. DEITSCH-PEREZ: Object to the
20      form.
21      A.   I've heard of an agreement. That
22 is -- that is -- I mean, if you are using aware
23 as heard, sure.
24      Q.   And you understand that one of the
25 terms of the agreement is that it was based on

Page 79

WATERHOUSE - 10-19-21

1
2 milestones that had to be reached; is that
3 right?
4          MS. DANDENEAU: Objection to form.
5      A.   That was one of the words that was
6 used when I heard about it, yes.
7      Q.   And when you heard about this
8 agreement that had a term in it concerning
9 milestones reached, did you ask the person who
10 was telling you about the agreement whether or
11 not it was in writing?
12      A.   I did not.
13      Q.   Did you ask any questions at all?
14          MS. DANDENEAU: Objection to form.
15      A.   Not that I recall.
16      Q.   But do you understand that going
17 forward, we're going to refer to the agreement
18 as the agreement that you just described that
19 you were --
20          MS. DANDENEAU: Object to the form.
21      A.   Yes.
22      Q.   Okay. You don't have any personal
23 knowledge concerning the terms of the
24 agreement; correct?
25          MS. DEITSCH-PEREZ: Object to the

Page 80

WATERHOUSE - 10-19-21

1
2 form.
3      Q.   You can answer.
4      A.   I don't -- I heard about the
5 agreement. I don't know anything -- I heard
6 there was an agreement. That is -- again, as I
7 testified before -- I said before, heard about
8 it, don't know the details. I believe it was
9 sometime this year.
10      Q.   Do you have any personal knowledge
11 about the terms of the agreement, sir?
12          MS. DANDENEAU: Objection to form.
13      A.   Other than what I have previously
14 discussed, I don't -- I don't know.
15      Q.   Did -- did Mr. Dondero tell you
16 about the existence of the agreement?
17      A.   I don't recall.
18      Q.   Do you recall the source of your
19 information when you learned about the
20 agreement?
21      A.   No, I don't -- I don't recall. I
22 don't remember. I just -- I heard about it
23 generally. I don't remember -- I don't
24 remember who, how, if, how. I don't remember.
25      Q.   You know, Mr. Waterhouse, I just

Page 81

WATERHOUSE - 10-19-21

1
2 want to be clear that I never would have asked
3 you to appear at this deposition if your name
4 hadn't been included in responses to discovery
5 as to somebody with knowledge about the -- who
6 was told about the existence of the agreement.
7          That is what prompted me do this,
8 and I really do feel compelled to tell you that
9 I otherwise would never have called you as a
10 witness. So I regret that you're being put
11 through this today. I had no intention of
12 burdening you or taking your time, but that is
13 the reason that we issued the subpoena is
14 because certain of the defendants identified
15 you as somebody --
16          MS. DEITSCH-PEREZ: Mr. Morris, you
17 are here to ask questions, not to have --
18          MR. MORRIS: I feel badly for the
19 guy. I really do.
20          MS. DEITSCH-PEREZ: I'm sure you do.
21          MR. MORRIS: I do. Stop.
22          MS. DEITSCH-PEREZ: You stop.
23          MR. MORRIS: I'm allowed.
24          MS. DEITSCH-PEREZ: No, you're not
25 allowed to have a chat with the witness.

Page 82

WATERHOUSE - 10-19-21

1
2 Q. Okay. Well, I hope that you
3 appreciate what I'm saying here,
4 Mr. Waterhouse.
5 MS. DANDENEAU: All right. Let's go
6 ahead and ask questions, and again, you're
7 entitled to probe his -- his knowledge
8 of -- whatever knowledge he has about
9 this -- this agreement and --
10 MR. MORRIS: That is what I'm doing.
11 MS. DANDENEAU: -- he will answer
12 the questions to the best that he can.
13 MR. MORRIS: That is what I'm doing.
14 Q. Mr. Waterhouse, I take it you do not
15 know which promissory notes issued by which
16 affiliates or Mr. Dondero are the subject of
17 this agreement; do I have that right?
18 A. Yes, I don't -- I don't know.
19 Q. Do you know of any way to determine
20 which promissory notes issued by the affiliates
21 and Mr. Dondero are the subject of this
22 agreement other than asking Jim or Nancy
23 Dondero?
24 MS. DANDENEAU: Objection to form.
25 A. I don't know.

Page 83

WATERHOUSE - 10-19-21

1
2 Q. Did you ever make --
3 A. I don't know anything about these
4 agreements.
5 Q. Did you ever make any effort to
6 determine which promissory notes are subject to
7 this agreement?
8 A. No.
9 Q. Did you ever ask anybody which
10 promissory notes are subject to this agreement?
11 A. No.
12 Q. Do you know if there is a list
13 anywhere of the promissory notes that are
14 subject to this agreement?
15 A. I'm not aware.
16 Q. Have you ever seen the terms of the
17 agreement written down anywhere?
18 A. No.
19 Q. Have you ever asked anybody whether
20 the terms of the agreement were written down
21 anywhere?
22 A. I have not.
23 Q. Did learning about the agreement
24 cause you to do anything in response?
25 MS. DANDENEAU: Objection to form.

Page 84

WATERHOUSE - 10-19-21

1
2 A. No.
3 Q. Did anybody ever describe to you the
4 nature of the milestones that you referred to
5 earlier?
6 A. No, I don't -- I don't have any
7 details of this.
8 Q. That is fine.
9 PricewaterhouseCoopers served as
10 Highland's outside auditors prior to the
11 petition date; correct?
12 A. Yes.
13 Q. You refer to PricewaterhouseCoopers
14 as PwC?
15 A. Yes.
16 Q. PricewaterhouseCoopers audited
17 Highland's financial statements on an annual
18 basis; correct?
19 A. During my -- during my time as -- as
20 CFO, yes, PricewaterhouseCoopers was the
21 auditor.
22 Q. Do you know why Highland had its
23 annual financial statements audited each year?
24 A. Generally.
25 Q. Tell me your general understanding

Page 85

WATERHOUSE - 10-19-21

1
2 as to the reason why Highland had its annual
3 financial statements audited each year.
4 A. From -- from time to time, they were
5 used -- or asked for, as part of diligence or
6 transactions or -- or things of that nature.
7 Q. And were they given to third parties
8 for purposes of diligence or transactions from
9 time to time?
10 A. As far as I'm aware, yes.
11 Q. And was it your understanding as the
12 CFO that the third parties who received the
13 financial statements in diligence or
14 transactions was going to rely on those?
15 MS. DANDENEAU: Objection to form.
16 A. I don't know -- I don't know gen --
17 I don't know specifically what they were going
18 to rely on. You know, we would get requests
19 for audited financial statements. I don't know
20 what they were relying on.
21 Q. And --
22 A. You would have to ask them.
23 Q. Did you personally play a role in
24 PwC's annual audit and the conduct of the
25 audit?

Page 86

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          MS. DANDENEAU:  Objection to form.
3      A.   During my tenure as CFO, I played a
4   very minimal role.
5      Q.   What was the minimal role that you
6   played?
7      A.   You know, again, it was -- it was to
8   check in with the team, to make sure that, you
9   know, audit -- the deadlines were being hit,
10  information was being presented to the auditors
11  in a -- in a timely fashion, but, you know,
12  other than that, it was a very capable team
13  that are still current employees of Highland
14  and, you know, they -- they conducted 99
15  percent of -- look, I don't want to give
16  percentages.  I mean, this is -- but I -- I
17  played a minimal role towards the end.
18         Before during my earlier years as
19  CFO, I did more, and then as time went on, I
20  did less in it.
21     Q.   Okay.  Was there a person at
22  Highland who was responsible for overseeing
23  Highland's participation in PwC's audit during
24  the time that you were the CFO?
25     A.   Yeah.  I mean, there was -- there

Page 87

WATERHOUSE - 10-19-21

1   was a -- there was a point -- it varies.  It
2   varies by year, in function, in time and, you
3   know, depending on the request, but yes, I
4   mean, there is -- there is -- there is
5   generally a point person of communication.
6      Q.   And who was the point person from
7   2016 until the time you left Highland?
8      A.   I don't -- I don't know
9   specifically, but it would have been, you
10  know -- you know, someone on the corporate
11  accounting team.
12     Q.   And was there a head of the
13  corporate accounting team?
14     A.   Yes, so -- yes.
15     Q.   Who was the head of corporate
16  accounting for the five years prior to the time
17  you left Highland?
18     A.   I don't -- if you're asking from
19  2016 on, I don't -- it was Dave Klos, but,
20  again, there was -- there was changes to the
21  team and the reporting structure.  I don't
22  remember exactly when that happened during --
23  you know, over the last -- since 2016.
24     Q.   Did the folks who participated and

Page 88

WATERHOUSE - 10-19-21

1   ran the audit all report to you, directly or
2   indirectly?
3      A.   Yes.
4      Q.   And did you have any responsibility
5   for making sure that the audit report was
6   accurate before it was finalized?
7      A.   Yeah.  I mean, you know, that --
8   that is -- my responsibility to the auditors
9   was -- again, is -- and the CFO is to -- we are
10  providing accurate financial statements; right?
11         And -- and -- and as part of any
12  audit, we disclose all relevant information as
13  part of any audit.
14     Q.   Okay.  And as the CFO, did you take
15  steps to make sure that the audit report was
16  accurate?
17     A.   I mean, I would say in a general
18  sense, yes.  But, again, I mean, I had a
19  very -- I had a very capable and competent
20  team.  I wasn't managing them.
21         You know, part of what I do is I let
22  the team -- I want managers to grow.  I want
23  managers to have rope.  And that is -- you
24  know, I'm not a stand-behind-you type of guy.

Page 89

WATERHOUSE - 10-19-21

1   If you -- if you talk to my team members, I'm
2   not micromanaging people.  I want people to
3   learn and grow in their function so they can go
4   on and do bigger and better things with their
5   careers.
6          And so, yes, generally I was
7   responsible for it, but I wanted the team to
8   learn and grow and be responsible for the bulk
9   of the audit.
10     Q.   Did you personally review each audit
11  report before it was finalized to satisfy
12  yourself that it was accurate?
13     A.   I don't -- I don't recall, you know,
14  for every single -- we're talking 2016, there
15  would have been three years, 2016 to '17, '18.
16  I don't -- we're -- we're going back
17  five years-plus.  I don't -- you know, I don't
18  recall.
19     Q.   Did you have a practice that you
20  employed to make sure that you were satisfied
21  that Highland's audit reports were true and
22  accurate to the best of your knowledge?
23     A.   I mean, our -- the practice was set
24  up with our -- the -- the practice to put

Page 90

WATERHOUSE - 10-19-21

1 together accurate audited or accurate financial
2 statements is to your control environment.
3 So, you know, the -- so the practice
4 was to maintain a stable control environment
5 which then the output is -- is accurate
6 financial statements.
7 So -- so, you know, if I was
8 comfortable that the control environment was
9 operating, then, you know, that would dictate
10 how I would -- you know, what I might or might
11 not do in a given year.
12 Q. Okay. Do you recall ever being
13 uncomfortable with the control environment
14 during the period that you served as CFO?
15 A. Yeah. I mean, look, yes, there are
16 times -- you know, nothing is perfect. So
17 there were -- there were times when, yes, you
18 know -- there are times I learned I was
19 uncomfortable with the control environment, and
20 that is part of the management of the process
21 and having, you know -- and -- and working
22 through whatever obstacles present themselves.
23 Q. Okay. Were you ever uncomfortable
24 with the control process as it related to

Page 91

WATERHOUSE - 10-19-21

1 reporting and disclosures of loans to
2 affiliates and Mr. Dondero?
3 MS. DANDENEAU: Objection to form.
4 A. I don't -- I don't recall --
5 Q. So you don't recall --
6 A. -- the --
7 MS. DANDENEAU: Mr. Morris --
8 A. I don't recall being uncomfortable.
9 But, again, we're going back several years. I
10 don't -- you know, the practice in an audit is
11 to disclose all information to the auditors.
12 And I don't -- I don't recall.
13 Q. As part of the process of the audit,
14 did you sign what is sometimes referred to as a
15 management representation letter?
16 A. Yes.
17 MR. MORRIS: Can we put up on the
18 screen a document that we have premarked as
19 Exhibit 33.
20 (Exhibit 33 marked.)
21 MS. DANDENEAU: Mr. Morris, that is
22 not in the binder; correct?
23 MR. MORRIS: Correct.
24 Q. So you will see, Mr. Waterhouse,

Page 92

WATERHOUSE - 10-19-21

1 this is a letter dated June 3rd. And if we
2 could go to the signature page.
3 And do you see that you and
4 Mr. Dondero signed this document?
5 A. Yes.
6 Q. That is your signature; right?
7 A. Yes.
8 MR. MORRIS: Okay. Can you go back
9 to the top.
10 MS. DANDENEAU: Mr. Morris, can you
11 have somebody post this in the chat so that
12 we have can have a copy of this, please.
13 MR. MORRIS: Yeah, sure. Asia, can
14 you do that, please.
15 Q. Okay. Do you see at the bottom of
16 the second paragraph there is a reference to
17 materiality?
18 A. Yes.
19 Q. Okay. It says, Materiality used for
20 purposes of these representations is
21 $1.7 million.
22 Do you see that?
23 A. I do.
24 Q. And did PwC set that level of

Page 93

WATERHOUSE - 10-19-21

1 materiality?
2 A. Yes.
3 Q. And for purposes of the audit, did
4 PwC set the level of materiality each year?
5 A. Yes.
6 Q. Did that number change over time?
7 A. I'm not aware of what materiality is
8 every single year, so -- but, you know, this
9 number would likely fluctuate.
10 Q. Okay. I'm going to go back to a
11 question I asked you earlier today. And that
12 is in connection -- this letter is issued in
13 connection with the audit for the period ending
14 12/31/2018; correct?
15 A. Yes.
16 Q. Okay. And is it fair to say that if
17 any -- actually, withdrawn. I'm going to take
18 it outside of this.
19 If Highland ever forgave the loan to
20 any affiliate or any of its officers or
21 employees, in whole or in part, to the best of
22 your knowledge, would that forgiveness have
23 been disclosed in the audited financial
24 statements if it exceeded the level of

Page 94

WATERHOUSE - 10-19-21

1    materiality that PwC established?
2        MS. DANDENEAU: Objection to form.
3        A.   So, again, during my tenure as CFO,
4    and -- Highland -- it was -- it is required to
5    disclose any affiliate loans that are in excess
6    of materiality.
7        Now, the forgiveness of those loans
8    may or may not -- I mean, since materiality
9    fluctuates every year, a -- you know, if a loan
10   was forgiven, it may or may not, you know --
11   and, look, I would want to consult the guidance
12   around this.
13       It is not something we do -- you
14   know, it is not -- you know, GAAP can be and
15   disclosures can be very specialized so, again,
16   we want to consult the guidance. But we would
17   see if and what would need to be disclosed if
18   it were deemed immaterial.
19       Q.   Did you and Mr. Dondero sign
20   management representation letters of this type
21   in each year in which you served as Highland's
22   CFO?
23       A.   I -- I -- I will speak for myself.
24   I signed them. There may have been others that
25

Page 95

WATERHOUSE - 10-19-21

1    signed as well. I don't -- I don't recall.
2        Q.   But to the best of your knowledge,
3    you, personally, signed a management
4    representation letter in connection with
5    Highland's audit each year that you served as
6    the CFO; correct?
7        A.   I would say generally speaking,
8    Mr. Morris. I don't recall for every single
9    year, you know, generally, but I would want to
10   refer to all the rep letters and see who signed
11   them.
12       Q.   Do you recall Highland having its
13   financial statements audited in any year during
14   the period that you were a CFO where you didn't
15   sign the management representation letter?
16       A.   I don't recall. But, John, we're
17   going back five, six, seven, eight, nine,
18   decade. I don't -- I don't remember.
19       Q.   I don't want to go back that many
20   decades, but I'm just asking you if you recall
21   that there was you didn't sign it?
22       A.   I -- I -- I don't, but my memory
23   is -- again, I -- I -- I can't tell you what I
24   did in 2012. I mean, I think generally, yes,
25

Page 96

WATERHOUSE - 10-19-21

1    but I don't -- I don't know for sure, and I
2    would want to rely on the document.
3        Q.   Let me ask the question a little bit
4    differently then.
5        Do you have any reason to believe
6    that Highland had its annual financial audit
7    and you did not sign a management
8    representation letter in connection with that
9    audit?
10       MS. DANDENEAU: Objection to form.
11       A.   I don't believe it would, but,
12   again, I would want to -- I don't recall and I
13   would want to confirm it to -- to make, you
14   know, an affirmative -- to give an affirmative
15   answer.
16       Q.   Do you know whether PwC required
17   management to sign management representation
18   letters?
19       MS. DANDENEAU: Objection to form.
20       A.   Yes. I mean, it -- management
21   representation letters are signed by
22   management.
23       Q.   Okay. And do you know -- do you
24   have any understanding as to why PwC requires
25

Page 97

WATERHOUSE - 10-19-21

1    management to sign management representation
2    letters?
3        MS. DEITSCH-PEREZ: Object to the
4    form.
5        A.   I don't know why PwC's -- what PwC's
6    specific practice is. I know generally what
7    management representation letters are.
8        Q.   Okay. Do you personally -- I'm not
9    asking about PwC. I'm asking for you -- I'm
10   asking about you, do you have an understanding
11   as to why the auditor asks for management
12   representation letters?
13       A.   Okay. So you're asking me in my
14   personal capacity, yes, I have a general
15   understanding of why.
16       Q.   Can you give me the general
17   understanding that you have as to why
18   management representation letters are required?
19       A.   They are -- they are required to --
20   they are -- they are one of the items required
21   in an audit to help verify completeness.
22       Q.   Do you have any -- any other
23   understanding as to why management
24   representation letters are required?
25

Page 98

WATERHOUSE - 10-19-21

1
2 A. That is – that is – other than
3 what I said, it is – it is – it is required
4 so – to ensure that the – you know, there
5 is – there is completeness in what is being
6 audited.
7 Q. Did you – did you have a practice
8 whereby you and Mr. Dondero conferred about the
9 management representation letters before you
10 signed them?
11 A. No.
12 Q. Did you have a practice –
13 withdrawn.
14 Do you see just the next sentence
15 after the materiality, there is a sentence that
16 states: We confirm, to the best of our
17 knowledge and belief, as of June 3rd, 2019, the
18 date of your report, the following
19 representations made to you during your audit.
20 Do you see that sentence?
21 A. Yes.
22 Q. Okay. Did you understand when you
23 signed this letter that you were confirming the
24 representations that followed?
25 A. When I signed this management

Page 99

WATERHOUSE - 10-19-21

1
2 letter – representation letter, yes.
3 Q. Okay. Did you discuss this letter
4 with Mr. Dondero before you signed it?
5 A. I don't recall.
6 Q. Do you recall if Mr. Dondero asked
7 you any questions before he signed the letter?
8 A. I don't recall.
9 Q. Do you recall if you asked
10 Mr. Dondero any questions before you signed
11 this letter?
12 A. I don't recall.
13 Q. Is it fair to say that Mr. Dondero
14 did not disclose to you the existence of the
15 agreement that we have – as we've defined that
16 term prior to the time you signed this letter?
17 MS. DANDENEAU: Objection to form.
18 A. I don't think I understand the
19 question. So, again, you are saying, did
20 Mr. Dondero not disclose to me the existence of
21 this letter?
22 Q. No, I apologize.
23 Did Mr. Dondero disclose to you the
24 existence of the agreement prior to the time
25 you signed this letter on June 3rd, 2019?

Page 100

WATERHOUSE - 10-19-21

1
2 A. The agreement – the agreement that
3 we talked about earlier?
4 Q. Correct.
5 A. Look, as I said earlier, the first
6 time I heard of this agreement was sometime
7 this year.
8 Q. Okay. Can we turn – let's just
9 look at a couple of items on the list. If we
10 can go to page 33416. Do you see in Number 35
11 it talks about the proper recording or
12 disclosure in the financial statements of ND
13 relationships and transactions with related
14 parties.
15 Do you see that?
16 A. I do.
17 Q. As the CFO, do you have any
18 understanding as to whether Dugaboy is a
19 related party?
20 A. I don't recall.
21 Q. Do you know whether any of the
22 affiliates are related parties?
23 A. If – if it was NexPoint, HCMFA,
24 HCMS, HCRE, yeah, if – if that is the
25 affiliate definition, and there. In ASC 850 –

Page 101

WATERHOUSE - 10-19-21

1
2 again, I mean, I haven't looked at ASC 850 in
3 quite some time, but, you know, if – if there
4 is a control language, you know, ASC 850, would
5 that – that section in GAAP would – would
6 pick up and define what are related parties.
7 So, you know, like I said, if – one
8 of the four entities I just described, if – if
9 they are in that control definition of ASC 850,
10 they would be picked up in 35D.
11 Q. Do you – do you have any reason to
12 believe that they would be picked up in that
13 definition, based on your knowledge and
14 experience?
15 A. I – I believe that entities
16 controlled under GAAP are – are affiliates.
17 Q. Okay. Would Mr. Dondero also
18 qualify as a related party for purposes of
19 Section 35D, to the best of your knowledge?
20 A. Yeah, I don't – I don't know. I
21 would think – I would have to read the code
22 section to see if someone personally – is it
23 talking about related parties. So, look, if
24 your own in control, yeah, I mean, I would have
25 to read the section.

Page 102

WATERHOUSE - 10-19-21

1
2    Q.   To the best of your knowledge, was
3    the existence of the agreement ever disclosed
4    to PwC?
5    A.   I'm not -- I'm not aware.
6    Q.   Do you recall if the agreement was
7    ever disclosed in Highland's audited financial
8    statements?
9    A.   I don't -- I don't remember if it
10   was in every Highland's audited financial
11   statements during my tenure.  We would have to
12   read the financial statements to see what was
13   disclosed, but I'm not -- I mean, as I sit here
14   today, I'm not aware.
15   Q.   That is all I'm asking for.
16   A.   I'm not aware.
17   Q.   Can we go to the next page, please,
18   and look at 36.  36 says, we have disclosed to
19   you the identity of the partnership's related
20   party relationships and all the related party
21   relationships and transactions of which we are
22   aware.
23        Do you see that?
24   A.   Yes.
25   Q.   To the best of your knowledge, as of

Page 103

WATERHOUSE - 10-19-21

1
2    June 3rd, 2019, did Highland disclose to PwC
3    the identity of the partnership's related
4    parties and all the related party relationships
5    and transactions of which it was aware?
6    A.   I mean, I can speak for myself as
7    signer of this representation letter.  I
8    disclosed what -- what, you know, what --
9    what -- what I knew.  Sorry, look, yes, so I --
10   I disclosed what I knew.
11   Q.   Okay.  Can we go to page 419.  Do
12   you see at the end there is a reference to
13   events that occurred since the end of the
14   fiscal year and the date of the letter?
15   A.   Yes.
16   Q.   And were you aware of that -- of
17   that provision of the management representation
18   letter before you signed the document?
19   A.   Yes.
20   Q.   Do you have an understanding as to
21   why PwC asked for that confirmation of that
22   particular part of the management
23   representation letter?
24   A.   It is -- it is -- it is just -- it
25   is a typical audit request.

Page 104

WATERHOUSE - 10-19-21

1
2    Q.   And do you understand -- do you have
3    an understanding that PwC wanted to know that
4    as of the date of the audit whether any
5    material changes had occurred since the end of
6    the fiscal year, using the definition of
7    materiality that is in this particular
8    management representation letter?
9    A.   It -- it is -- it is -- it is a --
10   it is as described.  It is just a poorly worded
11   question, so it is hard for me to say yes.
12   Q.   If I asked you this, I apologize,
13   but did you ever learn when the agreement was
14   entered into?
15   A.   I don't -- I don't -- like I said
16   before, I don't know or have any details of the
17   agreement.
18   Q.   Okay.  Did you ever ask anybody when
19   the agreement was entered into?
20   A.   I did not.
21   Q.   Let's look at the audited financial
22   statements.  We will put up on the screen a
23   document that has been premarked as Exhibit 34.
24        (Exhibit 34 marked.)
25        MS. DANDENEAU:  And again, if Ms. La

Page 105

WATERHOUSE - 10-19-21

1
2    Canty could please put that in the chat
3    room, that would be great.
4        MR. MORRIS:  I will assure you we
5    will put every document in the chat room.
6    Q.   Now, I'm just going to ask you
7    questions that are related to the provisions of
8    this report that concern the affiliate loans,
9    but again, Mr. Waterhouse, if there is any part
10   of the document that you need to see or that
11   you think you might need to see in order to
12   refresh your recollection to answer any of my
13   questions, will you let me know that?
14   A.   Yes.
15   Q.   Because this is a pretty lengthy
16   document, but do you see that the cover page
17   here is the Highland consolidated financial
18   statements for the period ending December 31st,
19   2018?
20   A.   Yes.
21   Q.   If we can go to -- I think it is the
22   next one, looking for PwC's signature line.
23        MS. CANTY:  I'm sorry, John, did you
24   say something?
25        MR. MORRIS:  Yes, can we turn the

Page 106

1      WATERHOUSE - 10-19-21
2    page. I think it is 215. Yes, stop right
3    there, just above -- I'm sorry, I want to
4    see just the date of the report.
5      Q.   Okay. Do you see at the bottom of
6    that page there, Mr. Waterhouse,
7    PricewaterhouseCoopers has signed this audit
8    report?
9      A.   Yes, I see their signature.
10     Q.   Okay. And it is the dated same day
11   as your management representation letter; is
12   that right?
13     A.   It is -- yes, it is the same day.
14     Q.   Was that the practice to sign the
15   management representation letter on the same
16   day that the audit report was signed?
17     A.   Yes, that is typical in every audit.
18     Q.   Can we just scroll down to the
19   balance sheet on the next page.
20         Do you see that there is a line
21   there that says, Notes and Other Amounts Due
22   from Affiliates?
23     A.   Yes.
24     Q.   Does that line, to the best of your
25   knowledge, include the amounts that were due

Page 107

1    under the affiliate under the notes signed by
2    the affiliates and Mr. Dondero?
3      MR. RUKAVINA:  Objection to the
4    extent that calls for a legal conclusion.
5      A.   I mean, I would want to see the
6    detail and the build to this $173,398,000, but,
7    yes, I mean, if -- if -- given what we
8    discussed before, you know, it -- it should
9    capture that.
10     Q.   And -- and while you were the CFO of
11   Highland, were all notes held by Highland that
12   were issued by an affiliate or Mr. Dondero
13   carried as assets on Highland's balance sheets?
14     MS. DANDENEAU:  Objection to form.
15     MS. DEITSCH-PEREZ:  Object to form.
16     A.   I don't -- I don't know how else
17   they would be carried.
18     Q.   Okay. Can you think of any -- are
19   you aware of any promissory note issued by an
20   affiliate or Mr. Dondero that was not carried
21   on Highland's audited financial balance sheets?
22     A.   I'm -- I'm -- I'm not aware.
23     Q.   Okay. Are you aware of any category
24   of asset on Highland's balance sheet in which

Page 108

1      WATERHOUSE - 10-19-21
2    any of the promissory notes issued by an
3    affiliate or Mr. Dondero would have been
4    included?
5      MS. DANDENEAU:  Objection to form.
6      A.   Sorry, am I aware of any asset of an
7    affiliate being included --
8      Q.   That -- let me -- let me try again.
9          Do you see there is a number of
10   different assets that are described on this
11   balance sheet?
12     A.   Yes.
13     Q.   One of the assets that is described
14   is Notes and Other Amounts Due from Affiliates;
15   right?
16     A.   Yes.
17     Q.   And it is reasonable to conclude
18   that the notes from the affiliates and
19   Mr. Dondero are included in that line item;
20   right?
21     A.   Yes, based on this description.
22   Again, I would want to see a build of this to
23   100 percent confirm, but based on the
24   description, the asset description, it is -- it
25   is likely.

Page 109

1      WATERHOUSE - 10-19-21
2          Now, does that mean absolute? I
3    don't know.
4      Q.   Do you have any reason to believe
5    that the promissory notes would have been
6    carried on the balance sheet in a category
7    other than Notes and Other Amounts Due from
8    Affiliates?
9      A.   If they were deemed -- no. If they
10   were deemed an affiliate, you know, under GAAP,
11   they should be carried in that line.
12   Otherwise, it would go into another line.
13     Q.   Okay. And do you see the total
14   asset base as of December 31st, 2018, was
15   approximately $1.04 billion?
16     A.   Yes.
17     Q.   Is my math correct that the Notes
18   and Other Amounts Due from Affiliates
19   constituted approximately 17 percent of
20   Highland's assets as of the end of 2018?
21     A.   Well, so how are you defining
22   Highland?
23     Q.   Highland Capital Management, L.P.,
24   the entity that this audit is subject to -- or
25   the subject of.

Page 110

WATERHOUSE - 10-19-21

1
2  A.  On a consolidated or unconsolidated
3  basis?
4  Q.  I'm looking at the balance sheet.
5  It is a consolidated balance sheet.  Okay?
6  Does the Notes and Other Amounts Due
7  from Affiliates constitute approximately
8  17 percent of the total assets of Highland
9  Capital Management, L.P., on a consolidated
10  basis?
11  MS. DANDENEAU:  Objection to form.
12  A.  I don't have a calculator in front
13  of me but I will take your math, if you are
14  taking the 173 divided by the billion.
15  Q.  Okay.
16  A.  If that is accurate, yes.  But,
17  again, on a consolidated basis.
18  Q.  And on an unconsolidated basis the
19  percentage would be higher; correct?
20  A.  I -- no.  I don't know.
21  Q.  Well, okay.  That is fair.
22  MR. MORRIS:  Can we turn to
23  page 241, please.
24  Q.  Do you see that this is a section of
25  the audit report that is entitled Notes and

Page 111

WATERHOUSE - 10-19-21

1
2  Other Amounts Due from Affiliates?
3  A.  Sorry, I can't see the -- the --
4  Q.  It is at the top.
5  A.  Notes and Other Amounts Due from
6  Affiliates, yes, I see that.  I don't -- I
7  don't have a page number, but I'm on a page
8  that says at the top:  Notes and Other Amounts
9  Due from Affiliates.
10  Q.  Okay.  And that is the same title of
11  the line item on the balance sheet that we just
12  looked at; right?  Notes and Other Amounts Due
13  from Affiliates?
14  A.  Yes.
15  Q.  And is it your understanding, based
16  on your experience and knowledge as the CFO,
17  that this is the section of the narrative that
18  ties into the line item that we just looked at?
19  A.  Yes.
20  Q.  And is this section of the audit
21  report intended to describe and disclose all of
22  the material facts concerning the Notes and
23  Other Amounts Due from Affiliates?
24  MS. DANDENEAU:  Objection, form.
25  A.  This -- these notes -- these notes

Page 112

WATERHOUSE - 10-19-21

1
2  of the financial statements are -- the purpose
3  is to disclose any material items in relation
4  to that balance sheet line item.
5  Q.  Okay.  And all of the information,
6  to the best of your knowledge, that is set
7  forth in this section of the audit report was
8  provided by Highland; correct?
9  A.  Yes, it would have been provided by
10  the corporate accounting team.
11  Q.  Okay.  And the corporate accounting
12  team, did that team report to you in the
13  organizational structure?
14  A.  Yes.
15  Q.  And did you have any concerns about
16  the controls that were in place to make sure
17  that the information provided with respect to
18  Notes and Other Amounts Due from Affiliates was
19  accurate and complete?
20  MS. DANDENEAU:  Objection to form.
21  A.  Not that I recall.
22  Q.  Okay.  Do you recall ever being
23  concerned that any portion of the Notes and
24  Other Amounts Due from Affiliates in any audit
25  report was inaccurate, incomplete, or not

Page 113

WATERHOUSE - 10-19-21

1
2  reliable?
3  A.  I didn't -- I had concerns about,
4  you know, like I talked about before, of there
5  were -- there were potentially issues in the
6  control environment.  But as far as it relates
7  to the audited financial statements, any -- the
8  team would work with the auditors to disclose
9  all -- all notes in Highland's possession.
10  And any -- any notes that were
11  deemed material by the auditor, right, these
12  were disclosed in these -- in this section, you
13  know, in -- in the notes to the consolidated
14  financial statements as you presented.
15  Q.  Do you recall ever having a
16  conversation with anybody at any time
17  concerning the accuracy of the section of audit
18  reports that relates to Notes and Other Amounts
19  Due from Affiliates?
20  MS. DANDENEAU:  Objection to form.
21  A.  You know, as -- as -- I didn't have
22  direct conversations with
23  PricewaterhouseCoopers as I had, you know --
24  I -- I had the team that managed this.
25  Again, I wasn't anywhere chose to

Page 114

WATERHOUSE - 10-19-21

1 being the point person of this audit. And I
2 can't recall, you know, when -- you know, I
3 don't even know if I was ever the point person
4 during my tenure as CFO.
5        I don't know if PwC had any concerns
6 when they were performing those audit
7 procedures. They may have and they may have --
8 and it may not have been communicated to me. I
9 don't know.
10        MR. MORRIS: All right. I move to
11 strike.
12    Q.    And I'm going to ask you to listen
13 carefully to my question.
14        Did you -- do you recall ever having
15 a conversation with anybody at any time
16 concerning the accuracy of the reporting
17 provided in the audited financial statement on
18 the topic of Notes and Other Amounts Due?
19        MS. DANDENEAU: Objection to form.
20    A.    I don't recall for this, but that
21 doesn't mean that it didn't exist.
22    Q.    Okay. But you have no reason to
23 believe, as you sit here right now, that you
24 ever discussed with anybody concerns over the

Page 115

WATERHOUSE - 10-19-21

1 accuracy of the section of the audit reports
2 called Notes and Other Amounts Due from
3 Affiliates; correct?
4        MS. DANDENEAU: Object to the form.
5        MS. DEITSCH-PEREZ: Objection to
6 form.
7    A.    I don't recall having any
8 conversations. But, again, I mean, this is --
9 this is two years ago.
10    Q.    I'm just asking for your
11 recollection, sir.
12    A.    Yes.
13    Q.    If you don't recall, this will --
14    A.    Yeah.
15    Q.    (Overspeak) -- if you don't
16 recall --
17    A.    Yeah, I don't -- I don't recall.
18    Q.    Do you know who was responsible for
19 drafting the audit report?
20    A.    Are you asking the actual Highland
21 employee responsible? I mean, it was
22 Highland's responsibility, so, I mean, that
23 is --
24    Q.    Right.

Page 116

WATERHOUSE - 10-19-21

1    A.    -- Highland's responsibility.
2 Highland's responsibility.
3    Q.    Who, at Highland, was responsible
4 for drafting this section of the audit report?
5    A.    I -- I don't know the answer to
6 that. Again, there was a team who worked on
7 this. And I don't know, you know, whether it
8 was the staff or the manager.
9        Again, this is where I let the teams
10 manage. And, you know, there may be a
11 corporate accountant who worked on this. I
12 just -- you know, I wasn't part of that process
13 to give that person experience. I don't know.
14    Q.    Do you recall having any
15 communications with anybody at any time
16 concerning this section of the report?
17    A.    Yeah, I don't recall.
18    Q.    Do you recall whether you ever told
19 anybody at any time that any aspect of this
20 section of the report was inaccurate or
21 incomplete?
22    A.    I don't recall.
23    Q.    As you sit here today, do you have
24 any reason to believe that this section of the

Page 117

WATERHOUSE - 10-19-21

1 audit report is incomplete or inaccurate in any
2 way?
3        And I'm happy to give you a moment
4 to -- to look at it, if you would like.
5        MS. DANDENEAU: Objection to form.
6        MS. DEITSCH-PEREZ: Same.
7    A.    I mean, I would have to look at -- I
8 would have to look at the bill to the note
9 schedule to make sure I know you presented me
10 with materiality, but again, there might be a
11 note as of 12/31/18 that somehow was -- was
12 under materiality not disclosed. I don't -- I
13 don't know. I would need more information.
14    Q.    Okay. But without more information,
15 you have no reason to believe anything this
16 section is inaccurate; correct?
17        MS. DANDENEAU: Objection to form.
18    A.    I don't. I mean, you know, this was
19 part of the audit.
20    Q.    Thank you. Now, you will see if we
21 could scroll just a little bit more that each
22 of the first five paragraphs concerns
23 specifically the four affiliates that we've
24 been discussing and Mr. Dondero.

Page 118

WATERHOUSE - 10-19-21

1          MR. MORRIS:  If we could go the
2    other way, La Asia.  We don't need Okada.
3    We're going to have to thread the needle.
4    Okay.  Good, perfect.
5      Q.    Do you see those five paragraphs
6    certain the four affiliates and Mr. Dondero as
7    we've been referring to today?
8      A.    Yes.
9      Q.    Okay.  And do you see at the end of
10   every paragraph it states, quote:  A fair value
11   of a partnership's outstanding notes receivable
12   approximates the carrying value of the notes
13   receivable?
14     A.    Yes, I see that.
15     Q.    Do you have an understanding of what
16   that means?
17     A.    Yes.
18     Q.    What is your understanding of that
19   sentence?
20     A.    It is the – again, the – the fair
21   value, right, which is – which is what the –
22   what Highland could sell that asset for.  This
23   statement is comparing the fair value of the
24   notes to the carrying value, so the carrying

Page 119

WATERHOUSE - 10-19-21

1    value is the line item that you showed me
2    earlier that is in Notes and Other Amounts Due
3    from Affiliates.
4      Q.    Okay.  Is another way to say this is
5    that the fair market value of the notes equals
6    the principal amount and – withdrawn.
7            Is the fair way to interpret this
8    that the fair market value of the notes equals
9    all remaining unpaid principal and interest due
10   under the notes?
11         MS. DANDENEAU:  Object to the form.
12         MS. DEITSCH-PEREZ:  Objection, form.
13     A.    I don't know the answer to that,
14   because I don't recall where – where any –
15   where – in what line item was the interest
16   component reported.
17     Q.    All right.  Well, if we look in this
18   audit report, you will see in the middle of the
19   first paragraph, for example, it states that as
20   of December 31st, 2018, total interest and
21   principal due on outstanding promissory notes
22   was approximately $5.3 million.
23           Do you see that?
24     A.    I do.

Page 120

WATERHOUSE - 10-19-21

1      Q.    Is that the carrying value or the
2    fair value?
3      A.    That would be the carrying value –
4      Q.    And is the last –
5      A.    – in my opinion.
6      Q.    Okay.  And it is in your opinion as
7    the chief financial officer of Highland during
8    the period of time that you described; right?
9    It is an educated opinion?
10     A.    I'm reading this at face value.  I'm
11   taking that as that is carrying value.
12     Q.    Okay.  And does the last sentence
13   say that the carrying value is roughly
14   approximate to the fair market value?
15         MS. DANDENEAU:  Objection to form.
16         MS. DEITSCH-PEREZ:  Objection, form.
17     A.    Again, this note to the financial
18   statement is specific to notes and other
19   amounts due from affiliates.
20     Q.    Correct.
21     A.    If the interest component is
22   reported elsewhere on the balance sheet, you
23   know, it – it could be off.  Again, I
24   don't have the detail.  I don't know, but yes,

Page 121

WATERHOUSE - 10-19-21

1    look, I mean, if you – I mean, if you are
2    saying the 5.3 million is in the notes and
3    other amounts due from affiliates, then the
4    last statement is saying the fair value
5    approximates 5.3 million.  That is what that
6    last sentence is saying.
7      Q.    Do you see in the middle of the
8    first paragraph – not in the middle, the next
9    to last sentence there is a statement that the
10   partnership will not demand payment on amounts
11   that exceed HCMFA's excess cash availability
12   prior to May 31st, 2021.
13           Do you see that?
14     A.    I do.
15     Q.    Do you know when Highland agreed not
16   to demand payment as described in that
17   sentence?
18     A.    I don't know specifically.
19     Q.    Do you know why Highland agreed not
20   to demand payment on HCMFA's notes until May
21   2021?
22     A.    Yes.
23     Q.    Why was that decision made?
24     A.    You know, well, it – it – that

Page 122

WATERHOUSE - 10-19-21

1 decision was made as to not put HCMFA into a
2 position where it didn't have sufficient assets
3 to pay for the demand note.
4     Q.   And at the time the agreement was
5 entered into, pursuant to which the partnership
6 wouldn't demand payment, did HCMFA have
7 insufficient assets to satisfy the notes if a
8 demand had been made?
9     MS. DANDENEAU:  Objection to form.
10     A.   I don't have HCMFA's financial
11 statements in front of me as of 12/31/18.
12     Q.   Was there a concern that HCMFA would
13 be unable to satisfy its demands under the
14 notes if demand was made?
15     MS. DANDENEAU:  Objection to form.
16     A.   Well, there is -- I don't recall a
17 I mean, there is something, right, in place to
18 basically not demand payment until May 31, 2021
19 as detailed here.
20     Q.   And who made the decision to enter
21 into -- who made the decision on behalf of
22 Highland not to demand payment until May 31st,
23 2021?
24     A.   I'm trying to remember.  I don't
25

Page 123

WATERHOUSE - 10-19-21

1 remember exactly -- I don't remember if it was
2 myself or -- or Jim Dondero who -- who -- there
3 was -- there was something signed, from what I
4 recall, that -- that -- that backed up this
5 line item in the -- in the notes I'm -- look,
6 I'm, I'm --
7     Q.   We will get to that.
8     A.   You --
9     Q.   I'm just --
10     A.   You have -- I mean --
11     Q.   We're going to give that to you.
12 I'm going to give that to you.
13     A.   You -- you -- you have all the
14 documents.  I don't have the documents, and
15 that is what makes it so hard.  I don't have
16 any documents to prepare for this deposition;
17 right?  You have all -- I don't -- I don't -- I
18 don't remember, but, you know, again, it would
19 probably be myself or Jim.
20     Q.   Do you know if Highland received
21 anything in return for its agreement not to
22 make a demand for two years?
23     A.   I don't -- I don't think it referred
24 anything.
25

Page 124

WATERHOUSE - 10-19-21

1     Q.   And did you and Mr. Dondero discuss
2 HCMFA's ability to satisfy the notes if a
3 demand was made at the time this agreement was
4 entered into?
5     MS. DANDENEAU:  Objection to form.
6     A.   I don't -- I don't -- I don't recall
7 having a specific conversation, if I did, or --
8 or David Klos.
9     Q.   Okay.  I'm just asking if you recall
10 any conversations that you had.
11     A.   I don't recall.
12     Q.   Okay.  Do you know why Highland
13 loaned the money to HCMFA that is the subject
14 of the notes described in this paragraph?
15     A.   I don't remember specifically why
16 5.3 million was loaned.  I mean, I -- it would
17 have to be put in the context.
18     Q.   Do you have any recollection at all
19 as to why Highland ever loaned any money to
20 HCMFA?
21     A.   Yes.
22     MS. DANDENEAU:  Objection to form.
23     Q.   What do you remember about that?
24     A.   There was a Highland Global
25

Page 125

WATERHOUSE - 10-19-21

1 Allocation Fund, which was a -- a fund managed
2 by Highland Capital Management Fund Advisors.
3 There was a -- we -- I'm just telling you,
4 there was -- there was -- there was a -- a
5 ultimately a NAV error found in this fund while
6 it was an open-ended fund and, you know, there
7 were amounts owed by the advisor in -- in
8 relation to that NAV error.
9         There were also, for the same fund,
10 that same fund was ongoing an
11 open-end-to-close-end conversion, and as part
12 of that proposal, shareholders who voted for
13 the conversion received compensation from the
14 advisor.
15     Q.   All right.  Now, the events that
16 you're describing occurred in the spring of
17 2019; right?
18     A.   These started back -- I think, I
19 mean --
20     Q.   I apologize.
21     A.   -- that -- I mean, the answer to
22 that is no.
23     Q.   I apologize, the loans that were
24 made in connection with the events that you're
25

Page 126

WATERHOUSE - 10-19-21

1 describing occurred in May 2019; right?
2 MR. RUKAVINA: Objection to the
3 extent that calls for a legal conclusion.
4 A. I don't recall specifically what
5 amounts of money were moved when, for what
6 purpose.
7 Q. Okay. Fair enough. Going to the
8 next paragraph, do you recall that NexPoint
9 Advisors had obtained a number of loans from
10 Highland, and they rolled up those loans into
11 one note in approximately 2017?
12 A. This is for NexPoint Advisors?
13 Q. Yes.
14 A. I -- I mean, I don't -- I don't
15 recall the NexPoint Advisors loan being a
16 roll-up loan, but --
17 Q. Do you know why?
18 A. But, look, if you have documents
19 that show -- I mean, look, I just don't recall.
20 Q. Okay. That is fair. Do you know
21 why -- do you have any recollection as to why
22 Highland loaned money to NexPoint?
23 A. Yes.
24 Q. Why did High -- why do you recall --

Page 127

WATERHOUSE - 10-19-21

1 what is the reason you recall Highland lending
2 money to NexPoint?
3 A. I mean, I was just -- I just -- I
4 just recall. I mean, I just -- I don't
5 remember why.
6 Q. I understand. And I'm asking you if
7 you recall --
8 A. Oh, why -- I thought you say --
9 NexPoint Advisors was launching a fund which
10 is -- I believe that the legal name is NexPoint
11 Capital, Inc. And it -- it provided a
12 co-invest into that fund.
13 And, from what I remember, the --
14 the -- that NexPoint borrowed money from
15 Highland at the time to make that co-invest.
16 Q. So this was an investment that
17 NexPoint was required to make; is that right?
18 MS. DANDENEAU: Objection to form.
19 A. I don't know if it was required to
20 make, I don't recall that, or if it just made
21 it.
22 Q. Okay. But your recollection is that
23 NexPoint made an investment and they borrowed
24 money from Highland to finance the investment.

Page 128

WATERHOUSE - 10-19-21

1 Do I have that right?
2 A. Yes.
3 Q. How about HCRE? Do you know why
4 HCRE borrowed money from Highland?
5 A. I don't remember specifically.
6 Q. Do you remember generally?
7 A. Generally, yeah -- I mean, yes.
8 Q. Can you tell me your general
9 recollection as to why Highland loaned money to
10 HCRE?
11 A. For -- for -- for investment
12 purposes.
13 Q. So HCRE made the investment and it
14 obtained a loan, or loans, from Highland in
15 order to finance that investment or those
16 investments.
17 Do I have that right?
18 A. I mean, I -- you know, generally.
19 Q. Okay. How about Highland Management
20 Services, Inc.?
21 Do you have any recollection as to
22 why HCMS borrowed money from Highland?
23 A. Generally.
24 Q. What is your general recollection as

Page 129

WATERHOUSE - 10-19-21

1 to why HCMS borrowed money from Highland?
2 A. For -- for investment purposes.
3 Q. So it is the same thing, HCMS wanted
4 to make investments and it borrowed money from
5 Highland in order to finance those investments;
6 is that right?
7 A. I mean, yes, generally. I mean, I
8 can't -- I don't -- on the services, there --
9 there are several loans in these schedules.
10 You know, I can't remember why every single one
11 of these were made, but I would say, yeah, I
12 mean, generally.
13 Q. Okay. I appreciate that.
14 MR. MORRIS: Let's go to the page
15 with Bates No. 251. La Asia, are you
16 there?
17 MS. CANTY: Sorry, John. It went
18 out for a minute. Can you say that again.
19 I don't know what is going on.
20 MR. MORRIS: The page with Bates
21 No. 251, can we go to that.
22 MS. CANTY: Yes, sorry.
23 MR. MORRIS: Keep going to the
24 bottom. Yeah, there you go.

Page 130

WATERHOUSE - 10-19-21

1
2  Q.  Do you see, Mr. Waterhouse, that
3  there is a section there called Subsequent
4  Events?
5  A.  I do.
6  Q.  And does this relate to the last
7  sentence above the signature line on the
8  management representation letter that we talked
9  about earlier where you made the representation
10  that you disclosed subsequent events?
11  A.  I mean, it relates to it, but not in
12  its entirety.
13  Q.  Okay.
14  MR. MORRIS:  If we can scroll up to
15  capture the entirety of this section right
16  here.
17  Q.  And what do you mean by that, sir?
18  MR. MORRIS:  Yeah, right there.
19  Perfect.
20  A.  There are -- there are different
21  subsequent events in -- under GAAP.  So there
22  are -- and -- and -- so what we see in the
23  notes to the financial statements are one type
24  of subevent.
25  Q.  Okay.  And -- and would the type of

Page 131

WATERHOUSE - 10-19-21

1
2  subsequent event relating to affiliate loans be
3  captured in this section if they were -- if
4  they were made after the end of the fiscal year
5  and prior to the issuance of the audit report?
6  A.  Yes, if they were deemed material or
7  disclosable.
8  Q.  Okay.  I appreciate that.
9  Do you see the next to the last
10  entry there?  It says, Over the course of 2019
11  through the report date, HCMFA issued
12  promissory notes to the partnership in the
13  aggregate amount of $7.4 million?
14  A.  Yes.
15  Q.  And does that refresh your
16  recollection that those are the notes that
17  related to the NAV error that you mentioned
18  earlier?
19  A.  I don't -- I don't remember the
20  exact.  Again, there are -- I mentioned two
21  line items; right?
22  Q.  Yes.
23  A.  I mean, it was the GAAP conversion
24  process plus the -- the NAV error.  I don't
25  have the details.  I don't recall specifically

Page 132

WATERHOUSE - 10-19-21

1
2  if -- you know, what -- if that 7.4 million was
3  solely attributable to the NAV error.
4  Q.  Okay.  But there is no question that
5  Highland told PricewaterhouseCoopers that over
6  the course of 2019 HCMFA issued promissory
7  notes to the partnership in the aggregate
8  amount of $7.4 million; correct?
9  A.  In the course of the audit, we would
10  have produced all promissory notes in our
11  possession, including the ones that are
12  detailed here.
13  Q.  Do you recall that you signed the
14  two promissory notes that are referenced in
15  that provision?
16  MS. DANDENEAU:  Objection to form.
17  A.  I didn't recall initially but I've
18  been reminded.
19  Q.  Okay.  And -- and do you recall that
20  those notes are dated May 2nd and May 3rd,
21  2019?
22  A.  Yes.
23  Q.  So that was just a month before the
24  audit was completed; correct?
25  A.  Yes.  I think we had a June 3rd

Page 133

WATERHOUSE - 10-19-21

1
2  date, right, if -- if my memory serves me
3  right.
4  Q.  Yes, I will represent to you that
5  your memory is accurate in that regard.
6  Did anybody ever instruct you as the
7  CFO to correct this statement that we're
8  looking at in subsequent events?
9  A.  So let me understand.  You're saying
10  when I was CFO at Highland Capital did anyone
11  ever ask me to correct the -- over the course
12  of 2019 through the report date HCMFA issued
13  promissory notes, this statement?
14  Q.  Right.
15  A.  Not that I'm aware.
16  Q.  While you were the CFO of Highland,
17  did anybody ever tell you that that sentence
18  was wrong?
19  A.  Not that I'm aware.
20  Q.  Highland -- withdrawn.
21  HCMFA disclosed these notes in its
22  own audited financial statements; right?
23  MR. RUKAVINA:  Objection, form.
24  A.  I assume that these would be
25  material -- if these are material financial

Page 134

WATERHOUSE - 10-19-21

1 statements, yes, they -- they -- they should be
2 and they were likely disclosed.
3 Q. Now, there is no statement
4 concerning the 2019 notes about the forbearance
5 that we looked at in the affiliated note
6 section of the report; right?
7 MS. DANDENEAU: Objection to form.
8 Q. I'll withdraw. That was bad.
9 Do you recall when we were looking
10 at the paragraph concerning HCMFA earlier it
11 had that disclosure about the agreement whereby
12 Highland wouldn't ask for demand on the -- on
13 the HCMFA notes?
14 A. Yes.
15 Q. That forbearance disclosure is not
16 made with respect to the 2019 notes; right?
17 A. Not -- look, not that I can recall,
18 unless -- unless it was done at a subsequent
19 day.
20 Q. Right. And it is not in the
21 subsequent event section that we're looking at
22 right now where the 2019 notes are described;
23 right?
24 A. Right. But this is through

Page 135

WATERHOUSE - 10-19-21

1 June 3rd. It could have been done on June 4th.
2 I don't -- I don't -- I don't recall.
3 Q. Okay.
4 MR. MORRIS: Can we put up on the
5 screen the HCMFA audit report. And while
6 we're --
7 MS. DANDENEAU: What exhibit is
8 this?
9 MR. MORRIS: La Asia, what number is
10 that?
11 MS. CANTY: 45.
12 MR. MORRIS: So this will be marked
13 as Exhibit 45.
14 (Exhibit 45 marked.)
15 MS. CANTY: Yeah, and I will put it
16 in the chat.
17 MS. DANDENEAU: Thank you.
18 Q. Okay. All right. Do you see that
19 this is the consolidated financial statements
20 for HCMFA for the period ending 12/31/18?
21 A. Yes.
22 Q. As the treasurer of HCMFA at the
23 time, did you have to sign a management
24 representation letter similar to the one that

Page 136

WATERHOUSE - 10-19-21

1 we looked at earlier for Highland?
2 A. I would imagine I would have been
3 asked to. I don't recall if I did.
4 Q. Do you recall ever being asked by an
5 auditor to sign a management representation
6 letter and then not doing it?
7 A. No.
8 MR. MORRIS: Can we just scroll down
9 again. I just want to see the date of the
10 document.
11 A. I mean, let me -- you know, there
12 are different versions to management
13 representation letters I will qualify.
14 Yes, there are certain -- from time
15 to time auditors can make representations
16 that -- in the rep letter that is being
17 proposed that are inaccurate or out of scope or
18 things like that and they've asked for
19 signature.
20 In that context, yes. I mean, you
21 know -- I mean, if I have been asked to sign
22 and make those representations and those
23 representations are invalid, yes, I would not,
24 I mean, I -- I wouldn't sign that.

Page 137

WATERHOUSE - 10-19-21

1 Q. Okay. PricewaterhouseCoopers served
2 as HCMFA's outside auditors as well; correct?
3 A. Yes.
4 Q. Do you see that this audit report is
5 signed on June 3rd, 2019, just like the
6 Highland audit report?
7 A. That is correct.
8 Q. And did the process of -- of
9 preparing HCMFA's audit report, was that the
10 same process that Highland followed when it did
11 its audit report at this time?
12 A. I mean, it is a different entity.
13 There are different assets. You know, it --
14 it -- it is -- as you saw, Highland's
15 financials are on a consolidated basis. This
16 is different, so it is under the same control
17 environment and team.
18 Q. Okay. I appreciate that. So the
19 same control environment and team participated
20 in the preparation of the audit for Highland
21 and for HCMFA at around the same time; correct?
22 A. Yes.
23 MR. MORRIS: Can we go to page 17 of
24 the report. I don't have the Bates number.

Page 138

WATERHOUSE - 10-19-21

1   Q.   Okay.  Do you see that just like
2  Highland's audited financial report, HCMFA's
3  audited financial report also has a section
4  related to subsequent events?
5   A.   Yes.
6   Q.   And am I reading this correctly that
7  just as Highland had done, HCMFA disclosed in
8  its audited financial report a subsequent event
9  that related to the issuance of promissory
10  notes to Highland in the aggregate amount of
11  $7.4 million in 2019?
12   A.   That is what I see in the report.
13   Q.   And you were the treasurer of HCMFA
14  at the time; right?
15   A.   Yes, to the best of my knowledge.
16   Q.   And did anybody ever tell you prior
17  to the time of the issuance of this audit
18  report that that sentence relating to HCMFA's
19  2019 notes was inaccurate or wrong in any way?
20   A.   Not that I recall.
21   Q.   As you sit here right now, has
22  anybody ever told you that that sentence is
23  inaccurate or wrong in any way?
24   A.   Not that I recall.

Page 139

WATERHOUSE - 10-19-21

1   Q.   I apologize if I asked you this
2  already, but has anybody ever told you at any
3  time that you are not authorized to sign the
4  promissory notes that are the subject of the
5  sentence we're looking at?
6   A.   Not that I recall.
7   Q.   Did anybody ever tell you at any
8  time that you had made a mistake when you
9  signed the promissory notes that are the
10  subject of this sentence?
11   A.   Say that again.  Did anyone ever say
12  that I made a mistake?
13   Q.   Let me ask the question again.
14   Did anybody ever tell you at any
15  time that you made a mistake when you signed
16  the two promissory notes in Highland's favor on
17  behalf of HCMFA in 2019?
18   A.   Not that I recall.
19   MR. MORRIS:  Let's just look at the
20  promissory notes quickly.  Can we please
21  put up Document Number 1, and so this is in
22  the pile that y'all have.  We'll just go
23  for a few more minutes and we can take our
24  lunch break.

Page 140

WATERHOUSE - 10-19-21

1   Q.   All right.  So I don't know if you
2  have seen this before, sir.  Do you see that
3  this is a complaint against HCMFA?
4   A.   Yes, I am looking at it on the
5  screen.
6   Q.   Okay.  And have you ever seen this
7  document before?
8   A.   I went through some of these
9  documents with my counsel here yesterday.
10   MR. MORRIS:  All right.  Can we go
11  to Exhibit 1 of this document.
12   Q.   Do you see Exhibit 1 is a
13  $2.4 million promissory note back in 2019?
14   A.   Yeah, I found it in the book.  Yes,
15  I have it here in front of me.
16   Q.   And this is a demand note, right, if
17  you look at Paragraph 2?
18   A.   Yes.
19   Q.   And this is a note where the maker
20  is HCMFA, and Highland is the payee; right?
21   A.   Yes.
22   MR. MORRIS:  And if we can scroll
23  down, can we just see Mr. Waterhouse's
24  signature.

Page 141

WATERHOUSE - 10-19-21

1   Q.   Is that your signature, sir?
2   A.   Yes, it is.
3   Q.   And did you sign this document on or
4  around May 2nd, 2019?
5   A.   I don't recall specifically signing
6  this, but this is my signature.
7   Q.   Okay.  And do you recall that
8  Highland transferred $2.4 million to HCMFA at
9  or around the time you signed this document?
10   A.   I don't recall specifically.  I
11  would want to, as I sit here today, go back and
12  confirm that, but again, presumably that --
13  that -- that did happen.
14   Q.   You wouldn't have signed this
15  document if you didn't believe that HCMFA
16  either received or was going to receive
17  $2.4 million from Highland; is that fair?
18   A.   I mean, it -- if -- if -- if there
19  wasn't a transfer of value, yeah, I mean, you
20  know, I would have no reason to -- to sign a
21  note.
22   Q.   And -- and Highland wouldn't have
23  given this note to PricewaterhouseCoopers if --
24  withdrawn.

Page 142

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2        HCMFA wouldn't have given this note
3    to PricewaterhouseCoopers if it hadn't received
4    the principal value of -- of the note in the
5    form of a loan; correct?
6        MR. RUKAVINA: Objection, legal
7    conclusion, speculation and form.
8        A.    Again, we -- what we provided to PwC
9    were, as part of the audit, any promissory
10   notes executed and outstanding. You know, as a
11   part of the audit, they, you know, they -- they
12   have copies of all the bank statements,
13   things -- things of that sort.
14       MR. MORRIS: Okay. Can we go to
15   Exhibit 2.
16       (Exhibit 2 marked.)
17       Q.    Do you see that this is a promissory
18   note dated May 3rd, 2019 in the amount of
19   $5 million?
20       A.    Yes.
21       Q.    Do you believe this is also a demand
22   note if you look at Paragraph 2?
23       A.    Yes.
24       Q.    And do you see that HCMFA is the
25   maker, and Highland is the payee?

Page 143

1    WATERHOUSE - 10-19-21
2        A.    Yes.
3        Q.    And if we go to the bottom, can we
4    just confirm that that is your signature?
5        A.    Yes.
6        Q.    And together these notes are the
7    notes that are referred to both in Highland and
8    HCMFA's audited financial reports in the
9    subsequent event sections; correct?
10       MS. DANDENEAU: Objection to form.
11       A.    They -- they -- they totaled
12   $7.4 million, so presumably, yes.
13       Q.    Okay. And you were authorized to
14   sign these two notes; correct?
15       MR. RUKAVINA: Objection, legal
16   conclusion.
17       A.    Yeah. I mean, I'm -- I was the
18   officer of -- of HCMFA. You know, I -- I'm not
19   the legal expert on -- on what that -- what
20   that confers to me or what it doesn't. I mean,
21   that is my signature on the notes.
22       Q.    And you believed you were authorized
23   to sign the notes; is that fair?
24       A.    I signed a lot of documents in my
25   capacity, just because it is operational in

Page 144

1    WATERHOUSE - 10-19-21
2    nature. So, you know, to me this was just
3    another document, to be perfectly honest.
4        Q.    Sir, would you have signed
5    promissory notes with the principal amount of
6    $7.4 million if you didn't believe you were
7    authorized to do so?
8        MS. DANDENEAU: Objection to form.
9        Q.    Are you frozen?
10       A.    No. I'm just -- you know, it is --
11   you know, again, I typically don't sign
12   promissory notes, and I don't recall why I
13   signed these, but -- you know, but I did.
14       Q.    All right. So listen carefully to
15   my question. Would you have signed
16   promissory notes with a face amount of
17   $7.4 million without believing that you were
18   authorized to do so?
19       A.    No. I mean, I'm -- I'm putting my
20   signature on there, so no.
21       Q.    Okay. And would you have signed two
22   promissory notes obligating HCMFA to pay
23   Highland $7.4 million without Mr. Dondero's
24   prior knowledge and approval?
25       MS. DEITSCH-PEREZ: Object to the

Page 145

1    WATERHOUSE - 10-19-21
2    form.
3        A.    You know, from -- from what I recall
4    around these notes, you know, I don't recall
5    specifically Mr. -- Mr. Dondero saying to -- to
6    make this a loan.
7            So my conversation with Mr. Dondero
8    around the culmination of the NAV error as
9    related to TerreStar which was a -- a -- I
10   think it was a year and a half process. I
11   don't know, it was a multi-month process, very
12   laborious, very difficult.
13           When we got to the end, I had a
14   conversation with Mr. Dondero on where to, you
15   know, basically get the funds to reimburse the
16   fund, and I recall him saying, get the money
17   from Highland.
18       Q.    And so he told you to get the money
19   from Highland; is that right?
20       A.    That is what I recall -- in my
21   conversation with him, that is -- that is what
22   I can recall.
23       Q.    Do you know who drafted these notes?
24       A.    I don't.
25       Q.    Did you ask somebody to draft the

Page 146

WATERHOUSE - 10-19-21

1
2 notes?
3    A.   I didn't ask -- I don't specifically
4 ask people to draft notes really.  I mean,
5 again, you know, the legal group at Highland is
6 responsible and has always been responsible for
7 drafting promissory notes.
8    Q.   So based on your -- based on the
9 practice, you believe that somebody from the
10 Highland's legal department would have drafted
11 these notes.  Do I have that right?
12       MS. DEITSCH-PEREZ:  Object to the
13    form.  John, I also asked you for the Word
14    versions of these notes so we could look at
15    the properties, and you have not provided
16    them.  Are you intending to?
17       MR. MORRIS:  No.
18    Q.   Can you answer my question, sir?
19    A.   Again, I --
20       MS. DANDENEAU:  Do you want him to
21    repeat it?
22    A.   Yeah, why don't you repeat it?
23    Q.   Sure.  Mr. Waterhouse, based on the
24 practice that you have described in your
25 understanding, do you believe that these notes

Page 147

WATERHOUSE - 10-19-21

1
2 would have been drafted by somebody in the
3 legal department?
4       MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   Yes.
7    Q.   Okay.  And do you know who would
8 have instructed -- do you have any knowledge as
9 to who would have instructed the legal
10 department to draft these notes?
11       MS. DEITSCH-PEREZ:  Object to the
12    form.
13    A.   It was whoever was working -- I
14 mean, it was likely someone on the team.  I
15 mean, I don't remember exactly on every note or
16 every document, but, again, a lot of these
17 things of this nature -- they're operational in
18 nature -- were handled by the team.
19       The team knows to -- I mean, we
20 don't draft documents.  We're not lawyers.
21 We're not attorneys.  It is not what I do or
22 accountants do.
23       So they are always instructed to go
24 and -- and go to the legal team to get
25 documents like this drafted.  Also, when you go

Page 148

WATERHOUSE - 10-19-21

1
2 to the legal team, the -- you know, we always
3 loop in compliance.  And compliance -- when you
4 go to the legal team, compliance is part of
5 legal team.  They're made aware of -- of -- of
6 these types of transactions.
7    Q.   And do you believe that you had
8 the -- withdrawn.
9       Did you ever tell Mr. Dondero --
10 (inaudible) -- did you see those?
11    A.   Sorry.
12       MS. DEITSCH-PEREZ:  I did not hear
13    the end of that question.
14    Q.   Did you ever tell Mr. Dondero that
15 you signed these two notes?
16    A.   I don't recall ever -- no, I don't
17 recall having a conversation with him.
18    Q.   Did you ever discuss these two notes
19 with him at any time?
20    A.   The conversation, I recall, was what
21 I described earlier.  And that is the only time
22 I recall ever discussing this.
23    Q.   Okay.  But the corporate accounting
24 group had a copy of this -- of these two notes.
25 And pursuant to the audit process, the

Page 149

WATERHOUSE - 10-19-21

1
2 corporate accounting group gave the two notes
3 to PricewaterhouseCoopers in connection with
4 the audit; correct?
5       MS. DANDENEAU:  Objection to form.
6    A.   Yes.  I mean, that is -- yeah, I
7 mean, they -- unless the legal team can also
8 retain copies of items like this.  I mean, I
9 don't know everything that they would retain as
10 well.
11       The legal team would also, if they
12 had documents as part of audits, turn that over
13 to the auditors as well.  So it could have been
14 the corporate accounting team.  It could be
15 someone on the legal team.
16    Q.   All right.  So you didn't -- you
17 didn't draft this note; right?
18    A.   I -- I -- I did not.
19    Q.   But somebody at Highland did; is
20 that fair?
21       MS. DEITSCH-PEREZ:  Object to the
22    form.
23    A.   I don't know.  I mean, we can go to
24 the legal team.  I don't -- I'm not sitting
25 behind someone in legal.  Maybe they went to

Page 150

WATERHOUSE - 10-19-21

1    outside counsel.  I have no idea.
2
3    Q.   Did you have any reason to believe
4    you weren't authorized to sign this note,
5    either of these two notes?
6    A.   I think I have already answered that
7    question.
8    Q.   Okay.  You didn't give these notes
9    to PricewaterhouseCoopers; correct?
10   MS. DANDENEAU:  Objection to form.
11   A.   I don't recall giving these to
12   PricewaterhouseCoopers.
13   Q.   And in the practice that you have
14   described, somebody in the corporate accounting
15   group would have given these two notes to
16   PricewaterhouseCoopers; correct?
17   MS. DANDENEAU:  Objection to form.
18   A.   I think I've answered that.  I said
19   either the corporate accounting team or maybe
20   the legal team.
21   MR. MORRIS:  Okay.  Why don't we
22   take our lunch break here.
23   VIDEOGRAPHER:  We're going off the
24   record at 1:04 p.m.
25   (Recess taken 1:04 p.m. to 1:49 p.m.)

Page 151

WATERHOUSE - 10-19-21

1    VIDEOGRAPHER:  We are back on the
2    record at 1:49 p.m.
3
4    Q.   Mr. Waterhouse, did you speak with
5    anybody during the break about the substance of
6    this deposition?
7    A.   I spoke to -- to Deb and Michelle.
8    Q.   About the substance of the
9    deposition?
10   A.   Yes.
11   Q.   Can you tell me what you talked
12   about?
13   MS. DANDENEAU:  No.  We object on
14   the basis of privilege.
15   Q.   Okay.  You are going to follow your
16   counsel's objection here?
17   A.   Yes.
18   Q.   Okay.
19   MR. MORRIS:  Can we put up on the
20   screen Exhibit 35.
21   (Exhibit 35 marked.)
22   Q.   Are you able to see that document,
23   sir?
24   A.   Yes.
25   Q.   Have you ever seen an incumbency

Page 152

WATERHOUSE - 10-19-21

1    certificate before?
2    A.   I have.
3    Q.   Do you have a general understanding
4    of what an incumbency certificate is?
5    A.   I have a general understanding.
6    Q.   What is your general understanding?
7    A.   You know, those -- my general
8    understanding is that the incumbency
9    certificate basically lists folks that can --
10   are like authorized signers.
11   Q.   Okay.  And do you see that this is
12   an incumbency certificate for Highland Capital
13   Management Fund Advisors, L.P.?
14   A.   Yes.
15   Q.   Okay.  And if we could scroll down
16   just a little bit, do you see that it's dated
17   effective as of April 11th, 2019?
18   A.   Yes, I see that.
19   Q.   Okay.  And is that your signature in
20   the middle of the signature block?
21   A.   Yes, it is.
22   Q.   And by signing it, did you accept
23   appointment as the treasurer of HCMFA effective
24   as of April 11th, 2019?

Page 153

WATERHOUSE - 10-19-21

1    A.   Again, I'm not the legal -- I don't
2    know if this makes me the treasurer or the
3    appointment.  I don't know -- I don't know
4    that, so I don't -- I don't know if that
5    document -- again, I think -- again, I'm not
6    the legal expert.  I think isn't there --
7    aren't there other legal documents that detail
8    who the officers are that could be incorporated
9    or things like that?  Again, I don't want to
10   play armchair attorney here.
11   Q.   I'm not asking you for a legal
12   conclusion.  I'm asking you for your knowledge
13   and understanding.  When you signed this
14   document, did you understand that you were
15   accepting an appointment as the treasurer of
16   HCMFA?
17   MS. DANDENEAU:  Objection to form.
18   MS. DEITSCH-PEREZ:  Objection, form.
19   A.   Again, I don't think this -- that
20   wasn't my understanding.  I don't think this
21   makes -- this document makes me the treasurer.
22   Q.   What do you think this document --
23   why did you sign this document?
24   MS. DEITSCH-PEREZ:  Objection to

Page 154

WATERHOUSE - 10-19-21

1    form.
2
3        MR. MORRIS:  You're objecting to the
4    form of the question when I asked him why
5    did you sign the document?  What is the
6    basis for the objection?
7        MS. DEITSCH-PEREZ:  Because, John, I
8    think that it does call for a legal
9    conclusion other than -- with him saying
10   because somebody told me to sign this
11   document.  But if you want to go there,
12   that is fine.
13       MR. MORRIS:  Okay.
14       MS. DANDENEAU:  I don't think --
15   he's already said he's not a lawyer.
16       MR. MORRIS:  I'll allow the witness
17   to answer this question.
18   Q.   Why did you sign this document, sir?
19   A.   I mean, our -- our legal group would
20   bring by these incumbency certificates from
21   time to time.  I have no idea why they're being
22   updated, and I was asked to sign.
23   Q.   Did you ask anybody, what is this
24   document?
25   A.   No.

Page 155

WATERHOUSE - 10-19-21

1
2    Q.   Did anybody tell you why they needed
3    you to sign the document?
4    A.   Not that I can recall.
5    Q.   You testified earlier that you
6    understood that you served as the acting
7    treasurer for HCMFA; correct?
8    A.   Yes.
9    Q.   How did you become the acting
10   treasurer of HCMFA?
11       MS. DANDENEAU:  Objection to form.
12   A.   I don't -- I don't know the legal --
13   I don't know the legal mechanic of how I became
14   the acting treasurer.
15   Q.   I'm not asking for the legal
16   mechanic.  I'm asking you as the person who
17   is --
18       MS. DANDENEAU:  John, you said --
19       MR. MORRIS:  Stop.
20       MS. DANDENEAU:  -- how did you
21   become the treasurer.  That is --
22       MR. MORRIS:  Please stop.
23       MS. DANDENEAU:  That is a legal
24   question.
25       MR. MORRIS:  I am not asking any

Page 156

WATERHOUSE - 10-19-21

1    legal questions, to be clear.  I'm asking
2    for this witness' understanding as to how
3    he became the acting treasurer of HCMFA.
4    If he doesn't know, he can say he doesn't
5    know, but this legal stuff is nonsense, and
6    I really object to it.
7    Q.   Sir, I'm asking you a very simple
8    question.
9        MS. DANDENEAU:  Argumentative.
10   Q.   You testified -- you testified that
11   you became the acting treasurer of HCM --
12   HCMFA; correct?
13   A.   Yes.
14   Q.   How did that happen?
15       MS. DANDENEAU:  Again, object to
16   form.
17       MR. MORRIS:  I can't wait to do this
18   in a courtroom.  Good God.
19   Q.   Go ahead, sir.
20   A.   I don't know the exact process of
21   how that happened.
22   Q.   Do you have any idea whether signing
23   this document was part of the process?
24       MR. MORRIS:  You know what --

Page 157

WATERHOUSE - 10-19-21

1
2        MS. DANDENEAU:  Objection.
3        MR. MORRIS:  -- withdrawn.  You guys
4    want to do this, I can't wait.  I can't
5    wait.  This is the craziest stuff ever.
6        MS. DANDENEAU:  John, he said he's
7    not a lawyer, and you are asking him for a
8    legal conclusion, and he says he doesn't
9    know, and you persist.
10       MR. MORRIS:  Okay.
11       MS. DANDENEAU:  So you can ask these
12   questions --
13       MR. MORRIS:  Did anyone -- please
14   stop talking.
15       MS. DANDENEAU:  -- at another
16   point -- no, no, no, I'm entitled to talk,
17   too; right?  If you're going to make these
18   accusations as if we're trying to stonewall
19   you, this is not the witness to ask that
20   question.
21       MR. MORRIS:  I can't -- I can't
22   wait -- I can't wait to do this in a
23   courtroom.  I will just leave it at that.
24       MS. DANDENEAU:  That's right, I'm
25   sure you can't.

Page 158

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2     Q.   Did anyone ever tell you, sir, that
3   even though you were the acting treasurer of
4   HCMFA, that you were not authorized to sign the
5   two promissory notes that we looked at before
6   lunch?
7     A.   I'm not sure I understand the
8   question.  I wasn't -- I mean, I'm -- I'm the
9   current acting treasurer.
10    Q.   Did anybody ever tell you at any
11  time that even though you were the acting
12  treasurer of HCMFA, that you were not
13  authorized to sign the two promissory notes
14  that we looked at before lunch?
15         MS. DANDENEAU:  Objection to form.
16    A.   Not that I recall.
17    Q.   Did anybody ever tell you at any
18  time that you were not authorized to sign the
19  two promissory notes that we looked at before
20  lunch?
21    A.   Not that I recall.
22    Q.   Did anybody ever tell you at any
23  time that you should not have signed the two
24  promissory notes that we looked at before
25  lunch?

Page 159

1          WATERHOUSE - 10-19-21
2     A.   Not that I recall.
3     Q.   Did you ever tell anybody at any
4   time that you weren't authorized to sign the
5   two promissory notes that we looked at before
6   lunch?
7     A.   Not that I recall.
8     Q.   Did you ever tell anybody at any
9   time that you made a mistake when you signed
10  the two promissory notes that we looked at
11  before lunch?
12    A.   Not that I recall.
13    Q.   As you sit here right now, do you
14  have any reason to believe that you were not
15  authorized to sign the two documents that we
16  looked at before lunch?
17         MS. DANDENEAU:  Objection to form.
18    A.   If -- if this is the -- the valid
19  incumbency certificate, I mean, this does --
20  this does detail who the signers are.
21    Q.   Okay.  And looking at that document,
22  does that give you comfort that you were
23  authorized to sign the two promissory notes
24  that we looked at before lunch?
25         MS. DEITSCH-PEREZ:  Object to the

Page 160

1          WATERHOUSE - 10-19-21
2   form.
3          MS. DANDENEAU:  Objection, form.
4     A.   Yes.
5     Q.   As of October 20th -- withdrawn.
6          I'm trying to take your mind back to
7   a year ago, October 2020.  Do you recall at
8   that time that the boards of the retail funds
9   were making inquiries about obligations that
10  were owed by the advisors to Highland in
11  connection with their 15(c) review?
12         MS. DANDENEAU:  Objection to form.
13    A.   I don't -- I don't recall.
14    Q.   As of October 2020, you had no
15  reason to believe you weren't authorized to
16  sign the two promissory notes that we just
17  looked at; correct?
18         MS. DANDENEAU:  Objection, form.
19         MS. DEITSCH-PEREZ:  Objection to
20  form.
21    A.   I didn't think about it in October
22  of 2020, but I mean --
23    Q.   Did you have any reason to believe
24  at that time that you weren't authorized to
25  sign the two notes that we just looked at?

Page 161

1          WATERHOUSE - 10-19-21
2     A.   Not that I'm aware, no.
3     Q.   Did you have any reason to believe a
4   year ago that you made a mistake when you
5   signed those two notes?
6     A.   Not that I'm aware.
7     Q.   A year ago you believed that HCMFA
8   owed Highland the unpaid principal amounts that
9   were due under those two notes; correct?
10    A.   They're -- they're promissory notes
11  that were -- as you presented, that were --
12  that were executed.  Whether they're valid or
13  if there's other reasons, I didn't -- I don't
14  know.
15    Q.   I'm not asking you whether they're
16  valid or not.  I'm asking you for your state of
17  mind.  A year ago you believed that HCMFA
18  was -- was obligated to pay the unpaid
19  principal amount under the two notes that you
20  signed; correct?
21    A.   Yeah, I'm -- I'm -- yes.
22    Q.   Thank you.  Are you aware -- you're
23  aware that -- that in 2017, NexPoint issued a
24  note in favor of Highland in the approximate
25  amount of $30 million; correct?

Page 162

WATERHOUSE - 10-19-21

1   A.   I'm – I'm – I'm generally aware.
2   A.   I'm – I'm – I'm generally aware.
3   Q.   Okay.  And are you generally aware
4   that from time to time, after the note was
5   issued by NexPoint, that moneys were applied to
6   principal and interest that were due under the
7   NexPoint note?
8   A.   Yes, I'm generally aware.
9   Q.   Okay.  And did anybody ever tell you
10  that the payments that were made against the
11  NexPoint notes were made by mistake?
12  A.   Yes.
13  Q.   And is it the one payment that we
14  talked about earlier today?
15  A.   We talked about a lot of things
16  today.  What payment are we talking about?
17  Q.   Okay.  Who told you that any payment
18  made against the NexPoint note was made by
19  mistake?
20  A.   D.C. Sauter.
21  Q.   When did Mr. Sauter tell you that?
22  A.   I don't – I don't remember
23  specifically.
24  Q.   Do you remember what payments –
25  A.   Sometime – sometime this year.

Page 163

WATERHOUSE - 10-19-21

1   Q.   Sometime in 2021?
2   Q.   Sometime in 2021?
3   A.   Yes.
4   Q.   Do you remember what payment he was
5   referring to?
6   A.   It was the – the payment made in
7   January of 2021 or – yeah, January of – of
8   this – January of 2021.
9   Q.   Okay.  So did anybody ever tell you
10  at any time that any payment that was made
11  against principal –
12  A.   And – and – and – hold on, and it
13  may have been other – again, it may have been
14  that payment or – or there may have been what
15  he was explaining, a misapplication of prior
16  payments as well.
17  Q.   Can you – can you give me any
18  specificity – withdrawn.
19      Withdrawn.  Can you tell me
20  everything that Mr. Sauter told you about –
21  about errors in relation to payments made
22  against principal and interest due under the
23  NexPoint note?
24      MS. DANDENEAU:  Can I just –
25      MR. RUKAVINA:  Hold on.  Hold on.

Page 164

WATERHOUSE - 10-19-21

1   I'm going to object here, and I'm going to
2   instruct the witness not to answer
3   depending on the discussion that you had –
4   Mr. Waterhouse, I'm the lawyer for
5   NexPoint, and as everyone here knows, D.C.
6   Sauter is in-house counsel.
7      So if you and Mr. Sauter were having
8   a factual discussion and him preparing his
9   affidavit, et cetera, then go ahead and
10  answer that.  But if you were having a
11  discussion as to our legal strategy in this
12  lawsuit, or anything having to do with
13  that, then do not answer that.
14      And if you need to talk to either
15  your counsel or me about that, then we need
16  to have that discussion now.
17  A.   Okay.  Yeah, I don't – I don't
18  really know how to make that distinction, so
19  maybe I need to talk to counsel before I
20  answer, or if I can answer.
21  Q.   Let me just ask you this question:
22  Did – did you have any conversation with
23  Mr. Sauter about any payment of principal and
24  interest prior to the time that you left

Page 165

WATERHOUSE - 10-19-21

1   Highland's employment, or did it happen after
2   you left Highland's employment?
3   A.   I don't – I don't recall if – I
4   don't recall.  I mean, it was sometime in 2021.
5   I don't remember if it was before or after I
6   was let go from Highland.
7   Q.   Okay.  So – so nobody told you
8   prior to 2021 that any error or mistake was
9   made in the application of payments against
10  principal and interest due on the NexPoint
11  note.  Do I have that right?
12  A.   Yeah, I don't – I don't recall this
13  being in 2020.
14  Q.   Okay.  And it didn't happen in 2019;
15  correct?
16  A.   I don't recall that happened.
17  Q.   And it didn't happen in 2018;
18  correct?
19  A.   I don't – I don't recall that
20  happening.
21  Q.   And it didn't happen in 2017;
22  correct?
23  A.   I don't recall.
24  Q.   But – but you believe the

Page 166

WATERHOUSE - 10-19-21

1 conversation took place in 2021. You just
2 don't remember if it was before or after you
3 left Highland's employment. Do I have that
4 right?
5 A. It was sometime this year. I
6 don't – I don't remember.
7 Q. Okay. Did you report this
8 conversation to Mr. Seery at any point?
9 A. I don't believe so.
10 Q. Did you report this conversation to
11 anybody at DSI at any time?
12 A. I don't recall.
13 Q. Do you have – you don't have a
14 recollection of ever doing that; correct?
15 A. Yeah, that's right. I don't recall
16 doing that.
17 Q. Do you recall telling anybody at
18 Pachulski Stang about the conversation you
19 recall with Mr. Sauter?
20 A. No, I don't – I don't recall.
21 Q. Did you tell any of the independent
22 board members about your conversation with
23 Mr. Sauter?
24 A. I don't recall.

Page 167

WATERHOUSE - 10-19-21

1 Q. Did you tell any of the employees at
2 Highland before you left Highland's employment
3 about this call that you had with Mr. Sauter?
4 MS. DANDENEAU: Objection to form.
5 A. No, I don't – no, I don't recall.
6 Q. NexPoint – to the best of your
7 knowledge, did NexPoint ever file a proof of
8 claim against Highland to try to recover moneys
9 that were mistakenly paid against the principal
10 and interest due under the note?
11 A. Okay. Hold on. You are saying did
12 NexPoint Advisors file a proof of claim to
13 Highland for errors related to payments under
14 the NexPoint note to Highland?
15 Q. Correct.
16 A. Yes, it is – I'm not – I'm not
17 aware.
18 Q. Are you aware –
19 A. I'm not the legal person here, I
20 don't know.
21 Q. I'm just asking for your knowledge,
22 sir.
23 A. Yeah, I don't know. I'm not aware.
24 Q. Are you aware of any claim of any

Page 168

WATERHOUSE - 10-19-21

1 kind that NexPoint has ever made to try to
2 recover the amounts that it contends were – or
3 that Mr. Sauter contend were mistakenly applied
4 against principal and interest due under the
5 NexPoint note?
6 A. I'm not aware.
7 MS. DANDENEAU: Objection to form.
8 Q. Okay. The advisors' agreements with
9 the retail funds are subject to annual renewal;
10 correct?
11 A. Yes.
12 Q. And do you participate in the
13 renewal process each year?
14 A. Yes.
15 Q. What role do you play in the renewal
16 process?
17 A. I'm – I'm asked by the retail board
18 to walk-through the advisors financials.
19 Q. And do you do that in the context of
20 a board meeting?
21 A. Yes, it is – yes, it is typically
22 done in a board meeting.
23 Q. And do you recall the time –
24 does – does the renewal process happen around

Page 169

WATERHOUSE - 10-19-21

1 the same time each year?
2 A. Yes, it is – it is around the same
3 time every year.
4 Q. And what – what time period of the
5 year does the renewal process occur?
6 A. Approximately the September
7 timeframe.
8 Q. During that process, in your
9 experience, does the board typically conduct
10 its own diligence and ask for information?
11 A. Does the board ask for lots of – I
12 mean, just – I mean, lots of information as a
13 part of that – that – as part of that board
14 meeting and that process.
15 Q. Okay. And do you recall that the
16 process in 2020 spilled into October?
17 A. Yes. Yes.
18 Q. Okay. And as part of the process in
19 2020, the retail board asked – asked what are
20 referred to as 15(c) questions; right?
21 A. I guess I don't want to be – they
22 asked 15(c) – are you saying they asked 15(c)
23 questions and this is why it went into October
24 or –

Page 170

WATERHOUSE - 10-19-21

1        Q.   No, I apologize.
2             Do you have an understanding of
3    what -- of what 15(c) refers to in the context
4    of the annual renewal process?
5        A.   Yes, generally.
6        Q.   All right.  What is your general
7    understanding of the term "15(c)" in the
8    context of the annual renewal process?
9        A.   I -- I think 15(c) is the section
10   that -- that -- you know, that -- that the
11   board has to evaluate every year, the retail
12   board.  They have to, you know, go through,
13   evaluate, and go through that approval process
14   on a yearly basis.
15       Q.   Okay.
16            MR. MORRIS:  Can we put up on the
17   screen Exhibit 36, please.
18            (Exhibit 36 marked.)
19            MR. MORRIS:  I guess let's just
20   start at the bottom so Mr. Waterhouse can
21   see what is here.
22       Q.   You see this begins with an email
23   from Blank Rome to a number of people.
24            MR. MORRIS:  And if we can scroll

Page 171

WATERHOUSE - 10-19-21

1    up -- keep going just a little bit.
2        Q.   You will see that there is an email
3    from Lauren Thedford to Thomas Surgent and
4    others where she reports that she was attaching
5    and reproducing below additional 15(c)
6    follow-up questions from the board.
7             Do you see that?
8        A.   Yes.
9        Q.   And do you see Question No. 2 asks
10   whether there are any material outstanding
11   amounts currently payable or due in the future
12   (e.g., notes) to HCMLP by HCMFA or NexPoint
13   Advisors or any other affiliate that provides
14   services to the funds?
15            Do you see that?
16       A.   Yes.
17       Q.   And -- and did you -- do you recall
18   that in -- in October of 2020 the retail boards
19   were asking for that information?
20       A.   I don't recall it, but there --
21   they're obviously asking in this email.
22       Q.   Okay.
23            MR. MORRIS:  Can we scroll up a
24   little bit, please.

Page 172

WATERHOUSE - 10-19-21

1        Q.   And then do you see that
2    Ms. Thedford includes you on the email string
3    on Tuesday, October 6th, at 5:52?
4        A.   Yes.
5        Q.   And she asks you and Dave Klos and
6    Kristin Hendrix for advice on that particular
7    Request No. 2 that I have just read; right?
8        A.   Yes.
9        Q.   Okay.  Can you tell me who
10   Ms. Thedford is?
11       A.   She was an attorney that was in the
12   legal group.
13       Q.   At Highland Capital Management,
14   L.P.?
15       A.   I'm -- I'm -- I'm -- I don't
16   remember if she was an employee of Highland or
17   any of the advisors.
18       Q.   Okay.  Do you know if she served as
19   the corporate secretary for both HCMFA and
20   NexPoint?
21       A.   Yes.
22       Q.   And -- okay.
23            Do you know whether Ms. Thedford
24   held any positions in relation to the retail

Page 173

WATERHOUSE - 10-19-21

1    funds as we defined that term?
2        A.   Yes.
3        Q.   What is your understanding of the
4    positions that Ms. Thedford held at the retail
5    funds?
6        A.   I -- I recall her being an officer.
7    I don't recall her title.
8        Q.   Okay.  Is still an officer at
9    any of the retail funds today?
10       A.   No.
11       Q.   Do you know when she ceased to be an
12   officer of the retail funds?
13       A.   Approximately.
14       Q.   And when did she approximately cease
15   to be an officer of the retail funds?
16       A.   It was in -- it was in early of
17   2021.
18       Q.   Okay.  Do you know when she became
19   an officer of the retail funds?
20       A.   I don't recall.
21       Q.   To the best of your recollection,
22   was she an officer of the retail funds in
23   October of 2020?
24       A.   I believe so.

Page 174

WATERHOUSE - 10-19-21

1
2 Q. Okay. Do you know what title she
3 held in her capacity as an officer, if any?
4 A. I told you I don't remember.
5 Q. Okay. So she sends this email to
6 you at 5:52 p.m. on October 6th.
7 And if we can scroll up to the
8 response, you responded a minute later with a
9 one-word answer: Yes.
10 Do you see that?
11 A. Yes.
12 Q. And – and yes is – yes was in
13 response to the retail board's Question No. 2,
14 right, whether there are any material
15 outstanding amounts currently payable or due in
16 the future?
17 A. Yes.
18 MR. MORRIS: And can we scroll up to
19 see what happened next.
20 Q. So Ms. Thedford writes back to you a
21 few minutes later and she asks whether you
22 could provide the amounts.
23 Do you see that?
24 A. Yes.
25 Q. And then you respond further and you

Page 175

WATERHOUSE - 10-19-21

1
2 refer her to the balance sheet that was
3 provided to the board as part of the 15(c)
4 materials.
5 Do you see that?
6 A. Yes.
7 Q. And – and did the advisors provide
8 to the board certain balance sheets in 2020 in
9 connection with the 15(c) review?
10 A. Yes, they did.
11 Q. Okay. And were the amounts that
12 were outstanding or that were to be due in the
13 future by the advisors to Highland included in
14 the liability section of the balance sheet that
15 was given to the retail board?
16 A. Yes. Notes would be reflected as
17 liabilities.
18 Q. Okay. And –
19 A. If I'm understanding your question
20 correctly.
21 Q. You are. And – and – and those
22 liabilities you – you were – you believed
23 were responsive to the retail board's question;
24 correct?
25 A. Yes.

Page 176

WATERHOUSE - 10-19-21

1
2 Q. Okay. And then if we can scroll up,
3 you see Ms. Thedford responds to you
4 nine minutes later with a draft response.
5 Do you see that?
6 A. Yes.
7 Q. And she says that she is taking from
8 the 6/30 financials certain information about
9 amounts that were due to HCMLP and affiliates
10 as of June 30th, 2020.
11 Do you see that?
12 A. I do.
13 Q. Okay. And did you believe, as the
14 treasurer of NexPoint and HCMFA and as the CFO
15 of Highland, that the information that
16 Ms. Thedford obtained from the 6/30 financials
17 was accurate and responsive in relation to the
18 retail fund board's question?
19 A. I just want to make sure I
20 understand the question.
21 Are you saying that the financial
22 information provided to the retail board as
23 part of the 15(c) process, which included
24 financial statements as of June 30th of 2021,
25 did I feel like those were responsive to their

Page 177

WATERHOUSE - 10-19-21

1
2 questions?
3 Q. Yes.
4 A. Yes.
5 Q. Thank you.
6 MS. DEITSCH-PEREZ: John, it is not
7 in the chat yet. Can you just make sure it
8 gets put in there.
9 MR. MORRIS: Sure.
10 MS. CANTY: I put it in there. I
11 think maybe I just sent it directly, so let
12 me make sure it says to everyone. But I
13 did put it in there. I will try again.
14 MR. MORRIS: Thank you, La Asia.
15 MS. DANDENEAU: What number is it.
16 MR. MORRIS: What, the Bates number?
17 MS. DEITSCH-PEREZ: No, the –
18 this – yeah, 36 is not in the chat.
19 MR. MORRIS: Okay. We'll get it.
20 MS. DANDENEAU: I think that
21 Ms. Canty just sent it to me originally.
22 Sorry.
23 MR. MORRIS: Okay. We will get it
24 there.
25 MS. CANTY: Okay. It is there now

Page 178

WATERHOUSE - 10-19-21

1  for everyone.
2  MS. DEITSCH-PEREZ: Got it. Thank
3  you.
4  Q. Do you recall if the proposed
5  response that Ms. Thedford crafted was
6  delivered to the retail board with the -- with
7  the yellow dates having been completed?
8  A. I don't know.
9  MR. MORRIS: Davor, I'm going to ask
10  that the advisors and -- the advisors of
11  both HCMFA and NexPoint produce to me any
12  report that was given to the retail board
13  concerning the promissory notes at issue,
14  including the obligations under the notes.
15  Q. Do you know -- do you know if
16  ultimately NexPoint informed the retail board
17  in response to its question that NexPoint owed
18  Highland approximately 23 or $24 million?
19  MS. DANDENEAU: Objection to the
20  form.
21  A. Sorry, are you asking, did NexPoint
22  tell the retail board that it owed Highland?
23  Q. Let me ask a better question,
24  Mr. Waterhouse.
25

Page 179

WATERHOUSE - 10-19-21

1  Did -- do you know if anybody ever
2  answered the retail board's question that was
3  Number 2?
4  A. I don't -- I can't say for sure.
5  Q. Okay. Do you recall -- I think you
6  testified earlier that you walked through the
7  advisors' financials with the retail board;
8  correct?
9  A. Yes.
10  Q. And as part of that process, did you
11  disclose to the retail board the obligations
12  that NexPoint and HCMFA had to Highland under
13  promissory notes?
14  A. The retail board, as I stated
15  earlier, receives financial information,
16  balance sheet, income statement information
17  from the advisors. That information is
18  provided to the retail board in connection with
19  the 15(c) process.
20  So any notes between the advisors
21  and the Highland would be -- anything would be
22  detailed in those financial statements.
23  Q. Do you recall in 2020 ever speaking
24  with the retail board about the advisors'
25

Page 180

WATERHOUSE - 10-19-21

1  obligations under the notes to Highland?
2  MS. DANDENEAU: Objection to form.
3  MS. DEITSCH-PEREZ: Object to the
4  form.
5  A. I don't recall specifically.
6  Q. Do you have any general recollection
7  of discussing with the retail board the
8  advisors' obligations to Highland under the
9  notes that they issued?
10  MS. DANDENEAU: Object to the form.
11  MS. DEITSCH-PEREZ: Object to the
12  form.
13  A. I just recall generally just -- it
14  is just -- I present the financial statements,
15  and if they have questions, I answer their
16  questions and walk them through.
17  I don't recall what they asked. I
18  don't recall where the discussion went. I
19  don't recall anything of that nature.
20  Q. Okay. Do you know if anybody on
21  behalf of HCMF -- HCMFA ever told the retail
22  board that HCMFA had no obligations under the
23  two 2019 notes that you signed? Withdrawn.
24  Do you know whether anybody on
25

Page 181

WATERHOUSE - 10-19-21

1  behalf of HCMFA ever told the retail boards
2  that you weren't authorized to sign either of
3  the two 2019 notes?
4  MS. DANDENEAU: Objection to form.
5  A. I'm not aware.
6  Q. Are you aware of anybody on behalf
7  of HCMFA ever telling the retail boards that
8  your execution of the two 2019 notes was a
9  mistake?
10  MS. DANDENEAU: Objection to form.
11  A. I'm not aware.
12  Q. Are you aware of anybody on behalf
13  of HCMFA ever telling the retail boards that
14  HCMFA did not have to pay the amounts reflected
15  in the two notes that you signed in 2019?
16  A. I'm not aware.
17  Q. Do you know whether anybody ever
18  told the retail boards -- withdrawn.
19  Do you know whether anybody ever
20  told the retail boards that Highland has
21  commenced a lawsuit to recover on the two notes
22  that you signed in 2019?
23  A. I'm not aware.
24  Q. Are you aware of anybody informing
25

Page 182

WATERHOUSE - 10-19-21

1  the retail boards that Highland has sued to
2  recover on the NexPoint note?
3  A.  I'm not aware.
4  Q.  Do you know whether anybody ever
5  told the retail board that Highland had
6  declared a default with respect to the two
7  HCMFA notes that you signed in 2019?
8  A.  I'm not aware.
9  Q.  Are you aware of anybody ever
10  informing the retail boards that Highland had
11  declared a default under the NexPoint note?
12  A.  I'm not aware.
13  Q.  Are you aware of anybody telling the
14  retail board that Highland made a demand for
15  payment under the 2019 notes that you signed on
16  behalf of HCMFA?
17  A.  I'm not aware.
18  Q.  Let's -- let's see if there is a
19  response to Ms. Thedford's email, if we can
20  scroll up.
21  Do you see you responded to
22  Ms. Thedford five minutes after she provided
23  the draft response to you?
24  A.  Yes.

Page 183

WATERHOUSE - 10-19-21

1  Q.  Okay.  And do you see that Dustin
2  Norris is copied on this email?
3  A.  Yes, he is.
4  Q.  Great.  Do you know whether
5  Mr. Norris held any positions at either of the
6  advisors as of October 6, 2020?
7  A.  I will go back to -- I'm not the
8  legal expert of what appoints you or how or
9  why, but you did see Dustin's name on the
10  incumbency certificate that you produced
11  earlier.
12  Q.  Do you know what his title was in
13  October of 2020?
14  MS. DANDENEAU:  Objection to form.
15  A.  I don't -- I don't recall.
16  Q.  Was he -- did he have a title with
17  each of the advisors, to the best of your
18  recollection?
19  A.  I don't recall.
20  Q.  Do you know why he is included on
21  this email string?
22  A.  I didn't add Dustin.  It looks like
23  Lauren did.  I don't know why she added him or
24  not.  You would have to ask her.

Page 184

WATERHOUSE - 10-19-21

1  Q.  Does Mr. Norris play a role in
2  formulating the advisors' responses to the
3  questions asked by the retail board in
4  connection with the 15(c) annual review?
5  MS. DANDENEAU:  Objection to form.
6  A.  He -- Dustin Norris is there in the
7  board meetings.  But -- so he has a role, yes.
8  Q.  Okay.  And does Mr. Norris hold any
9  positions, to the best of your knowledge, in
10  relation to any of the retail funds?
11  A.  I don't -- I don't believe he does.
12  Q.  How about Mr. Post, do you know
13  whether Mr. Post holds any position in either
14  of the advisors?
15  A.  I mean, he -- he -- yes.
16  Q.  What is your understanding of the
17  positions that Mr. Post holds in relation to
18  the advisors?
19  MS. DANDENEAU:  Objection to form.
20  A.  He is an employee of NexPoint
21  Advisors.  He is also the chief compliance
22  officer for -- for NexPoint.
23  Q.  Who is the chief compliance officer
24  for HCMFA, if you know?

Page 185

WATERHOUSE - 10-19-21

1  MS. DANDENEAU:  Objection to form.
2  A.  That would be Jason as well.
3  Q.  Okay.  Now, looking at your
4  response, you noted initially that nothing was
5  owed under shared services.  Do I have that
6  right in substance?
7  A.  Yeah.  I think I'm being responsive
8  to Lauren's question here, whether any of the
9  shared service invoices are outstanding.
10  Q.  Right.
11  A.  Yes.
12  Q.  And that is because -- and that is
13  because the retail the retail board has asked
14  for the disclosure of all material obligations
15  that were owed to HCMLP either then or in the
16  future; isn't that right?
17  MS. DANDENEAU:  Objection to form.
18  Q.  We can go back down and look.
19  A.  Look, I don't know if that's a
20  material item, I mean, again, but sure.
21  Q.  Okay.  But there were no shared
22  services outstanding; correct?
23  MS. DANDENEAU:  Objection to form.
24  A.  That is what this email seems to

Page 186

WATERHOUSE - 10-19-21

1 indicate.

2     Q.  And you wouldn't have written it if

3 you didn't believe it to be true at the time;

4 correct?

5     A.  Correct.

6     Q.  And when you referred to shared

7 services outstanding, what you meant there was

8 that neither NexPoint nor HCMFA owed Highland

9 any money under the shared services agreements

10 that they had with Highland as of October 6th,

11 2020; right?

12     A.  I don't know if it is as of October

13 6, 2020 or if it was from -- like through the

14 financials -- through the date of the

15 financials as of June 30.

16     Q.  Okay. And then you noted that

17 HCMA -- the HCMFA note is a demand note; right?

18     A.  Yes.

19     Q.  And then you referred Ms. Thedford

20 to Kristin Hendrix for the term of the NexPoint

21 note. Do I have that right?

22     A.  Yes.

23     Q.  And then you refer to that agreement

24 that is referenced in the 2018 audited

Page 187

WATERHOUSE - 10-19-21

1 financials about Highland's agreement not to

2 make demand upon HCMFA until May 2021; correct?

3     A.  Correct.

4     Q.  And then -- and then the next thing

5 you write is that the attorneys think that BK

6 doesn't change that, but don't know for sure at

7 the end of the day.

8     Do you see that sentence?

9     A.  Yes.

10     Q.  Which attorneys were you referring

11 to?

12     A.  I don't remember.

13     Q.  Did you have a conversation with

14 attorneys concerning whether the bankruptcy

15 would change or alter in any way the agreement

16 not to make a demand under the HCMFA note?

17     A.  Look, yeah, I mean, I don't

18 specifically remember, but generally, I mean,

19 it is in this email. I don't -- I don't -- I

20 don't -- I don't remember who I talked to or,

21 you know, was it inside counsel, outside

22 counsel, but obviously I talked to somebody.

23     Q.  Do you have any recollection --

24     A.  Well, I don't even know if it's --

Page 188

WATERHOUSE - 10-19-21

1 actually, it may not even have been me. I say

2 the attorneys in, you know, a lot of -- like I

3 talked about the team.

4     It could have been someone on the

5 team, like, hey, we need to run this down, and

6 maybe they talked to attorneys again and

7 relayed that information to me.

8     So I really don't know if I spoke or

9 someone else did or -- or, I mean, and maybe it

10 wasn't even from corporate accounting. Maybe

11 it was, you know, other -- I'm kind of

12 summarizing, you know, again, so I don't really

13 know -- I can't really say for sure. I don't

14 remember how I came about this knowledge.

15     Q.  I appreciate your efforts,

16 Mr. Waterhouse, but I will just tell you that

17 if I ask a question and you don't know the

18 answer or you don't recall, I'm happy to accept

19 that. I don't -- I don't want you to

20 speculate, so I want to be clear about that.

21 So I appreciate it.

22     Let me just ask you simply: Do you

23 know what attorneys -- can you identify any of

24 the attorneys who thought that the bankruptcy

Page 189

WATERHOUSE - 10-19-21

1 process didn't change the agreement?

2     A.  I don't recall.

3     Q.  Okay. Perfect.

4     And then let's look at the last

5 sentence. It says, quote: The response should

6 include, as I covered in the board meeting,

7 that both entities have the full faith and

8 backing from Jim Dondero, and to my knowledge

9 that hasn't changed.

10     Do you see that?

11     A.  Yes.

12     Q.  Okay. Prior to October 6th, 2020,

13 had you told the retail board that HCMFA and

14 NexPoint have the full faith and backing from

15 Jim Dondero?

16     A.  Yes.

17     Q.  Do you remember in the context in

18 which you told the retail board that?

19     A.  I mean, generally, yes.

20     Q.  Tell me what you recall.

21     A.  So we were walking through the

22 financials from the advisors; right? So as I

23 described to you, you have got HCMFA and NPA.

24 And these -- the financials, you know, show

Page 190

WATERHOUSE - 10-19-21

2 they have liabilities on them that exceed
3 assets.
4        So the retail board has asked, okay,
5 you know, how -- you know, if -- if these
6 liabilities come due or they're payable, you
7 know, how does that come about?
8        And, you know, the response is,
9 well, the advisors have the -- the full faith
10 and backing from -- from Jim Dondero.
11    Q.   And how did you know that the
12 advisors had the full faith and backing from
13 Jim Dondero?  What was the basis for that
14 statement that you made to the retail board?
15    A.   I talked to Jim about it at some
16 point in the past.
17    Q.   And did you tell Mr. Dondero that
18 you were going to inform the retail board that
19 the advisors had his full faith and backing
20 before you actually told that to the retail
21 board?
22    A.   I don't recall having that
23 conversation.
24    Q.   Do you recall if you ever informed
25 Mr. Dondero that you had disclosed or told the

Page 191

WATERHOUSE - 10-19-21

2 retail board that the advisors had the full
3 faith and backing of Mr. -- Mr. Dondero?
4        MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   I don't recall discussing that with
7 him at the time.
8    Q.   When you told this to the board, was
9 Mr. Dondero participating in the discussion?
10    A.   Not that I recall.
11    Q.   Withdrawn.  Was it not -- withdrawn.
12        Do you recall whether -- when you
13 covered this issue with the board, was that in
14 a -- a Zoom call or a Webex call?  Was it a
15 telephone call?  Was it in-person?  Like where
16 were you physically in relation to the board?
17    A.   I believe I was at home.
18    Q.   Okay.  Can you identify every person
19 that you recall who was present for this
20 disclosure other than -- other than the board
21 members themselves?
22        MS. DEITSCH-PEREZ:  Object to the
23    form.
24    A.   I don't recall everyone on the call.
25    Q.   Can you identify anybody who was on

Page 192

WATERHOUSE - 10-19-21

2 the call?
3    A.   Other than the board members?
4    Q.   Yes.
5    A.   Lauren Thedford.  I mean, there
6 are -- there are many -- my section is just one
7 of many sections that are just -- you know, as
8 you can appreciate, this is a long board
9 meeting.
10        I can't recall specifically, really
11 even generally, or who was on when this was
12 discussed.  But Lauren was typically on for the
13 entire time.
14    Q.   I apologize if I asked you this, but
15 do either of Mr. Norris or Mr. Post hold any
16 positions relative to the retail funds?
17    A.   I think you asked me this already,
18 John.
19    Q.   Okay.  I just don't recall.  Can you
20 just refresh my recollection if I did, in fact,
21 ask you the question?
22    A.   I don't believe -- if we can go
23 back.  I don't believe Mr. Norris has a title
24 at the retail funds.  Mr. -- and Mr. Post is
25 the CCO of the advisor, the advisors.

Page 193

WATERHOUSE - 10-19-21

2    Q.   Okay.  Do you know if either of them
3 have a position with the retail board -- with
4 the retail funds?
5    A.   I don't believe Mr. Norris has a
6 position with the retail funds.
7    Q.   All right.  What about Mr. Post?
8    A.   Mr. Post is the CCO of the advisors.
9    Q.   Okay.  Does he hold any position --
10    A.   I don't believe so.
11    Q.   -- with the retail funds?
12    A.   I don't believe so.
13    Q.   Okay.
14    A.   I don't know if being the CCO for
15 the advisor conveys something for the retail
16 funds.  Again, I am not -- that is the legal
17 compliance part of it.  I don't know.
18    Q.   Why did you tell the retail board
19 that the advisors have the full faith and
20 backing from Mr. Dondero?
21        MS. DANDENEAU:  Objection to form.
22    A.   It is -- it is -- it is what has
23 been discussed with them prior.
24    Q.   And were you -- were you trying to
25 give them comfort that even though the

Page 194

WATERHOUSE - 10-19-21

1 liabilities exceeded the assets that the
2 advisors would still be able to meet their
3 obligations as they become due?
4     MS. DANDENEAU: Objection to form.
5     MS. DEITSCH-PEREZ: Object form.
6   A. I -- I can't -- I don't remember
7 specifically the conversation, but generally --
8 you know, generally, yes. And that is why --
9 but, you know, again, in this email saying, you
10 know, I am sure I qualified it with the retail
11 board, you know, as I said I like -- you know,
12 to my knowledge, that hasn't changed. But,
13 again, generally -- generally that is what I
14 remember.
15   Q. Okay. Do you recall if in the
16 advisors' response to the retail board's
17 question if the response included any statement
18 concerning Mr. Dondero and -- and the full
19 faith and backing that he was giving to the
20 advisors?
21     MS. DEITSCH-PEREZ: Object to the
22   form.
23   A. I don't -- I don't remember
24 specifically what was provided.

Page 195

WATERHOUSE - 10-19-21

1   Q. Okay.
2   A. And I don't really -- I don't really
3 remember generally either.
4   Q. Okay.
5     MR. MORRIS: So -- so, again, I'm
6 just going to ask Mr. Rukavina if your
7 clients can produce as soon as possible the
8 15(c) response, the written response that
9 the advisors made, if any, to the board's
10 Question No. 2.
11   I'm not looking for the whole
12 response, but I certainly want the response
13 to Question No. 2.
14   Q. Do you have a general understanding
15 as to the amount by which -- withdrawn.
16   Did -- did the assets of --
17 withdrawn.
18   Did the liabilities of HCMFA exceed
19 its assets in 2020?
20     MS. DANDENEAU: Objection to form.
21     MS. DEITSCH-PEREZ: Objection, form.
22   A. I believe I have already answered
23 that question earlier, I think. I believe I
24 said yes.

Page 196

WATERHOUSE - 10-19-21

1   Q. Okay. And did the liabilities of
2 NexPoint exceed its assets in 2020?
3     MS. DEITSCH-PEREZ: Objection to
4   form.
5   A. I don't believe so.
6   Q. Okay. So -- so it was only one of
7 the two advisors who had liabilities that
8 exceeded the value of the assets.
9   Do I have that right?
10     MS. DEITSCH-PEREZ: Objection to
11   form.
12     MS. DANDENEAU: Form.
13   A. Yes.
14   Q. And do you know, ballpark, the
15 amount by which the value of HCMFA's
16 liabilities exceeded their assets in 2020?
17     MS. DANDENEAU: Objection to form.
18   A. I don't -- I don't recall.
19     MR. MORRIS: I had specifically
20 requested in discovery the audited
21 financial reports for both advisors and
22 NexPoint. I think I may have gotten one
23 for NexPoint but I'm still waiting for the
24 balance. And I'm going to renew my request

Page 197

WATERHOUSE - 10-19-21

1 for those documents too.
2   Q. Let's go to the next exhibit, which
3 is Number 10. So I think it is in your stack,
4 Mr. Waterhouse.
5     MR. MORRIS: And we can take the one
6 down from the screen and put up Number 10
7 for everybody.
8   (Exhibit 10 marked.)
9   Q. And I don't know if you have ever
10 seen this before, but I'm really putting it up
11 on the screen for purposes of turning to the
12 very last page of the document.
13   So this is a document that we have
14 been -- that we premarked as Exhibit 10. And
15 we're turning to the last page of the document,
16 which is a document that was filed in the
17 adversary proceeding 21-3004. And -- no, I
18 apologize, I think we -- right there. Perfect.
19   And it is page 31 of 31.
20     MR. MORRIS: I think there may have
21 been some something erroneously stapled to
22 the hard copy that I gave you folks, but
23 I'm looking for page 31 of 31 in the
24 document that begins with the first page of

Page 198

WATERHOUSE - 10-19-21

1
2  Exhibit 10.
3     Q.   Do you have that, Mr. Waterhouse?
4     A.   I don't have it yet.  I'm looking.
5     Q.   All right.  If you look at the top
6  right-hand corner, you will see it says page
7  hopefully something of 31?
8     A.   Yes, I've got it now.
9     Q.   Okay.  You have got 31 of 31.  You
10  can take a moment to read that, if you would
11  like.
12     A.   (Reviewing document.)  Okay.
13     Q.   Have you ever seen this before?
14     A.   I don't know if I have seen this
15  specific document, but, you know, I've --
16  I'm -- I'm aware of it.
17     Q.   And is this the document that you
18  had in mind when you sent that email to
19  Ms. Thedford that we just looked at where you
20  said that Highland had agreed not to make a
21  demand upon HCMFA on May 2021?
22     A.   Honestly, I don't -- it wasn't this
23  document.  I mean, it's something like this,
24  yes.  I mean, yes.
25     Q.   Well --

Page 199

WATERHOUSE - 10-19-21

1
2     A.   It is something like this, but I
3  don't think it was this specific document.
4     Q.   Well, but this document does say in
5  the last sentence that Highland agreed not to
6  seek -- not to demand payment from HCMFA prior
7  to May 31, 2021; right?
8     A.   Yes.
9     Q.   And are you aware of any other
10  document that was ever created pursuant to
11  which Highland agreed not to demand payment on
12  amounts owed by HCMFA before May 31, 2021?
13     A.   Hold on.  Are you asking, am I aware
14  of a document that by HCMFA that basically says
15  otherwise?
16     Q.   No.  Let me try again.
17     Are you aware of any other document
18  pursuant to which -- pursuant to which Highland
19  agreed not to make a demand on HCMFA until May
20  31st, 2021?
21     A.   I'm -- I think there was something
22  in connection with -- with the -- with the
23  audit that basically says the same thing.
24     Q.   Okay.  And do you think that the
25  audit is referring to this particular document?

Page 200

WATERHOUSE - 10-19-21

1
2     A.   I don't know.
3     Q.   All right.  This document is dated
4  April 15, 2019.  Do you see that?
5     A.   I do.
6     Q.   And do you remember that the audit
7  was completed on June 3rd, 2019?
8     A.   Yes.
9     Q.   And do you recall that the audited
10  financials -- and I'm happy to pull them up if
11  you would like, but do you recall that the
12  audited financials included a reference to the
13  agreement pursuant to which Highland agreed not
14  to make a demand until May 31st, 2021?
15     A.   Yes, I remember.
16     Q.   And as part of the process, would
17  you have expected the corporate accounting team
18  to have provided a copy of this document to
19  PwC?
20     MS. DANDENEAU:  Objection to form.
21     A.   Yes, I would have expected something
22  like this, or again, you know, some document
23  that basically states -- states the deferral
24  till May 31 of 2020.
25     Q.   Okay.

Page 201

WATERHOUSE - 10-19-21

1
2     A.   May 31 of 2021, excuse me.
3     Q.   And this document states the
4  deferral that you just described; correct?
5     A.   It does.
6     Q.   And this document states the
7  deferral that was described in the audited
8  financial statements that we looked at before;
9  correct?
10     A.   It does.
11     MR. MORRIS:  Okay.  Can we scroll
12  down just a little bit to see who signed on
13  behalf of the acknowledgment there.
14     Q.   Okay.  So Mr. Dondero signed this
15  document on behalf of both HCMFA and Highland;
16  do you see that?
17     A.   I do.
18     Q.   Okay.  Did you discuss this document
19  or the -- withdrawn.
20     Did you discuss the concept of the
21  deferral with Mr. Dondero in the spring of
22  2019?
23     A.   I think I testified I don't recall.
24     Q.   Okay.  Do you know whose idea it was
25  to issue the acknowledgment in this form?

Page 202

1       WATERHOUSE - 10-19-21
2   A.  I don't recall.
3     MR. MORRIS:  Can we scroll back up
4  to the document, please.
5   Q.  Do you see in the beginning it says,
6  reference is made to certain outstanding
7  amounts loaned from Highland to HCMFA for
8  funding ongoing operations.
9     Do you see that?
10  A.  Yes.
11   Q.  And were you aware as the CFO of
12  Highland and as the treasurer of HCMFA that as
13  of April 15, 2019, Highland had made certain
14  loans to HCMFA to fund HCMFA's ongoing
15  operations?
16  A.  Yes.
17   Q.  And were you aware that those loans
18  were payable on demand and remained outstanding
19  as of December 31st, 2018?
20  A.  Yes.
21   Q.  And were you aware that those
22  amounts were payable on demand, and they
23  remained outstanding as of April 15, 2019?
24     MS. DEITSCH-PEREZ:  Object to the
25  form.

Page 203

1       WATERHOUSE - 10-19-21
2   A.  Well, this -- this document dated
3  April 15, 2019 says they have been deferred to
4  May 31, 2021.
5   Q.  Right.  But I'm just sticking to the
6  first paragraph where they refer to the
7  outstanding amounts.  And in the end it says
8  the -- it remained outstanding on December
9  31st, 2018, and I think you told me that you
10  understood that, and then I'm just trying to
11  capture the last piece of it.
12     Did you understand that there were
13  amounts outstanding from the loan that Highland
14  made to HCMFA to fund ongoing operations as of
15  April 15th, 2019?
16  A.  Yes.
17   Q.  Thank you.  Let's look at the next
18  sentence.  HCMFA expects that it may be unable
19  to repay such amounts should they become due
20  for the period commencing today and continuing
21  through May 31st, 2021.
22     Do you see that?
23     MS. DANDENEAU:  Objection to form.
24  A.  I do.
25   Q.  As the CFO -- withdrawn.

Page 204

1       WATERHOUSE - 10-19-21
2     As the treasurer of HCMFA, did you
3  believe that -- do you believe that statement
4  was true and accurate at the time it was
5  rendered?
6  A.  I mean, it -- it -- the answer to
7  that is I really didn't have any -- I didn't
8  have an opinion really.
9   Q.  Did you do anything to educate
10  yourself in April of 2019 on the issue of
11  whether HCMFA could repay the amounts that it
12  owed to Highland should they become due?
13  A.  I don't believe so.
14   Q.  Did you at any time form any
15  opinions as to HCMFA's ability to repay all
16  amounts due to Highland should they become due?
17  A.  Not really.  I guess I don't...
18   Q.  Well, you told the retail board that
19  HCMFA's liabilities exceeded their assets in
20  2020; correct?
21  A.  Yes.
22   Q.  Based on the work that you did to
23  prepare for the retail board, did you form any
24  view as to whether HCMFA would be unable to
25  repay the amounts that it owed to Highland

Page 205

1       WATERHOUSE - 10-19-21
2  should they become due?
3     MS. DANDENEAU:  Objection to form.
4  A.  I mean, I -- when you look at that,
5  to answer you, completely, you know, again,
6  if -- the response I gave the retail board was,
7  you know, the -- the advice -- HCMFA advisors
8  have the -- have the full faith and backing of
9  Jim Dondero.  So I didn't form an opinion of
10  whether the advisor could pay it or not.
11   Q.  Did you form any view as to whether
12  the advisors could repay the amounts that it
13  owed to Highland should they become due without
14  the full faith and backing of Mr. Dondero?
15     MS. DANDENEAU:  Objection to form.
16     MS. DEITSCH-PEREZ:  Form.
17  A.  I mean, if you -- if you -- if you
18  take that last statement out, I mean, it would
19  be difficult for HCMFA to pay back demand notes
20  at that time.
21   Q.  And it was precisely for that reason
22  that you told the retail board that -- that the
23  retail -- that the advisors had the full faith
24  and backing of Mr. Dondero; correct?
25     MS. DANDENEAU:  Objection to form.

Page 206

WATERHOUSE - 10-19-21

1    A.  I mean, yes, as the mouthpiece, I
2  was relaying information.
3    Q.  Okay.  And you relayed that
4  information with the knowledge and approval of
5  Mr. Dondero; correct?
6      MS. DEITSCH-PEREZ:  Object to the
7  form.
8    A.  As I stated in the email, I don't
9  believe, and I think I testified I don't
10 believe I had conversations with Mr. Dondero at
11 the time of that board meeting.
12   Q.  Did you tell the retail board that
13 the advisors had the full faith and backing of
14 Mr. Dondero without Mr. Dondero's prior
15 approval?
16   A.  Yeah, I -- I -- yes, I'm -- like I
17 said, I think I testified earlier, I'm sure I
18 qualified it as well.
19   Q.  What do you mean by that?
20     MS. DANDENEAU:  Objection to form.
21   A.  Again -- again, like I said in the
22 email, it has the full faith and backing of Jim
23 Dondero unless that has changed.
24   Q.  Actually that is not what you said,

Page 207

WATERHOUSE - 10-19-21

1  so let's put the email back up.
2    A.  It is -- it is -- it is in the
3  email.
4    Q.  Let's put the email back up.  You
5  didn't say unless it has changed.  You said you
6  believe it hasn't changed; right?
7    A.  Okay.  And to my knowledge that
8  hasn't changed, that is what it says.
9    Q.  That's right.
10   A.  But, again, I mean, that is -- I
11 don't know everything.  And I'm not in every
12 conversation.  I'm not -- to presume that I am,
13 is -- and you have to put myself -- as you
14 started this out, Mr. Morris, I was at home in
15 October of 2020 with COVID -- or, you know,
16 under these COVID times that we described is
17 very difficult.
18     We have all been working at home for
19 really the first time ever, undergoing
20 processes, procedures, control environments
21 that have been untested, and there is poor
22 communication.
23     So I am relaying, as I'm telling you
24 now, what is in the email.  And unless

Page 208

WATERHOUSE - 10-19-21

1  something has changed -- to my knowledge, it
2  hasn't changed, but it could have changed.
3    Q.  When you say that the advisors have
4  the full faith and backing from Mr. Dondero,
5  did you intend to convey that, to the extent
6  the advisors were unable to satisfy their
7  obligations as they become due, Mr. Dondero
8  would do it for them?
9      MS. DANDENEAU:  Object to the form.
10     MS. DEITSCH-PEREZ:  Object to the
11 form.
12     And, John, we have given you a lot
13 of leeway here but this does not seem
14 relevant to this case.  You seem sort of
15 taking a complete sort of diversion into
16 the allegations and the complaint just
17 filed on Friday, and so I would ask you to
18 move on because --
19     MR. MORRIS:  And I will tell you --
20 I will tell you that I have never read that
21 complaint cover-to-cover.  I have nothing
22 to do with the prosecution of those claims.
23 And this issue that we're talking about
24 right now is related solely to the

Page 209

WATERHOUSE - 10-19-21

1  promissory notes that your clients refuse
2  to pay.
3      So I'm going to continue to ask my
4  questions, and I would ask the court
5  reporter to read back my last question.
6      (Record read.)
7      MS. DEITSCH-PEREZ:  And then I
8  believe there were objections to form.
9    Q.  You can answer the question.
10   A.  Yes.
11   Q.  Thank you very much, sir.
12     MR. MORRIS:  Can we go back to the
13 other document, please?
14   Q.  Mr. Waterhouse, do you know if this
15 document was ever shared with the retail board?
16   A.  I don't recall.
17   Q.  Did you ever share it with the
18 retail board?
19   A.  I don't recall.
20   Q.  Did you ever tell the retail board
21 about the substance of this document?
22   A.  I don't recall.
23   Q.  Did you ever tell the retail board
24 that Highland had agreed not to make a demand

Page 210

WATERHOUSE - 10-19-21

1  against HCMFA until May 2021?
2    Q.   Do you know whether anybody on
3    A.   I don't recall.
4    Q.   Do you know whether anybody on
5  behalf of the advisors ever informed the retail
6  board that Highland had agreed on April 15,
7  2019, not to make a demand against HCMFA under
8  the promissory notes?
9    A.   I don't recall.
10   Q.   Did you instruct Ms. Thedford or
11  anybody else responding to the retail board's
12  15(c) inquiry to disclose this document?
13   A.   Did I instruct Ms. Thedford or
14  anyone else to -- to -- to produce this, to
15  disclose this document?  Is that what you -- I
16  just want to make sure.
17   Q.   Uh-huh.
18   A.   Yeah, I don't -- I don't recall.
19   Q.   Did you instruct anybody to inform
20  the retail board, in response to their question
21  as part of the 15(c) process, to -- to tell the
22  retail board about Highland's agreement not to
23  make a demand until 2021?
24      MS. DANDENEAU:  Objection to form.
25   A.   I don't recall.

Page 211

WATERHOUSE - 10-19-21

1    Q.   Did you ever inform PwC that HCMFA's
2  liabilities exceeded its assets?
3      MS. DANDENEAU:  Object to the form.
4    A.   I don't -- I don't think I told
5  them.  I mean, they -- they audited the
6  financial statements.
7    Q.   Did -- do you know if anybody on
8  behalf of Highland ever informed
9  PricewaterhouseCoopers that HCMFA may be unable
10  to repay amounts owing to Highland, should they
11  become due?
12      MS. DANDENEAU:  Objection to form.
13   A.   Yes.  Again, I think I testified
14  earlier that -- that this was communicated to
15  the auditors.
16   Q.   Ideally --
17   A.   I don't know who exactly did that.
18  I don't recall doing it, but, yeah, it was --
19  it was communicated.  And that is why -- I
20  mean, there is a disclosure in the financial
21  statements; right?
22   Q.   There is, and that disclosure
23  relates to the last sentence of this document;
24  correct?

Page 212

WATERHOUSE - 10-19-21

1    A.   Yes.
2    Q.   Do you recall looking in the
3  document and seeing anything that was disclosed
4  with respect to the sentence above that?
5    A.   No.
6    Q.   Do you know whether anybody on
7  behalf of Highland ever informed
8  PricewaterhouseCoopers that HCMFA expects that
9  it may be unable to repay amounts due and owing
10  to Highland should they become due?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.  I think that is the third time.
13   A.   I don't recall.  Again, as I said,
14  we -- all of this was given to the auditors.
15   Q.   Do you know if Highland received
16  anything of value in exchange for its agreement
17  not to demand payment on amounts owed by HCMFA
18  prior to May 31st, 2021?
19      MS. DEITSCH-PEREZ:  Object to the
20  form.  That is the second time.
21      MS. DANDENEAU:  Object to the form.
22   A.   I have answered this question.
23      MR. RUKAVINA:  Hold on.  Object to
24  legal conclusion.  Go ahead.

Page 213

WATERHOUSE - 10-19-21

1    A.   I have answered this question
2  before.
3    Q.   And the answer was no?
4    A.   I'm not aware.
5    Q.   Now, this acknowledgment can't
6  possibly apply to the two notes that you signed
7  on behalf of HCMFA because those notes were
8  signed on May 2nd and May 3rd, 2019; is that
9  right?
10      MS. DANDENEAU:  Objection to form.
11   A.   Unless there is a drafting error.
12   Q.   Okay.  Are you aware of a drafting
13  error?
14   A.   I'm not aware.  I didn't -- I wasn't
15  part of -- I didn't sign this note or this
16  acknowledgment.  I didn't draft it.
17   Q.   But you do see it is dated April 15,
18  2019; right?
19   A.   Yes.
20   Q.   And this was a document that was
21  actually included by the advisors in a pleading
22  they filed with the Court; right?
23      MR. RUKAVINA:  Well, I don't know
24  that so I object to form.

Page 214

WATERHOUSE - 10-19-21

1    Q.   Okay.  Let's go to the first page of
2  the document and just confirm that.
3    MR. AIGEN:  Mr. Morris, I just note
4  that you already said there was some error
5  with the document that is listed as
6  exhibit –
7    MR. MORRIS:  No.  No, no, no.
8    MS. DEITSCH-PEREZ:  Oh, okay.
9    MR. MORRIS:  What I said is that
10  there is a few pages that were mistakenly
11  stapled to the end of the document.
12    MS. DEITSCH-PEREZ:  Okay.
13    MR. MORRIS:  There is no problem
14  with this document.
15    MS. DEITSCH-PEREZ:  And just so
16  we're clear that the document – the pages
17  that start with defendant's amended answer
18  are not intended to be part of this
19  document?
20    MR. MORRIS:  That's correct.
21    MS. DEITSCH-PEREZ:  And that the –
22  but it is your representation that the rest
23  of the document is – is – is correct
24  because we don't – we don't have any way

Page 215

WATERHOUSE - 10-19-21

1  of verifying that, we're just –
2    MR. MORRIS:  You do, actually.  You
3  could just go to Docket No. 21-3004.
4    MS. DEITSCH-PEREZ:  If you want to
5  stop this deposition so we can go and pull
6  that document up, we're happy to do it.  So
7  I am just asking you for your
8  representation.
9    MR. MORRIS:  Sure.  I gave that.
10    MS. DEITSCH-PEREZ:  Okay.
11    Q.   So do you see that this is a
12  document that was actually filed with the Court
13  by Highland Capital Management Fund Advisors?
14    A.   No.  I get with the first page in
15  the section.  Maybe I'm looking at the wrong
16  thing.  It says, Highland Capital Management.
17    Q.   Don't worry about it.  Don't worry
18  about it.
19    A.   Maybe I went back – okay.
20    MR. MORRIS:  All right.  Can we put
21  up on the screen Exhibit 2.
22    (Exhibit 2 marked.)
23    MR. MORRIS:  I think it is
24  Exhibit 1.

Page 216

WATERHOUSE - 10-19-21

1    MS. DANDENEAU:  I'm sorry, John, did
2  you say Exhibit 2 or Exhibit 1?
3    MR. MORRIS:  It is Exhibit 2 in the
4  binders so it is premarked Exhibit 2.  And
5  now I'm asking – right there – going to
6  Exhibit 1 to the document that was marked
7  as Exhibit 2.
8    MS. DANDENEAU:  Got it.  In the
9  binder there is no –
10    MS. DEITSCH-PEREZ:  There is no
11  Exhibit 1.
12    MR. MORRIS:  All right.  So look at
13  the one on the screen.
14    Q.   Do you see, Mr. Waterhouse, that
15  this is a promissory note dated May 31st, 2017,
16  in the approximate amount of $30.7 million?
17    A.   Yes.
18    Q.   And do you see that the maker of the
19  note is NexPoint?
20    A.   Yes.
21    Q.   And that Highland is the payee; is
22  that right?
23    A.   Yes.
24    Q.   Okay.  And do you see in Paragraph 2

Page 217

WATERHOUSE - 10-19-21

1  this is an annual installment note?
2    A.   Can you scroll down.
3    Q.   Sure.
4    MR. MORRIS:  Can we scroll down –
5  yeah, there you go.
6    A.   Right there, yeah.  Yes.
7    MR. MORRIS:  And can we scroll down
8  to the signature line.
9    Q.   And do you recognize that as
10  Mr. Dondero's signature?
11    A.   Yes.
12    Q.   And is this the promissory note that
13  we talked about earlier where NexPoint had made
14  certain payments in the aggregate amount of
15  about 6 to $7 million against principal and
16  interest?
17    A.   I don't recall discussing the
18  aggregate principal amounts of 6 to $7 million,
19  but – so I don't – I don't recall that prior
20  discussion with those amounts.
21    Q.   All right.  Let's take a look.
22  NexPoint always included this promissory note
23  as a liability on its audited financial
24  statements; right?

Page 218

1      WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   And NexPoint had its financial
4  statements audited; isn't that correct?
5    A.   Yes.
6    Q.   And was the process of NexPoint's
7  audit similar to the process you described
8  earlier for Highland and HCMFA?
9    A.   Yes, it is similar.
10   Q.   Okay.
11        MR. MORRIS:  Can we put up
12   NexPoint's audited financials and let
13   everybody know what exhibit number it is,
14   La Asia?
15        MS. CANTY:  It is going to be
16   Exhibit 46.
17        (Exhibit 46 marked.)
18   Q.   And do you see, sir, that we've put
19  up NexPoint Advisors' consolidated financial
20  statements and supplemental information for the
21  period ending December 31st, 2019?
22   A.   Yes.
23   Q.   Did you participate in the process
24  whereby these audited financial statements were
25  issued?

Page 219

1      WATERHOUSE - 10-19-21
2    A.   I didn't participate directly, as
3  I've described before, about the -- the team
4  performing the audit.
5    Q.   Do you recall when the audit of
6  NexPoint's financial statements for the period
7  ending December 31st, 2019 was completed?
8    A.   Yes.
9    Q.   And when do you recall it being
10  completed?
11   A.   In January of 2021.
12   Q.   Do you know why the 2019 audit
13  report wasn't completed until January of 2021?
14   A.   Yes.
15   Q.   Why was the NexPoint audit report
16  for the period ending 12/31/19 not completed
17  until January 2021?
18   A.   Because we had to deal with working
19  from home from -- with COVID, and on top of all
20  of our daily responsibilities and job duties
21  at -- at providing -- at Highland providing
22  services to NexPoint, we had to do all of this
23  extra work for a bankruptcy that was filed in
24  October of 2019.
25        MR. MORRIS:  Can we go to the

Page 220

1      WATERHOUSE - 10-19-21
2    balance sheet on page 3?  Okay.  Stop right
3    there.
4    Q.   Do you see under the liabilities
5  section, the last item is note payable to
6  affiliate?
7    A.   Yes.
8    Q.   And is that the note that we just
9  looked at?
10        MS. DANDENEAU:  Objection to form.
11   Q.   Withdrawn.
12        Is that the approximately
13   $30 million note that we just looked at that
14  was dated from 2017?
15        MS. DANDENEAU:  Objection to form.
16   A.   I believe no.
17   Q.   Okay.  You're not aware of any other
18  note that was outstanding from NexPoint to
19  Highland as of the end of the year 2019, other
20  than that one $30 million note; right?
21   A.   I don't recall.
22   Q.   And as of the end of 2019, the
23  principal amount that was due on the note was
24  approximately $23 million; right?
25        MS. DEITSCH-PEREZ:  Object to the

Page 221

1      WATERHOUSE - 10-19-21
2    form.
3    A.   Approximately.
4    Q.   And does that refresh your
5  recollection that between the time the note was
6  executed and the end of 2019, that NexPoint had
7  paid down approximately $7 million?
8    A.   Yes.  If we are just doing the math,
9  yes.
10   Q.   Okay.  Did NexPoint complete its
11  audit from 2020?
12   A.   Sorry, you kind of broke up.  Do
13  NexPoint complete?
14   Q.   The audit of its financial
15  statements for the period ending December 31st,
16  2020?
17   A.   No.
18   Q.   No, it's not complete?
19   A.   No, it is not complete.
20   Q.   Did HCMFA complete its audit for the
21  year ending December 31st, 2020?
22   A.   No.
23        MR. MORRIS:  Can we go to page 15,
24  please, the paragraph at the bottom.
25   Q.   Do you see that NexPoint has

Page 222

WATERHOUSE - 10-19-21

1 included under notes payable to Highland a
2 reference to the amounts that were outstanding
3 as of the year-end 2019 under the note that we
4 looked at just a moment ago?
5    A.  Yes. Are you talking about the
6 second paragraph?
7    Q.  I'm actually talking about first
8 paragraph. Do you understand that the first
9 paragraph is a reference to the 2017 note, and
10 the amounts that were -- the principal amount
11 that was outstanding as of the end of 2019?
12    MS. DANDENEAU: Objection to form.
13 John, do you mean the first paragraph of
14 that page?
15    MR. MORRIS: No, the first paragraph
16 under notes payable to Highland.
17    A.  Yeah, I see the paragraph, and
18 again, this is what I answered earlier. I
19 believe so, just because I don't -- again, this
20 is a number in a balance sheet, and without
21 matching it up and seeing the detail with the
22 schedule like I kind of talked about for
23 Highland's financial statements, it is a little
24 bit more difficult to tie everything in

Page 223

WATERHOUSE - 10-19-21

1 perfectly together.
2    Q.  Okay. But you're not aware of any
3 note that was outstanding at the end of 2019
4 from NexPoint to Highland other than whatever
5 principal was still due and owing under the
6 $30 million note issued in 2017; correct?
7    A.  Well, it -- I don't -- there is
8 reference in the second paragraph. I don't --
9 I don't -- I don't recall what that is
10 referring to, so I don't -- I don't know.
11    Q.  Well, if you listen carefully to my
12 question, right, I'm asking about notes that
13 were outstanding at the end of 2019, and if we
14 look at the paragraph you just referred to, it
15 says that during the year there were new notes
16 issued totaling $1.5 million, but by the end of
17 the year, no principal or interest was
18 outstanding on the notes.
19    Do you see that?
20    A.  Oh, I do, yes.
21    Q.  So does that refresh your
22 recollection that there were no notes
23 outstanding from NexPoint to Highland other
24 than the principal remaining under the original

Page 224

WATERHOUSE - 10-19-21

1 $30 million 2017 note that we looked at a
2 moment ago?
3    A.  Well, we're at the bottom of the
4 page. Is there anything on page 16?
5    Q.  That is a fair question, sure. That
6 is it.
7    A.  Okay. So it appears that that is
8 the only note that is detailed in the notes in
9 the financial statement.
10    Q.  And you don't have any memory of any
11 other note other than the 2017 note, right,
12 being outstanding as of the end of the year?
13    A.  I deal with thousands of
14 transactions every year. I don't really have a
15 very specific memory for what exactly was
16 outstanding.
17    MR. MORRIS: Why don't we take a
18 break now. We've been going for a little
19 while. It's 3:26. Let's come back at
20 3:40.
21    VIDEOGRAPHER: We're going off the
22 record at 3:26 p.m.
23    (Recess taken 3:26 p.m. to 3:39 p.m.)
24    VIDEOGRAPHER: We are going back on

Page 225

WATERHOUSE - 10-19-21

1 the record at 3:39 p.m.
2    Q.  All right. Mr. Waterhouse, we -- I
3 don't think we have a lot more here.
4    To the best of your knowledge and
5 recollection, were all affiliate loans and all
6 loans made to Mr. Dondero recorded on
7 Highland's books and records as assets of
8 Highland?
9    MS. DANDENEAU: Object to the form,
10 asked and answered.
11    A.  To my knowledge, yes.
12    Q.  Okay. Can you recall any loan to
13 any affiliate or Mr. Dondero that was not
14 recorded on Highland's books and records as an
15 asset?
16    A.  Like during my time as CFO? I don't
17 recall.
18    Q.  How about after the time that you
19 were CFO? Did you recall that there was a loan
20 by Highland to an affiliate or to Mr. Dondero
21 that hadn't been previously recorded on
22 Highland's books as an asset?
23    MS. DANDENEAU: Objection to form.
24    A.  I guess I don't understand the

Page 226

WATERHOUSE - 10-19-21

1 question. I left Highland as of -- I'm not
2 aware of -- I left Highland in February --
3 probably the last day of February of 2021.
4     Q.   Okay.
5     A.   I'm not -- I'm not aware of any --
6 I'm not aware of anything past that date.
7     Q.   Okay. While you were the CFO at
8 Highland, did Highland prepare in the ordinary
9 course of business a document that reported
10 operating results on a monthly basis?
11     A.   Yes.
12     Q.   And are you generally familiar with
13 the monthly operating reports?
14     A.   Yeah. You are referring to the
15 reports that we filed to the Court every month?
16     Q.   I apologize, I'm not. I'm taking
17 you back to the pre-petition period. There was
18 a report that I have seen that I'm going to
19 show you, but I'm just asking for your
20 knowledge.
21     MR. MORRIS:  Let's put it up on the
22 screen, Exhibit 39.
23     (Exhibit 39 marked.)
24     Q.   Do you see this is a document that

Page 227

WATERHOUSE - 10-19-21

1 is called operating results?
2     A.   Yeah, that's the title of it.
3     Q.   Okay. And was a report of operating
4 results prepared by Highland on a monthly basis
5 during the time that you served as CFO?
6     A.   No.
7     Q.   Are you familiar with a document of
8 this type? And we can certainly look at the
9 next page or two to refresh your recollection.
10     A.   I'm just looking at the title. I
11 don't really -- again, as I discussed before, I
12 don't have any records or documents or emails
13 or appointments or anything that I was able to
14 use prior to -- prior to this deposition, so
15 I'm doing the best I can.
16     Q.   Okay. You don't need to apologize.
17 I'm just asking you if you are familiar with
18 the document called Operating Results that was
19 prepared on a monthly basis at Highland?
20     MS. DEITSCH-PEREZ:  Object to the
21 form.
22     Q.   If you're not, you're not.
23     A.   I don't believe this was prepared on
24 a monthly basis.

Page 228

WATERHOUSE - 10-19-21

1     Q.   Okay. Do you see that this one
2 is -- is dated February 2018?
3     A.   Yes.
4     Q.   Do you have -- do you believe --
5 have you ever seen a document that was
6 purporting to report operating results for
7 Highland?
8     MS. DANDENEAU:  Objection to form.
9     A.   Yes.
10     Q.   Okay. And when you say that you
11 don't believe it was produced on a monthly
12 basis, was it produced on any periodic bases to
13 the best of your recollection?
14     A.   I believe it was -- it was prepared
15 on an annual basis.
16     Q.   Okay.
17     MR. MORRIS:  Can we look at the next
18 page.
19     Q.   Do you see that there is a statement
20 here called:  Significant items impacting
21 HCMLP's balance sheet?
22     And it is dated February 2018.
23     A.   Yes.
24     Q.   Do you recall that there was a

Page 229

WATERHOUSE - 10-19-21

1 report that Highland prepared that identified
2 significant items impacting the balance sheet?
3     A.   A report that was prepared.
4     Q.   Let me ask a better question:  Did
5 Highland prepare reports to the best of your
6 recollection that identified significant items
7 that impacted its balance sheet?
8     A.   Well, so Highland prepared a -- a
9 monthly close package. And maybe I'm
10 getting -- and maybe change names at one
11 time or maybe I'm just -- again, just
12 misremembering -- but in that, yes, there is a
13 page that would detail just changes in -- you
14 know, just changes month over month on the
15 balance sheet.
16     Q.   Okay. And maybe it is my fault.
17 Maybe I didn't know the proper name for it.
18 But let's use the phrase "monthly close
19 package."
20     Did Highland prepare a monthly close
21 package in the ordinary course of business
22 during the time that you served as CFO?
23     MS. DANDENEAU:  Objection to form.
24     A.   Yes.

Page 230

WATERHOUSE - 10-19-21

1  Q.  And did the monthly close package
2  that Highland prepared include information
3  concerning significant items that impacted
4  Highland's balance sheet?
5  A.  Yes, it had a page like that is --
6  that is on the screen that detailed items
7  like -- of that nature.
8  Q.  And do you know who -- was there
9  anybody at Highland who was responsible for
10 overseeing the preparation of the monthly
11 reporting package?
12 A.  That would have been -- again, it
13 varies over time during my tenure as CFO.
14 It -- it varied over -- over time, but -- but
15 typically a -- a corporate accounting manager.
16 Q.  And who were the corporate
17 accounting managers during your tenure as CFO?
18 A.  It would have been Dave Klos and
19 Kristin Hendrix.
20 Q.  And did the corporate accounting
21 manager deliver to you drafts of the monthly
22 close package before it was finalized?
23 A.  Sometimes.
24 Q.  Was that the practice even if there

Page 231

WATERHOUSE - 10-19-21

1  were exceptions to the practice?
2  A.  The practice meaning that they
3  sometimes lured them to me?
4  Q.  That that was the expectation even
5  if circumstances prevented that from happening
6  from time to time.
7  MS. DEITSCH-PEREZ:  Object to the
8  form.
9  A.  I -- I would say it started out that
10 way but over the years it -- it was not
11 enforced.
12 Q.  Okay.  So you were -- you reviewed
13 and approved monthly -- monthly reporting
14 packages for a certain period of time and then
15 over time you stopped doing that.
16 Do I have that right?
17 MS. DANDENEAU:  Objection to form.
18 A.  Yes, I mean, if you're talking about
19 a formal meeting where we sit down and go
20 through and approve it.  I would say that was
21 standard practice a decade -- you know, early
22 on.  And as time went on that -- that -- that
23 practice wasn't followed.
24 Q.  Okay.

Page 232

WATERHOUSE - 10-19-21

1  A.  And, quite frankly, I don't even
2  know if these were -- these were sent to me
3  even in any capacity.
4  Q.  What was the purpose of preparing
5  the monthly reporting package -- withdrawn.
6  What was the purpose of preparing
7  the monthly close package?
8  MS. DEITSCH-PEREZ:  Object to the
9  form.
10 A.  The -- the original purpose was so
11 that it would just -- it would be a report that
12 was reviewed monthly with senior management.
13 Q.  Who was included in the idea of
14 senior management?
15 A.  You know, I think originally when
16 this was conceived that would have been like
17 Jim Dondero and Mark Okada.
18 Q.  Were monthly reporting -- withdrawn.
19 Were monthly close packages prepared
20 to the best of your knowledge until the time
21 you left Highland?
22 A.  To my knowledge -- I don't know,
23 actually.  I mean, to my knowledge, I believe
24 it was being -- that still being done.  I

Page 233

WATERHOUSE - 10-19-21

1  don't know because, again, I wasn't reviewing
2  them.  I hadn't reviewed a close package for --
3  for a long time.  But I believe the standard
4  practice that was still being carried out.
5  Q.  Did you ever have any discussions
6  with the debtor's independent board concerning
7  any promissory notes that were issued by any of
8  the affiliates or Mr. Dondero?
9  A.  I can't -- I can't -- I can't recall
10 specifically.
11 Q.  Did you speak with the independent
12 board from time to time?
13 A.  Yes, from -- from -- from time to
14 time I had discussions with the independent
15 board members, you know, either -- either, you
16 know, by themselves or wholly, you know, as --
17 as a -- as a combined work.
18 Q.  Okay.  Before we talk about
19 Mr. Seery, do you recall ever having a
20 conversation with Mr. Nelms or Mr. Dubel
21 concerning any promissory note that was
22 rendered by one of the affiliates or
23 Mr. Dondero to Highland?
24 A.  I don't recall any conversations

Page 234

WATERHOUSE - 10-19-21

1 specifically.
2    Q.   Do you know if the topic was ever
3 discussed, even if you don't remember it
4 specifically?
5       MS. DANDENEAU: Objection to form.
6    A.   It -- it -- it may have. I don't
7 know. I don't recall.
8    Q.   Do you recall ever discussing any
9 promissory note issued by any of the affiliates
10 or Mr. Dondero with James Seery?
11    A.   I don't -- I don't recall
12 specifically.
13    Q.   Do you recall generally ever
14 discussing the topic of promissory notes issued
15 by any of the affiliates or Mr. Dondero to
16 Highland with Mr. Seery?
17    A.   Nothing -- nothing is really jumping
18 out at me.
19    Q.   Do you recall if you ever told
20 Mr. Seery that any of the affiliates or
21 Mr. Dondero didn't have an obligation to pay
22 all amounts due and owing under their notes?
23    A.   I don't recall having that
24 conversation.

Page 235

WATERHOUSE - 10-19-21

1    Q.   Did you ever tell Mr. Seery that you
2 had any reason to believe that the amounts
3 reflected in the notes issued by the affiliates
4 and Mr. Dondero were invalid for any reason?
5    A.   I don't -- I don't recall.
6    Q.   Did you tell Mr. Dondero -- did you
7 tell Mr. Seery that you thought the promissory
8 notes issued by the advisors and Mr. Dondero
9 that were outstanding as of the petition date
10 were assets of the estate?
11    A.   I don't recall having a specific
12 conversation about those -- you know, those
13 notes outstanding as -- as of the petition date
14 being assets on the estate. I mean, we put
15 together -- you know, they're in the books and
16 records of the financial statements. I don't
17 recall having a specific conversation.
18    Q.   Did you ever prepare any documents
19 that were delivered to Mr. Seery that concerned
20 the promissory notes issued by any of the
21 affiliates or Mr. Dondero?
22       MS. DANDENEAU: Objection to form.
23    A.   Did I produce any that concerned --
24 you mean did I just -- did I give Mr. Seery

Page 236

WATERHOUSE - 10-19-21

1 anything that -- that said I have concerns over
2 these notes?
3    Q.   No. Let me try again. Maybe it was
4 my question.
5       Did you ever give Mr. Seery any
6 information concerning any of the notes that
7 were issued by any of the affiliates or
8 Mr. Dondero?
9       MS. DANDENEAU: Objection to form.
10    A.   I don't recall if I did or not. I
11 don't -- I don't remember. I mean, you have my
12 emails. You may have asked. Again, I don't --
13 I don't know.
14       MR. MORRIS: Can we put up the
15 document that has been premarked as Exhibit
16 39?
17       MS. DANDENEAU: John, that is this
18 document, isn't it?
19       MR. MORRIS: Oh, yeah, it might be,
20 as a matter of fact. Let's go to Number
21 40.
22       (Exhibit 40 marked.)
23    Q.   During the bankruptcy,
24 Mr. Waterhouse, did you prepare documents that

Page 237

WATERHOUSE - 10-19-21

1 were filed with the bankruptcy court?
2    A.   I didn't -- I didn't prepare them
3 personally.
4    Q.   Did people prepare them under your
5 direction?
6    A.   Yes. There were members of the team
7 that prepared them, and they worked in -- you
8 know, there were members of DSI that were
9 involved in the process as well.
10    Q.   To the best of your knowledge, did
11 DSI rely on the employees of Highland for the
12 information that they used to prepare the
13 bankruptcy filings?
14    A.   Yes. The books and records were
15 with the Highland personnel.
16    Q.   Okay. And do you see on the screen
17 here, there is a document that we have marked
18 as Exhibit 40 that is -- that is titled Summary
19 of Assets and Liabilities?
20    A.   Uh-huh.
21    Q.   Okay. And do you recall reviewing
22 any summary of assets and liabilities before it
23 was filed with the bankruptcy court?
24    A.   Yes, I recall reviewing this at a

Page 238

WATERHOUSE - 10-19-21

1  high level.
2  Q.   And did you believe that it was
3  accurate at the time it was filed?
4  A.   I didn't have any other reason to
5  believe otherwise.
6  Q.   Okay.  Do you see that the total
7  value of all properties listed in Part 1 is
8  approximately $410 million?
9  MS. DEITSCH-PEREZ:  Objection to
10  form.
11  A.   Yes, it is in 1c.
12  Q.   Yes.
13  A.   Yes, I see that.
14  Q.   Okay.  If we go to the second page,
15  now I think I may just have excerpts here, just
16  so everybody is clear, but if we scroll down to
17  the second page, you will see that there is
18  a – a little further.  There you go.  You will
19  see there is a reference to Item 71, notes
20  receivable.
21  Do you see that?
22  A.   I do.
23  Q.   And that was a reference to the
24  notes receivable from the affiliates and
25  Mr. Dondero, among others; is that right?

Page 239

WATERHOUSE - 10-19-21

1  Mr. Dondero, among others; is that right?
2  MS. DANDENEAU:  Objection to form.
3  A.   Yes.  The affiliate notes and the
4  Dondero notes were in this amount, but they
5  weren't – again, like you said, and among
6  others.
7  Q.   Okay.  We will look at the
8  specificity because I'm not playing gaming
9  here, but do you know if the $150 million of
10  notes receivable was included within the
11  $410 million of total value of the debtor's
12  assets?
13  MS. DANDENEAU:  Objection to form.
14  A.   I – I – I believe so.
15  Q.   Right.  And so is it fair to say
16  that as of the date this document was prepared,
17  the notes receivable were more than one-third
18  of the value of the debtor's assets?
19  MS. DEITSCH-PEREZ:  Object to the
20  form.
21  MS. DANDENEAU:  Object to the form.
22  A.   Again, if you are just taking the
23  math, 150 divided by whatever the $400 million
24  number is above, then yes, you get there.
25

Page 240

WATERHOUSE - 10-19-21

1  Q.   Okay.
2  A.   You know, but as of the time of this
3  filing, that is what was put in this filing,
4  right, but, you know, I mean, numbers –
5  numbers change, facts and circumstances change.
6  Q.   But as the CFO of Highland, the
7  debtor in bankruptcy, did you believe that this
8  number accurately reflected the total amount
9  due under the notes receivable?
10  A.   That is what we had in our books and
11  records.
12  Q.   Okay.  And did you believe as the
13  CFO that the books and records accurately
14  reported the then value of the debtor's assets?
15  MS. DANDENEAU:  Objection to form.
16  A.   We didn't – as part of this filing,
17  there was no fair value measurement or
18  anything.  These were just accounting entries
19  for the promissory notes.  There is no analysis
20  for impairment or fair market value adjustments
21  or anything of that nature.  This is purely
22  taking numbers and putting them in our form.
23  Q.   Did you do any impairment analysis
24  at any time while you were employed by

Page 241

WATERHOUSE - 10-19-21

1  Highland?
2  A.   Yes, we did do impairment analysis
3  on – on assets.
4  Q.   Okay.  Did you ever do an impairment
5  analysis on any of the promissory notes that
6  were given to Highland by any of the affiliates
7  or Mr. Dondero?
8  A.   Not that I recall.
9  Q.   Under what circumstances do you
10  prepare impairment analyses?
11  A.   As – as – if you're preparing
12  financials in accordance with GAAP, generally
13  accepted accounting principles, if you're
14  preparing full GAAP financials, you should be
15  preparing – you should be undergoing on a
16  periodic basis any fair market value
17  adjustments to assets.
18  As I was instructed at the time of
19  the petition date, we weren't producing GAAP
20  financials.  So this wasn't something I was
21  worried about nor concerned about.
22  Q.   Okay.  Were NexPoint and HCMFA and
23  Highland's audited financial statements
24  prepared in accordance with GAAP?
25

Page 242

WATERHOUSE - 10-19-21

1     A.   The audited financials -- yes,
2  audited financial statements are prepared in
3  accordance with GAAP.
4     Q.   Do you recall whether any of
5  Highland or HCMFA or NexPoint ever made a fair
6  market value adjustment to any of the notes
7  issued by any of the affiliates or Mr. Dondero
8  to Highland?
9     A.   I do not recall that happening, but
10  the -- it is because under -- under GAAP,
11  the -- the treatment of liabilities is
12  different than assets.
13     Q.   Okay.  So then let's just focus on
14  Highland's audited financial statements.
15         The last audited financial
16  statements were for the period ending December
17  31st, 2018; correct?
18     A.   That is my understanding.
19     Q.   And you had -- you had an obligation
20  to disclose anything to PricewaterhouseCoopers
21  concerning any subsequent events between the
22  end of 2018 and June 3rd, 2019; correct?
23         MS. DANDENEAU:  Objection to form.
24         MS. DEITSCH-PEREZ:  Form.

Page 243

WATERHOUSE - 10-19-21

1     A.   Correct.
2     Q.   Okay.  To the best of your
3  knowledge, as Highland's CFO, did Highland ever
4  make any fair market value adjustments to any
5  of the promissory notes that were carried on
6  its balance sheet and that were issued by any
7  of the affiliates or Mr. Dondero?
8     A.   I think I answered that question
9  earlier.  I don't recall doing that for any of
10  the -- those -- those notes.  So it would have
11  included the audit for the -- for the 2018
12  period.
13     Q.   Okay.
14         MR. MORRIS:  Can we go to the next
15  page.
16     Q.   Do you see this is a note a list of
17  notes receivable?  Do you see that?
18     A.   Yes, I do.
19     Q.   And do you see that this ties into
20  the page that we were just looking?
21     A.   I'm sorry, can we go back to the
22  prior page?  I mean, it was at 150,331,222.  It
23  was on the prior page.  Next page.  Yes, it
24  agrees.

Page 244

WATERHOUSE - 10-19-21

1     Q.   Okay.  So now let's look at that
2  schedule.  So this was the face amount of all
3  of the promissory notes that Highland held at
4  the time this document was filed with the
5  bankruptcy court; right?
6     A.   Yes.
7     Q.   There is a footnote there that says,
8  doubtful or uncollectible accounts are
9  evaluated at year-end.
10         Do you see that?
11     A.   I do.
12     Q.   Okay.  And is it fair to say that as
13  of the year-end 2018, the year before this,
14  that to the extent any of these notes were
15  outstanding at that time, they weren't deemed
16  to be doubtful or uncollectible?
17     A.   Yeah.  For the 2018 audit, there
18  weren't any -- there weren't any adjustments to
19  fair value.
20     Q.   Okay.  And during the bankruptcy, do
21  you recall that Highland subsequently reserved
22  for the Hunter Mountain Investment Trust note?
23     A.   Yes.
24     Q.   Why did Highland -- were you

Page 245

WATERHOUSE - 10-19-21

1  involved in the decision to reserve the Hunter
2  Mountain Investment Trust note?
3     A.   I was not.
4     Q.   Do you know why Highland decided to
5  reserve for the Hunter Mountain Investment
6  Trust note?
7     A.   I don't know yet decision was made.
8  I believe it was made by someone at DSI.
9     Q.   Okay.  I'm just asking if you know
10  why.
11         Did you ever ask anyone why they
12  reserved for that particular note?
13     A.   I don't recall.
14     Q.   Do you know whether the debtor
15  reserved for any other note on this list during
16  the bankruptcy?
17     A.   Again, I don't recall.  I wasn't
18  part of any process of -- again, like any fair
19  value adjustments or anything to that degree.
20  Like I said, a lot of that was done by DSI and
21  it was kind of out of our court.
22     Q.   Okay.  Do you know if any note
23  receivable on this list was ever deemed by the
24  debtor to be doubtful or uncollectible?

Page 246

WATERHOUSE - 10-19-21

1
2    A.   I don't – I don't have a
3    recollection of every filing, so I don't know.
4    Q.   Did you ever have a discussion with
5    anybody at any time about whether any of the
6    notes receivable on this list should be deemed
7    to be doubtful or uncollectible?
8    A.   No.  As I previously stated, we were
9    told we didn't have to keep GAAP financials.
10   We weren't having – you know, there is no
11   underlying audits being performed, so I mean,
12   it wasn't something I worried about.
13   MR. MORRIS:  I move to strike.
14   Q.   Did you ever have a conversation
15   with anybody about any of the notes receivable
16   and whether they should be deemed to be
17   doubtful or uncollectible?  Did you have the
18   conversation, yes or no?
19   MS. DANDENEAU:  Objection to form.
20   A.   I don't recall.
21   Q.   Do you recall ever telling anybody
22   that you believed any of the notes receivable
23   on this list should be doubtful – should be
24   deemed to be doubtful or uncollectible?
25   MS. DANDENEAU:  Objection to form.

Page 247

WATERHOUSE - 10-19-21

1
2    A.   I don't recall.  I mean, it may have
3    happened, you know, again, when we initially
4    getting DSI up to speed and going through
5    financials, it may have happened, but I don't
6    recall specifically.
7    Q.   While you were the CFO of Highland
8    during the time that the company was in
9    bankruptcy, did you have any reason to believe
10   that any of the notes receivable on this list
11   other than Hunter Mountain Investment Trust
12   should have been characterized as doubtful or
13   uncollectible?
14   MS. DANDENEAU:  Objection to form.
15   MS. DEITSCH-PEREZ:  Form.
16   A.   I didn't know.  I didn't form an
17   opinion.  Bankruptcy was new to me.  It still
18   is new to me, even after going through this.
19   So I really didn't know what to expect nor
20   really – you know, I didn't know.
21   MR. MORRIS:  I move to strike.
22   Q.   During the period of Highland's
23   bankruptcy when you were serving as CFO, did
24   you have any reason to believe any of the notes
25   on this list were doubtful or uncollectible?

Page 248

WATERHOUSE - 10-19-21

1
2    MS. DEITSCH-PEREZ:  This is like the
3    fifth time you've asked it.  Object to the
4    form.
5    MR. MORRIS:  I'm moving to strike,
6    if you haven't noticed, because he's not
7    answering the question.
8    MS. DEITSCH-PEREZ:  He was answering
9    the question, you just didn't like it, like
10   the answer.
11   MR. MORRIS:  Good Lord.
12   Q.   Go ahead, Mr. Waterhouse.
13   A.   Again, I don't – we brought up a
14   myriad of issues at the start of the bankruptcy
15   case.  I don't recall if this was one of them,
16   but, again, there are a lot of things we
17   couldn't change.  Even, you know, I was told
18   status quo, blah, blah, blah, right, there is a
19   stay, you can't – you know, I don't recall
20   specifically, but that doesn't mean it didn't
21   happen.
22   MR. MORRIS:  I move to strike.
23   Q.   During the time that Highland was in
24   bankruptcy and you served as CFO, did you have
25   any reason to believe that any of the notes

Page 249

WATERHOUSE - 10-19-21

1
2    receivable on this list were doubtful or
3    uncollectible?
4    MS. DEITSCH-PEREZ:  Object to the
5    form.
6    A.   Potentially.
7    Q.   Did you ever tell anybody that?
8    A.   As I just stated five times,
9    yes, we – at the beginning after filing and we
10   were getting DSI and others up to speed, you
11   know, we had a myriad of discussions of a lot
12   of things and this was likely one of them.  I
13   don't – but I don't recall specifically we
14   talked –
15   Q.   I don't want to know – I don't want
16   to know what was –
17   MS. DEITSCH-PEREZ:  Wait, wait.
18   Excuse me.  Mr. Morris, you did not let him
19   finish his answer.
20   A.   I spoke – we had – we were
21   bringing Fred Karesa and Brad Sharp (phonetic)
22   up to speed on all of these items, contracts,
23   and investments and going through – we had
24   hours and hours and hours of discussion.  And
25   then not only do I have to repeat this not

Page 250

WATERHOUSE - 10-19-21

1
2 once, twice, three, four times with -- you
3 know, I mean, we -- I don't -- I don't remember
4 the sum culmination of all these discussions.
5 They all kind of blend together.
6     MR. MORRIS: Okay. I move to strike
7 and I will try one more time.
8     Q.   Did you ever tell anybody at DSI
9 that you believed any of the notes receivable
10 on this list were doubtful or uncollectible?
11     MS. DANDENEAU: Object to form.
12     A.   Potentially.
13     Q.   Potentially you told them or
14 potentially they were doubtful or
15 uncollectible?
16     A.   Potentially I told them that we
17 needed to look at the value of these -- of
18 these assets.
19     Q.   Okay. Did you -- okay. It is
20 potential that you told them and it is
21 potentially that you didn't; right?
22     MS. DANDENEAU: Objection to form.
23     A.   I've gone through that. I don't
24 recall specifically.
25     Q.   So you should just -- I don't want

Page 251

WATERHOUSE - 10-19-21

1
2 to tell what you to do. Do you have --
3     MS. DANDENEAU: Good.
4     Q.   Other than -- other than telling
5 them that they should look at the values, do
6 you have any recollection whatsoever of ever
7 having told anybody at DSI that any of the
8 notes receivable on this page were doubtful or
9 uncollectible?
10     MS. DEITSCH-PEREZ: Object to the
11 form.
12     MS. DANDENEAU: Objection.
13     A.   I recall having general discussions
14 about everything on our balance sheet which
15 would have included these -- these notes
16 receivable.
17     Q.   Okay.
18     A.   I don't recall specifically where
19 those discussions delved into.
20     Q.   Do you recall any discussion at all
21 on the topic of whether any of these notes on
22 this list were doubtful or uncollectible?
23     MR. AIGEN: Mr. Morris, how on earth
24 is that question different from the
25 question that you just asked for the last

Page 252

WATERHOUSE - 10-19-21

1
2 five times? I mean, really I thought you
3 were -- (overspeak.)
4     MR. MORRIS: Because he never
5 answered it.
6     MS. DEITSCH-PEREZ: Are you
7 listening to him?
8     MR. MORRIS: You know --
9     MS. DEITSCH-PEREZ: He basically
10 said that he had a conversation with DSI
11 that went over all of this stuff and that
12 conversation could have included the notes
13 but he doesn't recall specifically.
14     What more do you want him -- to ask
15 of him?
16     MR. MORRIS: I want him -- I would
17 love him to say -- I would like him to
18 testify to the truth, and that is he has no
19 recollection.
20     MS. DEITSCH-PEREZ: Well, the truth
21 as you would like to see it, but -- but he
22 is testifying truthfully. And I -- and, by
23 the way, I move to strike that comment --
24     MR. MORRIS: Okay.
25     MS. DEITSCH-PEREZ: -- because it

Page 253

WATERHOUSE - 10-19-21

1
2 suggests that he has not testified
3 truthfully.
4     MR. MORRIS: I will ask my question
5 again. And if at any time you want to
6 direct him not to answer, that is your
7 prerogative.
8     Q.   Mr. Waterhouse, do you have any
9 recollection at all of ever telling anybody
10 from DSI that any of these notes were doubtful
11 or uncollectible?
12     MS. DANDENEAU: Object to form.
13     A.   I don't remember specifically.
14     Q.   Do you remember generally that
15 specific topic?
16     A.   We generally talked about assets,
17 values. If -- we had discussions of that and
18 collectability in nature. I mean, of Highland,
19 the funds, the CLOs, the entire complex. We
20 had discussions like that, which is, you know,
21 as you look at a billion dollar consolidated
22 balance sheet.
23     So I generally remember -- this is
24 billions of dollars, including these assets --
25 having discussions of this -- of this type.

Page 254

WATERHOUSE - 10-19-21

1
2 Q. Do you believe that an affiliate
3 loan on this list was doubtful or
4 uncollectible? Would you have told that to
5 DSI?
6 MS. DANDENEAU: Objection to form.
7 MS. DEITSCH-PEREZ: Object to form.
8 A. If we had, like -- again, if we --
9 if -- if we weren't preparing financial
10 statements in accordance with GAAP, and -- you
11 know, if DSI at that point -- they were --
12 again, I was new to bankruptcy.
13 The CRO is -- we are delegating
14 everything to the CRO. All the decisionmaking.
15 Remember -- remember when you and I went into
16 Delaware Court and we were saying DSI basically
17 does everything, remember this, Mr. Morris?
18 You were my counsel at the time, and
19 basically we're running everything through DSI.
20 That was what this was like in the early part.
21 Everything was communicated through
22 DSI. So DSI says this. DSI says that. That
23 is what we're doing, and we're pointing out
24 things to them.
25 Now, they decide what direction this

Page 255

WATERHOUSE - 10-19-21

1
2 goes.
3 Q. Did you point out that any of
4 these --
5 A. I don't recall specifically.
6 Q. Okay. At any time that you served
7 as Highland's CFO, did you ever point out to
8 DSI that any of these loans were doubtful or
9 uncollectible?
10 MS. DEITSCH-PEREZ: Object to the
11 form.
12 MS. DANDENEAU: Objection.
13 A. If you're asking me if I had a
14 conversation with DSI, if any of these loans
15 were doubtful or uncollectible, I don't recall
16 specifically.
17 Q. Do you recall that the debtor filed
18 on the docket monthly operating reports?
19 A. Yes.
20 Q. You prepared those personally,
21 didn't you?
22 MS. DEITSCH-PEREZ: Objection to
23 form.
24 A. I didn't personally prepare them,
25 the team did with DSI.

Page 256

WATERHOUSE - 10-19-21

1
2 Q. But you signed them; correct?
3 A. My signature is on the MORs.
4 Q. And you signed them as the preparer
5 of the document; correct?
6 A. Yes, I did this pursuant to DSI's
7 instructions.
8 Q. Okay. You wouldn't have signed the
9 document if you didn't believe it to be
10 accurate; correct?
11 A. If I had reason to believe it
12 wasn't, presumably I wouldn't have signed it.
13 Q. Okay. And do you have any reason to
14 believe right now that any monthly operating
15 report that has your signature on it was
16 inaccurate in any way?
17 MS. DEITSCH-PEREZ: Object to the
18 form.
19 A. My understanding of the monthly
20 operating reports is we were filing them in
21 accordance with the standards set by the Court.
22 It wasn't -- you know, again, I don't -- you
23 know, it wasn't these other
24 standards, so I testified I didn't have
25 experience in this. The CRO was running the

Page 257

WATERHOUSE - 10-19-21

1
2 show. I followed their advice.
3 Q. But you assured yourself that
4 everything in the report was accurate before
5 you signed them; correct?
6 MS. DANDENEAU: Objection to form.
7 A. I trusted the guidance from the CRO
8 and their team and their experience and their
9 guidance for doing this for many, many, many
10 years to -- to -- to categorize and put things
11 in ways on the form.
12 You know, my team had -- had not
13 filled out these forms before and needed all of
14 this guidance. I'm not an expert in this. I
15 have oversight of it. I signed the form. DSI
16 told me to.
17 Q. And you and your team are the source
18 of the information that DSI used to create the
19 reports; correct?
20 MS. DANDENEAU: Objection to form.
21 A. The books and records reside with
22 the -- with -- with the corporate accounting
23 team.
24 Q. Okay. And the corporate accounting
25 team was the corporate accounting team that was

Page 258

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | under your direction; correct? |
| 3 | A. Yes. |
| 4 | Q. So -- so your team was responsible |
| 5 | for maintaining Highland's books and records; |
| 6 | correct? |
| 7 | A. I'm sorry, my team was responsible? |
| 8 | Q. Correct. |
| 9 | A. Yes. They -- they -- they were |
| 10 | the -- the -- the general ledger of Highland, |
| 11 | that responsibility was with the corporate |
| 12 | accounting team. |
| 13 | Q. The corporate accounting group |
| 14 | reported to you; correct? |
| 15 | A. Yes. |
| 16 | MR. MORRIS: Can we put up 41, |
| 17 | please. |
| 18 | (Exhibit 41 marked.) |
| 19 | Q. All right. You will see that this |
| 20 | is a report that is dated January 31st, 2020, |
| 21 | but it is for the month ending December 2019. |
| 22 | Do you see that? |
| 23 | A. I do. |
| 24 | Q. And you signed this report in your |
| 25 | capacity as the chief financial officer of |

Page 259

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | Highland; correct? |
| 3 | A. Yes. |
| 4 | Q. And you're the preparer -- you're |
| 5 | identified as the preparer of the report; |
| 6 | correct? |
| 7 | A. That is correct. |
| 8 | Q. Do you recall participating in the |
| 9 | preparation of monthly operating reports? |
| 10 | A. As I testified earlier, it was put |
| 11 | together, you know, with the team. The team |
| 12 | worked with DSI to put these monthly operating |
| 13 | reports together. We had no experience at this |
| 14 | time of the monthly operating reports or things |
| 15 | of this nature. |
| 16 | MR. MORRIS: Can you turn to the |
| 17 | next page, please. |
| 18 | Q. Do you see a line item under assets |
| 19 | due from affiliates? |
| 20 | A. Yes, I do. |
| 21 | Q. Okay. And to the best of your |
| 22 | knowledge and understanding, as the person who |
| 23 | is identified as the preparer of this report, |
| 24 | does that line item include the affiliate loans |
| 25 | that we've been talking about? |

Page 260

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A. Again, I would have to see, just |
| 3 | like we did with the financial statements of |
| 4 | Highland and NexPoint, I would have to see a |
| 5 | detailed build, but, you know, if you look at |
| 6 | the other line items, you know, the only other |
| 7 | place it could be would be in -- in other |
| 8 | assets. |
| 9 | Q. Okay. And as a matter of |
| 10 | arithmetic, is it fair to say that is the value |
| 11 | of the assets due from affiliates was more than |
| 12 | 25 percent of the value of Highland's total |
| 13 | assets as of 12/31/2019? |
| 14 | MS. DANDENEAU: Objection to form. |
| 15 | A. I'm really not doing the mental math |
| 16 | right now, so I've been going at this depo for |
| 17 | hours, so I'm really not -- you know -- |
| 18 | Q. All right. No problem. |
| 19 | A. -- these are millions of dollars. |
| 20 | Q. Let's look at the Footnote 1, |
| 21 | please. Do you see there is a reference to the |
| 22 | Hunter Mountain note? |
| 23 | A. Yes, I see that in Footnote 1. |
| 24 | Q. Okay. And that's the reserve that |
| 25 | was taken against that note? |

Page 261

| | |
|---|---|
| 1 | WATERHOUSE - 10-19-21 |
| 2 | A. Yes, that is what this indicates. |
| 3 | Q. Okay. And were you aware that the |
| 4 | reserve was being taken on that it was? |
| 5 | A. I was -- I was aware, yeah, at some |
| 6 | point, yes. |
| 7 | Q. Okay. And are you aware of any |
| 8 | reserve being taken with respect to any other |
| 9 | note that was issued in favor of Highland? |
| 10 | A. Again, as I testified, we didn't go |
| 11 | through an analysis on -- on -- on the other |
| 12 | notes. |
| 13 | Q. Can we turn -- |
| 14 | A. I believe -- I believe it says that |
| 15 | in Footnote 1, fair value has not been |
| 16 | determined with respect to any of the notes. |
| 17 | So this footnote -- footnotes, look, |
| 18 | there has been no determination. |
| 19 | Q. Okay. The determination was made in |
| 20 | the audited financial statements just six |
| 21 | months earlier; right? We saw that earlier? |
| 22 | A. That was as of 12/31/18. I mean, |
| 23 | things -- circumstances -- there's a bank -- |
| 24 | circumstances change, things change -- things |
| 25 | change over time, you know, facts and |

Page 262

WATERHOUSE - 10-19-21

1 circumstances change. Again, you have to do an
2 analysis.
3    Q.   Okay. And you do recall that in
4 Highland's 2018 financial statement, all of the
5 notes issued by affiliates and Mr. Dondero that
6 were due at year-end had a fair value equal to
7 the carrying value; correct? We looked at
8 that?
9    A.   Yes. That was in the -- in the
10 disclosure for the -- for the affiliate notes,
11 yes.
12    Q.   And -- and you were obligated to
13 share with PwC any subsequent events between
14 the end of 2018 and the date that you signed
15 your management representation letter on June
16 3rd, 2019; correct?
17       MS. DEITSCH-PEREZ:  Object to the
18    form.
19    A.   Yes. I -- I -- I signed the
20 management, you know, my signature is in the
21 management representation letter -- I hope I'm
22 answering your question -- that is dated in
23 June with the representations made in that
24 management representation letter.
25

Page 263

WATERHOUSE - 10-19-21

1    Q.   Okay. And there was nothing that
2 caused PricewaterhouseCoopers to include in
3 subsequent events any adjustment to the
4 conclusion that the fair value of the affiliate
5 notes and the notes issued by Mr. Dondero
6 equaled the carrying value; correct?
7       MS. DANDENEAU:  Objection to the
8    form.
9    A.   That is correct. That is what was
10 in the -- in the -- in the footnotes.
11    Q.   Okay. So are you aware of anything
12 that occurred between June 3rd, 2019 and
13 December 31st, 2019 that would have caused the
14 fair value of the notes to differ from the
15 carrying value?
16    A.   Yeah. Highland filed for
17 bankruptcy, things changed -- I mean, there was
18 a bankruptcy filed in October of -- of -- of
19 2019, right, the petition date that we've
20 described earlier.
21       I mean, I had a -- I guess looking
22 back naively, I thought we were going to get an
23 audit from PwC for year-ended 2019, and when we
24 had discussions with PwC, they were like, are
25

Page 264

WATERHOUSE - 10-19-21

1 you crazy, we're not auditing this. Values
2 change, all these things change, bankruptcy
3 changes the entire scenario. I mean -- and
4 they're like, we're not -- we're not touching
5 this.
6       And so, you know, I was like, okay,
7 sorry, I get it, okay, no an audit.
8       I mean, it is -- you know, and --
9 you know, and we weren't preparing GAAP
10 financial statements.
11       Again, I didn't know what we were
12 doing in relation to our financial statements,
13 but these were the discussions I was having at
14 the time. And yeah, I mean, filing bankruptcy
15 from what I got from outside auditors and
16 others involved changed things dramatically.
17    Q.   Okay. Highland wasn't the obligor
18 under any of the notes that we're talking
19 about; correct?
20    A.   No.
21    Q.   So --
22    A.   That's right.
23    Q.   So can you identify any fact that
24 would cause the fair value to deviate from the
25

Page 265

WATERHOUSE - 10-19-21

1 carrying value during the seven-month period
2 between June 3rd and the end of the year, 2019?
3       MS. DANDENEAU:  Objection to form.
4    A.   No. I mean, I'm putting myself back
5 at that time, right. Hindsight is 2020, but we
6 didn't do an analysis, but we would have done a
7 fulsome analysis and looked at all of the facts
8 and circumstances at the time, but asset values
9 change. You know, there could have been a
10 market crash in hindsight in 2020, which --
11 which affected entities' abilities.
12       There could have been all of these
13 things, right, that -- that happen. It is --
14 it is easy to look back in hindsight, but when
15 you are looking at this in -- in realtime, the
16 analysis is different, and again, we didn't do
17 an analysis.
18    Q.   Okay. You didn't do an analysis.
19    Do I have that right?
20    A.   I don't -- I don't recall doing one
21 or maybe -- you know, I don't recall doing one.
22       MR. MORRIS:  Okay. I'm going to
23    take a break. I may be done, so the time
24    now is -- is 4:30 your time. Let's just
25

Page 266

WATERHOUSE - 10-19-21

1 take a short break until 4:40 your time.
2 MS. DANDENEAU: Okay.
3 VIDEOGRAPHER: We're going off the
4 record, 4:31 p.m.
5 (Recess taken 4:31 p.m. to 4:43 p.m.)
6 VIDEOGRAPHER: We are back on the
7 record at 4:43 p.m.
8 MR. MORRIS: I have no further
9 questions.
10 MR. RUKAVINA: Okay.
11 Mr. Waterhouse, I will go next.
12 EXAMINATION
13 BY MR. RUKAVINA:
14 Q. Sir, my name is Davor Rukavina. I'm
15 the lawyer for --
16 MR. MORRIS: Hey, Davor, just before
17 you begin, I just want to put on the record
18 Highland's objection to documents that were
19 produced to me 10 minutes before the
20 deposition began.
21 MR. RUKAVINA: What the basis of
22 your objection?
23 MR. MORRIS: That they were due
24 quite some time ago, and the fact that you

Page 267

WATERHOUSE - 10-19-21

1 had -- I just think it's appropriate to --
2 to dump documents on somebody 10 minutes
3 before the deposition. I just think
4 that's --
5 MR. RUKAVINA: Well, these are
6 documents Highland produced. I'm not aware
7 of any rule I have to give you advance
8 documents when I know for the record that
9 other than the exhibits that you sent to us
10 last week, most of the exhibits you used
11 today you did not provide to me prior to
12 this deposition.
13 MR. MORRIS: No, but the documents
14 were produced by me in -- in litigation,
15 right?
16 MR. RUKAVINA: I'm going to use
17 primarily, John, the documents that you
18 produced to me today, but you may.
19 MR. MORRIS: Primarily. I've got --
20 I've got my objection. You have got your
21 response. Proceed.
22 Q. Mr. Waterhouse, again, I represent
23 the advisors, HCMFA and NexPoint Advisors.
24 Do you understand that?

Page 268

WATERHOUSE - 10-19-21

1 A. Yes.
2 Q. You and I have never met or talked
3 before today, have we?
4 A. No, I have -- I have heard your
5 voice on calls before.
6 Q. Okay.
7 MR. RUKAVINA: Madam Court Reporter,
8 I will use a few exhibits today. My
9 associate, Mr. Nguyen, will find some way
10 to get them to you. I don't know how to do
11 that, but it looks like you guys do.
12 I am going to use numbers as well.
13 But to differentiate them from Mr. Morris
14 we're going to mark mine with the prefix A
15 for advisors.
16 Do you understand?
17 COURT REPORTER: Yes.
18 MR. RUKAVINA: Okay. Perfect.
19 Q. Okay. So, Mr. Waterhouse, let's
20 start with those two HCMFA notes that you were
21 asked about, one for 5 million and one for
22 2.4 million.
23 Do you recall those notes?
24 A. Yes.

Page 269

WATERHOUSE - 10-19-21

1 Q. Were you ever the CFO of HCMFA?
2 A. I don't recall.
3 Q. So to the best of your recollection,
4 you were still an officer of HCMFA in 2019,
5 just that your title was treasurer?
6 MR. MORRIS: Object to the form of
7 the question. There is no leading here.
8 He works for your client.
9 MS. DANDENEAU: That is not -- that
10 is not true.
11 MR. MORRIS: He's the treasurer --
12 he is the treasurer of your client. I
13 don't -- I'm going to object every time you
14 try to lead, so...
15 MR. RUKAVINA: Totally fine to
16 object.
17 MR. MORRIS: Okay.
18 Q. Please answer my question,
19 Mr. Waterhouse.
20 A. I'm sorry, could you repeat? There
21 was...
22 Q. Yes. You were -- you testified
23 earlier that in 2019 you were an officer of
24 HCMFA; correct?

Page 270

WATERHOUSE - 10-19-21

2  A.  Yes, I testified that I was the
3  treasurer and I didn't know if that incumbency
4  certificate, you know, was one that appointed
5  me as a treasurer, but yes.
6  Q.  I'm just trying to confirm that
7  sitting here today, to the best of your
8  recollection, at that time you were -- your
9  title was treasurer.  It was not chief
10 financial officer.
11 A.  I don't recall that being my title.
12 Q.  Okay.  And in May of 2019, however,
13 I think you testified you were the chief
14 financial officer of the debtor; correct?
15    MR. MORRIS:  Objection to the form
16 of the question.
17 A.  Yes, I was -- yes.
18 Q.  Okay.  As such, in May of 2019, did
19 you have the authority, to your understanding,
20 to unilaterally loan $5 million or $2.4 million
21 to anyone on behalf of the debtor?
22    MR. MORRIS:  Objection to the form
23 of the question.
24 A.  Sorry, can you repeat that?
25 Q.  Yes.  So in your capacity as the

Page 271

WATERHOUSE - 10-19-21

2  chief financial officer of the debtor, Highland
3  Capital Management, L.P., in May of 2019, did
4  you believe that you unilaterally, just Frank
5  Waterhouse, had the authority to loan on behalf
6  of the debtor to anyone $5 million and
7  $2.4 million?
8     MR. MORRIS:  Objection to the form
9  of the question.
10 A.  No.
11 Q.  Is it because loans of that amount
12 would have had to be approved by someone else?
13 A.  Yes.
14 Q.  Who in '20 -- in May of 2019, if
15 Highland wanted to loan 5 million or
16 $2.4 million to someone, what would have been
17 the internal approval procedure?
18    MR. MORRIS:  Objection to the form
19 of the question.
20 A.  If -- if we had loans of that nature
21 that needed to be made due to their size, we
22 would have gotten approval from the -- the
23 president of Highland.
24 Q.  And who that was individual?
25 A.  It was James Dondero.

Page 272

WATERHOUSE - 10-19-21

2  Q.  Okay.  Now, I'm going to ask you a
3  similar question but for a different entity.
4     In May of 2019, as the treasurer of
5  HCMFA, did you believe that you unilaterally
6  had the ability to cause HCMFA to become the
7  borrower of a $5 million loan and a
8  $2.4 million loan?
9     MR. MORRIS:  Objection to the form
10 of the question.
11 A.  No.
12 Q.  What would -- what would the
13 approval have taken place -- strike that.
14    What would the approval process have
15 been like in May of 2019 at HCMFA for HCMFA to
16 take out a $7.4 million loan?
17    MR. MORRIS:  Objection to the form
18 of the question.
19 A.  The process would have been similar
20 to what we just discussed on -- for Highland to
21 make a loan to others.  So, again, you know,
22 we -- we would have -- either myself or someone
23 on the team would have discussed this with
24 the -- the president and owner of -- of HCMFA.
25 Q.  And who was that individual?

Page 273

WATERHOUSE - 10-19-21

2  A.  That was James -- Jim Dondero.
3  Q.  So do I understand that in May of
4  2019, on behalf of both the lender, Highland,
5  and the borrower, HCMFA, Mr. Dondero would have
6  had to approve $7.4 million in loans?
7     MR. MORRIS:  Objection to the form
8  of the question.
9  A.  Yes.
10 Q.  You mentioned when Mr. Morris was
11 asking you the NAV error, N-A-V error, with
12 respect to TerreStar, without writing us a
13 novel, unless you feel like you have to, can
14 you summarize what that NAV error was?  What
15 happened?
16 A.  There was a -- in the Highland
17 Global Allocation Fund, it owned at the time an
18 equity interest in a company called TerreStar.
19 And TerreStar is -- at the time was a private
20 company, and it may still be today.  Again, I'm
21 putting myself back then as a private company.
22    We had -- sorry, I don't mean we --
23 the fund and the advisor used Houlihan Lokey
24 to -- to value that investment.  And during
25 that time there was some trades that were

Page 274

WATERHOUSE - 10-19-21

1    WATERHOUSE - 10-19-21
2    executed at market levels that were much lower
3    than the Houlihan Lokey model.
4         And based on information and
5    discussions with the portfolio managers and,
6    you know, principals that were very familiar
7    with TerreStar, it was determined that those
8    trades were non-orderly and they were not
9    considered in the valuation as consulted with
10   Houlihan Lokey and PricewaterhouseCoopers at
11   the time.
12        Subsequent to a -- I can't remember
13   the exact circumstances of why the SEC got
14   involved.  I think it was due to this -- this
15   investment became a material position in the
16   fund.  It triggered an SEC, kind of, inquiry.
17   And as part of that inquiry, they questioned
18   the valuation methodology.  "They" meaning the
19   SEC.
20        And at the culmination of that
21   process -- this is all summarized -- the value
22   that was -- that ultimately had to be used in
23   the fund's NAV was different than -- materially
24   different than what the original valuation at
25   Houlihan Lokey provided.

Page 275

1    WATERHOUSE - 10-19-21
2         And given that there was this fund
3    was, as we discussed -- I don't know if we
4    discussed it, but it was an open-ended fund
5    that was going -- that was converting to a
6    close-end fund.
7         Due to the fact that it was an
8    open-ended fund, you had to recalculate NAV and
9    see what the impact was on people -- on
10   investors coming in and out of the fund and if
11   there is a detrimental impact and to calculate
12   what that -- what that impact was and if there
13   was any amounts owed to the fund pursuant to
14   the error.
15        Q.   Were you personally involved
16   internally at either Highland or HCMFA with
17   these investigations and discussions with the
18   SEC?
19        A.   I was.
20        Q.   Which other key people or senior
21   people at Highland were involved, to your
22   recollection?
23        A.   Myself, Thomas Surgent, David Klos,
24   Lauren Thedford, Jason Post.
25        Q.   Mr. Dondero, was he --

Page 276

1    WATERHOUSE - 10-19-21
2         A.   I believe Cliff Stoops.  I'm trying
3    to think.  And maybe that is -- that is -- that
4    is -- that is all kind I can recall at the
5    moment.
6         Q.   Do you recall whether it was
7    determined that the fund suffered losses as a
8    result of this error?
9         A.   The -- the fund -- the -- the --
10   because the open-ended nature of the fund,
11   there were losses that were attributable to
12   investors.  Meaning they -- they would have
13   redeemed and got a less money or -- or they
14   subscribed in and maybe because they didn't get
15   enough shares and then they later sold and then
16   they were harmed in that fashion.
17        And there is -- there is -- there
18   were very -- there were very detailed
19   calculations and, you know, all these different
20   scenarios that we had to -- I'm sorry, I keep
21   saying "we" -- that the individuals involved
22   had to calculate and quantify.
23        Q.   Well, do you recall whether HCMFA
24   admitted certain fault and liability for this
25   error?

Page 277

1    WATERHOUSE - 10-19-21
2         A.   I don't recall specifically.
3         Q.   Do you recall whether HCMFA caused
4    any funds to be paid to the investors and the
5    fund the subject of the NAV error?
6         A.   Yes.
7         Q.   Do you recall the approximate amount
8    of funds, moneys paid to the investors and the
9    fund?
10        A.   It was -- it was approximately
11   $7 million.
12        Q.   If I was to suggest 7.8 million,
13   would that ring more true or are you sticking
14   with your original answer?
15        A.   It was -- it was approximately 7 --
16   7 to $8 million.  Again, I don't remember the
17   exact number, but it was in that ballpark.
18        Q.   So regardless of whether HCMFA
19   accepted fault or liability, it caused some
20   $7 million or more to be paid out to affected
21   investors in the fund?
22        MR. MORRIS:  Objection to the form
23   of the question.
24        A.   And I want to make sure I'm
25   understanding your question because there is a

Page 278

WATERHOUSE - 10-19-21

1  lot of different entities that are going on to
2  my head.
3        I think what you are saying is based
4  on this error, shareholders were harmed by this
5  approximately $7.8 million -- by approximately
6  $7.8 million.  Is that what you are asking?
7     Q.   Yes, sir.
8     A.   Yes, that was -- again, I don't have
9  the exact numbers.  If I take -- it was -- it
10  was in that ballpark, and there is a detail
11  calculation and write-up that could, that --
12  that exists someplace.
13     Q.   Now, at that time, at the time that
14  the NAV error occurred, was there a contract in
15  place between HCMFA and the debtor pursuant to
16  which the debtor was providing services to
17  HCMFA?
18        MR. MORRIS:  Objection to the form
19  of the question.
20     A.   Yes.
21     Q.   Was that contract generally called a
22  shared services agreement?
23     A.   It was generally called that, but
24  there were -- there were -- I mean, it -- it --

Page 279

WATERHOUSE - 10-19-21

1  it depends on who you talk to, but yes,
2  generally, there were -- there are multiple
3  agreements.
4     Q.   Pursuant to one or more of those
5  agreements, was the debtor providing certain
6  services to HCMFA?
7        MR. MORRIS:  Objection to the form
8  of the question.
9     A.   Yes.
10     Q.   And can you at a very high level
11  summarize in 2018 and 2019 what those services
12  were?
13     A.   Yes, there was a -- yes.
14     Q.   Okay.  Please -- please go -- go
15  through a short summary.
16     A.   There was a -- a cost reimbursement
17  agreement between Highland Capital Management
18  Fund Advisors and Highland Capital Management,
19  L.P.  That agreement was for what we referred
20  to as front office services, so investment
21  management, things of that nature.
22        There was I think what most people
23  refer to as the shared services agreement that
24  was -- that agreement was between Highland

Page 280

WATERHOUSE - 10-19-21

1  Capital Management Fund Advisors and Highland
2  Capital Management for back office services.
3     Q.   And can you summarize what you mean
4  by back office services?
5     A.   Those services were for accounting,
6  finance, tax, valuation, HR, IT, you know,
7  legal compliance, things of -- things of those
8  nature -- or things of that nature, excuse me.
9     Q.   So in the spring of 2019, do you
10  recall whether HCMFA took the position that it
11  was actually Highland that caused the NAV error
12  to occur pursuant to the valuation services
13  that Highland was providing?
14        MR. MORRIS:  Objection to the form
15  of the question.
16     A.   I do not recall.
17     Q.   Did you ever have any discussions
18  with anyone, Jim Dondero or anyone in the first
19  half of 2019 as to whether Highland, the
20  debtor, that is, had any liability to HCMFA
21  related to the NAV error?
22        MR. MORRIS:  Objection to the form
23  of the question.
24     A.   I do not recall.

Page 281

WATERHOUSE - 10-19-21

1     Q.   And then you mentioned that the fund
2  was being closed and some compensation related
3  to that.  Can you -- can you elaborate?  What
4  were you referring to?
5     A.   Right.  So the advisor, pursuant to
6  board approval, put a proposal in front of the
7  shareholders of the Highland Global Allocation
8  Fund to convert it from an open-ended fund to a
9  closed-end fund.
10        As an open-ended fund, when
11  shareholders subscribe to the fund or redeem
12  into the fund, they do it at NAV.
13        When it is -- when you have a
14  closed-end fund, closed-end funds are -- are
15  publicly-traded, like on the New York Stock
16  Exchange, exchanges like that, and -- and
17  shareholders or investors, they're not --
18  they're -- they're not subscribing and
19  redeeming with the fund.  They are like shares
20  of Apple.
21        Those shares of the Highland Global
22  Allocation Fund trade on an exchange, and that
23  is how you, you know, that is how you, you know,
24  you become an equity owner in the fund or you

Page 282

WATERHOUSE - 10-19-21

1  sell your shares and you are no longer an
2  equity owner.
3
4        As part of that proposal, the
5  advisor told shareholders if you -- if you vote
6  for this proposal to -- to convert it from an
7  open-ended fund to a closed-end fund, we will
8  pay you some amounts of money. I forgot -- a
9  certain number of points. I think it was
10 like -- it was like two to three points or
11 something -- something like that.
12    Q.  Okay. You mentioned when Mr. Morris
13 was asking you, going back to those two
14 promissory notes, you will recall the 5 million
15 and 2.4 million, you mentioned something to the
16 effect that Mr. Dondero told -- told you to pay
17 some moneys out of Highland. Do you remember
18 that discussion with Mr. Morris?
19    A.  I do.
20    Q.  So, to the best of your
21 recollection, did you have a discussion with
22 Mr. Dondero about making some payments in May
23 of 2019 out of Highland?
24    A.  I recall, as I testified earlier,
25 that I had a conversation with Mr. Dondero

Page 283

WATERHOUSE - 10-19-21

1  for -- for these amounts attributable to -- it
2  was either the error -- you know, the error,
3  and in that conversation he said, go get the
4  money from Highland. I believe that is what I
5  testified earlier, and that -- that is my
6  recollection.
7
8    Q.  Do you recall if that was an
9  in-person meeting or some other mode for the
10 meeting?
11    A.  I -- I -- I recall that being
12 in-person.
13    Q.  Do you recall if anyone else was
14 present, or was it just you and Mr. Dondero?
15    A.  I recall just he and I.
16    Q.  And the moneys that he told you to
17 find from -- or get from Highland, was that in
18 the amount of $5 million and $2.4 million?
19        MR. MORRIS: Objection to the form
20    of the question.
21    A.  I believe so, but I would have to go
22 back and look and see when those moneys were
23 actually paid into the -- into the fund and,
24 you know, when those transfers were done. If
25 they were all done around that same time, then

Page 284

WATERHOUSE - 10-19-21

1  yes, I would say it was -- it was all related
2  to that.
3
4    Q.  Did Mr. Dondero tell you that those
5  funds would be a loan from Highland to HCMFA?
6    A.  I don't recall.
7        MR. MORRIS: Objection to the form
8    of the question.
9    Q.  Now, and forgive me, I'm probably
10 the only non-American born here, but I speak
11 reasonably well in English. I don't recall,
12 does that mean you don't remember or does that
13 mean it didn't happen?
14        MR. MORRIS: Objection to the form
15    of the question.
16    A.  It -- it means I don't -- I don't
17 remember.
18    Q.  Did Mr. Dondero tell you to have
19 those two promissory notes prepared?
20    A.  I don't recall.
21    Q.  When you -- again, when you say, I
22 don't recall today, that means that sitting
23 here today, you just don't remember one way or
24 the other. Is that accurate?
25    A.  Yes.

Page 285

WATERHOUSE - 10-19-21

1
2    Q.  Is it possible that you, having
3  heard what Mr. Dondero said and seeing funds
4  being transferred, assumed that that would be a
5  loan without him actually telling you that
6  would be a loan?
7        MR. MORRIS: Objection to the form
8    of the question.
9    A.  Sorry, I want to make sure -- did I
10 ask the amounts that were transferred that I --
11 that -- that I assumed that that was a loan?
12    Q.  Well, let me -- let me take -- let
13 me try again.
14        So you have established already that
15 there were quite a number of promissory notes
16 back and forth -- I'm sorry, quite a number of
17 promissory notes with affiliated companies and
18 individuals owing Highland money; right?
19    A.  Yes.
20    Q.  And you have established that there
21 were many transactions and transfers going back
22 and forth over the years; right?
23        MS. DANDENEAU: Objection to form.
24    A.  In -- yes, in my capacity as CFO and
25 my employment, yes, that is -- yes.

Page 286

WATERHOUSE - 10-19-21

1  Q. And that's part of the reason why
2  you just can't remember some of the details
3  today because this -- this happened years ago,
4  and there were a number of transactions. Is
5  that accurate?
6  MS. DANDENEAU: Objection to the
7  form.
8  MR. MORRIS: Objection to the form
9  of the question.
10  A. I mean, I deal with thousands of --
11  of -- of -- of transactions, you know, whether
12  it has -- the processing of transactions, you
13  know, if it has got, you know, more -- more
14  zeros, you know, behind it than others.
15  When you look at thousands of
16  transactions over the years for funds and
17  advisors and -- and, you know, financial
18  statements, I mean, it is -- it is very hard
19  going back in -- in -- in my -- you know,
20  14-ish year career at -- at Highland to
21  remember a lot of those details, especially
22  when I don't have any records or books or
23  anything like that, and -- and going back many
24  years.

Page 287

WATERHOUSE - 10-19-21

1  Q. And that is fine. That -- that --
2  that is why I asked the question.
3  Is it possible in May of 2019 when
4  Mr. Dondero told you to transfer the funds from
5  Highland, you just assumed on your own that
6  those would be loans without him actually
7  telling you that those would be loans?
8  MR. MORRIS: Objection to the form
9  of the question.
10  A. I don't know.
11  Q. I'm sorry, you --
12  A. I said I don't know.
13  Q. Okay. Well, as the -- as the CFO
14  for Highland, if you saw $7.4 million going
15  out, you would feel some responsibility to
16  account for that, wouldn't you?
17  MR. MORRIS: Objection to the form
18  of the question.
19  A. Yes.
20  Q. Is it fair to say that those would
21  be in the range large enough to rise up to your
22  level?
23  MR. MORRIS: Objection to the form
24  of the question.

Page 288

WATERHOUSE - 10-19-21

1  A. If -- I don't know if I understand
2  your question. Those amounts would arise to my
3  level where I would be involved or...
4  Q. You would want to know what a
5  transfer for that amount, $7.4 million, was all
6  about, as the CFO of Highland, wouldn't you?
7  MR. MORRIS: Objection to the form
8  of the question.
9  A. Yes, I make it -- I mean, I -- I
10  review all sorts of payments, I mean, even
11  smaller dollar payments on a periodic basis,
12  you know, to -- to -- to understand and to make
13  sure that we are paying things in a -- you
14  know, in -- in -- in an informed way. And, you
15  know -- and we're -- and we're paying things
16  pursuant to vendor contracts and things like
17  that.
18  Q. So as part of that, is it possible
19  that seeing $7.4 million go out you would have
20  promissory notes made in order to keep a paper
21  trail, assuming that those were loans, when
22  perhaps they were never intended to be loans by
23  Mr. Dondero?
24  MR. MORRIS: Objection to the form

Page 289

WATERHOUSE - 10-19-21

1  of the question.
2  A. I don't know. As I testified
3  earlier, I had conversations with Mr. Dondero
4  about -- about the -- the -- the moneys that
5  were needed for the NAV error. And I recall
6  him saying go get it from Highland -- or get it
7  from Highland.
8  Q. Well, why did you sign those
9  promissory notes and why didn't you have him
10  sign them?
11  MR. MORRIS: Objection to the form
12  of the question.
13  A. I don't know. I don't know.
14  Q. You mentioned earlier that you
15  typically don't sign promissory notes. Am I
16  remembering your testimony correctly?
17  I mean, promissory notes on behalf
18  of the entities. Not yourself, obviously.
19  A. Yes, that is what I said earlier.
20  Q. Do you recall any other promissory
21  notes in the million-plus range that you had
22  ever signed before on behalf of any entity?
23  A. There is -- there has been a lot of
24  transactions over the years. I don't -- I

Page 290

WATERHOUSE - 10-19-21

1 don't – I don't recall generally. I don't –
2 I don't recall.
3 
4    Q.    So – but to the best of your
5 recollection, it was on your initiative,
6 following your discussion with Mr. Dondero,
7 that you had someone draft those two promissory
8 notes; is that correct?
9        MR. MORRIS: Objection to the form
10 of the question.
11    A.    Yes, we would have – the team, as I
12 stated earlier, we don't draft promissory
13 notes. "The team" meaning the accounting and
14 finance team.
15        So the team would have worked with
16 the legal group at Highland to draft any notes.
17    Q.    Do you believe or do you have any
18 recollection as to whether you would have done
19 that pursuant to an email or telephone call or
20 in-person meeting?
21        MR. MORRIS: Objection to the form
22 of the question.
23    A.    Are you asking if I would have – if
24 those notes would have been drafted pursuant to
25 an email or phone call?

Page 291

WATERHOUSE - 10-19-21

1 
2    Q.    Strike that.
3        Do you recall whether you sent an
4 email to anyone asking them to draft those two
5 promissory notes?
6    A.    I don't recall because, again,
7 once – I would have instructed – likely
8 instructed the team to – to work with the
9 legal group to draft these documents.
10        I – I – I – yeah, I didn't – I
11 mean, that is more an operational-type
12 procedure. So, you know, a manager or a
13 controller or working with legal. You know,
14 they – they can certainly handle that task to
15 get that – you know, to request that from
16 legal.
17    Q.    And who on your team do you think
18 you would have asked to do that?
19        MR. MORRIS: Objection –
20    Q.    Who would have been the logical
21 person or people, if you don't remember their
22 name today?
23        MR. MORRIS: Objection to the form
24 of the question.
25    A.    It – it – there is only two

Page 292

WATERHOUSE - 10-19-21

1 managers of the group. That would have been
2 Dave Klos or Kristin Hendrix.
3        Dave was the – one of his duties
4 was managing the valuation team, and so he was
5 intimately involved with this process. So, you
6 know...
7    Q.    Okay.
8    A.    I don't recall specifically but, I
9 mean, my general – you know, I – I – I
10 likely would have talked to Dave first about it
11 versus someone like Kristin who hadn't been
12 intimately involved.
13    Q.    And – and do you have a view as to
14 whether it is most likely that you would have
15 done that by email or in-person or how would
16 you believe you would have communicated that to
17 Mr. Klos?
18        MR. MORRIS: Objection to the form
19 of the question.
20    A.    I likely would have done that in
21 person. Again, if things of this nature
22 that – again, you have to put ourselves back
23 to, we have been working on this very stressful
24 project for many, many months. And once the

Page 293

WATERHOUSE - 10-19-21

1 go-ahead was to – you know, we see the light
2 at the end of the tunnel with wrapping this up
3 and making shareholders whole – sorry to say
4 "we" – you know, the – so the folks that are
5 involved in it.
6    
7        I like to talk to people
8 face-to-face and – and – and go to – and go
9 to their desk, because that shows if I'm going
10 to their desk that – that is something that I
11 want done, you know.
12    Q.    And do you remember, Mr. Waterhouse,
13 getting those two promissory notes in paper
14 format or by email before they were executed?
15        MR. MORRIS: Objection to the form
16 of the question.
17    A.    I don't recall.
18    Q.    For whatever was the ordinary course
19 back then in May 2019, would you expect to have
20 received them only on paper or would you have
21 expected to have received them in Word document
22 or PDF document by email?
23        MR. MORRIS: Objection to the form
24 of the question.
25    A.    I – I didn't sign – I signed very

Page 294

WATERHOUSE - 10-19-21

1  WATERHOUSE - 10-19-21
2  few documents via email. I can't say that it
3  never happened, but people either stopped by my
4  office and physically walked in documents for
5  signature that we discussed face-to-face.
6       Or documents were -- if -- if --
7  if -- if -- let's say I wasn't there or I
8  wasn't available, documents were dropped off.
9  I had -- I had some in- and outboxes in front
10 of my -- my office there at the Crescent.
11      Documents would be dropped off for
12 signature. There would be a cover sheet that
13 would be -- have been applied to those
14 documents detailing, you know, who dropped it
15 off, the purpose, why, what time.
16      And then, you know, as I stated, I
17 don't draft documents and I always go to the
18 legal group and the compliance group to make
19 sure that they're in the loop. And there is
20 a -- a box or section that says, Has legal
21 reviewed or approved, or something to that
22 nature.
23      Again, I don't -- I don't have
24 access to that cover sheet anymore, but it
25 was -- it was something to that effect.

Page 295

1  WATERHOUSE - 10-19-21
2       And my assistant, you know, if she
3  was there, she would review that -- you know,
4  whatever was being dropped off. And if that
5  has legal, you know, reviewed or -- reviewed or
6  approved it, if that wasn't -- if that stuff
7  hadn't been done, it was like she would just
8  tell them like, go -- go -- go to the legal
9  group, because --
10      Q.  Let me -- let me pause --
11      MS. DANDENEAU: Let him finish.
12      MR. MORRIS: Thank you. Go ahead.
13      A.  I take -- go to the legal group
14 because that -- that was my -- you know, I
15 didn't -- I didn't review anything that -- that
16 they weren't -- you know, or there wasn't some
17 representation made to me that they had
18 reviewed, approved in some capacity.
19      Again, my -- my -- my goal, as CFO,
20 is to provide transparency and make sure that
21 groups like compliance and other things -- and
22 the other group in legal are -- are in -- you
23 know, their -- they're made aware of
24 transactions of -- you know, that are crossing
25 my desk.

Page 296

1  WATERHOUSE - 10-19-21
2       Because I'm not in every
3  conversation. They're not in every
4  conversation -- meaning legal compliance -- and
5  I just want to make sure that -- that everyone
6  is in sync to, you know, to -- to the extent
7  possible.
8       Q.  So if we summarize, you don't
9  specifically remember signing these two notes,
10 but most likely it would have been that they
11 would have presented -- been presented to you
12 physically on paper?
13      MR. MORRIS: Objection to the form
14 of the question.
15      A.  They would -- they would have been
16 presented physically on paper most likely or
17 someone would have left it. But, I mean,
18 again, I don't -- I don't recall.
19      Q.  I understand. Understand.
20      When you signed -- when you signed
21 documents, when you personally signed
22 documents, did you typically use a ink pen or
23 did you use a stamp?
24      A.  No, I -- I -- I use a -- an -- an
25 ink pen.

Page 297

1  WATERHOUSE - 10-19-21
2       Q.  Do you know -- was there a file at
3  Highland kept anywhere with ink-signed
4  originals of a promissory notes in general or
5  these two promissory notes specifically?
6       MR. MORRIS: Objection to the form
7  of the question.
8       A.  Sorry, I just want to make sure I
9  understand your question. Are you saying is
10 there a file somewhere that has ink-signed
11 originals of these two promissory notes?
12      Q.  Yes.
13      A.  I would -- I would assume they're
14 some place. I mean --
15      Q.  Well, was there a -- was there a
16 place where Highland generally kept originals
17 of promissory notes owed to it?
18      A.  I wouldn't -- no.
19      MR. RUKAVINA: Mr. Nguyen, would you
20 please pull up my A7, alpha 7.
21      Q.  These are the two promissory notes,
22 Mr. Waterhouse.
23      (Exhibit A7 marked.)
24      Q.  And please -- Mr. Waterhouse, please
25 command my associate to scroll down as you need

Page 298

WATERHOUSE - 10-19-21

1 to, but I want you to take a very close look at
2 your two signatures here and tell me whether
3 you believe, in fact, that you ink signed them
4 or whether you --
5     MS. DANDENEAU: Mr. Rukavina,
6 Mr. Waterhouse has the copies.
7     MR. RUKAVINA: Perfect. Then you
8 can take this down, Mr. Nguyen.
9     A. These -- these -- these signatures
10 are identical, now that I stare at them, and I
11 mean, they are so close -- I mean, they're
12 identical that, I mean, even with my chicken
13 scratch signature, I don't know if I can -- you
14 know, I do this 100 times, could I do that
15 as -- as precisely as I see between the two
16 notes.
17     Q. Well, that is why I ask.
18 Mr. Waterhouse, now that you have examined
19 them, does it seem like it is more likely that
20 you actually electronically signed these?
21     MR. MORRIS: Objection to the form
22 of the question.
23     A. Is -- I don't -- I don't recall
24 specifically. As I said before, my assistant

Page 299

WATERHOUSE - 10-19-21

1 did have a -- an electronic signature, and that
2 was used from time to time. It wasn't as
3 common practice back in 2019. It definitely
4 was more common practice when we had to work
5 from home and remotely for COVID because it
6 that made it almost impossible to, right,
7 provide wet signatures since we're all working
8 from home remotely.
9     Q. Well, going just for these two
10 promissory notes, Mr. Waterhouse, in light of
11 your inability to remember any details, are you
12 sure you actually signed either or both of
13 those notes?
14     MS. DANDENEAU: Objection to form.
15     A. I don't recall specifically
16 signing -- actually physically signing these
17 notes. As I said before, I don't recall doing
18 that. This -- this looks like my signature,
19 but yet these two signatures are identical.
20     Q. So you don't recall physically
21 signing them, and I take it you don't recall
22 electronically signing them either?
23     A. I don't recall. You know, Highland
24 has all my emails. If that occurred, you know,

Page 300

WATERHOUSE - 10-19-21

1 you know, I don't have any of these records is
2 what I'm saying. I don't have any of those
3 records.
4     Q. That is why I'm asking you these
5 questions in great detail because I don't have
6 those emails. I'm trying to -- I'm hoping that
7 you will give me some names or some details so
8 I can go look for more emails, but again, you
9 don't remember any -- any individual, other
10 than Mr. Dondero than that we've discussed, you
11 don't remember any individual with whom you
12 discussed these promissory notes prior to their
13 execution?
14     MR. MORRIS: Objection to the form
15 of the question.
16     A. I don't recall discussing it with
17 anybody else.
18     Q. Okay.
19     A. I mean, prior --
20     Q. I understand.
21     A. You know, there was no one else --
22 there was no one else in that meeting that I
23 recall with Mr. Dondero.
24     Q. Now, when you established that by

Page 301

WATERHOUSE - 10-19-21

1 May of 2019 --
2     A. And -- and from what I recall, and
3 the reason why I was by myself is -- is, you
4 know, I don't -- I don't want to speculate, I'm
5 sorry.
6     Q. Okay. We have established that by
7 May of 2019, in your view, the liabilities of
8 HCMFA exceeded its assets; correct?
9     A. Yeah. I mean, again, I don't have
10 financial statements in front of me, but I
11 think, if I recall, we'd have to go through the
12 testimony with Mr. Morris, I believe that was
13 the case.
14     Q. In fact, you will recall that in
15 April of 2019, Mr. Dondero signed a document
16 that extended the demand feature of two prior
17 notes to May 31, 2019. Do you recall that?
18     MS. DEITSCH-PEREZ: I think you
19 might -- maybe have the court reporter read
20 that back. You might have misspoke.
21     (Record read.)
22     MR. RUKAVINA: And I did misspeak.
23     Q. I meant to say to May 31, 2021. Do
24 you recall that, sir?

Page 302

1      WATERHOUSE - 10-19-21
2      MR. MORRIS: Objection to the form
3  of the question.
4      A.  Yes.
5      MR. RUKAVINA: And, Mr. Nguyen, just
6  so that the record is clear, will you please
7  pull up my Exhibit Alpha 10, A10.
8      (Exhibit A10 marked.)
9      Q.  You don't have this one in front of
10  you, Mr. Waterhouse?  This is the one that
11  Mr. Morris used earlier.  Do you see that
12  document, sir?
13      A.  Yes, I do.
14      Q.  And this is what you were testifying
15  about before when Mr. Morris was asking you.
16  Do you remember that?
17      A.  Yes.
18      Q.  So here is my question for you,
19  Mr. Waterhouse:  As the chief financial officer
20  of Highland, was it prudent for Highland less
21  than three weeks later to be lending
22  $7.2 million to an insolvent entity that
23  couldn't even then pay its debts back to
24  Highland?
25      MS. DANDENEAU: Objection to form.

Page 303

1      WATERHOUSE - 10-19-21
2      MR. MORRIS: Objection to the form
3  of the question.
4      A.  Sorry, I just want to make sure --
5  are you asking me, did you say, was it prudent
6  for Highland to loan $7.4 million to HCMFA a
7  few weeks after this document was executed?
8      Q.  Yes, and at a time when HCMFA's
9  liabilities exceeded its assets.
10      MR. MORRIS: Objection to the form
11  of the question.
12      A.  I don't -- it is odd.  I don't know.
13      MR. RUKAVINA: You can take this
14  exhibit down, Mr. Nguyen.
15      Q.  Do you recall asking anyone,
16  Mr. Dondero or -- or anyone outside as to
17  whether Highland ought to be lending
18  $7.4 million to HCMF regarding HCMF's
19  creditworthiness?
20      MR. MORRIS: Objection to the form
21  of the question.
22      A.  I don't recall.
23      Q.  Did you receive personally any of
24  that $7.4 million?
25      A.  No.

Page 304

1      WATERHOUSE - 10-19-21
2      Q.  Did you even --
3      MR. MORRIS: I didn't hear that
4  question, sir.
5      MR. RUKAVINA: The one that he
6  answered, John, or my new one?
7      MR. MORRIS: No, no, your question,
8  Davor.
9      MR. RUKAVINA: I had asked him
10  whether he received any of the
11  $7.4 million.  He said no.
12      MR. MORRIS: Yeah.  I thought there
13  was a question after that.  Maybe I was
14  mistaken.  I apologize.
15      MR. RUKAVINA: I had started a new
16  question, so here, let me start the new
17  question again.
18      Q.  Did you personally receive any
19  direct benefit from those two notes for
20  $7.4 million?
21      A.  No.
22      Q.  Did you ever personally consider
23  yourself obligated to repay either or both of
24  those notes?
25      A.  No.

Page 305

1      WATERHOUSE - 10-19-21
2      MR. RUKAVINA: Pull up those notes
3  again, Mr. Nguyen.
4      Q.  You can have them in front of you,
5  Exhibit 7, Mr. Waterhouse, whatever is easier
6  for you.  If you go to your signature page, my
7  question to you is, why did you not include
8  your title as treasurer by your name, Frank
9  Waterhouse?
10      MS. DANDENEAU: Objection to form.
11      A.  I didn't -- I didn't draft this
12  document.
13      Q.  So you relied on whoever drafted it
14  to draft it correctly?
15      A.  Yes.
16      Q.  Okay.  But back then when you signed
17  this, did it ever cross your mind that you were
18  the maker on these notes?
19      A.  No.
20      Q.  Back then when you signed this
21  document, did it ever cross your mind that you
22  could be a co-obligor on these notes?
23      A.  No.  I didn't receive $7.4 million,
24  I mean...
25      Q.  But can you say that HCMFA received

Page 306

WATERHOUSE - 10-19-21

1 $7.4 million?
2     A.   I would have to go back and look and
3 check in, you know, the -- the financial
4 records and the bank statements.
5     MR. RUKAVINA:  You can take this
6 exhibit down, Mr. Nguyen.
7     Q.   Mr. Waterhouse, I'm not trying to be
8 a smart-ass, but if the law says that because
9 of the way that you signed this promissory
10 note, if that is what the law says, that that
11 made you personally -- personally liable, then
12 you would agree with me that that was never
13 your intent?
14     MR. MORRIS:  Objection to the form
15 of the question.
16     A.   That was never -- I wouldn't sign a
17 note and not get consideration in return.
18     Q.   So putting all other issues aside,
19 if the law -- if the law says that you were
20 liable for those notes because of how you
21 signed them, then would you agree with me that
22 these notes are a mistake?
23     MR. MORRIS:  Objection to the form
24 of the question.

Page 307

WATERHOUSE - 10-19-21

1     MS. DANDENEAU:  Objection to the
2 form.
3     A.   Yes.
4     Q.   So do you agree with me that it's
5 odd -- I think that is the word you used --
6 that Highland would be loaning $7.4 million a
7 few weeks after that extension to an entity
8 whose liabilities exceeded its assets, and you
9 would agree with me that it was never your
10 intention to be in any way liable for these two
11 promissory notes; correct?
12     MR. MORRIS:  Objection to the form
13 of the question.
14     A.   Sorry, you -- you asked a lot there.
15     MR. RUKAVINA:  I will strike it and
16 I will move on.
17     Let's go to -- pull up Exhibit 9,
18 please Mr. Nguyen -- Alpha 9, I'm sorry, Alpha
19 9, A9.
20     (Exhibit A9 marked.)
21     Q.   Sir, take a moment to look at this,
22 but this is an email, and you will see attached
23 July 31, 2020 affiliate notes.
24     Do you see that attachment?

Page 308

WATERHOUSE - 10-19-21

1     A.   Yes.
2     Q.   Okay.  And do you see an entry for
3 Highland Capital Management Fund Advisors?
4     MR. MORRIS:  I'm sorry, hold on.
5 Where are you looking?
6     MR. RUKAVINA:  Last page, John.
7     MR. MORRIS:  Is it the page on the
8 screen?
9     MR. RUKAVINA:  Oh, I'm sorry.
10 Mr. Nguyen just did it.  Yes, the last page
11 there.
12     MR. MORRIS:  Thank you.
13     Q.   Do you see an entry there for HCMFA?
14     A.   Yes.
15     Q.   About $10.5 million.
16     Do you see that?
17     A.   I do.
18     Q.   And, now, do you have any
19 explanation for why if HCMFA owed $7.4 million,
20 plus the 5.3 million that had been extended,
21 why that amount was only 10.5 million?
22     A.   I don't know.  Okay.
23     MR. RUKAVINA:  Close this one and
24 pull up, Mr. Nguyen, the schedules,

Page 309

WATERHOUSE - 10-19-21

1 schedule of assets.  What exhibit is this
2 of ours, Mr. Nguyen?
3     MR. NGUYEN:  This is A11.
4     MR. RUKAVINA:  Oh, this will be A11.
5     (Exhibit A11 marked.)
6     Q.   You don't have this in front of you,
7 Mr. Waterhouse.
8     A.   Okay.
9     Q.   This is what Mr. Morris used
10 earlier.  Do you remember looking at this with
11 Mr. Morris?
12     A.   Yes.
13     MR. RUKAVINA:  You might have to
14 zoom in a little.  Okay.
15     Q.   Now, I see Affiliate Note A, B, and
16 C.
17     Do you have any recollection as to
18 why the names of the affiliates are omitted?
19     A.   I don't.  I testified earlier that,
20 you know, the team worked with DSI in providing
21 these.  I -- I don't -- I don't know.
22     Q.   Can we deduce -- is it logical to
23 deduce that Affiliate Note A would be NexPoint
24 given its size of $24.5 million?

Page 310

WATERHOUSE - 10-19-21

1          WATERHOUSE - 10-19-21
2          MR. MORRIS:  Objection to the form
3    of the question.
4          A.    I mean, it – it is a – it is – it
5    is approximate.
6          Q.    Well, can we – can we deduce – or,
7    I'm sorry, strike that.
8          Can you, sitting here today,
9    logically conclude that Affiliate Note B or C
10   represents HCMFA?
11         MR. MORRIS:  Objection to the form
12   of the question.
13         A.    I don't know.  I don't know.  I
14   can't.
15         Q.    Okay.  As of the petition date, we
16   have established that HCMFA, under promissory
17   notes, owed $7.4 million and $5.3 million to
18   the debtor; correct?
19         MR. MORRIS:  Objection to the form
20   of the question.
21         A.    Yes.
22         Q.    Okay.  And by my reckoning, that
23   would be somewhere approaching $13 million.
24         MR. MORRIS:  Objection to the form
25   of the question.

Page 311

1          WATERHOUSE - 10-19-21
2          Q.    It would be $12.7 million.  Is that
3    generally correct?
4          A.    Sorry, the amounts were 7.4, 5.3.
5          Q.    Yes.
6          A.    Okay.  Yeah, that – that – I can
7    do that math, yes.
8          Q.    Do you have any explanation or any
9    understanding of why there is no similar entry
10   listed here on the schedule of assets filed
11   with the bankruptcy court?
12         MR. MORRIS:  Objection to the form
13   of the question.
14         A.    I don't know.  We have to look at
15   the supporting schedules, like I talked about
16   other – presumably there is – there is a
17   build to the schedule that would provide the
18   detail.
19         Q.    Well, that was going to be my next
20   question.  You anticipated it.
21         MR. RUKAVINA:  You can – you can
22   take this down, Mr. Nguyen.
23         Q.    Do you believe that whenever you and
24   your team provided the underlying data to the
25   financial advisor that the actual names of the

Page 312

1          WATERHOUSE - 10-19-21
2    affiliates for Affiliate Note A, B, and C would
3    have been listed there?
4          A.    Are you asking we provided the names
5    to the financial advisor?  I don't – I don't
6    understand who the financial advisor is.
7          Q.    I'm sorry, DSI.
8          Let me ask the question this way,
9    Mr. Waterhouse.
10         Whenever you provided information
11   about the affiliate notes to DSI, do you
12   believe that you would have included the actual
13   names of the affiliates, you or your team, or
14   that you would have done the Affiliate Note A,
15   Note B, Note C?
16         MR. MORRIS:  Objection to the form
17   of the question.
18         MS. DANDENEAU:  Objection to the
19   form.
20         A.    We – like I testified earlier, when
21   we were – we gave everything to – to DSI.  We
22   were giving all of our records, all of our
23   files, everything to DSI.  We weren't redacting
24   information or saying, hey, here is a note,
25   here is Affiliate Note A or B.

Page 313

1          WATERHOUSE - 10-19-21
2          I mean, it was – our job and our
3    focus – and I testified in court back in 2019;
4    right – was – was to be transparent and, you
5    know, get DSI up to speed on – on the matters
6    at Highland.  So I can't see us redacting at
7    that point.
8          MR. RUKAVINA:  Mr. Nguyen, will you
9    please pull up Mr. Morris' Exhibit 36.
10         Just the very first page, the very top
11   email.  You might zoom in a little bit.
12         Q.    Now, you recall being asked about
13   this by Mr. Morris?
14         A.    Yes, I do.
15         Q.    And you wrote:  The HCMFA note is a
16   demand note.
17         You wrote that; right?
18         A.    Yes.
19         Q.    And, in fact, weren't there by that
20   point in time several notes?
21         A.    Yes, there were.  Again, I don't –
22   I don't remember everything specifically.  I
23   mean –
24         Q.    I understand.  I understand.
25         So this is an example where – where

Page 314

WATERHOUSE - 10-19-21

1 you might have made a mistake by referring to a
2 singular instead of a plural; right?
3 A. Yes.
4 Q. Okay. And you -- you wrote -- a
5 couple of sentences later, you wrote: There
6 was an agreement between HCMLP and HCMFA the
7 earliest they could demand is May 2021.
8 You wrote that; right?
9 A. Yes.
10 Q. But I think you -- you agreed with
11 Mr. Morris that that can't possibly apply to
12 the May 2019 notes, can it?
13 MR. MORRIS: Objection to the form
14 of the question. That is not what he
15 testified to.
16 Q. Let me ask -- let me ask a different
17 question.
18 Sitting here today -- or if you can
19 answer me from your memory on October 6,
20 2020 -- did the April acknowledgment that
21 extended the maturity date apply to the
22 May 2019 notes also?
23 A. I don't recall specifically.
24 Q. Well, you recall that the notes that

Page 315

WATERHOUSE - 10-19-21

1 you signed were demand notes; right?
2 A. Yes.
3 Q. Do you find it logical, based on
4 your experience, that had they intended to have
5 a different or a set maturity date, you would
6 have instructed that that set maturity date be
7 included instead of a demand feature?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. Sorry, just want to make sure I
11 understand. You are saying that -- that the
12 $5 million note, the $2.4 million note, if
13 those were supposed to be a term note, that I
14 would have made sure that those were a term
15 note?
16 Q. I'm saying -- I'm saying,
17 Mr. Waterhouse, that on May the 2nd and May the
18 3rd, 2019, if you intended that those two
19 promissory notes could not be called until May
20 2021, would you have included such language in
21 those two promissory notes?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. I guess -- I'm sorry, I don't recall

Page 316

WATERHOUSE - 10-19-21

1 putting language in those May notes. I don't
2 remember what language you are referring to.
3 Q. Well, let's read this again.
4 There was an agreement between HCMLP
5 and HCMFA the earliest they could demand is May
6 2021.
7 Do you recall that agreement?
8 A. Yes, that was the agreement we
9 looked at earlier; correct?
10 Q. Okay. Yes.
11 Do you -- do you understand now that
12 that agreement that we looked at earlier also
13 applied to the May 2019 notes that you signed?
14 A. I don't -- I don't know.
15 Q. But as of October 6, 2020, you're
16 writing that there is one demand note and
17 you're categorizing that demand note as not
18 being demandable on May 2021; correct?
19 A. Yes.
20 Q. And you know now that you made at
21 least one mistake in this email; correct?
22 MR. MORRIS: Objection to the form
23 of the question.
24 A. Yes.

Page 317

WATERHOUSE - 10-19-21

1 MR. RUKAVINA: You can pull this
2 down, Mr. Nguyen.
3 Q. So, Mr. Waterhouse, you don't
4 remember Mr. Dondero telling you to make these
5 loans or not. HCMLP was loaning $7.4 million
6 to someone that their assets were less than
7 their liabilities.
8 We don't see on the July list of
9 notes, where there is $12.7 million of notes,
10 we don't see that on the bankruptcy schedules,
11 and we have this Exhibit 36 where you are
12 confused.
13 Are you prepared to tell me, sir,
14 today that you might have made a mistake in
15 executing those two promissory notes?
16 MR. MORRIS: Objection to the form
17 of the question.
18 A. I -- I don't know.
19 Q. And if it turns out that you're
20 personally liable for those promissory notes,
21 it would certainly be a mistake, wouldn't it?
22 MS. DANDENEAU: Objection to the
23 form.
24 MR. MORRIS: Join.

Page 318

WATERHOUSE - 10-19-21

1
2 A. Yes.
3 Q. If Mr. Dondero testifies that he
4 never told you to make these loans, would you
5 disagree with his testimony?
6 MR. MORRIS: Objection to the form
7 of the question.
8 A. Like I testified earlier with my
9 conversation with Mr. Dondero, all I recall is
10 he said, get the money from Highland.
11 Q. And if Mr. Dondero testifies that
12 he, in consultation with other senior personnel
13 at Highland, decided that Highland needed to
14 pay HCMFA $7.4 million as compensation for the
15 NAV error and not a loan, would you have any
16 reason to disagree with Mr. Dondero?
17 MR. MORRIS: Objection to the form
18 of the question.
19 A. If that was – if that was his
20 intent, yes, it would – I would –
21 Q. Do you have any reason to disagree
22 with him?
23 MR. MORRIS: Objection to the form
24 of the question.
25 A. If that was his intent, I don't

Page 319

WATERHOUSE - 10-19-21

1 know. I don't know how I disagree with that.
2
3 Q. And just to confirm, you don't
4 remember ever asking Mr. Dondero whether you
5 should have two promissory notes prepared?
6 A. No.
7 Q. And you don't remember discussing
8 with Mr. Dondero what the terms of those two
9 promissory notes should be?
10 A. I don't recall – I testified all I
11 recall is he said, get the money from Highland.
12 I don't – the – the terms of the note, I
13 don't recall ever having a discussion around
14 the terms of the note, but since I don't draft
15 the notes, that – there could have been a
16 conversation with other people later.
17 Q. Do you have any memory of whether
18 after the notes were drafted, but before you
19 signed them, that you communicated with
20 Mr. Dondero in any way to just confirm or – or
21 get his blessing or ratification to signing
22 those notes?
23 MR. MORRIS: Objection to the form
24 of the question.
25 A. I don't recall.

Page 320

WATERHOUSE - 10-19-21

1
2 Q. Again, the only thing you remember,
3 sitting here today, was Mr. Dondero said, get
4 the money from Highland, and that is it, that
5 is all you remember?
6 MR. MORRIS: Objection to the form
7 of the question.
8 A. I testified to that several times.
9 This was over two years ago. A lot has
10 happened. That is all I recall.
11 Q. And help me here. I'm not very
12 technologically astute. When you – and I – I
13 recognize that you do it rarely, but when you
14 sign a document electronically, do you believe
15 that there is an electronic record of you
16 having authorized or signed a document
17 electronically?
18 MR. MORRIS: Objection to the form
19 of the question.
20 A. I – I don't know the tech answer to
21 that, but, you know, since I don't have – I
22 don't ever attach my signature block
23 electronically, my assistant would have done
24 that, and if that is done over email like we
25 did several times – you know, multiple,

Page 321

WATERHOUSE - 10-19-21

1
2 multiple times over COVID, she would attach my
3 signature block and then email it out to
4 whatever party.
5 Q. What was your assistant's name in
6 May 2019?
7 A. It was Naomi Chisum.
8 Q. Is she the only one? I'm sorry, was
9 she your only assistant that would have maybe
10 facilitated logistically something like you
11 just described?
12 A. You know, she was out on maternity
13 leave at some point. I don't – I don't recall
14 those dates where she was out for maternity
15 leave. There was – there were folks backing
16 her up. I don't recall specifically who
17 those – who those, you know, administrative
18 assistants were, and I don't recall
19 specifically if she was out during this time on
20 maternity leave.
21 I do know that that she was out for
22 a period of time, or who knows, or she could
23 have been on vacation that day or, you know, I
24 don't know.
25 Q. Switching gears now, the two

complaints that have been filed that is against HCMFA and NexPoint, did you see any drafts of those complaints before they were filed?

MR. MORRIS: Objection to the form of the question, and to the extent that you had any communications with counsel or you were shown drafts of the complaints by counsel while you were employed by Highland, I direct you not to answer.

A. I -- I reviewed documents yesterday with counsel here. I believe that is the first time I have ever seen those.

Q. Okay. Did you ever discuss with Mr. Seery these two lawsuits before or after they were filed?

A. I don't recall.

Q. Were you ever interviewed by legal counsel, to your knowledge, about these promissory notes before the complaints were filed? Without going into what was said, were you ever interviewed by legal counsel?

MR. MORRIS: Objection to the form of the question.

A. I don't recall.





Q. Obviously with COVID, it changed, but -- but before COVID, did you used to meet with Mr. Seery from time to time in-person?

A. Yeah, I mean, so before COVID -- so we're talking kind of late March, early April, right, there was about -- I don't remember the specific date when the board for Highland was appointed. I believe it was around February of 2020, so maybe there was a month-and-a-half, two-month window where we were meeting in-person or, you know, like we were actually in the office, excuse me, we were in the office.

And, you know, when they were first appointed, the board members and Mr. Seery were -- were definitely down here more in-person.

Q. Did you ever see Mr. Seery taking written notes of -- of his meetings with you or others?

A. I don't recall.

Q. Do you recall on any Zoom or video conference with Mr. Seery, seeing him take notes, written notes?





A. The Zoom calls we had, I don't recall having seen video or, you know, or if it was on Zoom, I just remember it being -- well, no, you know what, there were some -- you know, I take that back.

So there were -- there were some times that I did remember seeing Mr. Seery on -- on some of the Zoom calls.

Q. Well, let me --

A. I don't -- sorry, I'm thinking. I'm thinking -- I'm going back. I'm trying to process this.

Q. I can make it much quicker, Mr. Waterhouse. I have heard -- I have heard that Mr. Seery is a copious note taker.

Do you have any knowledge about that?

A. No.

Q. Okay. Switching gears yet again, and this will be last theme. Do you need a restroom break, or are you good to go for another half an hour?

MS. DEITSCH-PEREZ: I need a restroom break.





MR. RUKAVINA: Can we make it five minutes?

THE WITNESS: Five minutes would be great.

VIDEOGRAPHER: We're going off the record at 5:53 p.m.

(Recess taken 5:53 p.m. to 5:59 p.m.)

VIDEOGRAPHER: We are back on the record at 5:59 p.m.

Q. Mr. Waterhouse, I had asked you earlier about contracts between HCMFA and the debtor, and now I'm going to talk about contracts between the debtor and NexPoint Advisors. Okay?

A. Okay.

Q. Now, were there contracts similar to the ones with HCMFA that NexPoint had in the nature of employee reimbursement and shared services?

A. Yes, they -- NexPoint Advisors and Highland Capital Management Fund Advisors had cost reimbursement and shared services agreements with Highland Capital Management, L.P.

Page 326

WATERHOUSE - 10-19-21

1  
2   Q.   And was that shared services
3   agreement, to the best of your understanding,
4   in place as of December 31, 2020?
5       A.   It was -- it was terminated at some
6   point, and I remember the contracts had
7   different termination dates, but I think the --
8   the date of termination was January 31st of
9   2021, after the termination was put in.
10      So yeah, it would be in place at the
11  end of the year of December -- it would be in
12  place at December 31st, 2020.
13      Q.   And pursuant to that agreement as of
14  December 31st, 2020, was the debtor providing
15  what you would describe as back office services
16  to NexPoint?
17      A.   Yes.
18      Q.   Would those have included accounting
19  services?
20      A.   Yes.
21      Q.   And as part of those accounting
22  services, would the debtor have assisted
23  NexPoint with paying its bills?
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 327

WATERHOUSE - 10-19-21

1  
2   A.   Yes.
3   Q.   So let's break that up.  You were a
4   treasurer of NexPoint as well in December of
5   2020?
6       MR. MORRIS:  Objection to the form
7   of the question.
8   A.   Yes.
9   Q.   Okay.  And in December of 2020, did
10  NexPoint have its own bank accounts?
11      A.   Yes.
12      Q.   And did it use those bank accounts
13  to pay various of its obligations?
14      A.   Yes.
15      Q.   Did employees of the debtor have the
16  ability to cause transfers to be made from
17  those bank accounts on behalf of NexPoint?
18      A.   Yes.
19      Q.   And is that one of services that the
20  debtor provided NexPoint, basically ensuring
21  that accounts payable and other obligations
22  would be paid?
23      A.   Yes.
24      MR. MORRIS:  Objection to the form
25  of the question.

Page 328

WATERHOUSE - 10-19-21

1  
2   Q.   You answered yes?
3   A.   Yes.
4   Q.   And the payments, though, whose
5   funds would they be made from?
6       A.   From the bank account of NexPoint
7   Advisors.  If they were NexPoint advisor
8   obligations, it would be made from NexPoint
9   Advisors' bank account.
10      Q.   So let's pull up Exhibit Alpha 1.
11  You should have that -- it is my Tab 1 or my
12  Exhibit 1.
13      (Exhibit A1 marked.)
14      Q.   So this is a -- this is a series of
15  emails, Mr. Waterhouse.  Let's look at the
16  first page here, November 25, 2020, between
17  Kristin Hendrix and yourself.
18      Do you see that, sir?
19      A.   I do.
20      Q.   And do you see where Ms. Hendrix
21  writes:  NPA.
22      Do you know what NPA stood for?
23      A.   Yes.
24      Q.   And what does it stand for?
25      A.   NexPoint Advisors.

Page 329

WATERHOUSE - 10-19-21

1  
2   Q.   And was that how you-all internally
3   at Highland refer to NexPoint Advisors, L.P.?
4       A.   I mean, yes, amongst other things.
5       Q.   And she writes at the bottom of her
6   email:  Okay to release?
7       Do you see that?
8       A.   Yes, I do.
9       Q.   So what --
10      MR. MORRIS:  Hold on one second.
11      Okay.  Go ahead.
12      MR. RUKAVINA:  Yeah.
13      Q.   So what is -- what is Ms. Hendrix
14  here on November 25 asking of you?
15      A.   She is asking me -- so she -- these
16  are -- these are payments -- typically we would
17  do an accounts payable run every week at the
18  end of every Friday.  But looking at this date,
19  it is Wednesday, November 25th, which means, to
20  me, it is likely Thanksgiving weekend.
21      So this is the day before
22  Thanksgiving, so this is the last kind of --
23  kind of day before the holidays and vacation
24  and things of that nature.  So it is
25  effectively the Friday of that week.

Page 330

WATERHOUSE - 10-19-21

1
2 So she is -- she is putting in all
3 the payments for the week because we batch
4 payments weekly. And these are the payments
5 that go out that week, and she is informing me
6 of the payments and -- you know, again, at the
7 bottom of the email, she is asking for my okay
8 to -- to release these payments in the wire
9 system.
10 Q. So these would be accounts payable
11 of NexPoint?
12 A. I mean, it would be accounts payable
13 for all of these entities listed on this email.
14 Q. And who was Ms. Hendrix employed by
15 in November and December of 2020?
16 A. Highland Capital Management.
17 Q. Okay. So -- so part of the services
18 that NexPoint had contracted with was for
19 Highland to ensure that NexPoint timely paid
20 its accounts payable; is that accurate?
21 MR. MORRIS: Objection to the form
22 of the question. You have got to be
23 kidding me.
24 Q. Is that accurate?
25 A. Yes.

Page 331

WATERHOUSE - 10-19-21

1
2 Q. And did NexPoint rely on employees
3 of the debtor to ensure that NexPoint's
4 accounts payable were timely paid?
5 MR. MORRIS: Objection to the form
6 of the question.
7 A. Yes.
8 MR. RUKAVINA: Let's flip to the
9 next page, Mr. Nguyen, if you will please
10 scroll to the next page.
11 Q. So this is an email similar to the
12 prior one, November 30th.
13 Do you see where it says, NPA HCMFA,
14 USD $325,000 one-day loan?
15 Do you see that, sir?
16 A. I do.
17 Q. Do you have any memory of what that
18 was?
19 A. I don't recall what that -- what
20 that payment was for.
21 Q. Did it sometimes occur that one
22 advisor would, on very short-terms, make loans
23 to another advisor?
24 A. Yes. This -- this -- this occurred
25 from -- from -- from time to time. It actually

Page 332

WATERHOUSE - 10-19-21

1
2 looking at -- I'm -- I'm looking at the date of
3 this email. It is November 30th. It is the
4 last day of the month.
5 HCMFA has obligations it needs to
6 pay to its broker-dealer, which is HCFD. And
7 it likely was short funds to make those
8 obligations under that -- under its agreement,
9 and so it provided a one-day loan because on
10 the next business day on 12/1 -- or the next
11 business day in December, it would receive
12 management fees from the underlying funds that
13 it managed and it would be able to pay back
14 that loan to NexPoint Advisors.
15 Q. So -- so here Ms. Hendrix was
16 seeking your approval to transfer $325,000 from
17 NexPoint to HCMFA for a one-day loan; is that
18 correct?
19 A. That is correct.
20 Q. Let's flip to the next page, sir.
21 MR. RUKAVINA: And, Mr. Nguyen, if
22 you will please scroll down.
23 Q. Now we have an entry for
24 $325,000, 11/30 loan payment.
25 Do you see that, sir?

Page 333

WATERHOUSE - 10-19-21

1
2 A. Yes.
3 Q. And that is probably the loan that
4 was approved on the prior page?
5 A. Yes, most likely.
6 Q. So is it also true, sir, that in
7 addition to accounts payable debtor employees
8 would be assisting NexPoint with respect to
9 paying back its debt?
10 MR. MORRIS: Objection to the form
11 of the question.
12 A. I mean, yes, for loans of this
13 nature, yes.
14 Q. Well, what about long term loans?
15 Was it reasonable for NexPoint to expect debtor
16 employees to ensure that NexPoint timely paid
17 its obligations under long-term notes?
18 MR. MORRIS: Objection to the form
19 of the question.
20 MS. DANDENEAU: Objection to form.
21 A. I mean, that is one of the things
22 that the Highland personnel did provide to the
23 advisors. Yes, we would -- we would -- over
24 the years, yes, we -- we -- we -- we did do
25 that generally. Again, I don't remember

Page 334

WATERHOUSE - 10-19-21

1 specifically but, yes, generally we -- you
2 know, we did do that.
3 Q. So do you recall -- and we can pull
4 it up, if need be -- that under the NexPoint
5 note that Mr. Morris asked you about earlier,
6 the one for more than $30 million, that
7 NexPoint was obligated to make an annual
8 payment of principal and interest?
9 MR. MORRIS: Objection to the form
10 of the question.
11 A. Yes, it was -- yes, it -- it was an
12 amortizing note. It was -- you know, from what
13 we reviewed earlier, it was payable by
14 December 31st of each year. So -- but are --
15 are you asking me --
16 Q. I'm just asking you, sir, if you
17 recall the note.
18 A. Yes, the $30 million note, yes, we
19 reviewed it earlier, yes.
20 Q. And do you recall Mr. Morris had you
21 go through the fact that NexPoint had made
22 payments in years prior to 2020 on that note?
23 A. I do.
24 Q. And do you believe that employees of

Page 335

WATERHOUSE - 10-19-21

1 the debtor would have played any role in
2 NexPoint having made those prior payments?
3 MR. MORRIS: Objection to the form
4 of the question.
5 A. Yes.
6 Q. And what role in years prior to 2020
7 would employees of the debtor have had with
8 respect to NexPoint making that annual payment?
9 A. We -- we -- we would have -- I keep
10 saying "we." The team would have calculated
11 any amounts due under that loan and other
12 loans, as -- as standard course.
13 We would -- since we provided
14 treasury services to the advisors, we would
15 inform the -- the -- the -- we informed
16 Mr. Dondero of any cash obligations that are
17 forthcoming, whether we do cash projections.
18 If, you know, any of these payments
19 would have -- or, you know, the sum total of
20 all of these payments, including any note
21 payments, if there were any cash shortfalls, we
22 would have informed Mr. Dondero of any cash
23 shortfalls. We could adequately plan, you
24 know, in instances like that.

Page 336

WATERHOUSE - 10-19-21

1 Or, sorry, we -- I say "we" -- I
2 keep saying "we" -- I keep wearing my -- again,
3 my -- my treasurer hat.
4 But, yes, it is to -- it is to
5 inform Mr. Dondero of the obligations of the
6 advisors in terms of cash and obligations that
7 are -- are upcoming and that -- and that are --
8 are scheduled to be paid.
9 Q. And would those obligations that are
10 upcoming and scheduled to be paid prior to 2020
11 have incurred the annual payment on that
12 NexPoint $30 million note?
13 MS. DANDENEAU: Objection to form.
14 MS. DEITSCH-PEREZ: Davor, I think
15 you misspoke. You might want to just
16 repeat the question.
17 Q. Okay. Let me repeat the question,
18 sir.
19 Prior to 2020, those services that
20 you just described, would that -- on behalf of
21 the debtor, would that have included NexPoint's
22 payments on the $30 million note?
23 A. Yes.
24 Q. So someone at the debtor in treasury

Page 337

WATERHOUSE - 10-19-21

1 or accounting would have sent some schedule or
2 a reminder that a payment would be coming due
3 in the future. Is that generally the practice?
4 A. Yes, we would -- you know, again, I
5 didn't -- I didn't micromanage the teams, but
6 we had a -- a corporate accounting calendar
7 that we use as kind of a tickler file to keep
8 track of payments.
9 I actually, you know, don't know how
10 actively they're using that in -- in prior to
11 2020, but it was actively used at some point.
12 We did look at NexPoint cash
13 periodically and cash for the other advisors as
14 well and payments. You know, we -- payments
15 like this would have appeared in our cash
16 projections, in the advisor's cash projections.
17 And, again, as like I said earlier,
18 they would have appeared there, so there would
19 be time to plan for making any of these
20 payments.
21 Q. And based on your experience, would
22 it have been reasonable for NexPoint to rely on
23 the debtors' employees to inform NexPoint of an
24 upcoming payment due on the $30 million

Page 338

WATERHOUSE - 10-19-21

1 promissory note?

2 MR. MORRIS: Objection to form of

3 the question.

4 MS. DANDENEAU: Objection to form.

5 A. Yes. Yes, they did. I mean, but I

6 mean, but I don't think these -- these notes

7 were any secret to anybody.

8 Q. I understand, and I'm not suggesting

9 otherwise.

10 MR. RUKAVINA: Please pull up Alpha

11 2, Mr. Nguyen.

12 (Exhibit A2 marked.)

13 Q. Now, this document is similar to the

14 ones we've seen before as of December 31, 2020,

15 and I don't see under NTA anything there for

16 paying the promissory note to Highland.

17 Do you see anything like that?

18 A. I do not.

19 MR. RUKAVINA: You can pull that --

20 that exhibit down, Mr. Nguyen.

21 Q. You are aware, of course, by now

22 that, in fact, NexPoint failed to make the

23 payment due December 31, 2020, are you not?

24 A. I am aware, and yes, I do understand

Page 339

WATERHOUSE - 10-19-21

1 it.

2 Q. Were you aware that Highland

3 accelerated that $30 million promissory note?

4 A. I am aware.

5 Q. Were you aware of that acceleration

6 at the time that it occurred?

7 A. I don't remember specifically.

8 Q. Do you recall whether anyone asked

9 you -- prior to the acceleration, anyone asked

10 you at Highland, what Highland should do with

11 respect to the missed payment?

12 A. Did anyone ask me what Highland

13 should do about the missed payment?

14 Q. Yes, before acceleration.

15 MR. MORRIS: Objection to the form

16 of the question.

17 A. I mean, what -- what I recall is

18 there was the -- sorry, are you asking me --

19 MS. DANDENEAU: Why don't you just

20 repeat the question, Mr. Rukavina.

21 Q. Let me try again, Mr. Waterhouse,

22 let me try again.

23 I am saying you're the CFO of

24 someone, in this case, Highland, and the

Page 340

WATERHOUSE - 10-19-21

1 borrower failed to make the required payment.

2 Are you with me so far?

3 A. I am.

4 Q. Did anyone then ask you, what should

5 we do with respect to our rights against the

6 borrower that missed the payment?

7 A. Not that I recall.

8 Q. Did you play a role in the decision

9 to accelerate that $30 million promissory note?

10 A. I did not.

11 Q. Do you recall whether Mr. Seery ever

12 asked you before the acceleration as to whether

13 he should accelerate the note?

14 A. I don't recall.

15 Q. And you don't recall when you

16 learned of the acceleration itself?

17 MR. MORRIS: Objection to the form

18 of that question.

19 A. It was -- it was sometime in

20 early -- in early 2021. I don't remember

21 specifically.

22 Q. But do you recall whether it was

23 after the acceleration had already been

24 transmitted?

Page 341

WATERHOUSE - 10-19-21

1 MS. DANDENEAU: Objection to the

2 form of the question.

3 A. I don't recall.

4 Q. Do you recall in early to mid

5 January of 2021, after the default, discussing

6 the default with Mr. Dondero?

7 A. I do recall discussing with

8 Mr. Dondero after December 31, 2020?

9 Q. Yes, the fact of the default.

10 A. I don't recall.

11 MR. RUKAVINA: Let's pull up my

12 Exhibit 6, Alpha 6.

13 (Exhibit A6 marked.)

14 MR. RUKAVINA: And, Mr. Nguyen, if

15 you will please scroll down.

16 Q. This email chain begins with you

17 writing to Ms. Hendrix on January the 12th:

18 NexPoint note to HCMLP.

19 Do you see that, sir?

20 A. I do.

21 Q. Were you discussing this same

22 $30 million note we're talking about right now

23 with Ms. Hendrix?

24 A. Yes.

Page 342

WATERHOUSE - 10-19-21

1 Q. Okay. Do you recall what prompted
2 you to send that email to her?
3 A. Yes, I had -- I had a conversation
4 with Jim.
5 Q. Okay. And what -- what did you
6 discuss with Jim that led to this email chain?
7 A. He -- he called me and he said he
8 wanted to make payment on the NexPoint note,
9 and I didn't -- I didn't know the -- the amount
10 offhand, so I reached out to Kristin and got
11 the details and relayed that to him.
12 Q. And you see you sent that email to
13 her at 11:15 a.m. Does that help you remember
14 when you had this discussion with Mr. Dondero?
15 In other words, was it that morning or the day
16 before, or can you -- can you --
17 A. No, it was -- it was that morning.
18 Q. And do you recall how you had that
19 conversation with him?
20 MR. MORRIS: Objection to the form
21 of the question.
22 Q. By telephone, by email, in-person?
23 A. Yeah, he -- he called me. I was at
24 home. We were working from home here in

Page 343

WATERHOUSE - 10-19-21

1 December of 2020. He called me from home. He
2 said he was in court. He wanted to -- he asked
3 about, you know, making payment on the note and
4 the amount, and so I didn't have those numbers
5 in front of me, so I said I would get back to
6 him. I wanted all the details, so here is
7 this -- so I reached out to Kristin.
8 Q. And then she gave you that
9 $1,406,000 figure?
10 MR. RUKAVINA: Mr. Nguyen, if you
11 will scroll up, please.
12 A. Yes. Yeah, she -- the $1,406,112.
13 Q. And do you recall whether you
14 conveyed that amount to Mr. Dondero?
15 A. Yes. I -- I called him back and
16 gave him -- gave him this amount.
17 Q. Are you aware of whether NexPoint,
18 in fact, then made that 1 million 406 and
19 change payment?
20 A. Yes, they did.
21 Q. Did you discuss with Mr. Dondero at
22 that time, either the first conference or the
23 second conference that day -- strike that.
24 When you conveyed the number to

Page 344

WATERHOUSE - 10-19-21

1 Mr. Dondero, was -- was it also on January
2 12th?
3 A. Sorry, when I conveyed the
4 $1.4 million number?
5 Q. Yes.
6 A. Yes, yes, it was that -- it was --
7 Q. So you had --
8 A. It was that point.
9 Q. Well, to the best of your
10 recollection, you had a conference with
11 Mr. Dondero by the telephone in the morning,
12 and then another conference with him by
13 telephone after 11:40 a.m. that morning?
14 A. Yeah, I can't remember -- yeah, it
15 was either that morning or it could have been,
16 you know, early afternoon, but again, I
17 remember calling him back, relaying this
18 information to him, and he said, okay, pay --
19 you know, make -- make this payment.
20 Q. And during either of those two
21 calls, did you tell Mr. Dondero anything to the
22 effect that making those -- I'm sorry, making
23 that payment would not de-accelerate the
24 promissory note?

Page 345

WATERHOUSE - 10-19-21

1 A. No.
2 Q. Did you tell him anything to the
3 effect that making that payment would not cure
4 the default?
5 A. No.
6 Q. Did you discuss that in any way with
7 him?
8 A. No, I did not.
9 Q. Did he say why he wanted to have
10 that $1.4 million payment made?
11 MR. MORRIS: Objection to the form
12 of the question.
13 A. He -- he -- he didn't go into
14 specifics.
15 Q. Did he say anything to you to the
16 effect that if NexPoint makes that payment,
17 then the note will be de-accelerated?
18 MR. MORRIS: Objection to the form
19 of the question.
20 A. I don't recall.
21 MR. RUKAVINA: You can put this one
22 down, Mr. Nguyen.
23 Q. And, again, when you say you don't
24 recall, you mean you don't remember right now

Page 346

WATERHOUSE - 10-19-21

1    either way; correct?
2    A.   Yeah, I don't remember.  I don't
3    remember us discussing that.
4    Q.   Now -- and we're almost done, I
5    promise.  I'm just going to -- I don't know how
6    to ask this question, so I'm just going to try
7    to do my best.
8        Prior to the default on December 31,
9    2020, did Mr. Seery ever tell you any words to
10   the effect that you or someone at Highland
11   should ensure that NexPoint doesn't make its
12   payment?
13   A.   No.
14   Q.   Did you have any hint or any belief
15   that anyone at NexPoint -- I'm sorry, strike
16   that.
17       Did you have any reason to believe
18   that anyone with Highland was actively trying
19   to get NexPoint to make that default by not
20   paying on December 31?
21       MR. MORRIS:  Objection to the form
22   of the question.
23   A.   Are you asking, did any Highland
24   employees actively work to make -- to
25

Page 347

WATERHOUSE - 10-19-21

1    somehow --
2    Q.   Yes.  Let me take a step back.  Let
3    me take a step back.
4        So you are aware now that as a
5    result of that default, what was still some
6    25-year note was accelerated and became
7    immediately due.  You are aware of that now;
8    right?
9    A.   Yes.
10   Q.   And can you see how someone at
11   Highland might actually have been pleased with
12   that development?
13       MR. MORRIS:  Objection to the form.
14   Q.   Not that they were -- not that they
15   were pleased, but you can see how someone at
16   Highland might have been pleased with that
17   development?
18       MR. MORRIS:  Objection to the form
19   of the question.
20       MS. DANDENEAU:  Object to form.
21   A.   I don't know how they would have
22   reacted to that.
23   Q.   Okay.  But you're not -- you're not
24   aware of any instructions or any actions being
25

Page 348

WATERHOUSE - 10-19-21

1    given or taken at Highland by Mr. Seery, the
2    independent board, DSI, that -- that would have
3    basically led Highland to ensure that NexPoint
4    would fail to make that payment?
5    A.   I'm not aware.
6    Q.   In other words, there wasn't a trick
7    or a settlement; right?
8        MS. DEITSCH-PEREZ:  Objection to
9    form.
10       MS. DANDENEAU:  Object to form.
11       MR. MORRIS:  Object to form.
12   A.   I'm not aware.
13       Look, I'm not aware.  I'm not in
14   every conversation.  I mean, and I'm just --
15   again, I'm sitting at home.  It is the end of
16   the year.  Again, I'm not aware.
17   Q.   That is a perfectly legitimate
18   answer.  I don't know why -- why you think
19   otherwise.
20       Okay.  Just give me one second to
21   compose my thoughts.
22       MS. DEITSCH-PEREZ:  While you're
23   taking your one second, why don't we take
24   three minutes.  I will be right back.
25

Page 349

WATERHOUSE - 10-19-21

1    VIDEOGRAPHER:  Do we want to go off
2    the record?
3        MR. RUKAVINA:  Yes.
4        VIDEOGRAPHER:  All right.  We're
5    going off the record at 6:27 p.m.
6    (Recess taken 6:27 p.m. to 6:30 p.m.)
7        VIDEOGRAPHER:  We are back on the
8    record at 6:30 p.m.
9        MR. HORN:  Is Deb back?
10       MS. DANDENEAU:  Are you asking about
11   me?  I'm here.
12       MR. HORN:  Oh, okay.  I don't see
13   you, sorry.
14   Q.   Actually, yeah, Mr. Waterhouse, so
15   when you had --
16       MS. DANDENEAU:  Are you asking about
17   Deb Dandeneau or Deborah?  I mean, there
18   are a lot -- as we talked about, a lot of
19   Debs.  I'm here.
20       MS. DEITSCH-PEREZ:  I'm here.
21       MR. HORN:  Yes, I was asking about
22   DDP.
23       MS. DEITSCH-PEREZ:  Oh, DDP is here.
24       MR. HORN:  Okay.  Here we go.  I'm
25

Page 350

WATERHOUSE - 10-19-21

1 going back on mute.
2 MS. DANDENEAU: Get the right
3 nomenclature.
4 Q. Mr. Waterhouse, on January 12th,
5 2021, when you had those talks with Mr. Dondero
6 about the $1.4 million payment, did you have a
7 communication or a conversation with Mr. Seery
8 about that payment after January 12th, 2021?
9 A. I don't recall.
10 Q. Well, in response to Mr. Dondero
11 reaching out to you, do you recall on that day,
12 January 12th, talking to Mr. Seery or anyone at
13 Highland other than the email chain we just saw
14 about Mr. Dondero's call with you?
15 A. Did I talk to -- I spoke with
16 Kristin -- I don't know if I spoke to her. I
17 likely spoke to Kristin Hendrix because we had
18 to get the wire on NexPoint's behalf to make
19 the payment to Highland.
20 Q. So it is true, then, that -- that
21 employees of the debtor did actually cause that
22 payment to be made when it was made after
23 January 12th?
24 A. Yes, I mean, we -- we -- as I

Page 351

WATERHOUSE - 10-19-21

1 testified earlier, we provided that accounting
2 finance treasury function as -- under the
3 shared services agreement. And so once I
4 got the -- I talked to Jim, got the approval to
5 make this payment, we have to then make the
6 payment, or the team does, and so the payment
7 was made.
8 Q. Okay. But -- okay. And -- and
9 sitting here right now, after Jim called you,
10 you don't remember talking to anyone other than
11 the -- the couple of people you mentioned,
12 talking to anyone about something to the effect
13 that, hey, Jim wants to make this payment now?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. I don't -- I don't recall.
17 Q. And does that include legal counsel?
18 Without going into any detail, on
19 January 12th or before that payment was made,
20 did you consult with legal counsel about
21 anything having to do with the $1.4 million
22 payment?
23 A. I don't recall.
24 Q. Okay. Thank you, sir, for your

Page 352

WATERHOUSE - 10-19-21

1 time.
2 MR. RUKAVINA: Pass the witness.
3 MR. MORRIS: I just have a few
4 questions, if I may.
5 MS. DEITSCH-PEREZ: Don't you go at
6 the end?
7 MR. MORRIS: Oh, I apologize. He is
8 your witness. I'm surprised you want to
9 ask him questions, but go right ahead.
10 MS. DEITSCH-PEREZ: Just have a
11 couple of things.
12 MR. RUKAVINA: And I will just
13 object to that, that he's our witness.
14 That's not --
15 MR. MORRIS: I'm not talking to you.
16 I'm not talking to you.
17 MS. DANDENEAU: Also, Mr. Morris, it
18 is -- it is --
19 MS. DEITSCH-PEREZ: He is not my
20 witness. He's been subpoenaed by you.
21 Okay?
22 That is no offense, Mr. Waterhouse,
23 I'm -- I'm not -- okay. Anyway.
24 EXAMINATION

Page 353

WATERHOUSE - 10-19-21

1 BY MS. DEITSCH-PEREZ:
2 Q. Good evening. I'm very sorry to be
3 going last and I know you have had a long and
4 taxing day, so I thank you for indulging me.
5 The kinds of services that you
6 describe that the -- that Highland provided for
7 NexPoint, did Highland also provide similar
8 services to that to HCRE and HCMS?
9 A. Yes.
10 MR. MORRIS: Objection to the form
11 of the question.
12 Q. What kind of services did Highland
13 provide to HCRE and HCMS?
14 MR. MORRIS: Objection to the form
15 of the question.
16 MS. DEITSCH-PEREZ: What is your
17 objection, John?
18 MR. MORRIS: It is vague and
19 ambiguous. Unlike the advisors and
20 NexPoint, they actually had shared services
21 agreements.
22 MS. DEITSCH-PEREZ: I got -- I
23 understand your objection. That is fine.
24 Q. Let's take them one at a time.

Page 354

WATERHOUSE - 10-19-21

1 What kinds of services did Highland
2 provide to HCRE?
3 MR. MORRIS: Objection to the form
4 of the question.
5 A. HCMS, Highland employees provided
6 accounting services, treasury management
7 services, potentially legal services. I
8 don't -- but I wouldn't have been directly
9 involved in that. But as far as the teams that
10 I manage, it was accounting, treasury, things
11 of that nature.
12 Q. Okay. And that was for HCM, LLP --
13 A. And -- and, sorry, it would also be
14 any asset valuation if needed as well.
15 Q. Okay. We went back and forth on
16 each other and I apologize, so just to clarify.
17 You were talking about the services
18 that Highland Capital Management provided to
19 HCMS; is that right?
20 A. HCMS. So, again, yes. And
21 accounting, treasury, valuation, and also tax
22 services too.
23 Q. Okay.
24 A. Tax services. Look, I'm expanding

Page 355

WATERHOUSE - 10-19-21

1 this, their HR services as well.
2 Q. Okay. And did that include bill
3 paying?
4 MR. MORRIS: Objection to the form
5 of the question.
6 Q. Did the services that HCM provided
7 to HCMS include bill paying?
8 MR. MORRIS: Objection to the form
9 of the question.
10 A. Yes.
11 Q. And did the services that HCMLP
12 provided to HCMS include scheduling upcoming
13 bills?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. Yes.
17 Q. And did HCMLP regularly pay -- cause
18 to be paid the payments on loans HCMS had from
19 HCMLP?
20 MR. MORRIS: Objection to the form
21 of the question.
22 A. Yes.
23 Q. Typically -- if there is a
24 typically, how far in advance of due dates did

Page 356

WATERHOUSE - 10-19-21

1 HCMLP cause HCMS to pay its bills?
2 MR. MORRIS: Objection to the form
3 of the question.
4 A. I mean, it -- it -- it depend -- it
5 depended on the nature of the payment and the
6 vendor, but, you know, if there were -- if
7 there were larger scheduled payments, you know,
8 I would like to give at least 30 days notice.
9 And that is -- that is kind of my
10 rule of thumb so no one is surprised.
11 Q. Okay. And was it generally HCMLP's
12 practice to timely pay HCMS' bills?
13 MR. MORRIS: Objection to the form
14 of the question.
15 A. It -- it -- it -- that depended on
16 the nature of the payment.
17 Q. Okay. And can you explain what you
18 mean by that?
19 A. Yeah, I mean if -- if it was -- I
20 mean -- if there was some professional fees
21 that weren't -- you know, they were due but
22 they weren't urgent, those fees may not be paid
23 as timely as others that have a due date or --
24 or things like that.

Page 357

WATERHOUSE - 10-19-21

1 Q. Okay. Are loan payments the kinds
2 of thing that HCMLP would pay on time because
3 of potential consequences of not paying on
4 time?
5 MR. MORRIS: Objection to the form
6 of the question.
7 A. Yes. As I testified earlier, we
8 would want to give, you know, notice on -- on
9 -- on larger payments and -- and things of that
10 nature so we didn't miss due dates.
11 Q. Okay. And over the course of time,
12 did HCMLP generally pay HCMS' loan payments in
13 a timely fashion?
14 MR. MORRIS: Objection to the form
15 of the question.
16 A. I can't remember specifically, but
17 generally, yes.
18 Q. Okay. Now, did HCMLP provide
19 similar services to HCRE that you have
20 described it provided to HCMS?
21 MR. MORRIS: Objection to the form
22 of the question.
23 A. Yes, but I don't think it -- it
24 provided -- I don't think it provided HR

Page 358

WATERHOUSE - 10-19-21

1    services.
2    Q.    Can you describe the accounting and
3    treasury services that HCMLP provided for HCRE?
4    A.    Yeah, it -- it would provide
5    bookkeeping services on a -- on a periodic
6    basis.  It would make payments, you know, as
7    needed.
8    Q.    Okay.  So did it provide --
9    A.    And -- and I believe it -- it -- it
10   provided tax services as well.
11   Q.    Okay.  And so did it provide the
12   same kind of bill -- did HCMLP provide the same
13   kind of bill-paying services for HCRE that it
14   provided for HCMS and NexPoint?
15   MR. MORRIS:  Objection to the form
16   of the question.
17   A.    Yes.
18   Q.    And over the course of time, did
19   HCMLP generally cause to be made the loan
20   payments that HCRE owed to HCMLP?
21   MR. MORRIS:  Objection to the form
22   of the question.
23   A.    Yes.
24   Q.    Did HCMLP make loan payment -- the

Page 359

WATERHOUSE - 10-19-21

1    loan payment that was due from HCMS to HCMLP in
2    December of 2020?
3    MR. MORRIS:  Objection to the form
4    of the question.
5    A.    I don't believe that payment --
6    payment was made.
7    Q.    Okay.  And when HCMLP caused HCMS in
8    the past to make loan payments, whose money did
9    it use to make those payments?
10   MR. MORRIS:  Objection to the form
11   of the question.
12   A.    It was the -- the money in HCMS's
13   operating account would be made to that --
14   those moneys would be used to make payment to
15   Highland Capital Management.
16   Q.    Okay.  And Highland -- is it correct
17   that Highland Capital Management personnel had
18   the access to HCMS's accounts to be able to
19   cause such payments to be made?
20   A.    Yes, Highland personnel had access
21   to those accounts.
22   Q.    Okay.  And so now for HCRE, whose
23   money was used when HCMLP caused HCRE
24   payments -- loan payments to Highland to be

Page 360

WATERHOUSE - 10-19-21

1    made?
2    MR. MORRIS:  Objection to the form
3    of the question.
4    A.    It was -- it was cash in HCRE's bank
5    account that would be used to make payments to
6    Highland Capital Management.
7    Q.    Okay.  And so did Highland Capital
8    Management have access to HCRE's funds in order
9    to be able to make such payments?
10   MR. MORRIS:  Objection to the form
11   of the question.
12   A.    Personnel at Highland Capital
13   Management had access to HCRE's bank account to
14   effectuate the payments.
15   Q.    Okay.  And was the payment due from
16   HCRE to HCMLP due in December of 2020 made?
17   A.    It --
18   Q.    In December of 2020.
19   A.    It was not.
20   Q.    Okay.  And was there money in HCRE's
21   account that would have enabled the payment to
22   be made had HCM personnel attempted to make the
23   payment?
24   MR. MORRIS:  Objection to the form

Page 361

WATERHOUSE - 10-19-21

1    of the question.
2    A.    I -- I don't recall.
3    Q.    Do you have any reason to believe
4    that either HCRE or HCMS simply didn't have the
5    funds on hand to make the December 2020
6    payments?
7    A.    I don't know.
8    Q.    I guess I'm asking, do you have any
9    reason to believe that they didn't have the
10   funds?
11   A.    We managed cash for so many
12   different entities and funds, and I don't
13   recall, you know, where the cash position was
14   for HCRE and HCMS at 12/31/2020.
15   Q.    Okay.
16   A.    I just don't recall, and I don't --
17   and I don't remember what the loan payment
18   obligations were from HCRE to Highland, and
19   from HCMS to Highland.  I don't recall.  I
20   don't recall, I mean...
21   Q.    Let me come at it a different way.
22   Were the -- were the payments that would
23   otherwise have been due in December of 2020
24   made in January of 2021 for HCMS and HCRE?

Page 362

WATERHOUSE - 10-19-21

1  A.  I believe the HCRE payment was made
2  in January of 2021. I don't recall any
3  payments being made from HCMS to Highland.
4  Q.  If it – how is it the HCRE payment
5  came to be made? Why did you make it – why
6  did HCM make the payment in January of 2021?
7  A.  Jim – Jim called me and instructed
8  me to – to make the payment on behalf of HCRE,
9  Jim Dondero – Jim Dondero.
10  Q.  Did he seem upset that – that the
11  payment had not been made?
12  A.  Yeah. On the note that was, you
13  know, that was the term note, yes, he – he was
14  displeased that the – that the payment had not
15  been made by year-end.
16  Q.  Okay. And did you make the – cause
17  the payment to be made as – as requested?
18  A.  Yes.
19  Q.  And did anyone else from HCM
20  participate with you in causing the payment to
21  be made to – on the HCRE loan?
22  A.  Yes. It would have been Kristin
23  Hendrix. I – again, I don't – as I testified
24  earlier, I'm not an officer of HCRE. I don't

Page 363

WATERHOUSE - 10-19-21

1  believe I'm an authorized signer. So I
2  can't – other personnel have to make payment
3  from HCRE to – to – to – to Highland.
4  Q.  Okay. And in the conversation
5  that – that you had with Mr. Dondero when he
6  requested the payment to be made, did you say
7  to him words to the effect, Jim, this loan is
8  going to stay in default, what are you making
9  the payment for, anything like that?
10  A.  No.
11  Q.  In fact, did you have the impression
12  from him that he thought that the loan would
13  be – the default would be cured by making the
14  payment?
15  MR. MORRIS: Objection to the form
16  of the question.
17  A.  Did I get the impression from Jim
18  Dondero that the loan would be cured if the
19  payment from HCRE –
20  Q.  Yeah, if that is what he thought.
21  MR. MORRIS: Objection to the form
22  of the question.
23  A.  I didn't get any impression from him
24  on that at the time.

Page 364

WATERHOUSE - 10-19-21

1  Q.  Do you know whether there was an
2  HCMS term loan that had a payment due in
3  December of 2020?
4  A.  I don't recall.
5  Q.  Okay. And so the reason you don't
6  recall whether or not there was a payment in
7  January of 2021 is because you just don't
8  remember whether there was such a loan at all?
9  MR. MORRIS: Objection to the form
10  of the question.
11  A.  I don't remember. There is – there
12  is so many notes, and I mean, demands, and I
13  don't – I don't remember. It's a lot to keep
14  track in your head.
15  Q.  I understand, and – and I hear your
16  frustration when you have explained that the
17  debtor has your documents and you don't, and so
18  I fully appreciate it, and this is no knock on
19  you. It's a knock on somebody else on this
20  call.
21  MR. MORRIS: I move to strike. That
22  was pretty obnoxious, but go ahead.
23  Q.  Okay. But so, Mr. Waterhouse, if –
24  if a payment on the HCMS loan was made in

Page 365

WATERHOUSE - 10-19-21

1  January of 2021, do you think it was part of
2  the same discussion where Jim Dondero said,
3  hey, why didn't that get paid, please make
4  that – get that payment done?
5  MR. MORRIS: I object to the form of
6  the question.
7  A.  Yes. Likely it would have been – I
8  mean, again, I don't recall a payment being
9  made, but, you know, again, I don't remember
10  everything.
11  Q.  Okay. Did – at the time you were
12  communicating with Kristin Hendrix about the
13  payment being made, whichever payments were
14  made in January, did she say anything to you
15  about the payments not curing the loan
16  defaults?
17  A.  No.
18  Q.  Okay. All right. So I'm going to
19  take you back to very early in the deposition
20  when Mr. Morris was asking you about the –
21  the – the – the agreement with respect to
22  the – the forgiveness element of the loans, so
23  that is just to orient you.
24  Do you remember that there was a

Page 366

WATERHOUSE - 10-19-21

1 time that you and Mr. Dondero were
2 communicating about potential means of
3 resolving the Highland bankruptcy by what was
4 colloquially referred to as a pot plan?
5   A.  Yes.
6   Q.  Okay.  And can you tell me generally
7 when that was?
8   A.  Like mid -- mid 2020, sometime in
9 2020, mid 2020.
10   Q.  Okay.  And did the process of trying
11 to figure out what the numbers should be
12 involve looking at what one should pay for the
13 Highland assets?
14   MR. MORRIS:  Objection to the form
15   of the question.
16   A.  Yes.
17   Q.  Okay.  And did there come a time
18 when you were proposing some potential numbers
19 and Mr. Dondero said something to you like,
20 well, why are you including payment for the
21 related party notes, those, you know, were
22 likely to be forgiven as part of my deferred
23 executive compensation?
24   MR. MORRIS:  Objection to the form

Page 367

WATERHOUSE - 10-19-21

1 of the question.
2   A.  Yes, we did have that conversation.
3   Q.  Okay.  Was that conversation in
4 connection with trying to figure out the right
5 numbers for a pot plan?
6   A.  Yeah.  I mean, it was -- it was -- I
7 mean, Jim -- Jim would ask for, you know,
8 most -- most recent asset values, you know, for
9 Highland, and -- and myself and the team
10 provided those to him, so it was in that
11 context.
12   Q.  Okay.  And does that refresh your
13 recollection that these communications were in
14 2020 rather than 2021?
15   MR. MORRIS:  Objection to the form
16   of the question.
17   A.  The -- the -- the executive
18 compensation discussions were definitely in
19 2020.
20   Q.  Okay.  Now, did you ever make
21 proposals that took into account Jim's comment
22 that the notes were likely to end up forgiven
23 as part of his compensation?
24   MR. MORRIS:  Objection to the form

Page 368

WATERHOUSE - 10-19-21

1 of the question.
2   A.  Yes, we -- the team and myself put
3 together, you know, asset summaries of Highland
4 at various times for all the assets of
5 Highland, and not including the notes.
6   Q.  Okay.  And were those presentations
7 communicated to -- to Mr. Seery?
8   A.  No.  Well, look, I didn't tell -- I
9 didn't tell Mr. Seery.  I don't know what
10 Mr. Dondero did with the information.
11   Q.  Okay.
12   A.  I did not have conversations with
13 Mr. Seery.
14   Q.  Okay.  Do you know who saw the
15 presentations that you put together that didn't
16 include the value of the related party notes?
17   A.  We're talking presentations -- these
18 are -- these are Excel spreadsheets?
19   Q.  Uh-huh.
20   A.  I don't know who -- these were given
21 to -- to Jim Dondero.  I don't know what was
22 done with them after that.
23   Q.  Okay.  You also mentioned earlier
24 that sometime during your tenure at Highland

Page 369

WATERHOUSE - 10-19-21

1 you knew of the practice of giving forgivable
2 loans to executives.
3   MR. MORRIS:  Objection to the form
4   of the question.
5   Q.  Can you -- can you tell me what you
6 recall about that practice?
7   MR. MORRIS:  Objection to the form
8   of the question.
9   A.  Yes, so there were -- there were --
10 during my tenure at Highland, there were loans
11 or -- given to employees that were later
12 forgiven at a future date and time.
13   Q.  Okay.  And when the loans were
14 given, did the notes, to your recollection, say
15 anything about the potential forgiveness term?
16   MR. MORRIS:  Objection to the form
17   of the question.
18   A.  When you say "did the notes," did
19 the promissory notes detail the forgiveness?
20   Q.  Yes.
21   A.  Not that I recall.
22   Q.  And until such time as whatever was
23 to trigger the forgiveness occurred, were the
24 notes bona fide notes as far as you were

Page 370

WATERHOUSE - 10-19-21

1    concerned?
2        MR. MORRIS:  Objection to the form
3    of the question.
4    A.   Yes, similar to -- yes.
5    Q.   Okay.  You were going to say similar
6    to what?
7    A.   Mr. Morris earlier today showed
8    notes of the financial statements about various
9    affiliate loans.  I -- I -- I do recall these
10   notes because I -- at that time personally
11   worked on the -- the financial statements of
12   Highland.  That was, you know, in my role as a
13   corporate accountant.
14       And there were -- those loans
15   were -- to the partners were detailed in the
16   notes to the financial statements, similar to
17   what we went through earlier today in the prior
18   testimony about what we saw with Highland
19   and -- and -- and the -- and HCMFA.
20   Q.   Is it fair to say that on Highland's
21   balance sheet there were any number of assets
22   that the value of which could be affected by
23   subsequent events?
24       MR. MORRIS:  Objection to the form

Page 371

WATERHOUSE - 10-19-21

1    of the question.
2    A.   Yes.  I mean, yes, that -- there
3    are.  And that is -- yes.
4    Q.   Okay.  And is it typical accounting
5    practice that until there is some certainty
6    about those potential future events, that asset
7    value listed on -- on the books doesn't take
8    into account those potential future events?
9        MR. MORRIS:  Objection to the form
10   of the question.
11   A.   Yeah, if those -- yes.  If -- if
12   those future events, you know, at the time of
13   issuance are not known or knowable, like I
14   discussed earlier with, like, market practice,
15   asset dislocation, or, you know, I mean, things
16   like that, you -- I mean, it -- it could affect
17   its fair value --
18   Q.   Okay.
19   A.   -- in the future.
20   Q.   And am I correct you wouldn't feel
21   compelled to footnote in every possible change
22   in -- in an asset when those possibilities are
23   still remote?
24       MR. MORRIS:  Objection to the form

Page 372

WATERHOUSE - 10-19-21

1    of the question.
2    A.   The accounting standard is you have
3    to estimate to the best -- you know, to -- to
4    the best of your ability, the fair value of an
5    asset as of the balance sheet date under --
6    under GAAP.
7    Q.   Did -- strike that.
8        Okay.  Give me a minute.  I'm
9    close -- I'm close to done.  Let me just go off
10   and look at my notes for a second.  So take two
11   minutes.
12       VIDEOGRAPHER:  We're going off the
13   record at 7:02 p.m.
14       (Recess taken 7:02 p.m. to 7:03 p.m.)
15       VIDEOGRAPHER:  We are back on the
16   record at 7:03 p.m.
17   Q.   Mr. Waterhouse, is it generally your
18   understanding that people you work with now
19   have been asking the debtor for full and
20   unfettered access to their own former files?
21       MR. MORRIS:  Objection to the form
22   of the question.
23   A.   Yes, I am -- I am generally aware.
24   Q.   Okay.  And do you think you could

Page 373

WATERHOUSE - 10-19-21

1    have been better prepared for this deposition
2    if the debtor had complied with those requests?
3        MR. MORRIS:  Objection to the form
4    of the question.
5    A.   I -- I -- I most certainly -- yes.
6    I mean, again, these are multiple years,
7    multiple years ago, lots and lots of
8    transactions.
9        You know, we asked about NAV errors
10   and, you know, things like that would this
11   are -- it would make this process a lot more --
12   a lot easier and if we had -- if we had access
13   to that.
14   Q.   Okay.  And has the debtor -- is the
15   debtor suing you right now?
16   A.   Yes.
17   Q.   And is the debtor trying to renege
18   on deals that it had previously made with you?
19       MR. MORRIS:  Objection to the form
20   of the question.
21   A.   Sorry, I need to -- it is my
22   understanding that the litigation trust is
23   suing me.  And not being a lawyer, I don't
24   know -- is that the debtor?

Page 374

WATERHOUSE - 10-19-21

1
2 Is that -- I don't know the
3 relationship. So, again, I'm not the lawyers.
4 I've said many times. But my understanding is
5 the litigation trust is suing me. I could be
6 wrong there. I don't know.
7 Q. Okay. I understand.
8 Someone with some connection to the
9 Highland debtor has brought a claim against
10 you; is that fair?
11 MR. MORRIS: Objection to the form
12 of the question.
13 A. Yes.
14 Q. Okay. And is there also some motion
15 practice in the bankruptcy where the debtor or
16 someone associated with the debtor is
17 attempting to undo something that was
18 previously resolved with you?
19 A. Yes.
20 Q. And so in one action somebody is
21 associated with the debtors trying to --
22 threatening you with trying to take money from
23 you, and then in the other -- and trying to --
24 and in the other they are threatening not to
25 pay you things that had previously been agreed;

Page 375

WATERHOUSE - 10-19-21

1
2 is that correct?
3 MR. MORRIS: Objection to the form
4 of the question.
5 A. I want to be -- yes, I -- there
6 is -- I'm being sued, again, on -- on something
7 that was agreed to with Mr. Seery and myself.
8 I don't -- I don't -- I don't own that claim.
9 Q. Okay.
10 A. To be transparent, I don't own that
11 claim. So it is not my personal property.
12 Q. Okay.
13 A. And -- and being the nonlawyer, I
14 don't know how I can get sued for something
15 that I don't owe or, like, I don't own
16 anything. I'm not the lawyer. But, I mean, if
17 that is -- if I'm understanding the facts
18 correctly.
19 Q. Okay. And the lawsuit that was
20 filed that names you, that was just filed
21 this -- this past week; is that right?
22 MS. DANDENEAU: Ms. Deitsch-Perez, I
23 do want to interrupt at this point because
24 just as I told Mr. Morris, that this is a
25 deposition about the noticed litigation.

Page 376

WATERHOUSE - 10-19-21

1
2 I really don't want to go -- go
3 afield --
4 MS. DEITSCH-PEREZ: Yeah.
5 MS. DANDENEAU: -- and open up a
6 whole new line of inquiry about the lawsuit
7 or the -- the motion and the bankruptcy
8 court. We will be here all night.
9 MS. DEITSCH-PEREZ: And I
10 understand.
11 Q. My -- my point is: Do you feel
12 like -- like there is some effort by these
13 parties related to the debtor to intimidate
14 you -- not that you -- I'm not saying you are
15 or you aren't.
16 But do you feel like there is some
17 effort to intimidate you and maybe an effort to
18 deter you from being as prepared as you might
19 be in this deposition?
20 MR. MORRIS: Objection to the form
21 of the question.
22 A. I was -- I was surprised by the
23 lawsuit, by me being named, again, I
24 don't own the asset and things like that.
25 Yeah, I just -- I want to move forward with my

Page 377

WATERHOUSE - 10-19-21

1
2 life at Skyview.
3 MS. DEITSCH-PEREZ: Thank you.
4 THE WITNESS: Thank you.
5 FURTHER EXAMINATION
6 BY MR. MORRIS:
7 Q. If I may, I just have a few
8 questions.
9 Mr. Waterhouse, we saw a number of
10 documents that Mr. Rukavina put up on the
11 screen where Ms. Hendrix would send you a
12 schedule of payments that were due on behalf of
13 certain Highland affiliates.
14 Do you remember that?
15 A. Yes.
16 Q. And in each instance she asked for
17 your approval to make the payments; is that
18 right?
19 A. Yes, she did.
20 Q. And was that the -- was that the
21 practice in the second half of 2020 whereby
22 Ms. Hendrix would prepare a list of payments
23 that were due on behalf of Highland associates
24 and ask for approval?
25 A. Yes.

Page 378

WATERHOUSE - 10-19-21

1
2  Q. And I think you said that there was
3  a – a –
4  A. It was – I think I testified to
5  this earlier when we talked about procedures
6  and policy, you know, again, I want to be
7  informed of – of – of – of – of any
8  payments that are going out. I want to be made
9  aware of these payments, and that was just a
10  general policy, not just for 2020.
11  Q. Okay. So it went beyond 2020?
12  A. Yes.
13  Q. Is that right?
14  A. Yes.
15  Q. Okay. And the corporate accounting
16  group would prepare a calendar that would set
17  forth all of the payments that were anticipated
18  in the – in the three weeks ahead; is that
19  right?
20  A. I – like I testified earlier, we
21  had a corporate calendar that was set up, you
22  know, to – to provide reminders or, you know,
23  of anything of any nature, whether it is
24  payments or – or financial statements or, you
25  know, whatever it is, you know, to meet

Page 379

WATERHOUSE - 10-19-21

1
2  deadlines.
3       I don't know how, as I testified
4  earlier, how much they were using that
5  calendar.
6  Q. Okay. But – but you did get notice
7  and a request to approve the payments that were
8  coming due on behalf of Highland's affiliates.
9  Do I have that right?
10  MS. DANDENEAU: Objection to form.
11  A. I mean, generally, yes. I mean, you
12  know, as we saw with these emails, generally, I
13  mean, did that encompass everything, no.
14  Q. Okay. Do you know why the
15  payment – do you know why there was no payment
16  made by NexPoint at the end of 2020?
17  A. Yes. There was – there was – we
18  talked about these agreements between the
19  advisors and Highland, the shared services and
20  the cost reimbursement agreement.
21       And in late 2020, there were
22  overpayments, large overpayments that had been
23  made over the years on these agreements, and it
24  was my understanding that the advisors were –
25  were talking with – like Jim Seery and others

Page 380

WATERHOUSE - 10-19-21

1
2  to offset any obligations that the advisors
3  owed to Highland as offset to the overpayments
4  on these agreements.
5  Q. Okay. Did you participate in any of
6  those conversations?
7  A. I did not.
8  Q. Okay. Do you know – do you recall
9  that the – at the end of November, the debtor
10  did notice to the advisors of their intent to
11  terminate the shared services agreements?
12  A. Like I testified earlier, there
13  was – the agreements weren't identical, from
14  what I recall, and there is one that had a
15  longer notice period, which I think had a
16  60-day notice period. I don't recall which one
17  that was, so not all of them were – notice
18  hadn't been given as of November 30th, for all
19  of the agreements.
20  Q. Upon the receipt of the – the
21  termination notices that you recall, do you
22  know if the advisors decided at that point not
23  to make any further payments of any kind to
24  Highland?
25  MR. RUKAVINA: Objection, form.

Page 381

WATERHOUSE - 10-19-21

1
2  A. No. The advisors – the advisors
3  had stopped making payments prior to that
4  notice.
5  Q. Okay. And how do you know that the
6  advisors stopped making – making payments
7  prior to the notice?
8  A. I had – I had a conversation
9  with – with Jim Dondero.
10  Q. And did Mr. Dondero tell you that
11  the advisors would no longer make payments to
12  Highland?
13  MS. DEITSCH-PEREZ: Object to the
14  form.
15  A. Yes, he – he – again, he said
16  they – they – the advisors have overpaid on
17  these agreements, to not make any future
18  payments, and that there needs to be offsets,
19  and they're working on getting offsets to these
20  overpayment.
21  Q. Do you know if anybody ever
22  instructed Highland's employees to make the
23  payment that was due by NexPoint at the end of
24  the year?
25  A. Did anyone instruct Highland's

Page 382

WATERHOUSE - 10-19-21

1    employees to make that payment?
2    Q.   Correct.
3    A.   Anyone -- not that I'm aware.
4    Q.   Were any of Highland's employees
5    authorized to make the payments on behalf of
6    its affiliates -- withdrawn.
7         Was any of Highland's employees
8    authorized to effectuate the payment on behalf
9    of NexPoint that was due at the end of the year
10   without getting approval from either you or
11   Mr. Dondero?
12   A.   They had the -- they had the ability
13   to make the payment, but they didn't -- you
14   know, that -- that payment needed to be
15   approved.
16   Q.   Okay.  And it needed to be approved
17   by you or Mr. Dondero; is that right?
18   A.   I mean, I'm not going to make the
19   unilateral decision.
20   Q.   Is that a decision that you
21   understood had to be made by Mr. Dondero?
22   A.   Yes.  Sitting back in December of
23   2020, the -- that -- there was this off --
24   offset negotiation that -- that was happening,
25

Page 383

WATERHOUSE - 10-19-21

1    so I mean, until those negotiations were
2    resolved, you know, there wasn't any
3    payments -- there weren't any payments.
4    Q.   And -- and there were no payments
5    until the negotiations were resolved because
6    that was the directive that you received from
7    Mr. Dondero; correct?
8    A.   I don't think he said -- I mean, I
9    think -- yeah, I mean -- I'm trying to recall
10   the conversation.  It was -- you know, there
11   is -- there is these negotiations.  There's --
12   there needs to be these offsets.  They're
13   talking with the debtor.  So, you know, until
14   this is resolved, right, I mean, depending on
15   how, whatever that resolution was, were we to
16   take any action.
17   Q.   Okay.  How about with respect to
18   HCMS, did HCMS have a term payment due at the
19   end of the year?
20   A.   Again, I don't -- I don't recall.
21   Q.   Okay.  You discussed briefly two
22   payments that were made in January of 2021, one
23   on behalf of NexPoint, and one on behalf of
24   HCMS.  Do I have that right?
25

Page 384

WATERHOUSE - 10-19-21

1    A.   No.  The two payments I recall were
2    NexPoint and HCRE.
3    Q.   Okay.  And those two payments --
4    thank you for the correction.  And those two
5    payments were made because Mr. Dondero
6    authorized those payments to be made; correct?
7    A.   Yes.
8    Q.   And they hadn't been made before
9    that because Mr. Dondero had not authorized
10   them to be made?
11        MS. DEITSCH-PEREZ:  Object to the
12   form.
13   A.   Yes, because of these negotiations.
14   Q.   Okay.  Just a couple of more
15   questions.
16        Did anybody, to the best of your
17   knowledge, on behalf of HCMFA, ever tell the
18   SEC that HCMLP was responsible for the mistakes
19   that were made on the TerreStar valuation?
20   A.   Did anyone from Highland on HCMFA's
21   behalf tell the SEC that Highland -- that
22   Highland was responsible for there -- I just
23   want to make sure --
24   Q.   It was a little bit different, so

Page 385

WATERHOUSE - 10-19-21

1    let me try again.
2    A.   These are very long questions, John.
3    I'm not trying to be --
4    Q.   That is good.  Do you know whether
5    anybody -- do you know whether anybody on
6    behalf of HCMS -- HCMFA ever told the SEC that
7    Highland was the responsible party for the
8    TerreStar valuation error?
9    A.   Not that I'm aware.
10   Q.   Okay.  Did anybody on behalf of
11   the -- on behalf of HCMFA ever tell the retail
12   board that Highland was responsible for the
13   TerreStar valuation error?
14   A.   Not that I'm aware.
15   Q.   Do you know if HCMFA made an
16   insurance claim with respect to the damages
17   that were incurred in relation to the TerreStar
18   valuation error?
19   A.   Yes.
20   Q.   And do you know why they made that
21   insurance claim?
22   A.   Because there was an error.  I
23   mean --
24   Q.   Was the insured's claim made -- was
25

Page 386

1    WATERHOUSE - 10-19-21
2  the insurance claim made under HCMFA's policy?
3    A.   Yes.
4    Q.   Did HCMFA at any time prior to the
5  petition date -- withdrawn.
6    You were asked a couple of questions
7  where -- where you said that Mr. Dondero told
8  you that he was ascribing zero value to the
9  notes as part of a pot plan because he believed
10  that the notes were part of executive
11  compensation.
12    Do I have that right?
13    MS. DEITSCH-PEREZ:  Object to the
14  form.
15    A.   Yes.
16    Q.   Okay.  Have you ever heard that
17  before the time that Mr. Dondero told you that
18  in the conversation about the pot plan?
19    A.   Had I heard that prior to my
20  conversation with Mr. Dondero?
21    Q.   Yes.
22    A.   No, I had not heard that prior.
23    Q.   Okay.  And that was in the context
24  of his formulation of the settlement proposal;
25  is that right?

Page 387

1    WATERHOUSE - 10-19-21
2    A.   I mean, generally, yes.  You know,
3  we were asked to provide asset values, right,
4  and he was having settlement discussions.
5  Again, I don't know who those went to
6  ultimately.  I don't recall.
7    MR. MORRIS:  I have no further
8  questions.  Thank you very much for your
9  patience.  I apologize for the late hour.
10    MS. DEITSCH-PEREZ:  John, you stay
11  on about your email when --
12    MR. RUKAVINA:  Hold on, I'm not
13  done.
14    MS. DEITSCH-PEREZ:  Oh, okay.  Davor
15  still has questions.  Sorry.  I was going
16  to say both John and Davor, could you stay
17  on afterwards just to talk about the
18  requests.
19    FURTHER EXAMINATION
20  BY MR. RUKAVINA:
21    Q.   Mr. Waterhouse, you were just now
22  testifying about a discussion you had with
23  Mr. Dondero where he said something like no
24  more payments.
25    Do you remember that testimony?

Page 388

1    WATERHOUSE - 10-19-21
2    A.   Yes.
3    Q.   Okay.  And was that late November or
4  early December of 2020?
5    A.   It was, I would say, first or second
6  week of November.
7    Q.   Okay.  Do you recall whether --
8  whenever you had that discussion, whether
9  Mr. Dondero had already been fired by the
10  debtor?
11    A.   Yes, I -- I believe he was not an
12  employee of the debtor anymore at that time.
13    Q.   And when you were discussing this
14  with Mr. Dondero and he said no more payments,
15  you were discussing the two shared services
16  agreements and employee reimbursement
17  agreements we testified -- you testified about
18  before; is that correct?
19    MR. MORRIS:  Objection to the form
20  of the question.
21    A.   That is correct.
22    Q.   And had your office or you -- and we
23  will talk at a future deposition about the
24  administrative claim.
25    But had -- by that time that you

Page 389

1    WATERHOUSE - 10-19-21
2  talked to Mr. Dondero, had your office or you
3  done any estimate of what the alleged
4  overpayments were?
5    MR. MORRIS:  Objection to the form
6  of the question.
7    A.   Yes, we had -- there was a -- there
8  was a detailed analysis that was put together
9  by David Klos at the time.
10    Q.   And do you recall just generally
11  what the total amount for both advisors of the
12  overpayments was?
13    A.   It was in excess of $10 million.
14    Q.   Was it in excess of $14 million?
15    MR. MORRIS:  Objection to the form
16  of the question.
17    A.   I -- I remember it was an
18  eight-figure number.  I don't remember
19  specifically.
20    Q.   Okay.  And did you convey that
21  number to Mr. Dondero when you had that
22  conversation?
23    A.   Yes.
24    Q.   What was his reaction?
25    A.   I mean, he wasn't happy.

Page 390

WATERHOUSE - 10-19-21

1  Q.  Is it fair to say he was upset?
2  A.  Yes.
3  Q.  Did Mr. Dondero ever expressly tell
4  you to not have NexPoint make the required
5  December 31, 2020, payment?
6  A.  Yes, I recall him saying don't make
7  the payment because it was being negotiated, as
8  I discussed with Mr. Morris, this offset
9  concept.  So there were obligations due by the
10  advisors to Highland, they should be offset
11  that -- you know, those obligations should be
12  offset by this -- by this overpayment.
13  Q.  And when did he tell you that?
14  A.  I would say -- I would say around --
15  probably December -- December-ish.
16  Q.  Early December, late December?
17  A.  I don't recall with as much
18  specificity as -- as -- as -- as stopping the
19  shared services payments, because we had
20  actually made one shared services payment in
21  November.  So that is why I need to remember
22  that one more clearly.  I don't remember where
23  exactly in December that conversation occurred.
24  Q.  Did Mr. Dondero expressly use the

Page 391

WATERHOUSE - 10-19-21

1  word "NexPoint" when he was saying don't make
2  these payments?
3  MR. MORRIS:  Objection to the form
4  of the question, asked and answered.
5  A.  Yeah, we were -- we were discussing
6  advisor obligations.  So it was -- you know, it
7  was just obligations from the advisors.
8  And -- and he specifically talked
9  about the NexPoint payment as well.
10  Q.  Okay.  And it is your testimony that
11  he expressly told you not to make that NexPoint
12  December 31 payment?
13  MR. MORRIS:  Objection, asked and
14  answered twice.
15  A.  Yes, he -- he did, during that
16  conversation.
17  Q.  And did you ever follow up with him
18  after that about whether NexPoint should or
19  shouldn't make that payment?
20  A.  I did not.
21  Q.  Did you ever, on or about
22  December 31, 2020, remind him and say, hey,
23  this payment is due, what shall I -- what
24  should I do?

Page 392

WATERHOUSE - 10-19-21

1  A.  I did not.
2  Q.  So sitting here today, you -- you
3  remember distinctly that Dondero in December of
4  2020 expressly told you not to have NexPoint
5  make that payment?
6  MR. MORRIS:  Objection, asked and
7  answered three times.
8  A.  Yes.
9  Q.  Can you say categorically it wasn't
10  just some general discussion where he told you
11  not to make payments?
12  MR. MORRIS:  Objection, asked and
13  answer four times.
14  MR. HORN:  Four times now.  Go for
15  five.
16  A.  Yes.
17  Q.  Did you tell Mr. Seery that?
18  A.  I don't believe I did.  I don't
19  recall.
20  Q.  And was this an in-person discussion
21  or telephone or email?  Do you remember?
22  A.  This was a phone -- a phone
23  conversation.
24  Q.  Okay.  Would you have a record of --

Page 393

WATERHOUSE - 10-19-21

1  on your cell phone of when that conversation
2  might have taken place?
3  I'm sorry, strike that.
4  Was that by cell phone?
5  A.  I believe -- yes, because we -- I
6  was at home.  I mean, I don't have a landline.
7  All I have is my cell phone.
8  Q.  Do you know whether your cell phone
9  still has records of conversations from
10  December 2020 on it?
11  A.  My call log doesn't go back that
12  far.
13  Q.  Okay.  Thank you.
14  MR. RUKAVINA:  I will pass the
15  witness.
16  MS. DEITSCH-PEREZ:  Just a couple
17  quick questions.
18  FURTHER EXAMINATION
19  BY MS. DEITSCH-PEREZ:
20  Q.  With respect to HCRE and HCMS, am I
21  correct there was -- there was direction not
22  to pay those loan payments?
23  MR. MORRIS:  Objection to the form
24  of the question.

Page 394

WATERHOUSE - 10-19-21

1    A.   Yes, I don't recall having

2    conversations about, you know, those -- those

3    entities.

4    Q.    And, in fact, what was the tone that

5    Mr. Dondero had when he talked to you about the

6    fact that HCRE and HCMS payments hadn't been

7    made when he found out that they hadn't been

8    paid?

9         MS. DANDENEAU:  Objection to form.

10        MR. MORRIS:  Objection to form.

11   Q.    What was the tone he took with you?

12   A.    Oh, it was -- it was -- it was -- it

13   was very negative.  I mean, I think he cursed

14   at me and he doesn't usually curse.

15   Q.    Okay.  And in your mind, is that

16   consistent with the fact that he was surprised

17   that those payments hadn't been made?

18        MR. MORRIS:  Objection to the form

19   of the question.

20   A.    Yes.

21   Q.    Okay.  Thank you.

22        MR. MORRIS:  I have nothing further.

23   Thank you so much, Mr. Waterhouse.

24        MR. HORN:  I have no questions.

25

Page 395

WATERHOUSE - 10-19-21

1    Thank you, Mr. Waterhouse.  We appreciate

2    your time.  I am logging off the discussion

3    and I will talk to y'all tomorrow.

4         MR. MORRIS:  Super.

5         VIDEOGRAPHER:  If there are no

6    further questions, this ends the

7    deposition -- excuse me.  This ends the

8    deposition, and we are going off the record

9    at 7:30 p.m.

10        (Deposition concluded at 7:30 p.m.)

11

12

13   _____

14            FRANK WATERHOUSE

15

16   Subscribed and sworn to before me

17   this      day of          2021.

18

19   _____

20

21

22

23

24

25

Page 396

WATERHOUSE - 10-19-21

1         C E R T I F I C A T E

2

3    I, SUSAN S. KLINGER, a certified shorthand

4    reporter within and for the State of Texas, do

5    hereby certify:

6    That FRANK WATERHOUSE, the witness whose

7    deposition is hereinbefore set forth, was duly

8    sworn by me and that such deposition is a true

9    record of the testimony given by such witness.

10        I further certify that I am not related to

11   any of the parties to this action by blood or

12   marriage; and that I am in no way interested in

13   the outcome of this matter.

14        IN WITNESS WHEREOF, I have hereunto set my

15   hand this 19th of October, 2021.

16

17

18   _____

19        Susan S. Klinger, RMR-CRR, CSR

20        Texas CSR# 6531

21

22

23

24

25

Page 397

WATERHOUSE - 10-19-21

1    NAME OF CASE:  In re:  Highland Capital

2    DATE OF DEPOSITION:  October 19, 2021

3    NAME OF WITNESS:  Frank Waterhouse

4    Reason Codes:

5         1.  To clarify the record.

6         2.  To conform to the facts.

7         3.  To correct transcription errors.

8    Page____Line____Reason_____

9    From_____to_____

10   Page____Line____Reason_____

11   From_____to_____

12   Page____Line____Reason_____

13   From_____to_____

14   Page____Line____Reason_____

15   From_____to_____

16   Page____Line____Reason_____

17   From_____to_____

18   Page____Line____Reason_____

19   From_____to_____

20   Page____Line____Reason_____

21   From_____to_____

22   Page____Line____Reason_____

23   From_____to_____

24

25

## $

**$1,406,000** 343:10

**$1,406,112** 343:13

**$1.04** 109:15

**$1.4** 344:5 345:11 350:7 351:22

**$1.5** 223:17

**$1.7** 92:22

**$10** 389:13

**$10.5** 308:16

**$12.7** 311:2 317:10

**$13** 310:23

**$14** 389:14

**$150** 239:10

**$173,398,000** 107:7

**$2.4** 140:14 141:9,18 270:20 271:7,16 272:8 283:18 315:13

**$23** 220:24

**$24** 178:19

**$24.5** 309:25

**$30** 161:25 220:13,20 223:7 224:2 334:7,19 336:13,23 337:25 339:4 340:10 341:23

**$30.7** 216:17

**$325,000** 331:14 332:16,24

**$400** 239:24

**$410** 238:9 239:12

**$5** 142:19 270:20 271:6 272:7 283:18 315:13

**$5.3** 119:23 310:17

**$7** 217:16,19 221:7 277:11,20

**$7.2** 302:22

**$7.4** 131:13 132:8 138:12 143:12 144:6, 17,23 272:16 273:6

287:15 288:6,20 303:6,18,24 304:11, 20 305:23 306:2 307:7 308:20 310:17 317:6 318:14

**$7.8** 278:6,7

**$8** 277:16

## 1

**1** 8:9 35:17 139:22 140:12,13 215:25 216:3,7,12 238:8 260:20,23 261:15 328:10,11,12 343:19

**1/12** 6:9

**10** 5:6 197:4,7,9,15 198:2 266:20 267:3 302:7

**10-19-21** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1

129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1

297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1 388:1 389:1 390:1 391:1 392:1 393:1 394:1 395:1

**10.5** 308:22

**100** 108:23 298:15

**10010** 4:21

**10017** 3:10

**10:08** 36:15,16

**10:11** 36:16,18

**11/25** 6:7

**11/30** 332:24

**11:02** 72:25 73:2,5,6

**11:15** 73:3 342:14

**11:20** 73:6,8

**11:40** 344:14

**11th** 152:18,25

**12/1** 332:10

**12/19** 5:25

**12/31** 6:8

**12/31/18** 117:12 122:12 135:21 261:22

**12/31/19** 219:16

**12/31/2018** 93:15

**12/31/2019** 260:13

**12/31/2020** 361:15

**12th** 341:18 344:3 350:5,9,13,24 351:20

**135** 6:2

**14-ish** 286:21

**142** 5:15

**15** 73:3 200:4 202:13, 23 203:3 210:6 213:18 221:23

**15(c)** 5:21 160:11 169:21,23 170:4,8,10 171:6 175:3,9 176:23 179:20 184:5 195:9 210:12,21

**150** 239:24

**150,331,222** 243:23

**151** 5:20

**15th** 203:15

**16** 224:5

**17** 89:16 109:19 110:8 137:24

**170** 5:21

**173** 110:14

**18** 89:16

**1900** 3:15

**19th** 8:19 21:7

**1:04** 150:24,25

**1:49** 150:25 151:3

**1c** 238:12

**1st** 14:8

## 2

**2** 5:15 35:18 140:18 142:15,16,22 171:10

Case 21-03005-sgj Doc 106-3 Filed 12/01/21   Entered 12/01/21 14:47:42   Page 103 of 131
Case 3:21-cv-00880-X   Document 23   Filed 01/05/22   Page 676 of 899   PageID 1288

Index: 2.4..780

172:8 174:13 179:4
195:11,14 215:22,23
216:3,4,5,8,25
338:12

**2.4** 268:23 282:15

**2/18** 5:22

**20** 15:25 271:14

**2006** 18:15

**2011** 19:2,4,22

**2012** 19:2,4 95:25

**2013** 52:7

**2014** 20:2

**2016** 23:19 25:13
87:8,20,24 89:15,16

**2017** 126:12 161:23
165:22 216:16
220:14 222:10 223:7
224:2,12

**2018** 105:19 109:14,
20 119:21 165:18
186:25 202:19 203:9
228:3,23 242:18,23
243:12 244:14,18
262:5,15 279:12

**2019** 6:4 21:7 98:17
99:25 103:2 125:18
126:2 131:10 132:6,
21 133:12 134:5,17,
23 137:6 138:12,20
139:18 140:14 141:5
142:18 152:18,25
165:15 180:24 181:4,
9,16,23 182:8,16
200:4,7 201:22
202:13,23 203:3,15
204:10 210:7 213:9,
19 218:21 219:7,12,
24 220:19,22 221:6
222:4,12 223:4,14
242:23 258:21
262:17 263:13,14,20,
24 265:3 269:5,24
270:12,18 271:3,14
272:4,15 273:4
279:12 280:10,20
282:23 287:4 293:19
299:4 301:2,8,16,18
313:3 314:13,23
315:19 316:14 321:6

**2020** 59:7,9 68:15
70:17 160:7,14,22
165:14 169:17,20
171:19 173:24 175:8
176:10 179:24 183:7,
14 186:12,14 189:13
195:20 196:3,17
200:24 204:20
207:16 221:11,16,21
258:20 265:6,11
307:24 314:21
316:16 323:10 326:4,
12,14 327:5,9 328:16
330:15 334:23 335:7
336:11,20 337:12
338:15,24 341:9
343:2 346:10 359:3
360:17,19 361:6,24
364:4 366:9,10
367:15,20 377:21
378:10,11 379:16,21
382:24 388:4 390:6
391:23 392:5 393:11

**2021** 8:19 14:8 19:5
37:2,10,19 38:2
70:21 71:3,5,12
121:13,22 122:19,24
163:2,7,8 165:5,9
166:2 173:18 176:24
187:3 198:21 199:7,
12,20 200:14 201:2
203:4,21 210:2,23
212:19 219:11,13,17
226:4 301:24 314:8
315:21 316:7,19
326:9 340:21 341:6
350:6,9 361:25
362:3,7 364:8 365:2
367:15 383:23
395:17

**20th** 160:5

**21** 78:3

**21-03000-SGI** 8:15

**21-3004** 197:18
215:4

**215** 106:2

**218** 6:4

**226** 5:22

**228** 8:22

**23** 178:19

**236** 5:23

**241** 110:23

**25** 260:12 328:16
329:14

**25-year** 347:7

**251** 129:16,22

**256** 5:7

**258** 5:25

**25th** 329:19

**297** 6:10

**2nd** 132:20 141:5
213:9 315:18

---

**3**

**3** 220:2

**30** 7:19 16:3 186:16
356:9

**302** 6:12

**307** 6:11

**309** 6:13

**30th** 176:10,24
331:12 332:3 380:18

**31** 122:19 197:20,24
198:7,9 199:7,12
200:24 201:2 203:4
301:18,24 307:24
326:4 338:15,24
341:9 346:9,21 390:6
391:13,23

**3102** 4:7

**31st** 105:18 109:14
119:21 121:13
122:23 199:20
200:14 202:19 203:9,
21 212:19 216:16
218:21 219:7 221:15,
21 242:18 258:20
263:14 326:8,12,14
334:15

**328** 6:7

**33** 5:16 91:20,21

**33416** 100:10

**338** 6:8

**34** 5:18 104:23,24

**341** 6:9

**35** 5:20 15:20,22
100:10 151:20,21

**352** 5:8

**35D** 101:10,19

**36** 5:21 102:18
170:18,19 177:18
313:9 317:12

**377** 5:9

**387** 5:10

**39** 5:22 226:23,24
236:17

**393** 5:11

**3:26** 224:20,23,24

**3:39** 224:24 225:2

**3:40** 224:21

**3rd** 92:2 98:17 99:25
103:2 132:20,25
135:2 137:6 142:18
200:7 213:9 242:23
262:17 263:13 265:3
315:19

---

**4**

**40** 5:23 236:22,23
237:19

**406** 343:19

**41** 5:25 258:16,18

**419** 103:11

**45** 6:2 135:12,14,15

**45th** 8:23

**46** 6:4 218:16,17

**4:30** 265:25

**4:31** 266:5,6

**4:40** 266:2

**4:43** 266:6,8

**4th** 135:2

---

**5**

**5** 268:22 271:15
282:14

**5.3** 121:3,6 124:17
308:21 311:4

**500** 3:23

**51** 4:20

**5:52** 172:4 174:6

**5:53** 325:7,8

**5:59** 325:8,10

---

**6**

**6** 183:7 186:14
217:16,19 314:20
316:16 341:13

**6/3/19** 5:16

**6/30** 176:8,16

**60-day** 380:16

**650** 4:13

**6:27** 349:6,7

**6:30** 349:7,9

**6th** 172:4 174:6
186:11 189:13

---

**7**

**7** 277:15,16 297:20
305:5

**7.4** 132:2 311:4

**7.8** 277:12

**70130** 4:14

**71** 238:20

**71A** 6:13

**75** 18:2

**75201** 3:16

**75201-6659** 3:24

**75219** 4:8

**780** 3:9

**7:02** 372:14,15

**7:03** 372:15,17

**7:30** 395:10,11

---

**8**

**8/31** 6:11

**850** 100:25 101:2,4,9

---

**9**

**9** 307:18,19,20

**90** 18:4

**91** 5:16

**94** 5:18

**99** 86:14

**9:32** 8:20

**9th** 70:16

---

**A**

**a.m.** 8:20 36:15,16,18
73:5,6,8 342:14
344:14

**A1** 6:7 328:13

**A10** 6:12 302:7,8

**A11** 6:13 309:4,5,6

**A2** 6:8 338:13

**A6** 6:9 341:14

**A7** 6:10 297:20,23

**A9** 6:11 307:20,21

**abilities** 265:12

**ability** 20:17 42:6
124:3 204:15 272:6
327:16 372:5 382:13

**absolute** 109:2

**accelerate** 340:10,
14

**accelerated** 339:4
347:7

**acceleration** 339:6,
10,15 340:13,17,24

**accept** 16:17 152:23
188:19

**accepted** 241:14
277:19

**accepting** 153:16

**accepts** 8:6

**access** 294:24
359:19,21 360:9,14
372:21 373:13

**accordance** 241:13,
25 242:4 254:10
256:21

**account** 287:17
328:6,9 359:14
360:6,14,22 367:22
371:9

**accountant** 21:17
25:20 116:12 370:14

**accountants** 147:22

**accounting** 26:2,4,
7,17 28:16 38:24
87:12,14,17 112:10,
11 148:23 149:2,14
150:14,19 188:11
200:17 230:16,18,21
240:19 241:14
257:22,24,25 258:12,
13 280:6 290:13
326:18,21 337:2,7
351:2 354:7,11,22
358:3 371:5 372:3
378:15

**accounts** 244:9
327:10,12,17,21
329:17 330:10,12,20
331:4 333:7 359:19,
22

**accuracy** 113:17
114:17 115:2

**accurate** 88:7,11,17
89:13,23 90:2,6
110:16 112:19 133:5
176:17 204:4 238:4
256:10 257:4 284:24
286:6 330:20,24

**accurately** 240:9,14

**accusations** 157:18

**acknowledgment**

6:12 201:13,25
213:6,17 314:21

**acting** 23:23 24:2,3,8
28:5,8,12,18,20 29:5,
9,11 30:14,16,24
31:2,3,5 155:6,9,14
156:4,12 158:3,9,11

**action** 374:20 383:17

**actions** 9:7 347:25

**actively** 337:11,12
346:19,25

**actual** 115:21 311:25
312:12

**add** 183:23

**added** 183:24

**addition** 333:7

**additional** 171:6

**adequately** 335:24

**adjustment** 242:7
263:4

**adjustments** 36:4
240:21 241:18 243:5
244:19 245:20

**administrative**
321:17 388:24

**admissible** 7:17

**admitted** 276:24

**advance** 57:21 60:21
61:5,10 62:21 63:5
267:8 355:25

**adversary** 197:18

**advice** 172:7 205:7
257:2

**advisor** 125:8,15
192:25 193:15
205:10 273:23 281:6
282:5 311:25 312:5,6
328:7 331:22,23
391:7

**advisor's** 337:17

**advisors** 3:17,18
9:21,22 22:22 27:10
29:10,12 32:18,20,25
33:24 39:2 42:21,22
44:6,7 58:8,14,15,18

125:3 126:10,13,16
127:10 152:14
160:10 167:13
168:19 171:14
172:18 175:7,13
178:11 179:18,21
183:7,18 184:15,19,
22 189:23 190:9,12,
19 191:2 192:25
193:8,19 194:3,21
195:10 196:8,22
205:7,12,23 206:14
208:4,7 210:5 213:22
215:14 235:9 267:24
268:16 279:19 280:2
286:18 308:4 325:15,
21,22 328:7,25 329:3
332:14 333:23
335:15 336:7 337:14
353:20 379:19,24
380:2,10,22 381:2,6,
11,16 389:11 390:11
391:8

**advisors'** 168:9
179:8,25 180:9 184:3
194:17 218:19 328:9

**advisory** 32:21
33:24

**affect** 371:17

**affected** 265:12
277:20 370:23

**affidavit** 164:10

**affiliate** 41:18 42:2,4
44:12,16 47:25 48:9,
22 49:5,6,10 51:17
54:17 57:19 58:3
60:14,21 61:4 62:9,
20 63:3,15,22 64:6,
10,16,24 65:18 78:18
93:21 94:6 100:25
105:8 107:2,13,21
108:3,7 109:10 131:2
171:14 220:6 225:6,
14,21 239:4 254:2
259:24 262:11 263:5
307:24 309:16,24
310:9 312:2,11,14,25
370:10

**affiliated** 134:6
285:17

**affiliates** 41:2,5,8,10,
13,14 44:4,11,15,25

45:13 46:3,9 47:18
48:7,13 54:2,11,13,
20,21,25 55:6,11,18
56:2,16,23 61:20
62:2 63:11 65:4 66:8
82:16,20 91:3 100:22
101:16 106:22 107:3
108:14,18 109:8,18
110:7 111:2,6,9,13,
23 112:18,24 113:19
115:4 117:24 118:7
119:4 120:20 121:4
176:9 233:9,23
234:10,16,21 235:4,
22 236:8 238:25
241:7 242:8 243:8
259:19 260:11 262:6
309:19 312:2,13
377:13 379:8 382:7

**affirmative** 96:15

**afield** 16:22 376:3

**afternoon** 344:17

**aggregate** 131:13
132:7 138:11 217:15,
19

**agree** 77:5 306:13,22
307:5,10

**agreed** 16:17 75:20
121:16,20 198:20
199:5,11,19 200:13
209:25 210:6 314:11
374:25 375:7

**agreement** 17:9
59:24 65:9,16,23
66:2,6 67:3,7,8,12,
16,22 68:4,9,12,17,
24 69:15,19,22 70:2,
7,11,16,20 71:18,24
72:4,7,10,13 75:4,5,
9,14,16,23,24 76:3,6,
7,10,14 77:6 78:15,
21,25 79:8,10,17,18,
24 80:5,6,11,16,20
81:6 82:9,17,22 83:7,
10,14,17,20,23
99:15,24 100:2,6
102:3,6 104:13,17,19
122:5 123:22 124:4
134:12 186:24 187:2,
16 189:2 200:13
210:22 212:17
278:23 279:18,20,24,

25 314:7 316:5,8,9, 13 326:3,13 332:8 351:4 365:22 379:20

**agreements** 58:16 77:24 83:4 168:9 186:10 279:4,6 325:24 353:22 379:18,23 380:4,11, 13,19 381:17 388:16, 17

**agrees** 243:25

**ahead** 68:22 82:6 156:20 164:10 212:25 248:12 295:12 329:11 352:10 364:23 378:18

**Aigen** 4:5 9:24 214:4 251:23

**Akard** 3:23

**allegations** 208:17

**alleged** 389:3

**Allocation** 35:19,21 125:2 273:17 281:8, 23

**allowed** 62:8 81:23, 25

**alpha** 297:20 302:7 307:19 328:10 338:11 341:13

**alter** 187:16

**ambiguous** 353:20

**amended** 5:15 214:18

**amortizing** 334:13

**amount** 49:10,11 50:23,24 57:6 119:7 131:13 132:8 138:11 142:18 144:5,16 161:19,25 195:16 196:16 216:17 217:15 220:23 222:11 239:5 240:9 244:3 271:11 277:7 283:18 288:6 308:22 342:10 343:5,15,17 389:11

**amounts** 106:21,25 108:14 109:7,18 110:6 111:2,5,8,12, 23 112:18,24 113:18 114:19 115:3 119:3 120:20 121:4,11 125:8 126:6 161:8 168:3 171:12 174:15, 22 175:11 176:9 181:15 199:12 202:7, 22 203:7,13,19 204:11,16,25 205:12 211:11 212:10,18 217:19,21 222:3,11 234:23 235:3 275:13 282:8 283:2 285:10 288:3 311:4 335:12

**analyses** 241:11

**analysis** 240:20,24 241:3,6 261:11 262:3 265:7,8,17,18,19 389:8

**and/or** 42:8,16 43:3, 14 59:14

**annual** 26:10 84:17, 23 85:2,24 96:7 168:10 170:5,9 184:5 217:2 228:16 334:8 335:9 336:12

**answering** 248:7,8 262:23

**answers** 12:2 16:25 26:15

**anticipated** 311:20 378:17

**anymore** 294:24 388:12

**apologize** 30:10 40:22 78:14 99:22 104:12 125:21,24 139:2 170:2 192:14 197:19 226:17 227:17 304:14 352:8 354:17 387:9

**appearances** 3:3

**appeared** 337:16,19

**appearing** 8:18

**appears** 224:8

**Apple** 281:21

**application** 165:10

**applied** 55:16,24 56:6 59:17 60:12 162:5 168:4 294:13 316:14

**apply** 213:7 314:12, 22

**appointed** 18:21,24 24:14,19,25 25:8 29:11,15 270:4 323:9,16

**appointment** 152:24 153:4,16

**appointments** 227:14

**appoints** 183:9

**appreciated** 74:16

**approaching** 310:23

**approval** 57:13 62:5, 10 63:12,17,23 144:24 170:14 206:5, 16 271:17,22 272:13, 14 281:7 332:16 351:5 377:17,24 382:11

**approve** 56:21 57:2, 3,20 61:5,9 231:21 273:6 379:7

**approved** 57:5 60:20 231:14 271:12 294:21 295:6,18 333:4 382:16,17

**approximate** 17:22 23:15 27:24 30:19 36:23 38:15 120:15 161:24 216:17 277:7 310:5

**approximately** 8:20 15:13,20 19:23 109:15,19 110:7 119:23 126:12 169:7 173:14,15 178:19 220:12,24 221:3,7 238:9 277:10,15 278:6

**approximates** 118:13 121:6

**April** 152:18,25 200:4 202:13,23 203:3,15 204:10 210:6 213:18 301:16 314:21 323:6

**areas** 26:5

**Argumentative** 156:10

**arise** 288:3

**arithmetic** 260:10

**armchair** 153:11

**ASC** 100:25 101:2,4, 9

**ascribing** 386:8

**Asia** 4:24 92:14 118:3 129:16 135:10 177:14 218:14

**asks** 97:12 171:10 172:6 174:21

**aspect** 26:18 116:20

**asset** 107:25 108:6, 24 109:14 118:23 225:16,23 265:9 354:15 367:9 368:4 371:7,16,23 372:6 376:24 387:3

**assets** 5:23 107:14 108:10,13 109:20 110:8 122:3,8 137:14 190:3 194:2 195:17, 20 196:3,9,17 204:19 211:3 225:8 235:11, 15 237:20,23 239:13, 19 240:15 241:4,18 242:13 250:18 253:16,24 259:18 260:8,11,13 301:9 303:9 307:9 309:2 311:10 317:7 366:14 368:5 370:22

**assistant** 295:2 298:25 320:23 321:9

**assistant's** 321:5

**assistants** 321:18

**assisted** 326:22

**assisting** 333:8

**associate** 268:10 297:25

**associates** 377:23

**association** 7:5 8:25

**assume** 22:15 133:24 297:13

**assumed** 285:4,11 287:6

**assuming** 288:22

**assure** 105:4

**assured** 257:3

**astute** 320:12

**attach** 320:22 321:2

**attached** 307:23

**attaching** 171:5

**attachment** 307:25

**attempted** 360:23

**attempting** 374:17

**attorney** 153:11 172:12

**attorneys** 3:4,11,17 4:2,10,16 147:21 187:6,11,15 188:3,7, 24,25

**attributable** 132:3 276:11 283:2

**audit** 26:11 48:5 52:23 85:24,25 86:9, 23 88:2,6,13,14,16 89:10,11,22 91:11,14 93:4,14 95:6 96:7,10 97:22 98:19 103:25 104:4 106:7,16,17 109:24 110:25 111:20 112:7,24 113:17 114:2,7 115:2,20 116:5 117:2,20 119:19 131:5 132:9,24 135:6 137:5,7,10,12,21 138:18 142:9,11 148:25 149:4 199:23, 25 200:6 218:7 219:4,5,12,15 221:11,14,20 243:12 244:18 263:24 264:8

**audited** 6:4 41:7 47:25 84:16,23 85:3, 19 90:2 93:24 95:14

98:6 102:7,10 104:21
107:22 113:7 114:18
133:22 138:3,4,9
143:8 186:25 196:21
200:9,12 201:7 211:6
217:24 218:4,12,24
241:24 242:2,3,15,16
261:20

**auditing** 264:2

**auditor** 84:21 97:12
113:11 136:6

**auditors** 46:8 47:17
48:7,10 52:11,20
53:4,11,13 84:10
86:10 88:9 91:12
113:8 136:16 137:3
149:13 211:16
212:15 264:16

**audits** 149:12 246:11

**authority** 63:9,21
270:19 271:5

**authorized** 57:8
139:4 143:13,22
144:7,18 150:4
152:11 158:4,13,18
159:4,15,23 160:15,
24 181:3 320:16
363:2 382:6,9 384:7,
10

**availability** 121:12

**Avenue** 3:9 4:7,20

**aware** 12:14 21:6
32:7 43:22 45:12
48:8,11 49:4,8 50:20,
25 51:5,8,13,18
53:24 57:6 61:7,19,
23 65:3,5 66:21 78:5,
15,22 83:15 85:10
93:8 102:5,14,16,22
103:5,16 107:20,23,
24 108:6 133:15,19
148:5 161:2,6,22,23
162:2,3,8 167:18,19,
24,25 168:7 181:6,7,
12,13,17,24,25
182:4,9,10,13,14,18
198:16 199:9,13,17
202:11,17,21 213:5,
13,15 220:17 223:3
226:3,6,7 261:3,5,7
263:12 267:7 295:23

338:22,25 339:3,5,6
343:18 347:5,8,25
348:6,13,14,17
372:24 378:9 382:4
385:10,15

---

**B**

**back** 20:14 36:17
40:22 50:2 61:24
71:11 73:2,7 75:17
89:17 91:10 92:9
93:11 95:18,20
125:19 140:14
141:12 151:2 160:6
174:20 183:8 185:19
192:23 202:3 205:19
207:2,5 209:6,13
215:20 224:20,25
226:18 243:22
263:23 265:5,15
266:7 273:21 280:3,5
282:13 283:22
285:16,21 286:20,24
292:23 293:19 299:4
301:21 302:23
305:16,20 306:3
313:3 324:6,12 325:9
326:15 332:13 333:9
343:6,16 344:18
347:3,4 348:25
349:8,10 350:2
354:16 365:20
372:16 382:23
393:12

**backed** 50:22 123:5

**background** 13:22
16:13

**backing** 189:9,15
190:10,12,19 191:3
193:20 194:20 205:8,
14,24 206:14,23
208:5 321:15

**bad** 134:9

**badly** 81:18

**Baker** 3:14 9:9

**balance** 106:19
107:14,22,25 108:11
109:6 110:4,5 111:11
112:4 120:23 175:2,
8,14 179:17 196:25
220:2 222:21 228:22

229:3,8,16 230:5
243:7 251:14 253:22
370:22 372:6

**ballpark** 196:15
277:17 278:11

**bank** 142:12 261:23
306:5 327:10,12,17
328:6,9 360:5,14

**bankruptcy** 8:13
21:7 45:24 187:15
188:25 219:23
236:24 237:2,14,24
240:8 244:6,21
245:17 247:9,17,23
248:14,24 254:12
263:18,19 264:3,15
311:11 317:11 366:4
374:15 376:7

**base** 109:14

**based** 71:16 78:25
101:13 108:21,23
111:15 146:8,23
204:22 274:4 278:4
315:4 337:22

**bases** 228:13

**basically** 122:19
145:15 152:10
199:14,23 200:23
252:9 254:16,19
327:20 348:4

**basis** 16:18 19:4
47:10 84:18 110:3,
10,17,18 137:16
151:14 154:6 170:15
190:13 226:11 227:5,
20,25 228:13,16
241:17 266:22
288:12 358:7

**batch** 330:3

**Bates** 129:16,21
137:25 177:16

**bear** 17:5

**began** 20:8,13,17,23
266:21

**begin** 11:22 12:2
266:18

**beginning** 202:5
249:9

**begins** 12:15 170:23
197:25 341:17

**behalf** 58:11 122:22
139:18 180:22 181:2,
7,13 182:17 201:13,
15 210:5 211:9 212:8
213:8 270:21 271:5
273:4 289:18,23
327:17 336:21
350:19 362:9 377:12,
23 379:8 382:6,9
383:24 384:18,22
385:7,11,12

**belief** 98:17 346:15

**believed** 143:22
161:7,17 175:22
246:22 250:9 386:9

**believing** 144:17

**benefit** 17:19 304:19

**bigger** 89:5

**bill** 117:9 355:3,8
358:13

**bill-paying** 358:14

**billion** 109:15 110:14
253:21

**billions** 253:24

**bills** 326:23 355:14
356:2,13

**binder** 91:23 216:10

**binders** 216:5

**bit** 16:22 96:4 117:22
152:17 171:2,25
201:12 222:25
313:11 384:25

**BK** 187:6

**blah** 248:18

**Blank** 170:24

**blend** 250:5

**blessing** 319:21

**block** 152:21 320:22
321:3

**board** 33:5,12 34:4
166:23 168:18,21,23
169:10,12,14,20
170:12,13 171:7

175:3,8,15 176:22
178:7,13,17,23
179:8,12,15,19,25
180:8,23 182:6,15
184:4,8 185:14
189:7,14,19 190:4,
14,18,21 191:2,8,13,
16,20 192:3,8 193:3,
18 194:12 204:18,23
205:6,22 206:12,13
209:16,19,21,24
210:6,20,22 233:7,
13,16 281:7 323:8,16
348:3 385:13

**board's** 174:13
175:23 176:18 179:3
194:17 195:10
210:11

**boards** 33:8 160:8
171:19 181:2,8,14,
19,21 182:2,11

**bona** 369:25

**book** 140:15

**bookkeeping** 358:6

**books** 225:8,15,23
235:16 237:15
240:11,14 257:21
258:5 286:23 371:8

**born** 284:10

**borrowed** 127:15,24
128:5,23 129:2,5

**borrower** 272:7
273:5 340:2,7

**borrowers** 44:15,19

**bottom** 92:16 106:5
129:25 143:3 170:21
221:24 224:4 329:5
330:7

**box** 294:20

**Boyce** 21:5

**Brad** 249:21

**break** 36:6 72:17,20
73:10 74:4,14 139:25
150:22 151:5 224:19
265:24 266:2 324:22,
25 327:3

**briefly** 383:22

Index: bring..company

**bring** 73:16 154:20

**bringing** 249:21

**broke** 221:12

**broker-dealer** 332:6

**brought** 73:17
248:13 374:9

**build** 107:7 108:22
260:5 311:17

**bulk** 89:9

**burdening** 81:12

**business** 226:10
229:22 332:10,11

———————

**C**

**calculate** 275:11
276:22

**calculated** 335:11

**calculation** 278:12

**calculations** 276:19

**calculator** 110:12

**calendar** 337:7
378:16,21 379:5

**call** 46:14 55:2 68:6
70:3 154:8 167:4
191:14,15,24 192:2
290:19,25 350:15
364:21 393:12

**called** 16:10 22:21
27:10 29:25 31:8
32:4 81:9 115:3
130:3 227:2,19
228:21 273:18
278:22,24 315:20
342:8,24 343:2,16
351:10 362:8

**calling** 344:18

**calls** 45:17 46:10
55:21 107:5 126:4
268:6 324:2,9 344:22

**camera** 36:2

**Canty** 4:24 105:2,23
129:18,23 135:12,16
177:10,21,25 218:15

**capable** 86:12 88:20

**capacity** 11:3 19:25
21:3 24:17 26:22
65:10 97:15 143:25
174:3 232:4 258:25
270:25 285:24
295:18

**Capital** 3:4,18 8:11
9:6,22 10:22 11:7
15:16,23 18:7 22:21
30:2 41:18 42:10,18,
21 43:11,16 44:6
58:15,17,20 70:21
109:23 110:9 125:3
127:12 133:10
152:13 172:14
215:14,17 271:3
279:18,19 280:2,3
308:4 325:22,24
330:16 354:19
359:16,18 360:7,8,13

**capture** 107:10
130:15 203:11

**captured** 131:3

**career** 286:21

**careers** 89:6

**carefully** 40:14,18
47:9 114:14 144:14
223:12

**carried** 107:14,18,21
109:6,11 233:5 243:6

**carrying** 118:13,25
120:2,4,12,14 262:8
263:7,16 265:2

**case** 7:21 8:14
208:15 248:15
301:14 339:25

**cash** 57:3,4 121:12
335:17,18,22,23
336:7 337:13,14,16,
17 360:5 361:12,14

**categorically**
392:10

**categorize** 257:10

**categorizing** 316:18

**category** 107:24
109:6

**caused** 263:3,14
277:3,19 280:12
359:8,24

**causing** 362:21

**CCO** 192:25 193:8,14

**cease** 173:15

**ceased** 71:6 173:12

**cell** 393:2,5,8,9

**CEO** 14:16

**certainty** 371:6

**certificate** 5:20 22:3
152:2,5,10,13 159:19
183:11 270:4

**certificates** 21:21
154:20

**certification** 22:3

**certifications** 22:13

**certified** 7:5 21:17

**cetera** 164:10

**CF-** 25:2

**CFO** 14:14 18:10,17,
21,24 19:3,14,25
21:3 39:10,15,19,21,
23 40:3,4,9,12,25
42:5 43:10,23 44:25
46:7 47:16,24 49:17
50:10 51:10,15,20,25
53:9 55:16 60:23
61:21 62:4,8 84:20
85:12 86:3,19,24
88:10,15 90:15 94:4,
23 95:7,15 100:17
107:11 111:16 114:5
133:7,10,16 176:14
202:11 203:25
225:17,20 226:8
227:6 229:23 230:14,
18 240:7,14 243:4
247:7,23 248:24
255:7 269:2 285:24
287:14 288:7 295:19
339:24

**chain** 341:17 342:7
350:14

**challenges** 12:21

**change** 28:7,11,17
93:7 187:7,16 189:2

229:11 240:6 248:17
261:24,25 262:2
264:3 265:10 343:20
371:22

**changed** 20:6 28:11
189:10 194:13
206:24 207:6,7,9
208:2,3 263:18
264:17 323:2

**characterized**
247:12

**chat** 81:25 92:12
105:2,5 135:17
177:7,18

**check** 86:8 306:4

**chicken** 298:13

**chief** 14:12 26:24
27:5 120:8 184:22,24
258:25 270:9,13
271:2 302:19

**Chisum** 321:7

**chose** 113:25

**circumstances**
71:15 231:6 240:6
241:10 261:23,24
262:2 265:9 274:13

**Civil** 7:20

**claim** 167:9,13,25
374:9 375:8,11
385:17,22,25 386:2
388:24

**claims** 208:23

**clarify** 354:17

**clear** 40:15,16 54:22
55:5 75:16 81:2
156:2 188:21 214:17
238:17 302:6

**client** 74:5,10 75:19
269:9,13

**clients** 195:8 209:2

**Cliff** 276:2

**clock** 46:25

**CLOS** 253:19

**close** 229:10,19,21
230:2,23 232:8,20
233:3 298:2,12

308:24 372:10

**close-end** 275:6

**closed** 281:3

**closed-end** 281:10,
15 282:7

**co-invest** 127:13,16

**co-obligor** 305:22

**code** 101:21

**collect** 54:3

**collectability** 253:18

**collectively** 33:2
54:12

**colloquially** 366:5

**combined** 233:18

**comfort** 159:22
193:25

**comfortable** 90:9

**command** 297:25

**commenced** 53:25
54:11 181:22

**commencing**
203:20

**comment** 252:23
367:22

**common** 299:4,5

**communicate** 64:3

**communicated**
114:9 211:15,20
254:21 292:17
319:19 368:8

**communicating**
365:13 366:3

**communication**
87:6 207:23 350:8

**communications**
66:19 71:13,14
116:16 322:7 367:14

**comp** 78:10

**companies** 42:7
285:17

**company** 27:9 29:25
31:7 247:8 273:18,

20,21

**compared** 12:21

**comparing** 118:24

**compelled** 81:8
371:22

**compensation**
125:14 281:3 318:14
366:24 367:19,24
386:11

**competent** 88:20

**complaint** 5:15
140:4 208:17,22

**complaints** 322:2,4,
8,20

**complete** 112:19
208:16 221:10,13,18,
19,20

**completed** 132:24
178:8 200:7 219:7,
10,13,16

**completely** 13:4,7
205:5

**completeness**
97:22 98:5

**complex** 253:19

**compliance** 148:3,4
184:22,24 193:17
280:8 294:18 295:21
296:4

**complied** 373:3

**component** 119:17
120:22

**compose** 348:22

**conceived** 232:17

**concept** 52:24
201:20 390:10

**concern** 105:8
122:13

**concerned** 35:25
112:23 235:20,24
241:22 370:2

**concerns** 112:15
113:3 114:6,25
117:23 236:2

**conclude** 108:17
310:9

**concluded** 395:11

**conclusion** 42:20
43:9 44:18 45:5,9,17
46:11 47:21 48:4,17
49:2,14 55:21 107:5
126:4 142:7 143:16
153:13 154:9 157:8
212:25 263:5

**conduct** 85:24
169:10

**conducted** 86:14

**conference** 8:17
323:24 343:23,24
344:11,13

**conferred** 98:8

**confers** 143:20

**confirm** 96:14 98:16
108:23 141:13 143:4
214:3 270:6 319:3,20

**confirmation** 103:21

**confirming** 98:23

**confused** 78:11
317:13

**connection** 16:11,
16,19 48:15,23 50:15
93:13,14 95:5 96:9
125:25 149:3 160:11
175:9 179:19 184:5
199:22 367:5 374:8

**consequences**
357:4

**consideration**
306:18

**considered** 274:9

**consisted** 59:21

**consistent** 394:17

**consolidated** 5:18
6:2 105:17 110:2,5,9,
17 113:13 135:20
137:16 218:19
253:21

**constitute** 110:7

**constituted** 109:19

**consult** 94:12,17
351:21

**consultation** 318:12

**consulted** 274:9

**contend** 65:6 168:4

**contends** 168:3

**context** 41:21,22
58:13 124:18 136:21
168:20 170:4,9
189:18 367:12
386:23

**contexts** 41:15

**continue** 209:4

**continuing** 203:20

**continuous** 19:4

**contract** 278:15,22

**contracted** 330:18

**contracts** 15:9,11
249:22 288:17
325:12,14,17 326:6

**control** 90:3,5,9,14,
20,25 101:4,9,24
113:6 137:17,20
207:21

**controlled** 15:6 16:8
17:24 42:8,16,25
43:3,14 101:16

**controller** 291:13

**controls** 43:5,6
112:16

**conversation** 58:23
59:5 73:18 74:2 78:9
113:16 114:16 124:8
145:7,14,21 148:17,
20 164:23 166:2,9,
11,19,23 187:14
190:23 194:8 207:13
233:21 234:25
235:13,18 246:14,18
252:10,12 255:14
282:25 283:4 296:3,4
318:9 319:16 342:4,
20 348:15 350:8
363:5 365:3 367:3,4
381:8 383:11 386:18,
20 389:22 390:24
391:17 392:24 393:2

**conversations**
66:16 74:21 113:22
115:9 124:11 206:11
233:25 289:4 368:13
380:6 393:10 394:3

**conversion** 125:12,
14 131:23

**convert** 281:9 282:6

**converting** 275:5

**convey** 208:6 389:20

**conveyed** 343:15,25
344:4

**conveys** 193:15

**copied** 183:3

**copies** 13:11,16
142:12 149:8 298:7

**copious** 324:16

**copy** 92:13 148:24
197:23 200:18

**corner** 198:6

**corporate** 41:2,5
54:25 87:11,14,16
112:10,11 116:12
148:23 149:2,14
150:14,19 172:20
188:11 200:17
230:16,17,21 257:22,
24,25 258:11,13
337:7 370:14 378:15,
21

**correct** 11:16 18:10
19:8 22:16 24:7 29:3,
8 32:4,22 33:5 39:4,
12 41:3 43:24 45:2
50:24 55:19 59:18
69:24 74:12 79:24
84:11,18 91:23,24
93:15 95:7 100:4
109:17 110:19 112:8
115:4 117:17 120:21
132:8,24 133:7,11
137:3,8,22 142:5
143:9,14 149:4
150:9,16 155:7
156:13 160:17 161:9,
20,25 165:16,19,23
166:15 167:16
168:11 175:24 179:9
185:23 186:5,6

187:3,4 201:4,9
204:20 205:24 206:6
211:25 214:21,24
218:4 223:7 242:18,
23 243:2 256:2,5,10
257:5,19 258:2,6,8,
14 259:2,6,7 262:8,
17 263:7,10 264:20
269:25 270:14 290:8
301:9 307:12 310:18
311:3 316:10,19,22
332:18,19 346:2
359:17 371:21 375:2
382:3 383:8 384:7
388:18,21 393:22

**correction** 384:5

**correctly** 138:7
175:20 289:17
305:14 375:18

**cost** 279:17 325:23
379:20

**counsel** 9:2 66:17
73:13,14 74:15,21
140:10 150:2 164:7,
16,20 187:22,23
254:18 322:7,9,12,
19,22 351:18,21

**counsel's** 151:16

**Counselors** 7:4

**couple** 17:5 100:9
314:6 351:12 352:12
384:15 386:6 393:17

**court** 8:13,24 10:10
12:10 209:5 213:23
215:13 226:16 237:2,
24 244:6 245:22
254:16 256:21 268:8,
18 301:20 311:11
313:3 343:3 376:8

**courtroom** 7:18
156:19 157:23

**cover** 105:16 294:12,
24

**cover-to-cover**
208:22

**covered** 67:4 189:7
191:13

**COVID** 207:16,17
219:19 299:6 321:2

323:2,3,5

COVID-19 7:7 8:18

CPA 22:13

crafted 178:6

crash 265:11

craziest 157:5

crazy 264:2

create 257:18

created 199:10

creditworthiness 303:19

Crescent 294:10

CRO 254:13,14 256:25 257:7

cross 305:17,21

crossing 295:24

culmination 145:8 250:4 274:20

cure 345:4

cured 363:14,19

curing 365:16

current 86:13 158:9

curse 394:15

cursed 394:14

**D**

D.C. 162:20 164:6

daily 219:20

Dallas 3:16,24 4:8 8:14 9:20

damages 385:17

Dandeneau 3:12 7:23 9:8 13:10 14:25 16:9 17:7,18 20:4,20 22:14 25:15 31:16, 20,24 33:9 34:20 36:8,12 40:10 41:4, 12,24 42:11 43:17 46:18 47:3,7,12 50:7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15

61:12 62:11 63:13,24 64:19 65:12 66:14,24 67:17 69:5 72:15 73:12,21,24 74:8,12, 17 75:6,10,13 77:9, 14,21 79:4,14,20 80:12 82:5,11,24 83:25 85:15 86:2 91:4,8,22 92:11 94:3 96:11,20 99:17 104:25 107:15 108:5 110:11 111:24 112:20 113:20 114:20 115:5 117:6, 18 119:12 120:16 122:10,16 124:6,23 127:19 132:16 134:8 135:8,18 143:10 144:8 146:20 149:5 150:10,17 151:13 153:18 154:14 155:11,18,20,23 156:10,16 157:2,6, 11,15,24 158:15 159:17 160:3,12,18 163:24 167:5 168:8 177:15,20 178:20 180:3,11 181:5,11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21 196:13, 18 200:20 203:23 205:3,15,25 206:21 208:10 210:24 211:4, 13 212:22 213:11 216:2,9 220:10,15 222:13 225:10,24 228:9 229:24 231:18 234:6 235:23 236:10, 18 239:3,14,22 240:16 242:24 246:19,25 247:14 250:11,22 251:3,12 253:12 254:6 255:12 257:6,20 260:14 263:8 265:4 266:3 269:10 285:23 286:7 295:11 298:6 299:15 302:25 305:10 307:2 312:18 317:23 333:20 336:14 338:5 339:20 341:2 347:21 348:11 349:11,17,18 350:3 352:18 375:22 376:5 379:10 394:10

data 311:24

date 18:13,18,20 21:10 56:18 70:12 84:11 98:18 103:14 104:4 106:4 131:11 133:2,12 136:10 186:15 226:7 235:10, 14 239:17 241:20 262:15 263:20 310:15 314:22 315:6, 7 323:8 326:8 329:18 332:2 356:24 369:13 372:6 386:5

dated 92:2 106:10 132:20 142:18 152:17 200:3 203:2 213:18 216:16 220:14 228:3,23 258:20 262:23

dates 30:17 178:8 321:14 326:7 355:25 357:11

Dave 87:20 172:6 230:19 292:3,4,11

David 124:9 275:23 389:9

Davor 3:20 9:19 178:10 266:15,17 304:8 336:15 387:14, 16

day 106:10,13,16 134:20 187:8 226:4 321:23 329:21,23 332:4,10,11 342:16 343:24 350:12 353:5 395:17

days 71:12 356:9

DDP 349:23,24

de-accelerate 344:24

de-accelerated 345:18

deadlines 86:9 379:2

deal 74:25 219:18 224:14 286:11

deals 373:19

Deb 151:7 349:10,18

Deborah 4:4,18 9:8, 12 10:2,3 349:18

Debra 3:12

Debs 349:20

debt 333:9

debtor 240:8 245:15, 25 255:17 270:14,21 271:2,6 278:16,17 279:6 280:21 310:18 325:13,14 326:14,22 327:15,20 331:3 333:7,15 335:2,8 336:22,25 350:22 364:18 372:20 373:3, 15,16,18,25 374:9, 15,16 376:13 380:9 383:14 388:10,12

debtor's 233:7 239:12,19 240:15

debtors 374:21

debtors' 337:24

debts 302:23

decade 95:19 231:22

decades 95:21

December 59:9,12 105:18 109:14 119:21 202:19 203:8 218:21 219:7 221:15, 21 242:17 258:21 263:14 326:4,11,12, 14 327:4,9 330:15 332:11 334:15 338:15,24 341:9 343:2 346:9,21 359:3 360:17,19 361:6,24 364:4 382:23 388:4 390:6,16,17,24 391:13,23 392:4 393:11

December-ish 390:16

decide 254:25

decided 245:5 318:13 380:22

deciding 56:13,17

decision 121:24 122:2,21,22 245:2,8 340:9 382:20,21

decisionmaking 254:14

declared 182:7,12

deduce 309:23,24 310:6

deemed 53:2 94:19 109:9,10 113:11 131:6 244:16 245:24 246:6,16,24

default 182:7,12 341:6,7,10 345:5 346:9,20 347:6 363:9,14

defaults 365:17

defendant's 214:18

defendants 81:14

defended 11:14

deferral 200:23 201:4,7,21

deferred 203:3 366:23

define 32:9 33:21 101:6

defined 33:13 45:13 51:17 53:13 54:2 99:15 173:2

defining 44:16 69:8 109:21

definition 42:24 43:2 53:16 54:18 69:15 75:20 77:6 100:25 101:9,13 104:6

degree 245:20

degrees 22:7

Deitsch-perez 4:4 5:8,11 9:12,13 10:2 17:8,13 29:20 42:12 46:12 50:5 60:16,24 64:17 65:19 66:10 67:9,24 69:6,10,13 76:15,17,21,24 78:19 79:25 81:16,20,22,24 97:4 107:16 115:6 117:7 119:13 120:17 144:25 146:12 147:4, 11 148:12 149:21 153:19,25 154:7

159:25 160:19 177:6, 17 178:3 180:4,12 191:4,22 194:6,22 195:22 196:4,11 202:24 205:16 206:7 208:11 209:8 212:12, 20 214:9,13,16,22 215:5,11 216:11 220:25 227:21 231:8 232:9 238:10 239:20 242:25 247:15 248:2, 8 249:4,17 251:10 252:6,9,20,25 254:7 255:10,22 256:17 262:18 301:19 324:24 336:15 348:9, 23 349:21,24 352:6, 11,20 353:2,17,23 375:22 376:4,9 377:3 381:13 384:12 386:13 387:10,14 393:17,20

**Delaware** 254:16

**delegating** 254:13

**deliver** 50:14 230:22

**delivered** 178:7 235:20

**delved** 251:19

**demand** 121:11,17, 21 122:4,7,9,15,19, 23 123:23 124:4 134:13 140:17 142:21 182:15 186:18 187:3,17 198:21 199:6,11,19 200:14 202:18,22 205:19 209:25 210:7, 23 212:18 301:17 313:16 314:8 315:2,8 316:6,17,18

**demandable** 316:19

**demands** 122:14 364:13

**department** 146:10 147:3,10

**depend** 356:5

**depended** 356:6,16

**depending** 87:4 164:4 383:15

**depends** 41:20 57:15 279:2

**depo** 260:16

**deposed** 11:9,12

**deposition** 7:11 8:10,16 11:2,15,18 12:7,15,22 16:15,23 33:23 72:21,23 73:10,15,20 74:6 76:8 77:12 81:3 123:17 151:6,9 215:6 227:15 266:21 267:4, 13 365:20 373:2 375:25 376:19 388:23 395:8,9,11

**depositions** 11:19 12:19

**derived** 16:6 17:23

**describe** 56:4 84:3 111:21 326:15 353:7 358:3

**describing** 125:17 126:2

**description** 108:21, 24

**desk** 293:9,10 295:25

**detail** 107:7 120:25 153:8 159:20 222:22 229:14 278:11 300:6 311:18 351:19 369:20

**detailed** 122:20 132:12 179:23 224:9 230:7 260:5 276:18 370:16 389:8

**detailing** 294:14

**details** 77:24 78:7,12 80:8 84:7 104:16 131:25 286:3,22 299:12 300:8 342:12 343:7

**deter** 376:18

**determination** 41:25 42:4 261:18,19

**determine** 53:19 82:19 83:6

**determined** 261:16

274:7 276:7

**detrimental** 275:11

**development** 347:13,18

**deviate** 264:25

**dictate** 90:10

**differ** 263:15

**differentiate** 268:14

**differently** 96:5

**difficult** 145:12 205:19 207:18 222:25

**diligence** 85:5,8,13 169:11

**direct** 133:22 253:6 304:19 322:10

**directed** 57:17

**direction** 237:6 254:25 258:2 393:22

**directive** 383:7

**directly** 15:5 16:7 17:23 19:8 42:7,15 43:14 88:2 177:11 219:2 354:9

**director** 23:6 32:15 39:25

**directors** 15:22 72:7

**disagree** 318:5,16, 21 319:2

**disclosable** 131:7

**disclose** 46:7 47:17 52:11 53:10 88:13 91:12 94:6 99:14,20, 23 103:2 111:21 112:3 113:8 179:12 210:12,15 242:21

**disclosed** 48:7,9 52:19 53:4 93:24 94:18 102:3,7,13,18 103:8,10 113:12 117:13 130:10 133:21 134:3 138:8 190:25 212:4

**disclosure** 100:12 134:12,16 185:15

191:20 211:21,23 262:11

**disclosures** 91:2 94:16

**discovery** 81:4 196:21

**discuss** 99:3 124:2 148:18 201:18,20 322:14 342:7 343:22 345:7

**discussed** 26:18 73:23 74:11 80:14 107:9 114:25 192:12 193:23 227:12 234:4 272:20,23 275:3,4 294:5 300:11,13 371:15 383:22 390:9

**discussing** 117:25 148:22 180:8 191:6 217:18 234:9,15 300:17 319:7 341:6, 8,22 346:4 388:13,15 391:6

**discussion** 164:4,9, 12,17 180:19 191:9 217:21 246:4 249:24 251:20 282:18,21 290:6 319:13 342:15 387:22 388:8 392:11, 21 395:3

**discussions** 58:20 233:6,15 249:11 250:4 251:13,19 253:17,20,25 263:25 264:14 274:5 275:17 280:18 367:19 387:4

**dislocation** 371:16

**displeased** 362:15

**dispute** 61:7,10,13, 16

**disputes** 16:16

**distancing** 7:9

**distinction** 23:25 52:3 164:19

**distinctions** 33:17

**distinctly** 392:4

**District** 8:13

**diversion** 208:16

**divided** 110:14 239:24

**Division** 8:14

**docket** 215:4 255:18

**document** 13:3,6 91:19 92:5 96:3 103:18 104:23 105:5, 10,16 136:11 139:22 140:8,12 141:4,10,16 144:3 147:16 151:22 153:6,15,22,23,24 154:5,11,18,24 155:3 156:24 159:21 197:13,14,16,17,25 198:12,15,17,23 199:3,4,10,14,17,25 200:3,18,22 201:3,6, 15,18 202:4 203:2 209:14,16,22 210:12, 15 211:24 212:4 213:21 214:3,6,12, 15,17,20,24 215:7,13 216:7 226:10,25 227:8,19 228:6 236:16,19 237:18 239:17 244:5 256:5,9 293:21,22 301:16 302:12 303:7 305:12, 21 320:14,16 338:14

**documents** 12:24 13:12,14,16,19 25:5 123:15,17 126:19 140:10 143:24 147:20,25 149:12 153:8 159:15 197:2 227:13 235:19 236:25 266:19 267:3, 7,9,14,18 291:9 294:2,4,6,8,11,14,17 296:21,22 322:11 364:18 377:10

**dollar** 253:21 288:12

**dollars** 253:24 260:19

**Don-** 68:19

**Dondero** 4:2 9:14 15:6 16:8 17:24 19:8, 12,25 20:9,13,18,24 21:4 42:9,17 43:15, 24 44:3,5 50:11,14,

21,25 51:6,12 54:15,
17 55:2,7,11,19 56:2,
16,24 57:20,24 58:9
59:6 60:11,14,20
61:4,5,8,21 62:3,9,20
63:4,7,11 64:4,7,9,
10,13,16,21 65:3,5,9,
10,17,18 66:6,7,8
67:7,23 68:19,25
71:13 75:25 78:16,18
80:15 82:16,21,23
91:3 92:5 94:20 98:8
99:4,6,10,13,20,23
101:17 107:3,13,21
108:3,19 117:25
118:7 123:3 124:2
145:5,7,14 148:9,14
189:9,16 190:10,13,
17,25 191:3,9 193:20
194:19 201:14,21
205:9,14,24 206:6,
11,15,24 208:5,8
225:7,14,21 232:18
233:9,24 234:11,16,
22 235:5,7,9,22
236:9 239:2,5 241:8
242:8 243:8 262:6
263:6 271:25 273:2,5
275:25 280:19
282:16,22,25 283:14
284:4,18 285:3 287:5
288:24 289:4 290:6
300:11,24 301:16
303:16 317:5 318:3,
9,11,16 319:4,8,20
320:3 335:17,23
336:6 341:7,9 342:15
343:15,22 344:2,12,
22 350:6,11 362:10
363:6,19 365:3
366:2,20 368:11,22
381:9,10 382:12,18,
22 383:8 384:6,10
386:7,17,20 387:23
388:9,14 389:2,21
390:4,25 392:4 394:6

**Dondero's** 57:13
62:4,10 63:23 144:23
206:15 217:11
350:15

**doubtful** 244:9,17
245:25 246:7,17,23,
24 247:12,25 249:2
250:10,14 251:8,22
253:10 254:3 255:8,

15

**draft** 145:25 146:4
147:10,20 149:17
176:4 182:24 213:17
290:7,12,16 291:4,9
294:17 305:11,14
319:14

**drafted** 145:23
146:10 147:2,25
290:24 305:13
319:18

**drafting** 115:20
116:5 146:7 213:12,
13

**drafts** 230:22 322:3,8

**dramatically** 264:17

**Draper** 4:12 9:17

**driver's** 21:25

**dropped** 294:8,11,14
295:4

**DSI** 72:3 166:12
237:9,12 245:9,21
247:4 249:10 250:8
251:7 252:10 253:10
254:5,11,16,19,22
255:8,14,25 257:15,
18 259:12 309:21
312:7,11,21,23 313:5
348:3

**DSI's** 256:6

**Dubel** 233:21

**due** 7:7 8:18 50:3
55:17 56:18 58:2
59:15 63:10 106:21,
25 108:14 109:7,18
110:6 111:2,5,9,12,
23 112:18,24 113:19
114:19 115:3 119:3,
10,22 120:20 121:4
161:9 162:6 163:22
165:11 167:11 168:5
171:12 174:15
175:12 176:9 190:6
194:4 203:19 204:12,
16 205:2,13 208:8
211:12 212:10,11
220:23 223:6 234:23
240:10 259:19
260:11 262:7 266:24
271:21 274:14 275:7

335:12 337:3,25
338:24 347:8 355:25
356:22,24 357:11
359:2 360:16,17
361:24 364:3 377:12,
23 379:8 381:23
382:10 383:19
390:10 391:24

**Dugaboy** 4:10 9:18
42:23 43:6 65:11
100:18

**duly** 10:12

**dump** 267:3

**Dustin** 183:2,23
184:7

**Dustin's** 183:10

**duties** 25:17,19,22,
25 28:10 30:25 31:4
38:20 219:20 292:4

— — —

**E**

**e.g** 171:13

**earlier** 84:5 86:18
93:12 100:3,5 119:3
130:9 131:18 134:11
136:2 148:21 155:5
162:14 179:7,16
183:12 195:24
206:18 211:15
217:14 218:8 222:19
243:10 259:10
261:21 263:21
269:24 282:24 283:6
289:4,15,20 290:12
302:11 309:11,20
312:20 316:10,13
318:8 325:12 334:6,
14,20 337:18 351:2
357:8 362:25 368:24
370:8,18 371:15
378:5,20 379:4
380:12

**earliest** 314:8 316:6

**early** 19:5 173:17
231:22 254:20 323:6
340:21 341:5 344:17
365:20 388:4 390:17

**earth** 251:23

**easier** 305:5 373:13

**East** 8:23

**easy** 265:15

**educate** 204:9

**educated** 120:10

**education** 21:23
22:7

**effect** 282:16 294:25
344:23 345:4,17
346:11 351:13 363:8

**effective** 152:18,24

**effectively** 329:25

**effectuate** 57:8,12
63:22 360:15 382:9

**effort** 83:5 376:12,17

**efforts** 188:16

**eight-figure** 389:18

**elaborate** 26:12
281:4

**electronic** 299:2
320:15

**electronically**
298:21 299:23
320:14,17,23

**element** 365:23

**Ellington** 14:20,22

**email** 5:21 6:11 68:6
70:3 170:23 171:3,22
172:3 174:5 182:20
183:3,22 185:25
187:20 194:10
198:18 206:9,23
207:2,4,5,25 290:19,
25 291:4 292:16
293:14,22 294:2
307:23 313:11
316:22 320:24 321:3
329:6 330:7,13
331:11 332:3 341:17
342:3,7,13,23 350:14
387:11 392:22

**emails** 6:7,8,9
227:13 236:13
299:25 300:7,9
328:15 379:12

**Emanuel** 4:19 10:4

**employed** 14:2,6
23:3 27:15 30:7
32:10 34:7 89:21
240:25 322:9 330:14

**employee** 24:4
28:20,22 51:22 52:6,
17 70:24 71:7 72:12
115:22 172:17
184:21 325:19
388:12,16

**employees** 15:15,
19,23 39:12,19 40:6,
8,12 51:24 52:14,25
57:8,17 86:13 93:22
167:2 237:12 327:15
331:2 333:7,16
334:25 335:8 337:24
346:25 350:22 354:6
369:12 381:22 382:2,
5,8

**employment** 71:19
165:2,3 166:4 167:3
285:25

**enabled** 360:22

**encompass** 379:13

**encourage** 13:18
17:12

**end** 46:19,20 86:17
103:12,13 104:5
109:20 110:10 131:4
145:13 148:13 187:8
203:7 214:12 220:19,
22 221:6 222:12
223:4,14,17 224:13
242:23 262:15 265:3
293:3 326:11 329:18
348:16 352:7 367:23
379:16 380:9 381:23
382:10 383:20

**ending** 93:14 105:18
135:21 218:21 219:7,
16 221:15,21 242:17
258:21

**ends** 395:7,8

**enforced** 231:12

**English** 284:11

**ensure** 98:4 330:19
331:3 333:16 346:12

348:4

ensuring 327:20

enter 122:21

entered 67:7 68:25
104:14,19 122:6
124:5

entire 19:7 192:13
253:19 264:4

entirety 130:12,15

entities 16:7 17:23
43:13 44:3 54:21,25
55:4 101:8,15 189:8
278:2 289:19 330:13
361:13 394:4

entities' 265:12

entitled 41:8 82:7
110:25 157:16

entity 15:5 22:20,25
27:18 31:11,23 32:3,
6,11 42:14 109:24
137:13 272:3 289:23
302:22 307:8

entries 240:19

entry 131:10 308:3,
14 311:9 332:23

environment 90:3,5,
9,14,20 113:6
137:18,20

environments
207:21

equal 49:11 50:23
262:7

equaled 263:7

equals 119:6,9

equity 273:18 281:25
282:3

erroneously 197:22

error 125:6,9 131:17,
24 132:3 145:8 165:9
213:12,14 214:5
273:11,14 275:14
276:8,25 277:5
278:5,15 280:12,22
283:3 289:6 318:15
385:9,14,19,23

errors 163:21 167:14
373:10

Esq 3:6,7,12,13,20,
21 4:4,5,11,18

established 94:2
285:14,20 300:25
301:7 310:16

estate 31:12,17
235:11,15

estimate 20:12 372:4
389:3

et al 5:15

evaluate 170:12,14

evaluated 244:10

evening 353:3

event 131:2 134:22
138:9 143:9

events 103:13
125:16,25 130:4,10,
21 133:8 138:5
242:22 262:14 263:4
370:24 371:7,9,13

exact 15:24 17:25
18:13,18,19,22 20:5
30:17 131:20 156:21
274:13 277:17
278:10

EXAMINATION 5:6,
7,8,9,10,11 10:14
266:13 352:25 377:5
387:19 393:19

examined 298:19

exceed 121:12 190:2
195:19 196:3

exceeded 93:25
194:2 196:9,17
204:19 211:3 301:9
303:9 307:9

Excel 368:19

exceptions 231:2

excerpts 238:16

excess 94:6 121:12
389:13,14

exchange 45:15
212:17 281:17,23

exchanged 45:21

exchanges 281:17

excuse 14:25 35:23
201:2 249:18 280:9
323:13 395:8

execute 48:14,22

executed 49:21
142:10 161:12 221:6
274:2 293:14 303:7

executing 317:16

execution 181:9
300:14

executive 35:10,11,
16 36:20,24 37:5,18
38:3,4,9,14,16,21
39:3 78:10 366:24
367:18 386:10

executives 369:3

exhibit 5:15,16,18,
20,21,22,23,25 6:2,4,
7,8,9,10,11,12,13
13:13 91:20,21
104:23,24 135:8,14,
15 140:12,13 142:15,
16 151:20,21 170:18,
19 197:3,9,15 198:2
214:7 215:22,23,25
216:3,4,5,7,8,12
218:13,16,17 226:23,
24 236:16,23 237:19
258:18 297:23 302:7,
8 303:14 305:5 306:7
307:18,21 309:2,6
313:9 317:12 328:10,
12,13 338:13,21
341:13,14

exhibits 267:10,11
268:9

exist 15:12 16:17
114:22

existence 67:15
69:18 80:16 81:6
99:14,20,24 102:3

exists 278:13

expanding 354:25

expect 247:19
293:19 333:15

exchanged 45:21

exchanges 281:17

excuse 14:25 35:23
201:2 249:18 280:9
323:13 395:8

expectation 231:5

expected 200:17,21
293:21

expects 203:18
212:9

experience 101:14
111:16 116:14
169:10 256:25 257:8
259:13 315:5 337:22

experienced 47:13

expert 43:5 143:19
153:7 183:9 257:14

explain 356:18

explained 364:17

explaining 163:15

explanation 308:20
311:8

expressly 390:4,25
391:12 392:5

extended 301:17
308:21 314:22

extension 307:8

extent 45:17 55:21
66:15 107:5 126:4
208:6 244:15 296:6
322:6

extra 219:23

F

face 50:23 120:11
144:16 244:3

face-to-face 293:8
294:5

facilitated 321:10

fact 62:7 192:20
236:21 264:24
266:25 275:7 298:4
301:15 313:19
334:22 338:23
341:10 343:19
363:12 394:5,7,17

facts 111:22 240:6
261:25 265:8 375:17

factual 164:9

fail 12:3 348:5

failed 338:23 340:2

fair 11:23 19:24 44:14
49:7 52:4 93:17
99:13 110:21 118:11,
21,24 119:6,8,9
120:3,15 121:5
126:8,21 141:18
143:23 149:20 224:6
239:16 240:18,21
241:17 242:6 243:5
244:13,20 245:19
260:10 261:15 262:7
263:5,15 264:25
287:21 370:21
371:18 372:5 374:10
390:2

faith 189:8,15 190:9,
12,19 191:3 193:19
194:20 205:8,14,23
206:14,23 208:5

familiar 22:20 31:22
32:3 54:6,9 226:13
227:8,18 274:6

fashion 86:11 276:16
357:14

fault 229:17 276:24
277:19

favor 60:6 62:19
139:17 161:24 261:9

feature 301:17 315:8

February 70:21
226:3,4 228:3,23
323:9

Federal 7:19

feel 81:8,18 176:25
273:13 287:16
371:21 376:11,16

fees 332:12 356:21,
23

fide 369:25

figure 343:10 366:12
367:5

file 167:8,13 297:2,10
337:8

filed 21:6 197:17
208:18 213:23
215:13 219:23

226:16 237:2,24 238:4 244:5 255:17 263:17,19 311:10 322:2,4,16,21 375:20

**files** 312:23 372:21

**filing** 45:25 240:4,17 246:3 249:9 256:20 264:15

**filings** 237:14

**filled** 257:13

**finalized** 88:7 89:12 230:23

**finance** 25:21 26:2,4, 8,17 28:15 38:23 127:25 128:16 129:6 280:7 290:14 351:3

**financial** 5:18 6:2 14:12 26:24 27:5 41:7 48:2 84:17,23 85:3,13,19 88:11 90:2,7 93:24 95:14 96:7 100:12 102:7, 10,12 104:21 105:17 107:22 112:2 113:7, 14 114:18 120:8,18 122:11 130:23 133:22,25 135:20 138:3,4,9 143:8 176:21,24 179:16,23 180:15 196:22 201:8 211:7,21 217:24 218:3,19,24 219:6 221:14 222:24 224:10 235:17 241:24 242:3,15,16 254:9 258:25 260:3 261:20 262:5 264:11, 13 270:10,14 271:2 286:18 301:11 302:19 306:4 311:25 312:5,6 370:9,12,17 378:24

**financials** 6:5 137:16 168:19 176:8, 16 179:8 186:15,16 187:2 189:23,25 200:10,12 218:12 241:13,15,21 242:2 246:9 247:5

**find** 53:23 268:10 283:17 315:4

**fine** 36:8,9 45:10 84:8 154:12 269:16 287:2 353:24

**finish** 11:21 12:2 76:18,24 249:19 295:11

**fired** 388:9

**firm** 10:21

**fiscal** 103:14 104:6 131:4

**fit** 42:24

**flip** 331:8 332:20

**fluctuate** 93:10

**fluctuates** 94:10

**focus** 242:14 313:3

**folks** 46:15,24 87:25 152:10 197:23 293:5 321:15

**follow** 61:17 151:15 391:18

**follow-up** 171:7

**footnote** 244:8 260:20,23 261:15,17 371:22

**footnotes** 261:17 263:11

**forbearance** 134:5, 16

**forgave** 49:23 51:23 52:12 93:20

**forgivable** 369:2

**forgive** 51:10,15,20 52:5 284:9

**forgiven** 52:18 53:11 94:11 366:23 367:23 369:13

**forgiveness** 52:22 93:23 94:8 365:23 369:16,20,24

**forgot** 282:8

**form** 20:4,20 22:14 25:15 29:21 31:16 33:9 34:20 40:10 41:4,12,24 42:11,12

43:17 50:6,7 52:8 53:18 54:8 55:10 56:11,25 58:25 59:19,25 60:7,15,17, 25 61:12 62:11 63:13,24 64:18,19 65:12,20 66:11,24 67:10,17,25 69:7 75:6,10 78:20 79:4, 14,20 80:2,12 82:24 83:25 85:15 86:2 91:4 94:3 96:11,20 97:5 99:17 107:15,16 108:5 110:11 111:24 112:20 113:20 114:20 115:5,7 117:6,18 119:12,13 120:16,17 122:10,16 124:6,23 127:19 132:16 133:23 134:8 142:5,7 143:10 144:8 145:2 146:13 147:5, 12 149:5,22 150:10, 17 153:18,19 154:2,4 155:11 156:17 158:15 159:17 160:2, 3,12,18,20 167:5 168:8 178:21 180:3, 5,11,13 181:5,11 183:15 184:6,20 185:2,18,24 191:5,23 193:21 194:5,6,23 195:21,22 196:5,12, 13,18 200:20 201:25 202:25 203:23 204:14,23 205:3,9, 11,15,16,25 206:8,21 208:10,12 209:9 210:24 211:4,13 212:13,21,22 213:11, 25 220:10,15 221:2 222:13 225:10,24 227:22 228:9 229:24 231:9,18 232:10 234:6 235:23 236:10 238:11 239:3,14,21, 22 240:16,23 242:24, 25 246:19,25 247:14, 15,16 248:4 249:5 250:11,22 251:11 253:12 254:6,7 255:11,23 256:18 257:6,11,15,20 260:14 262:19 263:9 265:4 269:7 270:15, 22 271:8,18 272:9,17

273:7 277:22 278:19 279:8 280:15,23 283:19 284:7,14 285:7,23 286:8,9 287:9,18,24 288:8,25 289:12 290:9,21 291:23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2,25 303:2,10,20 305:10 306:15,24 307:3,13 310:2,11,19,24 311:12 312:16,19 314:14 315:9,23 316:23 317:17,24 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:3 342:21 345:12,19 346:22 347:14,19,21 348:10,11,12 351:15 353:11,15 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 365:6 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 381:14 384:13 386:14 388:19 389:5,15 391:4 393:24 394:10, 11,19

**formal** 231:20

**format** 293:14

**forms** 257:13

**formulating** 184:3

**formulation** 386:24

**forthcoming** 335:18

**forward** 79:17 376:25

**found** 53:17 66:12 125:6 140:15 394:8

**Frank** 5:5 8:10 9:11 10:11,18 271:4 305:8 395:14

**frankly** 232:2

**Fred** 249:21

**Friday** 208:18 329:18,25

**front** 110:12 122:12 140:16 279:21 281:7 294:9 301:11 302:9 305:4 309:7 343:6

**frozen** 144:9

**frustration** 364:17

**full** 189:8,15 190:9, 12,19 191:2 193:19 194:19 205:8,14,23 206:14,23 208:5 241:15 372:20

**fully** 13:4,7 17:4 364:19

**fulsome** 265:8

**function** 26:8,20 28:16 87:3 89:4 351:3

**fund** 3:18 9:22 22:21 33:23 35:2,6,18,19, 21 39:7 42:22 44:7 58:15 125:2,3,6,7,10, 11 127:10,13 145:16 152:14 176:18 202:14 203:14 215:14 273:17,23 274:16 275:2,4,6,8, 10,13 276:7,9,10 277:5,9,21 279:19 280:2 281:2,9,10,11, 12,13,15,20,23,25 282:7 283:23 308:4 325:22

**fund's** 274:23

**funding** 202:8

**funds** 32:22,25 33:2, 4,8,12,15,16,18,22 34:5,8,13,18,23 35:12,15,17,18 36:21,25 37:4,9,17 38:2,5,10,17,22 39:4 145:15 160:8 168:10 171:15 173:2,6,10,

13,16,20,23 184:11
192:16,24 193:4,6,
11,16 253:19 277:4,8
281:15 284:5 285:3
286:17 287:5 328:5
332:7,12 360:9
361:6,11,13

**future** 171:12 174:16
175:13 185:17 337:4
369:13 371:7,9,13,20
381:17 388:23

**G**

**GAAP** 94:15 101:5,
16 109:10 130:21
131:23 241:13,15,20,
25 242:4,11 246:9
254:10 256:23
264:10 372:7

**gaming** 239:9

**garbling** 46:14

**gave** 45:14 57:11
149:2 197:23 205:6
215:10 312:21 343:9,
17

**gears** 321:25 324:20

**gen** 85:16

**general** 11:17 32:20
57:5 84:25 88:18
97:15,17 128:9,25
152:4,6,7,8 170:7
180:7 195:15 251:13
258:10 292:10 297:4
378:10 392:11

**generally** 54:9 61:2
62:14 64:2 80:23
84:24 87:6 89:7 95:8,
10,25 97:7 128:7,8,
19,24 129:8,13
162:2,3,8 170:6
180:14 187:19
189:20 192:11 194:8,
9,14 195:4 226:13
234:14 241:13
253:14,16,23 278:22,
24 279:3 290:2
297:16 311:3 333:25
334:2 337:4 356:12
357:13,18 358:20
366:7 372:18,24

379:11,12 387:2
389:10

**give** 12:25 20:11
35:5,9 38:15 45:4
49:6 51:7 86:15
96:15 97:17 116:14
117:4 123:12,13
150:8 159:22 163:17
193:25 235:25 236:6
267:8 300:8 348:21
356:9 357:9 372:9

**giving** 16:19 26:14
51:3 150:11 194:20
312:22 369:2

**Global** 35:18,20
124:25 273:17 281:8,
22

**go-ahead** 293:2

**goal** 295:19

**God** 156:19

**good** 7:3 10:19 72:16
118:5 156:19 248:11
251:3 324:22 353:3
385:5

**governed** 33:4

**great** 32:8 105:3
183:5 300:6 325:5

**ground** 11:17

**group** 14:5,7,24
15:4,14 16:14 29:23
146:5 148:24 149:2
150:15 154:19
172:13 258:13
290:16 291:9 292:2
294:18 295:9,13,22
378:16

**groups** 295:21

**grow** 88:23 89:4,9

**guess** 73:3 169:22
170:20 204:17
225:25 263:22
315:25 361:9

**guidance** 94:12,17
257:7,9,14

**guy** 25:21 81:19
88:25

**guys** 77:3 157:3

268:12

**H**

**half** 72:16 145:10
280:20 324:23
377:21

**halfway** 48:18

**hand** 361:6

**handle** 291:14

**handled** 147:18

**happen** 141:14
156:15 165:2,15,18,
22 168:25 248:21
265:14 284:13

**happened** 87:23
156:22 165:17
174:19 247:3,5
273:15 286:4 294:3
320:10

**happening** 165:21
231:6 242:10 382:25

**happy** 117:4 188:19
200:10 215:7 389:25

**hard** 13:11,16 104:11
123:16 197:23
286:19

**HARDD** 3:22

**Hardt** 3:22 9:20

**harmed** 276:16
278:5

**Harr** 9:20

**Hartmann** 3:13 9:10

**hat** 336:4

**Hatch** 7:4 8:21

**Hayley** 3:7

**HCFD** 332:6

**HCM** 42:22 45:5
156:12 354:13 355:7
360:23 362:7,20

**HCMA** 186:18

**HCMF** 30:10 43:12
180:22 303:18

**HCMF's** 303:18

**HCMFA** 5:20 6:2
22:25 23:3,6,11,16,
22,24 24:6,9,11,13,
15,21 25:2,8,14,18,
24 26:3,5,8,22,24
27:4,5 29:3,6 31:5
32:18 43:12 54:14
100:23 122:2,7,13
124:14,21 131:11
132:6 133:12,21
134:11,14 135:6,21,
23 137:22 138:8,14
139:18 140:4,21
141:9,16 142:2,24
143:18 144:22
152:24 153:17 155:7,
10 156:4,13 158:4,12
161:7,17 171:13
172:20 176:14
178:12 179:13
180:22,23 181:2,8,
14,15 182:8,17
184:25 186:9,18
187:3,17 189:14,24
195:19 198:21 199:6,
12,14,19 201:15
202:7,12,14 203:14,
18 204:2,11,24
205:7,19 210:2,7
211:10 212:9,18
213:8 218:8 221:20
241:23 242:6 267:24
268:21 269:2,5,25
272:5,6,15,24 273:5
275:16 276:23 277:3,
18 278:16,18 279:7
280:11,21 284:5
301:9 303:6 305:25
308:14,20 310:10,16
313:15 314:7 316:6
318:14 322:3 325:12,
18 331:13 332:5,17
370:20 384:18 385:7,
12,16 386:4

**HCMFA's** 26:10
121:12,21 122:11
124:3 137:3,10
138:3,19 143:8
196:16 202:14
204:15,19 211:2
303:8 384:21 386:2

**HCMLP** 5:18,22 6:12,
13 171:13 176:9

185:16 314:7 316:5
317:6 341:19 355:12,
18,20 356:2 357:3,
13,19 358:4,13,20,
21,25 359:2,8,24
360:17 384:19

**HCMLP's** 228:22
356:12

**HCMS** 4:3 9:15 30:4,
6,7,10,13,16,20,22,
24 31:3 43:12 44:8,9
54:14 65:6 100:24
128:23 129:2,4
353:9,14 354:6,20,21
355:8,13,19 356:2
357:21 358:15 359:2,
8 361:5,15,20,25
362:4 364:3,25
383:19,25 385:7
393:21 394:7

**HCMS'** 356:13
357:13

**HCMS's** 359:13,19

**HCRA** 4:2 9:15

**HCRE** 31:8,14,15
32:4,7,10,12,15
43:18 44:7 54:14
65:6 100:24 128:4,5,
11,14 353:9,14 354:3
357:20 358:4,14,21
359:23,24 360:17
361:5,15,19,25
362:2,5,9,22,25
363:4,20 384:3
393:21 394:7

**HCRE's** 360:5,9,14,
21

**head** 87:13,16 278:3
364:15

**headquartered** 8:22

**hear** 46:13,20 148:12
304:3 364:16

**heard** 27:9 29:25
31:7 74:22 77:25
78:21,23 79:6,7 80:4,
5,7,22 100:6 268:5
285:3 324:15 386:16,
19,22

**held** 8:16 27:20 30:9,
12 37:8 107:12

172:25 173:5 174:3
183:6 244:4

**Heller** 4:12 9:16

**Hendrix** 172:7
186:21 230:20 292:3
328:17,20 329:13
330:14 332:15
341:18,24 350:18
362:24 365:13
377:11,22

**hey** 45:3 188:6
266:17 312:24
351:14 365:4 391:23

**high** 126:25 238:2
279:11

**higher** 110:19

**Highland** 3:4,18 8:11
9:6,22 10:22 11:6
15:16,23 18:6,7,12,
25 20:3 21:6 22:21
30:2 35:17,18 39:10,
15,19,23,24,25 40:3,
4,7,25 41:18 42:6,10,
18,21 43:11,16,23
44:6 45:2,14,25 46:7
47:16 48:6,14,24
49:5,10,17,23 50:4,
10,14,16,21 51:6,10,
15,20,23 52:5,11,18
53:9,10,24 54:11
55:23 58:15,16,20
60:6 61:20 62:8,19
63:8,20 64:7 70:20,
24 71:7,10,18 72:13
78:18 84:22 85:2
86:13,22 87:8,18
93:20 94:5 95:13
96:7 103:2 105:17
107:12 109:22,23
110:8 112:8 115:21
116:4 118:23 120:8
121:16,20 122:23
123:21 124:13,20,25
125:3 126:11,23
127:2,16,25 128:5,
10,15,20,23 129:2,6
132:5 133:10,16,20
134:13 136:2 137:7,
11,21 138:8,11
140:21 141:9,18,23
142:25 143:7 144:23
145:17,19 146:5
149:19 152:13

160:10 161:8,24
165:7 167:3,9,14,15
172:14,17 175:13
176:15 178:19,23
179:13,22 180:2,9
181:21 182:2,6,11,15
186:9,11 198:20
199:5,11,18 200:13
201:15 202:7,12,13
203:13 204:12,16,25
205:13 209:25 210:6
211:9,11 212:8,11,16
215:14,17 216:22
218:8 219:21 220:19
222:2,17 223:5,24
225:9,21 226:2,3,9
227:5,20 228:8
229:2,6,9,21 230:3,
10 232:22 233:24
234:17 237:12,16
240:7 241:2,7 242:6,
9 243:4 244:4,22,25
245:5 247:7 248:23
253:18 258:10 259:2
260:4 261:9 263:17
264:18 267:7 271:2,
15,23 272:20 273:4,
16 275:16,21 279:18,
19,25 280:2,12,14,20
281:8,22 282:17,23
283:5,17 284:5
285:18 286:21 287:6,
15 288:7 289:7,8
290:16 297:3,16
299:24 302:20,24
303:6,17 307:7 308:4
313:6 318:10,13
319:11 320:4 322:10
323:8 325:22,24
329:3 330:16,19
333:22 338:17 339:3,
11,13,25 346:11,19,
24 347:12,17 348:2,4
350:14,20 353:7,8,13
354:2,6,19 359:16,
17,18,21,25 360:7,8,
13 361:19,20 362:4
363:4 366:4,14
367:10 368:4,6,25
369:11 370:13,19
374:9 377:13,23
379:19 380:3,24
381:12 384:21,22,23
385:8,13 390:11

**Highland's** 18:10,17
19:3 39:10,15 40:25

41:7 44:24 46:6
47:16,24,25 50:19
51:10,15,20 52:19
55:16 57:8,17 72:6
84:10,17 86:23 89:22
94:22 95:6 102:7,10
107:14,22,25 109:20
113:9 115:23 116:2,3
137:15 138:3 139:17
146:10 165:2,3 166:4
167:3 187:2 210:22
222:24 225:8,15,23
230:5 241:24 242:15
243:4 247:22 255:7
258:5 260:12 262:5
266:19 370:21 379:8
381:22,25 382:5,8

**hindsight** 265:6,11,
15

**hint** 346:15

**hit** 86:9

**hold** 21:12,16 23:5,8
25:13 27:17 34:15
37:3,15,16,21 39:6
163:12,25 167:12
184:9 192:15 193:9
199:13 212:24 308:5
329:10 387:12

**holding** 37:25

**holds** 184:14,18

**holidays** 329:23

**home** 191:17 207:15,
19 219:19 299:6,9
342:25 343:2 348:16
393:7

**honest** 144:3

**honestly** 78:4
198:22

**hope** 82:2 262:22

**hoping** 300:7

**Horn** 4:11,12 7:22
9:16,17 349:10,13,
22,25 392:15 394:25

**Houlihan** 273:23
274:3,10,25

**hour** 46:24 72:16
324:23 387:9

**hours** 249:24 260:17

**HR** 280:7 355:2
357:25

**Hunter** 244:23 245:2,
6 247:11 260:22

─────

**I**

**idea** 150:2 154:21
156:23 201:24
232:14

**Ideally** 211:17

**identical** 298:11,13
299:20 380:13

**identified** 36:21
37:5,10 38:6,11,18
45:2 47:19 81:14
229:2,7 259:5,23

**identify** 35:14 42:14
52:17 57:23 58:6
60:10 61:3 62:25
188:24 191:18,25
264:24

**identity** 102:19 103:3

**imagine** 136:3

**immaterial** 53:3
94:19

**immediately** 347:8

**impact** 275:9,11,12

**impacted** 229:8
230:4

**impacting** 228:21
229:3

**impairment** 240:21,
24 241:3,5,11

**important** 11:21,25
12:25

**impossible** 299:7

**impression** 363:12,
18,24

**in-** 294:9

**in-house** 164:7

**in-person** 12:22
191:15 283:9,12
290:20 292:16 323:4,

12,18 342:23 392:21

**inability** 299:12

**inaccurate** 112:25
116:21 117:2,17
136:18 138:20,24
256:16

**inaudible** 48:14
148:10

**include** 26:9 106:25
189:7 230:3 259:24
263:3 305:7 351:18
355:3,8,13 368:17

**included** 54:17 81:4
108:4,7,19 175:13
176:23 183:21
194:18 200:12
213:22 217:23 222:2
232:14 239:11
243:12 251:15
252:12 312:12 315:8,
21 326:18 336:22

**includes** 172:3

**including** 132:11
178:15 253:24
335:21 366:21 368:6

**income** 35:18 179:17

**incomplete** 112:25
116:22 117:2

**incorporated** 153:9

**incumbency** 5:20
151:25 152:5,9,13
154:20 159:19
183:11 270:3

**incurred** 336:12
385:18

**independent** 72:7
166:22 233:7,12,15
348:3

**indirectly** 15:6 16:7
17:24 42:8,16 43:14
88:3

**individual** 11:3
271:24 272:25
300:10,12

**individually** 9:11
16:10

**individuals** 15:15

276:21 285:18

**indulging** 353:5

**inform** 190:18
210:19 211:2 335:16
336:6 337:24

**information** 16:14
80:19 86:10 88:13
91:12 112:5,17
117:14,15 169:11,13
171:20 176:8,15,22
179:16,17,18 188:8
206:3,5 218:20 230:3
236:7 237:13 257:18
274:4 312:10,24
344:19 368:11

**informed** 69:18
178:17 190:24 210:5
211:9 212:8 288:15
335:16,23 378:7

**informing** 64:13
181:25 182:11 330:5

**initially** 132:17 185:5
247:3

**initiated** 58:10

**initiating** 58:12

**initiative** 290:5

**ink** 296:22,25 298:4

**ink-signed** 297:3,10

**inquiries** 160:9

**inquiry** 210:12
274:16,17 376:6

**inside** 187:22

**insolvent** 302:22

**installment** 217:2

**instance** 52:12 57:16
60:10 377:16

**instances** 335:25

**instruct** 133:6 164:3
210:10,13,19 381:25

**instructed** 77:15
147:8,9,23 241:19
291:7,8 315:7 362:8
381:22

**instruction** 8:6
57:11 74:14,23

**instructions** 256:7
347:25

**insufficient** 122:8

**insurance** 385:17,22
386:2

**insured's** 385:25

**intend** 208:6

**intended** 111:21
214:19 288:23 315:5,
19

**intending** 16:25
146:16

**intent** 306:14 318:20,
25 380:10

**intention** 81:11
307:11

**interest** 50:3 55:25
56:22 57:18 58:2
59:14,17 60:13 62:18
63:2,10 64:5,15,22
119:10,16,21 120:22
162:6 163:22 164:25
165:11 167:11 168:5
217:17 223:18
273:18 334:9

**interests** 55:17

**internal** 271:17

**internally** 275:16
329:2

**interpret** 119:8

**interpreted** 74:20

**interrupt** 375:23

**interrupted** 76:25

**interrupting** 77:16,
18

**interviewed** 322:18,
22

**intimately** 292:6,13

**intimidate** 376:13,17

**introduce** 9:2

**invalid** 136:24 235:5

**investigations**
275:17

**investment** 4:10
9:18 32:21 65:11
127:17,24,25 128:12,
14,16 129:3 244:23
245:3,6 247:11
273:24 274:15
279:21

**investments** 128:17
129:5,6 249:23

**investors** 275:10
276:12 277:4,8,21
281:18

**invoices** 185:10

**involve** 366:13

**involved** 237:10
245:2 264:17 274:14
275:15,21 276:21
288:4 292:6,13 293:6
354:10

**issuance** 131:5
138:10,18 371:14

**issue** 54:7 178:14
191:13 201:25
204:10 208:24

**issued** 56:16 60:5
62:19 65:8,18 66:8
81:13 82:15,20 93:13
107:13,20 108:2
131:11 132:6 133:12
161:23 162:5 180:10
218:25 223:7,17
233:8 234:10,15
235:4,9,21 236:8
242:8 243:7 261:9
262:6 263:6

**issues** 113:5 248:14
306:19

**item** 108:19 111:11,
18 112:4 119:2,16
123:6 185:21 220:5
238:20 259:18,24

**items** 53:3 97:21
100:9 112:3 131:21
149:8 228:21 229:3,7
230:4,7 249:22 260:6

---

**J**

**James** 234:11
271:25 273:2

**investment**

**January** 70:16
163:7,8 219:11,13,17
258:20 326:8 341:6,
18 344:2 350:5,9,13,
24 351:20 361:25
362:3,7 364:8 365:2,
15 383:23

**Jason** 185:3 275:24

**Jim** 4:2 9:14 15:6
16:8 19:8 43:15,24
44:5 50:11,25 65:16
67:6,22 68:18 71:23
72:7 75:24 78:9,16
82:22 123:3,20
189:9,16 190:10,13,
15 205:9 206:23
232:18 273:2 280:19
342:5,7 351:5,10,14
362:8,10 363:8,18
365:3 367:8 368:22
379:25 381:9

**Jim's** 367:22

**job** 25:19,25 42:3
219:20 313:2

**John** 3:6 7:24 9:4
10:20 45:3 46:13,18
69:13 74:8 76:15,17
77:10 95:17 105:23
129:18 146:13 154:7
155:18 157:6 177:6
192:18 208:13 216:2
222:14 236:18
267:18 304:6 308:7
353:18 385:3 387:10,
16

**join** 18:12 317:25

**Jones** 3:8 9:5 10:21
72:10

**July** 307:24 317:9

**jumping** 234:18

**June** 92:2 98:17
99:25 103:2 132:25
135:2 137:6 176:10,
24 186:16 200:7
242:23 262:16,24
263:13 265:3

---

**K**

**Karesa** 249:21

**key** 275:20

**kidding** 330:23

**kind** 168:2 188:12
221:12 222:23
245:22 250:5 274:16
276:4 323:6 329:22,
23 337:8 353:13
356:10 358:13,14
380:23

**kinds** 353:6 354:2
357:2

**Kirschner** 4:16 10:5

**Klinger** 7:12 8:24

**Klos** 87:20 124:9
172:6 230:19 275:23
292:3,18 389:9

**knew** 68:18 103:9,10
369:2

**knock** 364:19,20

**knowable** 371:14

**knowledge** 43:10
46:5 47:23 48:12,21
49:9 50:13 52:5,10
53:10 62:5 63:12,16,
21,23 79:23 80:10
81:5 82:7,8 89:23
93:23 95:3 98:17
101:13,19 102:2,25
106:25 111:16 112:6
138:16 144:24 147:8
153:13 167:8,22
184:10 188:15 189:9
194:13 206:5 207:8
208:2 225:5,12
226:21 232:21,23,24
237:11 243:4 259:22
322:19 324:17
384:18

**Kopf** 3:22 9:20

**Kristin** 172:7 186:21
230:20 292:3,12
328:17 342:11 343:8
350:17,18 362:23
365:13

---

**L**

**L.P.** 3:19 8:12 9:6,23
10:22 11:7 15:16,23

18:7 41:19 42:10,18
43:16 58:17,21
109:23 110:9 152:14
172:15 271:3 279:20
325:25 329:3

**La** 4:24 104:25 118:3
129:16 135:10
177:14 218:14

**labeled** 8:9

**laborious** 145:12

**laid** 56:6

**landline** 393:7

**language** 101:4
315:21 316:2,3

**large** 287:22 379:22

**largely** 11:18

**larger** 356:8 357:10

**late** 323:6 379:21
387:9 388:3 390:17

**launching** 127:10

**Lauren** 171:4 183:24
192:5,12 275:24

**Lauren's** 185:9

**law** 12:11 306:9,11,
20

**Lawn** 4:7

**lawsuit** 55:8 164:13
181:22 375:19 376:6,
23

**lawsuits** 53:25 54:7,
10,12 322:15

**lawyer** 73:19 154:15
157:7 164:5 266:16
373:24 375:16

**lawyers** 147:20
374:3

**lead** 269:15

**leading** 269:8

**learn** 65:15 67:15
89:4,9 104:13

**learned** 66:16 68:3,8,
11 69:25 70:6,10,15,
19,23 71:17 76:2
80:19 90:19 340:17

**learning** 75:3 83:23

**leave** 157:23 321:13,
15,20

**led** 342:7 348:4

**ledger** 258:10

**leeway** 16:13 208:14

**left** 20:2 70:20 71:10,
18 87:8,18 164:25
165:3 166:4 167:3
226:2,3 232:22
296:17

**legal** 7:5 8:21 25:5
29:23 42:19 43:5,7,8
44:17,21 45:4,9,17
46:11 47:20 48:3,16,
25 49:13 55:21 107:5
126:4 127:11 142:6
143:15,19 146:5,10
147:3,9,24 148:2,4,5
149:7,11,15,24,25
150:20 153:2,7,8,12
154:8,19 155:12,13,
15,23 156:2,6 157:8
164:12 167:20
172:13 183:9 193:16
212:25 280:8 290:16
291:9,13,16 294:18,
20 295:5,8,13,22
296:4 322:18,22
351:18,21 354:8

**legitimate** 348:18

**lender** 273:4

**lending** 127:2 302:21
303:17

**lengthy** 105:15

**letter** 91:16 92:2
93:13 95:5,16 96:9
98:23 99:2,3,7,11,16,
21,25 103:7,14,18,23
104:8 106:11,15
130:8 135:25 136:7,
17 262:16,22,25

**letters** 94:21 95:11
96:19,22 97:3,8,13,
19,25 98:9 136:14

**level** 22:11 53:7
92:25 93:5,25 238:2
279:11 287:23 288:4

**levels** 274:2

**liabilities** 5:24
175:17,22 190:2,6
194:2 195:19 196:2,
8,17 204:19 211:3
220:4 237:20,23
242:12 301:8 303:9
307:9 317:8

**liability** 175:14
217:24 276:24
277:19 280:21

**liable** 306:12,21
307:11 317:21

**license** 21:22,25
22:2,8,9

**licenses** 21:13,16,21
22:12,16

**life** 377:2

**light** 293:2 299:11

**lighting** 35:25

**list** 83:12 100:9
243:17 245:16,24
246:6,23 247:10,25
249:2 250:10 251:22
254:3 317:9 377:22

**listed** 214:6 238:8
311:10 312:3 330:13
371:8

**listen** 40:14 47:8
114:13 144:14
223:12

**listening** 40:18
252:7

**lists** 152:10

**litigation** 4:17 10:5,6
16:12,20 17:3 267:15
373:23 374:5 375:25

**LLC** 31:8 32:4

**LLP** 9:13 354:13

**loan** 40:7 42:18 43:16
45:21 48:8,15,23
49:4,10,17,24 50:4,
15,20,24 51:2,5,16,
21 52:6,13,17,22
53:11 60:21 61:3,10,
19,22,23 62:9 63:10,
15,22 64:10 93:20

94:10 126:16,17
128:15 142:5 145:6
203:13 225:13,20
254:3 270:20 271:5,
15 272:7,8,16,21
284:5 285:5,6,11
303:6 318:15 331:14
332:9,14,17,24 333:3
335:12 357:2,13
358:20,25 359:2,9,25
361:18 362:22 363:8,
13,19 364:3,9,25
365:16 393:23

**loaned** 39:11,16,19
41:2 43:23 48:14
50:10 124:14,17,20
126:23 128:10 202:7

**loaning** 39:24 307:7
317:6

**loans** 40:4 41:8,23
42:9 44:10,12,16
45:15 46:8 47:18,25
48:6 51:11,23 52:22,
25 61:9,25 91:2 94:6,
8 105:8 125:24
126:10,11 128:15
129:10 131:2 202:14,
17 225:6,7 255:8,14
259:24 271:11,20
273:6 287:7,8
288:22,23 317:6
318:4 331:22 333:12,
14 335:13 355:19
365:23 369:3,11,14
370:10,15

**log** 393:12

**logging** 395:3

**logical** 291:20
309:23 315:4

**logically** 310:9

**logistically** 321:10

**Lokey** 273:23 274:3,
10,25

**long** 192:8 233:4
333:14 353:4 385:3

**long-term** 333:17

**longer** 282:2 380:15
381:11

**looked** 101:2 111:12,

94:10 126:16,17

18 134:6 136:2
158:5,14,19,24
159:5,10,16,24
160:17,25 198:19
201:8 220:9,13 222:5
224:2 262:8 265:8
316:10,13

**loop** 148:3 294:19

**Lord** 248:11

**losses** 276:7,11

**lot** 55:4 143:24
147:16 162:15 188:3
208:13 225:4 245:21
248:16 249:11 278:2
286:22 289:24
307:15 320:9 349:19
364:14 373:12,13

**lots** 169:12,13 373:8

**Louisiana** 4:14

**love** 252:17

**lower** 274:2

**LP** 3:17 9:21

**lunch** 139:25 150:22
158:6,14,20,25
159:6,11,16,24

**lured** 231:4

---

**M**

**Madam** 268:8

**made** 15:14 46:8
47:18 48:6,9 49:24
51:11,16,21 52:6,13
56:8,14,22 57:6,25
58:4,11 60:21 61:4,
11,19,22 62:2,4,18
63:2 64:5,9,14,22
78:5 98:19 121:24
122:2,9,15,21,22
124:4 125:25 127:21,
24 128:14 129:12
130:9 131:4 134:17
139:9,13,16 148:5
159:9 161:4 162:10,
11,18 163:6,10,21
165:10 168:2 182:15
190:14 195:10 202:6,
13 203:14 217:14
225:7 242:6 245:8,9

261:19 262:24
271:21 288:21
295:17,23 299:7
306:12 314:2 315:15
316:21 317:15
327:16 328:5,8
334:22 335:3 343:19
345:11 350:23 351:8,
20 358:20 359:7,14,
20 360:2,17,23
361:25 362:2,4,6,12,
16,18,22 363:7
364:25 365:10,14,15
373:19 378:8 379:16,
23 382:22 383:23
384:6,7,9,11,20
385:16,21,25 386:2
390:21 394:8,18

**Madison** 4:20

**maintain** 90:5

**maintaining** 258:5

**make** 36:4 41:25 42:3
57:17 63:9,14 74:3
83:2,5 86:8 88:16
89:21 96:14 112:16
117:10 123:23
127:16,18,21 129:5
136:16,23 145:6
157:17 164:19
176:19 177:7,12
187:3,17 198:20
199:19 200:14
209:25 210:7,16,23
243:5 272:21 277:24
285:9 288:10,13
294:18 295:20 296:5
297:8 303:4 315:11
317:5 318:4 324:14
325:2 331:22 332:7
334:8 338:23 340:2
342:9 344:20 346:12,
20,25 348:5 350:19
351:6,14 358:7,25
359:9,10,15 360:6,
10,23 361:6 362:6,7,
9,17 363:3 365:4
367:21 373:12
377:17 380:23
381:11,17,22 382:2,
6,14,19 384:24
390:5,7 391:2,12,20
392:6,12

**maker** 140:20 142:25

216:19 305:18

**makes** 123:16 153:3,
22 345:17

**making** 40:7 41:22
88:6 160:9 282:22
293:4 335:9 337:20
343:4 344:23 345:4
363:9,14 381:3,6

**manage** 26:7,17
28:15 38:23 116:11
354:11

**managed** 113:24
125:2 332:13 361:12

**management** 3:5,18
5:16 8:12 9:6,22
10:22 11:7 15:16,23
18:7 22:21 26:20
30:2 41:19 42:10,18,
22 43:11,16 44:6
58:15,17,20 70:21
90:21 91:16 94:21
95:4,16 96:8,18,21,
23 97:2,8,12,19,24
98:9,25 103:17,22
104:8 106:11,15
109:23 110:9 125:3
128:20 130:8 135:24
136:6,13 152:14
172:14 215:14,17
232:13,15 262:16,21,
22,25 271:3 279:18,
19,22 280:2,3 308:4
325:22,24 330:16
332:12 354:7,19
359:16,18 360:7,9,14

**manager** 116:9
230:16,22 291:12

**managers** 88:23,24
230:18 274:5 292:2

**managing** 88:21
292:5

**Marc** 4:16 10:5

**March** 14:8 323:6

**mark** 49:18,21
232:18 268:15

**marked** 91:21 104:24
135:13,15 142:16
151:21 170:19 197:9
215:23 216:7 218:17
226:24 236:23

237:18 258:18
297:23 302:8 307:21
309:6 328:13 338:13
341:14

**market** 119:6,9
120:15 240:21
241:17 242:7 243:5
265:11 274:2 371:15

**matching** 222:22

**material** 53:12 104:5
111:22 112:3 113:11
131:6 133:25 171:11
174:14 185:15,21
274:15

**materiality** 52:24
53:7,16,20 92:18,20
93:2,5,8 94:2,7,9
98:15 104:7 117:11,
13

**materially** 274:23

**materials** 175:4

**maternity** 321:12,14,
20

**math** 109:17 110:13
221:8 239:24 260:15
311:7

**matter** 236:21 260:9

**matters** 313:5

**maturity** 314:22
315:6,7

**Mckenzie** 3:14 9:9

**meaning** 231:3
274:18 276:12
290:13 296:4

**meanings** 41:14

**means** 33:23 41:11
118:17 284:16,22
329:19 366:3

**meant** 186:8 301:24

**measurement**
240:18

**mechanic** 155:13,16

**media** 8:9

**meet** 194:3 323:3
378:25

**meeting** 68:5 70:2
168:21,23 169:15
189:7 192:9 206:12
231:20 283:9,10
290:20 300:23
323:11

**meetings** 184:8
323:20

**members** 89:2
166:23 191:21 192:3
233:16 237:7,9
323:16

**memorialized** 75:9

**memory** 95:23
133:2,5 224:11,16
314:20 319:17
331:17

**mental** 260:15

**mentioned** 131:17,
20 273:10 281:2
282:12,15 289:15
351:12 368:24

**met** 268:3

**methodology**
274:18

**Michael** 4:5 9:24

**Michelle** 3:13 9:9
151:7

**micromanage** 337:6

**micromanaging**
89:3

**mid** 341:5 366:9,10

**middle** 119:19 121:8,
9 152:21

**milestones** 66:3,9,
12,22 69:2 76:3 79:2,
9 84:4

**million** 92:22 119:23
121:3,6 124:17
131:13 132:2,8
138:12 140:14 141:9,
18 142:19 143:12
144:6,17,23 161:25
178:19 216:17
217:16,19 220:13,20,
24 221:7 223:7,17
224:2 238:9 239:10,
12,24 268:22,23

270:20 271:6,7,15,16
272:7,8,16 273:6
277:11,12,16,20
278:6,7 282:14,15
283:18 287:15 288:6,
20 302:22 303:6,18,
24 304:11,20 305:23
306:2 307:7 308:16,
20,21,22 309:25
310:17,23 311:2
315:13 317:6,10
318:14 334:7,19
336:13,23 337:25
339:4 340:10 341:23
343:19 344:5 345:11
350:7 351:22 389:13,
14

**million-plus** 289:22

**millions** 260:19

**mind** 19:20 59:23
60:4 160:6 161:17
198:18 305:17,21
394:16

**mine** 268:15

**minimal** 86:4,5,17

**minute** 129:19 174:8
372:9

**minutes** 53:23
139:24 174:21 176:4
182:23 266:20 267:3
325:3,4 348:25
372:12

**misapplication**
163:15

**misremembering**
229:13

**missed** 339:12,14
340:7

**misspeak** 301:23

**misspoke** 301:21
336:16

**mistake** 61:17 139:9,
13,16 159:9 161:4
162:11,19 165:9
181:10 306:23 314:2
316:22 317:15,22

**mistaken** 304:14

**mistakenly** 167:10

168:4 214:11

**mistakes** 384:19

**mode** 283:9

**model** 274:3

**moment** 117:4
198:10 222:5 224:3
276:5 307:22

**money** 39:11,16,24
41:2 43:24 49:11,17
50:10 62:9 124:14,20
126:6,23 127:3,15,25
128:5,10,23 129:2,5
145:16,18 186:10
276:13 282:8 283:5
285:18 318:10
319:11 320:4 359:9,
13,24 360:21 374:22

**moneys** 39:19 162:5
167:9 277:8 282:17
283:16,22 289:5
359:15

**month** 59:11 132:23
226:16 229:15
258:21 332:4

**month-and-a-half**
323:10

**monthly** 5:25
226:11,14 227:5,20,
25 228:12 229:10,19,
21 230:2,11,22
231:14 232:6,8,13,
19,20 255:18 256:14,
19 259:9,12,14

**months** 261:21
292:25

**morning** 7:3 10:19
342:16,18 344:12,14,
16

**Morris** 3:6 5:6,9 7:24
9:4 10:7,15,20 13:10,
17 16:9,24 17:11,14,
19,20 22:16,18
31:18,19,21,25 35:24
36:5,11 45:6,10
46:15,23 47:4,6,11
55:4 69:8,11 72:15,
18,25 74:3,9,13,18,
24 75:11,15,19
76:19,23 77:2,11,19,
22 81:16,18,21,23

82:10,13 91:8,18,22,
24 92:9,11,14 95:9
105:4,25 110:22
114:11 118:2 129:15,
21,24 130:14,18
135:5,10,13 136:9
137:24 139:20
140:11,23 142:14
146:17 150:21
151:19 154:3,13,16
155:19,22,25 156:18,
25 157:3,10,13,21
170:17,20,25 171:24
174:18 177:9,14,16,
19,23 178:10 195:6
196:20 197:6,21
201:11 202:3 207:15
208:20 209:13 214:4,
8,10,14,21 215:3,10,
21,24 216:4,13
217:5,8 218:11
219:25 221:23
222:16 224:18
226:22 228:18
236:15,20 243:15
246:13 247:21 248:5,
11,22 249:18 250:6
251:23 252:4,8,16,24
253:4 254:17 258:16
259:16 265:23 266:9,
17,24 267:14,20
268:14 269:7,12,18
270:15,22 271:8,18
272:9,17 273:7,10
277:22 278:19 279:8
280:15,23 282:12,18
283:19 284:7,14
285:7 286:9 287:9,
18,24 288:8,25
289:12 290:9,21
291:19,23 292:19
293:15,23 295:12
296:13 297:6 298:22
300:15 301:13 302:2,
11,15 303:2,10,20
304:3,7,12 306:15,24
307:13 308:5,8,13
309:10,12 310:2,11,
19,24 311:12 312:16
313:13 314:12,14
315:9,23 316:23
317:17,25 318:6,17,
23 319:23 320:6,18
322:5,23 326:24
327:6,24 329:10
330:21 331:5 333:10,

18 334:6,10,21 335:4
338:3 339:16 340:18
342:21 345:12,19
346:22 347:14,19
348:12 351:15 352:4,
8,16,18 353:11,15,19
354:4 355:5,9,15,21
356:3,14 357:6,15,22
358:16,22 359:4,11
360:3,11,25 363:16,
22 364:10,22 365:6,
21 366:15,25 367:16,
25 369:4,8,17 370:3,
8,25 371:10,25
372:22 373:4,20
374:11 375:3,24
376:20 377:6 387:7
388:19 389:5,15
390:9 391:4,14
392:7,13 393:24
394:11,19,23 395:5

**Morris'** 313:9

**MORS** 256:3

**motion** 374:14 376:7

**Mountain** 244:23
245:3,6 247:11
260:22

**mouthpiece** 206:2

**move** 69:11,12
114:11 208:19
246:13 247:21
248:22 250:6 252:23
307:17 364:22
376:25

**moved** 126:6

**moving** 248:5

**muffled** 48:19

**multi-month** 145:11

**multiple** 279:3
320:25 321:2 373:7,8

**Munsch** 3:22 9:20

**mute** 36:10 350:2

**myriad** 248:14
249:11

---

**N**

**N-A-V** 273:11

**naively** 263:23

**named** 44:3 376:23

**names** 229:11 300:8
309:19 311:25 312:4,
13 375:20

**Nancy** 4:2 9:14 65:9,
17 66:7 67:6,22
68:19,25 75:25 78:16
82:22

**Naomi** 321:7

**narrative** 111:17

**nature** 84:4 85:6
144:2 147:17,18
180:20 230:8 240:22
253:18 259:15
271:20 276:10
279:22 280:9 292:22
294:22 325:19
329:24 333:13
354:12 356:6,17
357:11 378:23

**NAV** 125:6,9 131:17,
24 132:3 145:8
273:11,14 274:23
275:8 277:5 278:15
280:12,22 281:13
289:6 318:15 373:10

**needed** 155:2 250:17
257:13 271:21 289:6
318:13 354:15 358:8
382:15,17

**needle** 118:4

**negative** 7:25 394:14

**negotiated** 390:8

**negotiation** 382:25

**negotiations** 58:19
383:2,6,12 384:14

**Nelms** 233:21

**Newman** 4:18 10:3

**Nexpoint** 3:17 6:4
9:21 27:10,12,15,18,
21,25 28:4,6,16 29:7,
10,12,16,24 31:3,11,
17 32:17 42:21 43:12
44:6 54:14 58:7,11,
14 60:5 65:6 100:23
126:9,13,16,23
127:3,10,11,15,18,24

161:23 162:5,7,11,18
163:23 164:6 165:11
167:7,8,13,15 168:2,
6 171:13 172:21
176:14 178:12,17,18,
22 179:13 182:3,12
184:21,23 186:9,21
189:15 196:3,23,24
216:20 217:14,23
218:3,19 219:15,22
220:18 221:6,10,13,
25 223:5,24 241:23
242:6 260:4 267:24
309:24 322:3 325:14,
18,21 326:16,23
327:4,10,17,20
328:6,7,8,25 329:3
330:11,18,19 331:2
332:14,17 333:8,15,
16 334:5,8,22 335:3,
9 336:13 337:13,23,
24 338:23 341:19
342:9 343:18 345:17
346:12,16,20 348:4
353:8,21 358:15
379:16 381:23
382:10 383:24 384:3
390:5 391:2,10,12,19
392:5

**Nexpoint's** 59:18
218:6,12 219:6 331:3
336:22 350:19

**Nguyen** 3:21 268:10
297:19 298:9 302:5
303:14 305:3 306:7
307:19 308:11,25
309:3,4 311:22 313:8
317:3 331:9 332:21
338:12,21 341:15
343:11 345:23

**night** 376:8

**nomenclature** 350:4

**non-american**
284:10

**non-orderly** 274:8

**nonlawyer** 375:13

**nonsense** 156:6

**Norris** 183:3,6 184:2,
7,9 192:15,23 193:5

**North** 3:15,23

**Northern** 8:13

**note** 13:11 45:14,21 48:15,22 49:6,12 50:15,22 51:7 56:7 57:4,19 59:18 60:5, 13 62:19 63:3 64:6, 15,23 78:17 107:20 117:9,12 120:18 122:4 126:12 134:6 140:14,17,20 141:22, 24 142:2,4,18,22 147:15 149:17 150:4 161:24 162:4,7,18 163:23 165:12 167:11,15 168:6 182:3,12 186:18,22 187:17 213:16 214:4 216:16,20 217:2,13, 23 220:5,8,13,18,20, 23 221:5 222:4,10 223:4,7 224:2,9,12 233:22 234:10 243:17 244:23 245:3, 7,13,16,23 260:22,25 261:9 306:11,18 309:16,24 310:9 312:2,14,15,24,25 313:15,16 315:13,14, 16 316:17,18 319:12, 14 324:16 334:6,13, 18,19,23 335:21 336:13,23 338:2,17 339:4 340:10,14 341:19,23 342:9 343:4 344:25 345:18 347:7 362:13,14

**noted** 185:5 186:17

**notes** 6:10 44:20 45:2 46:2 49:21 50:18 54:3,6 55:7,18, 25 56:10,15,23 58:2 65:7,14,18 66:7 67:3 68:14,17 76:2 82:15, 20 83:6,10,13 106:21 107:2,12 108:2,14,18 109:5,7,17 110:6,25 111:5,8,12,22,25 112:18,23 113:9,10, 13,18 114:19 115:3 118:12,13,25 119:3, 6,9,11,22 120:19 121:3,21 122:8,15 123:6 124:3,15 130:23 131:12,16

132:7,10,14,20 133:13,21 134:5,14, 17,23 138:11,20 139:5,10,17,21 142:10 143:6,7,14, 21,23 144:5,12,16,22 145:4,23 146:2,4,7, 11,14,25 147:10 148:15,18,24 149:2 150:5,8,15 158:5,13, 19,24 159:5,10,23 160:16,25 161:5,9, 10,19 162:11 171:13 175:16 178:14,15 179:14,21 180:2,10, 24 181:4,9,16,22 182:8,16 205:19 209:2 210:8 213:7,8 222:2,17 223:13,16, 19,23 224:9 233:8 234:15,23 235:4,9, 14,21 236:3,7 238:20,25 239:4,5, 11,18 240:10,20 241:6 242:7 243:6, 11,18 244:4,15 246:6,15,22 247:10, 24 248:25 250:9 251:8,15,21 252:12 253:10 261:12,16 262:6,11 263:6,15 264:19 268:21,24 282:14 284:19 285:15,17 288:21 289:10,16,18,22 290:8,13,16,24 291:5 293:13 296:9 297:4, 5,11,17,21 298:17 299:11,14,18 300:13 301:18 304:19,24 305:2,18,22 306:21, 23 307:12,24 310:17 312:11 313:20 314:13,23,25 315:2, 20,22 316:2,14 317:10,16,21 319:5, 9,15,18,22 322:20 323:20,25 333:17 338:7 364:13 366:22 367:23 368:6,17 369:15,19,20,25 370:9,11,17 372:11 386:9,10

**notice** 7:25 356:9 357:9 379:6 380:10, 15,16,17 381:4,7

**noticed** 16:12,20 248:6 375:25

**notices** 380:21

**November** 59:12 328:16 329:14,19 330:15 331:12 332:3 380:9,18 388:3,6 390:22

**NPA** 5:15 189:24 328:21,22 331:13

**NTA** 338:16

**number** 8:9,14 13:13 15:24 17:25 93:7,10 100:10 108:9 111:7 126:10 135:10 137:25 139:22 170:24 177:15,16 179:4 197:4,7 218:13 222:21 236:21 239:25 240:9 277:17 282:9 285:15,16 286:5 343:25 344:5 370:22 377:9 389:18, 21

**numbers** 240:5,6,23 268:13 278:10 343:5 366:12,19 367:6

**O**

**Oak** 4:7

**object** 29:20 45:7,8,9 47:4 60:24 65:19 66:10,15 67:9,24 69:6 73:24 77:13 78:19 79:20,25 97:4 107:16 115:5 119:12 144:25 146:12 147:4, 11 149:21 151:13 156:7,16 159:25 164:2 180:4,11,12 191:4,22 194:6,22 202:24 206:7 208:10, 11 211:4 212:12,20, 22,24 213:25 220:25 225:10 227:21 231:8 232:9 239:20,22 248:3 249:4 250:11 251:10 253:12 254:7 255:10 256:17 262:18 269:7,14,17 347:21 348:11,12

352:14 365:6 381:13 384:12 386:13

**objecting** 154:3

**objection** 8:4 17:9, 10 20:4,20 22:14 25:15 31:16 33:9 34:20 40:10 41:4,12, 24 42:11,12,19 43:17 44:17 45:4,16 46:10 47:20 48:3,16,25 49:13 50:5,7 52:8 53:18 54:8 55:10,20 56:11,25 58:25 59:19,25 60:7,15,16 61:12 62:11 63:13,24 64:17,19 65:12 66:24 67:17 69:5,9,10 75:6, 10 79:4,14 80:12 82:24 83:25 85:15 86:2 91:4 94:3 96:11, 20 99:17 107:4,15 108:5 110:11 111:24 112:20 113:20 114:20 115:6 117:6, 18 119:13 120:16,17 122:10,16 124:6,23 126:3 127:19 132:16 133:23 134:8 142:6 143:10,15 144:8 149:5 150:10,17 151:16 153:18,19,25 154:6 155:11 157:2 158:15 159:17 160:3, 12,18,19 167:5 168:8 178:20 180:3 181:5, 11 183:15 184:6,20 185:2,18,24 193:21 194:5 195:21,22 196:4,11,18 200:20 203:23 205:3,15,25 206:21 210:24 211:13 213:11 220:10,15 222:13 225:24 228:9 229:24 231:18 234:6 235:23 236:10 238:10 239:3, 14 240:16 242:24 246:19,25 247:14 250:22 251:12 254:6 255:12,22 257:6,20 260:14 263:8 265:4 266:19,23 267:21 270:15,22 271:8,18 272:9,17 273:7 277:22 278:19 279:8

280:15,23 283:19 284:7,14 285:7,23 286:7,9 287:9,18,24 288:8,25 289:12 290:9,21 291:19,23 292:19 293:15,23 296:13 297:6 298:22 299:15 300:15 302:2, 25 303:2,10,20 305:10 306:15,24 307:2,13 310:2,11, 19,24 311:12 312:16, 18 314:14 315:9,23 316:23 317:17,23 318:6,17,23 319:23 320:6,18 322:5,23 326:24 327:6,24 330:21 331:5 333:10, 18,20 334:10 335:4 336:14 338:3,5 339:16 340:18 341:2 342:21 345:12,19 346:22 347:14,19 348:9 351:15 353:11, 15,18,24 354:4 355:5,9,15,21 356:3, 14 357:6,15,22 358:16,22 359:4,11 360:3,11,25 363:16, 22 364:10 366:15,25 367:16,25 369:4,8,17 370:3,25 371:10,25 372:22 373:4,20 374:11 375:3 376:20 379:10 380:25 388:19 389:5,15 391:4,14 392:7,13 393:24 394:10,11,19

**objections** 209:9

**obligated** 161:18 262:13 304:23 334:8

**obligating** 144:22

**obligation** 234:22 242:20

**obligations** 160:9 178:15 179:12 180:2, 9,23 185:15 194:4 208:8 327:13,21 328:8 332:5,8 333:17 335:17 336:6,7,10 361:19 380:2 390:10, 12 391:7,8

**obligor** 264:18

**obnoxious** 364:23

**obstacles** 90:23

**obtain** 57:12

**obtained** 48:23 49:5 50:4,16 51:6 126:10 128:15 176:16

**obtaining** 62:10

**occur** 169:6 280:13 331:21

**occurred** 103:13 104:5 125:17 126:2 263:13 278:15 299:25 331:24 339:7 369:24 390:24

**October** 8:19 21:7 160:5,7,14,21 169:17,24 171:19 172:4 173:24 174:6 183:7,14 186:11,13 189:13 207:16 219:24 263:19 314:20 316:16

**odd** 303:12 307:6

**offense** 352:23

**offhand** 342:11

**office** 279:21 280:3,5 294:4,10 323:13,14 326:15 388:22 389:2

**officer** 14:12 23:6 26:25 27:6 28:24 29:2,7 32:14 35:10, 12,16 36:20,24 37:6, 18 38:3,5,10,16,22 39:3,24 51:22 52:6, 17 120:8 143:18 173:7,9,13,16,20,23 174:3 184:23,24 258:25 269:5,24 270:10,14 271:2 302:19 362:25

**officers** 15:22 29:24 39:11 40:5,8,12 51:23 52:13 93:21 153:9

**offset** 380:2,3 382:25 390:9,11,13

**offsets** 58:21 381:18, 19 383:13

**Okada** 49:18,21,24 50:2 118:3 232:18

**omitted** 309:19

**one-day** 331:14 332:9,17

**one-third** 239:18

**one-word** 174:9

**ongoing** 125:11 202:8,14 203:14

**open** 36:13 376:5

**open-end-to-close-end** 125:12

**open-ended** 125:7 275:4,8 276:10 281:9,11 282:7

**operating** 5:22,25 90:10 226:11,14 227:2,4,19 228:7 255:18 256:14,20 259:9,12,14 359:14

**operational** 143:25 147:17

**operational-type** 291:11

**operations** 202:8,15 203:14

**opinion** 120:6,7,10 204:8 205:9 247:17

**opinions** 204:15

**opportunity** 13:2

**oral** 65:8,16

**order** 13:3,7 105:11 128:16 129:6 288:21 360:9

**ordinary** 226:9 229:22 293:18

**organizational** 112:13

**orient** 365:24

**original** 223:25 232:11 274:24 277:14

**originally** 177:21 232:16

**originals** 297:4,11, 16

**Orleans** 4:14 9:17

**outboxes** 294:9

**output** 90:6

**outstanding** 118:12 119:22 142:10 171:11 174:15 175:12 185:10,23 186:8 202:6,18,23 203:7,8,13 220:18 222:3,12 223:4,14, 19,24 224:13,17 235:10,14 244:16

**overpaid** 58:16 381:16

**overpayment** 381:20 390:13

**overpayments** 58:22 379:22 380:3 389:4,12

**overruled** 17:15

**overseeing** 26:10 86:22 230:11

**oversight** 257:15

**overspeak** 115:16 252:3

**owe** 375:15

**owed** 125:8 160:10 161:8 178:18,23 185:6,16 186:9 199:12 204:12,25 205:13 212:18 275:13 297:17 308:20 310:17 358:21 380:3

**owing** 50:3 211:11 212:10 223:6 234:23 285:18

**owned** 15:6 16:7 17:24 42:8,16,24 43:3,13 273:17

**owner** 272:24 281:25 282:3

**P**

**p.m.** 150:24,25 151:3 174:6 224:23,24 225:2 266:5,6,8 325:7,8,10 349:6,7,9 372:14,15,17 395:10, 11

**Pachulski** 3:8 9:4 10:20 72:9 166:19

**package** 229:10,20, 22 230:2,12,23 232:6,8 233:3

**packages** 231:15 232:20

**pages** 214:11,17

**paid** 50:2 56:18 167:10 221:7 277:4, 8,20 283:23 327:22 330:19 331:4 333:16 336:9,11 355:19 356:23 365:4 394:9

**paper** 288:21 293:13, 20 296:12,16

**paragraph** 92:17 118:11 119:20 121:9 124:15 126:9 134:11 140:18 142:22 203:6 216:25 221:24 222:7, 9,10,14,16,18 223:9, 15

**paragraphs** 117:23 118:6

**part** 42:9,17 43:15 50:18 51:11,16,21 52:12,19,23 53:12 58:17 85:5 88:12,14, 22 90:21 91:14 93:22 103:22 105:9 116:13 117:20 125:12 142:9, 11 148:4 149:12 156:24 169:14,19 175:3 176:23 179:11 193:17 200:16 210:21 213:16 214:19 238:8 240:17 245:19 254:20 274:17 282:4 286:2 288:19 326:21 330:17 365:2 366:23

**participants** 8:17

**participate** 168:13 218:23 219:2 362:21 380:5

**participated** 87:25 137:20

**participating** 191:9 259:8

**participation** 86:23

**parties** 7:15 9:25 85:7,12 100:14,22 101:6,23 103:4 376:13

**partner** 9:9

**partners** 31:8,12,15, 18 32:4 370:16

**partnership** 121:11 122:6 131:12 132:7

**partnership's** 102:19 103:3 118:12

**party** 17:10 100:19 101:18 102:20 103:4 321:4 366:22 368:17 385:8

**pass** 352:3 393:15

**passing** 78:8

**past** 190:16 226:7 359:9 375:21

**patience** 387:9

**Patrick** 21:5

**pause** 295:10

**pay** 65:7 122:4 144:22 161:18 181:15 205:10,19 209:3 234:22 282:8, 16 302:23 318:14 327:13 332:6,13 344:19 355:18 356:2, 13 357:3,13 366:13 374:25 393:23

**payable** 171:12 174:15 190:6 202:18, 22 220:5 222:2,17 327:21 329:17 330:10,12,20 331:4

367:24 386:9,10

333:7 334:14

**payee** 140:21 142:25
216:22

**paying** 288:14,16
326:23 333:9 338:17
346:21 355:4,8 357:4

**payment** 56:5,21
57:4,6,12,18,25 58:6,
10,12 59:14,16,20,22
60:3,4,9,11 62:17,25
63:9,15 64:4,9,22
121:11,17,21 122:7,
19,23 162:13,16,17
163:4,6,10,14 164:24
182:16 199:6,11
212:18 331:20
332:24 334:9 335:9
336:12 337:3,25
338:24 339:12,14
340:2,7 342:9 343:4,
20 344:20,24 345:4,
11,17 346:13 348:5
350:7,9,20,23 351:6,
7,14,20,23 356:6,17
358:25 359:2,6,7,15
360:16,22,24 361:18
362:2,5,7,9,12,15,18,
21 363:3,7,10,15,20
364:3,7,25 365:5,9,
14 366:21 379:15
381:23 382:2,9,14,15
383:19 390:6,8,21
391:10,13,20,24
392:6

**payments** 55:16,24
56:8,14 57:2,9 64:14
162:10,24 163:16,21
165:10 167:14
217:15 282:22
288:11,12 328:4
329:16 330:3,4,6,8
334:23 335:3,19,21,
22 336:23 337:9,15,
21 355:19 356:8
357:2,10,13 358:7,21
359:9,10,20,25
360:6,10,15 361:7,23
362:4 365:14,16
377:12,17,22 378:8,
9,17,24 379:7 380:23
381:3,6,11,18 382:6
383:4,5,23 384:2,4,6,
7 387:24 388:14
390:20 391:3 392:12

393:23 394:7,18

**PDF** 293:22

**Pearl** 3:15

**pen** 296:22,25

**pending** 7:21 16:16

**people** 33:7,11 34:4
89:3 146:4 170:24
237:5 275:9,20,21
279:23 291:21 293:7
294:3 319:16 351:12
372:19

**percent** 18:2,4 86:15
108:23 109:19 110:8
260:12

**percentage** 110:19

**percentages** 86:16

**perfect** 90:17 118:5
130:19 189:4 197:19
268:19 298:8

**perfectly** 144:3
223:2 348:18

**performed** 48:5
246:11

**performing** 114:7
219:4

**period** 25:12 39:9,14
40:24 90:15 93:14
95:15 105:18 120:9
135:21 169:5 203:20
218:21 219:6,16
221:15 226:18
231:15 242:17
243:13 247:22 265:2
321:22 380:15,16

**periodic** 228:13
241:17 288:12 358:6

**periodically** 337:14

**persist** 157:9

**person** 26:2,4 43:7
44:21 57:7 79:9
86:21 87:6,7 114:2,4
116:14 155:16
167:20 191:18
259:22 291:21
292:22

**personal** 79:22
80:10 97:15 375:11

**personally** 62:20
64:3 85:23 89:11
95:4 97:9 101:22
237:4 255:20,24
275:15 296:21
303:23 304:18,22
306:12 317:21
370:11

**personnel** 237:16
318:12 333:22
359:18,21 360:13,23
363:3

**pertaining** 65:17

**petition** 21:9 70:11
84:11 235:10,14
241:20 263:20
310:15 386:5

**phone** 68:6 70:3
290:25 392:23 393:2,
5,8,9

**phonetic** 249:21

**phrase** 41:10 229:19

**physically** 191:16
294:4 296:12,16
299:17,21

**pick** 101:6

**picked** 101:10,12

**piece** 203:11

**pile** 139:23

**place** 58:24 59:6
112:16 122:18 166:2
260:7 272:13 278:16
297:14,16 326:4,10,
12 393:3

**plaintiff** 9:7

**plan** 335:24 337:20
366:5 367:6 386:9,18

**play** 85:23 153:11
168:16 184:2 340:9

**played** 86:3,6,17
335:2

**playing** 239:9

**pleading** 213:22

**pleased** 347:12,16,
17

**plural** 314:3

**point** 78:9 87:2,6,7
114:2,4 157:16 166:9
190:16 254:11 255:3,
7 261:6 313:7,20
321:13 326:6 337:12
344:9 375:23 376:11
380:22

**pointing** 254:23

**points** 282:9,10

**policy** 378:6,10
386:2

**poor** 207:22

**poorly** 104:10

**portfolio** 274:5

**portion** 13:2,6 16:5
17:22 19:13,16,19
112:23

**portions** 12:10

**position** 37:9 122:3
184:14 193:3,6,9
274:15 280:11
361:14

**positions** 38:24
172:25 173:5 183:6
184:10,18 192:16

**possession** 45:25
113:9 132:11

**possibilities** 29:19
371:23

**possibly** 213:7
314:12

**post** 92:12 184:13,
14,18 192:15,24
193:7,8 275:24

**pot** 366:5 367:6
386:9,18

**potential** 250:20
357:4 366:3,19
369:16 371:7,9

**potentially** 113:5
249:6 250:12,13,14,
16,21 354:8

**Poydras** 4:13

**practice** 7:8 64:13
89:20,24,25 90:4

91:11 97:7 98:7,12
106:14 146:9,24
150:13 230:25 231:2,
3,22,24 233:5 299:4,
5 337:4 356:13
369:2,7 371:6,15
374:15 377:21

**pre-petition** 226:18

**precisely** 205:21
298:16

**prefix** 268:15

**premarked** 91:19
104:23 197:15 216:5
236:16

**preparation** 137:21
230:11 259:9

**prepare** 123:17
204:23 226:9 229:6,
21 235:19 236:25
237:3,5,13 241:11
255:24 377:22
378:16

**prepared** 227:5,20,
24 228:15 229:2,4,9
230:3 232:20 237:8
239:17 241:25 242:3
255:20 284:19
317:14 319:5 373:2
376:18

**preparer** 256:4
259:4,5,23

**preparing** 137:10
164:9 232:5,7
241:12,15,16 254:9
264:10

**prerogative** 253:7

**present** 4:23 90:23
180:15 191:19
283:14

**presentations**
368:7,16,18

**presented** 86:10
113:14 117:10
161:11 296:11,16

**presents** 12:20

**president** 14:16
271:23 272:24

Case 21-03005-sgj Doc 106-3 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 123 of 131
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 696 of 899 PageID 1308

Index: presume..question

presume 207:13

pretty 105:15 364:23

prevented 231:6

previously 18:9 24:4
80:13 225:22 246:8
373:19 374:18,25

Pricewaterhouseco
opers 84:9,13,16,20
106:7 113:23 132:5
137:2 141:24 142:3
149:3 150:9,12,16
211:10 212:9 242:21
263:3 274:10

primarily 267:18,20

principal 35:10,11,
15 36:20,24 37:5,18
38:3,4,9,13,16,21
39:3 49:11 50:3,23
55:17,25 56:22
57:18,25 59:14,17
60:12 62:18 63:2,9
64:5,14,22 119:7,10,
22 142:4 144:5
161:8,19 162:6
163:11,22 164:24
165:11 167:10 168:5
217:16,19 220:23
222:11 223:6,18,25
334:9

principals 274:6

principles 241:14

prior 20:14 26:12
37:10,18 54:21 56:18
57:13 62:4,10 63:23
74:14 84:10 87:17
99:16,24 121:13
131:5 138:17 144:24
163:15 164:25 165:9
189:13 193:23 199:6
206:15 212:19
217:20 227:15
243:23,24 267:12
300:13,20 301:17
331:12 333:4 334:23
335:3,7 336:11,20
337:11 339:10 346:9
370:18 381:3,7
386:4,19,22

private 273:19,21

privilege 151:14

privileged 66:18
74:2

probe 82:7

problem 8:3 214:14
260:18

procedure 271:17
291:12

procedures 7:20
114:8 207:21 378:5

Proceed 267:22

proceeding 197:18

process 52:23 55:23
56:4,5 58:18 90:21,
25 91:14 116:13
131:24 137:9,11
145:10,11 148:25
156:21,24 168:14,17,
25 169:6,9,15,17,19
170:5,9,14 176:23
179:11,20 189:2
200:16 210:21 218:6,
7,23 237:10 245:19
272:14,19 274:21
292:6 324:13 366:11
373:12

processes 207:21

processing 286:13

produce 178:12
195:8 210:14 235:24

produced 132:10
183:11 228:12,13
266:20 267:7,15,19

producing 241:20

professional 21:12,
15,20,22 22:15
356:21

proficiency 22:11

project 292:25

projections 335:18
337:17

promise 346:6

promissory 6:10
45:14,21 46:2 48:15,
22 49:6,12,20 50:15,
18,22 51:7 54:3 55:7
56:6,9 60:5,13 67:3
75:25 78:17 82:15,20

83:6,10,13 107:20
108:2 109:5 119:22
131:12 132:6,10,14
133:13 138:10 139:5,
10,17,21 140:14
142:9,17 144:5,12,
16,22 146:7 158:5,
13,19,24 159:5,10,23
160:16 161:10
178:14 179:14 209:2
210:8 216:16 217:13,
23 233:8,22 234:10,
15 235:8,21 240:20
241:6 243:6 244:4
282:14 284:19
285:15,17 288:21
289:10,16,18,21
290:7,12 291:5
293:13 297:4,5,11,
17,21 299:11 300:13
306:10 307:12
310:16 315:20,22
317:16,21 319:5,9
322:20 338:2,17
339:4 340:10 344:25
369:20

prompted 81:7
342:2

proof 167:8,13

proper 100:11
229:18

properties 146:15
238:8

property 375:11

proposal 125:13
281:7 282:4,6 386:24

proposals 367:22

proposed 136:18
178:5

proposing 366:19

prosecution 208:23

provide 15:4 28:24
174:22 175:7 267:12
295:20 299:8 311:17
333:22 353:8,14
354:3 357:19 358:5,
9,12,13 378:22 387:3

provided 32:20
112:8,9,17 114:18
127:12 142:8 146:15

175:3 176:22 179:19
182:23 194:25
200:18 274:25
311:24 312:4,10
327:20 332:9 335:14
351:2 353:7 354:6,19
355:7,13 357:21,25
358:4,11,15 367:11

providing 88:11
219:21 278:17 279:6
280:14 309:21
326:14

provision 103:17
132:15

provisions 105:7

prudent 302:20
303:5

public 21:17

publicly-traded
281:16

pull 200:10 215:6
297:20 302:7 305:2
307:18 308:25 313:9
317:2 328:10 334:4
338:11,20 341:12

purely 240:22

purporting 228:7

purpose 16:23 17:2
36:6 53:17 112:2
126:7 232:5,7,11
294:15

purposes 16:11
33:22 85:8 92:21
93:4 101:18 128:13
129:3 197:12

pursuant 15:8 122:6
148:25 199:10,18
200:13 256:6 275:13
278:16 279:5 280:13
281:6 288:17 290:19,
24 326:13

put 12:23 36:9 61:24
71:11 81:10 89:25
91:18 104:22 105:2,5
122:2 124:18 135:5,
16 139:22 151:19
170:17 177:8,10,13
197:7 207:2,5,14
215:21 218:11,18

226:22 235:15
236:15 240:4 257:10
258:16 259:10,12
266:18 281:7 292:23
326:9 345:22 368:3,
16 377:10 389:8

putting 144:19
197:11 240:23 265:5
273:21 306:19 316:2
330:2

Pwc 84:14 92:25 93:5
94:2 96:17,25 97:10
102:4 103:2,21 104:3
114:6 142:8 200:19
211:2 262:14 263:24,
25

Pwc's 85:24 86:23
97:6 105:22

_____

Q

qualified 194:11
206:19

qualify 101:18
136:14

quantify 276:22

question 11:22 12:3
13:4,8 17:17 22:17
26:13 35:4 38:8
40:15 45:11,22
46:19,20 48:19 51:4
68:20,21 93:12 96:4
99:19 104:11 114:14
132:4 139:14 144:15
146:18 148:13 150:7
154:4,17 155:24
156:9 157:20 158:8
164:22 171:10
174:13 175:19,23
176:18,20 178:18,24
179:3 185:9 188:18
192:21 194:18
195:11,14,24 209:6,
10 210:20 212:23
213:2 223:13 224:6
226:2 229:5 236:5
243:9 248:7,9
251:24,25 253:4
262:23 269:8,19
270:16,23 271:9,19
272:3,10,18 273:8
277:23,25 278:20

279:9 280:16,24
283:20 284:8,15
285:8 286:10 287:3,
10,19,25 288:3,9
289:2,13 290:10,22
291:24 292:20
293:16,24 296:14
297:7,9 298:23
300:16 302:3,18
303:3,11,21 304:4,7,
13,16,17 305:7
306:16,25 307:14
310:3,12,20,25
311:13,20 312:8,17
314:15,18 315:10,24
316:24 317:18 318:7,
18,24 319:24 320:7,
19 322:6,24 326:25
327:7,25 330:22
331:6 333:11,19
334:11 335:5 336:17,
18 338:4 339:17,21
340:19 341:3 342:22
345:13,20 346:7,23
347:20 351:16
353:12,16 354:5
355:6,10,16,22
356:4,15 357:7,16,23
358:17,23 359:5,12
360:4,12 361:2
363:17,23 364:11
365:7 366:16 367:2,
17 368:2 369:5,9,18
370:4 371:2,11
372:2,23 373:5,21
374:12 375:4 376:21
388:20 389:6,16
391:5 393:25 394:20

**questioned** 274:17

**questions** 11:20
17:2,4 26:15 40:19,
21,23 47:9 77:13
79:13 81:17 82:6,12
99:7,10 105:7,13
156:2 157:12 169:21,
24 171:7 177:2
180:16,17 184:4
209:5 266:10 300:6
352:5,10 377:8
384:16 385:3 386:6
387:8,15 393:18
394:25 395:7

**quick** 393:18

**quicker** 324:14

**quickly** 139:21

**Quinn** 4:19 10:4

**quo** 248:18

**quote** 118:11 189:6

---

## R

**ran** 88:2

**range** 287:22 289:22

**rarely** 320:13

**ratification** 319:21

**reached** 66:4,9 69:3
76:3 79:2,9 342:11
343:8

**reaching** 350:12

**reacted** 347:23

**reaction** 389:24

**read** 101:21,25
102:12 172:8 198:10
208:21 209:6,7
301:20,22 316:4

**reading** 120:11
138:7

**Real** 31:11,17

**realtime** 265:16

**reason** 81:13 85:2
96:6 101:11 109:4
114:23 116:25
117:16 127:2 141:21
150:3 159:14 160:15,
23 161:3 205:21
235:3,5 238:5 247:9,
24 248:25 256:11,13
286:2 301:4 318:16,
21 346:18 361:4,10
364:6

**reasonable** 108:17
333:15 337:23

**reasons** 161:13

**recalculate** 275:8

**recall** 15:3 18:13,18,
20,22 19:17,20 20:8,
10,21,22 23:4,12,20
24:23 25:16 27:16

29:13,17 30:17,18
32:16 36:22,23 37:7,
12,22,23,25 38:19
39:8,20 40:2 49:19,
22,25 50:2,8,9 52:9,
21 53:8,15,16 57:22
59:2,3,11,20 60:18
61:25 62:6,17,23
63:6 65:2 67:19 68:2,
3,7,8,11 69:17,20,21,
25 70:5 71:6,21,22,
23 78:5 79:15 80:17,
18,21 89:14,19 90:13
91:5,6,9,13 95:2,9,
13,17,21 96:13 99:5,
6,8,9,12 100:20
102:6 112:21,22
113:15 114:3,15,21
115:8,14,17,18
116:15,18,19,23
119:15 122:17 123:5
124:7,10,12 126:5,9,
16,20,25 127:2,5,8,
21 131:25 132:13,17,
19 134:10,18 135:3
136:4,5 138:21,25
139:7,19 141:6,8,11
144:12 145:3,4,16,
20,22 148:16,17,20,
22 150:11 155:4
158:16,21 159:2,7,12
160:7,13 165:4,5,13,
17,20,24 166:13,16,
18,20,21,25 167:6
168:24 169:16
171:18,21 173:7,8,21
178:5 179:6,24
180:6,14,18,19,20
183:16,20 188:19
189:3,21 190:22,24
191:6,10,12,19,24
192:10,19 194:16
196:19 200:9,11
201:23 202:2 209:17,
20,23 210:3,9,18,25
211:19 212:3,14
217:18,20 219:5,9
220:21 223:10
225:13,18,20 228:25
233:10,20,25 234:8,
9,12,14,20,24 235:6,
12,18 236:11 237:22,
25 241:9 242:5,10
243:10 244:22
245:14,18 246:20,21
247:2,6 248:15,19

249:13 250:24
251:13,18,20 252:13
255:5,15,17 259:8
262:4 265:21,22
268:24 269:3 270:11
276:4,6,23 277:2,3,7
280:11,17,25 282:14,
24 283:8,11,13,15
284:6,11,20,22
289:6,21 290:2,3
291:3,6 292:9 293:17
296:18 298:24
299:16,18,21,22,24
300:17,24 301:3,12,
15,18,25 303:15,22
313:12 314:24,25
315:25 316:8 318:9
319:10,11,13,25
320:10 321:13,16,18
322:17,25 323:22,23
324:3 331:19 334:4,
18,21 339:9,18
340:8,12,15,16,23
341:4,5,8,11 342:2,
19 343:14 345:21,25
350:10,12 351:17,24
361:3,14,17,20,21
362:3 364:5,7 365:9
369:7,22 370:10
380:8,14,16,21
383:10,21 384:2
387:6 388:7 389:10
390:7,18 392:20
394:2

**receipt** 380:20

**receivable** 118:12,
14 238:21,25 239:11,
18 240:10 243:18
245:24 246:6,15,22
247:10 249:2 250:9
251:8,16

**receive** 11:6 22:10
141:17 303:23
304:18 305:23
332:11

**received** 42:9,17
43:15 85:12 123:21
125:14 141:17 142:3
212:16 293:20,21
304:10 305:25 383:7

**receives** 179:16

**recent** 367:9

**recess** 36:16 73:6
150:25 224:24 266:6
325:8 349:7 372:15

**reckoning** 310:22

**recognize** 217:10
320:13

**recollection** 24:25
29:14 39:22 40:6
67:21 71:5 105:12
115:12 124:19
126:22 127:23
128:10,22,25 131:16
166:15 173:22 180:7
183:19 187:24
192:20 221:5 223:23
225:6 227:10 228:14
229:7 246:3 251:6
252:19 253:9 269:4
270:8 275:22 282:21
283:7 290:5,18
309:18 344:11
367:14 369:15

**record** 7:10 10:17
36:3,15,18 73:5,8
150:24 151:3 209:7
224:23 225:2 266:5,
8,18 267:9 301:22
302:6 320:15 325:7,
10 349:3,6,9 372:14,
17 392:25 395:9

**recorded** 8:10 225:7,
15,22

**recording** 7:16
100:11

**records** 50:19 225:8,
15 227:13 235:17
237:15 240:12,14
257:21 258:5 286:23
300:2,4 306:5 312:22
393:10

**recover** 167:9 168:3
181:22 182:3

**redacting** 312:23
313:6

**redeem** 281:12

**redeemed** 276:13

**redeeming** 281:20

**refer** 13:13 18:6 21:9
22:24 27:12 30:4

31:14 32:7,17,24
33:19 44:2,10 54:10,
24 68:24 79:17 84:13
95:11 175:2 186:24
203:6 279:24 329:3

**reference** 92:17
103:12 200:12 202:6
222:3,10 223:9
238:20,24 260:21

**referenced** 132:14
186:25

**referred** 84:4 91:15
123:24 143:7 169:21
186:7,20 223:15
279:20 366:5

**referring** 33:16
50:17 75:24 76:6
118:8 163:5 187:11
199:25 223:11
226:15 281:5 314:2
316:3

**refers** 170:4

**reflected** 13:14 75:5
175:16 181:15 235:4
240:9

**refresh** 24:24 105:12
131:15 192:20 221:4
223:22 227:10
367:13

**refuse** 74:9,10 209:2

**regard** 133:5

**regret** 81:10

**regularly** 355:18

**reimburse** 145:15

**reimbursement**
279:17 325:19,23
379:20 388:16

**relate** 130:6

**related** 59:23 60:4
90:25 100:13,19,22
101:6,18,23 102:19,
20 103:3,4 105:7
131:17 138:5,10
145:9 167:14 208:25
280:22 281:3 284:2
366:22 368:17
376:13

**relates** 76:14 113:6,
18 130:11 211:24

**relating** 131:2
138:19

**relation** 27:21 30:10,
13 35:6 41:18 58:21
112:3 125:9 163:21
172:25 176:17
184:11,18 191:16
264:13 385:18

**relationship** 374:3

**relationships**
100:13 102:20,21
103:4

**relative** 192:16

**relayed** 188:8 206:4
342:12

**relaying** 206:3
207:24 344:18

**release** 329:6 330:8

**relevant** 88:13
208:15

**reliable** 113:2

**relied** 305:13

**rely** 85:14,18 96:3
237:12 331:2 337:23

**relying** 85:20

**remained** 202:18,23
203:8

**remaining** 119:10
223:25

**remember** 59:8 70:9
71:2,3 80:22,23,24
87:23 95:19 102:9
122:25 123:2,19
124:16,24 127:6,14
128:6,7 129:11
131:19 147:15
162:22,24 163:4
165:6 166:3,7 172:17
174:4 187:13,19,21
188:15 189:18 194:7,
15,24 195:4 200:6,15
234:4 236:12 250:3
253:13,14,23 254:15,
17 274:12 277:16
282:17 284:12,17,23
286:3,22 291:21

293:12 296:9 299:12
300:10,12 302:16
309:11 313:22 316:3
317:5 319:4,7 320:2,
5 323:7 324:4,8
326:6 333:25 339:8
340:21 342:14
344:15,18 345:25
346:3,4 351:11
357:17 361:18 364:9,
12,14 365:10,25
377:14 387:25
389:17,18 390:22,23
392:4,22

**remembering**
289:17

**remind** 72:19 77:17
391:23

**reminded** 132:18

**reminder** 337:3

**reminders** 378:22

**remote** 7:16 371:24

**remotely** 7:11,14
8:18 12:20 299:6,9

**rendered** 204:5
233:23

**renege** 373:18

**renew** 196:25

**renewal** 168:10,14,
16,25 169:6 170:5,9

**reorganized** 3:4 9:5

**rep** 95:11 136:17

**repaid** 57:4

**repay** 203:19 204:11,
15,25 205:12 211:11
212:10 304:23

**repeat** 17:19 38:7
45:11 46:21 48:20
146:21,22 249:25
269:21 270:24
336:17,18 339:21

**report** 5:25 14:13,21
19:12 26:21 88:2,6,
16 89:12 98:18 105:8
106:4,8,16 110:25
111:21 112:7,12,25
115:20 116:5,17,21

117:2 119:19 131:5,
11 133:12 134:7
135:6 137:5,7,10,12,
25 138:3,4,9,13,19
166:8,11 178:13
219:13,15 226:19
227:4 228:7 229:2,4
232:12 256:15 257:4
258:20,24 259:5,23

**reported** 19:7,10,17,
21,25 20:23 21:2
119:17 120:23
226:10 240:15
258:14

**reporter** 7:12 8:24
10:10 209:6 268:8,18
301:20

**reporting** 7:6 8:22,
25 20:9,13,17,23
21:4 87:22 91:2
114:17 230:12
231:14 232:6,19

**reports** 89:22 113:18
115:2 143:8 171:5
196:22 226:14,16
229:6 255:18 256:20
257:19 259:9,13,14

**represent** 9:25 10:4,
22 133:4 267:23

**representation** 5:17
91:16 94:21 95:5,16
96:9,18,22 97:2,8,13,
19,25 98:9 99:2
103:7,17,23 104:8
106:11,15 130:8,9
135:25 136:6,14
214:23 215:9 262:16,
22,25 295:17

**representations**
92:21 98:19,24
136:16,23,24 262:24

**representing** 9:11,
14,17,21

**represents** 310:10

**reproducing** 171:6

**request** 87:4 103:25
172:8 196:25 291:15
379:7

**requested** 196:21
362:18 363:7

**requests** 85:18
373:3 387:18

**require** 63:16

**required** 56:9 94:5
96:17 97:19,20,21,25
98:3 127:18,20 340:2
390:5

**requires** 96:25

**reserve** 245:2,6
260:24 261:4,8

**reserved** 244:22
245:13,16

**reserving** 46:17

**reside** 257:21

**resolution** 383:16

**resolved** 374:18
383:3,6,15

**resolving** 366:4

**respect** 27:18 34:13,
18,23 35:2 37:4 39:7
56:15 112:17 134:17
182:7 212:5 261:8,16
273:12 333:8 335:9
339:12 340:6 365:22
383:18 385:17
393:21

**respond** 174:25

**responded** 174:8
182:22

**responding** 210:11

**responds** 176:3

**response** 8:5 83:24
174:8,13 176:4
178:6,18 182:20,24
185:5 189:6 190:8
194:17,18 195:9,13
205:6 210:20 267:22
350:11

**responses** 81:4
184:3

**responsibilities**
25:18,23 28:10 31:2,
4 38:21 219:20

**responsibility** 26:6,
10 88:5,9 115:23
116:2,3 258:11

287:16

**responsible** 56:13, 17 86:22 89:8,9 115:19,22 116:4 146:6 230:10 258:4,7 384:19,23 385:8,13

**responsive** 175:23 176:17,25 185:8

**rest** 214:23

**restate** 75:17

**restrictions** 8:19

**restroom** 324:22,25

**result** 276:8 347:6

**results** 5:22 226:11 227:2,5,19 228:7

**retail** 32:21,24 33:2, 4,8,12,14,15,18,22, 23 34:5,8,13,18,23 35:2,6,12,14 36:21 37:17 38:2,5,10,17, 22 39:4,7 160:8 168:10,18 169:20 170:12 171:19 172:25 173:5,10,13, 16,20,23 174:13 175:15,23 176:18,22 178:7,13,17,23 179:3,8,12,15,19,25 180:8,22 181:2,8,14, 19,21 182:2,6,11,15 184:4,11 185:14 189:14,19 190:4,14, 18,20 191:2 192:16, 24 193:3,4,6,11,15, 18 194:11,17 204:18, 23 205:6,22,23 206:13 209:16,19,21, 24 210:5,11,20,22 385:12

**retain** 149:8,9

**retract** 39:17

**return** 49:7 51:7 123:22 306:18

**reveal** 66:17,18

**revenue** 16:6 17:22

**review** 11:5,6 13:2 89:11 160:11 175:9 184:5 288:11 295:3,

15

**reviewed** 231:13 232:13 233:3 294:21 295:5,18 322:11 334:14,20

**reviewing** 198:12 233:2 237:22,25

**right-hand** 198:6

**rights** 340:6

**ring** 277:13

**rise** 287:22

**role** 14:14 31:5 85:23 86:4,5,17 168:16 184:2,8 335:2,7 340:9 370:13

**roll-up** 126:17

**rolled** 126:11

**Rome** 170:24

**room** 7:9,13 9:10 105:3,5

**rope** 88:24

**roughly** 120:14

**Rukavina** 3:20 5:7, 10 9:19 42:19 44:17 45:3,8,16 46:10 47:20 48:3,16,25 49:13 55:20 107:4 126:3 133:23 142:6 143:15 163:25 195:7 212:24 213:24 266:11,14,15,22 267:6,17 268:8,19 269:16 297:19 298:6, 8 301:23 302:5 303:13 304:5,9,15 305:2 306:6 307:16 308:7,10,24 309:5,14 311:21 313:8 317:2 325:2 329:12 331:8 332:21 338:11,20 339:21 341:12,15 343:11 345:22 349:4 352:3,13 377:10 380:25 387:12,20 393:15

**rule** 7:19 267:8 356:11

**rules** 7:19,20 11:17

**run** 46:24 188:6 329:17

**running** 45:4 254:19 256:25

---

**S**

**satisfied** 89:21

**satisfy** 89:12 122:8, 14 124:3 208:7

**Sauter** 162:20,21 163:20 164:7,8,24 166:20,24 167:4 168:4

**scenario** 264:4

**scenarios** 276:20

**schedule** 6:13 117:10 222:23 244:3 309:2 311:10,17 337:2 377:12

**scheduled** 336:9,11 356:8

**schedules** 129:10 308:25 311:15 317:11

**scheduling** 355:13

**school** 22:5

**scope** 136:18

**Scott** 7:4 8:21 14:20

**scratch** 298:14

**screen** 12:24 91:19 104:22 135:6 140:6 151:20 170:18 197:7, 12 215:22 216:14 226:23 230:7 237:17 308:9 377:11

**scroll** 106:18 117:22 130:14 136:9 140:23 152:16 170:25 171:24 174:7,18 176:2 182:21 201:11 202:3 217:3,5,8 238:17 297:25 331:10 332:22 341:16 343:12

**SEC** 274:13,16,19 275:18 384:19,22 385:7

**secret** 338:8

**secretary** 172:20

**section** 41:8 101:5, 19,22,25 110:24 111:17,20 112:7 113:12,17 115:2 116:5,17,21,25 117:17 130:3,15 131:3 134:7,22 138:4 170:10 175:14 192:6 215:16 220:5 294:20

**sections** 143:9 192:7

**seek** 12:9 199:6

**seeking** 332:16

**Seery** 71:23 72:2 166:9 233:20 234:11, 17,21 235:2,8,20,25 236:6 322:15 323:4, 16,19,24 324:8,16 340:12 346:10 348:2 350:8,13 368:8,10,14 375:7 379:25 392:18

**sell** 118:23 282:2

**send** 13:20 342:3 377:11

**sends** 174:5

**senior** 232:13,15 275:20 318:12

**sense** 57:5 88:19

**sentence** 98:14,15, 20 118:20 120:13 121:7,10,18 130:7 133:17 138:19,23 139:6,11 187:9 189:6 199:5 203:18 211:24 212:5

**sentences** 314:6

**separate** 54:24

**September** 169:7

**series** 11:20 328:14

**serve** 19:3 24:15,21 29:2 32:14 33:7,12 34:4 35:11,15 37:17 38:25 39:2

**served** 11:7 18:10 19:13 32:25 39:9,14 40:9,24 46:6 47:16 49:16 51:9,14,19 84:9 90:15 94:22 95:6 137:2 155:6 172:19 227:6 229:23 248:24 255:6

**serves** 133:2

**service** 185:10

**services** 15:5 28:25 30:2 32:21 33:25 42:22 59:23 128:21 129:9 171:15 185:6, 23 186:8,10 219:22 278:17,23 279:7,12, 21,24 280:3,5,6,13 325:20,23 326:2,15, 19,22 327:19 330:17 335:15 336:20 351:4 353:6,9,13,21 354:2, 7,8,18,23,25 355:2,7, 12 357:20 358:2,4,6, 11,14 379:19 380:11 388:15 390:20,21

**serving** 247:23

**set** 89:24 92:25 93:5 112:6 256:21 315:6,7 378:16,21

**settlement** 348:8 386:24 387:4

**seven-month** 265:2

**severity** 7:7

**shades** 36:13

**share** 209:18 262:14

**shared** 59:23 185:6, 10,22 186:7,10 209:16 278:23 279:24 325:19,23 326:2 351:4 353:21 379:19 380:11 388:15 390:20,21

**shareholders** 125:13 278:5 281:8, 12,18 282:5 293:4

**shares** 276:15 281:20,22 282:2

**Sharp** 249:21

Index: sheet..stipulate

**sheet** 106:19 107:25 108:11 109:6 110:4,5 111:11 112:4 120:23 175:2,14 179:17 220:2 222:21 228:22 229:3,8,16 230:5 243:7 251:14 253:22 294:12,24 370:22 372:6

**sheets** 107:14,22 175:8

**short** 266:2 279:16 332:7

**short-terms** 331:22

**shortfalls** 335:22,24

**show** 126:20 189:25 226:20 257:2

**showed** 119:2 370:8

**shown** 322:8

**shows** 293:9

**sign** 50:14 91:15 94:20 95:16,22 96:8, 18 97:2 106:14 135:24 136:6,22,25 139:4 141:4,21 143:14,23 144:11 150:4 153:24 154:5, 10,18,22 155:3 158:4,13,18 159:4, 15,23 160:16,25 181:3 213:16 289:9, 11,16 293:25 306:17 320:14

**signature** 92:3,7 105:22 106:9 130:7 136:20 140:25 141:2, 7 143:4,21 144:20 152:20,21 217:9,11 256:3,15 262:21 294:5,12 298:14 299:2,19 305:6 320:22 321:3

**signatures** 298:3,10 299:8,20

**signed** 46:2 55:7,12 92:5 94:25 95:2,4,11 96:22 98:10,23,25 99:4,7,10,16,25 103:18 106:7,16 107:2 123:4 132:13

**sheet** 137:6 139:10,16 141:10,15 143:24 144:4,13,15,21 148:15 153:14 158:23 159:9 161:5, 20 180:24 181:16,23 182:8,16 201:12,14 213:7,9 256:2,4,8,12 257:5,15 258:24 262:15,20 289:23 293:25 296:20,21 298:4,21 299:13 301:16 305:16,20 306:10,22 315:2 316:14 319:19 320:16

**signer** 103:7 363:2

**signers** 152:11 159:20

**significant** 228:21 229:3,7 230:4

**signing** 141:6 152:23 156:23 296:9 299:17, 22,23 319:21

**similar** 135:25 218:7, 9 272:3,19 311:9 325:17 331:11 338:14 353:8 357:20 370:5,6,17

**simple** 156:8

**simply** 188:23 361:5

**single** 62:13,24 89:15 93:9 95:9 129:11

**singular** 314:3

**sir** 13:23 21:13 22:17 43:9 68:17 69:14 80:11 115:12 130:17 140:3 141:2 144:4 146:18 151:23 154:18 156:8,20 158:2 167:23 209:12 218:18 266:15 278:8 301:25 302:12 304:4 307:22 317:14 328:18 331:15 332:20,25 333:6 334:17 336:19 341:20 351:25

**sit** 102:13 114:24

**sitting** 116:24 138:22 141:12 159:13 231:20

**sitting** 149:24 270:7 284:22 310:8 314:19 320:3 348:16 351:10 382:23 392:3

**size** 271:21 309:25

**skip** 55:13

**Skyview** 14:5,7,9,17, 24 15:4,14,19 16:6, 14 24:4 28:20,22 377:2

**Skyview's** 16:6 17:22

**smaller** 288:12

**smart-ass** 306:9

**social** 7:8

**sold** 276:15

**solely** 132:3 208:25

**someplace** 278:13

**sort** 142:13 208:15, 16

**sorts** 288:11

**source** 80:18 257:17

**speak** 62:13 63:25 72:20 73:9,14 74:15, 19 94:24 103:6 151:4 233:12 284:10

**speaking** 95:8 179:24

**specialist** 8:21

**specialized** 94:16

**specific** 25:22 40:19, 23 97:7 120:19 124:8 198:15 199:3 224:16 235:12,18 253:15 323:8

**specifically** 29:13 40:21 57:22 59:2,11 68:10 70:9 71:21 85:17 87:10 117:24 121:6 124:16 126:5 128:6 131:25 141:6, 11 145:5 146:3 162:23 180:6 187:19

**sitting** 192:10 194:8,25 196:20 233:11 234:2, 5,13 247:6 248:20 249:13 250:24 251:18 252:13 253:13 255:5,16 277:2 292:9 296:9 297:5 298:25 299:16 313:22 314:24 321:16,19 334:2 339:8 340:22 357:17 389:19 391:9

**specificity** 163:18 239:9 390:19

**specifics** 345:15

**speculate** 20:5 188:21 301:5

**speculation** 142:7

**speed** 247:4 249:10, 22 313:5

**spilled** 169:17

**spoke** 62:14 74:5 151:7 188:9 249:20 350:16,17,18

**spreadsheets** 368:19

**spring** 125:17 201:21 280:10

**stable** 90:5

**stack** 197:4

**staff** 116:9

**stamp** 296:23

**stand** 328:24

**stand-behind-you** 88:25

**standard** 231:22 233:4 335:13 372:3

**standards** 256:21,24

**Stang** 3:8 9:5 10:20 72:10 166:19

**stapled** 197:22 214:12

**stare** 298:11

**start** 8:9 41:9 170:21 214:18 248:14

**sitting** 268:21 304:16

**started** 21:3 36:7 125:19 207:15 231:10 304:15

**state** 8:4 10:16 47:2 161:16

**state's** 7:20

**stated** 8:3 24:5 179:15 206:9 246:8 249:8 290:12 294:16

**statement** 114:18 118:24 120:19 121:5, 10 133:7,13 134:4 179:17 190:14 194:18 204:3 205:18 224:10 228:20 262:5

**statements** 5:19 6:3 41:7 48:2 84:17,23 85:3,13,19 88:11 90:3,7 93:25 95:14 100:12 102:8,11,12 104:22 105:18 112:2 113:7,14 122:12 130:23 133:22 134:2 135:20 142:12 176:24 179:23 180:15 201:8 211:7, 22 217:25 218:4,20, 24 219:6 221:15 222:24 235:17 241:24 242:3,15,17 254:10 260:3 261:20 264:11,13 286:19 301:11 306:5 370:9, 12,17 378:24

**states** 8:12 98:16 118:11 119:20 200:23 201:3,6

**status** 248:18

**stay** 248:19 363:9 387:10,16

**step** 347:3,4

**steps** 88:16

**stick** 20:7

**sticking** 203:5 277:13

**Stinson** 4:6 9:13,25

**stipulate** 7:15

**stipulation** 8:6

**Stock** 281:16

**stonewall** 157:18

**stood** 328:22

**Stoops** 276:2

**stop** 76:19,20,21,23 77:11,22 81:21,22 106:2 155:19,22 157:14 215:6 220:2

**stopped** 231:16 294:3 381:3,6

**stopping** 390:19

**strategy** 164:12

**Street** 3:15,23 4:13 8:23

**stressful** 292:24

**strike** 114:12 246:13 247:21 248:5,22 250:6 252:23 272:13 291:2 307:16 310:7 343:24 346:16 364:22 372:8 393:4

**string** 5:21 172:3 183:22

**structure** 87:22 112:13

**stuff** 156:6 157:5 252:11 295:6

**subevent** 130:24

**subject** 55:8 65:8 82:16,21 83:6,10,14 109:24,25 124:14 139:5,11 168:10 277:5

**subpoena** 11:6 16:18 81:13

**subpoenaed** 352:21

**subscribe** 281:12

**subscribed** 276:14 395:16

**subscribing** 281:19

**subsequent** 130:3, 10,21 131:2 133:8 134:19,22 138:5,9

143:9 242:22 262:14 263:4 274:12 370:24

**subsequently** 244:22

**substance** 72:22 73:15,19 74:6 151:5, 8 185:7 209:22

**substantively** 12:15

**substitute** 16:15

**succeeded** 31:22 32:11

**successor** 32:8,15

**sued** 182:2 375:6,14

**suffered** 276:7

**sufficient** 122:3

**suggest** 277:12

**suggesting** 338:9

**suggests** 253:2

**suing** 373:16,24 374:5

**SULLIVAN** 4:19

**sum** 250:4 335:20

**summaries** 368:4

**summarize** 273:14 279:12 280:4 296:8

**summarized** 274:21

**summarizing** 188:13

**summary** 5:23 237:19,23 279:16

**Suntrust** 4:17 10:6

**Super** 395:5

**supplemental** 218:20

**supporting** 311:15

**supposed** 315:14

**Surgent** 171:4 275:23

**surprised** 352:9 356:11 376:22 394:17

**Susan** 7:12 8:24

**sustained** 17:14

**swear** 7:13 10:10

**swearing** 7:17

**Switching** 321:25 324:20

**sworn** 10:12 395:16

**sync** 296:6

**system** 330:9

---

**T**

**Tab** 328:11

**taker** 324:16

**taking** 81:12 110:14 120:12 176:7 208:16 226:17 239:23 240:23 323:19 348:24

**talk** 89:2 157:16 164:15,20 233:19 279:2 293:7 325:13 350:16 387:17 388:23 395:4

**talked** 100:3 113:4 130:8 151:11 162:14, 15 187:21,23 188:4,7 190:15 217:14 222:23 249:14 253:16 268:3 292:11 311:15 349:19 351:5 378:5 379:18 389:2 391:9 394:6

**talking** 40:5 59:13,16 75:14 76:20,23 77:12,22 89:15 101:23 157:14 162:16 208:24 222:6, 8 231:19 259:25 264:19 323:6 341:23 350:13 351:11,13 352:16,17 354:18 368:18 379:25 383:14

**talks** 58:19 100:11 350:6

**task** 291:14

**tax** 280:7 354:22,25 358:11

**taxing** 353:5

**team** 53:4 86:8,12 87:12,14,22 88:21,23 89:2,8 112:10,12 113:8,24 116:7 137:18,20 147:14,18, 19,24 148:2,4,5 149:7,11,14,15,24 150:19,20 188:4,6 200:17 219:3 237:7 255:25 257:8,12,17, 23,25 258:4,7,12 259:11 272:23 290:11,13,14,15 291:8,17 292:5 309:21 311:24 312:13 335:11 351:7 367:10 368:3

**teams** 116:10 337:6 354:10

**tech** 320:20

**technologically** 320:12

**telephone** 191:15 290:19 342:23 344:12,14 392:22

**telling** 71:23 79:10 125:4 166:18 181:8, 14 182:14 207:24 246:21 251:4 253:9 285:5 287:8 317:5

**tendered** 45:2 55:18 57:19 58:3 60:13 63:3 64:6,15,23

**tenure** 39:20 40:2 86:3 94:4 102:11 114:5 230:14,18 368:25 369:11

**term** 28:19 33:13 41:17 44:16 45:14 51:17 53:13 54:2 58:14 69:8 71:20 75:23 79:8 99:16 170:8 173:2 186:21 315:14,15 333:14 362:14 364:3 369:16 383:19

**terminate** 380:11

**terminated** 326:5

**termination** 326:7,8, 9 380:21

**terms** 33:21 65:23 66:2,6 69:22 75:8 76:2 78:25 79:23 80:11 83:16,20 319:8,12,14 336:7

**Terrestar** 145:9 273:12,18,19 274:7 384:20 385:9,14,18

**testified** 10:12 68:18 80:7 155:5 156:11 179:7 201:23 206:10, 18 211:14 253:2 256:24 259:10 261:10 269:23 270:2, 13 282:24 283:6 289:3 309:20 312:20 313:3 314:16 318:8 319:10 320:8 351:2 357:8 362:24 378:4, 20 379:3 380:12 388:17

**testifies** 318:3,11

**testify** 252:18

**testifying** 252:22 302:14 387:22

**testimony** 16:11,19 20:7,15 29:5 72:22 289:17 301:13 318:5 370:19 387:25 391:11

**Texas** 3:16,24 4:8 8:14

**Thanksgiving** 329:20,22

**Thedford** 171:4 172:3,11,24 173:5 174:20 176:3,16 178:6 182:23 186:20 192:5 198:19 210:10, 13 275:24

**Thedford's** 182:20

**theme** 324:21

**thing** 129:4 187:5 199:23 215:17 320:2 357:3

**things** 61:14 85:6
89:5 136:19 142:13
147:17 153:10
162:15 248:16
249:12 254:24
257:10 259:14
261:23,24 263:18
264:3,17 265:14
279:22 280:8,9
288:14,16,17 292:22
295:21 329:4,24
333:21 352:12
354:11 356:25
357:10 371:16
373:11 374:25
376:24

**thinking** 22:18
324:11,12

**Thomas** 171:4
275:23

**thought** 37:14 40:11
54:20 127:9 188:25
235:8 252:2 263:23
304:12 363:13,21

**thoughts** 348:22

**thousands** 224:14
286:11,16

**thread** 118:4

**threatening** 374:22,
24

**thumb** 356:11

**tickler** 337:8

**tie** 222:25

**ties** 111:18 243:20

**till** 200:24

**time** 12:23 17:15
19:7,13,16,19 20:2
24:16,18,20,21 25:3,
12 37:18 38:25
39:10,15,18,23 40:8,
25 42:2 43:22,23
45:9,24 46:6 47:15
49:16 50:10 51:9,14,
19,25 55:15 56:8
58:19 60:22 61:10,
21,25 62:3 64:4
72:17 73:2,3 75:21
76:7 77:8 81:12
84:19 85:4,9 86:19,

24 87:3,8,17 93:7
99:16,24 100:6 101:3
113:16 114:16
116:16,20 120:9
122:5 124:4 127:16
135:24 136:15,16
137:12,22 138:15,18
139:4,9,16 141:10
148:19,21 154:21
158:11,18,23 159:4,9
160:8,24 162:4
163:10 164:25
166:12 168:24 169:2,
4,5 186:4 191:7
192:13 204:4,14
205:20 206:12
207:20 212:13,21
221:5 225:17,19
227:6 229:12,23
230:14,15 231:7,15,
16,23 232:21 233:4,
13,14,15 238:4
240:3,25 241:19
244:5,16 246:5 247:8
248:3,23 250:7 253:5
254:18 255:6 259:14
261:25 264:15 265:6,
9,24,25 266:2,25
269:14 270:8 273:17,
19,25 274:11 278:14
283:25 294:15 299:3
303:8 313:20 321:19,
22 322:13 323:4
331:25 337:20 339:7
343:23 352:2 353:25
357:3,5,12 358:19
363:25 365:12 366:2,
18 369:13,23 370:11
371:13 386:4,17
388:12,25 389:9
395:3

**timeframe** 169:8

**timeline** 40:20

**timely** 86:11 330:19
331:4 333:16 356:13,
24 357:14

**times** 11:11,13 25:7
62:12 90:17,18,19
207:17 249:8 250:2
252:2 298:15 320:8,
25 321:2 324:8 368:5
374:4 392:8,14,15

**title** 14:9,11,12 23:6,8

25:13 27:17 28:7,11,
17 34:12,22,25 35:5,
8 37:3,9,16 39:6
51:25 111:10 173:8
174:2 183:13,17
192:23 227:3,11
269:6 270:9,11 305:8

**titled** 237:19

**titles** 27:20 30:9,12
34:15,17 37:15,21,
22,23,25

**today** 11:2 13:20
23:22,23 24:7,13
28:4 30:23 31:11
51:17 73:15 81:11
93:12 102:14 116:24
118:8 141:12 162:14,
16 173:10 203:20
267:12,19 268:4,9
270:7 273:20 284:22,
23 286:4 291:22
310:8 314:19 317:15
320:3 370:8,18 392:3

**told** 47:8 58:18 60:11
67:19,21 69:21 78:3
81:6 116:19 132:5
138:23 139:3 145:18
154:10 162:17
163:20 165:8 174:4
180:22 181:2,19,21
182:6 189:14,19
190:20,25 191:8
203:9 204:18 205:22
211:5 234:20 246:9
248:17 250:13,16,20
251:7 254:4 257:16
282:5,16 283:16
287:5 318:4 375:24
385:7 386:7,17
391:12 392:5,11

**tomorrow** 395:4

**tone** 394:5,12

**top** 92:10 111:4,8
198:5 219:19 313:10

**topic** 114:19 234:3,
15 251:21 253:15

**total** 109:13 110:8
119:21 238:7 239:12
240:9 260:12 335:20
389:11

**totaled** 143:11

**totaling** 223:17

**Totally** 269:16

**touching** 264:5

**track** 337:9 364:15

**trade** 281:23

**trades** 273:25 274:8

**trail** 288:22

**transactions** 85:6,8,
14 100:13 102:21
103:5 148:6 224:15
285:21 286:5,12,13,
17 289:25 295:24
373:9

**transfer** 141:20
287:5 288:6 332:16

**transferred** 141:9
285:4,10

**transfers** 283:24
285:21 327:16

**transmitted** 340:25

**transparency**
295:20

**transparent** 313:4
375:10

**treasurer** 23:9,10,
16,22,23 24:2,3,6,8,
10,13,15,21 25:2,8,
14,18,23 26:19,22
27:4,22,23,25 28:3,5,
8,12,18,20 29:5,9,12,
15 30:14,15,16,20,
22,24 31:2,3,5 39:2
135:23 138:14
152:24 153:3,16,22
155:7,10,14,21
156:4,12 158:3,9,12
176:14 202:12 204:2
269:6,12,13 270:3,5,
9 272:4 305:8 327:4
336:4

**treasury** 335:15
336:25 351:3 354:7,
11,22 358:4

**treatment** 242:12

**trick** 348:7

**trigger** 369:24

**triggered** 274:16

**true** 74:18 89:22
186:4 204:4 269:11
277:13 333:6 350:21

**trust** 4:10 9:18 65:11
244:23 245:3,7
247:11 373:23 374:5

**trusted** 257:7

**trustee** 4:16 10:5
65:10

**truth** 252:18,20

**truthfully** 252:22
253:3

**TSG** 7:6 8:22,25

**Tuesday** 8:19 172:4

**tunnel** 293:3

**turn** 100:8 105:25
110:22 149:12
259:16 261:13

**turning** 197:12,16

**turns** 317:20

**two-month** 323:11

**type** 88:25 94:21
130:23,25 227:9
253:25

**types** 148:6

**typical** 103:25
106:17 371:5

**typically** 144:11
168:22 169:10
192:12 230:16
289:16 296:22
329:16 355:24,25

---

**U**

**Uh-huh** 69:4 210:17
237:21 368:20

**ultimately** 125:6
178:17 274:22 387:6

**unable** 122:14
203:18 204:24 208:7
211:10 212:10

**unaware** 64:24

**uncollectible** 244:9, 17 245:25 246:7,17, 24 247:13,25 249:3 250:10,15 251:9,22 253:11 254:4 255:9, 15

**uncomfortable** 90:14,20,24 91:9

**unconsolidated** 110:2,18

**undergoing** 207:20 241:16

**underlying** 246:11 311:24 332:12

**understand** 10:21, 25 12:6,9 13:24 17:3 31:10 41:13 45:22 53:22 55:9 68:20 74:4 75:22 76:5 78:24 79:16 98:22 99:18 104:2 127:7 133:9 153:15 158:7 176:20 203:12 222:9 225:25 267:25 268:17 273:3 288:2, 13 296:19 297:9 300:21 312:6 313:24 315:12 316:12 338:9, 25 353:24 364:16 374:7 376:10

**understanding** 41:10,17 53:6 65:22, 25 66:5 84:25 85:11 96:25 97:11,16,18,24 100:18 103:20 104:3 111:15 118:16,19 146:25 152:4,6,7,9 153:14,21 156:3 170:3,8 173:4 175:19 184:17 195:15 242:19 256:19 259:22 270:19 277:25 311:9 326:3 372:19 373:23 374:4 375:17 379:24

**understood** 69:2 155:6 203:10 382:22

**undo** 374:17

**unfettered** 372:21

**unilateral** 382:20

**unilaterally** 270:20 271:4 272:5

**unique** 12:21

**United** 8:12

**unlike** 12:18 353:20

**unpaid** 119:10 161:8, 18

**untested** 207:22

**upcoming** 336:8,11 337:25 355:13

**updated** 154:22

**upset** 362:11 390:2

**urgent** 356:23

**URQUHART** 4:19

**USD** 331:14

**V**

**vacation** 321:23 329:23

**vague** 353:19

**valid** 159:18 161:12, 16

**validity** 7:16

**valuation** 274:9,18, 24 280:7,13 292:5 354:15,22 384:20 385:9,14,19

**values** 251:5 253:17 264:2 265:9 367:9 387:3

**varied** 230:15

**varies** 87:2,3 230:14

**vendor** 288:17 356:7

**verify** 97:22

**verifying** 215:2

**versions** 136:13 146:14

**versus** 292:12

**video** 7:16 8:10,17, 21 323:23 324:3

**videotape** 12:10

**view** 204:24 205:11 292:14 301:8

**voice** 268:6

**vote** 282:5

**voted** 125:13

**W**

**wait** 156:18 157:4,5, 22 249:17

**waiting** 196:24

**walk** 180:17

**walk-through** 168:19

**walked** 179:7 294:4

**walking** 189:22

**wanted** 89:8 104:3 129:4 271:15 342:9 343:3,7 345:10

**Warren** 4:11 9:16

**Waterhouse** 3:1 4:1 5:1,5 6:1 7:1 8:1,11 9:1,11 10:1,11,18,19 11:1 12:1,24 13:1,15 14:1 15:1 16:1,10 17:1,16 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,19 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1,7,15 48:1 49:1 50:1 51:1,4 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1,19 73:1,9 74:1 75:1,3,22 76:1 77:1 78:1,14 79:1 80:1,25 81:1 82:1,4,14 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,25 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1

100:1 101:1 102:1 103:1 104:1 105:1,9 106:1,6 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,2 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1,23 147:1 148:1 149:1 150:1 151:1,4 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1,5 165:1 166:1 167:1 168:1 169:1 170:1,21 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1,25 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1,17 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1,5 198:1, 3 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1,15 210:1 211:1 212:1 213:1 214:1 215:1 216:1,15 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1,3 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1,25 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1,12 249:1 250:1 251:1 252:1 253:1,8 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1,12

267:1,23 268:1,20 269:1,20 270:1 271:1,5 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1,12 294:1 295:1 296:1 297:1, 22,24 298:1,7,19 299:1,11 300:1 301:1 302:1,10,19 303:1 304:1 305:1,5,9 306:1,8 307:1 308:1 309:1,8 310:1 311:1 312:1,9 313:1 314:1 315:1,18 316:1 317:1,4 318:1 319:1 320:1 321:1 322:1 323:1 324:1,15 325:1,11 326:1 327:1 328:1,15 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1,22 340:1 341:1 342:1 343:1 344:1 345:1 346:1 347:1 348:1 349:1,15 350:1,5 351:1 352:1,23 353:1 354:1 355:1 356:1 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1,24 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,18 373:1 374:1 375:1 376:1 377:1,9 378:1 379:1 380:1 381:1 382:1 383:1 384:1 385:1 386:1 387:1,21 388:1 389:1 390:1 391:1 392:1 393:1 394:1,24 395:1,2,14

**Waterhouse's** 140:24

**ways** 257:11

**wearing** 336:3

**Webex** 191:14

**Wednesday** 329:19

Index: week..zoom

**week** 267:11 329:17, 25 330:3,5 375:21 388:6

**weekend** 329:20

**weekly** 330:4

**weeks** 302:21 303:7 307:8 378:18

**wet** 299:8

**whatsoever** 251:6

**whichever** 365:14

**wholly** 233:17

**window** 323:11

**Winograd** 3:7

**wire** 330:8 350:19

**withdraw** 35:4 134:9

**withdrawn** 19:11 34:16,21 38:14 57:23 59:15 62:16 63:7 65:4 93:18 98:13 119:7 133:20 141:25 148:8 157:3 160:5 163:18,19 180:24 181:19 191:11 195:16,18 201:19 203:25 220:11 232:6, 19 382:7 386:5

**witness'** 36:2 156:3

**word** 68:23 76:7 146:13 293:21 307:6 391:2

**worded** 104:10

**words** 79:5 342:16 346:10 348:7 363:8

**work** 113:8 204:22 219:23 233:18 291:8 299:5 346:25 372:19

**worked** 116:7,12 237:8 259:12 290:15 309:21 370:12

**working** 90:22 147:13 207:19 219:18 291:13 292:24 299:8 342:25 381:19

**works** 269:9

**worried** 241:22 246:12

**worry** 215:18

**wrapping** 293:3

**write** 187:6

**write-up** 278:12

**writes** 174:20 328:21 329:5

**writing** 67:13 75:5 79:11 273:12 316:17 341:18

**written** 15:9 83:17,20 186:3 195:9 323:20, 25

**wrong** 77:3,4 133:18 138:20,24 215:16 374:6

**wrote** 313:15,17 314:5,6,9

**Y**

**y'all** 139:23 395:4

**year** 18:14,16,20,22 19:23 20:6,12 23:13, 14,15 27:24 30:19 36:23 38:15 59:3,5 68:11 80:9 84:23 85:3 87:3 90:12 93:5, 9 94:10,22 95:6,10, 14 100:7 103:14 104:6 131:4 145:10 160:7 161:4,7,17 162:25 166:6 168:14 169:2,4,6 170:12 220:19 221:21 223:16,18 224:13,15 244:14 265:3 286:21 326:11 334:15 348:17 381:24 382:10 383:20

**year-end** 222:4 244:10,14 262:7 362:16

**year-ended** 263:24

**yearly** 170:15

**years** 18:23 62:13,22 86:18 87:17 89:16 91:10 115:10 123:23 231:11 257:10 285:22 286:4,17,25 289:25 320:9 333:24 334:23 335:7 373:7,8 379:23

**years-plus** 89:18

**yellow** 178:8

**yesterday** 8:2 66:13 140:10 322:11

**York** 3:10 4:21 8:23 281:16

**you-all** 329:2

**Z**

**zeros** 286:15

**Ziehl** 3:8 9:5 10:21 72:10

**zoom** 3:3 191:14 309:15 313:11 323:23 324:2,4,9

# EXHIBIT 4

1              DONDERO - 10/29/21

2      IN THE UNITED STATES BANKRUPTCY COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
3           DALLAS DIVISION
  -----------------------------
4  IN RE:

5             Chapter 11
  HIGHLAND CAPITAL
6  MANAGEMENT, L.P.,     CASE NO.
             19-34054-SGI11
7

       Debtor.
8  -----------------------------
  HIGHLAND CAPITAL MANAGEMENT, L.P.,
9

       Plaintiff,
10  vs.               Adversary
             Proceeding No.
11  JAMES D. DONDERO,      21-03003-sgi

12       Defendant.
  -----------------------------
13

14     REMOTE VIDEOTAPED DEPOSITION OF

15      JAMES DONDERO - VOLUME 2

16        October 29, 2021

17

18

19

20

21

22

23

24  Reported by: Susan S. Klinger, RMR-CRR, CSR

25  Job No. 201874

Page 284

1        DONDERO - 10/29/21

2

3

4        October 29, 2021

5        10:21 a.m.

6

7

8

9        Remote Deposition of JAMES DONDERO, held

10   before Susan S. Klinger, a Registered Merit

11   Reporter and Certified Realtime Reporter of the

12   State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 285

1        DONDERO - 10/29/21

2   A P P E A R A N C E S :

3   (All appearances via Zoom.)

4   Attorneys for the Reorganized Highland Capital

5   Management:

6        John Morris, Esq.

7        Hayley Winograd, Esq.

8        Gregory Demo, Esq.

9        PACHULSKI STANG ZIEHL & JONES

10       780 Third Avenue

11       New York, New York 10017

12

13   Attorneys for NexPoint Advisors, LP and

14   Highland Capital Management Fund Advisors,

15   L.P.:

16       Davor Rukavina, Esq.

17       Thomas Berghman, Esq.

18       MUNSCH HARDT KOPF & HARR

19       500 North Akard Street

20       Dallas, Texas 75201

21

22

23

24

25

Page 286

1        DONDERO - 10/29/21

2   Attorneys for Jim Dondero, Nancy Dondero, HCRA,

3   and HCMS:

4        Deborah Deitsch-Perez, Esq.

5        Michael Aigen, Esq.

6        STINSON

7        3102 Oak Lawn Avenue

8        Dallas, Texas 75219

9

10   Attorneys for Dugaboy Investment Trust:

11       Douglas Draper, Esq.

12       Michael Landis, Esq.

13       HELLER, DRAPER & HORN

14       650 Poydras Street

15       New Orleans, Louisiana 70130

16   Attorneys for Marc Kirschner as the trustee for

17   the litigation SunTrust:

18       Deborah Newman, Esq.

19       QUINN EMANUEL URQUHART & SULLIVAN

20       51 Madison Avenue

21       New York, New York 10010

22   Also Present:

23       Dan Elms

24       Aaron Lawrence

25       Patricia Jeffries, Pachulski Stang

Page 287

1        DONDERO - 10/29/21

2        I N D E X

3   WITNESS                        PAGE

4   JAMES DONDERO

5   EXAMINATION BY MR. MORRIS            289

6        E X H I B I T S

7   No.                         Page

8   Exhibit 1  Original Complaint        466

9   Exhibit 2  NexPoint Complaint        408

10  Exhibit 3  HCMS Complaint            433

11  Exhibit 4  Letter, 12/3/20           464

12  Exhibit 6  Term note                 446

13  Exhibit 15 NexPoint Advisors Answer     380

14  Exhibit 16 HCMS's Answer             362

15  Exhibit 17 HCRE's Answer             377

16  Exhibit 31 Answer to Complaint       354

17  Exhibit 35 Incumbency Certificate    309

18  Exhibit 37 Incumbency Certificate    323

19  Exhibit 47 NexPoint 30(b)(6) notice     345

20  Exhibit 48 HCMS 30(b)(6) notice      353

21  Exhibit 49 HCRE 30(b)(6) notice      354

22

23

24

25

Page 288

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2          P R O C E E D I N G S
3          VIDEOGRAPHER:  This marks the
4    beginning of Video 1 in Volume 2 of the
5    deposition of James Dondero in the matter
6    In Re: Highland Capital Management, L.P.
7    Today's date is October 29, 2021.  The time
8    on the video monitor is 10:21 a.m.
9          Will the court reporter please swear
10   in the witness.
11         JAMES DONDERO,
12   having been first duly sworn, testified as
13   follows:
14         MR. MORRIS:  Deborah, would you like
15   to make a statement?
16         MS. DEITSCH-PEREZ:  I didn't know if
17   you wanted appearances first.  Sure.  This
18   is Deborah Deitsch-Perez from Stinson.  I'm
19   counsel for Mr. Dondero, Nancy Dondero,
20   HCRE and HCMS in this deposition.
21         I want to apologize for everybody
22   that we're starting late.  Mr. Dondero was
23   under the weather.  It is -- he has taken
24   something, so he should not have to leave
25   the deposition, but if at any point he

Page 289

DONDERO - 10/29/21

1    looks green to me, I will ask that we stop
2    and reconvene when he is not feeling
3    nauseous.
4          MR. MORRIS:  All right.  I would
5    like to just begin here.  We have counsel
6    on the line for all of the defendants, we
7    have counsel for the plaintiff, and we have
8    counsel for the Highland Litigation Trust,
9    and I think that that is everybody who
10   is -- is supposed to be here, so I would
11   like to just begin.
12         EXAMINATION
13   BY MR. MORRIS:
14         Q.   Mr. Dondero, can you hear me okay?
15         A.   Yes.
16         Q.   Okay.  And are you feeling well
17   enough to begin today's deposition?
18         A.   Yes.
19         Q.   Okay.  I understand that you are not
20   feeling well.  And I want you to know that I do
21   not want to proceed with this deposition unless
22   you believe that you are physically and
23   mentally able to participate to the best of
24   your ability.  Okay?  Do you understand that?

Page 290

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2          A.   Yes.
3          Q.   So if at any time you don't feel
4    like you can continue, I would rather adjourn
5    to one day next week to complete the deposition
6    rather than forcing you to do something that
7    you don't believe you're capable of doing.
8    Okay?
9          A.   Yes.  Yes.  I did throw up twice
10   last night.
11         Q.   Okay.
12         A.   I imagine we could go for -- let's
13   shoot for four hours today, you know, maybe --
14   maybe five, I don't know, but if we don't
15   finish --
16         Q.   I don't want to --
17         A.   -- we will do the rest next week.
18         Q.   Okay.  I don't want to put an
19   arbitrary time on it.  You tell me if you are
20   unable to continue.  Okay?  Is that fair?
21         A.   Yes.  That is my estimate at this
22   point.
23         Q.   Okay.  You founded Highland Capital
24   Management, L.P.; correct?
25         A.   Yes.

Page 291

DONDERO - 10/29/21

1          DONDERO - 10/29/21
2          Q.   And we are going to refer to that
3    entity and that entity only today as Highland;
4    is that okay?
5          A.   Yes.
6          Q.   When did you found -- when did you
7    create Highland?
8          A.   '94.
9          Q.   And did you serve as Highland's
10   president from 1994 until on or around January
11   9th, 2020?
12         A.   Yes.
13         Q.   Did -- can you describe in your own
14   words what the business of Highland was while
15   you were president?
16         A.   We were largely below investment
17   grade, credit strap, and we diversified over
18   the years to become more of an alternative
19   asset manager in a variety of formats.
20         Q.   And --
21         MS. DEITSCH-PEREZ:  I'm sorry, John,
22   one sec.  This was set up by someone a lot
23   shorter than Mr. Dondero.  Let me just take
24   one minute to adjust it.
25         MR. MORRIS:  May I proceed, Deborah?

Page 292

DONDERO - 10/29/21

2  MS. DEITSCH-PEREZ: (Nods head.)

3  Q.  Okay.  Mr. Dondero, at its peak,

4  what is the -- the largest value of assets that

5  Highland had under management while you were

6  president?

7  A.  35 billion.

8  Q.  And do you recall what year that

9  was?

10  A.  Not exactly.

11  Q.  Was it before the 2008 financial

12  crisis?

13  A.  Yes.

14  Q.  Okay.  So you were the president of

15  Highland for about 25 years; is that right?

16  A.  Yes, 25, 26, whatever.

17  Q.  And do you consider yourself to be

18  expert in the area of money management?

19  A.  Yeah, on the things that we focus

20  on.

21  Q.  You are a sophisticated investor;

22  right?

23  A.  Yes.  I would believe I'm

24  categorized as such.

25  Q.  And you are a sophisticated money

Page 293

DONDERO - 10/29/21

2  manager; is that fair?

3  A.  Yes.

4  Q.  And you manage money on behalf of

5  thousands of people; isn't that right?

6  A.  Yes.

7  Q.  And as a general matter, you know

8  how to read and understand balance sheets,

9  don't you?

10  A.  Yes.

11  Q.  You have signed promissory --

12  promissory notes before, haven't you?

13  A.  Yes.

14  Q.  Is it fair to say you have signed

15  hundreds of promissory notes during the 25-year

16  period that you were the president of Highland?

17  A.  No.

18  Q.  Is it fair to say that you signed

19  dozens of promissory notes during the time that

20  you were president of Highland?

21  A.  Yeah, dozens is probably fair.

22  Q.  Okay.  And is it fair to say that

23  the aggregate principal amount of the

24  promissory notes that you signed while you were

25  president of Highland likely exceeded

Page 294

DONDERO - 10/29/21

2  $200 million?

3  MS. DEITSCH-PEREZ:  Objection to the

4  form.

5  A.  I don't have a basis for knowing

6  that.

7  Q.  You do know that it is more than

8  $100 million, don't you?

9  A.  No.

10  Q.  Do you owe today Highland Capital

11  Management Services more than $75 million?

12  A.  I don't know what the amount is.  I

13  don't believe it is that much.

14  Q.  Are the obligations to Highland

15  Capital --

16  MS. DEITSCH-PEREZ:  Hold on.  Hold

17  on.  My connection just disappeared.

18  MR. MORRIS:  Okay.

19  MS. DEITSCH-PEREZ:  Okay, I'm back.

20  Q.  Okay.  Did the -- did the

21  obligations that you have to Highland Capital

22  Management Services, are they reflected in

23  promissory notes?

24  MS. DEITSCH-PEREZ:  Could you repeat

25  that question?

Page 295

DONDERO - 10/29/21

2  MR. MORRIS:  Sure.

3  Q.  Mr. Dondero, you borrowed money from

4  Highland Capital Management Services; correct?

5  A.  I'm sorry, it sounds like at first

6  you were asking me, did Highland Capital

7  Services borrow money from Highland.  Now

8  you're asking me if I borrowed money from

9  Services?

10  Q.  Yeah, let me -- let me rephrase the

11  question, sir, because if it's not clear, that

12  is my fault, and I apologize.

13  Did you -- have you borrowed money

14  from Highland Capital Management Services?

15  A.  I believe so.

16  Q.  Okay.  Do you know the aggregate

17  principal amount that is outstanding today,

18  ballpark?

19  A.  No.

20  Q.  Are the obligations that you have to

21  Highland Capital Management Services reflected

22  in promissory notes where you're the maker and

23  Highland Capital Management Services is the

24  payee?

25  A.  Please repeat that question.

Page 296

DONDERO - 10/29/21

1         Q. Are you the maker on promissory
2 notes in favor of Highland Capital Management
3 Services, Inc.?
4      A. I don't know. I believe -- I
5 believe so, or I believe I have in the past,
6 but I don't know.
7      Q. Do you have any -- any estimate as
8 to how much money you owe Highland Capital
9 Management Services, Inc. today?
10         MS. DEITSCH-PEREZ: Asked and
11     answered.
12      A. No.
13      Q. Can you say if it is more or less
14 than $50 million?
15      A. I don't know.
16      Q. Can you say if it is more or less
17 than $25 million?
18      A. I don't know.
19      Q. As a general matter, is it fair to
20 say that you know how to read and understand
21 promissory notes?
22         MS. DEITSCH-PEREZ: Object to the
23     form.
24      A. In general, yes.

Page 297

DONDERO - 10/29/21

1      Q. Okay. When you were in control of
2 Highland, you personally decided who was hired
3 at that company; is that fair?
4      A. Sometimes, in senior positions.
5      Q. Okay. Did your duties as president
6 of Highland include being familiar with the
7 debts and obligations that were owed to
8 Highland?
9         MS. DEITSCH-PEREZ: Object to the
10     form.
11      A. I mean, generally.
12      Q. Okay. Did you ever do anything to
13 familiarize yourself with the debts and
14 obligations that were owed to Highland?
15      A. Are you referring to the affiliated
16 notes or --
17      Q. Sure.
18      A. -- or what -- what are --
19      Q. I was -- I was asking -- I
20 apologize. I don't mean to step on your words.
21      A. No, you just -- because I don't
22 think Highland had a lot of other obligations
23 due from other parties, and the affiliated
24 notes in aggregate were always de minimis to

Page 298

DONDERO - 10/29/21

1 Highland than now, at any time.
2      Q. It is your -- it is your position
3 that the affiliate notes to Highland were de
4 minimis in amount?
5      A. Yes.
6      Q. And how do you define de minimus for
7 that purpose?
8      A. I believe the balance sheet of
9 Highland today for the last three years, four
10 years, five years has been between 5 and
11 $600 million. I believe the notes have never
12 been more than 8 or 10 or 12 percent of that
13 number.
14      Q. And you believe that 8 or 10 or
15 12 percent of Highland's asset base you
16 would -- you would define as de minimis?
17      A. Yes.
18      Q. Okay. As -- as president of
19 Highland, did you ever do anything to
20 familiarize yourself with the number and amount
21 of affiliate loans that Highland carried on its
22 books and records?
23      A. Not that I can recall.
24      Q. Was there anybody at Highland who

Page 299

DONDERO - 10/29/21

1 was charged with the responsibility of knowing
2 the number and amount of affiliate loans that
3 Highland carried on its balance sheet?
4      A. Sure.
5      Q. Can you identify the people who were
6 responsible for that?
7      A. The people in accounting responsible
8 for tracking assets and liabilities in
9 preparing all the audited financial statements
10 every year and the quarterly unaudited
11 financial statements that were prepared and the
12 monthly operating reports.
13      Q. Can you -- can you name any names of
14 the people who had the responsibilities that
15 you just described?
16      A. I think it changed regularly, but it
17 would have been people in Frank's group in
18 accounting.
19      Q. Did Frank have any responsibility
20 for knowing and understanding the affiliate
21 loans that Highland carried on its balance
22 sheet?
23      A. Sure. I -- as CFO he had to sign
24 off on the audited financials and rep letters

Page 300

DONDERO - 10/29/21

1
2 and -- yes.
3    Q.   And can you -- can you identify the
4 name of any person in the accounting group in,
5 let's say, the three years prior to the
6 bankruptcy who had responsibility for knowing
7 and understanding the scope of affiliate loans
8 that Highland carried on its balance sheet?
9    A.   No, I would just be speculating but
10 it would be -- the senior people in Frank's
11 group would be responsible for the financial
12 statements.
13    Q.   Are you able to name the people, the
14 senior people in Frank's group in the couple of
15 years prior to the bankruptcy?
16    A.   Yes, but I don't know -- like
17 David Klos was a senior person, Cliff Stoops
18 was a senior person. There were a couple
19 up-and-comers below them, but who did the
20 financials -- how Frank assigned the work in
21 his group, I have no idea.
22    Q.   Did you ever ask?
23    A.   No.
24    Q.   Do you have any knowledge as you sit
25 here today who within Frank's group had

Page 301

DONDERO - 10/29/21

1
2 responsibility for knowing and understanding
3 the affiliate loans that Highland carried on
4 its balance sheets?
5    A.   No.
6    Q.   And to the best of your knowledge as
7 you sit here today, you never personally did
8 anything to know and understand the extent and
9 scope of the affiliate loans that Highland
10 carried on its balance sheet; is that right?
11    A.   Correct.
12    Q.   Okay. You appointed Mr. Waterhouse
13 as Highland's CFO; is that right?
14    A.   I think it was appointed and
15 recommended by Patrick Boyce, but I agreed with
16 the selection.
17    Q.   And you --
18    A.   That -- (speaking simultaneously.)
19    Q.   I apologize, are you done?
20    A.   I'm just saying that was a long time
21 ago, but I don't remember the details exactly.
22    Q.   But you had the authority and you
23 used that authority to appoint Frank as CFO;
24 correct?
25       MS. DEITSCH-PEREZ: There's a lag in

Page 302

DONDERO - 10/29/21

1
2 the video. I don't know if it matters, but
3 for a while Jim was frozen. And I know
4 because -- since there was voice and no --
5 his mouth wasn't moving. So let's just --
6 if the videographer sees there is a
7 problem, please let us know.
8    Q.   I --
9    A.   Yes. I'm sorry, could you just
10 repeat the question regarding Frank, please?
11    Q.   Sure.
12       As the president of Highland, did
13 you have the authority and did you exercise
14 that authority to appoint him as Highland's
15 CFO?
16    A.   Yes.
17    Q.   Okay. Do you recall when you
18 appointed Mr. Waterhouse CFO of Highland?
19    A.   No.
20    Q.   Was it more than five years prior to
21 the bankruptcy?
22    A.   Yes.
23    Q.   As the president -- during the time
24 that you served as president of Highland, did
25 you believe that Mr. Waterhouse fulfilled his

Page 303

DONDERO - 10/29/21

1
2 duties as chief financial officer?
3    A.   Yes.
4    Q.   Can you recall anything that
5 Mr. Waterhouse did in his capacity as
6 Highland's CFO that did not comport with your
7 expectations?
8    A.   I think we will talk about some of
9 those today.
10    Q.   Okay. Do you have any reason to
11 believe that Mr. Waterhouse ever breached his
12 duties to Highland during the time that you
13 served as president?
14       COURT REPORTER: We can't hear you
15 speaking.
16    Q.   We haven't heard any portion of your
17 answer, Mr. Dondero.
18       MR. MORRIS: I don't know if people
19 can -- can hear, but I cannot hear
20 Mr. Dondero.
21       COURT REPORTER: I can't either.
22       MR. MORRIS: Yeah, Deborah, can you
23 speak, please.
24       COURT REPORTER: They're on the same
25 speaker.

Page 304

1        DONDERO - 10/29/21
2      VIDEOGRAPHER: Do we want to go off
3 the record?
4      MR. MORRIS: Yes, please.
5      VIDEOGRAPHER: Off the record,
6 10:41.
7 (Recess taken 10:41 a.m. to 10:47 a.m.)
8      VIDEOGRAPHER: Back on the record,
9 10:47.
10    Q. Okay. Let me just ask the question
11 again so the record is clean, Mr. Dondero.
12      Do you have any reason to believe as
13 you sit here right now that Mr. Waterhouse ever
14 breached his duties to Highland during the time
15 that you served as president?
16      MS. DEITSCH-PEREZ: Asked and
17 answered.
18    A. Yeah, I think I did ask and answer
19 that. Again, not intentionally, not
20 maliciously. I am -- I guess things we're
21 going to talk about today are for periods of
22 time after I was president, so...
23    Q. Right. That is going to be the next
24 question that I ask. But to be clear -- I just
25 want to have a clear record -- during the time

Page 305

1 that you were president, do you have any reason
2 to believe that Mr. Waterhouse breached his
3 duties to Highland?
4      MS. DEITSCH-PEREZ: Asked and
5 answered. This is the third time.
6    A. No.
7      MR. MORRIS: It is actually not.
8    Q. But thank you, Mr. Dondero. I
9 appreciate that.
10      After you ceased to be president of
11 Highland, do you have any reason to believe
12 that Mr. Waterhouse breached his duties to
13 Highland?
14    A. Breached his duties to -- I don't --
15 I don't know if it is -- I don't want to -- I
16 don't want to make a judgment overall. When we
17 talk about the notes we can make conclusions
18 then.
19    Q. All right. But you're not able to
20 tell me in response to my question whether you
21 believe today that Mr. Waterhouse breached his
22 duties to Highland after the time that you
23 served as president?
24      MS. DEITSCH-PEREZ: Object to the

Page 306

1        DONDERO - 10/29/21
2 form of the question.
3    A. I don't want to comment off the top
4 of my head, but I've highlighted that we will
5 discuss it around the note issue.
6    Q. Okay. You are familiar with an
7 entity called Highland Capital Management Fund
8 Advisors, L.P.; is that correct?
9    A. Yes.
10    Q. And we're going to refer to that
11 entity as HCMFA. Is that okay?
12    A. Yes.
13    Q. Do you know who owns HCMFA?
14    A. I believe it is myself and
15 Mark Okada.
16    Q. Okay. And do you have an
17 understanding as to -- as to the percentage of
18 each of your interests, ownership interests in
19 HCMFA?
20    A. No, and I don't know the entities.
21 I don't know if I own it directly or through
22 Dugaboy. And I do believe Okada tends to use
23 his trusts, but I don't know the percentages
24 either.
25    Q. Do you own a -- do you own a

Page 307

1        DONDERO - 10/29/21
2 major- -- withdrawn.
3      Do you directly or indirectly own a
4 majority of the ownership interests in HCMFA?
5    A. I believe so.
6    Q. Okay. And do you control HCMFA?
7    A. Yes.
8    Q. And do you know when HCMFA was
9 created?
10    A. No, I do not.
11    Q. Do you know if it was before or
12 after 2010?
13    A. I don't know.
14    Q. Have you controlled HCMFA since the
15 time it was created?
16    A. I believe so, but I don't know for
17 sure.
18    Q. Can you think of any period of time
19 when you didn't control HCMFA?
20    A. I don't know. I don't remember the
21 ownership structure prior and I don't remember
22 when it started, so I don't know.
23    Q. Okay. I'm asking about control and
24 not ownership.
25      Can you think of any period of time

Page 308

DONDERO - 10/29/21

1
2 when you did not control HCMFA?
3    A.  I don't know.
4    Q.  Okay.  Can you tell me what the
5 nature of HCMFA's business is?
6    A.  It largely housed our mutual funds.
7    Q.  What does it mean to house mutual
8 funds?
9    A.  It managed – it managed the mutual
10 funds from a portfolio asset side and captured
11 the management fees as the advisor or sub
12 advisor – I can't remember the structure.  I
13 can't remember if it was the advisor and
14 Highland was the sub advisor or vice versa, but
15 in general, a good portion, or most of the
16 portfolio team that managed the mutual funds
17 was employed at HCMFA.
18    Q.  Do you have a title with HCMFA
19 today?
20    A.  I don't know.
21    Q.  Do you know who the president of
22 HCMFA is?
23    A.  I would believe – I would – I
24 would think I am, but I don't know.
25    Q.  Do you know of any title that you

Page 309

DONDERO - 10/29/21

1
2 have at HCMFA today?
3    A.  I know I'm the portfolio manager on
4 a bunch of the funds, one of usually two or
5 three portfolio managers, and I believe I'm the
6 president, but I don't know beyond that.
7    Q.  Okay.  Did Frank Waterhouse serve as
8 treasurer of HCMFA at any point in time?
9    A.  I don't know.  I don't know.  I
10 just – I don't know.  I don't remember.
11      MR. MORRIS:  Can I ask my – my
12 colleague to please put up a document that
13 was premarked as Exhibit 35 to see if I can
14 refresh your recollection.
15      MS. DEITSCH-PEREZ:  Is that in the
16 book that you sent over?
17      MR. MORRIS:  No.  She will post it
18 and she will put it in the chat room.
19    Q.  Are you able to see that,
20 Mr. Dondero?
21    A.  Yes.
22    Q.  Can you see that this is an
23 incumbency certificate?
24    A.  Yes.
25    Q.  Do you know what an incumbency

Page 310

DONDERO - 10/29/21

1
2 certificate is?
3    A.  I'm reading it here for a second.  I
4 guess it is an officer statement or signature
5 authority, or some combination thereof.
6    Q.  Is that your signature at the bottom
7 of this document?
8    A.  Yes.
9    Q.  And do you see that this is an
10 incumbency certificate for HCMFA that you
11 signed effective as of April 11th, 2019?
12    A.  Yes.
13    Q.  Do you see that Frank Waterhouse is
14 identified as the treasurer of HCMFA as of that
15 date?
16    A.  Yes.
17    Q.  Does that refresh your recollection
18 that Mr. Waterhouse served as the treasurer of
19 HCMFA?
20    A.  It seems to be an authoritative
21 document, but I didn't have a recollection.
22    Q.  Do you know of anybody else who has
23 ever served as the treasurer of HCMFA other
24 than Mr. Waterhouse?
25    A.  I don't recall.

Page 311

DONDERO - 10/29/21

1
2    Q.  Did you, in your capacity as the
3 person who was in control of HCMFA, appoint
4 Mr. Waterhouse as the treasurer of that entity?
5      MS. DEITSCH-PEREZ:  Object to the
6 form.
7    A.  It appears to me that that's what
8 this incumbency certificate does, but...
9    Q.  Is it fair to say that you knew for
10 at least a few years prior to the petition date
11 that Mr. Waterhouse was simultaneously serving
12 as Highland's CFO and HCMFA's treasurer?
13    A.  No.  I mean, like I said, I don't
14 remember, and a lot of the officers had
15 multiple roles and multiple entities.  I mean,
16 it is not surprising, but I didn't have any
17 recollection.
18    Q.  Are you aware that Mr. Waterhouse
19 served in any capacity in the Highland universe
20 of companies other than as CFO of Highland
21 Capital Management, L.P.?
22    A.  I would – I would assume he would
23 have a position here in multiple other
24 entities, but I don't know which ones or what
25 titles he would have off the top of my head.

Page 312

DONDERO - 10/29/21

2  Q.   Is it fair to say, though, that he
3  wouldn't have obtained any of those titles
4  without your knowledge and approval?
5  A.   It is -- it is fair to say he was --
6  he had -- the lawyers or whoever worked on
7  general corporate structuring, Frank was a
8  senior officer in good standing, so they would
9  have used him as appropriate in different
10  things.
11       So to that extent, I guess I approve
12  it, but I sign hundreds of things like this.
13  Would -- you know, would I have been
14  specifically aware or remember -- remember it
15  is a very low likelihood.
16  Q.   Is there any position that
17  Mr. Waterhouse has ever held that you learned
18  about and you objected to on the grounds that
19  you hadn't approved it?
20  A.   No, not that I recall.
21  Q.   Okay.  Do you know if Mr. Waterhouse
22  held any positions with any of the retail
23  funds?
24  A.   I don't know.
25  Q.   He may have, you just don't recall;

Page 313

DONDERO - 10/29/21

2  is that right?
3  A.   That is correct.
4  Q.   And you can't identify any title
5  that Mr. Waterhouse held during the time that
6  you served as Highland's president other than
7  CFO of Highland.  Do I have that right?
8  A.   No, I don't think that is fair.
9  Q.   Okay.
10  A.   I mean -- I mean, he was CFO, but he
11  was other things before he was CFO.  And as we
12  were just saying, he's -- he's treasurer on
13  this incumbency certificate, but I think he
14  might have been on other incumbency
15  certificates, so I think your -- your summary
16  was too narrow.
17  Q.   Okay.  Can you identify any position
18  that Mr. Waterhouse held at the same time that
19  he is CFO of Highland other than treasurer of
20  HCMFA as reflected on this document?
21  A.   I can't recall, but I imagine there
22  to be others.
23  Q.   And to the extent there are others,
24  is it fair to say that you knew at the time
25  that Mr. Waterhouse was serving in more than

Page 314

DONDERO - 10/29/21

2  one role?
3  A.   Yes.
4  Q.   Okay.  And in his capacity as CFO of
5  Highland, did he report directly to you?
6  A.   Yes.
7  Q.   In his capacity as treasurer of
8  HCMFA, did he report directly to you?
9  A.   Yeah, it appears that, yes, that is
10  how it was structured.
11  Q.   Can you think of any position that
12  Mr. Waterhouse ever held in the Highland family
13  of companies where he didn't report directly to
14  you?
15  A.   I can't -- I can't think of any.
16  Q.   Is Mr. Waterhouse the treasurer of
17  HCMFA today?
18  A.   I don't know.  I'm not aware of any
19  changes, nor did I orchestrate any changes, but
20  I don't know for sure.
21  Q.   Can you identify any position that
22  Mr. Waterhouse holds with any former affiliated
23  company of Highland today?
24  A.   Again, I'm not aware of any changes,
25  nor did I orchestrate or precipitate any

Page 315

DONDERO - 10/29/21

2  changes.  With the formation of Skyview, I
3  don't know if there was changes.  I'm not
4  aware.
5  Q.   Have you considered firing
6  Mr. Waterhouse from any of the positions that
7  he holds with any of the companies that were
8  formerly affiliated with Highland?
9  A.   No.
10  Q.   As the president of HCMFA --
11  withdrawn.
12       As the person who was in control of
13  HCMFA, did you have any responsibility for
14  being familiar with HCMFA's debts and
15  obligations?
16       MS. DEITSCH-PEREZ:  Object to the
17  form.
18  A.   I don't know.
19  Q.   Did you ever do anything in your
20  capacity as the person in control of HCMFA to
21  familiarize yourself with HCMFA's debts and
22  obligations?
23  A.   Not during -- I mean, not prior to
24  bankruptcy.
25  Q.   So before the bankruptcy, you didn't

Page 316

DONDERO - 10/29/21

1

2 take any steps to familiarize yourself with

3 HCMFA's debts and obligations. Do I have that

4 right?

5    A.   Correct, not specifically.

6    Q.   Okay. Who was responsible for

7 knowing and understanding the scope and extent

8 of HCMFA's debts and obligations?

9    A.   That would have fallen on Frank and

10 his group.

11    Q.   Okay. Do you have an understanding

12 as to who was authorized to incur obligations

13 on behalf of HCMFA?

14    A.   I mean, beyond – beyond due course,

15 I struggle to see why it would be anybody other

16 than me, but I don't know.

17    Q.   Do you know if Mr. Waterhouse was

18 authorized as the treasurer of HCMFA to incur

19 obligations on its behalf?

20    A.   He wasn't the senior operating or

21 executive positions there. So the answer is

22 no, beyond, you know – beyond the normal

23 course of operating expenses or whatever, but

24 it would – he would never be the person on

25 anything of significance.

Page 317

DONDERO - 10/29/21

1

2    Q.   How do you define "significance"?

3    A.   Like waiving fees on a mutual fund,

4 purchasing another mutual fund, yeah, things

5 like that.

6    Q.   Was there any document or policy

7 that you are aware of that specifically

8 identifies the scope of Mr. Waterhouse's

9 authority as the treasurer of HCMFA?

10    A.   No.

11    Q.   Is there anything that you are aware

12 of that specifically limits Mr. Waterhouse's

13 authority other than what might be in your

14 head?

15    A.   No, I would – I would say what is

16 in my head is – would be typical industry

17 practice. You wouldn't – you wouldn't have

18 executive vice presidents or ownership defined

19 if you were going to delegate everything to an

20 employee three levels down, you know.

21    MS. DEITSCH-PEREZ:  Okay. John,

22 I've had a request from Davor to take a

23 quick restroom break, so –

24    MR. MORRIS:  You know, I really –

25 Davor, I'm happy to accommodate, but at

Page 318

DONDERO - 10/29/21

1

2 some point we have got to be able to get

3 more than 10 minutes of testimony in a row.

4 So let's take a short break.

5    MS. DEITSCH-PEREZ:  Thank you.

6    VIDEOGRAPHER:  Going off the record.

7 The time is 11:08.

8 (Recess taken 11:08 a.m. to 11:16 a.m.)

9    VIDEOGRAPHER:  Back on the record,

10 11:16.

11    Q.   Mr. Dondero, did you communicate

12 with anybody on the break about the substance

13 of your testimony?

14    A.   No.

15    Q.   As treasurer of HCMFA, did

16 Mr. Waterhouse's responsibilities include being

17 familiar with HCMFA's debts and obligations?

18    A.   Yes.

19    Q.   Do you have any reason to believe as

20 you sit here today that Mr. Waterhouse failed

21 to fulfill his responsibilities as treasurer of

22 HCMFA and familiarize himself with their debts

23 and responsibilities?

24    MS. DEITSCH-PEREZ:  Object to the

25 form.

Page 319

DONDERO - 10/29/21

1

2    A.   I don't know.

3    Q.   I appreciate that you don't know,

4 but do you have any reason as you sit here

5 today to believe that he failed to fulfill that

6 particular responsibility?

7    A.   I don't know.

8    Q.   Okay. Are you an authorized

9 signatory on HCMFA's bank accounts?

10    A.   I don't know.

11    Q.   Do you know who the authorized

12 signatories are on HCMFA's bank accounts?

13    A.   No.

14    Q.   Do you know whether anybody now

15 employed or previously employed by Highland was

16 an authorized signatory with respect to any of

17 HCMFA's bank accounts?

18    A.   I don't know.

19    Q.   Do you know whether Mr. Waterhouse

20 was an authorized signatory on any of HCMFA's

21 bank accounts?

22    A.   I don't know how he had – had it

23 set up. There would have been, I imagine,

24 checks and balances. We run, as far as I know,

25 a compliant accounting group, you know, with

Page 320

DONDERO - 10/29/21

1 the right audit controls, et cetera. So I
2 would imagine there would have been somebody
3 preparing it and multiple signatures or
4 multiple sign-offs on wires, but I have no
5 awareness of this. I mean, I would believe
6 that it was done compliantly and correctly, but
7 I don't have any specific awareness.
8     Q.   Okay.  Do you know Lauren Thedford?
9     A.   Yes.
10     Q.   And was Ms. Thedford an employee of
11 Highland at one time?
12     A.   Yes.
13     Q.   Do you recall what position she held
14 at any particular point in time?
15     A.   I believe she held several different
16 positions over the years, but I remember most
17 as a corporate attorney working on document --
18 documents when we -- we do new funds or amend
19 old funds.
20     Q.   Okay.  Do you recall whether she
21 served as an officer of HCMFA?
22     A.   Wasn't her name on the incumbency
23 certificate we had up earlier?
24     Q.   It was.  We can put it back up if

Page 321

DONDERO - 10/29/21

1 you want to look at that.
2     A.   No, but I think that is -- that is
3 the answer, but that is my only awareness.
4     Q.   Okay.  Do you have -- do you have --
5 do you know whether she was ever appointed to
6 any position within the Highland corporate
7 family other than as an attorney with Highland
8 and as the secretary of HCMFA?
9     A.   I don't know.
10     Q.   Other than Ms. Waterhouse --
11 withdrawn.
12     Other than Mr. Waterhouse and
13 Ms. Thedford, can you identify any current or
14 former employee of Highland that ever served as
15 an officer of HCMFA?
16     A.   I don't know.
17     Q.   Okay.  Can you identify any current
18 or former employee of Highland who was
19 simultaneously also an employee of HCMFA?
20     MS. DEITSCH-PEREZ:  Object to the
21 form.
22     A.   You mean somebody who was a dual
23 employee?
24     Q.   Yeah, who was actually -- yeah, to

Page 322

DONDERO - 10/29/21

1 be clear, who was actually employed by both,
2 who received, you know, income from both.
3     A.   I don't know regarding income, but
4 some of that historic portfolio managers like
5 Michael Gregory or Jonathan Lamensdorf, they
6 did work for HCMFA primarily, but they also did
7 other things for Highland.  I don't know how
8 their compensation or their bonuses were split.
9 I just -- I wouldn't have awareness of that.
10     Q.   Let's move on to NexPoint.  You're
11 familiar with an entity called NexPoint
12 Advisors, L.P.; correct?
13     A.   Yes.
14     Q.   We will refer to that as NexPoint,
15 okay?
16     A.   Sure.
17     Q.   Do you know who owns NexPoint?
18     A.   Directly or indirectly, I believe I
19 do.
20     Q.   Okay.  And do you control NexPoint?
21     A.   Yes.
22     Q.   And do you know when NexPoint was
23 created?
24     A.   More than five years ago, but I

Page 323

DONDERO - 10/29/21

1 don't remember when.
2     Q.   Can you tell me generally the nature
3 of NexPoint's business?
4     A.   It is generally real estate related.
5     Q.   Have you controlled NexPoint
6 throughout its corporate existence, to the best
7 of your knowledge?
8     A.   Yes.
9     Q.   Do you have a title with NexPoint
10 today?
11     A.   I believe I'm president, but I don't
12 know for sure.
13     Q.   Did you appoint Mr. Waterhouse to
14 serve as treasurer of NexPoint?
15     A.   I don't know.
16     MR. MORRIS:  Please put up Exhibit
17 37.
18     Q.   This is another incumbency
19 certificate, sir?
20     A.   Yes.
21     Q.   And do you see, is that your
22 signature at the bottom?
23     A.   Looks like it, yes.
24     Q.   And does this refresh your

Page 324

DONDERO - 10/29/21

1 recollection that you personally identified
2 Mr. Waterhouse as the treasurer of NexPoint
3 Advisors, L.P. effective as of April 11th,
4 2019?
5     A.   No, I mean, not – no.
6     Q.   Do you have any reason to doubt that
7 Mr. Waterhouse served as the treasurer of
8 NexPoint Advisors prior to the petition date?
9     A.   No, I don't have a reason to
10 disagree with it.  I just didn't have an
11 awareness.  And when you asked me earlier, the
12 thing that was running through my mind is that
13 it could have been, you know, Brian Mitts who
14 has a strong accounting background at NexPoint.
15 I just wasn't – I didn't know, based on
16 recollection, who was treasurer.
17     Q.   Okay.  Were you aware that – but
18 you were aware, were you not, that
19 Mr. Waterhouse wore multiple hats?
20        MS. DEITSCH-PEREZ:  Objection to
21     form.
22     Q.   Withdrawn.
23        You were aware, were you not, sir,
24 that during the time that you served as

Page 325

DONDERO - 10/29/21

1 president of Highland, that Mr. Waterhouse
2 served in capacities with respect to affiliated
3 companies?
4     A.   I was aware that multiple senior
5 executives had multiple titles at multiple
6 different entities, but I didn't have specific
7 awareness whatsoever on entities that Frank was
8 or was not involved in.
9     Q.   Okay.  But to the extent that he
10 held a title with one of the affiliated
11 companies, those affiliated companies would
12 have been managed or controlled by you;
13 correct?
14     A.   Generally.
15     Q.   You can't think of any title that he
16 held with an affiliated company that wasn't
17 managed by you, can you?
18     A.   No, not off the top of my head.
19     Q.   And you knew and intended prior to
20 the petition date to have Mr. Waterhouse serve
21 in multiple roles; is that fair?
22     A.   Yes.
23     Q.   Have you ever considered firing
24 Mr. Waterhouse from his position as treasurer

Page 326

DONDERO - 10/29/21

1 of NexPoint Advisors?
2     A.   No.
3     Q.   Okay.  As the president of NexPoint
4 Advisors, do you believe that you had a
5 responsibility to familiarize yourself with
6 NexPoint's debts and obligations?
7        MS. DEITSCH-PEREZ:  Object to the
8     form.
9     A.   Just generally.
10     Q.   Okay.  Did you do anything to
11 generally inform yourself of NexPoint's debts
12 and obligations?
13     A.   Not – not specifically that I can
14 recall.
15     Q.   Can you recall doing anything to
16 familiarize yourself with NexPoint's debts and
17 obligations at any time?
18     A.   Not that I recall.
19        MS. DEITSCH-PEREZ:  Object to the
20     form.
21     A.   Not that I recall.
22     Q.   Did you ever look at NexPoint's
23 balance sheet?
24     A.   Not – not that I – not that I
25 recall.

Page 327

DONDERO - 10/29/21

1     Q.   Do you know whether NexPoint's
2 balance sheet reflected obligations that it
3 carried as liabilities that were due and owing
4 to Highland?
5     A.   I was aware generally of the notes,
6 but I didn't study the NexPoint balance sheet.
7     Q.   Do you believe that Mr. Waterhouse
8 had any responsibility as NexPoint's treasurer
9 to familiarize himself with NexPoint's debts
10 and obligations?
11     A.   Yeah.  I mean, the role is different
12 and the burden is different, and Frank and his
13 team orchestrated all the audits and compliance
14 statements and regulatory stuff for all of the
15 funds managed by NexPoint.
16     Q.   Well, you personally were
17 responsible for Highland's audited financial
18 statements, weren't you?
19        MS. DEITSCH-PEREZ:  Objection, form.
20     A.   No.  I mean, "responsible" is not
21 the right word.  I mean, we – I have to – as
22 the senior most executive, I have to – to
23 sign – sign statements regarding completeness
24 and no known frauds and those kinds of things,

Page 328

DONDERO - 10/29/21

1
2  but I am in no way involved in the preparation.
3  Q.   We will talk about that in a bit.
4      Do you have any reason to believe
5  today that Mr. Waterhouse failed to fulfill his
6  responsibilities as treasurer of NexPoint to
7  familiarize himself with NexPoint's debts and
8  obligations?
9  A.   I don't know.
10  Q.   You can't identify any particular
11  reason that you might have for concluding that
12  Mr. Waterhouse failed to fulfill his duties as
13  treasurer of NexPoint to familiarize himself
14  with NexPoint's duties and respons -- duties
15  and obligations; correct?
16  A.   Yes, I don't know.
17  Q.   Okay. Do you know who the
18  authorized signatories are on NexPoint's bank
19  accounts?
20  A.   No.
21  Q.   Do you know if you're an authorized
22  signatory on NexPoint's bank accounts?
23  A.   I don't know.
24  Q.   Do you know if Mr. Waterhouse is an
25  authorized signatory on NexPoint's bank

Page 329

DONDERO - 10/29/21

1
2  accounts?
3  A.   I don't know.
4  Q.   Do you know whether there is any
5  current or former employee of Highland who did
6  not hold an officer position at NexPoint who
7  would have been an authorized signatory on
8  NexPoint's bank accounts?
9      MS. DEITSCH-PEREZ:  Object to the
10  form.
11  A.   I don't know.
12  Q.   Can you identify any current or
13  former employee of Highland who served as an
14  officer of NexPoint at any time other than
15  Ms. Thedford and Mr. Waterhouse?
16  A.   I don't know.
17  Q.   Okay. Let's go to HCMS. Are you
18  familiar with an entity called Highland Capital
19  Management Services, Inc.?
20  A.   Generally, yes.
21  Q.   And can we refer to that as HCMS?
22  A.   Yes.
23  Q.   Do you have a direct or indirect
24  ownership interest in HCMS?
25  A.   I believe so.

Page 330

DONDERO - 10/29/21

1
2  Q.   And do you own a majority of the
3  interest directly or indirectly in HCMS?
4  A.   I believe so.
5  Q.   Do you control HCMS?
6  A.   I believe so.
7  Q.   Have you -- has there ever been a
8  period of time in HCMS's corporate existence
9  where you did not control that entity?
10  A.   Not that I'm aware of.
11  Q.   Do you recall when HCMS was created?
12  A.   More than five years ago, but I
13  don't remember when.
14  Q.   Do you have an understanding of the
15  nature of HCMS's business?
16  A.   It manages some assets, and it was
17  trying to create track records that then could
18  be marketed.
19  Q.   What does it mean to create a track
20  record that could be marketed?
21  A.   You execute investments and
22  investment strategy that you can refine and
23  articulate and show good results to potential
24  third-party investors as -- as evidence that
25  you can do it. And then that track record is

Page 331

DONDERO - 10/29/21

1
2  something the investors are willing to take a
3  chance on and then give you separate account
4  money along those lines.
5  Q.   Do you have a title with HCMS today?
6  A.   I don't know.
7  Q.   But you do control the entity; is
8  that fair?
9      MS. DEITSCH-PEREZ:  Object to the
10  form, asked and answered.
11  A.   I believe so.
12  Q.   Okay. Do you know whether
13  Mr. Waterhouse has ever served as an officer of
14  HCMS?
15  A.   I have no idea.
16  Q.   Can you identify any person in the
17  world who has ever served as an officer of
18  HCMS?
19  A.   I don't know what the incumbency
20  certificate would look like for services, but
21  I'm willing to be refreshed.
22  Q.   Do you know if anybody ever served
23  as the chief -- withdrawn.
24      Did HCMF ever have anybody serve in
25  the capacity of chief financial officer?

Page 332

DONDERO - 10/29/21

2  A.  The subject of that question was
3  HCMF.  Is that what you meant to say, or did
4  you mean Services?
5  Q.  No, I apologize.  Thank you for the
6  clarification.  I did mean HCMS, so let me try
7  again.
8  Has anybody ever served in the
9  capacity of chief financial officer of HCMS?
10  A.  HCMF.
11  MS. DEITSCH-PEREZ:  S.
12  A.  Not –
13  Q.  S.
14  A.  Not of Services – not that –
15  again, I don't know.  I'm willing to be
16  refreshed, but I – I have no awareness.
17  Q.  Okay.  As president – as the person
18  in control of HCMS, do you believe you had any
19  responsibility to familiarize yourself with
20  that entity's debts and obligations?
21  A.  Again, just generally, to the extent
22  that they were material or an issue or
23  whatever, but no more than generally.
24  Q.  Can you describe anything you ever
25  did to generally familiarize yourself with

Page 333

DONDERO - 10/29/21

2  HCMS's debts and obligations?
3  A.  I guess my answer, which would apply
4  to all of these entities, is awareness to know
5  that the amounts were de minimis relative to
6  the value of the entity, and the debt service
7  costs or issues were very de minimis relative
8  to the entities, but beyond that, I didn't
9  study them.
10  Q.  Well, did – did HCMFA have
11  obligations to HCMLP that you would
12  characterize as di minimis from HCMFA's
13  perspective?
14  A.  Yeah, or just – it never had
15  obligations that were more than de minimis.
16  Q.  As – as the person in control of
17  HCMFA, did you ever have any concern that HCMFA
18  would not be able to satisfy its obligations to
19  HCMLP if – if a demand was made?
20  A.  No.
21  Q.  Okay.  Was anybody charged with the
22  responsibility of familiarizing themselves with
23  HCMS's debts and obligations?
24  A.  Again, to differentiate or separate
25  myself from the treasury function or from what

Page 334

DONDERO - 10/29/21

2  Frank and his group were doing.
3  From my perspective, I had to be
4  aware about it – aware of any obligations or
5  notes or debt service costs, et cetera, but to
6  the extent that I was aware and knew that it
7  was de minimis, I didn't spend any time
8  focusing on it, studying it, calculating it
9  exactly, or anything like that.
10  Having said that, we are highly
11  compliant.  We do – we did audits every year
12  with reputable accounting firms that were
13  complete and in depth.  And any obligations
14  and/or assets, de minimis or not, in my view,
15  would nonetheless have to be reflected or
16  captured accurately and prepared for the
17  auditors in supplying, you know, detail or
18  source documents or whatever, whatever they do
19  in accounting as part of the audit function.
20  And all that would have done – been
21  done exactly and expertly, as far as I know,
22  and it would have been done by Frank and his
23  group.
24  Q.  Okay.
25  A.  That is – I'm trying to give a

Page 335

DONDERO - 10/29/21

2  complete answer regarding a myriad of ways
3  you've asked me kind of the same structural
4  questions.
5  Q.  I am, and just to be clear, I'm
6  asking kind of the same structural questions
7  with respect to each of the entities at issue.
8  I think you picked up on that.  I hope you
9  don't think I'm being repetitive.
10  You mentioned Frank and his group in
11  the context of HCMS.  Did I hear that
12  correctly?
13  A.  Yes.
14  Q.  Okay.  HCMS did not have a shared
15  services agreement with Highland; correct?
16  MS. DEITSCH-PEREZ:  You mean a
17  written shared services agreement, John?
18  Q.  Do you understand the question, sir?
19  A.  Yeah.  My answer would be the
20  advisors like NexPoint and HFAM that had to
21  have by law and regulatory statute have to have
22  formal sub advisors and shared services
23  agreements had formal shared services
24  agreement.
25  Entities that didn't need to have

Page 336

DONDERO - 10/29/21

1
2 formal written shared services agreements were
3 often serviced similarly or -- or exactly the
4 same as those entities, but without a written
5 agreement, but with a verbal shared services
6 agreement providing, again, all the same
7 similar services.
8         And the entities that didn't have a
9 written shared services agreement weren't
10 getting shared services or support from any
11 other entities other than Highland doing the
12 same thing for them that it did for the mutual
13 funds.
14    Q.   Okay. Can you tell me who entered
15 into an oral shared services agreement between
16 Highland and HCMS?
17    A.   Boy, I can imagine way back in the
18 day it would have been myself and Frank, but he
19 and his group understood and knew that they
20 were doing it for all the new entities that
21 came along, and I can't imagine it was even
22 talked about much over the years.
23    Q.   Did -- did HCMFA and NexPoint pay
24 money to Highland under the shared services
25 agreement until let's just say late 2020?

Page 337

DONDERO - 10/29/21

1
2    A.   Yeah, yes, and early into '21, I
3 believe also.
4    Q.   Okay. As -- as part of the oral
5 agreement that you referenced, was there -- was
6 there ever an agreement that HCMS would pay any
7 money to Highland in exchange for the services
8 that Highland provided to it?
9    A.   I do not believe there was a
10 financial remuneration aspect of it.
11    Q.   Okay. And do you recall during your
12 time as president of Highland whether Highland
13 ever received payment from HCMS for services
14 rendered?
15       MS. DEITSCH-PEREZ: And are we just
16 talking about money?
17       MR. MORRIS: Correct.
18    A.   Yeah, I don't -- I don't recall
19 moneys being -- well, you know what, let me --
20 let me clarify that a little bit.
21       If there were any direct costs that
22 Highland would have incurred like getting the
23 audits done, you know, like if Price Waterhouse
24 said, okay, give us the details on, you know,
25 all the different entities that roll up into

Page 338

DONDERO - 10/29/21

1
2 the Highland entity.
3       And then -- and they prepared
4 statements or did work for services, Frank and
5 his group would have passed through those costs
6 and expected services and/or Dugaboy or any of
7 the other entities to pay for direct
8 out-of-pocket costs. But it wouldn't have paid
9 a supplemental fee or profit or anything to
10 Highland.
11    Q.   Okay. To the best of your
12 recollection, during the time that you were
13 president of Highland, did Highland ever
14 receive anything of value from HCMS on account
15 of services other than the reimbursement of
16 out-of-pocket expenses?
17    A.   Yeah, I'm going to go back to my
18 comment in terms of building track record. And
19 I would use -- yeah, we had done it several
20 times in the past and it had worked
21 effectively. And that is -- you know, yeah, I
22 mean, the -- the track record in CLO paper was
23 what was used to track -- (inaudible) -- as an
24 investor.
25       And so, you know, to the extent that

Page 339

DONDERO - 10/29/21

1
2 the DAF wasn't paying a fee, along the way, to
3 Highland for shared services, Highland got the
4 benefit of the track record that was being
5 built at the DAF to then market to third
6 parties, which then created a revenue stream
7 for Highland down the line.
8       And I would say that was the same
9 intent on Services.
10    Q.   Is there anything -- anything else
11 of value that you believe HCMS provided to
12 Highland in exchange for the services that
13 Highland rendered?
14    A.   That would be primarily it. I would
15 say there is probably times where Services
16 provided liquidity for Highland or helped on
17 investments that Highland was involved in, but
18 I would have to refresh myself on exactly what.
19    Q.   Is it fair to say that HCMF -- HCMS
20 never provided a revenue stream to Highland
21 similar to the revenue stream that was provided
22 by HCMFA and NexPoint under the shared services
23 agreements?
24    A.   That is correct.
25    Q.   Okay. Did anybody at HCMF --

Page 340

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  withdrawn.
3      Did anybody at HCMS ever have the
4  responsibility for familiarizing themselves
5  with HCMS' debts and obligations?
6      MS. DEITSCH-PEREZ: Object to the
7  form.
8      A.  Frank and his team, as part of
9  preparing the audited financials for all the
10  entities, would have definitively been aware of
11  all of them. Who else on the services
12  incumbency certificate or -- would be aware or
13  have knowledge, I don't know.
14      Q.  Okay. And when you refer to "Frank
15  and his team," are any of them acting as an
16  officer or employee of HCMS in what you are
17  thinking about?
18      A.  I -- I don't know. I don't know.
19  Did -- we haven't -- have we looked at the
20  incumbency certificate for services?
21      Q.  No.
22      A.  I don't know. I don't know off the
23  top of my head.
24      Q.  Okay. Let's just finish this up.
25      Can you identify any current or

Page 341

1  DONDERO - 10/29/21
2  former Highland employee who served as an
3  officer of HCMS at any time?
4      A.  No, I would need to be refreshed.
5      Q.  Okay. Can you identify --
6  withdrawn. Let's go to the last one, HCRE.
7      Are you familiar with an entity
8  called HCRE Partners, LLC?
9      A.  Yes.
10      Q.  And is that entity now known as
11  NexPoint Real Estate Partners, LLC?
12      A.  You know what, I do believe it had a
13  name change. I don't know if that is the name
14  change, but that would make sense.
15      Q.  Okay. Can we just refer to that
16  entity as HCRE?
17      A.  That is fine.
18      Q.  Okay. Do you have any direct or
19  indirect ownership interest in HCRE?
20      A.  Yes.
21      Q.  And is it a majority interest to the
22  best of your knowledge?
23      A.  Yes.
24      Q.  Do you control HCRE?
25      A.  Yes.

Page 342

1  DONDERO - 10/29/21
2      Q.  Have you controlled HCRE throughout
3  its corporate existence?
4      A.  Yes.
5      Q.  Can you tell me what the nature of
6  HCRE's business is?
7      A.  It makes real estate investments.
8      Q.  Do you have a title with that
9  entity?
10      A.  I don't know, but I'm willing to be
11  refreshed. And I assume its incumbency
12  certificate looks similar to the ones that you
13  have put up.
14      Q.  Can you identify for me today
15  anybody who has ever served as an officer of
16  HCRE at any time?
17      A.  I would rather be refreshed. I
18  would imagine myself and Matt McGraner are two
19  of those people, but I don't know for sure.
20      Q.  Okay. Without the incumbency
21  certificates or other documentation, you are
22  not able to give me any names other than Mr. --
23  other than you and Mr. McGraner; is that fair?
24      A.  That's correct.
25      Q.  Okay. Do you know whether anybody

Page 343

1  DONDERO - 10/29/21
2  has ever been given the responsibility --
3  withdrawn.
4      Do you know whether anybody has ever
5  had the responsibility for familiarizing
6  themselves with the debts and obligations of
7  HCRE?
8      A.  It would be the same answer as given
9  on the other entities. It would be the
10  treasurer, which is probably Frank. And if not
11  the treasurer it would be Frank in his role and
12  his team of putting together the complete and
13  accurate financials of HCRE.
14      Q.  Other than putting together the
15  complete and accurate financials of HCRE, did
16  Frank and his team have any other
17  responsibility with respect to understanding
18  the debts and obligations of HCRE?
19      MS. DEITSCH-PEREZ: Objection, form.
20      A.  Again, just the general overlay
21  being that they were de minimis and -- de
22  minimus, and the service obligations were de
23  minimus relative to the value or operating
24  income of the enterprise.
25      In other words, had they been more

Page 344

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  material or material, they would have had more
3  focus. But they didn't deserve more focus.
4      Q.   And so is it fair to say that you
5  didn't do anything to familiarize yourself with
6  HCRE's debts and obligations?
7      MS. DEITSCH-PEREZ:  Object to the
8  form.
9      A.   Not on a regular detailed basis, you
10  know, just a general awareness.
11      Q.   Did you ever take any steps to
12  review the affiliate loans and obligations that
13  were due between and among Highland and its
14  affiliated companies?
15      A.   Again, just generally.
16      Q.   What did you do?
17      A.   Like I said, I had a general
18  awareness of them.
19      Q.   And did you receive from time to
20  time lists or information that specifically
21  described the amounts that were due and owing
22  from the affiliates to Highland?
23      A.   Yeah, from time to time the amounts,
24  yes.
25      Q.   Let's just quickly go to the

Page 345

1  30(b)(6) notices if we can.
2      MR. MORRIS:  Can we put up a
3  document that has been marked as
4  Exhibit 47.
5      (Exhibit 47 marked.)
6      Q.   Do you understand, Mr. Dondero, that
7  you are here today in your individual capacity
8  and in your capacity as what is called a
9  30(b)(6) witness for certain entities?
10      A.   Yes, a little bit to my chagrin.
11  And I don't think you will see me again as a
12  30(b)(6) witness, but yes.
13      Q.   All right.  Well, it wasn't my
14  choice, so let's just go through it quickly.
15      Have you seen this document before,
16  sir?
17      A.   Yes.
18      Q.   And do you understand that you are
19  here today in your capacity as NexPoint's
20  corporate representative?
21      A.   Yes.
22      Q.   And do you understand that your
23  answers today in your capacity as NexPoint's
24  corporate representative will be binding on

Page 346

1  DONDERO - 10/29/21
2  NexPoint?
3      MS. DEITSCH-PEREZ:  As qualified by
4  the objections that we made.
5      MR. MORRIS:  Sure.
6      A.   I will do the best I can.
7      Q.   Thank you so much.
8      MR. MORRIS:  Can we go to the next
9  page, please.  The last page.  The topics.
10      Q.   Okay.  Have you seen these topics
11  before, sir?
12      A.   Yes.
13      Q.   Okay.  Do you see that we asked for
14  somebody to testify as to NexPoint's answer?
15      A.   Yes.
16      Q.   Okay.  Are you aware that
17  NexPoint -- are you aware that NexPoint filed
18  an answer to Highland's amended complaint?
19      A.   Yes.
20      Q.   And did you review NexPoint's answer
21  at any time before today's deposition?
22      A.   It was in the binder, I believe,
23  that you guys sent over.
24      Q.   I think that's right.  Are you
25  prepared to answer questions today about

Page 347

1  DONDERO - 10/29/21
2  NexPoint's answer?
3      MS. DEITSCH-PEREZ:  Again, subject
4  to our objection, but...
5      A.   Yeah, to the best I can.
6      Q.   Okay.  The next topic concerns
7  affirmative defenses.
8      Do you see that?
9      A.   Yes.
10      Q.   Do you have an understanding of what
11  an affirmative defense is?
12      A.   Yes.
13      Q.   What is your understanding of an
14  affirmative defense?
15      A.   I think it is those -- phrase that
16  you see in most of our answers, the
17  justification, estoppel, waiver, and then --
18  and then there is some specific answers beyond
19  that, I guess.
20      Q.   Okay.  Are you prepared --
21      MS. DEITSCH-PEREZ:  John, I take it
22  you will show him.  He doesn't have to have
23  them memorized.
24      MR. MORRIS:  No, of course not.
25      MS. DEITSCH-PEREZ:  So if you are

Page 348

DONDERO - 10/29/21

1 going to ask him, you will put it in front
2 of him?
3     MR. MORRIS: Of course.
4     MS. DEITSCH-PEREZ: Thank you.
5     Q.   Are you prepared to testify today to
6 the circumstances, communications, documents,
7 and facts concerning NexPoint's affirmative
8 defenses?
9     A.   Yeah, to the best that I can.
10     Q.   Okay.  Do you see Topic 3 concerns
11 the demand notes?
12     A.   Yes.
13     Q.   Okay.  Are you prepared to testify
14 about the demand notes, including with respect
15 to the specific issues identified in that
16 topic?
17     MS. DEITSCH-PEREZ: Again, subject
18 to the objections, particularly I think
19 with respect to use of the proceeds.
20     Q.   We will get to it.
21     Are you prepared to testify?
22     A.   I hope so.
23     Q.   And -- and I know that there is an
24 objection there, but just a simple yes or no,

Page 349

DONDERO - 10/29/21

1 are you -- do you have knowledge of the -- of
2 NexPoint's use of the proceeds of the note?
3     A.   Not specifically.
4     Q.   All right.  Maybe I will refresh
5 your recollection later.
6     And then the last topic is discovery
7 requests.
8     Do you see that?
9     A.   Yes.
10     Q.   Are you prepared to testify today on
11 NexPoint's behalf concerning Highland's
12 discovery requests?
13     A.   To the best of my knowledge.
14     Q.   Okay.  Did you do anything to
15 prepare for today's deposition?
16     A.   I met with Deborah.
17     Q.   When did you do that?
18     A.   A couple of days ago for a couple of
19 hours, and a few days before that for a couple
20 of hours.
21     Q.   How many times --
22     MS. DEITSCH-PEREZ: Are you also
23 asking about calls?
24     MR. MORRIS: I appreciate that.

Page 350

DONDERO - 10/29/21

1     A.   Yeah.  There were a couple of phone
2 calls too.
3     Q.   How many times did you communicate
4 with Deborah in preparation for today's
5 deposition?
6     A.   A half dozen, maybe, you know.
7     Q.   How many times --
8     A.   You know, in-person and phone calls,
9 but...
10     Q.   How many times did you meet with her
11 in-person?
12     A.   Two, maybe three.
13     Q.   And can you just tell me an estimate
14 of the total time spent preparing for this
15 deposition, inclusive of both the meetings and
16 the phone calls?
17     A.   I don't know.  Does it matter?  I
18 mean, I don't know.  I don't know, four hours,
19 four hours.
20     Q.   Okay.  Did anybody participate in
21 these meetings or phone calls other than your
22 lawyers?
23     A.   No.
24     Q.   Did any lawyers participate in any

Page 351

DONDERO - 10/29/21

1 of these meetings or phone calls who didn't
2 represent you in your individual capacity?
3     A.   No.  It was just -- it was just
4 Deborah and I.
5     Q.   Okay.  Have you had a chance to
6 review the transcript of Mr. Waterhouse's
7 deposition?
8     A.   No.  I haven't seen it yet.
9     Q.   You haven't seen any portion of that
10 deposition?
11     A.   No.
12     Q.   Are you aware of anything that
13 Mr. Waterhouse testified to in his deposition?
14     A.   No.
15     Q.   You have no knowledge of anything
16 that Mr. Waterhouse said last week in his
17 deposition; do I have that right?
18     A.   That's correct.
19     Q.   Okay.  Do you have any knowledge as
20 to anything your sister said in her deposition?
21     A.   No, other than she is glad it is
22 over.
23     Q.   I hope -- I hope -- I hope she
24 thinks at least I was respectful.

Page 352

DONDERO - 10/29/21

1    DONDERO - 10/29/21
2        Did – did you ever see her
3    transcript – the transcript from her
4    deposition?
5        A.    No.
6        Q.    How about Mr. Seery, did you see the
7    transcript from Mr. Seery's deposition?
8        A.    I didn't even know that Seery was
9    deposed, so the answer is no.
10       Q.    Okay.  Are you aware that Dave Klos
11   was deposed?
12       A.    You know what, I think I had
13   awareness of that, but I haven't seen that
14   deposition.
15       Q.    Do you know anything about anything
16   that he testified to the other day?
17       A.    Nope.
18       Q.    How about Kristin – Kristin
19   Hendrix, are you aware that she was deposed?
20       A.    I think I heard that she was also.
21       Q.    Do you know anything about anything
22   that she testified to?
23       A.    No.
24       Q.    Did you look at any documents to
25   refresh your recollection in advance of this

Page 353

1    deposition other than the stack that I provided
2    and the deposition notices?
3        A.    I mean just – no, just a listing of
4    the notes, but that is it.
5        Q.    Did you see any emails at all in
6    connection with your preparation for today's
7    deposition?
8        A.    No, not a single email.
9        MR. MORRIS:  Okay.  Let's put up
10   Exhibit 48, please.
11       (Exhibit 48 marked.)
12       Q.    And I think you will see that this
13   is the 30(b)(6) notice for HCMS.  If we can go
14   to the next page.  And it is really the same –
15   I will represent to you that the topics for
16   HCMS are the same as the topics for NexPoint.
17       Have you seen HCMS's 30(b)(6) notice
18   that is up on the screen right now?
19       A.    Yes.
20       Q.    And if we took the time – if I took
21   the time to ask you the same questions about
22   your ability to answer on behalf of HCMS –
23   HCMS with respect to the topics identified
24   there and subject to your counsel's objections,

Page 354

1    DONDERO - 10/29/21
2    would you be able to do so?
3        A.    Yes.
4        MR. MORRIS:  Let's put up Exhibit
5    49, please.
6        (Exhibit 49 marked.)
7        Q.    And this is the 30(b)(6) notice for
8    HCRE.  You're here today to testify on behalf
9    of HCRE as its corporate representative.  Do
10   you understand that?
11       A.    Yes.
12       Q.    And did you review the list of
13   topics that we included in our 30(b)(6) notice
14   for HCRE?
15       A.    Yes.
16       Q.    And subject to your counsel's
17   objections, are you prepared to testify to the
18   topics that are listed on the page that is up
19   on the screen?
20       A.    Yes.
21       MR. MORRIS:  Okay.  Can we please
22   put up Exhibit 31.
23       (Exhibit 31 marked.)
24       Q.    Mr. Dondero, we're putting up on the
25   screen now your answer to the – to Highland's

Page 355

1    DONDERO - 10/29/21
2    amended complaint.
3        MS. DEITSCH-PEREZ:  Is that in the
4    notebook?
5        MR. MORRIS:  No, no.  This is one
6    that we had – we had –
7        MS. DEITSCH-PEREZ:  All right.  Hang
8    on.
9        MR. MORRIS:  That's okay.  That is
10   why we're putting it up on the screen, and
11   we will put it in the chat room.  It is
12   already in there, actually.
13       MS. DEITSCH-PEREZ:  Yeah, I think we
14   have it here.  Hold on.  I think Nancy
15   walked off with the duplicate of this, so
16   if you need it, I will hand it to you.
17       Q.    Mr. Dondero, while we wait to see if
18   your counsel has a hard copy, do you recall
19   reviewing your answer to the plaintiff's
20   amended complaint before it was filed?
21       A.    I don't know if I was involved at
22   that juncture.
23       Q.    All right.  So just to refresh your
24   recollection, this is a document that was filed
25   with the Court at the beginning of September.

Page 356

DONDERO - 10/29/21

1 If you recall, Highland filed an original
2 complaint, and after you amended your answer
3 late in August pursuant to an agreement,
4 Highland filed amended complaints against
5 certain of the obligors in the notes
6 litigation.
7       Does that refresh your recollection
8 that this document was prepared in early
9 September?
10    A.   Okay.
11    Q.   Okay.
12    A.   I don't have specific memory.
13    Q.   Okay.  So as always, Mr. Dondero, we
14 have done this many times before, if there is
15 anything in the document that you think that
16 you need to because it is a little bit of a
17 lengthy document, will you let me know that?
18    A.   Sure.
19       MS. DEITSCH-PEREZ:  Yeah.  And we
20    have a copy if you need to stop and take a
21    look.  We did get a hard copy.  We have a
22    hard copy here.
23    Q.   Okay.
24    A.   All right.

Page 357

DONDERO - 10/29/21

1    Q.   So -- so let me ask the question
2 again then:  Do you recall, with that
3 background, having reviewed and approved the
4 filing of this document at the beginning of
5 September 2021?
6    A.   Generally.
7    Q.   Okay.  As you sit here today, are
8 you aware of anything in this document that is
9 inaccurate?
10    A.   Not that I'm aware of.
11    Q.   Okay.  Are you aware of anything in
12 the document that you believe should be
13 modified or amended to make it more complete or
14 more accurate?
15    A.   Not as of this moment.
16    Q.   Okay.  Can we please go to Paragraph
17 83.  Okay.  Right there.
18       So do you see that on -- on page 13
19 of the exhibit, we have in Paragraphs 82
20 through 91 what are called your affirmative
21 defenses?
22    A.   Yes.
23    Q.   All right.  I'm going to skip the
24 one in 82 for the moment, but focusing on 83.

Page 358

DONDERO - 10/29/21

1 Can you just read that to yourself and tell me
2 when you have done that?
3    A.   Yes.
4    Q.   Are you aware of any facts that
5 concern this particular affirmative defense?
6    A.   Which notes are these again?
7    Q.   These would be your personal notes.
8    A.   The -- personal notes.  I'm trying
9 to remember.  No, I -- well, if you read the
10 question one more time.
11    Q.   Sure.  Just so -- so to make sure
12 that you understand, because I'm not here to
13 trick you, this is your answer to Highland's
14 complaint against you where Highland is trying
15 to recover on the notes that you signed.
16       Do you understand that?
17    A.   Right.
18    Q.   Okay.  So in Paragraph 83 you have
19 asserted an affirmative defense that the
20 plaintiff's claims are barred in whole or in
21 part due to waiver.
22       Do you see that?
23    A.   Yes.
24    Q.   Do you have any facts that you can

Page 359

DONDERO - 10/29/21

1 share with me that concern that particular
2 affirmative defense?
3       MS. DEITSCH-PEREZ:  And, again, just
4    in this particular answer.
5       MR. MORRIS:  That is all I'm asking
6    about.
7    Q.   We're going to go through the answer
8 for each one of them.  So just one at a time.
9 We're only talking about your -- your notes.
10    A.   No, not the moment.
11    Q.   Let's go to Paragraph 84.
12       Do you see Paragraph 84 states,
13 among other things, that plaintiff's claims are
14 barred, in whole or in part, due to estoppel?
15    A.   Yes.
16    Q.   Can you share with me any facts that
17 you are aware of that concern that particular
18 affirmative defense?
19    A.   No.
20    Q.   Okay.  I'm going to skip over 85
21 because I've gotten that answer elsewhere.  If
22 we can go to 86, do you see that Paragraph 86
23 asserts as an affirmative defense, among other
24 things, that, quote:  Plaintiff's claims may be

Page 360

DONDERO - 10/29/21

1  barred, in whole or in part, due to failure of
2  consideration, closed quote?
3  A.  Right, I see that.
4  Q.  Do you -- do you -- do you
5  acknowledge that Highland transferred to you an
6  amount of money equal to the principal amount
7  on each of the notes that are at issue?
8  A.  I believe -- yes.
9  Q.  Okay.  I appreciate that.
10     Do you have any facts that would
11 support the affirmative defense that is set
12 forth in Paragraph 86?
13 A.  No.
14 Q.  Okay.  And then, finally,
15 Paragraph 88 asserts, among other things, that
16 the fraudulent transfer claim should be barred,
17 in whole or in part, because the alleged
18 fraudulent transfer -- and I'm summarizing
19 here -- was taken in good faith and for
20 reasonably equivalent value.
21     Do you see that?
22 A.  Yes.
23 Q.  Okay.  Do you have any facts that
24 concern that particular affirmative defense?

Page 361

DONDERO - 10/29/21

1  A.  Let me read that one more time.
2  Q.  Take your time.
3  A.  I think that one is -- I'm trying --
4  I'm trying to remember if that one -- if the
5  partner defense is on alternative comp that
6  could have been taken or forgiveness that was
7  in lieu of other comp -- I'm trying to remember
8  if that falls under this category.  I think it
9  does.
10 Q.  Okay.  Is there anything else that
11 you can -- any other facts that you can think
12 of that concern the affirmative defense in
13 Paragraph 88?
14 A.  I mean, the -- yes.  Okay.  To the
15 extent that the -- in lieu of additional comp
16 falls under there, so does the incentives to --
17 the incentive to me to help monetize illiquid
18 investments better faster.
19 Q.  And does that relate to the three
20 portfolio companies that are the subject of the
21 oral agreement between you and your sister or
22 to something else?
23 A.  It is --
24     MS. DEITSCH-PEREZ:  Objection, form.

Page 362

DONDERO - 10/29/21

1  A.  -- regarding that, yeah.
2  Q.  It is the same thing.  Do I have
3  that right?
4  A.  Yes.
5  Q.  Okay.  Thank you very much.
6     Is there anything else you can share
7  with me about the facts that concern the
8  affirmative defense in Paragraph 88?
9  A.  I think that is -- that is -- that
10 is it.
11 Q.  Okay.  Can we change now to
12 Exhibit 16, which you should have in your pile,
13 which is the answer that was filed by the HCMS
14 to Highland's amended complaint.
15     (Exhibit 16 marked.)
16 A.  Which number is this?
17 Q.  It is number 16.
18 A.  16 in the binder?
19 Q.  It should be, yeah.
20 A.  Yes.  Okay.  I got it.
21 Q.  Okay.  And is the first page titled
22 Defendant, Highland Capital Management
23 Services, Inc.'s Answer to Amended Complaint?
24 A.  Yes.

Page 363

DONDERO - 10/29/21

1  Q.  Okay.  So these questions I'm asking
2  in your capacity as HCMS' 30(b)(6) witness.
3  Okay?
4  A.  Okay.
5  Q.  And you recall that one of the
6  topics under the deposition notice was HCMS'
7  answer; right?
8     Are you prepared to answer questions
9  about this document?
10 A.  Yep, to the best I can.
11 Q.  Okay.  Have you seen it before?
12 A.  Yes.
13 Q.  And do you know whether HCMS
14 authorized this Stinson firm to file this
15 document on its behalf at the beginning of
16 2021?
17 A.  Yes.
18 Q.  Did you personally have any role in
19 reviewing and preparing this document?
20 A.  I mean, just generally that the
21 transition of former Judge Lynn passing and
22 Bonds Ellis not being able to handle
23 complexity -- maybe I shouldn't say it like
24 that -- or handle this aspect of the case

Page 364

DONDERO - 10/29/21

1 and/or – I think it was – yeah, just
2 whatever. He moved to Stinson from – I think
3 maybe it started at Bonds Ellis and then maybe
4 it went to Wick Phillips and then it went to
5 Stinson, but, you know, there was a migration
6 of these notes in general.
7    Q. Was there a particular person who
8 was charged with the responsibility of
9 approving and authorizing the filing of this
10 document on behalf of HCMS?
11    A. Like I said, I think generally that
12 was myself.
13    Q. Okay. Are you aware of anything in
14 this document today that is inaccurate in any
15 way?
16    A. Not specifically.
17    Q. Are you aware of anything generally
18 in this document that is inaccurate in any way?
19    A. Not at the moment.
20    Q. Are you aware of anything in this
21 document that you believe should be modified or
22 amended to make it more complete or more
23 accurate?
24    A. Not yet.

Page 365

DONDERO - 10/29/21

1    Q. Let's go to Paragraph 40 – 94,
2 please.
3    MS. DEITSCH-PEREZ: We may be
4 imperfect creatures as lawyers.
5    A. Yes.
6    Q. Okay.
7    A. Yes.
8    Q. Okay. I was just going to say, do
9 you see from Paragraphs 94 through 102 HCMS has
10 set forth its affirmative defenses?
11    A. Yes.
12    Q. Okay. Let's – let's start with the
13 first one.
14    Do you see in Paragraph 94 HCMS
15 asserts that, quote: Plaintiff's claims are
16 barred, in whole or in part, by the doctrine of
17 justification and/or repudiation?
18    A. Yes.
19    Q. Are you aware of any facts that
20 concern that particular defense?
21    A. I believe there is – they were material
22 prepayments of the loan. I believe that is –
23 those are the – they were material and
24 numerous prepayments of the loan, which I think

Page 366

DONDERO - 10/29/21

1 was – that is incorporated into that defense.
2    Q. Okay. We will talk about the – the
3 details of that in a moment, but are there any
4 other kind of broad statements that you can
5 give me that identify facts related to this
6 particular affirmative defense?
7    MS. DEITSCH-PEREZ: Object to the
8 form.
9    A. That is all I have at the moment.
10    Q. Okay. Do you know whether any
11 document that HCMS ever filed with the
12 bankruptcy court ever asserted, as in a
13 defense, that they didn't have to pay because
14 they had prepaid any obligations that were due
15 and owing?
16    MS. DEITSCH-PEREZ: Object to the
17 form.
18    A. I don't have awareness.
19    Q. And this document doesn't – doesn't
20 use the word "prepayment" anywhere, does it?
21    MS. DEITSCH-PEREZ: Object to the
22 form.
23    A. I don't know.
24    Q. Do you know of anything that HCMS

Page 367

DONDERO - 10/29/21

1 ever did before this week to put Highland on
2 notice that it contended that it didn't have to
3 pay its obligations under the notes because of
4 a prepayment defense?
5    MS. DEITSCH-PEREZ: Object to the
6 form.
7    A. We have no records. I'm not sure we
8 would have ever been in a position to – to do
9 that. The – you know, we were relying on
10 shared services from Highland, and Highland had
11 all the records regarding the amounts and
12 prepayments, et cetera.
13    Q. When did you learn that HCMS had
14 made a prepayment to Highland?
15    A. I don't know, but I – I imagine –
16 I imagine it was – if you are asking why it
17 wasn't mentioned earlier but then mentioned
18 later, it is because somewhere in that time
19 period we became aware.
20    Q. So you didn't – you didn't have
21 knowledge of the prepayment until the debtor
22 produced documents. Do I have that right?
23    Withdrawn.
24    How did you learn that HCMS made a

Page 368

DONDERO - 10/29/21

1
2 prepayment?
3    A.   I don't know.  I just know that we
4 became aware of that being a material fact
5 somewhere along the line.
6    Q.   Do you remember when you learned
7 that material fact?
8    A.   No.
9    Q.   Do you have any facts that you can
10 share with me concerning the prepayment?
11    A.   Eventually there was a spreadsheet
12 that summarized it, but I don't -- I don't
13 know -- I don't know when that occurred.
14    Q.   Does -- does this defense of
15 prepayment apply to demand notes or a term
16 note?
17    A.   I would -- I would -- I would say,
18 you know, primarily a term note, but -- yeah, I
19 think primarily the term note because I think
20 that was the one that was declared to be in
21 default of share, you know, whatever, so I
22 think it was regarding the term note.
23    Q.   Do you recall -- do you have any
24 knowledge as to when the prepayment was made?
25    A.   I believe there were numerous and

Page 369

DONDERO - 10/29/21

1
2 material prepayments, but I don't know exactly
3 when they were made.
4    Q.   Do you know what year they were
5 made?
6    A.   No, but -- no, but -- no, I don't.
7       MS. DEITSCH-PEREZ:  If you want,
8    John, if you would like for him to give you
9    dates, he could probably dig up the
10    spreadsheet and give you dates, but you
11    have it also.
12       MR. MORRIS:  Thank you.  Okay.  I
13    think we're doing just fine here.
14    Q.   Do you know if there were any
15 prepayments made by HCMS in 2018?
16    A.   I don't know the specifics off the
17 top of my head.
18    Q.   Do you know if HCMS made any
19 prepayments in 2019?
20    A.   I don't know the specifics off the
21 top of my head.
22    Q.   Are you aware that under the term
23 note, HCMS was required to pay annual
24 installment payments at the end of each year?
25       MS. DEITSCH-PEREZ:  Object to the

Page 370

DONDERO - 10/29/21

1
2 form.
3    A.   I wouldn't say it like that.
4    Q.   We will look -- we will look at the
5 documents in a few minutes.
6       Are you aware of any facts that
7 support the justification or repudiation
8 defense in Paragraph 94 other than what you
9 have testified to so far?
10    A.   I think it is largely the prepayment
11 aspect of it that is captured there.
12    Q.   Okay.  And -- and -- all right.  I
13 will leave it at that.
14       Let's go to Paragraph 95.  Do you
15 see the affirmative defense in 95 is that,
16 quote, plaintiff's claims are barred in whole
17 or in part by the doctrine of estoppel.
18       Do you see that?
19    A.   Yes.
20    Q.   Do you have any facts as the
21 30(b)(6) witness of HCMS that concern that
22 particular affirmative defense?
23    A.   You know, I think for both 95 and
24 96, the way I understand it is that was
25 reliance on Highland's and Highland's screw-up,

Page 371

DONDERO - 10/29/21

1
2 to the extent that there was a screw-up, on the
3 term loans.
4    Q.   What screw-up are you referring to?
5    A.   Well, we didn't have accountants or
6 employees at Services, you know, and Services
7 was relying on Highland and shared services to
8 stay in compliance or to -- on the various
9 loans.
10    Q.   Did you ever personally instruct
11 anybody in December of 2020 to make a payment
12 on behalf of HCMS under the term note?
13    A.   To make -- I'm sorry, is this --
14 what was the timeframe again?
15    Q.   December 2020 -- let's just say
16 anytime in 2020.  Did you, in your capacity as
17 the person in control of HCMS, ever direct or
18 authorize any person in the world to make a
19 payment from HCMS to Highland in satisfaction
20 of the obligation that was due under the term
21 note at the end of the year?
22    A.   Not that -- not that I recall.
23    Q.   Okay.  Do you know whether anybody
24 acting on behalf of HCMS ever instructed or
25 authorized Highland to make a payment on

Page 372

1            DONDERO - 10/29/21
2 account of HCMS's term note to Highland?
3     A.    Well, again, and maybe I didn't say
4 it clearly enough. I think there was a
5 reliance in the due course aspect, especially
6 on small amounts, and it would have been done
7 by Highland personnel on behalf of Services.
8       MR. MORRIS: Okay. Move to strike.
9     Q.    And I'm going to ask you,
10 Mr. Dondero, to be patient with me and to
11 listen carefully to my question.
12       Are you aware of anybody acting on
13 behalf of HCMS, whoever instructed Highland to
14 make a payment in satisfaction of any payment
15 that was due at the year-end of 2020 under the
16 term note?
17     A.    Not specifically, but I'm saying I
18 don't think it needed to be made specifically.
19     Q.    Okay. So you are not aware of any
20 instruction that was ever given to Highland by
21 HCMS to make the payment; is that fair? You
22 relied on the course of dealing?
23     A.    Right. I relied on ordinary course.
24 I don't believe there was a specific -- I'm not
25 aware of a specific request.

Page 373

1            DONDERO - 10/29/21
2     Q.    Okay. And you were aware that the
3 payment was due at the end of the year; isn't
4 that right?
5       MS. DEITSCH-PEREZ: Object to the
6    form.
7     A.    Not -- not specifically. There
8 is -- to be bona fide notes, there is -- I know
9 there is -- there is tax structuring and things
10 that the auditors want to see in terms of -- of
11 regular payment that everything just doesn't
12 accrue indefinitely, but what those roles are
13 and when and if it needs to be paid and whether
14 it was by the end of the year or not.
15       I'm generally not specifically
16 knowledgeable of or involved in, and nor do I
17 have an awareness that was it or could it have
18 been satisfied by other payments throughout the
19 year. I'm not -- I'm not the person for that
20 knowledge.
21     Q.    Now, do you recall in December of
22 2020 there was some tension between you and
23 Mr. Seery?
24     A.    Tension between me and Mr. Seery. I
25 would say there was tension between Mr. Seery

Page 374

1            DONDERO - 10/29/21
2 and everybody. He was trying to steal the
3 estate, you know, so yes.
4       MR. MORRIS: I move to strike.
5     Q.    You were asked to resign from
6 Highland in late September of 2020; correct?
7     A.    Yes.
8     Q.    And you did resign as of October
9 9th, 2020; correct?
10     A.    Yes.
11     Q.    And do you recall that in early
12 December, Highland sought a temporary
13 restraining order against you?
14     A.    Yes.
15     Q.    And do you recall that Highland
16 obtained a temporary restraining order against
17 you in early December?
18     A.    Yes.
19     Q.    Okay. Do you recall that the
20 advisors that you controlled filed a motion
21 against the debtor in mid December 2020?
22     A.    Yes.
23     Q.    Okay. And do you recall that that
24 motion was curved by the Court in the middle of
25 December?

Page 375

1            DONDERO - 10/29/21
2     A.    Yes, roughly.
3     Q.    And do you recall that at the end of
4 November, Highland had given notice of
5 termination of the shared services agreements
6 with the advisors?
7     A.    I believe they did that multiple
8 times or extended it multiple times. I can't
9 remember if that was -- if it was done then or
10 not.
11     Q.    Okay. And it is your testimony that
12 notwithstanding those facts and circumstances,
13 you relied on Highland to make the payment that
14 HCMS owed at the end of the year?
15     A.    Yes, absolutely. We were still
16 deluded in terms of thinking that Seery was
17 working to resolve the estate, not to steal the
18 estate.
19       MR. MORRIS: I move to strike.
20     Q.    Do you have any other facts and
21 circumstances that relate to the affirmative
22 defenses in Paragraphs 95 and 96?
23     A.    I mean, not at the moment, not that
24 I want to volunteer. When you ask more
25 questions about the specifics, I guess we will

Page 376

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  get to some of it.
3      Q.   Well, I'm asking you questions now.
4  You are the 30(b)(6) witness.  This is one of
5  the topics that you were supposed to be
6  prepared to answer questions about, and I would
7  just like to know everything that you have in
8  your head as to facts that relate to these two
9  affirmative defenses.
10      MS. DEITSCH-PEREZ:  Object to the
11  form.
12      Q.   Because if I don't ask the right
13  question later, you know, we can't do that;
14  right?
15      So do you have any other facts that
16  you are aware of that relate to these two
17  particular affirmative defenses?
18      MS. DEITSCH-PEREZ:  John, the fact
19  that it's a 30(b)(6) deposition doesn't
20  absolve you of the necessity to ask
21  questions.
22      MR. MORRIS:  I asked the question.
23      Q.   Can I please have an answer?
24      A.   Again, the notes in general are de
25  minimis relative to asset values of Highland or

Page 377

1  the counterparties.  So the annual obligations
2  are even more de minimis or a million bucks or
3  less than a million bucks.
4      There was never an intent, nor would
5  there be a logical intent to -- from my
6  perspective or any of the entities that had
7  notice to Highland to be in default.  And it is
8  not logical that they would do that for any
9  purpose.
10      And the facts around the curing
11  quickly of the notes and getting the curing
12  amounts from Highland and making the payments
13  and Highland accepting them as they're defining
14  what it took to cure it, I think, are all you
15  know, the key facts that make any, you know,
16  acceleration argument, you know, ridiculous.
17      Q.   Okay.  Anything else?
18      A.   That's it at this point.
19      MR. MORRIS:  Okay.  Let's go to
20  Exhibit 17, please.
21      (Exhibit 17 marked.)
22      Q.   This is HCRE's answer.  Do you see
23  that, sir?
24      A.   Yes.

Page 378

1  DONDERO - 10/29/21
2      Q.   And I'm going to ask these questions
3  in your capacity as the 30(b)(6) representative
4  of HCRE.  Do you understand that?
5      A.   Yes.
6      Q.   Have you seen this document before?
7      A.   Yes.
8      Q.   Are you aware of anything in this
9  document that is inaccurate today?
10      A.   I mean, I think 96 we put in there
11  similar to the other affirmative defenses in
12  case there was a prepayment.  But, again, we
13  have been so blocked from getting information
14  and detail we didn't know it at the time
15  regarding, you know, prepayments.
16      So I don't think the prepayment
17  defense works for 96.  So that would be my
18  clarification of an inaccuracy.
19      Q.   Why do you believe that the
20  prepayment defense doesn't work in Paragraph 96
21  for HCRE?
22      A.   Because I don't think there were any
23  prepayments.
24      Q.   All right.  I appreciate that.
25      A.   We didn't -- we didn't know it at

Page 379

1  DONDERO - 10/29/21
2  the time --
3      Q.   Okay.
4      A.   -- we put this together.
5      Q.   Is there any other aspect of this
6  document that you believe is inaccurate today?
7      A.   Not as far as I know.
8      Q.   Is there anything in this document
9  that you believe should be modified or amended
10  to make it more accurate or more complete?
11      MS. DEITSCH-PEREZ:  Object to the
12  form.
13      A.   Not yet.
14      Q.   Okay.  Looking at Paragraph 96, I
15  believe you just testified that,
16  notwithstanding the assertion of the defense
17  therein, you are not aware of any facts
18  concerning the prepayment defense that you
19  described earlier for HCMS.
20      Do I have that right?
21      A.   Yes.
22      Q.   Okay.  Do you have any facts at all
23  that relate to the affirmative defense in
24  Paragraph 96?
25      A.   I don't believe so at this moment.

Page 380

DONDERO - 10/29/21

1
2  Q.  Okay.  How about Paragraphs 97 and
3  98?  Do you have any facts that relate to those
4  affirmative defenses?
5      A.   It would be the same answer as on
6  the last one.
7      Q.   Okay.  I appreciate that.  And so –
8  but we don't have to go over it again.  I will
9  just leave it at that.
10     Let's go to Exhibit 15, please.
11     (Exhibit 15 marked.)
12     MR. MORRIS:  This is the next –
13     MS. DEITSCH-PEREZ:  Hey, John.
14  John, can we take a – like a very quick
15  restroom break?
16     MR. MORRIS:  You know, if we could
17  just get through this document, which
18  shouldn't take long, then perhaps we can
19  take a short half-hour lunch break.
20     MS. DEITSCH-PEREZ:  Well, we can
21  take a short half-hour lunch break after we
22  get through this, but I just need to run to
23  the restroom.
24     MR. MORRIS:  Okay.
25     MS. DEITSCH-PEREZ:  So you can leave

Page 381

DONDERO - 10/29/21

1
2  the screen on if you want so that we can
3  get back fast.
4      MR. MORRIS:  My pleasure, Deborah.
5  No problem.
6      MS. DEITSCH-PEREZ:  Thank you.
7      VIDEOGRAPHER:  Off the record,
8  12:40.
9      (Recess taken 12:40 p.m. to 12:51 p.m.)
10     Q.   Before we go on to this document,
11  sir, did HCRE have a shared services agreement
12  with Highland?
13     VIDEOGRAPHER:  We're back on the
14  record.
15     MR. MORRIS:  Oh, do I need to read
16  the question again?
17     COURT REPORTER:  No, I've got it.
18     A.   I – I don't believe it is a formal
19  written one.  I think it is just a verbal one.
20     Q.   And who is the verbal agreement
21  between?
22     A.   It was between Highland and HCRE.
23  Now it is between NexPoint and HCRE.
24     Q.   And who entered into the agreement
25  between Highland and HCRE?

Page 382

DONDERO - 10/29/21

1
2      A.   I would give the same answer I gave
3  before where it was just – it was just
4  understood that we supported all the related
5  entities or entrepreneurial efforts and it was,
6  you know, modest amounts of work.
7      There wasn't specific financial
8  remuneration, but – and NexPoint is a good
9  example, too.  There was a significant track
10  record gulf that was able to be used to raise
11  other money.
12     Q.   I'm just asking you who entered into
13  the agreement between Highland and – and HCRE
14  for the provision of services by Highland?
15     MS. DEITSCH-PEREZ:  Asked and
16  answered.
17     A.   Yeah, again, same answer as before.
18  I don't think anybody specifically, formally
19  did it.
20     Q.   Okay.  Is it – are the terms of the
21  agreement written down anywhere?
22     A.   No, like I said, it is just
23  understood the accounting department and tax
24  department would handle the accounting and tax
25  for all entities.

Page 383

DONDERO - 10/29/21

1
2      Q.   Did the legal department also
3  provide services to HCRE?
4      A.   It would depend on the specific
5  entity.  In the case of HCRE I think they used
6  the – the two lawyers that worked at NexPoint.
7      I don't think they use the legal
8  staff per se.  I think they – the shared
9  services that they relied on were accounting
10  and tax primarily.
11     Q.   Did Mark Patrick do work for HCRE
12  while he was employed by Highland?
13     A.   Boy, I don't know.  I imagine
14  probably tax-related stuff.
15     Q.   Did HCRE ever pay Highland anything
16  for the services that it received?
17     MS. DEITSCH-PEREZ:  Are you talking
18  about cash or –
19     MR. MORRIS:  Please, please, please.
20  – I'm trying to be really patient,
21  Deborah, but please no speaking objections.
22  Mr. Dondero is a very sophisticated man.
23      We have done this many times
24  together.  He will ask me if he doesn't
25  understand the question.  And if you would

Page 384

DONDERO - 10/29/21

1
2 like to object, by all means. I don't have
3 a problem with that. I don't.
4      MS. DEITSCH-PEREZ: But I asked –
5 (speaking simultaneously.)
6    Q.   Mr. Dondero – Mr. Dondero –
7 Mr. Dondero, did HCRE ever pay anything to
8 Highland for services rendered?
9      MS. DEITSCH-PEREZ: Asked and
10 answered.
11    A.   Yeah, that is what I was going to
12 say. Same answer. You know, not – not a
13 formal cash remuneration, but, you know, a –
14 which wouldn't have been much anyway. But –
15 but more in terms of track record and presence
16 in the market that then Highland or NexPoint
17 could use to further its business.
18    Q.   Are you saying that – that all of
19 the entities were working kind of as a unified
20 unit and got synergistic benefits from the work
21 that it did?
22      MS. DEITSCH-PEREZ: Object to the
23 form.
24    A.   I don't want to over generalize and
25 say yes to that, but – but there were

Page 385

DONDERO - 10/29/21

1
2 definitely – you know, when I use the DAF
3 example, you know, we would have never got the
4 Harvard vest as an investor if it wasn't for
5 the track record that the DAF had in CLO
6 equity.
7      I think there is business that
8 NexPoint got in the real estate space
9 benefiting from the HCRE performance. So I do
10 believe there was specific definable benefit
11 gained for the modest amount of cost of
12 services provided.
13    Q.   And you –
14    A.   There wasn't specific remuneration.
15    Q.   And you controlled all of these
16 entities; right?
17      MS. DEITSCH-PEREZ: Object to the
18 form.
19    A.   Well, the DAF is independent and
20 separate, but the – HCRE-type entity, yes.
21    Q.   And did you decide that HCRE and
22 HCMS and the DAF wouldn't be required to pay
23 for services rendered to Highland?
24      MS. DEITSCH-PEREZ: Object to the
25 form.

Page 386

DONDERO - 10/29/21

1
2    A.   My recollection on the services and
3 the HCRE is that the dollar value of the
4 services provided was – was small and nominal.
5      With regard to the DAF, it was more
6 complicated. There is rules – there is
7 charging rules in terms of fees and then there
8 is also – I wasn't the one that decided that.
9 And there are other issues there other than
10 just the value for services argument.
11      And so I don't – the short answer
12 is, I don't know and I'm not involved in that,
13 and I don't understand why sometimes there is
14 one and sometimes there isn't one. Even to
15 this day I don't know the answer to that.
16    Q.   Did – did – did you decide on
17 behalf of Highland that Highland would provide
18 services to DAF without receiving a stream of
19 income in return?
20      MS. DEITSCH-PEREZ: John, I think
21 we're really far outside of either any of
22 the 30(b)(6)s or the permissible topics for
23 Mr. Dondero's personal deposition.
24      So could you move on?
25      MR. MORRIS: Okay. I will after I

Page 387

DONDERO - 10/29/21

1
2 get an answer to this question.
3    Q.   Can you repeat the question?
4    Q.   Sure.
5      Did you make the decision on behalf
6 of Highland to provide services to the DAF
7 without receiving a stream of income in return?
8      MS. DEITSCH-PEREZ: Same objection.
9    A.   Yeah, I think I answered it with my
10 rambling a few minutes ago, but the short
11 answer is no.
12    Q.   Who made that decision? Who made
13 that decision?
14      MS. DEITSCH-PEREZ: Was that Mike's
15 dog or yours?
16      MR. MORRIS: That was my dog. I
17 apologize.
18      MS. DEITSCH-PEREZ: Okay.
19    Q.   Who made that decision, sir?
20    A.   I wasn't sure –
21      MS. DEITSCH-PEREZ: Again – again,
22 John, this is well beyond the scope of the
23 30(b)(6)s or even anything permissible for
24 Mr. Dondero's personal. And, in fact, you
25 said last time that is it, that was my last

Page 388

```
1              DONDERO - 10/29/21
2    question.  So...
3         MR. MORRIS:  That is -- that is
4    because I thought that he would say as the
5    control person at the enterprise that he
6    made the decision, but he said that he
7    didn't.
8         So I'm just asking one follow-up
9    question.  I just want to know -- Deborah,
10   please.
11    Q.    I just want to know who made the
12   decision on behalf of Highland to render
13   services to the DAF without receiving a stream
14   of income in return.
15        MS. DEITSCH-PEREZ:  Object to the
16   form of the question for all of the reasons
17   I stated before.
18    A.    And I don't know the answer.
19    Q.    Okay.  So looking back at the
20   document on the screen, we're going to ask --
21   I'm going to ask these questions in your
22   capacity as NexPoint's 30(b)(6) representative,
23   okay?
24    A.    Sure.
25    Q.    And do you understand that the
```

Page 389

```
1    document on the screen is NexPoint's answer to
2    Highland's amended complaint?
3     A.    Yes.
4     Q.    Did you review this document before?
5     A.    Just generally.
6     Q.    And did you authorize the filing of
7    this document on behalf of NexPoint?
8     A.    Yes, yes.
9     Q.    Are you aware of anything in this
10   document today that you believe to be
11   inaccurate?
12    A.    I think the -- on the affirmative
13   defenses on the -- do you remember on the prior
14   one we had the -- I think it was called
15   justification as the first one, but there
16   wasn't a prepay in that one?
17    Q.    Correct.
18    A.    I think this one there were prepays,
19   but the justification defense is missing from
20   the front here.  And I think that is -- I think
21   if that were to continue -- I think that is
22   partly due to different law firms and what was
23   known at the time, et cetera, but I would say
24   that is -- that is the -- that is the one thing
```

Page 390

```
1              DONDERO - 10/29/21
2    that jumps out at me between the two.
3         MR. MORRIS:  Okay.  Can we go to
4    Paragraph 80, and let's see if we can see
5    what Mr. Dondero is talking about.
6     Q.    Okay.  So I'm just going to focus on
7    the first three paragraphs, 80, 81, and 82, and
8    ask you whether -- whether you are aware of any
9    facts that concern the affirmative defenses set
10   forth in those paragraphs.  And I think they're
11   related, and that is why I'm asking you to do
12   it all together, but we can do it one at a
13   time, whatever you are comfortable with.
14        MS. DEITSCH-PEREZ:  Object to the
15   form.  I mean, other than the facts in
16   those paragraphs?
17        MR. MORRIS:  You are doing it again,
18   Deborah.
19        MS. DEITSCH-PEREZ:  It --
20        MR. MORRIS:  Please, please.
21        MS. DEITSCH-PEREZ:  John, when you
22   ask questions -- I understand Mr. Dondero
23   is sophisticated, but he's also not a
24   lawyer, and when you ask questions that are
25   misleading, I'm going to interject
```

Page 391

```
1              DONDERO - 10/29/21
2    something.
3         MR. MORRIS:  It is completely
4    improper.  He doesn't need to be a lawyer.
5    He's a 30(b)(6) witness, and I'm asking
6    such a simple question, what facts do you
7    have that support the affirmative defense.
8     A.    Okay.  Is it okay if I repeat some
9    of them from the prior one?
10    Q.    Sure.  Whatever you are comfortable
11   with.
12    A.    The -- to the extent that -- to the
13   extent that the notes were prepaid -- prepaid
14   significantly, it is a real question on whether
15   or not there could have been a breach at the
16   end of the year, even if there wasn't a payment
17   at the end of the year.
18        There is no logical reason, nor
19   would I have ever authorized or suggested no
20   payment to put us on -- in default due to a de
21   minimis amount of money, like a few hundred
22   thousand dollars, even if I was highly annoyed
23   with Seery, even if we knew that Seery and
24   Highland had overcharged NexPoint by whatever
25   it was, 14, 16 million bucks, I would not have
```

Page 392

DONDERO - 10/29/21

1  let a small amount cause a – cause a breach.
2        You know, the – how would I – how
3  would I add to that now.  The overpayment on
4  the $14 million, holding back additional shared
5  services amount, made an inordinate amount of
6  sense.
7        There was supposed to be at that
8  time – there was another netting from Seery in
9  terms of wanting to be fair and reasonable, you
10  know, with employees and with the transition of
11  the estate, et cetera, and everything was going
12  to get trued up.
13        So I do believe there was an
14  expectation of a netting, et cetera, but
15  overall, Highland should have paid it.  It
16  shouldn't have let it breach the cause, but at
17  least when I found out about it and they knew I
18  was annoyed.  And I told them I didn't want it
19  to be in default, they gave me the numbers and
20  the amounts to cure it in their mind, and they
21  accepted it.
22        Now, I think they should have gone
23  back and incorporated prepays and said that no
24  amounts were due because of the prepays, et

Page 393

DONDERO - 10/29/21

1  cetera, but the calculation that they came up
2  to get it in compliance in good standing was a
3  million 4.  And just like we relied on them to
4  pay it and keep us out of default, we relied on
5  them to set the amount to cure.
6        But I guess I would make the
7  argument that it shouldn't have been, but
8  again, I didn't want to mince – I didn't want
9  to on small dollars make an argument that could
10  get us in bigger trouble – bigger trouble.  So
11  it was easier to – to pay the million bucks
12  than it was to argue that it wasn't due.
13     Q.   Did you at any time in your capacity
14  as the person in control of NexPoint instruct
15  anybody at Highland to make the payment that
16  was due at the end of 2020?
17     A.   Not specifically to pay it or not
18  specifically not to pay it.  It was something,
19  again, small and de minimis that I expected to
20  be done in due course.
21        MR. MORRIS:  I move to strike.
22     Q.   It's a very simple question.
23        Did you personally take any steps to
24  ensure that NexPoint made the payment that was

Page 394

DONDERO - 10/29/21

1  due at the end of 2020?
2        MS. DEITSCH-PEREZ:  Asked and
3  answered.
4     A.   Yes, I would like to repeat my same
5  answer.
6     Q.   Did you tell anybody to make the
7  payment on behalf of NexPoint at the end of
8  2020?
9        MS. DEITSCH-PEREZ:  Asked and
10  answered.
11     A.   I would like to give the same answer
12  that you – you – you struck.
13     Q.   Can you just say yes or no, sir, did
14  you tell anybody to make the payment at the end
15  of 2020 on behalf of NexPoint?
16        MS. DEITSCH-PEREZ:  Asked and
17  answered.
18     A.   I don't want to give anything beyond
19  the answer that I gave.
20     Q.   Okay.
21     A.   I get myself in trouble because I
22  paraphrase.  I don't want to answer yes – I
23  don't think yes or no would be an appropriate
24  answer.  I want to stay with the answer that I

Page 395

DONDERO - 10/29/21

1  gave.
2     Q.   Okay.  I'm going to say the word
3  "Yankees," and every time I say the word
4  "Yankees" today, everybody should know that
5  that is the question that I'm going to bring to
6  the Court on a motion to compel, okay?
7        It's a very simple question.  It's a
8  very simple question.  I will ask one more
9  time, and if you don't want to answer, that is
10  fine.
11        MS. DEITSCH-PEREZ:  What –
12     Q.   Mr. Dondero – Mr. Dondero, in
13  December of 2020, did you give anybody any
14  instructions at Highland to make sure that
15  NexPoint made the payment that was due at the
16  end of the year?
17        MS. DEITSCH-PEREZ:  Asked and
18  answered.
19     A.   I think that means I'm supposed to
20  stick with the answer that I gave.
21        MS. DEITSCH-PEREZ:  You're on mute,
22  John.  John, you're on mute.  John, you're
23  on mute.  John, we can't hear you.
24        THE WITNESS:  I do like it better

Page 396

```
1           DONDERO - 10/29/21
2    when he yells at me on mute.
3           MS. DEITSCH-PEREZ:  John, we can't
4    hear you.
5           COURT REPORTER:  We can't hear you,
6    John.
7           MR. MORRIS:  You can't hear me?
8           COURT REPORTER:  Now we can.
9           MS. DEITSCH-PEREZ:  Now we can hear
10   you, but we couldn't hear you.  It looks
11   like you were yelling, but we couldn't hear
12   you.
13      A.   I do like it better when you yell at
14   me on mute.
15      Q.   I try not to yell at you, and I hope
16   that you haven't perceived this -- we do have a
17   videotape this time.  So to the extent that
18   anybody perceives your comment as suggesting
19   that I have yelled at you, I would invite them
20   to look at the video.
21          MS. DEITSCH-PEREZ:  Well, we said we
22   couldn't hear you, but your animation
23   looked like that.
24      Q.   Sir, can you identify any person in
25   the world acting on behalf of NexPoint who
```

Page 397

```
1    instructed Highland to make the payment that
2    was due on the NexPoint term note in December
3    of 2020?
4           MS. DEITSCH-PEREZ:  John, that is
5    the fifth or sixth time.
6           MR. MORRIS:  It is a completely
7    different question.  Please.
8           MS. DEITSCH-PEREZ:  Could you read
9    it back, if I was mistaken.  So read it
10   back.
11          (Record read.)
12      A.   NexPoint did not have the accounting
13   staff or the systems or the records or the
14   knowledge to have any person in the world at
15   NexPoint to give that instruction.
16          So the long answer -- the short
17   answer is no, but the long answer is we had
18   been kept away from our books and records.  I
19   think we largely still don't have them, and
20   there would -- I am not aware of anybody who --
21   anybody in the world at NexPoint who made that
22   request.
23      Q.   Frank Waterhouse was the treasurer
24   of NexPoint in December of 2020; is that
```

Page 398

```
1           DONDERO - 10/29/21
2    correct?
3       A.   I think he was very much viewing his
4    responsibilities as Highland related and as an
5    employee of Highland.  But yes, based on that
6    incumbency certificate, but that is your --
7    your question to ask Frank if he was taking
8    that seriously, but NexPoint was relying on
9    Highland.
10      Q.   Do you have any other facts that you
11   are aware of that relate to the affirmative
12   defenses set forth in Paragraphs 81 through 82?
13      A.   I think I -- I think I've said them
14   all.
15          MR. MORRIS:  Okay.  It is 2:13
16   Eastern time.  Let's just take a short
17   half-hour lunch break, and let's return at
18   2:45, or 1:45 Central.
19          VIDEOGRAPHER:  Off the record, 1:13.
20   (Recess taken 1:13 p.m. to 1:48 p.m.)
21          VIDEOGRAPHER:  Back on the record,
22   1:48.
23          Mr. Dondero, are you comfortable?
24      A.   Yes.
25      Q.   And are you able to proceed?
```

Page 399

```
1           DONDERO - 10/29/21
2       A.   Yes.
3       Q.   Okay.  Did you speak with anybody
4    during the break about the substance of this
5    deposition?
6       A.   No.
7       Q.   You entered into certain oral
8    agreements with your sister concerning some of
9    the notes at issue in these lawsuits.
10          Do I have that right?
11          MS. DEITSCH-PEREZ:  Object to the
12   form.
13      A.   Can you rephrase or repeat, please?
14      Q.   Sure.
15          You entered into certain oral
16   agreements with your sister concerning certain
17   of the notes at issue in these lawsuits.
18          Do I have that right?
19          MS. DEITSCH-PEREZ:  Object --
20      A.   Yes.
21          MS. DEITSCH-PEREZ:  Object to the
22   form.  And I'm going to object -- object
23   every time because it just -- just so it is
24   on the record because you are saying "your
25   sister" without giving her -- her capacity.
```

Page 400

DONDERO - 10/29/21

1
2 A. Okay.
3 MS. DEITSCH-PEREZ: But I don't want
4 to disrupt the deposition, so I'm just
5 telling you why I'm doing it and he can
6 continue to answer thereafter. That is why
7 I'm doing it.
8 Q. Okay. Can we -- can we agree,
9 Mr. Dondero, when I refer to your sister in the
10 context of oral agreements that she was
11 entering into those agreements with you as a
12 representative of Dugaboy -- as Dugaboy
13 trustee, as representative for a majority of
14 the class A interest holders of Highland?
15 A. Yeah. How about just to make it
16 simple let's just call it the Dugaboy trustee,
17 and everybody will know that it is my sister
18 and everybody will know that it is the majority
19 of the class A unit holders.
20 Q. Okay. Okay. I appreciate that and
21 I will do just that.
22 You entered into certain oral
23 agreements with the Dugaboy trustee concerning
24 certain of the notes at issue in these
25 lawsuits; is that right?

Page 401

DONDERO - 10/29/21

1
2 A. Yes.
3 Q. Okay. Let's discuss the purpose of
4 those oral agreements.
5 MR. MORRIS: Can we put back up on
6 the screen Mr. Dondero's answer.
7 Q. And while we're doing that,
8 Mr. Dondero, can you confirm that your sister
9 is the only trustee of the Dugaboy Investment
10 Trust?
11 MS. DEITSCH-PEREZ: Object to the
12 form.
13 A. For what period of time are we
14 talking about?
15 Q. During the period of time at which
16 you entered into the oral agreements with the
17 Dugaboy trustee.
18 MS. DEITSCH-PEREZ: Object to the
19 form.
20 A. Yeah, I believe she has been the
21 trustee since 2015 and remains so today. I
22 don't have an awareness of -- I don't have an
23 awareness of another functional trustee.
24 So some of these -- sometimes
25 complex trusts have other layers that are

Page 402

DONDERO - 10/29/21

1
2 called trustees but they're not trustees per
3 se. But I think I'm over thinking it. But I'm
4 not aware of anybody I've interacted with,
5 other than her, as trustee with regard to the
6 notes.
7 Q. Okay. So up on the screen we
8 have -- no, that is the wrong document.
9 MR. MORRIS: We need Exhibit 31,
10 please.
11 Yeah, there you go. That one.
12 Perfect. Okay.
13 MS. DEITSCH-PEREZ: 31 is not -- oh,
14 is that the '03 answer?
15 MR. MORRIS: Correct, that is
16 Mr. Dondero's answer.
17 Q. Do you see that, sir, on the screen?
18 MS. DEITSCH-PEREZ: Hang on. I'm
19 going to get it again.
20 Okay. If you want a hard copy, I
21 have one here but he's got it up.
22 Q. Do you see on the screen,
23 Mr. Dondero, marked as Exhibit 31 is your
24 answer to Highland's amended complaint?
25 A. Yes.

Page 403

DONDERO - 10/29/21

1
2 Q. Okay.
3 MR. MORRIS: Can we go to
4 Paragraph 82, please.
5 Q. Is it your understanding that
6 Paragraph 82 describes, among other things, in
7 general terms your oral agreements with --
8 between you and the Dugaboy trustee?
9 A. Yes.
10 Q. Is it your position that the oral
11 agreements that you entered into with your
12 sister -- withdrawn.
13 Is it your contention that the oral
14 agreements you entered into with the Dugaboy
15 trustee applied to each of the notes that were
16 executed by NexPoint and that are the subject
17 of Highland's lawsuit against NexPoint?
18 A. Yes.
19 Q. Is it your contention that the oral
20 agreements that were entered into with the
21 Dugaboy trustee apply to the notes executed by
22 HCMS that are the subject of Highland's lawsuit
23 against HCMS?
24 A. Yes.
25 Q. Is it your contention that the oral

Page 404

DONDERO - 10/29/21

1
2 agreements between you and the Dugaboy trustee
3 apply to the notes that were executed by HCRE
4 that are the subject of the lawsuit that
5 Highland has commenced against HCRE?
6    A.   Yes.
7    Q.   Okay.  Do I understand correctly
8 that your oral agreements with your sister do
9 not apply to the notes that were executed on
10 behalf of HCMFA that are the subject of the
11 lawsuit that Highland commenced against HCMFA?
12    A.   Correct.
13    Q.   Okay.  I appreciate that.
14        Do you see in this paragraph towards
15 the middle it says, quote:  The purpose of this
16 agreement was to provide compensation to
17 defendant, James Dondero, who was otherwise
18 underpaid, compared to reasonable compensation
19 levels in the industry through the use of
20 forgivable loans, a practice that was standard
21 at HCMLP in the industry.
22        Have I read that correctly?
23    A.   Yes.
24    Q.   Is that the purpose of the agreement
25 that you entered into with your sister --

Page 405

DONDERO - 10/29/21

1
2 withdrawn.
3        Is that the purpose of the agreement
4 that you entered into with the Dugaboy trustee
5 concerning the notes at issue in the lawsuits
6 that were commenced against you personally?
7        Withdrawn.  That was a bad question.
8        Does that purpose apply only to the
9 notes that you executed or does it apply to the
10 corporate notes as well?
11        MS. DEITSCH-PEREZ:  Object to the
12 form.
13        Other than HCMFA?
14        MR. MORRIS:  Correct.  I think we've
15 established the scope of the agreements.
16    A.   To give a complete answer, from my
17 perspective it is about 50 million of notes
18 between -- current balance between NexPoint,
19 Services, myself, and HCRE.
20    Q.   And HCMS; right?
21    A.   Yes, Services, Highland Capital
22 Management, yes.
23    Q.   Okay.  So I just want to know, that
24 sentence there concerning the purpose was
25 omitted from the answers of NexPoint, HCMS,

Page 406

DONDERO - 10/29/21

1
2 HCRE.
3        And I'm happy to walk you through to
4 show you.  And I just want to know in your
5 capacity as a 30(b)(6) witness for those
6 entities, if you know why that statement of
7 purpose was omitted.
8    A.   Well, we talked about it earlier.  I
9 think there is some cleanup.  There has been
10 multiple lawyers involved.  We didn't know
11 which loans were prepaid, which loans weren't.
12 But, you know, I don't know why it was omitted
13 but it applies to all of them.
14        MS. DEITSCH-PEREZ:  I think that is
15 the first time that I've noticed that.  So,
16 John, I'm going to take a mea culpa.  I
17 think that is a cut-and-paste error.
18        MR. MORRIS:  All right.  Well, I
19 will -- I will just point out that the
20 affirmative defense concerning the oral
21 agreements is the exact same in all four
22 answers, except for the omission of the
23 statement of purpose for the three
24 corporate entities.
25    Q.   And so, Mr. Dondero, is it fair to

Page 407

DONDERO - 10/29/21

1
2 say that you don't know why that statement of
3 purpose was omitted from the corporate
4 entities' answers?
5    A.   Yeah, I don't know why it is omitted
6 or why the complaints aren't consistent with
7 that regard.
8    Q.   Okay.  But it is your -- it is your
9 position as the purpose -- as one of the people
10 who entered into this oral agreement that the
11 purpose for the -- for the condition subsequent
12 agreement is the same as for the corporate
13 entities as it is for you, as stated in this
14 paragraph; is that right?
15    A.   Yes.
16    Q.   Okay.  We talked a little bit about
17 the NexPoint term note.
18        Do you remember that?
19    A.   Yes.
20    Q.   And do you recall that in its
21 original form the NexPoint term note was for a
22 principal amount of approximately $30 million?
23    A.   Yes.
24    Q.   And do you recall that the NexPoint
25 term note was a rollup of the outstanding

Page 408

DONDERO - 10/29/21

1 principal and interest then due on certain
2 promissory notes that had previously been given
3 by NexPoint to Highland?
4 A. Yes.
5 Q. Okay.
6 MR. MORRIS: Can we put up, please,
7 Exhibit Number 2, which I believe is the
8 complaint against NexPoint.
9 (Exhibit 2 marked.)
10 MR. MORRIS: And if we can go to
11 Exhibit Number 1 of Deposition Exhibit
12 Number 2.
13 Q. Okay. And do you see -- I'm sorry,
14 sir, do you see that Exhibit Number 1 to the
15 complaint is a promissory note dated May 31st,
16 2017 in the approximate amount of
17 $30.75 million?
18 A. Yes.
19 Q. Okay. And is that your signature on
20 page 2?
21 A. Looks like it.
22 Q. Okay. And did you sign this note on
23 behalf of NexPoint on or around May 31st, 2017?
24 A. I assume so.

Page 409

DONDERO - 10/29/21

1 Q. Do you know if you read the note
2 before you signed it?
3 A. Not likely.
4 Q. Do you recall whether there was
5 anything about the note that you didn't
6 understand before you signed it on behalf of
7 NexPoint?
8 MS. DEITSCH-PEREZ: Object to the
9 form.
10 A. Yeah, I'm not -- I doubt I read it,
11 so I don't remember objecting to anything.
12 Q. Looking at Paragraph 2.1, am
13 I characterizing that section fairly when I say
14 that the borrower was required to make an
15 annual installment payment at the end of each
16 calendar year?
17 MS. DEITSCH-PEREZ: Object to the
18 form.
19 A. I see that paragraph, yes.
20 Q. Okay. And did you understand when
21 you signed it that an annual installment
22 payment would be due at the end of each year by
23 NexPoint?
24 MS. DEITSCH-PEREZ: Object to the

Page 410

DONDERO - 10/29/21

1 form.
2 A. I never read it that closely.
3 Q. So as the control person of
4 NexPoint, is it fair to say then that you don't
5 recall having an understanding when you signed
6 this note that NexPoint would be required to
7 make annual payments at the end of each year?
8 MS. DEITSCH-PEREZ: Object to the
9 form.
10 A. I didn't have knowledge of the
11 specifics, and again, I would describe those
12 specifics as de minimis.
13 Q. Okay. Do you see -- do you have any
14 idea who drafted this note?
15 A. It would have come from accounting.
16 I think they have boilerplate -- I don't know
17 if they work with legal at all. I have no
18 idea, but it would have come through
19 accounting.
20 Q. Do you recall that all three of the
21 term notes at issue were signed on the same
22 day, May 31st, 2017?
23 A. That doesn't surprise me. I think
24 there was an accounting reason, if I remember

Page 411

DONDERO - 10/29/21

1 correctly. I think it had something to do with
2 either the audit or the financials or if we had
3 a credit facility at the time. I think that is
4 probably why, but I don't remember exactly.
5 Q. Do you have any other recollection
6 as to why all three notes were executed at the
7 end of May 2017?
8 A. Again, I believe they're -- the --
9 aggregating or solidifying them into one
10 defined note I think was required by the
11 auditors or the -- the accounting department as
12 best practices. I don't think -- it wasn't a
13 regulatory reason and it wasn't a compliance
14 reason. I believe it was just an accounting or
15 an audit reason.
16 Q. Did you ever make sure on behalf of
17 NexPoint that the terms of the promissory note
18 were fair and reasonable?
19 MS. DEITSCH-PEREZ: Object to the
20 form.
21 A. Yeah, I don't remember ever
22 negotiating or reading it that closely. And
23 again, I think the view from all concerned is
24 that it was relatively de minimis from the

Page 412

DONDERO - 10/29/21

1
2  balance sheet at Highland then or now and/or de
3  minimis relevant to NexPoint's value.
4      Q.   It is a $30 million note.  Do I have
5  that right?
6      A.   Yes.
7      Q.   Okay.  And it was material enough to
8  be included in Highland's financial statements;
9  is that correct?
10     A.   Anything material or not as part of
11 doing proper audited financials needs to be
12 properly included.
13     Q.   Okay.  And you know, because you
14 signed the management representation letter,
15 that this note was specifically disclosed to
16 PwC and included in both Highland's and
17 NexPoint's audited financial statements;
18 correct?
19     A.   I would -- I would have been shocked
20 if it wasn't, if it is an asset and a liability
21 respectively of the companies.
22     Q.   Okay.  Do you see the section on
23 acceleration upon default, Paragraph 4?
24     A.   Yes.
25     Q.   Have you ever seen that section

Page 413

DONDERO - 10/29/21

1
2  before?
3      A.   No.
4      Q.   Do you think a prudent executive
5  signing a $30 million note should take the time
6  to read the terms and conditions of the note?
7      A.   Not necessarily.
8      Q.   Under what circumstances do you
9  think that an executive shouldn't take the time
10 to read the terms and conditions of a
11 $30 million promissory note?
12     A.   When it is between affiliates,
13 between friendly affiliates with no even
14 inkling that bankruptcy or the parties could be
15 at odds create a note, when it is a soft note
16 with limited collateral and limited other
17 protections.  And then the servicing or value
18 of the note is de minimis relative to the
19 balance sheets of each entity I think is a good
20 reason or logical reason for the executives on
21 both sides not to spend much time focusing on
22 it.
23     Q.   All right.  So you thought it was
24 reasonable not to read this particular note for
25 the reasons you just gave.

Page 414

DONDERO - 10/29/21

1
2      Do I have that right?
3      A.   Right.
4      MR. MORRIS:  Okay.  Can we go to the
5  next page, please.
6      Q.   Do you see Paragraph 5?  There is a
7  paragraph entitled Waiver.
8      A.   Yes.
9      Q.   And I will read it out loud:  Maker
10 hereby waives grace, demand, presentment for
11 payment, notice of non-payment, protest, notice
12 of protest, notice of intent to accelerate,
13 notice of acceleration, and all other notices
14 of any kind hereunder.
15     Have I read that correctly?
16     A.   Yes.
17     Q.   Do you know that that paragraph is
18 included in every single note that you signed
19 that is part of the litigation that we're here
20 to talk about today?
21     A.   You have to -- you have to define
22 when.  You know, like today I know that it
23 is -- it is in those notes.
24     At the end of '20, Seery and DSI
25 were withholding all notes, all information,

Page 415

DONDERO - 10/29/21

1
2  anything regarding the company from any of the
3  other subsidiaries, and Frank was administering
4  the notes on behalf of both the related parties
5  and Highland.
6      So at the time -- at the time I
7  would have -- would have never known that at
8  the end of 2020.  And it is crazy to think I
9  would have remembered a clause in a soft note
10 from three years earlier.
11     Q.   Okay.  Is it fair to say that -- do
12 you understand today that that provision is
13 included in every note that you signed?
14     MS. DEITSCH-PEREZ:  Object to the
15 form.
16     A.   You're saying it, so I believe you.
17 I'm not asking you to go show me all the other
18 notes, but --
19     Q.   Thank you.
20     A.   -- I'm assuming it is in all the
21 other notes.  I will take your word for it.
22     Q.   And is it fair to say that at the
23 time you signed these notes you didn't take the
24 time to read that particular provision?
25     MS. DEITSCH-PEREZ:  Object to the

Page 416

DONDERO - 10/29/21

1
2 form.
3 A. That is correct. A lot of it is
4 boilerplate. And, again, treasury or
5 accounting would have put in what was necessary
6 for regulatory, tax, audit purposes. Maybe the
7 auditors put that in. I have no idea.
8 But the content and the bullet
9 points here, the nine paragraphs on a soft note
10 would have been put in by other people and
11 administered by other people other than me.
12 Q. What is a soft note?
13 A. You know, like a secured -- I mean,
14 a note that isn't a hard note, like a note that
15 isn't secured, deed in lieu, UCC filed,
16 guaranteed, you know, performance and bad boy
17 clauses and all of that other stuff.
18 A soft note is an unsecured loan
19 that has basic terms to it, but it is likely
20 subject to renegotiation over time.
21 Q. Were any of the notes that you
22 signed subject to negotiation?
23 A. Well, I'm saying by definition that
24 is what a soft note is.
25 Q. One that -- that is not subject to

Page 417

DONDERO - 10/29/21

1 the negotiation -- to negotiations?
2
3 A. No, one that is over time subject to
4 negotiation or modification.
5 Q. Okay.
6 A. Because there is -- there is
7 limited -- there is limited, team collateral,
8 guarantee, bad boy features in -- in a soft
9 note.
10 Q. Okay. Perhaps my question wasn't
11 clear.
12 Did the notes that you signed -- did
13 you negotiate them with anybody, the terms of
14 each note?
15 A. No.
16 Q. Okay. Did you personally decide on
17 the terms of each note?
18 A. No. Again, they were two highly
19 solvent, highly well-capitalized subsidiaries,
20 and the amount of the notes was de minimis and
21 friendly, and they were soft notes administered
22 by a centralized treasury shared services
23 department.
24
25 They were the ones deciding what it

Page 418

DONDERO - 10/29/21

1
2 took to be compliant from an accounting
3 regulatory-wise standpoint, but wasn't -- they
4 were trying to come up with a balance note,
5 which I think this is, such that it wouldn't
6 have to be negotiated or haggled by any of the
7 parties.
8 And there is no evidence of any of
9 the notes ever being haggled or ever being
10 negotiated.
11 Q. Okay. I appreciate that.
12 At the time you signed each of the
13 notes on behalf of the obligors, did the
14 obligors have an intention at the time you put
15 your signature on the page of repaying the
16 notes in accordance with their terms?
17 A. Yes. They're all -- soft note
18 doesn't mean it's not a bona fide note. They
19 were all intended to be bona fide notes, and
20 they all are bona fide notes that were intended
21 to be paid and for the -- virtually most part,
22 were always paid or prepaid and, you know, paid
23 in accordance.
24 Q. Do you see to the right there is a
25 list of prior notes?

Page 419

DONDERO - 10/29/21

1
2 A. Yes.
3 Q. And is it your understanding that
4 this note substituted and superseded the
5 promissory notes that are listed on Exhibit A
6 on the page there?
7 A. Yeah. I mean, effectively pay those
8 off and reestablish an aggregate note.
9 Q. Right. And Exhibit A actually set
10 forth the outstanding principal and interest
11 that NexPoint owed Highland under the prior
12 notes as defined there as of May 31st, 2017;
13 right?
14 A. Yeah, that is what it looks like.
15 Q. Okay. And -- and so the initial
16 principal amount of the prior notes was what is
17 stated there, approximately $27.675 million?
18 A. Right.
19 Q. Okay. You wouldn't have signed this
20 note on behalf of NexPoint if you didn't
21 believe at the time you signed it that NexPoint
22 owed Highland that amount of money; correct?
23 A. Yeah, it is a bona fide note,
24 consistent with my testimony.
25 Q. Okay. Do you know why NexPoint

Page 420

DONDERO - 10/29/21

1  borrowed the money from Highland at the times
2  and in the amounts listed on Exhibit A?
3  A. No.
4  Q. Did you authorize NexPoint to borrow
5  the money that is reflected in the prior note
6  set forth on Exhibit A?
7  A. I don't know. Probably some of
8  them, yes.
9  Q. Okay. And you have no recollection
10 at all as to why NexPoint borrowed over
11 $27 million from Highland in the 12-month
12 period from August 2014 to July 2015?
13 A. Not without being refreshed.
14 Q. Okay. Do you have any knowledge as
15 to what NexPoint did with the proceeds from
16 these loans?
17 A. Not without being refreshed.
18 Q. Okay. And you contend that this
19 note is subject to -- subject to one of your
20 oral agreements with the Dugaboy trustee;
21 correct?
22 A. Yes.
23 Q. Who decided to include this
24 particular note in your agreement with the

Page 421

DONDERO - 10/29/21

1  Dugaboy trustee?
2  A. Me, myself.
3  Q. Okay. What was the purpose of
4  including this note in your agreement with the
5  Dugaboy trustee?
6  Was it to provide you with a
7  compensation?
8  A. Yeah. I mean, in fact, I think it
9  was articulated in that big paragraph
10 reasonably well that my cash compensation, I
11 believe through any lens, people would look at
12 it as de minimis from the standpoint of
13 Highland as asset manager.
14 I don't think it was more than a
15 couple million bucks in a year and it went
16 down, I think, in the '15 through '20 period.
17 So I think it is common in private
18 companies to loan money that is bona fide debt
19 and then forgive it at different times to
20 manage compensation and incentives to managers
21 of private companies.
22 This is a -- we're in -- we each
23 have experts talking about it, but I think this
24 is, you know, typical.

Page 422

DONDERO - 10/29/21

1  Q. Can you identify any moment in the
2  25 or 26 year history that you were president
3  of Highland where Highland forgave an
4  intercompany loan for the purpose of providing
5  compensation to you or any other employee
6  except for the agreements that are described in
7  Paragraph 82 of your answer?
8  A. Boy, I know we have masked it. I
9  don't know if we -- it sounds like we may not
10 have sent it to you, but we have done it for a
11 dozen employees over the years in -- in fairly
12 significant amount --
13 Q. I'm going to interrupt you, sir,
14 because it's not responsive to my question. I
15 apologize for that. I'm just focusing on
16 intercompany loans.
17 Can you identify any loan in the 25
18 or 26 years that you were president, an
19 intercompany loan where -- where Highland was
20 the payee that was forgiven for purposes of
21 giving you or any employee compensation, other
22 than -- other than the agreements that you
23 struck with the Dugaboy trustee?
24 A. It is an odd question because I'm

Page 423

DONDERO - 10/29/21

1  the only one at the compensation level with the
2  interrelated entities who could possibly get
3  intercompany loans forgiven as part of the
4  comp, but it --
5  Q. Okay. So let me ask a cleaner --
6  let me ask a cleaner question. I appreciate
7  that clarification.
8  Other than the agreements described
9  in Paragraph 82, can you think of any other
10 intercompany loan that was ever forgiven while
11 you were president of Highland for the purpose
12 of giving you compensation?
13 A. I don't -- I don't know.
14 Q. This is an important issue; right?
15 The notion of a prior practice. It is your
16 contention that there was a prior practice at
17 Highland -- hold on one second. I apologize.
18 Sorry about that. Somebody almost
19 dropped an air conditioner out the window.
20 MS. DEITSCH-PEREZ: That would not
21 be good.
22 MR. MORRIS: No.
23 Q. All right. Apologies.
24 MR. MORRIS: May I have the last

Page 424

1           DONDERO - 10/29/21

2 question read back?

3      (Record read.)

4    Q.   I'm going to start all over here.

5    Mr. Dondero, do you contend that

6 there was a practice at Highland of forgiving

7 loans; is that correct?

8    A.   Yes.

9    Q.   And do you recall that we talked

10 about that issue back in May?

11    A.   Yes.

12    Q.   Okay. And since -- since that time

13 have you made any effort to gather any

14 information that would demonstrate that there

15 was a prior practice at Highland of forgiving

16 loans?

17    A.   Yes.

18    Q.   And what efforts have you made?

19    A.   Like I said, we amassed a list, and

20 not insignificant list and not insignificant

21 amounts, proportionate to the people's

22 compensation where it was a practice.

23      You know, for some people for

24 relocation, for some people for bonuses, for

25 house purposes, for senior executives, senior

Page 425

1 executives at the bank and board members at the

2 bank in the seven-figure kind of numbers that

3 were then subsequently forgiven.

4      It is -- I know we amassed more than

5 a dozen examples that were significant and

6 material.

7      MR. MORRIS: Deborah, I apologize.

8 It is certainly possible I missed it, but I

9 don't recall seeing any list or any

10 documents of any kind that Mr. Dondero has

11 described.

12      Have they been produced?

13      MS. DEITSCH-PEREZ: I think so. I

14 will double-check, but I believe that

15 they're listed --

16      MR. MORRIS: I know there is a list

17 of -- I apologize. I know there is a list

18 of names in one of the discovery responses.

19 But other than the list of names in the

20 discovery response, I don't recall

21 receiving any documents at all.

22      MS. DEITSCH-PEREZ: No. And I think

23 we asked you for the documents because we

24 don't have access to the documents on

Page 426

1           DONDERO - 10/29/21

2 Highland's server. The only thing I can

3 think of that we might owe you is there

4 might be a few additional names to list in

5 the interrogatory, and I will check whether

6 that has been done.

7      MR. MORRIS: Okay.

8    Q.   Mr. Dondero, you sign management

9 representation letters in connection with

10 Highland's audit each year; is that right?

11    A.   Yes.

12    Q.   Do you understand that you have an

13 obligation when you sign the management

14 representation to disclose to the auditor all

15 agreements with affiliated entities and people

16 that are deemed to be material?

17      MS. DEITSCH-PEREZ: Object to the

18 form.

19    A.   Generally, yes.

20    Q.   Okay. And is it your understanding

21 that at least since 2008 Highland has disclosed

22 to its auditors all agreements with affiliates

23 that are material, as defined in the management

24 representation letter?

25    A.   Yes.

Page 427

1           DONDERO - 10/29/21

2    Q.   And would that include any

3 agreements to forgive loans that were deemed to

4 be material amounts?

5    A.   No, because it is contingent in long

6 term and speculative.

7    Q.   But at some point if it is forgiven

8 would that be -- would that be an event that

9 would be disclosed to the auditor?

10    A.   Sure.

11    Q.   Okay. So is it fair to say that all

12 loans that were deemed to be material to the

13 extent they were forgiven were disclosed to the

14 auditors?

15    A.   Yes.

16    Q.   Okay.

17    A.   But, yeah, the only caveat I would

18 put on it is we have such limited information

19 regarding Cornerstone and Trust Life, which is

20 part of my agreement with the Dugaboy trustee

21 or with the majority of class A holders.

22      They could have been sold in

23 secrecy, without disclosure to us, such that

24 the notes are all forgiven at this point, but

25 we -- we -- we may never know.

Page 428

DONDERO - 10/29/21

1
2 Q. So you can't rely on anything that
3 you don't know; is that fair?
4 A. Yeah.
5 MS. DEITSCH-PEREZ: Objection to
6 form.
7 A. Yeah, we can't rely on things we
8 don't know and we can't rely on the debtor to
9 be honorable.
10 Q. Well, the debtor has produced to
11 you, sir, every single audited financial
12 statement without redaction since 2008. Are
13 you aware of that?
14 A. That is actually news to me because
15 we were asking for them a couple of months ago.
16 That must be -- that must be a new production.
17 Q. No. Actually, it was produced to
18 you way back in July. You are not aware of
19 that?
20 A. No, I'm looking --
21 MS. DEITSCH-PEREZ: Hang on.
22 A. I'm looking at Deborah. She'll --
23 MS. DEITSCH-PEREZ: I will get the
24 date.
25 A. Yeah. I would love to see them.

Page 429

DONDERO - 10/29/21

1
2 Q. So then -- so then it -- so is it
3 fair to say, sir, that when you are describing
4 this practice of forgiveness of loans, you are
5 doing so without having reviewed any of the
6 audited financial statements that Highland
7 provided to your attorneys going back to 2008?
8 MS. DEITSCH-PEREZ: Object to the
9 form.
10 A. What I'm saying, I guess, is that we
11 haven't treated the loans as forgiven yet
12 because if the condition precedent has been
13 satisfied, we're not aware of it yet.
14 Now, if there is something in those
15 financial statements that will show that the
16 condition precedent is satisfied, then we have
17 a decision to make about the -- or figure out
18 what the mechanism is for forgiving the loans.
19 Q. Are you saying that there are loans
20 out there subject to forgiveness where the
21 maker is somebody other than you or an entity
22 that you control?
23 A. No, I'm just -- I'm talking about
24 the 50 million of loans that we've been talking
25 about.

Page 430

DONDERO - 10/29/21

1
2 Q. Okay. So -- so I just want to go
3 back and focus on your assertion that there was
4 this practice of loan forgiveness. I think you
5 have agreed with me that any loan that was
6 forgiven in a material amount would be
7 contained within the Highland audited financial
8 statements; right?
9 A. I believe they -- material or not,
10 they were all included in the Highland
11 financials. Now, they might not have been
12 specifically footnoted, you know.
13 Like in other words, if we gave
14 somebody half a million bucks to relocate and
15 then forgave the loan, it might just be mixed
16 with all other compensation in the line item.
17 It might not have been listed separately
18 because it would have been small relative to
19 the overall financial statement.
20 Q. But you're just speculating right
21 now because, in fact, you haven't read the
22 audited financial statements for the purpose of
23 seeing whether or not there were loan -- loans
24 that were forgiven and disclosed; right?
25 MS. DEITSCH-PEREZ: Object to the

Page 431

DONDERO - 10/29/21

1
2 form.
3 A. Well, what I'm saying, just to be
4 clear, is I haven't looked at the presentation
5 of forgiven loans in the historic financials
6 because I was unaware that we had gotten
7 historic financials, but I am testifying that
8 we had amassed at least a dozen, 15 material
9 examples of material loan forgiveness amounts
10 to different executives.
11 Q. All right. Do you have any
12 documentation to support your assertion of the
13 practice of forgiving loans at Highland?
14 A. Again, we have very, very little
15 access to anything, and we didn't take anything
16 with us that we weren't supposed to take, so we
17 don't have any of that documentation.
18 At NexBank, one of the sister
19 companies that we still have full control over
20 our records, we could show seven-figure-plus
21 loans to senior management and the entire board
22 of directors and forgiveness thereof as an
23 example, but that -- that is the only
24 documentation that we would be able to present
25 without having access to the records that you

Page 432

1    DONDERO - 10/29/21
2  guys are keeping from us.
3       MR. MORRIS:  I move to strike the
4  last comment, and I take offense to it,
5  sir.  We're not withholding anything, okay.
6    Q.    Would the NexBank audited financial
7  statements include a disclosure of the loans
8  that you are describing?
9    A.    Yes.
10   Q.    Okay.  So is it fair to say that if
11 Highland forgave loans, it would be disclosed
12 in its audited financial statements?
13      MS. DEITSCH-PEREZ:  Object, asked
14 and answered.
15   A.    Well, just to be clear, these loans
16 like the one up on the sheet, those were
17 included in Highland's financials, those loans,
18 just like the NexBank loans, when they were
19 made to senior executives were included.  But
20 there wasn't a - at NexBank there wasn't any
21 kind of disclosure that said, these might be
22 forgiven, or these are the terms that they
23 would be forgiven under, just like there was no
24 disclosure in the Highland financials that
25 these are the terms that it might be forgiven

Page 433

1    DONDERO - 10/29/21
2  under, et cetera, et cetera.
3    Q.    It's certainly disclosed in the
4  financials when it was forgiven.  Will you --
5  will you concede that point?
6    A.    Yes, sure.
7    Q.    Okay.  Let's move on.
8       Let's go to HCMS.  Are you familiar
9  with the notes at issue in the lawsuit that was
10 commenced by Highland against HCMS?
11      MS. DEITSCH-PEREZ:  S or --
12   A.    S as in Services.  Yes.
13      MR. MORRIS:  Okay.  Can we please
14 put up Exhibit 3.
15      (Exhibit 3 marked.)
16      MS. DEITSCH-PEREZ:  Is that in the
17 binder that you sent?
18      MR. MORRIS:  Yes, as Exhibit 3.
19      MS. DEITSCH-PEREZ:  Okay.
20      MR. MORRIS:  And if we could go to
21 the Exhibits 1 through 4, okay.
22   Q.    Sir, we've put up on the screen
23 Exhibit 1 to Exhibit 3, which is the complaint
24 against HCMS.  Do you see Exhibit 1 up on your
25 screen?

Page 434

1    DONDERO - 10/29/21
2    A.    Yeah.  This is the $150,000
3  promissory note; is that what that is?
4    Q.    Yes, sir.
5    A.    Okay.  As long as I can see it on
6  the screen, I don't need to find it in hard
7  copy, do I?
8       MS. DEITSCH-PEREZ:  Yeah.
9       MR. MORRIS:  Can you scroll to the
10 second page, PJ.
11   Q.    Is that your signature, sir?
12   A.    Close.
13   Q.    Are you aware that your signature is
14 affixed to a $150,000 promissory note that was
15 made by HCMS to Highland Capital Management?
16   A.    Like I said --
17      MS. DEITSCH-PEREZ:  Objection, form.
18   A.    Like I said, it's close.  I don't
19 know if that is mine, but it's close.
20   Q.    Do you have any reason to believe
21 that either you or somebody you authorized
22 didn't sign this particular promissory note?
23   A.    Not specifically.
24      MR. MORRIS:  Okay.  Can we go to the
25 first page, please.

Page 435

1    DONDERO - 10/29/21
2    Q.    Did HCMS receive a loan from
3  Highland in the amount of $150,000 on March
4  28th, 2018?
5    A.    I assume so.
6    Q.    Okay.  You wouldn't have either
7  signed or allowed your signature to be affixed
8  to this document if you didn't understand that
9  HCMS had received from Highland $150,000;
10 correct?
11   A.    This is one of the many things I
12 would have signed on a given day.
13   Q.    Okay.  And -- and are you aware that
14 this note was given to Highland's auditors?
15   A.    It could.  I'm not aware
16 specifically, but it should be.
17   Q.    Okay.  Do you have any recollection
18 as to why HCMS obtained this loan from
19 Highland?
20   A.    Unless it says it on these two
21 pages, I have no idea.
22   Q.    Okay.  Do you have any recollection
23 as to what HCMS did with the proceeds of this
24 loan?
25   A.    No.

Page 436

DONDERO - 10/29/21

2 Q. Okay. Let's just flip through the
3 Exhibits 2, 3, and 4, if we could.
4 Looking at Exhibit 2, is that your
5 signature on Exhibit 2, sir?
6 A. Again, it is close.
7 Q. Okay. And do you have any reason to
8 believe that that is either not your signature
9 or that you did not authorize somebody to sign
10 this on behalf of HCMS in June of 2018?
11 A. No.
12 Q. Okay.
13 MR. MORRIS: Can we go to Exhibit 3,
14 please, and if we can go to the signature
15 line.
16 Q. Do you see that that is Frank
17 Waterhouse?
18 A. Yes.
19 MR. MORRIS: Okay. And can we go to
20 the page before that, the first page.
21 Q. Frank Waterhouse was the treasurer
22 of HCMS in May 2019; correct?
23 A. That is what it said right on that
24 thing we saw earlier; right?
25 Q. Incumbency certificate.

Page 437

DONDERO - 10/29/21

2 A. Yes.
3 Q. Do you recall that HCMS borrowed
4 $400,000 from Highland in or around May 2019?
5 A. Not specifically.
6 Q. Do you have any reason to believe
7 that it didn't?
8 A. I have no knowledge -- I have no
9 knowledge of what it was used for and whether
10 it did or didn't.
11 MR. MORRIS: Okay. Let's go to the
12 next exhibit, please.
13 Q. Do you see Frank Waterhouse signed
14 here on behalf of the maker, HCMS Services?
15 A. Yes.
16 Q. Okay. Are you aware that HCMS
17 borrowed $150,000 from Highland in June 2019?
18 A. No.
19 Q. Okay. Do you have --
20 A. I'm not aware and --
21 Q. Do you have --
22 A. I didn't -- I'm sorry, go ahead. I
23 was just saying, looking at Frank's signature,
24 you know, we're switching from me signing to
25 Frank signing. And I guess we're saying Frank

Page 438

DONDERO - 10/29/21

1 is an authorized signatory, although if you
2 look at Frank's, it looks like an automated
3 signature versus, you know, an actual
4 signature, but I assume you went over this with
5 him, but I don't have specific knowledge of
6 these at all.
7 Q. And do you know that Mr. Waterhouse
8 from time to time used an electronic signature?
9 MS. DEITSCH-PEREZ: Object to the
10 form.
11 A. I believe he did.
12 Q. And you saw -- you have seen his
13 electronic signature on other documents; is
14 that right?
15 A. Yes.
16 Q. So it doesn't surprise you to see
17 his electronic signature on a note; correct?
18 A. Yeah. Yeah, okay. Yeah, I don't
19 know. But whether or not he did it or somebody
20 else did it or -- we're just getting a little
21 far afoot from me signing it; right? That is
22 all.
23 Q. Right.
24 A. To -- Frank -- Frank may have signed

Page 439

DONDERO - 10/29/21

1 it. He may have done it electronically or
2 somebody may have done it electronically for
3 him. Those are just different answers than me
4 signing it; right?
5 Q. Okay. And -- and that is fair.
6 Are you aware that on December 3rd,
7 2020, Highland made a demand upon HCMS for
8 payment under these four notes that we have
9 just looked at?
10 A. I knew there was a demand on the
11 NexPoint one. Can you refresh me on this one?
12 Q. Sure.
13 MR. MORRIS: Can we go to the next
14 exhibit in Exhibit 3. Exhibit 5.
15 Q. You will see that there is a letter
16 dated December 3rd, 2020, from Mr. Seery to
17 HCMS?
18 A. Yep.
19 Q. And do you see that it was sent to
20 the attention of Mr. Waterhouse?
21 Do you see that, sir?
22 A. Yes, yep.
23 Q. And, again, Mr. Waterhouse at that
24 time was the treasurer of HCMS to the best of

Page 440

DONDERO - 10/29/21

1  your recollection; correct?
2      A.   He primarily was the CFO of
3  Highland.  But, yes, I mean, I do see that.
4      Q.   Okay.  And did you learn on or
5  around December 3rd that Highland had made
6  demand upon HCMS for payment of all outstanding
7  principal and interest due under the four
8  demand notes that are listed on the page there?
9      A.   Yes, yep.
10     Q.   So you knew that at the time; right?
11     A.   Well, more importantly I knew they
12  were all subject to the same forgiveness
13  provisions as the other note.
14     Q.   Okay.  So I move to strike.
15         You knew in December 3rd, 2020, that
16  Highland made demand; correct?
17     A.   Yes.
18     Q.   Okay.  And do you see that Highland
19  gave HCMS an eight-day grace period or until
20  December 11th, 2020, to make payment?
21     A.   Yes.
22     Q.   Under the demand note do you have
23  any understanding that Highland was required to
24  give any grace period at all?

Page 441

DONDERO - 10/29/21

1      A.   I don't know.
2         MS. DEITSCH-PEREZ:  Object to the
3  form.
4      Q.   Do you know whether HCMS ever
5  responded to this demand letter prior to the
6  commencement of litigation?
7      A.   I don't know.
8      Q.   Prior to the commencement of
9  litigation, did you discuss with anyone whether
10  HCMS should respond to Highland's demand
11  letter?
12     A.   Did I discuss with anyone?  No, I
13  don't remember -- I don't remember talking
14  about this with Frank at all where --
15         MS. DEITSCH-PEREZ:  And I'm just
16  going to stop you to make sure you don't
17  blurt out any privileged communications, if
18  there are any.
19         We object to the disclosure.  But
20  with that caveat, go ahead.
21     A.   I'm sorry, repeat the question
22  again.  Let me try and keep it simple here.
23     Q.   Sure.  It may be my fault.
24         Mr. Dondero, you testified that you

Page 442

DONDERO - 10/29/21

1  were aware that Highland made a demand for
2  payment on these four notes; correct?
3      A.   Yes.
4      Q.   Okay.  Did you have any
5  non-privileged communications at any time after
6  Highland sent this letter about whether and how
7  HCMS should respond?
8      A.   You know, let me just -- let me
9  adjust the prior answer for a second.
10         I'm aware that this letter was sent.
11  I'm not sure I knew contemporaneously or when I
12  knew the letter was sent.  I can't -- I have no
13  recollection of receiving it at the time.
14         And to answer your question, I can't
15  recollect talking to Frank or anybody else
16  about it at the time.  I'm not sure I knew
17  about it at the time.  But I have -- I don't
18  have any recollection of discussing it with
19  anybody at or around the time.
20     Q.   Did you ever instruct anybody at any
21  time to respond to this letter, whenever it is
22  you learned about it?
23     A.   No.
24     Q.   Do you know if anyone acting on

Page 443

DONDERO - 10/29/21

1  behalf of HCMS ever informed Highland of HCMS'
2  defenses to the -- to the demand letter prior
3  to the commencement of litigation?
4      A.   Yeah, Frank would be the person to
5  ask there.  I don't know.
6      Q.   I'm just asking you.  Prior to the
7  commencement of litigation, did you ever
8  instruct anyone to inform Highland that the
9  HCMS notes were subject to oral agreements with
10  the Dugaboy trustee?
11     A.   I believe former Judge Lynn sent a
12  letter in that regard.  But other than that, I
13  don't remember talking to anybody -- I don't
14  remember talking to the debtor about it per se.
15     Q.   It is your recollection that
16  Judge Lynn sent a letter to Highland before the
17  commencement of litigation, putting Highland on
18  notice that the HCMS notes were the subject of
19  oral agreements between you and the Dugaboy
20  trust.
21         Do I have that right?
22     A.   Yeah, that they were part of
23  forgiveness or compensation or something.  He
24  sent a letter in that regard.

Page 444

DONDERO - 10/29/21

1

2    Q.    And was this part of a settlement

3    discussion or was this in response to this

4    demand letter?

5    A.    I don't know.

6    Q.    Have you produced that letter in

7    discovery?

8        MS. DEITSCH-PEREZ:  I'm aware that

9    you have the letter.  I don't know if it

10    was attached to something, but I know you

11    have it.

12        MR. MORRIS:  Because you produced it

13    in discovery or because Mr. Dondero is

14    testifying that his recollection was that

15    Mr. Dondero sent this letter to the debtor?

16        MS. DEITSCH-PEREZ:  The -- the

17    letter has either been produced and was

18    attached to something or was used in a

19    deposition, but I am aware that you have

20    it.  If you need it to be Bates stamped, we

21    could do that.

22        MR. MORRIS:  I definitely need it to

23    be Bates stamped, I do, because I'm not

24    aware of this particular letter.  But I

25    appreciate that.

Page 445

DONDERO - 10/29/21

1

2        MR. RUKAVINA:  This is Davor.

3    Couple things, John -- and I apologize for

4    interjecting.  I have not made an

5    appearance yet today.  Deborah has been

6    objecting for everyone.

7        Thomas Berghman will take over

8    around 3:00 o'clock.  Is that okay with

9    you, John?

10        He is probably just going to sit

11    here and not object.

12        MR. MORRIS:  I will miss you and I

13    hope you have safe travels.

14        MR. RUKAVINA:  Okay.  Thank you very

15    much.

16        And, second, I think that the letter

17    that is being referred to is the email

18    letter, so I have produced it to you.

19        With that, thank you everyone.

20        MR. MORRIS:  Okay.  Take care.

21    Q.    Did anyone -- did you ever instruct

22    anyone in December 2020 to make the payments

23    that Highland demanded under the HCMS notes?

24        MS. DEITSCH-PEREZ:  The demand notes

25    that are listed here on the Exhibit 5?

Page 446

DONDERO - 10/29/21

1

2        MR. MORRIS:  Yes.

3    A.    Yes, not that I recall.

4    Q.    Did you ever instruct anyone in

5    December 2020 not to make the payments that

6    Highland demanded that are listed in this

7    exhibit?

8    A.    No.

9    Q.    Do you know why HCMS did not make

10    the payments that Highland demanded under the

11    notes?

12    A.    Again, beyond compensation

13    forgiveness argument, no.

14        MR. MORRIS:  Okay.  Let's go to the

15    next exhibit, 6.

16        (Exhibit 6 marked.)

17    Q.    And this is another one of the term

18    notes; right?

19    A.    Yes.

20        MR. MORRIS:  And can we just go to

21    the signature line, please.

22    Q.    Is that your signature, sir?

23    A.    That looks more like it.

24    Q.    And do you -- are you willing to

25    agree that you signed this promissory note in

Page 447

DONDERO - 10/29/21

1

2    favor of Highland on May 31st, 2017?

3    A.    Yes.

4    Q.    And is it fair to say you didn't

5    read this note before you signed it?

6    A.    Correct.  No reason to, really.

7    Q.    Okay.  So it is fair to say that

8    there is not a provision of this note that you

9    didn't understand before you signed it;

10    correct?

11        MS. DEITSCH-PEREZ:  Object to the

12    form.

13    A.    That I didn't review it, so

14    therefore I didn't have an opinion one way or

15    the other.

16    Q.    Okay.  This note substituted and

17    superseded for the promissory notes that are

18    set forth on Exhibit A to this document;

19    correct?

20    A.    Yes.

21    Q.    So just like NexPoint and HCMS, HCRE

22    also consolidated their outstanding demand

23    notes into one term notes at the end of

24    May 2017; right?

25    A.    Yep.

Page 448

DONDERO - 10/29/21

1           DONDERO - 10/29/21
2     Q.   Okay.  Let's go to HCRE, if we can
3  take this down and put up Exhibit 4.
4           Actually, before we go to that, do
5  you have any recollection as to why HCRE
6  borrowed money from Highland in the amounts
7  equal to the prior notes as set forth to the
8  exhibit to the term note?
9     A.   Nope.
10    Q.   Do you have any recollection at all
11  as to what HCRE did with the proceeds of the
12  loans that it obtained from Highland?
13    A.   No.
14    Q.   This is Exhibit 4, so this is the
15  complaint -- this is actually the complaint
16  against HCRE.
17         MR. MORRIS:  Can we go to Exhibit 6,
18  please.
19         MS. DEITSCH-PEREZ:  Exhibit 6 of
20  Exhibit 4?
21         MR. MORRIS:  No, I apologize.  That
22  was my mistake.  Yes, Exhibit 6 to Exhibit
23  4.
24         MS. DEITSCH-PEREZ:  Okay.  If you
25  want the hard copy, it is in a booklet.

Page 449

DONDERO - 10/29/21

1           DONDERO - 10/29/21
2     Otherwise, she is pulling it up.
3     Q.   So this is the last of the three
4  term notes.  Do you see that?
5     A.   Yes.
6     Q.   Also signed on May 31st, 2017;
7  correct?
8     A.   Yes.
9     Q.   And if we could look at the
10  signature line, is that your signature, sir?
11    A.   Yes.
12    Q.   And did you sign this note on behalf
13  of HCRE on or about May 31st, 2017?
14    A.   Yes.
15    Q.   Did you read this note before you
16  signed it?
17    A.   No.
18    Q.   And since you didn't read it, is it
19  fair to say that there wasn't a provision of
20  this agreement that you didn't understand at
21  the time that you signed it?
22         MS. DEITSCH-PEREZ:  Object to the
23  form.
24    A.   There is -- there wasn't a
25  provisions I did or didn't understand because I

Page 450

DONDERO - 10/29/21

1           DONDERO - 10/29/21
2  didn't review it.
3     Q.   Okay.  This note substituted and
4  superseded for the promissory notes that are
5  listed on Exhibit A on the right side of the
6  page; correct?
7     A.   Yes.
8     Q.   And Exhibit A set forth the
9  outstanding principal and interest that HCRE
10  owed to Highland under the prior notes as of
11  May 31st, 2017; correct?
12    A.   Uh-huh.
13    Q.   That is a yes, sir; correct?
14    A.   Yes.
15    Q.   Okay.  Do you know why HCRE borrowed
16  the money from Highland at the times and -- and
17  in the amounts set forth on Exhibit A to the
18  promissory note?
19    A.   No.
20    Q.   Do you have any recollection as to
21  what HCRE did with the proceeds of the loans
22  that they had obtained from Highland between
23  January 2014 and April 2015?
24    A.   No.
25    Q.   Can we call the three term notes

Page 451

DONDERO - 10/29/21

1           DONDERO - 10/29/21
2  that were signed by NexPoint, HCRE, and HCMS on
3  May 31st, 2017 collectively as the term notes?
4     A.   Yes.
5     Q.   Okay.  You had the authority to sign
6  each of the term notes on behalf of each of the
7  respective makers; correct?
8     A.   Yes.
9     Q.   Each of the term notes was for a
10  30-year term; correct?
11    A.   I believe so.
12    Q.   Okay.  Who decided to give each note
13  a 30-year term, if you know?
14    A.   The auditors, the accountants, not
15  me.
16    Q.   But you knew that each of the notes
17  was for a 30-year term; is that fair?
18    A.   Yes, I guess, yes.
19    Q.   Notes were unsecured; right?
20    A.   Yes.
21    Q.   And the notes were not the product
22  of any negotiations; correct?
23    A.   Correct.
24    Q.   Is it fair to say that none of the
25  makers of the term notes ever sought financing

Page 452

DONDERO - 10/29/21

1
2 from a third party as an alternative to the
3 Highland notes?
4    A.   That's correct.
5    Q.   Okay.  You don't have any reason to
6 believe that an unrelated third party would
7 have loaned money to NexPoint, HCRE, and HCMS
8 on the terms set forth in each of the term
9 notes, do you?
10       MS. DEITSCH-PEREZ:  Object to the
11    form.
12    A.   I -- it is not fair to draw that
13 conclusion.  You know, particularly NexPoint
14 has borrowed a lot of money at much lower rates
15 at or around 2017 and later, and to this day.
16    Q.   So then why --
17    A.   The same thing with HCRE.
18    Q.   So then why would HCRE and NexPoint
19 enter into these loans rather than obtaining
20 loans at lower interest rates if they were
21 available?
22    A.   These are soft loans, again, so
23 they're -- especially affiliate soft loans to
24 other creditors are viewed almost as equity or
25 subordinated to senior secured mortgages or

Page 453

DONDERO - 10/29/21

1
2 other financings that NexPoint and HCRE did.
3 So I would say that is -- that is the reason.
4    Q.   Are you saying that Highland today
5 really has equity interests in NexPoint, HCRE,
6 and HCMS?
7       MS. DEITSCH-PEREZ:  Object to the
8    form.
9    A.   Yeah, no, I didn't say that.  I'm
10 saying it has subordinated debt interest, but
11 they are soft notes, so they're viewed as
12 deeply subordinated equity-ish, so to speak, as
13 far as the senior secured debtholders are
14 concerned.
15    Q.   Well, that would be true of any
16 senior secured debt relative to unsecured debt;
17 isn't that right?
18    A.   Yes, but again, these are
19 particularly soft notes, you know.
20    Q.   Okay.  At the time you signed these
21 notes, were you aware that each of the term
22 notes required payment of an annual installment
23 on December 31st of each year?
24       MS. DEITSCH-PEREZ:  Object to the
25    form.

Page 454

DONDERO - 10/29/21

1
2    A.   I knew there was more required
3 periodic payments than historically, and that
4 was part of -- partly driven by the -- the
5 auditors, I believe.
6       THE WITNESS:  You know what, can
7    we -- can we take a break for like five or
8    10 minutes, and then, you know, at most --
9    at most I've got another hour in me today,
10    and then so we could just work on when it
11    fits on everybody else's calendar if we
12    can't wrap up in an hour; okay?
13       MR. MORRIS:  No problem,
14    Mr. Dondero.  So the time now is what --
15    what time do we have?
16       VIDEOGRAPHER:  Off the record, 2:56.
17 (Recess taken 2:56 p.m. to 3:19 p.m.)
18       VIDEOGRAPHER:  Back on the record,
19    3:19.
20    Q.   Are you ready to proceed, sir?
21    A.   Yes.
22    Q.   Okay.  Did you speak with anybody
23 during the break about the substance of this
24 deposition?
25    A.   No.

Page 455

DONDERO - 10/29/21

1
2    Q.   So we were just looking at the third
3 in the series of term notes, and if we can go
4 to the -- I apologize, the first page of this
5 one, just to refresh your recollection after
6 the break that this is the term note that was
7 executed by you on behalf of HCRE Partners on
8 May 31st, 2017.
9       Do you see that?
10    A.   Yes.
11    Q.   Okay.  And I looked at Paragraph 5
12 before, but I just want to make sure, you're
13 telling me that you didn't read this before you
14 signed it, do I have that right, Paragraph 5?
15    A.   Yes.
16    Q.   And so you are unaware -- when did
17 you first -- when did you first become aware of
18 the provision that is set forth in Paragraph 5?
19       MS. DEITSCH-PEREZ:  Object to the
20    form.
21    A.   I don't know.
22    Q.   Okay.  Was it before or after the
23 commencement of the litigation?
24    A.   I don't know.
25    Q.   Okay.  NexPoint didn't make the

Page 456

DONDERO - 10/29/21

1  DONDERO - 10/29/21
2  installment payment that was due at the end of
3  2020; correct?
4       MS. DEITSCH-PEREZ: Object to -- are
5  you still talking -- have you left HCRE?
6       MR. MORRIS: No. I said what I
7  meant to. So we can take down the exhibit
8  if that's the part that is confusing you.
9  I appreciate that.
10      MS. DEITSCH-PEREZ: Okay.
11   Q.  Okay. NexPoint didn't make the
12  installment payment that was due at the end of
13  2020; correct?
14      MS. DEITSCH-PEREZ: Object to the
15  form.
16   A.  Yeah. I mean, I think maybe the
17  right way to describe it is Highland or --
18  yeah, Highland or Frank Waterhouse on behalf of
19  NexPoint didn't make the payment.
20   Q.  Okay. And HCRE didn't make the
21  installment payment that was due at the end of
22  2020; correct?
23   A.  I don't -- I guess -- okay, if they
24  missed it too, I -- I did not have specific
25  awareness to that, I guess, but if you are

Page 457

1  suing under it, I guess they did.
2   Q.  Right. And HCMS didn't make the
3  payment that was due at the end of the year, to
4  the best of your knowledge; correct?
5       MS. DEITSCH-PEREZ: Object to the
6  form.
7   A.  Yeah. I mean, what I'd just
8  separate in my notes here is the HCMFA was just
9  not -- it wasn't a bona fide note, I guess,
10  is -- that is -- which I guess is a
11  different -- a different conversation.
12   Q.  Yeah. Do you understand that the
13  question was about HCMS? Let me restate the
14  question.
15      MS. DEITSCH-PEREZ: Yes.
16   Q.  HCMS --
17   A.  Oh, I'm sorry.
18      MS. DEITSCH-PEREZ: John, I'm sorry,
19  it is really hard on the video to
20  distinguish between HCMF and HCMS, so if
21  you could just --
22   A.  How about just say Services for
23  Highland Capital Management Services, just
24  say -- instead of S, just say Services.

Page 458

1  DONDERO - 10/29/21
2   Q.  Sure. All right. So from now on, I
3  will try and use the word "Services" and you
4  will know that that means Highland Management
5  Services, Inc.; is that fair?
6   A.  Yes, okay.
7   Q.  Okay. So Services didn't make the
8  installment payment that was due at year-end;
9  correct?
10   A.  Yes.
11   Q.  Okay. And I just want to make sure
12  that I have this right. Is it -- is it the
13  corporate obligors' -- those three corporate
14  obligors' contention that one of the reasons
15  they didn't make the payments at the end of the
16  year is that they were relying on Highland to
17  make the payment for them?
18   A.  Absolutely.
19   Q.  Okay.
20   A.  It was due course de minimis, and
21  those entities didn't have a single employee or
22  capable financial person other than the people
23  at Highland that were doing the shared services
24  for them.
25   Q.  NexPoint didn't have any employees

Page 459

1  DONDERO - 10/29/21
2  in December 2020. Is that your testimony?
3   A.  I was thinking about HCRE and
4  Services had zero employees. NexPoint had
5  employees but none that were involved in basic
6  accounting functions.
7   Q.  Okay. And -- and there are people,
8  including yourself, who were officers or
9  employees of NexPoint in December 2020;
10  correct?
11   A.  Yes.
12   Q.  And HCRE had officers in December
13  2020, including you; correct?
14   A.  Yes. Officers, yes.
15   Q.  And Services had officers in
16  December 2020, including you; correct?
17   A.  Yes.
18   Q.  Okay. I think in summary form, to
19  be fair, I think we have identified one of the
20  defenses for these three corporate obligors.
21      Two of them have the defense of
22  prepayment; right?
23   A.  Yes.
24   Q.  And one of them is NexPoint,
25  NexPoint has the defense of prepayment.

Page 460

DONDERO - 10/29/21

1
2 Do you have that -- do I have that
3 right?
4 A. Yes.
5 Q. Which of the other two, remind me?
6 A. Services.
7 Q. Okay. So NexPoint and Services have
8 the defense of prepayment. Are there any other
9 reasons that you know of that these three
10 corporate obligors didn't make the annual
11 installment payment that was due at the end of
12 the year?
13 MS. DEITSCH-PEREZ: Object to the
14 form.
15 A. Again, they -- they should have been
16 in regular course. Those payments -- using the
17 word "payment" is almost like an overstatement
18 of the significance or the amount. If the
19 amounts were small in all cases, they should
20 have been made or they should have been paid,
21 even in the context of contention and even in
22 the context of the larger amounts of money that
23 Highland owed us.
24 Q. I'm just -- I'm just asking a pretty
25 simple question, sir. I don't mean to be

Page 461

DONDERO - 10/29/21

1
2 contentious with you. We have identified one
3 defense that these corporate obligors contends
4 exists; and that is, Highland was supposed to
5 make the payment. Fair?
6 A. Yes.
7 Q. And then we have identified a second
8 defense for NexPoint and HCMS, and that is
9 their defense that they prepaid.
10 Do I have that generally right?
11 A. Yes.
12 Q. Can you describe for me any other
13 defenses that these three corporate obligors
14 have for not making the payment that was due at
15 the end of the year?
16 MS. DEITSCH-PEREZ: Object to the
17 form.
18 A. I'm thinking. Not at the moment.
19 Q. Okay. Did you instruct anyone in
20 December of 2020 to make the installment
21 payments that were due on December 31st under
22 these three term notes?
23 MS. DEITSCH-PEREZ: Object to the
24 form, asked and answered.
25 A. No.

Page 462

DONDERO - 10/29/21

1
2 Q. Okay. Did you take any steps to
3 confirm that Highland would make the payments
4 that were due under these three term notes at
5 the end of the year?
6 MS. DEITSCH-PEREZ: Object to the
7 form.
8 A. No. I testified already the first I
9 heard about it was a week or two later. And I
10 called up Frank and confirmed with him to make
11 sure they got paid and make sure they were back
12 in compliance.
13 Q. Okay.
14 MR. MORRIS: I move to strike
15 everything after the word "no."
16 Q. Do you know whether anybody on
17 behalf of any of the three corporate obligors
18 under the term notes ever directed Highland to
19 make the payments under them at the end of the
20 year?
21 MS. DEITSCH-PEREZ: Object to the
22 form.
23 A. Not before the end of the year, no.
24 Q. Okay. And do you know whether
25 anybody acting on behalf of any of the three

Page 463

DONDERO - 10/29/21

1
2 corporate obligors under the term notes ever
3 took any steps in December 2020 to make sure
4 that Highland would, in fact, make the payments
5 that were due at year-end?
6 MS. DEITSCH-PEREZ: Object to the
7 form.
8 A. No, there was a reliance on
9 Highland.
10 Q. Okay. Is it your testimony that
11 Highland was authorized to make the payments
12 under the notes at year-end without being
13 directed by a representative of the three
14 corporate obligors?
15 A. Yes. It is my contention that that
16 is how it worked in prior years also.
17 Q. And so you believe that nobody on
18 behalf of any of the corporate obligors ever
19 authorized or directed Highland to make the
20 payments but that Highland did it without --
21 without direction?
22 MS. DEITSCH-PEREZ: Object to the
23 form.
24 A. Yes, typically. And in 2017 or
25 2018, 2019, for sure.

Page 464

DONDERO - 10/29/21

1
2  Q.  Okay.  We have looked at one -- at
3  one December 3rd letter.  I mean, do you
4  remember that you also received a number of
5  letters on December 3rd demanding payment on
6  certain promissory notes?
7  A.  No.
8  Q.  All right.
9  MR. MORRIS:  Can we call up
10  Exhibit 2, please.  No, I apologize.  Not
11  Exhibit 2, Exhibit 4.
12  (Exhibit 4 marked.)
13  MS. DEITSCH-PEREZ:  Exhibit 4 in the
14  notebook?
15  MR. MORRIS:  Yes, ma'am.
16  Okay.  And now let's -- let's go to
17  the exhibits.  Exhibit 2, Exhibit 3,
18  Exhibit 4, Exhibit 5.
19  Q.  Do you see, sir, that this is a
20  letter addressed to you on behalf of HCRE
21  Partners that is also dated December 3rd, 2020?
22  A.  Yes.
23  Q.  Does that refresh your recollection
24  that you also received notices, demand notices
25  on or around December 3rd, 2020, with respect

Page 465

DONDERO - 10/29/21

1
2  to notes that were held by Highland?
3  A.  No.
4  Q.  Do you recall this letter at all?
5  A.  No, if I -- if I had, I would have
6  made the forgiveness argument or I would have
7  told someone to make the forgiveness argument,
8  but I don't remember this at all.
9  Q.  Okay.  Is it fair to say that
10  neither you nor anyone acting on behalf of
11  yourself, HCMS, or HCRE ever responded to any
12  of the demand letters at the beginning of
13  December 2020?
14  MS. DEITSCH-PEREZ:  Object to the
15  form.
16  A.  Yes, I don't -- I don't know.
17  Q.  You don't have any knowledge of
18  that; is that fair?
19  MS. DEITSCH-PEREZ:  Object to the
20  form.
21  A.  I don't know.
22  Q.  And you don't have any knowledge of
23  anybody responding to any demand letter that
24  was sent to HCMFA; correct?
25  MS. DEITSCH-PEREZ:  Object to the

Page 466

DONDERO - 10/29/21

1
2  form.
3  A.  HCMFA or Services?
4  Q.  HCMFA?
5  A.  I -- I don't know.  I don't have any
6  knowledge.
7  MR. MORRIS:  Can we put up
8  Exhibit 1, please.
9  (Exhibit 1 marked.)
10  MR. MORRIS:  We probably want to go
11  to Exhibit 3 of that document.
12  Q.  This one was sent to Mr. Waterhouse.
13  Do you see that?
14  A.  Yes.
15  Q.  Okay.  And did you become aware on
16  or around December 3rd, 2020, that Highland
17  made demand under the two notes listed in this
18  letter?
19  A.  Yes.  Why would this one go to
20  Frank Waterhouse?
21  Q.  Was he the treasurer -- was he the
22  treasurer of Highland Capital Management Fund
23  Advisors at the time?
24  A.  Right.
25  Q.  So does it make sense that the payee

Page 467

DONDERO - 10/29/21

1
2  on a note might send a demand letter to the
3  treasurer of the maker of the note?
4  MS. DEITSCH-PEREZ:  Object to form.
5  A.  I'm just saying they could have sent
6  the NexPoint letter or the Services letter to
7  him also; right?
8  Q.  I don't -- I think the NexPoint is
9  only a term note; right?  So there is no demand
10  letter.
11  A.  No, I know that.  But whatever --
12  whatever the other one we were just looking at,
13  the Services one could have gone to him, too.
14  Anyway, whatever.  It doesn't
15  matter.  But, no, I don't have a specific
16  recollection of this, if that was your
17  question.
18  Q.  You don't have -- you don't have any
19  recollection of Highland making demand under
20  promissory notes that were issued by you and
21  certain of your affiliates in early December
22  2020.  You don't remember that at all?
23  A.  There was a lot going on then.  And,
24  again, it wasn't something that we either
25  thought was legitimate based on forgiveness or

Page 468

DONDERO - 10/29/21

2 other issues or it wasn't things that we
3 thought were legitimate as part of the overall
4 settlement.
5      You've got to remember we didn't
6 realize Seery betrayed the estate at this
7 point. We thought we were moving towards, you
8 know, resolution or a pot plan.
9   Q.   Okay.
10     MR. MORRIS: I move to strike.
11   Q.   And please listen carefully to my
12 question.
13     Did you have any knowledge in early
14 December 2020 that Highland made demand for
15 payment under demand notes that were issued by
16 you and certain of your affiliates?
17   A.   Same answer.
18   Q.   Were you aware or you were not
19 aware?
20   A.   Well, no specific knowledge for the
21 reasons articulated in the answer that you --
22 you moved to strike.
23   Q.   Okay. So -- so you had -- you had
24 no particularized knowledge of the demands in
25 December 2020; correct?

Page 469

DONDERO - 10/29/21

2   A.   Right.
3   Q.   Okay. And so it is fair to say that
4 you never directed anybody to respond to these
5 demands because you didn't have knowledge of
6 them; correct?
7   A.   Right.
8   Q.   Okay. Do you know whether anybody
9 responded on behalf -- on your behalf or any of
10 the corporate obligors' behalf to any of the
11 demand letters that were -- that you now know
12 were sent in early December 2020?
13   A.   Well, yes. I mean, I know
14 eventually. I don't know when, but I don't
15 think anybody believes these -- these HVIN
16 notes are legitimate notes.
17     I know the response was more around
18 it being payments for the TerreStar regulatory
19 obligations for all the things that Highland
20 had mucked up in the TerreStar situation.
21   Q.   While you were president of that
22 entity; right?
23   A.   Yes.
24   Q.   Okay. And -- and
25 PricewaterhouseCoopers certainly doesn't think

Page 470

DONDERO - 10/29/21

2 these are frivolous obligations, does it?
3     MS. DEITSCH-PEREZ: Object to the
4 form.
5   A.   PricewaterhouseCoopers doesn't --
6   Q.   PricewaterhouseCoopers specifically
7 included a disclosure of all of these
8 promissory notes in the audited financial
9 statements; correct?
10     MS. DEITSCH-PEREZ: Object to the
11 form.
12   A.   I mean, as they should have with the
13 information they had at the time, but I think
14 what has come out since then is that they -- it
15 was moneys that moved from Highland to HFAM for
16 things that were caused by Highland and people,
17 not me, not even Frank, I think, but other
18 people assumed it was a note and made notes out
19 of it. And that is what PricewaterhouseCoopers
20 put into the financials, but I think what
21 everybody acknowledges is that they were
22 never -- they were never notes.
23   Q.   Is there a document that you have
24 ever seen in your life that supports what you
25 just said?

Page 471

DONDERO - 10/29/21

2     MS. DEITSCH-PEREZ: Object to the
3 form.
4   A.   Yes.
5   Q.   Can you identify that document for
6 me?
7   A.   Yeah. It is a -- it is a settlement
8 with the SEC in terms of what they said the
9 breaches were, and why they were finding HFAM,
10 the rationale that they had in the regulatory
11 breaches and in the settlement, and all of the
12 breaches in the settlement were things that
13 Highland did, not that HFAM did.
14     It was all valuation, it was all --
15 it was all services that HFAM had contracted
16 with Highland that were performed deficiently
17 in the eyes of the SEC.
18   Q.   Okay. We will -- we will get to
19 that in more detail, but I just would like to
20 know if you believe that any correspondence to
21 the SEC specifically stated that Highland
22 Capital Management, L.P. and not Highland
23 Capital Management Fund Advisors, L.P. was
24 responsible for the TerreStar valuation error.
25   A.   The SEC would not have parsed

Page 472

DONDERO - 10/29/21

1  between the different players in the entities.
2  They would have said what they thought the
3  breaches were overall in their letter, and what
4  would govern the split is the shared services
5  agreement and where were the employees that
6  performed the activities that they cited.
7  Q.  Okay.  We will get to that at a
8  later time.
9  All right.  Let's go back to the
10 oral agreements that you entered into with the
11 Dugaboy trustee.
12 MR. MORRIS:  And let's start by
13 putting back up Exhibit 31, Paragraph 82.
14 MS. JEFFRIES:  I'm sorry, can you
15 repeat that?
16 MR. MORRIS:  Yes.  Exhibit 31,
17 Paragraph 82, yes.
18 Q.  And, again, Mr. Dondero, I think you
19 have testified already that you believe
20 Paragraph 82 generally describes the oral
21 agreement that you entered into with the
22 Dugaboy trustee with respect to the promissory
23 notes that we've described; right?
24 A.  Yes.

Page 473

DONDERO - 10/29/21

1  Q.  And -- and it is -- and that
2  includes the promissory notes that you signed
3  that Highland is suing on as well as the
4  promissory notes that HCRE, HCMS, and NexPoint
5  signed that Highland is suing on; correct?
6  A.  Yes.
7  Q.  Okay.  Do you contend that the oral
8  agreements that you entered into with the
9  Dugaboy trustee modified the parties' rights
10 under the original promissory notes?
11 MS. DEITSCH-PEREZ:  Object to the
12 form.
13 A.  Modify, boy, sounds like a legal
14 term.  It said conditions by which they could
15 be forgiven.
16 Q.  And there were no such conditions in
17 the original notes; right?
18 A.  That is correct.
19 Q.  Okay.  So I'm just asking you from
20 your perspective whether the oral agreements
21 that you entered into with the Dugaboy trustee
22 were intended to modify the parties' rights and
23 obligations under the original promissory
24 notes.

Page 474

DONDERO - 10/29/21

1  MS. DEITSCH-PEREZ:  Object to the
2  form.
3  A.  It was meant to condition the
4  forgiveness.
5  Q.  Did it change --
6  A.  I would like to use those words
7  versus modified the agreement.
8  Q.  Did it -- did it alter the parties'
9  rights and obligations?
10 MS. DEITSCH-PEREZ:  Object to the
11 form.
12 Q.  I'm not trying to play a game with
13 you.  I just --
14 MS. DEITSCH-PEREZ:  That is exactly
15 what you are doing.  Why don't you just ask
16 him --
17 MR. MORRIS:  Please stop talking.
18 Please stop talking.
19 Q.  Mr. Dondero, is it fair to say that
20 the promissory notes that are the subject of
21 your oral agreements with the Dugaboy --
22 Dugaboy trustee set forth the parties' rights
23 and obligations thereunder, both the maker and
24 the payee?

Page 475

DONDERO - 10/29/21

1  MS. DEITSCH-PEREZ:  Can you read
2  that back again.
3  Q.  Is it fair to say that the original
4  promissory notes that are the subject of the
5  oral agreements between you and the Dugaboy --
6  withdrawn.
7  Is it fair to say that the original
8  promissory notes that Highland is suing under
9  set forth the maker and the payees' rights and
10 obligations under those notes?
11 MS. DEITSCH-PEREZ:  Object to the
12 form.  Object to the form.
13 A.  Yeah, I -- again, I want to -- I
14 want to avoid using the term "modification" or
15 implying modification because, again, the notes
16 are soft, and they really just talk about a
17 rate and/or payment or amortizations, but
18 they're soft notes.  Something in the agreement
19 that lays out the conditions for forgiveness
20 aren't necessarily a modification of the note,
21 and I'd like that to be --
22 Q.  Let me --
23 A.  -- my testimony.
24 Q.  Let me ask it this way:  Under each

Page 476

DONDERO - 10/29/21

1 of the demand notes, Highland as the payee had
2 the unfettered right to demand payment at any
3 time; correct? Did you understand that?
4          MS. DEITSCH-PEREZ: At the time that
5 the notes were first signed?
6          MR. MORRIS: Yes, ma'am.
7     A.    Yeah. I mean, at the -- at the time
8 that they were first put in place, but by the
9 time the demand was made, they had already been
10 subject to the conditions present or the
11 conditions for forgiveness.
12    Q.    Okay. So this is exactly what I'm
13 trying to get at. At the time the notes were
14 signed, Highland had the right to make demand
15 for payment at any time; correct?
16    A.    Yes.
17    Q.    And when you entered into the oral
18 agreements with the Dugaboy trustee, Highland's
19 right to make a demand -- pick your word,
20 modified, altered, amended, changed -- it
21 was -- your oral agreement had an impact on
22 Highland's rights under the promissory notes;
23 correct?
24          MS. DEITSCH-PEREZ: Object to form

Page 477

DONDERO - 10/29/21

1 of the question.
2     Q.    You can answer.
3     A.    The conditions subsequent -- the
4 condition precedent -- precedence for
5 forgiveness changed the ability for the demand
6 notes to be demanded.
7     Q.    Okay. And -- and each of the oral
8 agreements that you entered into with the
9 Dugaboy trustee was related to the loans that
10 were reflected in the promissory notes;
11 correct?
12    A.    Well, it was related to the
13 promissory notes themselves.
14    Q.    Correct. And the promissory notes
15 reflect notes that were made from the payee to
16 the maker; correct?
17    A.    Yeah. Most of them were roll-ups
18 from prior.
19    Q.    No. Those are the term notes. I'm
20 only talking about the demand notes.
21    A.    Okay.
22    Q.    Okay. So with respect to the demand
23 notes, the oral agreements that you entered
24 into with the Dugaboy trustee related to the

Page 478

DONDERO - 10/29/21

1 loans that were the subject of the promissory
2 notes; correct?
3     A.    Yeah, I -- I -- I am just not
4 understanding the nuance enough to answer that
5 question.
6     Q.    Did the oral agreements relate to
7 the loans that were the subject of the
8 promissory notes?
9     A.    The oral agreements affected the
10 term loans and the demand notes.
11    Q.    Okay.
12    A.    Does that answer your question?
13    Q.    And so -- and so is it fair to say
14 that the oral agreements related to -- to
15 the -- to the -- to the loans that were the
16 subject of the notes?
17    A.    I don't know.
18    Q.    Okay.
19    A.    I'm not -- I'm not sure what you are
20 asking, but I don't know the answer.
21    Q.    Okay. It is your --
22          MS. DEITSCH-PEREZ: John, just
23 how -- I just think the witness is lagging
24 a little. So how much longer do you think

Page 479

DONDERO - 10/29/21

1 you have?
2          MR. MORRIS: Oh, I've got probably
3 four hours, so I don't expect to finish
4 today. If Mr. Dondero -- if Mr. Dondero
5 wants to stop --
6     Q.    Are you unable to continue right
7 now, Mr. Dondero?
8     A.    Well, if we have four more hours, I
9 would rather do it a day next -- next week, one
10 afternoon.
11         MR. MORRIS: Okay. Can we check our
12 calendars before we go off the record?
13         We have a deposition on Tuesday.
14 I'm not available on Monday. I can make
15 myself free on Wednesday, Thursday, or
16 Friday. And I think that we should expect,
17 you know, a substantial period of time,
18 perhaps as long as a full day.
19         I mean, with all due respect --
20         MS. DEITSCH-PEREZ: How do you have
21 a full day? You have already gone -- you
22 have already gone more than half a day.
23         MR. MORRIS: Yeah. And just -- just
24 to be clear -- and I'm happy, you know,

Page 480

DONDERO - 10/29/21

1        DONDERO - 10/29/21
2  to -- to discuss this with you offline, but
3  I didn't decide that Mr. Dondero would
4  appear in his personal capacity and on
5  behalf of three separate 30(b)(6)
6  witnesses.
7        If you had given me a different
8  witness for each, I would have a total of
9  28 hours. I don't expect to use anything
10  remotely close to that time, but I am
11  examining four witnesses here and I
12  would -- I would appreciate --
13        MS. DEITSCH-PEREZ: But we also --
14        MR. MORRIS: I would appreciate it.
15  And, look, you can stop me at any time. If
16  I haven't finished asking the questions
17  that I believe I'm entitled to, I will, you
18  know, take it to the judge. I'm just
19  putting you on notice. I have -- I'm on
20  page 27 of a 57-page outline, so...
21        MS. DEITSCH-PEREZ: Oh, geez.
22        MR. MORRIS: Yeah, so I do have a
23  fair amount more to cover. Okay?
24        MS. DEITSCH-PEREZ: All right.
25        MR. MORRIS: So Wednesday, Thursday,

Page 481

1  or Friday, Mr. Dondero, I will make myself
2  available at your convenience.
3        THE WITNESS: I have all day board
4  meetings on Wednesday.
5        MR. MORRIS: Okay.
6        THE WITNESS: I could do Thursday
7  afternoon or I can do Friday afternoon.
8  Hold on.
9        MS. DEITSCH-PEREZ: Let me put this
10  on mute and we will look at our calendars.
11        MR. MORRIS: Thank you.
12        VIDEOGRAPHER: Do you want to stay
13  on the record?
14        MR. MORRIS: Yes, please.
15        THE WITNESS: Hello. All right. I
16  can do Thursday afternoon for four hours.
17  And if we need more time than that we can
18  either do Friday afternoon or sometime
19  the -- the week after that, but I have -- I
20  have got --
21        MR. MORRIS: Thank you very much.
22        What time on Thursday works for you,
23  sir?
24        THE WITNESS: How about 1:00 o'clock

Page 482

1        DONDERO - 10/29/21
2  my time?
3        MR. MORRIS: Okay. I appreciate it.
4  Thank you very much. 1:00 o'clock Central,
5  it is, next Thursday for the continuation
6  of this.
7        And hopefully I will finish that
8  day, you know, if we can go without a lot
9  of breaks and the rest of it. Hopefully I
10  can finish that day. My intention is to do
11  that. Okay?
12        THE WITNESS: Perfect. Thank you.
13        MS. DEITSCH-PEREZ: Can -- can I get
14  the rough?
15        COURT REPORTER: Yes. Yes.
16        MR. MORRIS: All right. We can go
17  off the record.
18        MS. DEITSCH-PEREZ: Thank you.
19        COURT REPORTER: Thank you.
20        VIDEOGRAPHER: Off the record, 3:53.
21  (Deposition adjourned at 3:53 p.m.)
22
23
24
25

Page 483

1        DONDERO - 10/29/21
2        _____
3        JAMES DONDERO
4
5  Subscribed and sworn to before me
6  this      day of        2021.
7
8  ------------------------------
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 484

| | |
|---|---|
| | DONDERO - 10/29/21 |
| 1 | |
| 2 | C E R T I F I C A T E |
| 3 | |
| 4 | I, SUSAN S. KLINGER, a certified shorthand |
| 5 | reporter within and for the State of Texas, do |
| 6 | hereby certify: |
| 7 | That JAMES DONDERO, the witness whose |
| 8 | deposition is hereinbefore set forth, was duly |
| 9 | sworn by me and that such deposition is a true |
| 10 | record of the testimony given by such witness. |
| 11 | I further certify that I am not related to |
| 12 | any of the parties to this action by blood or |
| 13 | marriage; and that I am in no way interested in |
| 14 | the outcome of this matter. |
| 15 | IN WITNESS WHEREOF, I have hereunto set my |
| 16 | hand this 29th of October, 2021. |
| 17 | |
| 18 | _____ |
| 19 | Susan S. Klinger, RMR-CRR, CSR |
| 20 | Texas CSR# 6531 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 485

| | |
|---|---|
| | DONDERO - 10/29/21 |
| 1 | |
| 2 | NAME OF CASE: In re: Highland Capital |
| 3 | DATE OF DEPOSITION: October 29, 2021 |
| 4 | NAME OF WITNESS: James Dondero |
| 5 | Reason Codes: |
| 6 | 1. To clarify the record. |
| 7 | 2. To conform to the facts. |
| 8 | 3. To correct transcription errors. |
| 9 | Page____Line_____Reason_____ |
| 10 | From_____to_____ |
| 11 | Page____Line_____Reason_____ |
| 12 | From_____to_____ |
| 13 | Page____Line_____Reason_____ |
| 14 | From_____to_____ |
| 15 | Page____Line_____Reason_____ |
| 16 | From_____to_____ |
| 17 | Page____Line_____Reason_____ |
| 18 | From_____to_____ |
| 19 | Page____Line_____Reason_____ |
| 20 | From_____to_____ |
| 21 | Page____Line_____Reason_____ |
| 22 | From_____to_____ |
| 23 | Page____Line_____Reason_____ |
| 24 | From_____to_____ |
| 25 | |

Index: $100..84

**$**

**$100** 294:8

**$14** 392:5

**$150,000** 434:2,14
435:3,9 437:17

**$200** 294:2

**$25** 296:18

**$27** 420:12

**$27.675** 419:17

**$30** 407:22 412:4
413:5,11

**$30.75** 408:18

**$400,000** 437:4

**$50** 296:15

**$600** 298:12

**$75** 294:11

**0**

**03** 402:14

**1**

**1** 288:4 408:12,15
433:21,23,24 466:8,9

**10** 298:13,15 318:3
454:8

**10/29/21** 288:1 289:1
290:1 291:1 292:1
293:1 294:1 295:1
296:1 297:1 298:1
299:1 300:1 301:1
302:1 303:1 304:1
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1 313:1
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1 327:1 328:1
329:1 330:1 331:1
332:1 333:1 334:1
335:1 336:1 337:1
338:1 339:1 340:1

341:1 342:1 343:1
344:1 345:1 346:1
347:1 348:1 349:1
350:1 351:1 352:1
353:1 354:1 355:1
356:1 357:1 358:1
359:1 360:1 361:1
362:1 363:1 364:1
365:1 366:1 367:1
368:1 369:1 370:1
371:1 372:1 373:1
374:1 375:1 376:1
377:1 378:1 379:1
380:1 381:1 382:1
383:1 384:1 385:1
386:1 387:1 388:1
389:1 390:1 391:1
392:1 393:1 394:1
395:1 396:1 397:1
398:1 399:1 400:1
401:1 402:1 403:1
404:1 405:1 406:1
407:1 408:1 409:1
410:1 411:1 412:1
413:1 414:1 415:1
416:1 417:1 418:1
419:1 420:1 421:1
422:1 423:1 424:1
425:1 426:1 427:1
428:1 429:1 430:1
431:1 432:1 433:1
434:1 435:1 436:1
437:1 438:1 439:1
440:1 441:1 442:1
443:1 444:1 445:1
446:1 447:1 448:1
449:1 450:1 451:1
452:1 453:1 454:1
455:1 456:1 457:1
458:1 459:1 460:1
461:1 462:1 463:1
464:1 465:1 466:1
467:1 468:1 469:1
470:1 471:1 472:1
473:1 474:1 475:1
476:1 477:1 478:1
479:1 480:1 481:1
482:1

**102** 365:10

**10:21** 288:8

**10:41** 304:6,7

**10:47** 304:7,9

**11:08** 318:7,8

**11:16** 318:8,10

**11th** 310:11 324:4
440:21

**12** 298:13,16

**12-month** 420:12

**12:40** 381:8,9

**12:51** 381:9

**13** 357:19

**14** 391:25

**15** 380:10,11 421:17
431:8

**16** 362:13,16,18,19
391:25

**17** 377:21,22

**1994** 291:10

**1:00** 481:25 482:4

**1:13** 398:19,20

**1:45** 398:18

**1:48** 398:20,22

**2**

**2** 288:4 408:8,10,13,
21 436:3,4,5 464:10,
11,17

**2.1** 409:13

**20** 414:24 421:17

**2008** 292:11 426:21
428:12 429:7

**2010** 307:12

**2014** 420:13 450:23

**2015** 401:21 420:13
450:23

**2017** 408:17,24
410:23 411:8 419:12
447:2,24 449:6,13
450:11 451:3 452:15
455:8 463:24

**2018** 369:15 435:4
436:10 463:25

**2019** 310:11 324:5
369:19 436:22 437:4,
17 463:25

**2020** 291:11 336:25
371:11,15,16 372:15
373:22 374:6,9,21
393:17 394:2,9,16
395:14 397:4,25
415:8 439:8,17
440:16,21 445:22
446:5 456:3,13,22
459:2,9,13,16 461:20
463:3 464:21,25
465:13 466:16
467:22 468:14,25
469:12

**2021** 288:7 357:6
363:17

**21** 337:2

**25** 292:15,16 422:3,
18

**25-year** 293:15

**26** 292:16 422:3,19

**27** 480:20

**28** 480:9

**28th** 435:4

**29** 288:7

**2:13** 398:15

**2:45** 398:18

**2:56** 454:16,17

**3**

**3** 348:11 433:14,15,
18,23 436:3,13
439:15 464:17
466:11

**30(b)(6)** 345:2,10,13
353:14,18 354:7,13
363:3 370:21 376:4,
19 378:3 388:22
391:5 406:5 480:5

**30(b)(6)s** 386:22
387:23

**30-year** 451:10,13,17

**31** 354:22,23 402:9,
13,23 472:14,17

**31st** 408:16,24
410:23 419:12 447:2

449:6,13 450:11
451:3 453:23 455:8
461:21

**35** 292:7 309:13

**37** 323:18

**3:00** 445:8

**3:19** 454:17,19

**3:53** 482:20,21

**3rd** 439:7,17 440:6,16
464:3,5,21,25 466:16

**4**

**4** 393:4 412:23 433:21
436:3 448:3,14,20,23
464:11,12,13,18

**40** 365:2

**47** 345:5,6

**48** 353:11,12

**49** 354:5,6

**5**

**5** 298:11 414:6 439:15
445:25 455:11,14,18
464:18

**50** 405:17 429:24

**57-page** 480:20

**6**

**6** 446:15,16 448:17,
19,22

**8**

**8** 298:13,15

**80** 390:4,7

**81** 390:7 398:12

**82** 357:20,25 390:7
398:12 403:4,6 422:8
423:10 472:14,18,21

**83** 357:18,25 358:19

**84** 359:12,13

Case 21-03005-sgj Doc 106-4 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 55 of 71
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 759 of 899 PageID 1371

Index: 85..aspect

**85** 359:21

**86** 359:23 360:13

**88** 360:16 361:14 362:9

**9**

**91** 357:21

**94** 291:8 365:2,10,15 370:8

**95** 370:14,15,23 375:22

**96** 370:24 375:22 378:10,17,20 379:14, 24

**97** 380:2

**98** 380:3

**9th** 291:11 374:9

**A**

**a.m.** 288:8 304:7 318:8

**ability** 289:25 353:23 477:6

**absolutely** 375:15 458:18

**absolve** 376:20

**accelerate** 414:12

**acceleration** 377:17 412:23 414:13

**accepted** 392:22

**accepting** 377:14

**access** 425:25 431:15,25

**accommodate** 317:25

**accordance** 418:16, 23

**account** 331:3 338:14 372:2

**accountants** 371:5 451:14

**accounting** 299:8, 19 300:4 319:25 324:15 334:12,19 382:23,24 383:9 397:13 410:16,20,25 411:12,15 416:5 418:2 459:6

**accounts** 319:9,12, 17,21 328:19,22 329:2,8

**accrue** 373:12

**accurate** 343:13,15 357:15 364:24 379:10

**accurately** 334:16

**acknowledge** 360:6

**acknowledges** 470:21

**acting** 340:15 371:24 372:12 396:25 442:25 462:25 465:10

**activities** 472:7

**actual** 438:4

**add** 392:4

**additional** 361:16 392:5 426:4

**addressed** 464:20

**adjourn** 290:4

**adjourned** 482:21

**adjust** 291:24 442:10

**administered** 416:11 417:21

**administering** 415:3

**advance** 352:25

**advisor** 308:11,12, 13,14

**advisors** 306:8 322:13 324:4,9 326:2,5 335:20,22 374:20 375:6 466:23 471:23

**affected** 478:10

**affiliate** 298:4,22

299:3,21 300:7 301:3,9 344:12 452:23

**affiliated** 297:16,24 314:22 315:8 325:3, 11,12,17 344:14 426:15

**affiliates** 344:22 413:12,13 426:22 467:21 468:16

**affirmative** 347:7,11, 14 348:8 357:21 358:6,20 359:3,19,24 360:12,25 361:13 362:9 365:11 366:7 370:15,22 375:21 376:9,17 378:11 379:23 380:4 389:13 390:9 391:7 398:11 406:20

**affixed** 434:14 435:7

**afoot** 438:22

**afternoon** 479:11 481:8,17,19

**aggregate** 293:23 295:16 297:25 419:8

**aggregating** 411:10

**agree** 400:8 446:25

**agreed** 301:15 430:5

**agreement** 335:15, 17,24 336:5,6,9,15, 25 337:5,6 356:4 361:22 381:11,20,24 382:13,21 404:16,24 405:3 407:10,12 420:25 421:5 427:20 449:20 472:6,22 474:8 475:19 476:22

**agreements** 335:23 336:2 339:23 375:5 399:8,16 400:10,11, 23 401:4,16 403:7, 11,14,20 404:2,8 405:15 406:21 420:21 422:7,23 423:9 426:15,22 427:3 443:10,20 472:11 473:9,21 474:22 475:6 476:19 477:9,24 478:7,10,15

**ahead** 437:22 441:21

**air** 423:20

**alleged** 360:18

**allowed** 435:7

**alter** 474:9

**altered** 476:21

**alternative** 291:18 361:6 452:2

**amassed** 424:19 425:5 431:8

**amend** 320:19

**amended** 346:18 355:2,20 356:3,5 357:14 362:15,24 364:23 379:9 389:3 402:24 476:21

**amortizations** 475:18

**amount** 293:23 294:12 295:17 298:5, 21 299:3 360:7 385:11 391:21 392:2, 6 393:6 407:22 408:17 417:20 419:16,22 422:13 430:6 435:3 460:18 480:23

**amounts** 333:5 344:21,23 367:12 372:6 377:13 382:6 392:21,25 420:3 424:21 427:4 431:9 448:6 450:17 460:19, 22

**and/or** 334:14 338:6 364:2 365:18 412:2 475:18

**animation** 396:22

**annoyed** 391:22 392:19

**annual** 369:23 377:2 409:16,22 410:8 453:22 460:10

**answers** 345:24 347:16,18 405:25 406:22 407:4 439:4

**anytime** 371:16

**Apologies** 423:24

**apologize** 288:21 295:12 297:21 301:19 332:5 387:17 422:16 423:18 425:8, 18 445:3 448:21 455:4 464:10

**appearance** 445:5

**appearances** 288:17

**appears** 311:7 314:9

**applied** 403:15

**applies** 406:13

**apply** 333:3 368:15 403:21 404:3,9 405:8,9

**appoint** 301:23 302:14 311:3 323:14

**appointed** 301:12,14 302:18 321:6

**approval** 312:4

**approve** 312:11

**approved** 312:19 357:4

**approving** 364:10

**approximate** 408:17

**approximately** 407:22 419:17

**April** 310:11 324:4 450:23

**arbitrary** 290:19

**area** 292:18

**argue** 393:13

**argument** 377:17 386:10 393:8,10 446:13 465:6,7

**articulate** 330:23

**articulated** 421:10 468:21

**aspect** 337:10 363:25 370:11 372:5 379:5

**asserted** 358:20 366:13

**assertion** 379:16 430:3 431:12

**asserts** 359:24 360:16 365:16

**asset** 291:19 298:16 308:10 376:25 412:20 421:14

**assets** 292:4 299:9 330:16 334:14

**assigned** 300:20

**assume** 311:22 342:11 408:25 435:5 438:5

**assumed** 470:18

**assuming** 415:20

**attached** 444:10,18

**attention** 439:21

**attorney** 320:18 321:8

**attorneys** 429:7

**audit** 320:2 334:19 411:3,16 416:6 426:10

**audited** 299:10,25 327:18 340:9 412:11, 17 428:11 429:6 430:7,22 432:6,12 470:8

**auditor** 426:14 427:9

**auditors** 334:17 373:10 411:12 416:7 426:22 427:14 435:14 451:14 454:5

**audits** 327:14 334:11 337:23

**August** 356:4 420:13

**authoritative** 310:20

**authority** 301:22,23 302:13,14 310:5 317:9,13 451:5

**authorize** 371:18 389:7 420:5 436:9

**authorized** 316:12, 18 319:8,11,16,20 328:18,21,25 329:7 363:15 371:25 391:19 434:21 438:2 463:11,19

**authorizing** 364:10

**automated** 438:3

**avoid** 475:15

**aware** 311:18 312:14 314:18,24 315:4 317:7,11 324:18,19, 24 325:5 327:6 330:10 334:4,6 340:10,12 346:16,17 351:13 352:10,19 357:9,11,12 358:5 359:18 364:14,18,21 365:20 367:20 368:4 369:22 370:6 372:12, 19,25 373:2 376:16 378:8 379:17 389:10 390:8 397:21 398:11 402:4 428:13,18 429:13 434:13 435:13,15 437:16,20 439:7 442:2,11 444:8,19,24 453:21 455:17 466:15 468:18,19

**awareness** 320:6,8 321:4 322:10 324:12 325:8 332:16 333:4 344:10,18 352:13 366:19 373:17 401:22,23 456:25

**B**

**back** 294:19 304:8 318:9 320:25 336:17 338:17 381:3,13 388:19 392:5,24 397:10,11 398:21 401:5 424:2,10 428:18 429:7 430:3 454:18 462:11 472:10,14 475:3

**background** 324:15 357:4

**bad** 405:7 416:16 417:8

**balance** 293:8 298:9 299:4,22 300:8 301:4,10 326:23 327:3,7 405:18 412:2 413:19 418:4

**balances** 319:24

**ballpark** 295:18

**bank** 319:9,12,17,21 328:18,22,25 329:8 425:2,3

**bankruptcy** 300:6, 15 302:21 315:24,25 366:13 413:14

**barred** 358:21 359:15 360:2,17 365:17 370:16

**base** 298:16

**based** 324:16 398:5 467:25

**basic** 416:19 459:5

**basis** 294:5 344:9

**Bates** 444:20,23

**begin** 289:6,12,18

**beginning** 288:4 355:25 357:5 363:16 465:12

**behalf** 293:4 316:13, 19 349:12 353:23 354:8 363:16 364:11 371:12,24 372:7,13 386:17 387:5 388:12 389:8 394:8,16 396:25 404:10 408:24 409:7 411:17 415:4 418:13 419:20 436:10 437:14 443:2 449:12 451:6 455:7 456:18 462:17,25 463:18 464:20 465:10 469:9,10 480:5

**believes** 469:15

**benefit** 339:4 385:10

**benefiting** 385:9

**benefits** 384:20

**Berghman** 445:7

**betrayed** 468:6

**big** 421:10

**bigger** 393:11

**billion** 292:7

**binder** 346:22 362:19 433:17

**binding** 345:25

**bit** 328:3 337:20 345:11 356:17 407:16

**blocked** 378:13

**blurt** 441:18

**board** 425:2 431:21 481:4

**boilerplate** 410:17 416:4

**bona** 373:8 418:18, 19,20 419:23 421:19 457:10

**Bonds** 363:23 364:4

**bonuses** 322:9 424:24

**book** 309:16

**booklet** 448:25

**books** 298:23 397:19

**borrow** 295:7 420:5

**borrowed** 295:3,8,13 420:2,11 437:3,17 448:6 450:15 452:14

**borrower** 409:15

**bottom** 310:6 323:23

**boy** 336:17 383:13 416:16 417:8 422:9 473:14

**Boyce** 301:15

**breach** 391:15 392:2, 17

**breached** 303:11 304:14 305:3,13,15, 22

**breaches** 471:9,11, 12 472:4

**break** 317:23 318:4, 12 380:15,19,21 398:17 399:4 454:7, 23 455:6

**breaks** 482:9

**Brian** 324:14

**bring** 395:6

**broad** 366:5

**bucks** 377:3,4 391:25 393:12 421:16 430:14

**building** 338:18

**built** 339:5

**bullet** 416:8

**bunch** 309:4

**burden** 327:13

**business** 291:14 308:5 323:4 330:15 342:6 384:17 385:7

**C**

**calculating** 334:8

**calculation** 393:2

**calendar** 409:17 454:11

**calendars** 479:13 481:11

**call** 400:16 450:25 464:9

**called** 306:7 322:12 329:18 341:8 345:9 357:21 389:15 402:2 462:10

**calls** 349:24 350:3,9, 17,22 351:2

**capable** 290:7 458:22

**capacities** 325:3

**capacity** 303:5 311:2,19 314:4,7 315:20 331:25 332:9 345:8,9,20,24 351:3 363:3 371:16 378:3 388:22 393:14

399:25 406:5 480:4

**Capital** 288:6 290:23 294:10,15,21 295:4, 6,14,21,23 296:3,9 306:7 311:21 329:18 362:23 405:21 434:15 457:24 466:22 471:22,23

**captured** 308:10 334:16 370:11

**care** 445:20

**carefully** 372:11 468:11

**carried** 298:22 299:4,22 300:8 301:3,10 327:4

**case** 363:25 378:12 383:5

**cases** 460:19

**cash** 383:18 384:13 421:11

**categorized** 292:24

**category** 361:9

**caused** 470:16

**caveat** 427:17 441:21

**ceased** 305:11

**Central** 398:18 482:4

**centralized** 417:22

**certificate** 309:23 310:2,10 311:8 313:13 320:24 323:20 331:20 340:12,20 342:12 398:6 436:25

**certificates** 313:15 342:21

**cetera** 320:2 334:5 367:13 389:24 392:12,15 393:2 433:2

**CFO** 299:24 301:13, 23 302:15,18 303:6 311:12,20 313:7,10, 11,19 314:4 440:3

**chagrin** 345:11

**chance** 331:3 351:6

**change** 341:13,14 362:12 474:6

**changed** 299:17 476:21 477:6

**characterize** 333:12

**characterizing** 409:14

**charged** 299:2 333:21 364:9

**charging** 386:7

**chat** 309:18 355:11

**check** 426:5 479:12

**checks** 319:24

**chief** 303:2 331:23, 25 332:9

**choice** 345:15

**circumstances** 348:7 375:12,21 413:8

**cited** 472:7

**claim** 360:17

**claims** 358:21 359:14,25 365:16 370:16

**clarification** 332:6 378:18 423:8

**clarify** 337:20

**class** 400:14,19 427:21

**clause** 415:9

**clauses** 416:17

**clean** 304:11

**cleaner** 423:6,7

**cleanup** 406:9

**clear** 295:11 304:24, 25 322:2 335:5 417:11 431:4 432:15 479:25

**Cliff** 300:17

**CLO** 338:22 385:5

**close** 434:12,18,19 436:6 480:10

**closed** 360:3

**closely** 410:3 411:23

**collateral** 413:16 417:7

**colleague** 309:12

**collectively** 451:3

**combination** 310:5

**comfortable** 390:13 391:10 398:23

**commenced** 404:5, 11 405:6 433:10

**commencement** 441:7,9 443:4,8,11 455:23

**comment** 306:3 338:18 396:18 432:4

**common** 421:18

**communicate** 318:11 350:4

**communications** 348:7 441:18 442:6

**comp** 361:6,8,16 423:5

**companies** 311:20 314:13 315:7 325:4, 12 344:14 361:21 412:21 421:19,22 431:19

**company** 297:4 314:23 325:17 415:2

**compared** 404:18

**compel** 395:7

**compensation** 322:9 404:16,18 421:8,11,21 422:6,22 423:2,13 424:22 430:16 443:24 446:12

**complaint** 346:18 355:2,20 356:3 358:15 362:15,24 389:3 402:24 408:9,

16 433:23 448:15

**complaints** 356:5 407:6

**complete** 290:5 334:13 335:2 343:12, 15 357:14 364:23 379:10 405:16

**completely** 391:3 397:7

**completeness** 327:24

**complex** 401:25

**complexity** 363:24

**compliance** 327:14 371:8 393:3 411:14 462:12

**compliant** 319:25 334:11 418:2

**compliantly** 320:7

**complicated** 386:6

**comport** 303:6

**concede** 433:5

**concern** 333:17 358:6 359:2,18 360:25 361:13 362:8 365:21 370:21 390:9

**concerned** 411:24 453:14

**concerns** 347:6 348:11

**concluding** 328:11

**conclusion** 452:13

**conclusions** 305:18

**condition** 407:11 429:12,16 474:4 477:5

**conditioner** 423:20

**conditions** 413:6,10 473:15,17 475:20 476:11,12 477:4

**confirm** 401:8 462:3

**confirmed** 462:10

**confusing** 456:8

16 433:23 448:15

**complaints** 356:5 407:6

**connection** 294:17 353:7 426:9

**consideration** 360:3

**considered** 315:5 325:24

**consistent** 407:6 419:24

**consolidated** 447:22

**contained** 430:7

**contemporaneously** 442:12

**contend** 420:19 424:5 473:8

**contended** 367:3

**contends** 461:3

**content** 416:8

**contention** 403:13, 19,25 423:17 458:14 460:21 463:15

**contentious** 461:2

**context** 335:11 400:10 460:21,22

**contingent** 427:5

**continuation** 482:5

**continue** 290:4,20 389:22 400:6 479:7

**contracted** 471:15

**control** 297:2 307:6, 19,23 308:2 311:3 315:12,20 322:21 330:5,9 331:7 332:18 333:16 341:24 371:17 388:5 393:15 410:4 429:22 431:19

**controlled** 307:14 323:6 325:13 342:2 374:20 385:15

**controls** 320:2

**convenience** 481:3

**conversation** 457:12

**copy** 355:18 356:21, 22,23 402:20 434:7

Case 21-03005-sgj Doc 106-4 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 58 of 71
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 762 of 899 PageID 1374

Index: Cornerstone..demands

448:25

**Cornerstone** 427:19

**corporate** 312:7
320:18 321:7 323:7
330:8 342:3 345:21,
25 354:9 405:10
406:24 407:3,12
458:13 459:20
460:10 461:3,13
462:17 463:2,14,18
469:10

**correct** 290:24 295:4
301:11,24 306:8
313:3 316:5 322:13
325:14 328:15
335:15 337:17
339:24 342:24
351:19 374:6,9
389:18 398:2 402:15
404:12 405:14 412:9,
18 416:3 419:22
420:22 424:7 435:10
436:22 438:18 440:2,
17 442:3 447:6,10,19
449:7 450:6,11,13
451:7,10,22,23 452:4
456:3,13,22 457:5
458:9 459:10,13,16
465:24 468:25 469:6
470:9 473:6,19
476:4,16,24 477:12,
15,17 478:3

**correctly** 320:7
335:12 404:7,22
411:2 414:15

**correspondence**
471:20

**cost** 385:11

**costs** 333:7 334:5
337:21 338:5,8

**counsel** 288:19
289:6,8,9 355:18

**counsel's** 353:25
354:16

**counterparties**
377:2

**couple** 300:14,18
349:19,20 350:2
421:16 428:15 445:3

**court** 288:9 303:14,
21,24 355:25 366:13
374:24 381:17 395:7
396:5,8 482:15,19

**cover** 480:23

**crazy** 415:8

**create** 291:7 330:17,
19 413:15

**created** 307:9,15
322:24 330:11 339:6

**creatures** 365:5

**credit** 291:17 411:4

**creditors** 452:24

**crisis** 292:12

**culpa** 406:16

**cure** 377:15 392:21
393:6

**curing** 377:11,12

**current** 321:14,18
329:5,12 340:25
405:18

**curved** 374:24

**cut-and-paste**
406:17

---

**D**

**DAF** 339:2,5 385:2,5,
19,22 386:5,18 387:6
388:13

**date** 288:7 310:15
311:10 324:9 325:21
428:24

**dated** 408:16 439:17
464:21

**dates** 369:9,10

**Dave** 352:10

**David** 300:17

**Davor** 317:22,25
445:2

**day** 290:5 336:18
352:16 386:15
410:23 435:12
452:15 479:10,19,22,

23 481:4 482:8,10

**days** 349:19,20

**de** 297:25 298:4,7,17
333:5,7,15 334:7,14
343:21,22 376:24
377:3 391:20 393:20
410:13 411:25 412:2
413:18 417:20
421:13 458:20

**dealing** 372:22

**Deborah** 288:14,18
291:25 303:22
349:17 350:5 351:5
381:4 383:21 388:9
390:18 425:8 428:22
445:5

**debt** 333:6 334:5
421:19 453:10,16

**debtholders** 453:13

**debtor** 367:22
374:21 428:8,10
443:15 444:15

**debts** 297:8,14
315:14,21 316:3,8
318:17,22 326:7,12,
17 327:10 328:7
332:20 333:2,23
340:5 343:6,18 344:6

**December** 371:11,
15 373:21 374:12,17,
21,25 395:14 397:3,
25 439:7,17 440:6,
16,21 445:22 446:5
453:23 459:2,9,12,16
461:20,21 463:3
464:3,5,21,25 465:13
466:16 467:21
468:14,25 469:12

**decide** 385:21
386:16 417:16 480:3

**decided** 297:3 386:8
420:24 451:12

**deciding** 417:25

**decision** 387:5,12,
13,19 388:6,12
429:17

**declared** 368:20

**deed** 416:15

**deemed** 426:16
427:3,12

**deeply** 453:12

**default** 368:21 377:8
391:20 392:20 393:5
412:23

**defendant** 362:23
404:17

**defendants** 289:7

**defense** 347:11,14
358:6,20 359:3,19,24
360:12,25 361:6,13
362:9 365:21 366:2,
7,14 367:5 368:14
370:8,15,22 378:17,
20 379:16,18,23
389:20 391:7 406:20
459:21,25 460:8
461:3,8,9

**defenses** 347:7
348:9 357:22 365:11
375:22 376:9,17
378:11 380:4 389:14
390:9 398:12 443:3
459:20 461:13

**deficiently** 471:16

**definable** 385:10

**define** 298:7,17
317:2 414:21

**defined** 317:18
411:11 419:12
426:23

**defining** 377:14

**definition** 416:23

**definitively** 340:10

**Deitsch-perez**
288:16,18 291:21
292:2 294:3,16,19,24
296:11,23 297:10
301:25 304:16 305:5,
25 309:15 311:5
315:16 317:21 318:5,
24 321:21 324:21
326:8,19 327:20
329:9 331:9 332:11
335:16 337:15 340:6
343:19 344:7 346:3
347:3,21,25 348:5,18
349:23 355:3,7,13

356:20 359:4 361:25
365:4 366:8,17,22
367:6 369:7,25 373:5
376:10,18 379:11
380:13,20,25 381:6
382:15 383:17 384:4,
9,22 385:17,24
386:20 387:8,14,18,
21 388:15 390:14,19,
21 394:3,10,17
395:12,18,22 396:3,
9,21 397:5,9 399:11,
19,21 400:3 401:11,
18 402:13,18 405:11
406:14 409:9,18,25
410:9 411:20 415:14,
25 423:21 425:14,23
426:17 428:5,21,23
429:8 430:25 432:13
433:11,16,19 434:8,
17 438:10 441:3,16
444:8,16 445:24
447:11 448:19,24
449:22 452:10 453:7,
24 455:19 456:4,10,
14 457:6,16,19
460:13 461:16,23
462:6,21 463:6,22
464:13 465:14,19,25
467:4 470:3,10 471:2
473:12 474:2,11,15
475:2,12 476:5,25
478:23 479:21
480:13,21,24 481:10
482:13,18

**delegate** 317:19

**deluded** 375:16

**demand** 333:19
348:12,15 368:15
414:10 439:8,11
440:7,9,17,23 441:6,
11 442:2 443:3 444:4
445:24 447:22
464:24 465:12,23
466:17 467:2,9,19
468:14,15 469:11
476:2,3,10,15,20
477:6,21,23 478:11

**demanded** 445:23
446:6,10 477:7

**demanding** 464:5

**demands** 468:24
469:5

demonstrate 424:14

department 382:23, 24 383:2 411:12 417:23

depend 383:4

deposed 352:9,11, 19

deposition 288:5,20, 25 289:18,22 290:5 346:21 349:16 350:6, 16 351:8,11,14,18,21 352:4,7,14 353:2,3,8 363:7 376:19 386:23 399:5 400:4 408:12 444:19 454:24 479:14 482:21

depth 334:13

describe 291:13 332:24 410:12 456:17 461:12

describes 403:6 472:21

describing 429:3 432:8

deserve 344:3

detail 334:17 378:14 471:19

detailed 344:9

details 301:21 337:24 366:4

di 333:12

differentiate 333:24

dig 369:9

direct 329:23 337:21 338:7 341:18 371:17

directed 462:18 463:13,19 469:4

direction 463:21

directly 306:21 307:3 314:5,8,13 322:19 330:3

directors 431:22

disagree 324:11

disappeared 294:17

disclose 426:14

disclosed 412:15 426:21 427:9,13 430:24 432:11 433:3

disclosure 427:23 432:7,21,24 441:20 470:7

discovery 349:7,13 425:19,21 444:7,13

discuss 306:5 401:3 441:10,13 480:2

discussing 442:19

discussion 444:3

disrupt 400:4

distinguish 457:21

diversified 291:17

doctrine 365:17 370:17

document 309:12 310:7,21 313:20 317:6 320:18 345:4, 16 355:24 356:9,16, 18 357:5,9,13 363:10,16,20 364:11, 15,19,22 366:12,20 378:6,9 379:6,8 380:17 381:10 388:20 389:2,5,8,11 402:8 435:8 447:18 466:11 470:23 471:5

documentation 342:21 431:12,17,24

documents 320:19 334:18 348:7 352:24 367:23 370:5 425:11, 22,24,25 438:14

dog 387:15,16

dollar 386:3

dollars 391:22 393:10

Dondero 288:1,5,11, 19,22 289:1,15 290:1 291:1,23 292:1,3 293:1 294:1 295:1,3 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1,17,20

304:1,11 305:1,9 306:1 307:1 308:1 309:1,20 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1,11 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:1 337:1 338:1 339:1 340:1 341:1 342:1 343:1 344:1 345:1,7 346:1 347:1 348:1 349:1 350:1 351:1 352:1 353:1 354:1,24 355:1,17 356:1,14 357:1 358:1 359:1 360:1 361:1 362:1 363:1 364:1 365:1 366:1 367:1 368:1 369:1 370:1 371:1 372:1,10 373:1 374:1 375:1 376:1 377:1 378:1 379:1 380:1 381:1 382:1 383:1,22 384:1,6,7 385:1 386:1 387:1 388:1 389:1 390:1,5, 22 391:1 392:1 393:1 394:1 395:1,13 396:1 397:1 398:1,23 399:1 400:1,9 401:1,8 402:1,23 403:1 404:1,17 405:1 406:1,25 407:1 408:1 409:1 410:1 411:1 412:1 413:1 414:1 415:1 416:1 417:1 418:1 419:1 420:1 421:1 422:1 423:1 424:1,5 425:1,11 426:1,8 427:1 428:1 429:1 430:1 431:1 432:1 433:1 434:1 435:1 436:1 437:1 438:1 439:1 440:1 441:1,25 442:1 443:1 444:1,13,15 445:1 446:1 447:1 448:1 449:1 450:1 451:1 452:1 453:1 454:1,14 455:1 456:1 457:1 458:1 459:1 460:1 461:1 462:1 463:1

464:1 465:1 466:1 467:1 468:1 469:1 470:1 471:1 472:1,19 473:1 474:1,20 475:1 476:1 477:1 478:1 479:1,5,8 480:1,3 481:1,2 482:1

Dondero's 386:23 387:24 401:6 402:16

double-check 425:15

doubt 324:7 409:11

dozen 350:7 422:12 425:6 431:8

dozens 293:19,21

drafted 410:15

draw 452:12

driven 454:4

dropped 423:20

DSI 414:24

dual 321:23

due 297:24 316:14 327:4 344:13,21 358:22 359:15 360:2 366:15 371:20 372:5, 15 373:3 389:23 391:20 392:25 393:13,17,21 394:2 395:16 397:3 408:2 409:23 440:8 456:2, 12,21 457:4 458:8,20 460:11 461:14,21 462:4 463:5 479:20

Dugaboy 306:22 338:6 400:12,16,23 401:9,17 403:8,14,21 404:2 405:4 420:21 421:2,6 422:24 427:20 443:11,20 472:12,23 473:10,22 474:22,23 475:6 476:19 477:10,25

duly 288:12

duplicate 355:15

duties 297:6 303:2, 12 304:14 305:4,13, 15,23 328:12,14

E

earlier 320:24 324:12 367:18 379:19 406:8 415:10 436:24

early 337:2 356:9 374:11,17 467:21 468:13 469:12

easier 393:12

Eastern 398:16

effective 310:11 324:4

effectively 338:21 419:7

effort 424:13

efforts 382:5 424:18

eight-day 440:20

electronic 438:9,14, 18

electronically 439:2,3

Ellis 363:23 364:4

else's 454:11

email 353:9 445:17

emails 353:6

employed 308:17 319:15 322:2 383:12

employee 317:20 320:11 321:15,19,20, 24 329:5,13 340:16 341:2 398:5 422:6,22 458:21

employees 371:6 392:11 422:12 458:25 459:4,5,9 472:6

end 369:24 371:21 373:3,14 375:3,14 391:16,17 393:17 394:2,8,15 395:17 409:16,23 410:8 411:8 414:24 415:8 447:23 456:2,12,21 457:4 458:15 460:11 461:15 462:5,19,23

**ensure** 393:25

**enter** 452:19

**entered** 336:14 381:24 382:12 399:7, 15 400:22 401:16 403:11,14,20 404:25 405:4 407:10 472:11, 22 473:9,22 476:18 477:9,24

**entering** 400:11

**enterprise** 343:24 388:5

**entire** 431:21

**entities** 306:20 311:15,24 325:7,8 333:4,8 335:7,25 336:4,8,11,20 337:25 338:7 340:10 343:9 345:10 377:7 382:5, 25 384:19 385:16 406:6,24 407:13 423:3 426:15 458:21 472:2

**entities'** 407:4

**entitled** 414:7 480:17

**entity** 291:3 306:7,11 311:4 322:12 329:18 330:9 331:7 333:6 338:2 341:7,10,16 342:9 383:5 385:20 413:19 429:21 469:22

**entity's** 332:20

**entrepreneurial** 382:5

**equal** 360:7 448:7

**equity** 385:6 452:24 453:5

**equity-ish** 453:12

**equivalent** 360:21

**error** 406:17 471:24

**established** 405:15

**estate** 323:5 341:11 342:7 374:3 375:17, 18 385:8 392:12 468:6

**estimate** 290:21 296:8 350:14

**estoppel** 347:17 359:15 370:17

**event** 427:8

**eventually** 368:11 469:14

**evidence** 330:24 418:8

**exact** 406:21

**EXAMINATION** 289:13

**examining** 480:11

**examples** 425:6 431:9

**exceeded** 293:25

**exchange** 337:7 339:12

**execute** 330:21

**executed** 403:16,21 404:3,9 405:9 411:7 455:7

**executive** 316:21 317:18 327:23 413:4, 9

**executives** 325:6 413:20 424:25 425:2 431:10 432:19

**exercise** 302:13

**exhibit** 309:13 323:17 345:5,6 353:11,12 354:4,6, 22,23 357:20 362:13, 16 377:21,22 380:10, 11 402:9,23 408:8, 10,12,15 419:5,9 420:3,7 433:14,15, 18,23,24 436:4,5,13 437:12 439:15 445:25 446:7,15,16 447:18 448:3,8,14, 17,19,20,22 450:5,8, 17 456:7 464:10,11, 12,13,17,18 466:8,9, 11 472:14,17

**exhibits** 433:21 436:3 464:17

**existence** 323:7 330:8 342:3

**exists** 461:4

**expect** 479:4,17 480:9

**expectation** 392:15

**expectations** 303:7

**expected** 338:6 393:20

**expenses** 316:23 338:16

**expert** 292:18

**expertly** 334:21

**experts** 421:24

**extended** 375:8

**extent** 301:8 312:11 313:23 316:7 325:10 332:21 334:6 338:25 361:16 371:2 391:12, 13 396:17 427:13

**eyes** 471:17

## F

**facility** 411:4

**fact** 368:4,7 376:18 387:24 421:9 430:21 463:4

**facts** 348:8 358:5,25 359:17 360:11,24 361:12 362:8 365:20 366:6 368:9 370:6,20 375:12,20 376:8,15 377:11,16 379:17,22 380:3 390:9,15 391:6 398:10

**failed** 318:20 319:5 328:5,12

**failure** 360:2

**fair** 290:20 293:2,14, 18,21,22 296:20 297:4 311:9 312:2,5 313:8,24 325:22 331:8 339:19 342:23 344:4 372:21 392:10 406:25 410:5 411:19

415:11,22 427:11 428:3 429:3 432:10 439:6 447:4,7 449:19 451:17,24 452:12 458:5 459:19 461:5 465:9,18 469:3 474:20 475:4,8 478:14 480:23

**fairly** 409:14 422:12

**faith** 360:20

**fallen** 316:9

**falls** 361:9,17

**familiar** 297:7 306:6 315:14 318:17 322:12 329:18 341:7 433:8

**familiarize** 297:14 298:21 315:21 316:2 318:22 326:6,17 327:10 328:7,13 332:19,25 344:5

**familiarizing** 333:22 340:4 343:5

**family** 314:12 321:8

**fast** 381:3

**faster** 361:19

**fault** 295:12 441:24

**favor** 296:3 447:2

**features** 417:8

**fee** 338:9 339:2

**feel** 290:3

**feeling** 289:3,17,21

**fees** 308:11 317:3 386:7

**fide** 373:8 418:18,19, 20 419:23 421:19 457:10

**figure** 429:17

**file** 363:15

**filed** 346:17 355:20, 24 356:2,5 362:14 366:12 374:20 416:15

**filing** 357:5 364:10

**389:7**

**finally** 360:15

**financial** 292:11 299:10,12 300:11 303:2 327:18 331:25 332:9 337:10 382:7 412:8,17 428:11 429:6,15 430:7,19,22 432:6,12 458:22 470:8

**financials** 299:25 300:20 340:9 343:13, 15 411:3 412:11 430:11 431:5,7 432:17,24 433:4 470:20

**financing** 451:25

**financings** 453:2

**find** 434:6

**finding** 471:9

**fine** 341:17 369:13 395:11

**finish** 290:15 340:24 479:4 482:7,10

**finished** 480:16

**firing** 315:5 325:24

**firm** 363:15

**firms** 334:12 389:23

**fits** 454:11

**flip** 436:2

**focus** 292:19 344:3 390:6 430:3

**focusing** 334:8 357:25 413:21 422:16

**follow-up** 388:8

**footnoted** 430:12

**forcing** 290:6

**forgave** 422:4 430:15 432:11

**forgivable** 404:20

**forgive** 421:20 427:3

**forgiven** 422:21

Case 21-03005-sgj Doc 106-4 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 61 of 71
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 765 of 899 PageID 1377

Index: forgiveness..hear

423:4,11 425:4
427:7,13,24 429:11
430:6,24 431:5
432:22,23,25 433:4
473:16

**forgiveness** 361:7
429:4,20 430:4
431:9,22 440:13
443:24 446:13 465:6,
7 467:25 474:5
475:20 476:12 477:6

**forgiving** 424:6,15
429:18 431:13

**form** 294:4 296:24
297:11 306:2 311:6
315:17 318:25
321:22 324:22 326:9,
20 327:20 329:10
331:10 340:7 343:19
344:8 361:25 366:9,
18,23 367:7 370:2
373:6 376:11 379:12
384:23 385:18,25
388:16 390:15
399:12,22 401:12,19
405:12 407:21
409:10,19 410:2,10
411:21 415:15 416:2
426:18 428:6 429:9
431:2 434:17 438:11
441:4 447:12 449:23
452:11 453:8,25
455:20 456:15 457:7
459:18 460:14
461:17,24 462:7,22
463:7,23 465:15,20
466:2 467:4 470:4,11
471:3 473:13 474:3,
12 475:13 476:25

**formal** 335:22,23
336:2 381:18 384:13

**formally** 382:18

**formation** 315:2

**formats** 291:19

**found** 291:6 392:18

**founded** 290:23

**Frank** 299:20 300:20
301:23 302:10 309:7
310:13 312:7 316:9
325:8 327:13 334:2,
22 335:10 336:18

338:4 340:8,14
343:10,11,16 397:24
398:7 415:3 436:16,
21 437:13,25 438:25
441:15 442:16 443:5
456:18 462:10
466:20 470:17

**Frank's** 299:18
300:10,14,25 437:23
438:3

**frauds** 327:25

**fraudulent** 360:17,
19

**free** 479:16

**Friday** 479:17 481:2,
8,19

**friendly** 413:13
417:21

**frivolous** 470:2

**front** 348:2 389:21

**frozen** 302:3

**fulfill** 318:21 319:5
328:5,12

**fulfilled** 302:25

**full** 431:19 479:19,22

**function** 333:25
334:19

**functional** 401:23

**functions** 459:6

**fund** 306:7 317:3,4
466:22 471:23

**funds** 308:6,8,10,16
309:4 312:23 320:19,
20 327:16 336:13

---

### G

**gained** 385:11

**game** 474:13

**gather** 424:13

**gave** 382:2 392:20
394:20 395:2,21
413:25 430:13
440:20

**geez** 480:21

**general** 293:7
296:20,25 308:15
312:7 343:20 344:10,
17 364:7 376:24
403:7

**generalize** 384:24

**generally** 297:12
323:3,5 325:15
326:10,12 327:6
329:20 332:21,23,25
344:15 357:7 363:21
364:12,18 373:15
389:6 426:19 461:10
472:21

**give** 331:3 334:25
337:24 342:22 366:6
369:8,10 382:2
394:12,19 395:14
397:16 405:16
440:25 451:12

**giving** 399:25 422:22
423:13

**glad** 351:22

**good** 308:15 312:8
330:23 360:20 382:8
393:3 413:19 423:22

**govern** 472:5

**grace** 414:10 440:20,
25

**grade** 291:17

**green** 289:2

**Gregory** 322:6

**grounds** 312:18

**group** 299:18 300:4,
11,14,21,25 316:10
319:25 334:2,23
335:10 336:19 338:5

**guarantee** 417:8

**guaranteed** 416:16

**guess** 304:20 310:4
312:11 333:3 347:19
375:25 393:7 429:10
437:25 451:18
456:23,25 457:2,10,
11

**gulf** 382:10

**guys** 346:23 432:2

---

### H

**haggled** 418:6,9

**half** 350:7 430:14
479:23

**half-hour** 380:19,21
398:17

**hand** 355:16

**handle** 363:23,25
382:24

**Hang** 355:7 402:18
428:21

**happy** 317:25 406:3
479:25

**hard** 355:18 356:22,
23 402:20 416:14
434:6 448:25 457:20

**Harvard** 385:4

**hats** 324:20

**HCMF** 331:24 332:3,
10 339:19,25 457:21

**HCMFA** 306:11,13,
19 307:4,6,8,14,19
308:2,17,18,22
309:2,8 310:10,14,
19,23 311:3 313:20
314:8,17 315:10,13,
20 316:13,18 317:9
318:15,22 320:22
321:9,16,20 322:7
333:10,17 336:23
339:22 404:10,11
405:13 457:9 465:24
466:3,4

**HCMFA's** 308:5
311:12 315:14,21
316:3,8 318:17
319:9,12,17,20
333:12

**HCMLP** 333:11,19
404:21

**HCMS** 288:20
329:17,21,24 330:3,
5,11 331:5,14,18

332:6,9,18 335:11,14
336:16 337:6,13
338:14 339:11,19
340:3,16 341:3
353:14,17,23,24
362:14 363:14
364:11 365:10,15
366:12,25 367:14,25
369:15,18,23 370:21
371:12,17,19,24
372:13,21 375:14
379:19 385:22
403:22,23 405:20,25
433:8,10,24 434:15
435:2,9,18,23
436:10,22 437:3,14,
16 439:8,18,25
440:7,20 441:5,11
442:8 443:2,10,19
445:23 446:9 447:21
451:2 452:7 453:6
457:3,14,17,21 461:8
465:11 473:5

**HCMS'** 340:5 363:3,7
443:2

**HCMS's** 330:8,15
333:2,23 353:18
372:2

**HCRE** 288:20 341:6,
8,16,19,24 342:2,16
343:7,13,15,18
354:8,9,14 378:4,21
381:11,22,23,25
382:13 383:3,5,11,15
384:7 385:9,21 386:3
404:3,5 405:19 406:2
447:21 448:2,5,11,16
449:13 450:9,15,21
451:2 452:7,17,18
453:2,5 455:7 456:5,
20 459:3,12 464:20
465:11 473:5

**HCRE's** 342:6 344:6
377:23

**HCRE-TYPE** 385:20

**head** 292:2 306:4
311:25 317:14,16
325:19 340:23
369:17,21 376:8

**hear** 289:15 303:14,
19 335:11 395:24
396:4,5,7,9,10,11,22

**heard** 303:16 352:20 462:9

**held** 312:17,22 313:5, 18 314:12 320:14,16 325:11,17 465:2

**helped** 339:16

**Hendrix** 352:19

**hereunder** 414:14

**Hey** 380:13

**HFAM** 335:20 470:15 471:9,13,15

**Highland** 288:6 289:9 290:23 291:3, 7,14 292:5,15 293:16,20,25 294:10, 14,21 295:4,6,7,14, 21,23 296:3,9 297:3, 7,9,15,23 298:2,4,10, 20,22,25 299:4,22 300:8 301:3,9 302:12,18,24 303:12 304:14 305:4,12,14, 23 306:7 308:14 311:19,20 313:7,19 314:5,12,23 315:8 319:15 320:12 321:7, 8,15,19 322:8 325:2 327:5 329:5,13,18 335:15 336:11,16,24 337:7,8,12,22 338:2, 10,13 339:3,7,12,13, 16,17,20 341:2 344:13,22 356:2,5 358:15 360:6 362:23 367:2,11,15 371:7, 19,25 372:2,7,13,20 374:6,12,15 375:4,13 376:25 377:8,13,14 381:12,22,25 382:13, 14 383:12,15 384:8, 16 385:23 386:17 387:6 388:12 391:24 392:16 393:16 395:15 397:2 398:4, 5,9 400:14 404:5,11 405:21 408:4 412:2 415:5 419:11,22 420:2,12 421:14 422:4,20 423:12,18 424:6,15 426:21 429:6 430:7,10 431:13 432:11,24

433:10 434:15 435:3, 9,19 437:4,17 439:8 440:4,6,17,19,24 442:2,7 443:2,9,17, 18 445:23 446:6,10 447:2 448:6,12 450:10,16,22 452:3 453:4 456:17,18 457:24 458:4,16,23 460:23 461:4 462:3, 18 463:4,9,11,19,20 465:2 466:16,22 467:19 468:14 469:19 470:15,16 471:13,16,21,22 473:4,6 475:9 476:2, 15

**Highland's** 291:9 298:16 301:13 302:14 303:6 311:12 313:6 327:18 346:18 349:12 354:25 358:14 362:15 370:25 389:3 402:24 403:17,22 412:8,16 426:2,10 432:17 435:14 441:11 476:19,23

**highlighted** 306:4

**highly** 334:10 391:22 417:18,19

**hired** 297:3

**historic** 322:5 431:5, 7

**historically** 454:3

**history** 422:3

**hold** 294:16 329:6 355:14 423:18 481:9

**holders** 400:14,19 427:21

**holding** 392:5

**holds** 314:22 315:7

**honorable** 428:9

**hope** 335:8 348:23 351:24 396:15 445:13

**hour** 454:9,12

**hours** 290:13 349:20,

21 350:19,20 479:4,9 480:9 481:17

**house** 308:7 424:25

**housed** 308:6

**hundred** 391:21

**hundreds** 293:15 312:12

**HVIN** 469:15

---

**I**

**idea** 300:21 331:15 410:15,19 416:7 435:21

**identified** 310:14 324:2 348:16 353:24 459:19 461:2,7

**identifies** 317:8

**identify** 299:6 300:3 313:4,17 314:21 321:14,18 328:10 329:12 331:16 340:25 341:5 342:14 366:6 396:24 422:2, 18 471:5

**illiquid** 361:18

**imagine** 290:12 313:21 319:23 320:3 336:17,21 342:18 367:16,17 383:13

**impact** 476:22

**imperfect** 365:5

**implying** 475:16

**important** 423:15

**importantly** 440:12

**improper** 391:4

**in-person** 350:9,12

**inaccuracy** 378:18

**inaccurate** 357:10 364:15,19 378:9 379:6 389:12

**inaudible** 338:23

**Inc.'s** 362:24

**incentive** 361:18

**incentives** 361:17 421:21

**include** 297:7 318:16 420:24 427:2 432:7

**included** 354:13 412:8,12,16 414:18 415:13 430:10 432:17,19 470:7

**includes** 473:3

**including** 348:15 421:5 459:8,13,16

**inclusive** 350:16

**income** 322:3,4 343:24 386:19 387:7 388:14

**incorporated** 366:2 392:24

**incumbency** 309:23,25 310:10 311:8 313:13,14 320:23 323:19 331:19 340:12,20 342:11,20 398:6 436:25

**incur** 316:12,18

**incurred** 337:22

**indefinitely** 373:12

**independent** 385:19

**indirect** 329:23 341:19

**indirectly** 307:3 322:19 330:3

**individual** 345:8 351:3

**industry** 317:16 404:19,21

**inform** 326:12 443:9

**information** 344:20 378:13 414:25 424:14 427:18 470:13

**informed** 443:2

**initial** 419:15

**inkling** 413:14

**inordinate** 392:6

**insignificant** 424:20

**installment** 369:24 409:16,22 453:22 456:2,12,21 458:8 460:11 461:20

**instruct** 371:10 393:15 442:21 443:9 445:21 446:4 461:19

**instructed** 371:24 372:13 397:2

**instruction** 372:20 397:16

**instructions** 395:15

**intended** 325:20 418:19,20 473:23

**intent** 339:9 377:5,6 414:12

**intention** 418:14 482:10

**intentionally** 304:19

**interacted** 402:4

**intercompany** 422:5,17,20 423:4,11

**interest** 329:24 330:3 341:19,21 400:14 408:2 419:10 440:8 450:9 452:20 453:10

**interests** 306:18 307:4 453:5

**interject** 390:25

**interjecting** 445:4

**interrelated** 423:3

**interrogatory** 426:5

**interrupt** 422:14

**investment** 291:16 330:22 401:9

**investments** 330:21 339:17 342:7 361:19

**investor** 292:21 338:24 385:4

Index: investors..maker

**investors** 330:24
331:2

**invite** 396:19

**involved** 325:9 328:2
339:17 355:21
373:16 386:12
406:10 459:5

**issue** 306:5 332:22
335:7 360:8 399:9,17
400:24 405:5 410:22
423:15 424:10 433:9

**issued** 467:20
468:15

**issues** 333:7 348:16
386:9 468:2

**item** 430:16

**J**

**James** 288:5,11
404:17

**January** 291:10
450:23

**JEFFRIES** 472:15

**Jim** 302:3

**John** 291:21 317:21
335:17 347:21 369:8
376:18 380:13,14
386:20 387:22
390:21 395:23,24
396:3,6 397:5 406:16
445:3,9 457:19
478:23

**Jonathan** 322:6

**judge** 363:22 443:12,
17 480:18

**judgment** 305:17

**July** 420:13 428:18

**jumps** 390:2

**juncture** 355:22

**June** 436:10 437:17

**justification** 347:17
365:18 370:7 389:16,
20

**K**

**keeping** 432:2

**key** 377:16

**kind** 335:3,6 366:5
384:19 414:14 425:3,
11 432:21

**kinds** 327:25

**Klos** 300:17 352:10

**knew** 311:9 313:24
325:20 334:6 336:19
391:23 392:18
439:11 440:11,12,16
442:12,13,17 451:16
454:2

**knowing** 294:5
299:2,21 300:6 301:2
316:7

**knowledge** 300:24
301:6 312:4 323:8
340:13 341:22 349:2,
14 351:16,20 367:22
368:24 373:20
397:15 410:11
420:15 437:8,9 438:6
457:5 465:17,22
466:6 468:13,20,24
469:5

**knowledgeable**
373:16

**Kristin** 352:18

**L**

**L.P.** 288:6 290:24
306:8 311:21 322:13
324:4 471:22,23

**lag** 301:25

**lagging** 478:24

**Lamensdorf** 322:6

**largely** 291:16 308:6
370:10 397:20

**larger** 460:22

**largest** 292:4

**late** 288:22 336:25
356:4 374:6

**Lauren** 320:9

**law** 335:21 389:23

**lawsuit** 403:17,22
404:4,11 433:9

**lawsuits** 399:9,17
400:25 405:5

**lawyer** 390:24 391:4

**lawyers** 312:6
350:23,25 365:5
383:6 406:10

**layers** 401:25

**lays** 475:20

**learn** 367:14,25
440:5

**learned** 312:17 368:6
442:23

**leave** 288:24 370:13
380:9,25

**left** 456:5

**legal** 383:2,7 410:18
473:14

**legitimate** 467:25
468:3 469:16

**lengthy** 356:18

**lens** 421:12

**letter** 412:14 426:24
439:16 441:6,12
442:7,11,13,22
443:3,13,17,25
444:4,6,9,15,17,24
445:16,18 464:3,20
465:4,23 466:18
467:2,6,10 472:4

**letters** 299:25 426:9
464:5 465:12 469:11

**level** 423:2

**levels** 317:20 404:19

**liabilities** 299:9
327:4

**liability** 412:20

**lieu** 361:8,16 416:15

**life** 427:19 470:24

**likelihood** 312:15

**limited** 413:16 417:7
427:18

**limits** 317:12

**lines** 331:4

**liquidity** 339:16

**list** 354:12 418:25
424:19,20 425:10,17,
18,20 426:4

**listed** 354:18 419:5
420:3 425:16 430:17
440:9 445:25 446:6
450:5 466:17

**listen** 372:11 468:11

**listing** 353:4

**lists** 344:20

**litigation** 289:9
356:7 414:19 441:7,
10 443:4,8,18 455:23

**LLC** 341:8,11

**loan** 365:23,25
416:18 421:19 422:5,
18,20 423:11 430:4,
5,15,23 431:9 435:2,
18,24

**loaned** 452:7

**loans** 298:22 299:3,
22 300:7 301:3,9
344:12 371:3,9
404:20 406:11
420:17 422:17 423:4
424:7,16 427:3,12
429:4,11,18,19,24
430:23 431:5,13,21
432:7,11,15,17,18
448:12 450:21
452:19,20,22,23
477:10 478:2,8,11,16

**logical** 377:6,9
391:18 413:20

**long** 301:20 380:18
397:17,18 427:5
434:5 479:19

**longer** 478:25

**looked** 340:19
396:23 431:4 439:10
455:11 464:2

**lot** 291:22 297:23
311:14 416:3 452:14
467:23 482:8

**loud** 414:9

**love** 428:25

**low** 312:15

**lower** 452:14,20

**lunch** 380:19,21
398:17

**Lynn** 363:22 443:12,
17

**M**

**made** 333:19 346:4
367:15,25 368:24
369:3,5,15,18 372:18
387:12,19 388:6,11
392:6 393:25 395:16
397:22 424:13,18
432:19 434:15 439:8
440:6,17 442:2 445:4
460:20 465:6 466:17
468:14 470:18
476:10 477:16

**major-** 307:2

**majority** 307:4 330:2
341:21 400:13,18
427:21

**make** 288:15 305:17,
18 341:14 357:14
358:12 364:23
371:11,13,18,25
372:14,21 375:13
377:16 379:10 387:5
393:7,10,16 394:7,15
395:15 397:2 400:15
409:15 410:8 411:17
429:17 440:21
441:17 445:22 446:5,
9 455:12,25 456:11,
19,20 457:3 458:7,
11,15,17 460:10
461:5,20 462:3,10,
11,19 463:3,4,11,19
465:7 466:25 476:15,
20 479:15 481:2

**maker** 295:22 296:2
414:9 429:21 437:14
467:3 474:24 475:10

Index: makers..Nexpoint

477:17

**makers** 451:7,25

**makes** 342:7

**making** 377:13
461:14 467:19

**maliciously** 304:20

**man** 383:22

**manage** 293:4
421:21

**managed** 308:9,16
325:13,18 327:16

**management** 288:6
290:24 292:5,18
294:11,22 295:4,14,
21,23 296:3,10 306:7
308:11 311:21
329:19 362:23
405:22 412:14 426:8,
13,23 431:21 434:15
457:24 458:4 466:22
471:22,23

**manager** 291:19
293:2 309:3 421:14

**managers** 309:5
322:5 421:21

**manages** 330:16

**March** 435:3

**Mark** 306:15 383:11

**marked** 345:4,6
353:12 354:6,23
362:16 377:22
380:11 402:23
408:10 433:15
446:16 464:12 466:9

**market** 339:5 384:16

**marketed** 330:18,20

**marks** 288:3

**masked** 422:9

**material** 332:22
344:2 365:22,24
368:4,7 369:2 412:7,
10 425:7 426:16,23
427:4,12 430:6,9
431:8,9

**Matt** 342:18

**matter** 288:5 293:7
296:20 350:18
467:15

**matters** 302:2

**Mcgraner** 342:18,23

**mea** 406:16

**means** 384:2 395:20
458:4

**meant** 332:3 456:7
474:4

**mechanism** 429:18

**meet** 350:11

**meetings** 350:16,22
351:2 481:5

**members** 425:2

**memorized** 347:23

**memory** 356:13

**mentally** 289:24

**mentioned** 335:10
367:18

**met** 349:17

**Michael** 322:6

**mid** 374:21

**middle** 374:24
404:15

**migration** 364:6

**Mike's** 387:14

**million** 294:2,8,11
296:15,18 298:12
377:3,4 391:25 392:5
393:4,12 405:17
407:22 408:18 412:4
413:5,11 419:17
420:12 421:16
429:24 430:14

**mince** 393:9

**mind** 324:13 392:21

**mine** 434:19

**minimis** 297:25
298:5,17 333:5,7,12,
15 334:7,14 343:21
376:25 377:3 391:21
393:20 410:13

**411:25** 412:3 413:18
417:20 421:13
458:20

**minimus** 298:7
343:22,23

**minute** 291:24

**minutes** 318:3 370:5
387:10 454:8

**misleading** 390:25

**missed** 425:9 456:24

**missing** 389:20

**mistake** 448:22

**mistaken** 397:10

**Mitts** 324:14

**mixed** 430:15

**modest** 382:6 385:11

**modification** 417:4
475:15,16,21

**modified** 357:14
364:22 379:9 473:10
474:8 476:21

**modify** 473:14,23

**moment** 357:16,25
359:11 364:20 366:4,
10 375:23 379:25
422:2 461:18

**Monday** 479:15

**monetize** 361:18

**money** 292:18,25
293:4 295:3,7,8,13
296:9 331:4 336:24
337:7,16 360:7
382:11 391:21
419:22 420:2,6
421:19 448:6 450:16
452:7,14 460:22

**moneys** 337:19
470:15

**monitor** 288:8

**monthly** 299:13

**months** 428:15

**MORRIS** 288:14
289:5,14 291:25
294:18 295:2 303:18,

22 304:4 305:8
309:11,17 317:24
323:17 337:17 345:3
346:5,8 347:24 348:4
349:25 353:10 354:4,
21 355:5,9 359:6
369:12 372:8 374:4
375:19 376:22
377:20 380:12,16,24
381:4,15 383:19
386:25 387:16 388:3
390:3,17,20 391:3
393:22 396:7 397:7
398:15 401:5 402:9,
15 403:3 405:14
406:18 408:7,11
414:4 423:23,25
425:8,17 426:7 432:3
433:13,18,20 434:9,
24 436:13,19 437:11
439:14 444:12,22
445:12,20 446:2,14,
20 448:17,21 454:13
456:6 462:14 464:9,
15 466:7,10 468:10
472:13,17 474:18
476:7 479:3,12,24
480:14,22,25 481:6,
12,15,22 482:3,16

**mortgages** 452:25

**motion** 374:20,24
395:7

**mouth** 302:5

**move** 322:11 372:8
374:4 375:19 386:24
393:22 432:3 433:7
440:15 462:14
468:10

**moved** 364:3 468:22
470:15

**moving** 302:5 468:7

**mucked** 469:20

**multiple** 311:15,23
320:4,5 324:20
325:5,6,22 375:7,8
406:10

**mute** 395:22,23,24
396:2,14 481:11

**mutual** 308:6,7,9,16
317:3,4 336:12

**myriad** 335:2

## N

**names** 299:14
342:22 425:19,20
426:4

**Nancy** 288:19 355:14

**narrow** 313:16

**nature** 308:5 323:3
330:15 342:5

**nauseous** 289:4

**necessarily** 413:7
475:21

**necessity** 376:20

**needed** 372:18

**negotiate** 417:13

**negotiated** 418:6,10

**negotiating** 411:23

**negotiation** 416:22
417:2,4

**negotiations** 417:2
451:22

**netting** 392:9,15

**news** 428:14

**Nexbank** 431:18
432:6,18,20

**Nexpoint** 322:11,12,
15,18,21,23 323:6,
10,15 324:3,9,15
326:2,4 327:7,16
328:6,13 329:6,14
335:20 336:23
339:22 341:11 346:2,
17 353:17 381:23
382:8 383:6 384:16
385:8 389:8 391:24
393:15,25 394:8,16
395:16 396:25 397:3,
13,16,22,25 398:8
403:16,17 405:18,25
407:17,21,24 408:4,
9,24 409:8,24 410:5,
7 411:18 419:11,20,
21,25 420:5,11,16
439:12 447:21 451:2
452:7,13,18 453:2,5

Case 21-03005-sgj Doc 106-4 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 65 of 71
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 769 of 899 PageID 1381

Index: Nexpoint's..paragraph

455:25 456:11,19
458:25 459:4,9,24,25
460:7 461:8 467:6,8
473:5

**Nexpoint's** 323:4
326:7,12,17,22
327:2,9,10 328:7,14,
18,22,25 329:8
345:20,24 346:14,20
347:2 348:8 349:3,12
388:22 389:2 412:3,
17

**night** 290:10

**nods** 292:2

**nominal** 386:4

**non-payment**
414:11

**non-privileged**
442:6

**nonetheless** 334:15

**normal** 316:22

**note** 306:5 349:3
368:16,18,19,22
369:23 371:12,21
372:2,16 397:3
407:17,21,25 408:16,
23 409:2,6 410:7,15
411:11,18 412:4,15
413:5,6,11,15,18,24
414:18 415:9,13
416:9,12,14,18,24
417:9,14,17 418:4,
17,18 419:4,8,20,23
420:6,20,25 421:5
434:3,14,22 435:14
438:18 440:14,23
446:25 447:5,8,16
448:8 449:12,15
450:3,18 451:12
455:6 457:10 467:2,
3,9 470:18 475:21

**notebook** 355:4
464:14

**notes** 293:12,15,19,
24 294:23 295:22
296:3,22 297:17,25
298:4,12 305:18
327:6 334:5 348:12,
15 353:5 356:6
358:7,8,9,16 359:10

360:8 364:7 367:4
368:15 373:8 376:24
377:12 391:13 399:9,
17 400:24 402:6
403:15,21 404:3,9
405:5,9,10,17 408:3
410:22 411:7 414:23,
25 415:4,18,21,23
416:21 417:12,20,21
418:9,13,16,19,20,25
419:5,12,16 427:24
433:9 439:9 440:9
442:3 443:10,19
445:23,24 446:11,18
447:17,23 448:7
449:4 450:4,10,25
451:3,6,9,16,19,21,
25 452:3,9 453:11,
19,21,22 455:3 457:9
461:22 462:4,18
463:2,12 464:6 465:2
466:17 467:20
468:15 469:16 470:8,
18,22 472:24 473:3,
5,11,18,25 474:21
475:5,9,11,16,19
476:2,6,14,23 477:7,
11,14,15,16,20,21,24
478:3,9,11,17

**notice** 353:14,18
354:7,13 363:7 367:3
375:4 377:8 414:11,
12,13 443:19 480:19

**noticed** 406:15

**notices** 345:2 353:3
414:13 464:24

**notion** 423:16

**notwithstanding**
375:12 379:16

**November** 375:4

**nuance** 478:5

**number** 298:14,21
299:3 362:17,18
408:8,12,13,15 464:4

**numbers** 392:20
425:3

**numerous** 365:25
368:25

**O**

**object** 296:23 297:10
305:25 311:5 315:16
318:24 321:21 326:8,
19 329:9 331:9 340:6
344:7 366:8,17,22
367:6 369:25 373:5
376:10 379:11 384:2,
22 385:17,24 388:15
390:14 399:11,19,21,
22 401:11,18 405:11
409:9,18,25 410:9
411:20 415:14,25
426:17 429:8 430:25
432:13 438:10 441:3,
20 445:11 447:11
449:22 452:10 453:7,
24 455:19 456:4,14
457:6 460:13 461:16,
23 462:6,21 463:6,22
465:14,19,25 467:4
470:3,10 471:2
473:12 474:2,11
475:12,13 476:25

**objected** 312:18

**objecting** 409:12
445:6

**objection** 294:3
324:21 327:20
343:19 347:4 348:25
361:25 387:8 428:5
434:17

**objections** 346:4
348:19 353:25
354:17 383:21

**obligation** 371:20
426:13

**obligations** 294:14,
21 295:20 297:8,15,
23 315:15,22 316:3,
8,12,19 318:17
326:7,13,18 327:3,11
328:8,15 332:20
333:2,11,15,18,23
334:4,13 340:5
343:6,18,22 344:6,12
366:15 367:4 377:2
469:19 470:2 473:24
474:10,24 475:11

**obligors** 356:6

418:13,14 459:20
460:10 461:3,13
462:17 463:2,14,18

**obligors'** 458:13,14
469:10

**obtained** 312:3
374:16 435:18
448:12 450:22

**obtaining** 452:19

**occurred** 368:13

**October** 288:7 374:8

**odd** 422:25

**odds** 413:15

**offense** 432:4

**officer** 303:2 310:4
312:8 320:22 321:16
329:6,14 331:13,17,
25 332:9 340:16
341:3 342:15

**officers** 311:14
459:8,12,14,15

**offline** 480:2

**Okada** 306:15,22

**omission** 406:22

**omitted** 405:25
406:7,12 407:3,5

**operating** 299:13
316:20,23 343:23

**opinion** 447:14

**oral** 336:15 337:4
361:22 399:7,15
400:10,22 401:4,16
403:7,10,13,19,25
404:8 406:20 407:10
420:21 443:10,20
472:11,21 473:8,21
474:22 475:6 476:18,
22 477:8,24 478:7,
10,15

**orchestrate** 314:19,
25

**orchestrated** 327:14

**order** 374:13,16

**ordinary** 372:23

**original** 356:2
407:21 473:11,18,24
475:4,8

**out-of-pocket**
338:8,16

**outline** 480:20

**outstanding** 295:17
407:25 419:10 440:7
447:22 450:9

**overcharged** 391:24

**overlay** 343:20

**overpayment** 392:4

**overstatement**
460:17

**owe** 294:10 296:9
426:3

**owed** 297:8,15
375:14 419:11,22
450:10 460:23

**owing** 327:4 344:21
366:16

**ownership** 306:18
307:4,21,24 317:18
329:24 341:19

**owns** 306:13 322:18

**P**

**p.m.** 381:9 398:20
454:17 482:21

**pages** 435:21

**paid** 338:8 373:13
392:16 418:21,22
460:20 462:11

**paper** 338:22

**paragraph** 357:17
358:19 359:12,13,23
360:13,16 361:14
362:9 365:2,15
370:8,14 378:20
379:14,24 390:4
403:4,6 404:14
407:14 409:13,20
412:23 414:6,7,17
421:10 422:8 423:10
455:11,14,18 472:14,
18,21

**paragraphs** 357:20 365:10 375:22 380:2 390:7,10,16 398:12 416:9

**paraphrase** 394:23

**parsed** 471:25

**part** 334:19 337:4 340:8 358:22 359:15 360:2,18 365:17 370:17 412:10 414:19 418:21 423:4 427:20 443:23 444:2 454:4 456:8 468:3

**participate** 289:24 350:21,25

**particularized** 468:24

**parties** 297:24 339:6 413:14 415:4 418:7

**parties'** 473:10,23 474:9,23

**partly** 389:23 454:4

**partner** 361:6

**Partners** 341:8,11 455:7 464:21

**party** 452:2,6

**passed** 338:5

**passing** 363:22

**past** 296:6 338:20

**patient** 372:10 383:20

**Patrick** 301:15 383:11

**pay** 336:23 337:6 338:7 366:14 367:4 369:23 383:15 384:7 385:22 393:5,12,18, 19 419:7

**payee** 295:24 422:21 466:25 474:25 476:2 477:16

**payees'** 475:10

**paying** 339:2

**payment** 337:13 371:11,19,25 372:14,

21 373:3,11 375:13 391:16,20 393:16,25 394:8,15 395:16 397:2 409:16,23 414:11 439:9 440:7, 21 442:3 453:22 456:2,12,19,21 457:4 458:8,17 460:11,17 461:5,14 464:5 468:15 475:18 476:3, 16

**payments** 369:24 373:18 377:13 410:8 445:22 446:5,10 454:3 458:15 460:16 461:21 462:3,19 463:4,11,20 469:18

**peak** 292:3

**people** 293:5 299:6, 8,15,18 300:10,13,14 303:18 342:19 407:9 416:10,11 421:12 424:23,24 426:15 458:22 459:7 470:16, 18

**people's** 424:21

**perceived** 396:16

**perceives** 396:18

**percent** 298:13,16

**percentage** 306:17

**percentages** 306:23

**Perfect** 402:12 482:12

**performance** 385:9 416:16

**performed** 471:16 472:7

**period** 293:16 307:18,25 330:8 367:20 401:13,15 420:13 421:17 440:20,25 479:18

**periodic** 454:3

**periods** 304:21

**permissible** 386:22 387:23

**person** 300:4,17,18

311:3 315:12,20 316:24 331:16 332:17 333:16 364:8 371:17,18 373:19 388:5 393:15 396:24 397:15 410:4 443:5 458:22

**personal** 358:8,9 386:23 387:24 480:4

**personally** 297:3 301:7 324:2 327:17 363:19 371:10 393:24 405:6 417:16

**personnel** 372:7

**perspective** 333:13 334:3 377:7 405:17 473:21

**petition** 311:10 324:9 325:21

**Phillips** 364:5

**phone** 350:2,9,17,22 351:2

**phrase** 347:15

**physically** 289:23

**pick** 476:20

**picked** 335:8

**pile** 362:13

**PJ** 434:10

**place** 476:9

**plaintiff** 289:8

**plaintiff's** 355:19 358:21 359:14,25 365:16 370:16

**plan** 468:8

**play** 474:13

**players** 472:2

**pleasure** 381:4

**point** 288:25 290:22 309:8 318:2 320:15 377:19 406:19 427:7, 24 433:5 468:7

**points** 416:9

**policy** 317:6

**portfolio** 308:10,16 309:3,5 322:5 361:21

**portion** 303:16 308:15 351:10

**position** 298:3 311:23 312:16 313:17 314:11,21 320:14 321:7 325:25 329:6 367:9 403:10 407:9

**positions** 297:5 312:22 315:6 316:21 320:17

**possibly** 423:3

**post** 309:17

**pot** 468:8

**potential** 330:23

**practice** 317:17 404:20 423:16,17 424:6,15,22 429:4 430:4 431:13

**practices** 411:13

**precedence** 477:5

**precedent** 429:12,16 477:5

**precipitate** 314:25

**premarked** 309:13

**prepaid** 366:15 391:13 406:11 418:22 461:9

**preparation** 328:2 350:5 353:7

**prepare** 349:16

**prepared** 299:12 334:16 338:3 346:25 347:20 348:6,14,22 349:11 354:17 356:9 363:9 376:6

**preparing** 299:10 320:4 340:9 350:15 363:20

**prepay** 389:17

**prepayment** 366:21 367:5,15,22 368:2, 10,15,24 370:10 378:12,16,20 379:18

**prepayments** 365:23,25 367:13 369:2,15,19 378:15, 23

**prepays** 389:19 392:24,25

**presence** 384:15

**present** 431:24 476:11

**presentation** 431:4

**presentment** 414:10

**president** 291:10,15 292:6,14 293:16,20, 25 297:6 298:19 302:12,23,24 303:13 304:15,22 305:2,11, 24 308:21 309:6 313:6 315:10 323:12 325:2 326:4 332:17 337:12 338:13 422:3, 19 423:12 469:21

**presidents** 317:18

**pretty** 460:24

**previously** 319:15 408:3

**Price** 337:23

**Pricewaterhouseco opers** 469:25 470:5, 6,19

**primarily** 322:7 339:14 368:18,19 383:10 440:3

**principal** 293:23 295:17 360:7 407:22 408:2 419:10,16 440:8 450:9

**prior** 300:5,15 302:20 307:21 311:10 315:23 324:9 325:20 389:14 391:9 418:25 419:11,16 420:6 423:16,17 424:15 441:6,9 442:10 443:3,7 448:7 450:10 463:16 477:19

**private** 421:18,22

Case 21-03005-sgj Doc 106-4 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 67 of 71
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 771 of 899 PageID 1383

Index: privileged..relative

**privileged** 441:18

**problem** 302:7 381:5
384:3 454:13

**proceed** 289:22
291:25 398:25
454:20

**proceeds** 348:20
349:3 420:16 435:23
448:11 450:21

**produced** 367:23
425:13 428:10,17
444:6,12,17 445:18

**product** 451:21

**production** 428:16

**profit** 338:9

**promissory** 293:11,
12,15,19,24 294:23
295:22 296:2,22
408:3,16 411:18
413:11 419:5 434:3,
14,22 446:25 447:17
450:4,18 464:6
467:20 470:8 472:23
473:3,5,11,24 474:21
475:5,9 476:23
477:11,14,15 478:2,9

**proper** 412:11

**properly** 412:12

**proportionate**
424:21

**protections** 413:17

**protest** 414:11,12

**provide** 383:3
386:17 387:6 404:16
421:7

**provided** 337:8
339:11,16,20,21
353:2 385:12 386:4
429:7

**providing** 336:6
422:5

**provision** 382:14
415:12,24 447:8
449:19 455:18

**provisions** 440:14
449:25

**prudent** 413:4

**pulling** 449:2

**purchasing** 317:4

**purpose** 298:8
377:10 401:3 404:15,
24 405:3,8,24 406:7,
23 407:3,9,11 421:4
422:5 423:12 430:22

**purposes** 416:6
422:21 424:25

**pursuant** 356:4

**put** 290:18 309:12,18
320:25 323:17
342:13 345:3 348:2
353:10 354:4,22
355:11 367:2 378:10
379:4 391:20 401:5
408:7 416:5,7,10
418:14 427:18
433:14,22 448:3
466:7 470:20 476:9
481:10

**putting** 343:12,14
354:24 355:10
443:18 472:14
480:19

**Pwc** 412:16

### Q

**qualified** 346:3

**quarterly** 299:11

**question** 294:25
295:11,25 302:10
304:10,24 305:21
306:2 332:2 335:18
357:2 358:11 372:11
376:13,22 381:16
383:25 387:2,3
388:2,9,16 391:6,14
393:23 395:6,8,9
397:8 398:7 405:7
417:10 422:15,25
423:7 424:2 441:22
442:15 457:14,15
460:25 467:17
468:12 477:2 478:6,
13

**questions** 335:4,6

346:25 353:22 363:2,
9 375:25 376:3,6,21
378:2 388:21 390:22,
24 480:16

**quick** 317:23 380:14

**quickly** 344:25
345:15 377:12

**quote** 359:25 360:3
365:16 370:16
404:15

### R

**raise** 382:10

**rambling** 387:10

**rate** 475:18

**rates** 452:14,20

**rationale** 471:10

**read** 293:8 296:21
358:2,10 361:2
381:15 397:9,10,12
404:22 409:2,11
410:3 413:6,10,24
414:9,15 415:24
424:2,3 430:21 447:5
449:15,18 455:13
475:2

**reading** 310:3
411:23

**ready** 454:20

**real** 323:5 341:11
342:7 385:8 391:14

**realize** 468:6

**reason** 303:10
304:12 305:2,12
318:19 319:4 324:7,
10 328:4,11 391:18
410:25 411:14,15,16
413:20 434:20 436:7
437:6 447:6 452:5
453:3

**reasonable** 392:10
404:18 411:19
413:24

**reasons** 388:16
413:25 458:14 460:9
468:21

**recall** 292:8 298:24
302:17 303:4 310:25
312:20,25 313:21
320:14,21 326:15,16,
21,25 330:11 337:11,
18 355:18 356:2
357:3 363:6 368:23
371:22 373:21
374:11,15,19,23
375:3 407:20,24
409:5 410:6,21 424:9
425:10,21 437:3
446:3 465:4

**receive** 338:14
344:19 435:2

**received** 322:3
337:13 383:16 435:9
464:4,24

**receiving** 386:18
387:7 388:13 425:22
442:14

**recess** 304:7 318:8
381:9 398:20 454:17

**recollect** 442:16

**recollection** 309:14
310:17,21 311:17
324:2,17 338:12
349:6 352:25 355:24
356:8 386:2 411:6
420:10 435:17,22
440:2 442:14,19
443:16 444:14 448:5,
10 450:20 455:5
464:23 467:16,19

**recommended**
301:15

**reconvene** 289:3

**record** 304:3,5,8,11,
25 318:6,9 330:20,25
338:18,22 339:4
381:7,14 382:10
384:15 385:5 397:12
398:19,21 399:24
424:3 454:16,18
479:13 481:14
482:17,20

**records** 298:23
330:17 367:8,12
397:14,19 431:20,25

**recover** 358:16

**redaction** 428:12

**reestablish** 419:8

**refer** 291:2 306:10
322:15 329:21
340:14 341:15 400:9

**referenced** 337:5

**referred** 445:17

**referring** 297:16
371:4

**refine** 330:22

**reflect** 477:16

**reflected** 294:22
295:21 313:20 327:3
334:15 420:6 477:11

**refresh** 309:14
310:17 323:25
339:18 349:5 352:25
355:23 356:8 439:12
455:5 464:23

**refreshed** 331:21
332:16 341:4 342:11,
17 420:14,18

**regard** 386:5 402:5
407:7 443:13,25

**regular** 344:9 373:11
460:16

**regularly** 299:17

**regulatory** 327:15
335:21 411:14 416:6
469:18 471:10

**regulatory-wise**
418:3

**reimbursement**
338:15

**relate** 361:20 375:21
376:8,16 379:23
380:3 398:11 478:7

**related** 323:5 366:6
382:4 390:11 398:4
415:4 477:10,13,25
478:15

**relative** 333:5,7
343:23 376:25
413:18 430:18
453:16

**relevant** 412:3

**reliance** 370:25 372:5 463:8

**relied** 372:22,23 375:13 383:9 393:4,5

**relocate** 430:14

**relocation** 424:24

**rely** 428:2,7,8

**relying** 367:10 371:7 398:8 458:16

**remains** 401:21

**remember** 301:21 307:20,21 308:12,13 309:10 311:14 312:14 320:17 323:2 330:13 358:10 361:5, 8 368:6 375:9 389:14 407:18 409:12 410:25 411:5,22 441:14 443:14,15 464:4 465:8 467:22 468:5

**remembered** 415:9

**remind** 460:5

**remotely** 480:10

**remuneration** 337:10 382:8 384:13 385:14

**render** 388:12

**rendered** 337:14 339:13 384:8 385:23

**renegotiation** 416:20

**rep** 299:25

**repaying** 418:15

**repeat** 294:24 295:25 302:10 387:3 391:8 394:5 399:13 441:22 472:16

**repetitive** 335:9

**rephrase** 295:10 399:13

**report** 314:5,8,13

**reporter** 288:9

**reports** 299:13

**represent** 351:3 353:16

**representation** 412:14 426:9,14,24

**representative** 345:21,25 354:9 378:3 388:22 400:12, 13 463:13

**repudiation** 365:18 370:7

**reputable** 334:12

**request** 317:22 372:25 397:23

**requests** 349:8,13

**required** 369:23 385:22 409:15 410:7 411:11 440:24 453:22 454:2

**resign** 374:5,8

**resolution** 468:8

**resolve** 375:17

**respect** 319:16 325:3 335:7 343:17 348:15, 20 353:24 464:25 472:23 477:23 479:20

**respectful** 351:25

**respective** 451:7

**respond** 441:11 442:8,22 469:4

**responded** 441:6 465:11 469:9

**responding** 465:23

**respons** 328:14

**response** 305:21 425:21 444:3 469:17

**responses** 425:19

**responsibilities** 299:15 318:16,21,23 328:6 398:4

**responsibility** 299:2,20 300:6 301:2 315:13 319:6 326:6 327:9 332:19 333:22 340:4 343:2,5,17 364:9

**responsible** 299:7,8 300:11 316:6 327:18, 21 471:24

**responsive** 422:15

**rest** 290:17 482:9

**restate** 457:14

**restraining** 374:13, 16

**restroom** 317:23 380:15,23

**results** 330:23

**retail** 312:22

**return** 386:19 387:7 388:14 398:17

**revenue** 339:6,20,21

**review** 344:12 346:20 351:7 354:12 389:5 447:13 450:2

**reviewed** 357:4 429:5

**reviewing** 355:19 363:20

**ridiculous** 377:17

**rights** 473:10,23 474:10,23 475:10 476:23

**road** 339:7

**role** 314:2 327:12 343:11 363:19

**roles** 311:15 325:22 373:12

**roll** 337:25

**roll-ups** 477:18

**rollup** 407:25

**room** 309:18 355:11

**rough** 482:14

**roughly** 375:2

**row** 318:3

**RUKAVINA** 445:2,14

**rules** 386:6,7

**run** 319:24 380:22

**running** 324:13

———

**S**

**safe** 445:13

**satisfaction** 371:19 372:14

**satisfied** 373:18 429:13,16

**satisfy** 333:18

**scope** 300:7 301:9 316:7 317:8 387:22 405:15

**screen** 353:19 354:19,25 355:10 381:2 388:20 389:2 401:6 402:7,17,22 433:22,25 434:6

**screw-up** 370:25 371:2,4

**scroll** 434:9

**sec** 291:22 471:8,17, 21,25

**secrecy** 427:23

**secretary** 321:9

**section** 409:14 412:22,25

**secured** 416:13,15 452:25 453:13,16

**Seery** 352:6,8 373:23,24,25 375:16 391:23 392:9 414:24 439:17 468:6

**Seery's** 352:7

**sees** 302:6

**selection** 301:16

**send** 467:2

**senior** 297:5 300:10, 14,17,18 312:8 316:20 325:5 327:23

**sense** 341:14 392:7 466:25

**sentence** 405:24

**separate** 331:3 333:24 385:20 457:9 480:5

**separately** 430:17

**September** 355:25 356:10 357:6 374:6

**series** 455:3

**serve** 291:9 309:7 323:15 325:21 331:24

**served** 302:24 303:13 304:15 305:24 310:18,23 311:19 313:6 320:22 321:15 324:8,25 325:3 329:13 331:13, 17,22 332:8 341:2 342:15

**server** 426:2

**service** 333:6 334:5 343:22

**serviced** 336:3

**services** 294:11,22 295:4,7,9,14,21,23 296:4,10 329:19 331:20 332:4,14 335:15,17,22,23 336:2,5,7,9,10,15,24 337:7,13 338:4,6,15 339:3,9,12,15,22 340:11,20 362:24 367:11 371:6,7 372:7 375:5 381:11 382:14 383:3,9,16 384:8 385:12,23 386:2,4, 10,18 387:6 388:13 392:6 405:19,21 417:22 433:12 437:14 457:23,24,25 458:3,5,7,23 459:4, 15 460:6,7 466:3 467:6,13 471:15 472:5

**424:25 431:21 432:19 452:25 453:13,16**

Index: servicing..subject

**servicing** 413:17

**serving** 311:11
313:25

**set** 291:22 319:23
360:12 365:11 390:9
393:6 398:12 419:9
420:7 447:18 448:7
450:8,17 452:8
455:18 474:23
475:10

**settlement** 444:2
468:4 471:7,11,12

**seven-figure** 425:3

**seven-figure-plus**
431:20

**share** 359:2,17 362:7
368:10,21

**shared** 335:14,17,22,
23 336:2,5,9,10,15,
24 339:3,22 367:11
371:7 375:5 381:11
383:8 392:5 417:22
458:23 472:5

**She'll** 428:22

**sheet** 298:9 299:4,23
300:8 301:10 326:23
327:3,7 412:2 432:16

**sheets** 293:8 301:4
413:19

**shocked** 412:19

**shoot** 290:13

**short** 318:4 380:19,
21 386:11 387:10
397:17 398:16

**shorter** 291:23

**show** 330:23 347:22
406:4 415:17 429:15
431:20

**side** 308:10 450:5

**sides** 413:21

**sign** 299:24 312:12
327:24 408:23 426:8,
13 434:22 436:9
449:12 451:5

**sign-offs** 320:5

**signatories** 319:12
328:18

**signatory** 319:9,16,
20 328:22,25 329:7
438:2

**signature** 310:4,6
323:23 408:20
418:15 434:11,13
435:7 436:5,8,14
437:23 438:4,5,9,14,
18 446:21,22 449:10

**signatures** 320:4

**signed** 293:11,14,18,
24 310:11 358:16
409:3,7,22 410:6,22
412:14 414:18
415:13,23 416:22
417:12 418:12
419:19,21 435:7,12
437:13 438:25
446:25 447:5,9
449:6,16,21 451:2
453:20 455:14 473:3,
6 476:6,15

**significance** 316:25
317:2 460:18

**significant** 382:9
422:13 425:6

**significantly** 391:14

**signing** 413:5
437:24,25 438:22
439:5

**similar** 336:7 339:21
342:12 378:11

**similarly** 336:3

**simple** 348:25 391:6
393:23 395:8,9
400:16 441:23
460:25

**simultaneously**
301:18 311:11
321:20 384:5

**single** 353:9 414:18
428:11 458:21

**sir** 295:11 323:20
324:24 335:18
345:17 346:11
377:24 381:11
387:19 394:14

**signatories** 396:24 402:17
408:15 422:14
428:11 429:3 432:5
433:22 434:4,11
436:5 439:22 446:22
449:10 450:13
454:20 460:25
464:19 481:24

**sister** 351:21 361:22
399:8,16,25 400:9,17
401:8 403:12 404:8,
25 431:18

**sit** 300:24 301:7
304:13 318:20 319:4
357:8 445:10

**situation** 469:20

**sixth** 397:6

**skip** 357:24 359:21

**Skyview** 315:2

**small** 372:6 386:4
392:2 393:10,20
430:18 460:19

**soft** 413:15 415:9
416:9,12,18,24
417:8,21 418:17
452:22,23 453:11,19
475:17,19

**sold** 427:22

**solidifying** 411:10

**solvent** 417:19

**sophisticated**
292:21,25 383:22
390:23

**sought** 374:12
451:25

**sounds** 295:5 422:10
473:14

**source** 334:18

**space** 385:8

**speak** 303:23 399:3
453:12 454:22

**speaker** 303:25

**speaking** 301:18
303:15 383:21 384:5

**specific** 320:8 325:7
347:18 348:16

**specifically** 356:13 372:24,25
382:7 383:4 385:10,
14 438:6 456:24
467:15 468:20

**specifically** 312:14
316:5 317:7,12
326:14 344:20 349:4
364:17 372:17,18
373:7,15 382:18
393:18,19 412:15
430:12 434:23
435:16 437:5 470:6
471:21

**specifics** 369:16,20
375:25 410:12,13

**speculating** 300:9
430:20

**speculative** 427:6

**spend** 334:7 413:21

**spent** 350:15

**split** 322:9 472:5

**spreadsheet** 368:11
369:10

**stack** 353:2

**staff** 383:8 397:14

**stamped** 444:20,23

**standard** 404:20

**standing** 312:8
393:3

**standpoint** 418:3
421:13

**start** 365:13 424:4
472:13

**started** 307:22 364:4

**starting** 288:22

**stated** 388:17 407:13
419:17 471:21

**statement** 288:15
310:4 406:6,23 407:2
428:12 430:19

**statements** 299:10,
12 300:12 327:15,19,
24 338:4 366:5
412:8,17 429:6,15
430:8,22 432:7,12
470:9

**states** 359:13

**statute** 335:21

**stay** 371:8 394:25
481:13

**steal** 374:2 375:17

**step** 297:21

**steps** 316:2 344:11
393:24 462:2 463:3

**stick** 395:21

**Stinson** 288:18
363:15 364:3,6

**Stoops** 300:17

**stop** 289:2 356:21
441:17 474:18,19
479:6 480:15

**strap** 291:17

**strategy** 330:22

**stream** 339:6,20,21
386:18 387:7 388:13

**strike** 372:8 374:4
375:19 393:22 432:3
440:15 462:14
468:10,22

**strong** 324:15

**struck** 394:13 422:24

**structural** 335:3,6

**structure** 307:21
308:12

**structured** 314:10

**structuring** 312:7
373:9

**struggle** 316:15

**study** 327:7 333:9

**studying** 334:8

**stuff** 327:15 383:14
416:17

**subject** 332:2 347:3
348:18 353:25
354:16 361:21
403:16,22 404:4,10
416:20,22,25 417:3
420:20 429:20
440:13 443:10,19

474:21 475:5 476:11
478:2,8,17

**subordinated**
452:25 453:10,12

**subsequent** 407:11
477:4

**subsequently** 425:4

**subsidiaries** 415:3
417:19

**substance** 318:12
399:4 454:23

**substantial** 479:18

**substituted** 419:4
447:16 450:3

**suggested** 391:19

**suggesting** 396:18

**suing** 457:2 473:4,6
475:9

**summarized** 368:12

**summarizing**
360:19

**summary** 313:15
459:18

**superseded** 419:4
447:17 450:4

**supplemental** 338:9

**supplying** 334:17

**support** 336:10
360:12 370:7 391:7
431:12

**supported** 382:4

**supports** 470:24

**supposed** 289:11
376:5 392:8 395:20
431:16 461:4

**surprise** 410:24
438:17

**surprising** 311:16

**swear** 288:9

**switching** 437:24

**sworn** 288:12

**synergistic** 384:20

**systems** 397:14

---

**T**

**taking** 398:7

**talk** 303:8 304:21
305:18 328:3 366:3
414:20 475:17

**talked** 336:22 406:8
407:16 424:9

**talking** 337:16
359:10 383:17 390:5
401:14 421:24
429:23,24 441:14
442:16 443:14,15
456:5 474:18,19
477:21

**tax** 373:9 382:23,24
383:10 416:6

**tax-related** 383:14

**team** 308:16 327:14
340:8,15 343:12,16
417:7

**telling** 400:5 455:13

**temporary** 374:12,
16

**tension** 373:22,24,25

**term** 368:15,18,19,22
369:22 371:3,12,20
372:2,16 397:3
407:17,21,25 410:22
427:6 446:17 447:23
448:8 449:4 450:25
451:3,6,9,10,13,17,
25 452:8 453:21
455:3,6 461:22
462:4,14,18 463:2 467:9
473:15 475:15
477:20 478:11

**termination** 375:5

**terms** 338:18 373:10
375:16 382:20
384:15 386:7 392:10
403:7 411:18 413:6,
10 416:19 417:13,17
418:16 432:22,25
452:8 471:8

**Terrestar** 469:18,20

**testified** 288:12
351:14 352:16,22
370:9 379:15 441:25
462:8 472:20

**testify** 346:14 348:6,
14,22 349:11 354:8,
17

**testifying** 431:7
444:14

**testimony** 318:3,13
375:11 419:24 459:2
463:10 475:24

**Thedford** 320:9,11
321:14 329:15

**thereof** 310:5 431:22

**thereunder** 474:24

**thing** 324:13 336:12
362:3 389:25 426:2
436:24 452:17

**things** 292:19 304:20
312:10,12 313:11
317:4 322:8 327:25
359:14,25 360:16
373:9 403:6 428:7
435:11 445:3 468:2
469:19 470:16
471:12

**thinking** 340:17
375:16 402:3 459:3
461:18

**thinks** 351:25

**third-party** 330:24

**Thomas** 445:7

**thought** 388:4
413:23 467:25 468:3,
7 472:3

**thousand** 391:22

**thousands** 293:5

**throw** 290:9

**Thursday** 479:16
480:25 481:7,17,23
482:5

**time** 288:7 290:3,19
293:19 298:2 301:20
302:23 303:12

304:14,22,25 305:6,
23 307:15,18,25
309:8 313:5,18,24
318:7 320:12,15
324:25 326:18
329:14 330:8 334:7
337:12 338:12 341:3
342:16 344:19,20,23
346:21 350:15
353:21,22 358:11
359:9 361:2,3 367:19
378:14 379:2 387:25
389:24 390:13 392:9
393:14 395:4,10
396:17 397:6 398:16
399:23 401:13,15
406:15 411:4 413:5,
9,21 415:6,23,24
416:20 417:3 418:12,
14 419:21 424:12
438:9 439:25 440:11
442:6,14,17,18,20,22
449:21 453:20
454:14,15 466:23
470:13 472:9 476:4,
5,8,10,14,16 479:18
480:10,15 481:18,23
482:2

**timeframe** 371:14

**times** 338:20 339:15
349:22 350:4,8,11
356:15 375:8 383:23
420:2 421:20 450:16

**title** 308:18,25 313:4
323:10 325:11,16
331:5 342:8

**titled** 362:22

**titles** 311:25 312:3
325:6

**today** 290:13 291:3
294:10 295:17
296:10 298:10
300:25 301:7 303:9
304:21 305:22
308:19 309:2 314:17,
23 318:20 319:5
323:11 328:5 331:5
342:14 345:8,20,24
346:25 348:6 349:11
354:8 357:8 364:15
378:9 379:6 389:11
395:5 401:21 414:20,
22 415:12 445:5

453:4 454:9 479:5

**today's** 288:7 289:18
346:21 349:16 350:5
353:7

**told** 392:19 465:7

**top** 306:3 311:25
325:19 340:23
369:17,21

**topic** 347:6 348:11,
17 349:7

**topics** 346:9,10
353:16,17,24 354:13,
18 363:7 376:5
386:22

**total** 350:15 480:8

**track** 330:17,19,25
338:18,22,23 339:4
382:9 384:15 385:5

**tracking** 299:9

**transcript** 351:7
352:3,7

**transfer** 360:17,19

**transferred** 360:6

**transition** 363:22
392:11

**travels** 445:13

**treasurer** 309:8
310:14,18,23 311:4,
12 313:12,19 314:7,
16 316:18 317:9
318:15,21 323:15
324:3,8,17 325:25
327:9 328:6,13
343:10,11 397:24
436:21 439:25
466:21,22 467:3

**treasury** 333:25
416:4 417:22

**treated** 429:11

**trick** 358:14

**trouble** 393:11
394:22

**true** 453:15

**trued** 392:13

**trust** 289:9 401:10

Case 21-03005-sgj Doc 106-4 Filed 12/01/21 Entered 12/01/21 14:47:42 Page 71 of 71
Case 3:21-cv-00880-X Document 23 Filed 01/05/22 Page 775 of 899 PageID 1387

Index: trustee..yells

427:19 443:21

**trustee** 400:13,16,23
401:9,17,21,23 402:5
403:8,15,21 404:2
405:4 420:21 421:2,6
422:24 427:20
443:11 472:12,23
473:10,22 474:23
476:19 477:10,25

**trustees** 402:2

**trusts** 306:23 401:25

**Tuesday** 479:14

**typical** 317:16
421:25

**typically** 463:24

**U**

**UCC** 416:15

**Uh-huh** 450:12

**unable** 290:20 479:7

**unaudited** 299:11

**unaware** 431:6
455:16

**underpaid** 404:18

**understand** 289:20,
25 293:8 296:21
301:8 335:18 345:7,
19,23 354:10 358:13,
17 370:24 378:4
383:25 386:13
388:25 390:22 404:7
409:7,21 415:12
426:12 435:8 447:9
449:20,25 457:13
476:4

**understanding**
299:21 300:7 301:2
306:17 316:7,11
330:14 343:17
347:10,13 403:5
410:6 419:3 426:20
440:24 478:5

**understood** 336:19
382:4,23

**unfettered** 476:3

**unified** 384:19

**unit** 384:20 400:19

**universe** 311:19

**unrelated** 452:6

**unsecured** 416:18
451:19 453:16

**up-and-comers**
300:19

**V**

**valuation** 471:14,24

**values** 376:25

**variety** 291:19

**verbal** 336:5 381:19,
20

**versa** 308:14

**versus** 438:4 474:8

**vest** 385:4

**vice** 308:14 317:18

**video** 288:4,8 302:2
396:20 457:20

**videotape** 396:17

**view** 334:14 411:24

**viewed** 452:24
453:11

**viewing** 398:3

**virtually** 418:21

**voice** 302:4

**Volume** 288:4

**volunteer** 375:24

**W**

**wait** 355:17

**waiver** 347:17
358:22 414:7

**waives** 414:10

**waiving** 317:3

**walk** 406:3

**walked** 355:15

**wanted** 288:17

**wanting** 392:10

**Waterhouse** 301:12
302:18,25 303:5,11
304:13 305:3,13,22
309:7 310:13,18,24
311:4,11,18 312:17,
21 313:5,18,25
314:12,16,22 315:6
316:17 318:20
319:19 321:11,13
323:14 324:3,8,20
325:2,21,25 327:8
328:5,12,24 329:15
331:13 337:23
351:14,17 397:24
436:17,21 437:13
438:8 439:21,24
456:18 466:12,20

**Waterhouse's**
317:8,12 318:16
351:7

**ways** 335:2

**weather** 288:23

**Wednesday** 479:16
480:25 481:5

**week** 290:5,17
351:17 367:2 462:9
479:10 481:20

**well-capitalized**
417:19

**whatsoever** 325:8

**Wick** 364:5

**window** 423:20

**wires** 320:5

**withdrawn** 307:2
315:11 321:12
324:23 331:23 340:2
341:6 343:3 367:24
403:12 405:2,7 475:7

**withholding** 414:25
432:5

**witnesses** 480:6,11

**word** 327:22 366:21
395:3,4 415:21 458:3
460:17 462:15

476:20

**words** 291:14 297:21
343:25 430:13 474:7

**wore** 324:20

**work** 300:20 322:7
338:4 378:20 382:6
383:11 384:20
410:18 454:10

**worked** 312:6 338:20
383:6 463:16

**working** 320:18
375:17 384:19

**works** 378:17 481:23

**world** 331:17 371:18
396:25 397:15,22

**wrap** 454:12

**written** 335:17 336:2,
4,9 381:19 382:21

**wrong** 402:8

**Y**

**Yankees** 395:4,5

**year** 292:8 299:11
334:11 369:4,24
371:21 373:3,14,19
375:14 391:16,17
395:17 409:17,23
410:8 421:16 422:3
426:10 453:23 457:4
458:16 460:12
461:15 462:5,20,23

**year-end** 372:15
458:8 463:5,12

**years** 291:18 292:15
298:10,11 300:5,15
302:20 311:10
320:17 322:25
330:12 336:22
415:10 422:12,19
463:16

**yell** 396:13,15

**yelled** 396:19

**yelling** 396:11

**yells** 396:2



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 3, 2021**

**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Reorganized Debtor. | Case No. 19-34054-sgj11<br><br>Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>JAMES D. DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No. 21-03003-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03005-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff. | |

| | |
|---|---|
| v.<br><br>HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03006-sgj |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>    Plaintiff.<br><br>v.<br><br>HCRE PARTNERS, LLC (n/k/a NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST,<br><br>    Defendants. | Adversary No.: 21-03007-sgj |

## MEMORANDUM OPINION AND ORDER DENYING ARBITRATION REQUEST AND RELATED RELIEF

### I.    Introduction and Background

The four above-referenced adversary proceedings, Adversary Proceeding Nos. 21-3003, 21-3005, 21-3006, and 21-3007, started out as what seemed like simple suits by a Chapter 11 Debtor to collect on large promissory notes owed to it (collectively, the "Note Adversary Proceedings"). The court held a hearing on November 9, 2021 ("Hearing") on various motions filed by certain defendants in the Note Adversary Proceedings. This Memorandum Opinion and Order addresses certain motions to compel arbitration and to stay these Note Adversary Proceedings while arbitration would be proceeding.[1] For the reasons set forth below, the court will not compel arbitration or stay these Note Adversary Proceedings.

The Note Adversary Proceedings were originally brought many months ago by Plaintiff Highland Capital Management L.P., now a reorganized debtor ("Highland" or "Reorganized Debtor"), again, as simple suits on notes—that is, alleging breach of contract and seeking turnover of amounts owed from the various obligors under the notes (the "Note Obligor Defendants"). Each Note Obligor Defendant was closely related to Highland's former president, James Dondero ("Mr. Dondero),[2] and collectively borrowed tens of millions of dollars from Highland prepetition. The

---

[1] Certain defendants herein earlier filed a motion to withdraw the reference in these Note Adversary Proceedings (arguing that the claims were statutory noncore claims or that the bankruptcy court otherwise did not have Constitutional authority to enter final orders). The District Court accepted the bankruptcy court's report and recommendation that the reference should be withdrawn when these Note Adversary Proceedings are trial-ready with the bankruptcy court acting essentially in the position of a magistrate judge for the District Court prior to trial, presiding over all pretrial matters.

[2] In fact, Mr. Dondero personally was an obligor on three notes.

indebtedness was memorialized in a series of demand and term notes. The indebtedness represented by those notes remains unpaid.

The Note Adversary Proceedings morphed, so to speak, when the Note Obligor Defendants defended the Note Adversary Proceedings by alleging that an oral agreement existed such that the underlying notes would be forgiven by Highland as compensation to Highland's former president, Mr. Dondero, if certain conditions subsequent occurred. The oral agreement was allegedly made on behalf of Highland, acting through one of its largest limited partners, Dugaboy Investment Trust ("Dugaboy"), which is a family trust of Mr. Dondero, on which the trustee is his sister Nancy Dondero ("Ms. Dondero").

When this "oral agreement" defense was articulated, this court granted Highland's request for leave to amend its original complaints in each of the Note Adversary Proceedings to allege alternative theories of liability and add Mr. Dondero,[3] Dugaboy, and Ms. Dondero as additional defendants on new counts—the theories being that, if such an oral agreement was made, it may have given rise other causes of action on the part of the actors involved. Highland amended its complaints in each of the Note Adversary Proceedings, adding new Counts III, IV, V, VI, and VII alleging, among other things, fraudulent transfers (Counts III and IV), declaratory judgment as to certain provisions of Highland's limited partnership agreement (Count V), breach of fiduciary duty (Count VI), and aiding and abetting breach of fiduciary duty (Count VII) (the "Amended Complaints").

Presently before the court are a set of virtually identical motions filed by Mr. Dondero, Dugaboy, and Ms. Dondero in each of the four Note Adversary Proceedings seeking to compel arbitration as to Counts V, VI, and VII of, and stay litigation altogether in, the Note Adversary Proceedings, pending the arbitration of Counts V, VI, and VII (the *Motion to Compel Arbitration and Stay Litigation* [Doc. 85, 66, 74, and 65, respectively, in each sequentially-numbered Note Adversary Proceeding[4]], the "Arbitration Motions"). Highland timely filed objections to the motions [Doc. 92, 76, 81, and 77] and replies were filed by Mr. Dondero, Dugaboy and Ms. Dondero [Doc. 107, 88, 93, and 88].[5]

As set forth below, Mr. Dondero, Dugaboy, and Ms. Dondero (hereinafter the "Dondero/Dugaboy Defendants") rely on a mandatory arbitration clause in Highland's Limited Partnership Agreement as the basis for their arbitration request. To be clear, there are no arbitration clauses in the underlying promissory notes. And the Note Obligor Defendants are not seeking arbitration of the breach of contract claims, turnover claims, or fraudulent transfer claims. It is

---

[3] Mr. Dondero was actually already a Note Obligor Defendant in Adv. Proc. No. 21-3003, as he as an obligor on three notes.

[4] All subsequent "Doc." references in this Memorandum Opinion and Order follow this convention.

[5] The court considered these replies despite the lateness of their filing, less than two business days before the Hearing. At the Hearing, Highland noted its displeasure with these replies being filed 37 days after Highland filed its objections but did expressly did not ask the court to strike the replies. The court reminds the parties, as Highland correctly pointed out, that the Local Civil Rules for the Northern District of Texas, and not the Local Bankruptcy Rules, apply to these adversary proceedings in all respects, since the reference to the Bankruptcy Court was withdrawn and this court is conducting all proceedings in the position of a magistrate judge for the District Court. The replies here were required to be filed no later than 14 days following the filing of Highland's objections. *See* Local Civil Rule 7.1(f).

APP 776

only the Dondero/Dugaboy Defendants seeking arbitration as to Count V (seeking declaratory judgment as to provisions of the Highland limited partnership agreement) and Counts VI and VII (the fiduciary duty claims). The court denies the Arbitration Motions for the reasons stated below.

## II.    The Agreement Containing the Arbitration Clause

First, a word about what is and is not in dispute regarding the Arbitration Motions. The parties agree that Highland's *Fourth Amended and Restated Agreement of Limited Partnership* (the "LPA")[6] contained Section 6.14, a typical mandatory arbitration provision that requires parties to the LPA to arbitrate certain disputes under certain circumstances (the "Arbitration Clause"):

> In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act …

The Arbitration Clause also significantly limited discovery that could occur in arbitration:

> The discovery process shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each, each deposition to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admissions; (v) ten request for production (in response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents, including electronic documents); and (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure.

***The parties further agree that the LPA, as an executory contract, was rejected under 11 U.S.C. § 365 in connection with the court's order confirming Highland's plan of reorganization in February 2021.***

The Dondero/Dugaboy Defendants acknowledge that Counts I–IV of the Amended Complaints (Breach of Contract; Turnover; Fraudulent Transfers under 11 U.S.C. § 548; and Fraudulent Transfers under 11 U.S.C. § 544 and the Texas Uniform Fraudulent Transfer Act) are not subject to the Arbitration Clause.

The Dondero/Dugaboy Defendants argue in the Arbitration Motions, however, that Counts V, VI, and VII of the Amended Complaints (seeking a declaratory judgment as to provisions of LPA and claiming breach of fiduciary duty and aiding and abetting of breach of fiduciary duty—

---

[6] The LPA was executed by Highland's then-general partner, Strand Advisors, Inc., through the individual James Dondero, who was also then Highland's CEO and Highland's majority limited partner, The Dugaboy Investment Trust, James Dondero's family trust, through its trustee, the individual Nancy Dondero, James Dondero's sister. (Various other limited partners also signed the LPA, but they are not Note Obligor Defendants.) The "oral agreement" defense alleges that The Dugaboy Investment Trust, through Nancy Dondero as trustee, as the holder of a Majority Interest (as defined in the LPA), entered into oral agreements on behalf of Highland with James Dondero to forgive the demand notes at the center of these Note Adversary Proceedings if certain conditions subsequent were met.

4

all counts that, notably, Highland only added after the Note Obligor Defendants articulated their "oral agreement" defense) *are* subject to the Arbitration Clause. Highland counters that: (a) the rejection of the LPA excuses Highland from being forced to submit to mandatory arbitration of Counts V, VI, and VII; (b) the Dondero/Dugaboy Defendants have waived the Arbitration Clause by not invoking it at any earlier point in these Note Adversary Proceedings; and (c) the Dondero/Dugaboy Defendants should be judicially estopped from invoking the Arbitration Clause now. Highland also argues that arbitration of some but not all the counts of the Amended Complaints would be inefficient and wasteful, and that any stay of proceedings in this court would do a disservice to the resolution of the admittedly non-arbitrable issues in Counts I–IV.

### III. The Significance of the Rejection of the Executory Contract (*i.e.*, the LPA) that Contained the Arbitration Clause

The court acknowledges that there is a wealth of federal case law dictating the strong federal policy undergirding the Federal Arbitration Act ("**FAA**"). *See, e.g., Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983) (describing the FAA as "a congressional declaration of a liberal federal policy favoring arbitration agreements"). The FAA was enacted by Congress in 1925 and became effective in 1926. It is codified at Title 9 of the United States Code and is predicated upon Congress's exercise of the Commerce Clause powers granted in the Constitution. The FAA contemplates the judiciary's respect for and enforcement of private parties' agreements to resolve disputes through arbitration. The FAA provides:

> A written provision in … a contract … to settle by arbitration a controversy thereafter arising out of such contract … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[7]

Thus, arbitration, pursuant to the FAA, is entirely a matter of contract. And, where a contract contains a provision in which parties agreed to submit future disputes thereunder to arbitration, these provisions should be enforced according to their terms. Section 4 of the FAA specifically directs a court to order parties to arbitrate upon a request by a party that is entitled to demand arbitration in a written contract. The courts have often stated that the FAA reflects a liberal federal policy favoring arbitration and requires arbitration agreements to be rigorously enforced according to their terms.[8]

The court also notes that some courts have grappled with whether a bankruptcy court needs to treat an arbitration provision in a contract any "less mandatory" than other courts. After all, bankruptcy cases are not like other lawsuits; they are multi-faceted, multi-party, and fast-moving. It has often been stated that the underlying purposes of the Bankruptcy Code are to: (a) provide debtors and creditors with orderly and effective administration of bankruptcy estates; and (b) *centralize disputes over debtors' assets and obligations in one forum*. But there is *no* "bankruptcy exception" to an arbitration agreement *per se*—not in any statute and not according

---

[7] 9 U.S.C. § 2.

[8] *See AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011) (citations omitted).

APP 778

to any court so far. Some courts have opined or suggested that a bankruptcy court, when presiding over a proceeding involving "non-core" disputes pursuant to 28 U.S.C. § 157(b)—*i.e.,* disputes that are merely related to a bankruptcy case and would have been litigated elsewhere but for the broad nexus created by the debtor's bankruptcy filing—*generally* must abstain from adjudication and direct the parties to arbitration when presented with an applicable arbitration provision.[9] But when a bankruptcy court is presented with a "core" dispute—*i.e.,* one which derives from the provisions of the Bankruptcy Code—it *may* be permissible for the bankruptcy court to decline to order arbitration; after determining that "core" disputes are involved, courts tend to employ a framework for analysis derived from a nonbankruptcy Supreme Court case called *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220 (1987). In a nutshell, the *McMahon* Court held that a party seeking to avoid arbitration pursuant to an otherwise applicable agreement must show that Congress—in enacting whatever statute is involved (*i.e.,* the Bankruptcy Code) intended to preclude arbitration and that intent must be deducible from: (1) the statute's text; (2) its legislative history; or (3) "an inherent conflict between arbitration and the statute's underlying purposes."[10] Thus, courts—after finding "core" disputes are involved—tend to plow down a complicated trail of considering whether there is an "inherent conflict" between arbitration and the Bankruptcy Code in whatever dispute happens to be before the court.

The Fifth Circuit has addressed the topic of enforceability of arbitration clauses in bankruptcy in the cases of *In re Gandy* and *In re Nat'l Gypsum*.[11] In those cases, the Fifth Circuit instructed that a bankruptcy court may refuse to enforce arbitration clauses and may itself adjudicate a dispute when it finds that: (a) a matter is core or derives from rights under the Bankruptcy Code; *and* (b) enforcement of the arbitration provision would irreconcilably conflict with the purposes or goals of the Bankruptcy Code.[12]

While this is all somewhat enlightening, a slightly different argument is presented to this court by Highland in its argument that the bankruptcy court should not compel arbitration. Highland does not deny the existence of any of the above case law nor the fact that Counts V, VI, and VII involve non-core matters that do not derive from rights under the Bankruptcy Code. Rather, Highland argues, these Note Adversary Proceedings present a circumstance that very few courts have addressed. ***The LPA (or at least the Arbitration Clause) was an executory contract that Highland rejected in its confirmed Chapter 11 plan.*** As noted above, no one disputes that the LPA was rejected pursuant to Bankruptcy Code section 365. The result, argues Highland, is

---

[9] At least one court has suggested that there is a "presumption in favor of arbitration [that] usually trumps the lesser interest of bankruptcy courts in adjudicating non-core proceedings." *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006). *But see Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 885 F.2d 1149, 1156-1158 (3d Cir. 1989) (determining there is no discretion to deny arbitration in non-core matters). *See also Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 496 (5th Cir. 2002) ("it is generally accepted that a bankruptcy court has no discretion to refuse to compel the arbitration of matters not involving 'core' bankruptcy proceedings under 28 U.S.C. § 157(b)"); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997) (same).

[10] *McMahon*, 482 U.S. at 227.

[11] *Gandy*, 299 F.3d at 489; *Nat'l Gypsum Co.*, 118 F.3d at 1056.

[12] *In re Nat'l Gypsum Co.*, 118 F.3d at 1068-69.

APP 779

that Highland is no longer bound by the LPA's provisions that impose **specific performance** obligations on it—provisions such as the Arbitration Clause.  A counterparty to a rejected executory contract can merely seek monetary damages, Highland argues, but it cannot force a debtor to **perform** under a rejected executory contract.

Highland's argument finds support in a both lengthy and well-reasoned opinion by District Judge David Godbey of this District — *Janvey v. Alguire*, 2014 U.S. Dist. LEXIS 193394 (N.D. Tex. Jul. 20, 2014), *aff'd on different grounds* at 847 F.3d 231 (5th Cir. 2017), dealing with federal receiverships (in which the court made analogies to the bankruptcy process)—as well as in an old law review article written by renowned University of Texas Law School Professor Jay Westbrook (often considered the modern-day expert on executory contracts in bankruptcy).  *See* Jay Westbrook, *The Coming Encounter: International Arbitration and Bankruptcy*, 67 UNIV. OF MINN. LAW SCHOOL 595 (1983).

The *Janvey* opinion arose in the context of a federal receivership commenced at the request of the Securities and Exchange Commission in response to the massive R. Allen Stanford Ponzi scheme.  Ralph S. Janvey was the receiver ("Receiver") who took possession of all receivership assets and records.  Pursuant to those powers, the Receiver filed suit against former employees (the "Employee Defendants") who previously worked in various capacities for the Stanford enterprises ("Stanford Entities") and received salary, commissions, bonuses, or later forgiven loans from the Stanford Entities.  The Receiver's suit alleged that the Employee Defendants received fraudulent transfers in violation of the Texas Uniform Fraudulent Transfer Act (TUFTA) or, in the alternative, were unjustly enriched at the expense of the creditors of the Receivership Estate.  Some of the Employee Defendants filed motions to compel arbitration.  According to a later Fifth Circuit opinion, the arbitration agreements were contained in: (1) promissory notes between the Employee Defendants and the company that governed the upfront loan payments that the company awarded to the Employee Defendants when they joined Stanford; (2) the broker-dealer forms that the company submitted to the Financial Industry Regulation Authority (FINRA) when registering the Employee Defendants as brokers; (3) FINRA's internal rules governing disputes between brokers and their employers; and (4) the company's Performance Appreciation Rights plan.  The arbitration clauses provided that "any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, bylaws, rules and regulations of the National Association of Securities Dealers (NASD)." *Janvey v. Alguire*, 847 F.3d 231, 237 (5th Cir. 2017).

The issue of whether arbitration was required went back and forth between Judge Godbey and the Fifth Circuit and, ultimately, the precise issue pending before Judge Godbey was whether to deny or grant the motions to compel arbitration based on the question of "whether the Receiver is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities."

 Judge Godbey declined to order arbitration because the Receiver had not adopted the arbitration agreements at issue and because arbitration of the Receiver's claims would frustrate a central purpose of federal equity receiverships.  Judge Godbey noted that, before a general requirement to arbitrate exists, a party must first be bound to an arbitration agreement — either as a signatory or through a principle of law or equity.  Judge Godbey stated that discussions of

possible exceptions to this general requirement to arbitrate, like *McMahon*'s contrary congressional command, ***are only necessary after such an initial determination***.  Judge Godbey opined that equity receivers, as non-signatories to an arbitration agreement, can, in fact, be bound to the arbitration agreement to the same extent receivership entities would be bound.  But there remained a significant resultant question: whether the Employee Defendants' arbitration agreements were contracts that the Receiver could ***reject***, "an ability that has deep historical roots for both federal equity receivers and bankruptcy trustees and that continues to be an important tool for both."

Applying Professor Vern Countryman's material breach test, Judge Godbey concluded that arbitration agreements must be analyzed as separate executory contracts, based on the nature of the agreement as well as arbitration caselaw regarding severability.  Citing Professor Westbrook, he noted that, "'[v]iewed as an independent contractual obligation of the parties, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought.' *Westbrook*, *supra note 26, at 623* (footnote omitted).  Furthermore, the appropriate remedy in this circumstance cannot be for the Court to require specific performance by the trustee — *i.e.,* to compel arbitration — because 'injured part[ies] cannot insist on specific performance by the trustee.' *See id. at 619* (collecting cases)." *Janvey*, 2014 U.S. Dist. LEXIS 193394 at *113.

Judge Godbey went on to opine that the Receiver had rejected the arbitration agreement, that the rejection was proper, and that the Receiver was not bound to arbitrate—further noting that if the court required the Receiver to adopt the arbitration agreements, it would greatly burden and deplete the receivership estate.  Such a result, weighed in the balance, would be unjust and inequitable.

The Fifth Circuit ultimately affirmed, 847 F.3d 231 (5th Cir. 2017), but applied a different analysis.  It determined that the Stanford entity in whose shoes the Receiver had stepped, for purposes of bringing the TUFTA claims (*i.e.,* Stanford International Bank), was not a signatory to the arbitration agreements and was not otherwise bound by them.  The Fifth Circuit also determined that, with regard to one Employee Defendant (Giusti) who stood in a unique position (in that there was an arbitration agreement that the Receiver's predecessor was party to and bound), that Giusti waived the right to arbitrate by substantially invoking the judicial process (through the filing of a motion to dismiss, an answer, serving written discovery and answering discovery— which had caused delay and expense).  As for Judge Godbey's "broader policy argument" that the federal receivership statutes were at odds with the FAA's mandate in favor of arbitration, noting that these were "important concerns," the Fifth Circuit stated that "we are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court." *Id.* at 245.  But the Fifth Circuit did not otherwise address the arguments.

While the *Janvey* case involved a federal receiver, Judge Godbey looked almost entirely to bankruptcy law and to Bankruptcy Code section 365 to reach his ruling. This court finds *Janvey* to be persuasive (and possibly binding) on this court.  Moreover, just as a federal receiver is analogous to a bankruptcy trustee, a debtor-in-possession is, of course, statutorily the same as a bankruptcy trustee. *See, e.g.,* 11 U.S.C. § 1107.

To be clear, if a bankruptcy trustee rejects an executory contract, the rejection, of course, constitutes a breach of the contract and subjects the estate to a claim for money damages on behalf of the injured party. 11 U.S.C. § 365(g). Significantly, however, *the injured party cannot insist on specific performance by the trustee. See* Westbrook, *The Coming Encounter,* at 619 (and numerous cases cited therein). Instead, the injured party is treated as having a prepetition claim for damages arising as if the breach occurred immediately before the filing of the bankruptcy petition. Professor Westbrook notes that the issue then becomes whether such a prepetition claim, including a claim arising from rejection, must be liquidated pursuant to the arbitration clause. *Most jurisprudence in the bankruptcy context dealing with arbitration clauses does not analyze this as a traditional executory contract conundrum*. And yet, to use Professor Westbrook's words, an arbitration agreement is a classic executory contract, since neither side has substantially performed the arbitration agreement at the time enforcement is sought. *Id.* at 623. And although "arbitration survives the contract" *as a matter of contract law*, "executory obligations may be avoided by the trustee as a matter of bankruptcy law through the exercise of the trustee's power to reject executory contracts." *Id.* "If specific performance is not available against a trustee, it follows that an arbitration agreement is like any other executory contract which the trustee may reject." *Id.* at 624.

The *Janvey* decision is not the only case to have addressed the effect of rejection on the viability of an arbitration clause within a rejected executory contract. The Dondero/Dugaboy Defendants cite the court to *In re Fleming Companies, Inc.,* 325 B.R. 687 (Bankr. D. Del. 2005), a case from another bankruptcy court that predates *Janvey* by almost a decade, for the proposition that rejection of an executory contract does not prevent a party from invoking an arbitration clause in that contract. With due respect, the court believes the reasoning in *Janvey* to be more persuasive than the bankruptcy court's in *Fleming Cos.* (and *Janvey* is potentially binding precedent on this court). It also bears noting that it was the debtor in *Fleming Cos.,* not the executory contract's counterparty, who was invoking the arbitration clause in the contract the debtor had previously rejected. That distinction is not without significance.

In summary, this court accepts Highland's argument that the LPA was an executory contract duly rejected pursuant to Bankruptcy Code section 365, and that the Arbitration Clause should likewise be considered a separate executory agreement that was rejected. Accordingly, Highland cannot be forced to specifically perform under the Arbitration Clause or the LPA by mandatorily participating in arbitration of Counts V, VI, and VII. The court defers to the compelling reasoning of Judge Godbey in *Janvey* on this point. The court, like Judge Godbey, also finds as a matter of fact that requiring arbitration in this case would impose undue and unwarranted burdens and expenses on the parties to the detriment of Highland's creditors.

## IV.     Waiver

Even if this court is in error in determining that the Arbitration Clause is no longer binding on Highland because it was rejected pursuant to Bankruptcy Code section 365, the court finds as a matter fact that the Dondero/Dugaboy Defendants have waived any right to invoke the Arbitration Clause. The court has taken judicial notice of its own docket, both in these Note Adversary Proceedings and in the administrative Chapter 11 case, and has considered the entire

9

record of both proceedings, as well as the *Declaration of John A. Morris in Support of Debtor's Objection to Motion to Compel Arbitration and Stay Litigation* [Doc. 94, 78, 83, and 78], and the exhibits annexed thereto, in making the following findings of fact.

The Note Adversary Proceedings were filed in January 2021 (after Highland earlier made demands on the Note Obligor Defendants or otherwise declared events of default). One of the Note Obligor Defendants (Mr. Dondero) timely answered, pleading an affirmative defense that Highland agreed not collect on the underlying notes—but that answer contained nothing more specific than this, nor any mention of arbitration. Amended Answers were later filed by the Note Obligor Defendants, elaborating on and/or adopting the affirmative defense that, through the oral agreement, Highland agreed to forgive the obligations under the notes as compensation to Mr. Dondero "upon fulfillment of conditions precedent." Roughly 90 days after the filing of the Note Adversary Proceedings, the Note Obligor Defendants filed motions to withdraw the reference, which this court spent significant time addressing in making a report and recommendation to the District Court in each Note Adversary Proceeding. No mention of arbitration was made to this court during those proceedings. During a hearing before the court on June 10, 2021, Highland announced its intention to add claims against the Dondero/Dugaboy Defendants for breach of fiduciary duty, yet the issue of arbitration was not raised at that point, or a month later when the Dondero/Dugaboy Defendants received a draft of the Amended Complaint adding Counts V, VI, and VII. Pursuant to the parties' agreement, Highland filed that Amended Complaint on August 27, 2021, as the Dondero/Dugaboy Defendants' "oral agreement" defense became clearer. Only on September 1, 2021, did the Dondero/Dugaboy Defendants file their Arbitration Motions and raise the issue of arbitration under the Arbitration Clause for the first time in these proceedings, more than seven months after the litigation began. At the same time, the Dondero/Dugaboy Defendants also pursued extensive discovery, seeking and obtaining responses to interrogatories and documents requests in scope and number ***significantly more than the Arbitration Clause permitted***, all in accordance with pre-trial stipulations the defendants both negotiated with Highland and then asked this court to approve, which the court did.

Although courts in the Fifth Circuit sometimes apply a presumption against waiver of an arbitration right, the right can certainly be waived. [13] "Waiver will be found when the party seeking arbitration substantially invokes the judicial process to the detriment or prejudice of the other party." [14] In this context, prejudice "refers to the inherent unfairness—in terms of delay, expense, or damage to a party's legal position—that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue.'" [15] A party waives arbitration when it "'engage[s] in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration.'" [16]

---

[13] *Williams v. Cigna Fin. Advisors, Inc.,* 56 F.3d 656, 661 (5th Cir. 1995).

[14] *Miller Brewing Co. v. Fort Worth Distrib. Co.,* 781 F.2d 494, 497 (5th Cir. 1986).

[15] *Subway Equip. Leasing Corp. v. Forte,* 169 F.3d 324, 327 (5th Cir. 1999) (quoting *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 134 (2d Cir. 1997)).

[16] *Keytrade USA v. Ain Temouchent M/V,* 404 F.3d 891, 897 (5th Cir. 2005) (quoting *Republic Ins. Co. v. PAICO Receivables, LLC,* 383 F.3d 341, 344 (5th Cir. 2004)). *See also Price v. Drexel Burnham Lambert, Inc.,* 791 F.2d

While every situation is unique, here the court finds that the Dondero/Dugaboy Defendants waived their right (if any still remained) to demand arbitration, due to their multiple answers, their motions to withdraw the reference, extensive discovery that far exceeded what the Arbitration Clause permitted, and complete silence about the possibility of arbitration for more than eight months. Even though Counts V, VI, and VII were not added by Highland until more than seven months after the Note Adversary Proceedings were filed, the Dondero/Dugaboy Defendants had reason to know that their "oral agreement" affirmative defense might implicate the LPA and the Arbitration Clause, and yet they didn't raise the subject of arbitration until many months of litigation activity in the Note Adversary Proceedings had occurred in this court.[17] The resulting delay and expense warrant this court's applying waiver as permitted by the Fifth Circuit authority cited above. This court finds as a matter of fact that the Dondero/Dugaboy Defendants waived the relief they seek in the Arbitration Motions.

## V.    Judicial Estoppel, Waste and Inefficiency

Highland also asked the court: (a) to judicially estop the Dondero/Dugaboy Defendants from arguing entitlement to arbitration in light of prior contradictory positions these defendants took in earlier pleadings and arguments before this court, and (b) to decline to order arbitration because of the waste and inefficiency arbitration would represent for these proceedings. Because the court rules that rejection of the Arbitration Clause precludes Highland's being forced to submit to arbitration, and because the court finds that the Dondero/Dugaboy Defendants waived the relief they sought in the Arbitration Motions, the court need not and does not address Highland's arguments pertaining to judicial estoppel or the practical implications of ordering arbitration.

## VI.    Stay of Counts I–IV

Finally, because the court denies the arbitration requested in the Arbitration Motions, there is no good cause to stay litigation in the entire Note Adversary Proceedings. Even if the court has erred in its ruling on the Arbitration Motions, there still exists no good cause to stay the Note Adversary Proceeding as to Counts I-IV. The Dondero/Dugaboy Defendants acknowledge that Counts I-IV are non-arbitrable claims and, moreover, in the event Plaintiff were to prevail on them, it is likely that Plaintiff would not even pursue Counts V–VII. To clarify, if Plaintiff prevails on Counts I and II (*i.e.,* the breach of contract claims and turnover)—which would involve a finding that there was no oral agreement for nonpayment—then all other counts would become moot. And, if the court were to find that there *were* such an agreement, Plaintiff could potentially still prevail on Counts III and IV (the claims that such an agreement would constitute a fraudulent transfer—also non-arbitrable). It would seem that only if Plaintiff loses on all of these non-arbitrable claims would it have any interest in pursuing Counts V-VII (*i.e.,* an interest in arguing that the oral agreements amounted to breach of fiduciary duty and aiding and abetting breach of fiduciary duty).

---

1156, 1162 (5th Cir. 1986) (party waived arbitration because it "initiated extensive discovery, answered twice, filed motions to dismiss and for summary judgment, filed and obtained two extensions of pre-trial deadlines, all without demanding arbitration").

[17] The court notes that all Note Obligor Defendants consist of either Mr. Dondero or entities he controls.

The requested stay would also be illogical in this context. The "oral agreement" defense relies on the existence of an oral contract between Highland (via Dugaboy, through its trustee, Ms. Dondero) and Mr. Dondero. The existence of that contract is ***not*** an arbitrable issue. The implications of that contract's existence are what would potentially be arbitrable. If litigation on Counts I–IV demonstrates that there was no such "oral agreement," then there would be nothing to arbitrate because Counts V–VII would be rendered moot. Staying the litigated determination regarding the existence of the "oral agreement" in favor of arbitrating issues that only arise if there ever were such an agreement strikes the court as backwards. Arbitration should await that determination, not the other way around.

Accordingly, the Dondero/Dugaboy Defendants' requests to stay the Note Adversary Proceedings have no merit and are denied.

## ORDER

For the reasons stated in the above Memorandum Opinion and Order, the Arbitration Motions and Stay Motions related thereto are DENIED.

*### End of Order ###*

APP 785

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email: drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

**REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION
TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES**

TO THE HONORABLE STACEY G.C. JERNIGAN, U.S. BANKRUPTCY JUDGE:

COMES NOW NexPoint Advisors, L.P. ("NexPoint"), one of the defendants in the above

styled and numbered Adversary Proceeding initiated by Highland Capital Management, L.P. as

the plaintiff (the "Debtor"), and files this its *Reply* (the "Reply") in support of its *Motion to Extend*

*Expert Disclosure and Discovery Deadlines* (the "Motion"), and replying to the *Objection to*

*Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery*

*Deadlines* (the "Objection"), filed by the Debtor, respectfully stating as follows:

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 1

APP 786

## I.     <u>SUMMARY</u>

1.      The Shared Services Agreement required the Debtor to assist and *advise* with payments, including on notes.  That is in the contract.  The Debtor's former CFO confirmed it.  The Shared Services Agreement contains a standard of care that the Debtor had to follow.  That is also in the contract.  And the Fifth Circuit confirms that expert testimony is appropriate, and potentially *required*, when the standard of care is not obvious.  Here, it was obvious until it wasn't.  Before Mr. Waterhouse's deposition, the standard of care was not at issue *per se*.  The Defendant simply alleged the Debtor was obligated to facilitate the December payment but did not.  That came down to simple contract interpretation.  No expert was needed because any lay juror could understand that the Debtor breached its duties by doing nothing to facilitate the payment.  But things changed after Mr. Waterhouse's testimony in late October, when he testified that Mr. Dondero allegedly *told* him not to pay this note.  The question then became what the Debtor was obligated to do next under the contractual standard of care.  The answer is not obvious.  And it is the type of issue on which a jury could only benefit from expert opinion testimony.  This is precisely the type of case where the Fifth Circuit finds expert testimony appropriate, if not required.  Nor is there prejudice to the Debtor: there is no trial setting, the Debtor can contest the admission of the expert's testimony and present its own rebuttal, and, if the Debtor prevails, it also can also seek to recover all collection costs.

## II.     <u>THE EXPERT TESTIMONY IS APPROPRIATE</u>

2.      The Shared Services Agreement, in place during November and December, 2020, provides as follows:

Section 6.01.  <u>Standard of Care</u>.  Except as otherwise expressly provided herein, each Covered Person shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  To the extent not

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 2

APP 787

inconsistent with the foregoing, each Covered Person shall follow its customary standards, policies, and procedures in performing its duties hereunder.

*See* Rukavina Declaration, Exh. A at § 6.01.

3.      "Covered Person" includes the "Staff and Services Provider," *i.e.* the Debtor, and its managers, directors, officers, and shareholders.  *See id.* at p 2.  There can be no dispute that section 6.01 applied to the Debtor itself, to Mr. Waterhouse, and to the other employees involved (David Kloss, the controller, and Kristin Hendrix, the senior accountant).

4.      The Debtor argues that section 6.01 applies only to duties specifically set forth in the Shared Services Agreement, and that the duty to facilitate payments on NexPoint's behalf is not among those duties.  This argument is wrong.  The Shared Services Agreement identifies at least three services that the Debtor was required to provide that are directly on point:

(a)      *Back- and Middle Office*.  Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, <u>payments</u>, operation, book keeping, cash management . . . accounts payable . . .

(k)      *Ancillary Services*.  Assistance and advice on all things ancillary or incidental to the foregoing.

(l)      *Other*.  Assistance and advice relating to such other back- and middle-office services in connection with the day-to-day business of [NexPoint] as [NexPoint] and [the Debtor] may from time to time agree.

*See id.* at § 2.02 (emphasis added).

5.      Assistance and advice—again, *advice*—with respect to "payments" is expressly included.  And, should there be any doubt, the Debtor's own Chief Financial Officer at the time confirmed that it was "reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note."  *See* Rukavina Declaration at Exh. C, 337:22-338:8.  That is why NexPoint was paying millions of dollars to the Debtor, to assist and *advise* NexPoint with respect to NexPoint's payment obligations.  Advice would include advising NexPoint of the consequences of a potential default, especially given the

Debtor's conflict-of-interest at the time between being NexPoint's creditor as well as its accounting, payment, and legal professional. This is especially the case if Mr. Dondero in fact instructed Mr. Waterhouse not to make the payment on the belief that the payment was not due, or would be netted against NexPoint's overpayments to the Debtor.

6. Next, the Debtor argues that expert testimony is not proper on the scope of a party's legal duty, because that is a legal conclusion for the Court. NexPoint agrees. The Debtor also argues that whether the Debtor owed or breached a legal duty is for the jury to decide. NexPoint agrees in part: whether duties are *breached* is an issue for the jury; not whether duties were owed. *See Askanese v. Fajto*, 130 F.3d 657, 673 (5th Cir. 1997). None of these issues are present here: the Court will construe the Shared Services Agreement as a matter of law; that agreement contains section 6.01, and the Court will construe that section. But, the standard of care in that section is:

> the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

*See* Rukavina Declaration, Exh. A at § 6.01.

7. The issue is simple: if the jury finds that Mr. Dondero did in fact instruct Mr. Waterhouse not to make the payment, then did the Debtor fail to act with "the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" by failing to do anything to advise NexPoint as to the consequences of a default, failing to confirm that Mr. Waterhouse correctly understood the instruction, or not even trying to dissuade Mr. Dondero from his alleged instruction? As simple as this issue appears to sophisticated bankruptcy professionals, it is not one a lay juror could resolve from personal experience or common sense.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 4

APP 789

8.      "Expert testimony is generally <u>required</u> to prove the applicable standard of care."

*Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003) (emphasis added); *Streber v. Hunter*,

221 F.3d 701, 724 (5th Cir. 2000) ("Breach of the standard of care must generally be proven by

expert testimony"). [E]xpert testimony is <u>necessary</u> to establish the standard of care . . . Similarly,

breach of a fiduciary duty or a conflict of interest <u>requires</u> proof of expert testimony." *Geiserman*

*v. MacDonald*, 893 F.2d 787, 793-94 (5th Cir. 1990) (internal quotations removed) (emphasis

added).  An expert is appropriate, and potentially needed, for the jury to understand whether the

Debtor employed "the care, skill, prudence and diligence under the circumstances then prevailing

that a prudent person acting in a like capacity and familiar with such matters would use in the

conduct of an enterprise of a like character and with like aims."  That should not be a controversial

proposition.

9.      The Debtor cites the Fifth Circuit's opinion in *Askanese v. Fajto* as support for its

argument.  130 F.3d 657 (5th Cir. 1997).  In that opinion, the Fifth Circuit affirmed the exclusion

of an expert because "[i]t is not for [the expert] to tell the trier of fact what to decide."  *Id*. at 1997.

Here, NexPoint's expert would not be telling the jury what to decide; only whether, in his opinion,

the Debtor's actions and inactions breached the duties as otherwise specified in the Shared Services

Agreement and construed by the Court.  The Debtor would have the ability to have a rebuttal

expert, and the jury would be free to disregard the expert's testimony.  NexPoint's expert would

not be telling the jury how to decide, only his opinion as to whether the standard of care as specified

in the agreement and construed by the Court was met.  Conversely, if NexPoint's lay witnesses

purported to present evidence on these duties at trial, the Debtor would certainly object to any such

evidence because it would *not* be expert testimony.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 5

APP 790

### III.    REPLY REGARDING "GOOD CAUSE"

**A.    NEXPOINT'S NEED AND GOOD CAUSE FOR LEAVE**

10.    The Debtor argues that NexPoint seeks leave because the testimony of its witness, Mr. Waterhouse, allegedly did not go well.  But the Debtor takes some liberties in its argument. For one thing, Mr. Waterhouse is not one of NexPoint's witnesses.  In fact, the Debtor took his deposition and he is not NexPoint's witness.  Also, his deposition did not go badly for NexPoint. On the contrary, other than his unexpected testimony regarding Mr. Dondero's alleged instruction not to pay the note, his testimony was not harmful to NexPoint and was, objectively, neither helpful nor harmful to either side.  The Debtor makes these wrong allegations solely to shoehorn its argument into a case that it cites.  *See* Objection at ¶ 43.

11.    But the more pertinent objection is that, as NexPoint has always argued that the Debtor caused the alleged default, NexPoint should have retained an expert months ago: "[i]If NexPoint wanted to offer 'expert testimony' concerning Highland's duties under the SSA, it had nine months to do so, and Mr. Waterhouse's testimony, expected or not, does nothing to change that." Objection at ¶ 44.  This argument is wrong as a matter of Fifth Circuit law.

12.    Prior to Mr. Waterhouse's deposition, NexPoint did not know that Mr. Dondero allegedly instructed Mr. Waterhouse not to make the payment.  NexPoint understood that the Debtor's employees simply dropped the ball on ensuring that the payment was made.  Under those facts, expert testimony would not have been needed because anyone, using common sense, can determine whether the Debtor in that case breached it duties.  But the situation changed when Mr. Waterhouse gave his deposition testimony because, if the jury believes that Mr. Dondero gave the instruction, now the situation is much more complicated; *i.e.* whether, in light of such an alleged instruction, the Debtor nevertheless breached its duties.  This important distinction has been aptly explained by the Fifth Circuit in a case where the issue was whether a trustee breached his duties:

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 6

APP 791

Finders of fact are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn.  Accordingly, we have explained that, as a general rule, expert testimony is not needed in many if not most cases. Moreover, although expert testimony may be necessary in a professional negligence case to establish the standard of care for the industry, an exception applies in instances of negligence that are a matter of common knowledge comprehensible to laymen.

Although Liberty Mutual contends that expert testimony was required in this case, Lamesa suggests that inasmuch as the Trustee failed to act in the face of obvious danger posed by Mrs. Schooler's ready access to the bankruptcy estate's assets, and in the face of repeated warnings and inquiries by a concerned creditor, a layperson could discern that the standard of care was not met in this case.

We agree with Lamesa that, under the facts of this case, expert testimony was not required to establish that the Trustee breached her duties. While the precise course of action the Trustee should have taken may be subject to reasonable debate, it requires no technical or expert knowledge to recognize that she affirmatively should have undertaken *some* form of action to acquire for the bankruptcy estate the assets to which it was entitled. As the bankruptcy court explained, by doing nothing, the Trustee ignored basic human nature.

*In re Schooler*, 725 F.3d 498, 514-15 (5th Cir. 2013) (internal citations and quotations omitted).

13.     So too, here, NexPoint did not need an expert for the jury to conclude that the Debtor breached its duties by doing *nothing* in light of the upcoming payment, without Mr. Dondero's alleged instruction.  But if the jury finds that that instruction occurred, the situation is more complicated: did the Debtor have an affirmative duty after receiving such instruction to seek confirmation, advise as to the potential consequences of a default, or try to dissuade Mr. Dondero? These issues are not within a lay person's common knowledge or common sense.  And this is all the more important because, at the same time, the Debtor was providing legal services to NexPoint; *i.e.* the Debtor was NexPoint's law firm.

14.     By analogy, it is one thing for a lawyer to fail to inform his client of an upcoming deposition, which leads to a "death penalty" order.  Anyone can know, using common sense, that the lawyer committed professional negligence.  But what if the lawyer advises the client of the

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 7

APP 792

deadline, but the client tells the lawyer he does not feel like attending the deposition? Can the lawyer sit on his hands and do nothing, or must the lawyer take affirmative steps, for example, to inform the client of the potential consequences, try to reschedule the deposition, or try to dissuade the client from his decision? That is a much more difficult question. Here again:

> the general rule is that expert testimony is required to establish the standard of care in a legal malpractice action; an exception to the general rule is recognized where the attorney's lack of care and skill is so evident that the jury can find negligence as a matter of common knowledge, e.g., when an attorney allows the statute of limitations to run on a client's claim.

*Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008).

15.     The Debtor's objection that the expert testimony is irrelevant is likewise wrong. NexPoint has explained above why expert testimony is appropriate, and arguably required, to address the standard of care in the Shared Services Agreement. NexPoint has likewise demonstrated that the Shared Services Agreement expressly provides for assistance and advice with respect to "payments." Here, the Debtor attempts misdirection:

> NexPoint does not and cannot identify any provision in the SSA that imposes a duty on Highland to make Annual Installment payments on NexPoint's behalf without direction from an authorized NexPoint representative.

Objection at ¶ 49.

16.     NexPoint has never argued that the Debtor should have made the payment "on NexPoint's behalf," in the sense that the Debtor would do so from its funds. And, the issue is not whether the payment should have been made without direction from an authorized NexPoint representative—itself a disputed question of fact made much more complicated by the fact that it was the same individual responsible for the payment on both sides, who was also an officer of both parties. Even if the Debtor is correct, though, the point is that the Debtor failed in its duties to *seek* such authorization.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 8

APP 793

17.    The Debtor also argues that, as NexPoint should always have known that Mr. Dondero did not authorize the payment, Mr. Waterhouse's testimony that Mr. Dondero instructed him not to make the payment does not change the situation such that NexPoint's delay is unreasonable.  First, the issue is not whether NexPoint instructed the Debtor to make the payment; that is merely the Debtor's interpretation of its duties under the Shared Services Agreement and the Court or the jury will have to decide whether that is correct.  NexPoint does not agree that is the correct standard (and its expert has not been asked to opine on that issue).  Second, the issue is the Debtor's failure to *advise* NexPoint on the issue—and *advice* is an express duty under the contract.  Third, the Debtor fails to recount the whole of Mr. Dondero's testimony on the "authorization" issue:

> Q. Okay. And do you know whether anybody acting on behalf of any of the three corporate obligors under the term notes ever took any steps in December 2020 to make sure that Highland would, in fact, make the payments that were due at year-end?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A.    No, there was a reliance on Highland.
>
> Q.    Okay.  Is it your testimony that Highland was authorized to make the payments under the notes at year-end without being directed by a representative of the three corporate obligors?
>
> A. Yes.  It is my contention that that is how it worked in prior years also.
>
> Q. And so you believe that nobody on behalf of any of the corporate obligors ever authorized or directed Highland to make the payments but that Highland did it without -- without direction?
>
> MS. DEITSCH-PEREZ:  Object to the form.
>
> A.    Yes, typically.  And in 2017 or 2018, 2019, for sure.

Morris Declaration Exh. 4 at: 462:24-463:25.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 9

APP 794

18.    And contrary to the Debtor's characterization of Mr. Waterhouse's testimony, Mr.

Waterhouse testified as follows:

Q.    Well, what about long term loans?  Was it reasonable for NexPoint to expect debtor employees to ensure that NexPoint timely paid its obligations under long-term notes?

MR. MORRIS:  Objection to the form of the question.

MS. DANDENEAU:  Objection to form.

A.    I mean, that is one of the things that the Highland personnel did provide to the advisors.  Yes, we would -- we would – over the years, yes, we -- we -- we -- we did do that generally.  Again, I don't remember specifically but, yes, generally we – you know, we did do that.

*       *       *

Q. And what role in years prior to 2020 would employees of the debtor have had with respect to NexPoint making that annual payment?

A. We -- we -- we would have -- I keep saying "we." The team would have calculated any amounts due under that loan and other loans, as -- as standard course. We would -- since we provided treasury services to the advisors, we would inform the -- the -- the -- we informed Mr. Dondero of any cash obligations that are forthcoming, whether we do cash projections. If, you know, any of these payments would have -- or, you know, the sum total of all of these payments, including any note payments, if there were any cash shortfalls, we would have informed Mr. Dondero of any cash shortfalls. We could adequately plan, you know, in instances like that.

Or, sorry, we -- I say "we" – I keep saying "we" -- I keep wearing my -- again, my -- my treasurer hat.  But, yes, it is to -- it is to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are -- are upcoming and that -- and that are -- are scheduled to be paid.

*       *       *

Q.  And based on your experience, would it have been reasonable for NexPoint to rely on the debtors' employees to inform NexPoint of an upcoming payment due on the $30 million promissory note?

MR. MORRIS: Objection to form of the question.

MS. DANDENEAU: Objection to form.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 10

APP 795

A. Yes. Yes, they did. I mean, but I mean, but I don't think these -- these notes were any secret to anybody

Rukavina Declaration at Exh. C: 333:14-338:8.

19.     The situation was not, therefore, as the Debtor construes it; that the Debtor could sit around and do nothing until an instruction to pay was issued. On the contrary, as the Shared Services Agreement requires, it was to *advise* NexPoint: "to inform Mr. Dondero of the obligations of the advisors in terms of cash and obligations that are [] upcoming . . . [and] scheduled to be paid." Whatever else can be said about what happened, and whether the jury will believe Mr. Dondero or Mr. Waterhouse, one thing is clear: the course that had been followed for years was not followed here, because the Debtor failed to inform Mr. Dondero of the upcoming alleged obligation, whether outright or because of Mr. Dondero's alleged instruction not to pay.

20.     On the issue of timing, NexPoint has already explained that, while it understood that Mr. Dondero instructed Mr. Waterhouse to make no further payments on the Shared Services Agreement, Mr. Dondero never made a similar instruction regarding the Note. *See* Rukavina Declaration at ¶ 10. Mr. Waterhouse's counsel prevented NexPoint's counsel from discussing the matter with Mr. Waterhouse, due to ongoing litigation between the Debtor and Mr. Waterhouse. *See id.* at ¶ 11. If the Court questions the truthfulness of this, the Court need only review the transcript of Mr. Waterhouse' deposition, where NexPoint's attorney asked four (4) times whether Mr. Waterhouse was sure of the instruction, as evidence of counsel's surprise at the answer. *See* Rukavina Declaration a Exh. C: 390:4-392:17.

21.     At the same time, it appears that the Debtor knew what Mr. Waterhouse's answer would be well ahead of time—an issue also relevant below to prejudice. On May 11, 2021, the Debtor served its amended responses to NexPoint's discovery. *See* Supplemental Rukavina

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 11

APP 796

Declaration [filed concurrently herewith] at Exh. "A."  In those, the Debtor answered the following interrogatory:

**INTERROGATORY NO. 2:**

If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

*See* Supplemental Rukavina Declaration at Exh. "B" at p. 7.

22.    Even though NexPoint asked the Debtor to explain, factually, why the Debtor was not responsible for causing payments to be made, rather than including in its answer that Mr. Dondero gave Mr. Waterhouse the alleged instruction, the Debtor merely answered (as it does now, despite the clear language of the Shard Services Agreement) that the contract did not impose this responsibility on the Debtor.  Yet, the Debtor's answer to the following request for production strongly suggests that the Debtor knew of the alleged instruction, yet did not include it in the interrogatory answer:

**REQUEST FOR PRODUCTION NO. 1**:

All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 12

APP 797

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. <u>Any Communications responsive to Request for Production No. 1 were verbal</u>.

*See id*. at p. 10 (emphasis added).

23.     The Debtor could and should have stated what these verbal communications were in May, 2021. Instead, NexPoint was forced to wait until Mr. Waterhouse's deposition to learn of the alleged verbal communication. Alternatively, the Debtor too did not know ahead of time how Mr. Waterhouse would answer, but then it can hardly accuse NexPoint of any delay.

**B.     EXPERT TESTIMONY IS RELEVANT**

24.     NexPoint has already addressed above why expert testimony is appropriate, why it may even be required, and why, both pursuant to the language of the contract and the Debtor's CFO's testimony, the Debtor had *some* level of duties with respect to the payment.

25.     The Debtor argues that the agreement exculpates the Debtor for "any acts or omissions unless it is determined by a court of competent jurisdiction to 'be the result of gross negligence or to constitute fraud or willful misconduct.'" Objection at p. 13, n. 8. That is not true. That exculpation provision applies only to the "conduct of the business of [NexPoint]." Rukavina Declaration Exh. A at § 6.02. The payment of a note is not the "business" of NexPoint; its business is managing and advising funds and investments. Even so, if the Debtor argues otherwise, then that is a matter for the jury, and the issue is not one appropriate to the present Motion.

26.     The Debtor's reliance on the Shared Service Agreement's indemnification provision is likewise unavailing: "an indemnity provision does not apply to claims between the parties to the agreement." *Derr Constr. Co. v. Houston*, 846 S.W.2d 854, 858 (Tex. App. – Houston [14th Dist.] 1992). *Accord In re 1701 Commerce LLC*, 2014 Bankr. LEXIS 3962 at *40 (Bankr. N.D. Tex. 2014) ("[u]nder Texas law, indemnity agreements do not generally apply to

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 13

APP 798

claims between the parties to an agreement"). There is an exception if the agreement expressly provides that the indemnification applies to a claim brought by one party against the other, *see In re 1701 Commerce LLC*, 2014 Bankr. LEXIS at *40, but the language in the Shared Services Agreement does not so provide.

## C.    THE DEBTOR WILL NOT BE PREJUDICED

27.    The Debtor will not suffer prejudice if the Motion is granted. If the Debtor hires a rebuttal expert and prevails at trial, then it will be entitled to the costs of that expert. The scheduling order provided for expert designations by October 29, 2021. NexPoint filed its motion on that day. The Debtor cannot credibly argue prejudice with respect to added costs when the Debtor would have incurred those costs anyway had NexPoint provided an expert report on that day. In this respect:

> any additional costs incurred from an extension would not be unreasonable. Here, Plaintiffs seek an extension so they can offer an expert witness for their products liability claims. Defendants have been aware of these claims since this case's inception. Because expert witnesses are crucial for Plaintiffs' prima facie case, Defendants have known they would need to prepare rebuttal evidence since this case began on October 14, 2019. These facts do not present an instance in which a party adds an additional claim, or introduces an eleventh-hour witness, to foist additional litigation costs without warning.

*Adams v. Medtronics Inc.*, 2021 U.S. Dist. LEXIS 47246 at *12 (E.D. Tex. 2021).

28.    Likewise here, the Debtor always knew of NexPoint's defense. And, as discussed above, it appears that the Debtor (but not NexPoint) knew what Mr. Waterhouse's testimony would be in May, 2021. Again, had NexPoint provided an expert report on October 29, the Debtor would have incurred whatever costs it would have incurred anyway, except that, in that instance, the Debtor would likely be moving to extend the expert deadline, since the scheduling order does not provide for a separate rebuttal expert deadline. Moreover, the Debtor will have every opportunity

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT
DISCLOSURE AND DISCOVERY DEADLINES—Page 14

APP 799

to contest the expert's admission at trial; the Court's approval of the Motion does not mean that the expert's testimony is admissible.

29.     The Debtor's discussion of a "continuance" is irrelevant, as trial has not been set and likely will not be set for a long time given the Debtor's own desire to pursue summary judgment practice.  In that respect, assuming the Court grants the Motion on December 13, 2021, and the Debtor needs one month for a rebuttal expert, and the parties need two weeks for expert depositions, that would still mean that this case would be trial ready by the end of February, 2022—thirteen (13) months after being filed.  This is not unreasonable and is faster than many cases are declared trial ready.  In fact, the Debtor has indicated that it will move for summary judgment by December 17, 2021, with responses due on January 17, 2022, with the Debtor's reply on January 31, 2022—a schedule the Court accepted.  And, on December 7, 2021, the Debtor apparently filed motions seeking to consolidate for trial various note cases, including this one, which motion alone will likely take significant time to decide as several District Court judges are involved.  In other words, this Adversary Proceeding is not going to be certified as trial ready for a few months at least.  Nor would granting this Motion affect the timing of the summary judgment proceedings; whether the Debtor breached the standard of care is a question of fact outside the scope of summary judgment.

## IV.     **PRAYER**

WHEREFORE, PREMISES CONSIDERED, NexPoint respectfully requests that the Court overrule the Debtor's objection and grant the Motion.

REPLY OF DEFENDANT NEXPOINT ADVISORS, L.P. IN SUPPORT OF MOTION TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES—Page 15

APP 800

RESPECTFULLY SUBMITTED this 8th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 8th, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served via the Court's CM/ECF system on parties entitled to notice thereof, including on counsel for the Debtor.

/s/ Davor Rukavina
Davor Rukavina

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

### SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA

The undersigned, Davor Rukavina, hereby declares under penalty of perjury pursuant to the laws of the United States of America the following:

1.    My name is Davor Rukavina.  I am over the age of 21, have never been convicted of a felony or crime of moral turpitude, and am otherwise qualified to give this Declaration.

2.    I am an attorney duly licensed to practice law in the State of Texas.  I am lead counsel for NexPoint Advisors, L.P. ("NexPoint"), in the above styled and numbered Adversary Proceeding.  As such, I directly supervised discovery served by NexPoint in this Adversary Proceeding and the receipt of responses to the same from Highland Capital Management, LP (the "Debtor"), and I have personal knowledge of the same (although not the underlying facts).

3.    Attached to this Declaration as Exhibit "A" is a true and correct copy of discovery served by NexPoint on the Debtor on or about March 31, 2021.

SUPPLEMENTAL DECLARATION OF DAVOR RUKAVINA—Page 1

4.      Attached to this Declaration as Exhibit "B" is a true and correct copy of the Debtor's amended responses to said discovery.

5.      I hereby swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and ability.

Executed: December 8, 2021.

/s/ Davor Rukavina
DAVOR RUKAVINA

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

*Counsel for NexPoint Advisors, L.P*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Chapter 11 |
| | § | |
| | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adv. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S REQUESTS FOR ADMISSIONS, INTERROGATORIES, AND REQUESTS FOR PRODUCTION TO PLAINTIFF

TO:   Highland Capital Management, L.P. through its counsel of record, Jeffrey Pomerantz and John Morris, Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Blvd., 13th Floor, Los Angeles, CA 90067, jpomerantz@pszjlaw.com; jmorris@pszjlaw.com; Zachery Annable, Hayward PLLC, 10501 N. Central Expy., Ste. 106, Dallas, TX 75231, zannable@haywardfirm.com

NexPoint Advisors, L.P., the defendant in the above-styled and numbered adversary

proceeding, hereby serves these *Requests for Admissions, Interrogatories, and Requests for*

EXHIBIT "A"

*Production* pursuant to Rules 33, 34, and 36 of the Federal Rules of Civil Procedure and Rules 7033, 7034, and 7036 of the Federal Rules of Bankruptcy Procedure.

Highland Capital Management, L.P. is instructed to serve its responses to these requests and interrogatories, along with all documents responsive to these requests, no later than **April 30, 2021**, by delivering them to Julian Vasek, Munsch Hardt Kopf & Harr P.C., 500 N. Akard St., Ste. 3800, Dallas, Texas 75201, jvasek@munsch.com.

Pursuant to Federal Rule of Civil Procedure 34(b)(1)(C), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7034, electronically stored information should be produced in native format.

## I.   DEFINITIONS

1.     "Adversary Proceeding" means the above-captioned adversary proceeding.

2.     "Committee" means the Official Committee of Unsecured Creditors appointed in the Debtor's bankruptcy case, including its officers, directors, employees, agents, and representatives.

3.     "Communication" or "Communications" means every kind of written, recorded, or oral transmission of information.

4.     "Complaint" means the *Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate* filed at Dkt. No. 1 in the Adversary Proceeding.

5.     "Debtor" means Highland Capital Management, L.P., including its officers, directors, employees, agents, and representatives.

6.     "December Payment" means the payment that was allegedly due on December 31, 2020 under the Note.

7.     "<u>Default Letters</u>" means the letters sent from the Debtor to NexPoint dated January 7, 2021 and January 15, 2021 that are attached as exhibits to the Complaint.

8.     "<u>Document</u>" or "<u>Documents</u>" means writings of every type and from any source, including e-mail and electronic documents and including originals and nonidentical copies thereof that are in your possession, custody, or control or known by you to exist.

The term also includes communications not only in words, but in symbols, pictures, sound recordings, film, tapes, and information stored in, or accessible through, computer or other information storage or retrieval systems.  If the information is kept in a computer or informational storage or retrieval system, the term also includes codes and programming instructions and other materials necessary to understand such systems.

The term includes, but is not limited to:  the original and all copies (regardless of origin and whether or not including additional writing thereon or attached thereto) of pictures, loan agreements, memoranda, reports, books, manuals, instructions, financial reports, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, inter-office and intra-office communications, contracts, cables, electronic mails, deleted electronic mails, text messages, notations or memoranda of any sort of any conversation, telephone calls, meetings or other communications, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes and amendments of any of the foregoing), graphic or oral records or representations of any kind, (including, without limitation, tapes, cassettes, discs and records)

and other written, printed, typed, photographed, or other graphic recorded matter of any kind or nature, however reproduced and whether preserved in writing, phono record, film, photograph, type or video tape.

9. "January Payment" means the payment made by NexPoint under the Note on January 14, 2021 in the amount of $1,406,111.92.

10. "NexPoint" means NexPoint Advisors, L.P., including its officers, directors, employees, agents, and representatives.

11. "Note" means that certain *Promissory Note* attached to the Complaint as Exhibit 1.

12. "Shared Services Agreement" means that certain *Amended and Restated Shared Services Agreement* between NexPoint and the Debtor, dated effective as of January 1, 2018.

## II. REQUESTS FOR ADMISSIONS

1. Admit that the Debtor was responsible for making payments under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

2. Admit that the Debtor was responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

3. Admit that the Debtor did not make the December Payment on NexPoint's behalf.

4. Admit that the Debtor did not cause the December Payment to be made on NexPoint's behalf.

5. Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2018.

6. Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2018.

7.     Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

8.     Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2019.

9.     Admit that, prior to the alleged default on December 31, 2020, NexPoint never defaulted under the Note.

### III.     <u>INTERROGATORIES</u>

1.     If the Debtor contends that it was not responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

2.     If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

3.     Provide the following information with respect to each payment made under the Note since its inception: (a) the date such payment was made; (b) the amount of such payment; (c) the individuals involved in making such payment or causing such payment to be made; (d) the account from which such payment was made; and (e) the method by which such payment was made.

4.     Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Note, the December Payment, the January Payment, and/or the alleged default.

5.     Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Debtor's obligations to make a payment or cause a payment to be made under the Note on NexPoint's behalf.

6.     Identify all records the Debtor kept regarding services the Debtor provided to NexPoint under the Shared Services Agreement with respect to the Note, and indicate whether such records identify what employee(s) provided services, when such services were provided, and how much time was spent providing such services.

7.     For each request for admission above that the Debtor did not unequivocally admit, explain the factual and legal basis for not doing so.

## IV.    **REQUESTS FOR PRODUCTION**

1.     All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

2.     All Communications between directors, officers, and/or employees of the Debtor related to the Note.

3.     All Communications between directors, officers, and/or employees of the Debtor related to any and all defaults under the Note.

4.     All Communications between directors, officers, and/or employees of the Debtor related to the December Payment.

5.     All Communications between directors, officers, and/or employees of the Debtor related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

6.      All Communications between directors, officers, and/or employees of the Debtor related to the January Payment.

7.      All Communications with third parties related to the Note.

8.      All Communications with third parties related to the December Payment.

9.      All Communications with third parties related to the January Payment.

10.      All Communications with third parties related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

11.      All Communications with third parties related to any and all defaults under the Note.

12.      All Communications with the Committee (including, but not limited to, Communications solely between counsel for the Debtor and the Committee) related to the Note, any and all defaults under the Note, the December Payment, the January Payment, and/or the Default Letters.

13.      All ledgers, statements, and accounting records related to payments made under the Note to date.

14.      All Documents pursuant to which the Debtor was authorized and/or required to make payments or cause payments to be made on NexPoint's behalf under the Note.

15.      All Documents and Communications pursuant to which the Debtor contends it was relieved of its obligation to make payments or cause payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

16.      All Communications related to potentially marketing and/or selling the Note.

17.      The Shared Services Agreement, including all amendments and supplements thereto, whether informal or formal, regardless of how documented.

18.     All Documents and Communications construing the Debtor's obligations to NexPoint under the Shared Services Agreement.

19.     All Documents and Communications related to the scope of the Debtor's obligations to NexPoint under the Shared Services Agreement.

20.     All Documents and Communications identified in connection with Interrogatory 6 above.

21.     All billing statements from Pachulski Stang Ziehl & Jones LLP and Hayward PLLC related to fees the Debtor seeks to collect in the Adversary Proceeding.

RESPECTFULLY SUBMITTED this 31st day of March, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ *Julian P. Vasek*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard Street, Suite 3800
Dallas, Texas  75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375
drukavina@munsch.com
jvasek@munsch.com

**COUNSEL FOR NEXPOINT ADVISORS, L.P.**

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on the 31st day of March, 2021, a true and correct copy of this document was electronically served via email on counsel for the Debtor (jpomerantz@pszjlaw.com; jmorriss@pszjlaw.com; zannable@haywardfirm.com), as well as by first class U.S. mail, postage prepaid to the following recipients:

Zachery Z. Annable
HAYWARD PLLC
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Jeffrey N. Pomerantz
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

/s/ *Julian P. Vasek*
Julian P. Vasek, Esq.

DEFENDANT'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION TO DEFENDANT
4848-7374-7683v.2 .

Page **9** of 9
APP 812

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) *(admitted pro hac vice)*
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 21-03005 |
| v. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendant. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

EXHIBIT "B"

**DEBTOR'S AMENDED RESPONSES AND OBJECTIONS TO NEXPOINT ADVISORS,
L.P.'S REQUESTS FOR ADMISSIONS, INTERROGATORIES,
AND REQUESTS FOR PRODUCTION**

Highland Capital Management, L.P., ("Plaintiff" or the "Debtor") hereby responds to
*Defendant's Requests for Admissions, Interrogatories, and Requests for Production to Plaintiff*
(the "Requests")[2] served by NexPoint Advisors, L.P. ("NexPoint" or "Defendant") in the above-
captioned adversary proceeding (the "Adversary Proceeding").  The Debtor's amended responses
and objections to the Requests (the "Amended Responses") are made pursuant to Federal Rules of
Civil Procedure ("FRCP") 26, 33, and 34 as made applicable in bankruptcy cases pursuant to
Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to
each and every Response and are incorporated into each Response as though set forth in full:

1.      The Responses contained herein are based upon information presently
known and ascertained by the Debtor.

2.      The Debtor objects to the Requests to the extent they seek information or
documents that are protected from discovery by the attorney-client privilege, the attorney work
product doctrine or any other privilege or immunity.  The inadvertent disclosure or production of
any document that is protected from discovery by any privilege or immunity shall not constitute a
waiver of any such privilege or immunity.  All references in these objections and responses to the
Debtor's agreement to produce documents shall be construed to mean non-privileged documents.

3.      The Debtor objects to the Requests to the extent they request information
that is not reasonably or readily available to it, in its possession, custody or control, or is more

---

[2]  Capitalized terms not defined herein shall have the meanings set forth in the Requests.

readily available to NexPoint from another source or for which the burden of obtaining such information is not substantially greater for NexPoint than it is for the Debtor.

4.      The Debtor objects to the Requests to the extent they call for legal conclusions and/or legal analyses.

5.      All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6.      The Debtor objects to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7.      The Debtor's agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within Plaintiff's possession, custody or control.

8.      These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## RESPONSES TO REQUESTS FOR ADMISSIONS

**REQUEST FOR ADMISSION NO. 1**:

Admit that the Debtor was responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

The Debtor denies Request for Admission No. 1 on the ground that the Shared Services Agreement does not provide that the Debtor was responsible for making payments under the Note.

**REQUEST FOR ADMISSION NO. 2**:

Admit that the Debtor was responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shard Services Agreement.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

The Debtor denies Request for Admission No. 2 on the ground that the Shared Services Agreement does not provide that Debtor was responsible for causing payments to be made under the Note.

**REQUEST FOR ADMISSION NO. 3**:

Admit that the Debtor did not make the December Payment on NexPoint's behalf.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Admit, providing that NexPoint did not request that any such payment be made, and providing also that when the Debtor received instruction from NexPoint to make a payment during January 2021, it did make the payment.

**REQUEST FOR ADMISSION NO. 4**:

Admit that the Debtor did not cause the December Payment to be made on NexPoint's behalf.

**RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Admit, providing also that when the Debtor received instruction from NexPoint to cause a payment to be made during January 2021, it did so.

**REQUEST FOR ADMISSION NO. 5**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

The Debtor admits that it made a payment on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2018. The Debtor otherwise denies Request for Admission No. 5 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 6**:

Admit that, pursuant to the Shared Services Agreement, the Debtor caused a payment to be made on the Debtor's behalf under the Note on or about December 31, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

The Debtor admits that it caused a payment to be made on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2018. The Debtor otherwise denies Request for Admission No. 6 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 7**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

The Debtor admits that it made a payment on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2019. The Debtor otherwise denies Request for Admission No. 7 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 8**:

Admit that, pursuant to the Shared Services Agreement, the Debtor made a payment on the Debtor's behalf under the Note on or about December 31, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

The Debtor admits that it caused a payment to be made on NexPoint's behalf, and at NexPoint's request and instruction, under the Note on or about December 31, 2019. The Debtor otherwise denies Request for Admission No. 8 on the grounds that the Shared Services Agreement speaks for itself and the Debtor did not make any payment on its own behalf.

**REQUEST FOR ADMISSION NO. 9**:

Admit that, prior to the alleged default on December 31, 2020, NexPoint never defaulted under the Note.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

Admit.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

If the Debtor contends that it was not responsible for making payments under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 1:**

The Debtor objects to Interrogatory No. 1 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not require that the Debtor to make payments under the Note on NexPoint's behalf. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel processed the January Payment upon instruction from NexPoint.

**INTERROGATORY NO. 2:**

If the Debtor contends that it was not responsible for causing payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement, explain the legal and factual basis for such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

The Debtor objects to Interrogatory No. 2 on the ground that it seeks a legal conclusion or legal analysis. Subject to its objection, the Shared Services Agreement did not provide that the Debtor was responsible for causing payments to be made under the Note. The Debtor further states that after the Debtor sent NexPoint the Default Letters, NexPoint did not contend that the Debtor was required to make payments under the Note on NexPoint's behalf. The Debtor's personnel caused the January Payment to be processed upon instruction from NexPoint.

**INTERROGATORY NO. 3:**

Provide the following information with respect to each payment made under the Note since its inception: (a) the date such payment was made; (b) the amount of such payment; (c) the individuals involved in making such payment or causing such payment to be made; (d) the account from which such payment was made; and (e) the method by which such payment was made.

**RESPONSE TO INTERROGATORY NO. 3:**

See **Exhibit A**.

**INTERROGATORY NO. 4:**

Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Note, the December Payment, the January Payment, and/or the alleged default.

**RESPONSE TO INTERROGATORY NO. 4:**

The Debtor objects to Interrogatory No. 4 on the grounds that it calls for a legal conclusion or legal analysis, is vague and ambiguous, and is overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1).  Subject to its objection, the Debtor identifies the following individuals and entity in response to Interrogatory No. 4:

Jim Seery

Greg Demo

John Morris

Frank Waterhouse

Kristin Hendrix

DSI Consulting

**INTERROGATORY NO. 5:**

Describe in detail all steps the Debtor took, including by identifying every individual involved, to evaluate the Debtor's obligations to make a payment or cause a payment to be made under the Note on NexPoint's behalf.

**RESPONSE TO INTERROGATORY NO. 5:**

The Debtor objects to Interrogatory No. 5 on the grounds that it assumes the Debtor was obligated to make payments or cause a payment to be made under the Note on NexPoint's behalf. The Debtor further objects on the grounds that it calls for a legal conclusion or analysis, and is

overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1).  Subject to its objection, the

Debtor identifies the following individuals and entity in response to Interrogatory No. 5:

> Jim Seery
>
> Greg Demo
>
> John Morris
>
> Frank Waterhouse
>
> Kristin Hendrix
>
> Blair Hillis
>
> DSI Consulting

## INTERROGATORY NO. 6:

Identify all records the Debtor kept regarding services the Debtor provided to NexPoint under the Shared Services Agreement with respect to the Note, and indicate whether such records identify what employee(s) provided services, when such services were provided, and how much time was spent providing such services.

## RESPONSE TO INTERROGATORY NO. 6:

The Debtor does not possess information responsive to Interrogatory No. 6.

## INTERROGATORY NO. 7:

For each request for admission above that the Debtor did not unequivocally admit, explain the factual and legal basis for not doing so.

## RESPONSE TO INTERROGATORY NO. 7:

The Debtor objects to Interrogatory No. 7 on the grounds that it calls for a legal analysis

or legal conclusion, and is overly broad and unduly burdensome. *See* Fed. R. Civ. P. 26(b)(1).

## SPECIFIC OBJECTIONS AND RESPONSES TO DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 1:

All Communications pursuant to which any director, officer, or employee of the Debtor was advised or instructed not to make the December Payment or to cause the December Payment to be made.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 1:

Subject to the General Objections, the Debtor is unaware of any documents responsive to Request for Production No. 1. Any Communications responsive to Request for Production No. 1 were verbal.

### REQUEST FOR PRODUCTION NO. 2:

All Communications between directors, officers, and/or employees of the Debtor related to the Note.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 2:

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 2.

### REQUEST FOR PRODUCTION NO. 3:

All Communications between directors, officers, and/or employees of the Debtor related to any and all defaults under the Note.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 3:

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 3.

### REQUEST FOR PRODUCTION NO. 4:

All Communications between directors, officers, and/or employees of the Debtor related to the December Payment.

### RESPONSE TO REQUEST FOR PRODUCTION NO. 4:

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 4.

**REQUEST FOR PRODUCTION NO. 5:**

All Communications between directors, officers, and/or employees of the Debtor related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 5.

**REQUEST FOR PRODUCTION NO. 6:**

All Communications between directors, officers, and/or employees of the Debtor related to the January Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 6.

**REQUEST FOR PRODUCTION NO. 7:**

All Communications with third parties related to the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 7.

**REQUEST FOR PRODUCTION NO. 8:**

All Communications with third parties related to the December Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 8.

**REQUEST FOR PRODUCTION NO. 9:**

All Communications with third parties related to the January Payment.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 9.

**REQUEST FOR PRODUCTION NO. 10:**

All Communications with third parties related to prior payments the Debtor made or caused to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 10.

**REQUEST FOR PRODUCTION NO. 11:**

All Communications with third parties related to any and all defaults under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 11.

**REQUEST FOR PRODUCTION NO. 12:**

All Communications with the Committee (including, but not limited to, Communications solely between counsel for the Debtor and the Committee) related to the Note, any and all defaults under the Note, the December Payment, the January Payment, and/or the Default Letters.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 12.

**REQUEST FOR PRODUCTION NO. 13:**

All ledgers, statements, and accounting records related to payments made under the Note to date.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 13.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents pursuant to which the Debtor was authorized and/or required to make payments or cause payments to be made on NexPoint's behalf under the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

The Debtor objects to Request for Production No. 14 to the extent that it assumes that the Debtor was required to make payments or cause payments to be made on NexPoint's behalf under the Note. Subject to its General and Specific Objections, the Debtor is not aware of documents otherwise responsive to Request for Production No. 14.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents and Communications pursuant to which the Debtor contends it was relieved of its obligation to make payments or cause payments to be made under the Note on NexPoint's behalf pursuant to the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

The Debtor objects to Request for Production No. 15 to the extent that it assumes that the Debtor was obligated to make payments or cause payments to be made on NexPoint's behalf under the Note. Subject to its General and Specific Objections, the Debtor is not aware of documents otherwise responsive to Request for Production No. 15.

**REQUEST FOR PRODUCTION NO. 16:**

All Communications related to potentially marketing and/or selling the Note.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

The Debtor objects to Request for Production No. 16 on the ground that it is not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 17:**

The Shared Services Agreement, including all amendments and supplements thereto, whether informal or formal, regardless of how documented.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 17.

**REQUEST FOR PRODUCTION NO. 18:**

All Documents and Communications construing the Debtor's obligations to NexPoint under the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

The Debtor objects to Request for Production No. 18 on the ground that it is vague and ambiguous, overly broad, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 19:**

All Documents and Communications related to the scope of the Debtor's obligations to NexPoint under the Shared Services Agreement.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

The Debtor objects to Request for Production No. 19 on the ground that it is overly broad, unduly burdensome, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications identified in connection with Interrogatory 6 above.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

The Debtor objects to Request for Production No. 20 on the ground that it is not aware of any such documents.  Subject to the General and Specific Objections, the Debtor will search for and produce documents responsive to Request for Production No. 20.

**REQUEST FOR PRODUCTION NO. 21:**

All billing statements from Pachulski Stang Ziehl & Jones LLP and Hayward PLLC related to fees the Debtor seeks to collect in the Adversary Proceeding.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Subject to the General Objections, the Debtor will search for and produce documents responsive to Request for Production No. 21.

Dated: May 11, 2021          **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
            ikharasch@pcszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com
            hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## EXHIBIT A

**Response to Interrogatory No. 3**

**NexPoint Advisors**
**Note Receivable Payment Summary**

| Payment Date | Total Paid | Pmt Account | Pmt Method | Individuals Involved in Making Pmt |
|---|---|---|---|---|
| 10/20/2017 | 800,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/5/2017 | 1,301,504.99 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 4/10/2018 | 439,721.54 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 5/1/2018 | 146,573.85 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 5/9/2018 | 879,927.65 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 9/5/2018 | 280,765.40 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 9/21/2018 | 1,023,750.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/18/2018 | 294,695.10 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 3/29/2019 | 750,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 4/16/2019 | 1,300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 6/4/2019 | 300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 6/19/2019 | 2,100,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 7/9/2019 | 630,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 8/13/2019 | 1,300,000.00 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 12/30/2019 | 530,112.36 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |
| 1/14/2021 | 1,406,111.92 | NexBank Operating Acct *171 | Electronic Bank Transfer | Frank Waterhouse, Dave Klos, Kristin Hendrix, Blair Roeber |

EXHIBIT "A"

Davor Rukavina
Julian P. Vasek
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790
(214) 855-7500 telephone
(214) 978-4375 facsimile
Email:  drukavina@munsch.com

ATTORNEYS FOR NEXPOINT ADVISORS, L.P.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | Case No. 19-34054-sgj11 |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03005-sgj |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | |
| DONDERO, NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

## <u>NOTICE OF EXPERT REPORT OF STEVEN J. PULLY</u>

NexPoint Advisors, L.P., one of the defendants in the above styled and numbered Adversary Proceeding, hereby serves upon all parties the *Expert Report of Steven J. Pully, CPA, CFA, Esq.*, a true, correct, and full copy of which is attached hereto.

Dated at Dallas, Texas this the 10th day of December, 2021.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina
    State Bar No. 24030781
    Julian P. Vasek.
    State Bar No. 24070790
    500 N. Akard Street, Suite 3800
    Dallas, Texas 75202-2790
    Telephone: (214) 855-7500
    Facsimile: (214) 978-4375
    Email:  drukavina@munsch.com
    Email: jvasek@munsch.com

**ATTORNEYS FOR NEXPOINT ADVISORS, L.P.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on December 10th, 2021, a true and correct copy of the foregoing document, including the exhibit thereto, was served via the Court's CM/ECF system on parties entitled to notice thereof, including on counsel for the Debtor/Plaintiff.

/s/ Davor Rukavina
Davor Rukavina

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| NEXPOINT ADVISORS, L.P., JAMES | § | Adversary Proceeding No. |
| DONDERO, NANCY DONDERO, AND | § | 21-03005 |
| THE DUGABOY INVESTMENT | § | |
| TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HIGHLAND CAPITAL | § | Adversary Proceeding No. |
| MANAGEMENT SERVICES, INC., | § | 21-03006 |
| JAMES DONDERO, NANCY | § | |
| DONDERO, AND THE DUGABOY | § | |
| INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| HCRE PARTERS, LLC (N/K/A/ | § | Adversary Proceeding No. |
| NEXPOINT REAL ESTATE | § | 21-03007 |
| PARTNERS, LLC), JAMES DONDERO, | § | |
| NANCY DONDERO, AND THE | § | |
| DUGABOY INVESTMENT TRUST, | § | |
| | § | |
| Defendants. | § | |

# EXPERT REPORT OF
# STEVEN J. PULLY, CPA, CFA, ESQ.

### December 10, 2021

*Confidential*

## TABLE OF CONTENTS

I.    BACKGROUND AND QUALIFICATIONS ............................................................. 3

II.   ENGAGEMENT ................................................................................................... 6

III.  BRIEF SUMMARY OF OPINIONS ..................................................................... 7

IV.   ASSUMPTIONS .................................................................................................. 7

V.    SERVICES AGREEMENTS GENERALLY ...................................................... 13

VI.   OPINIONS.......................................................................................................... 15

VII.  CONCLUSION ................................................................................................... 21

APP 833

## I.   BACKGROUND AND QUALIFICATIONS

1. My professional background includes over thirty-six years of experience as an investment banker, corporate board member, corporate executive, hedge fund executive, attorney, consultant, and expert witness.

2. I graduated with honors from Georgetown University in 1982 with a BSBA in Accounting, and I graduated from The University of Texas at Austin in 1985 with a Doctor of Jurisprudence degree. I hold the Chartered Financial Analyst (CFA) designation and am a licensed CPA and attorney in the State of Texas. I also hold the Series 7, 63, and 79 FINRA securities licenses[1]. My CFA designation and my law, CPA, and FINRA licenses are all current.

3. I currently work as a corporate executive, as a corporate board member, as an investment banker, and as an expert witness.

   a. I work on a part-time basis as the Chief Executive Officer of Harvest Oil & Gas, a former public company that is in the process of dissolving. I was Chairman of the Board of Harvest before assuming the Chief Executive Officer role. Until recently, Harvest was largely managed by another company pursuant to a services agreement. When the services agreement was entered into, the services provider and the predecessor of Harvest were affiliates, which they ceased to be during the term of the agreement. Services provided under the agreement included treasury, accounting, and operating functions. One of my roles as Chief Executive Officer is to replace the former service provider by bringing most business functions in-house.

   b. I currently serve on the boards of seven private companies. I am typically appointed to boards by large shareholders. In total, I have been on the boards of thirty-two public and private companies. Those companies have operated in a broad cross section of industries, including agriculture, aviation, energy, entertainment, manufacturing, real estate, refining, retail, restaurants, technology, and telecom. I have served on the boards of companies that have outsourced most of their corporate functions or provided outsourcing services for other companies.

   c. I conduct my investment banking work through Speyside Partners, LLC ("Speyside Partners"), an entity that I co-founded.[2]  At Speyside I work on mergers, acquisitions and divestitures, financings, and restructurings.

4. Through the end of 2014, I spent thirteen years working for two different hedge funds. I was the General Counsel and a partner of Carlson Capital, the most recent hedge fund for which I worked. Carlson Capital managed approximately $9 billion across a number of different funds during much of my tenure and followed a multi-strategy investing approach. Prior to working at Carlson Capital, I worked for Newcastle Capital Management, a hedge fund that pursued a deep value and activist investment strategy. I was the President of Newcastle Capital

---

[1] I formerly held the Series 24 FINRA license.
[2] The website for Speyside Partners is www.speysidepartners.com.

Management and worked there for almost six years. Newcastle Capital Management managed as much as $650 million across a variety of funds while I was employed there. During my tenure, I served as the Chief Executive Officer of two companies controlled by the firm. Both Carlson Capital and Newcastle Capital Management had "shared-services" arrangements, where a separate entity provided a variety of back office, mid-office, and front office services to an affiliated party.

5. Prior to becoming a hedge fund executive, I was an investment banker for approximately twelve years at various large firms, including as a Managing Director for Bank of America Securities and as a Senior Managing Director for Bear Stearns. I also worked as an investment banker at Kidder Peabody, PaineWebber, and Wasserstein Perella. Over the course of my work at large investment banking firms, I focused on mergers, acquisitions, divestitures, capital raising, and restructurings.

6. Prior to becoming an investment banker, I was a securities and corporate lawyer for almost four years at Baker Botts.

7. Based on the work that I have done over the past thirty-six years, I have developed a deep understanding of services agreements and outsourcing generally as well as corporate governance-related matters. I applied the knowledge and experience that I have gained over the past thirty-six years to my analysis in this report.

8. I have previously served as a testifying and/or consulting witness in the following actions:

   a. Ascent Resources – *Utica, LLC (f/k/a American Energy – Utica, LLC); Ascent Resources, LLC (f/k/a American Energy Appalachia Holdings, LLC); Ascent Resources Utica Holdings, LLC (f/k/a American Energy Ohio Holdings, LLC); The Energy & Minerals Group Fund III, LP; EMG Fund III Offshore Holdings, LP; FR AEU Holdings, LLC and FR AE Marcellus Holdings, LLC v. Duane Morris LLP*, in the 165th Judicial District Court of Harris County, Cause No. 2015-46550) — Consulting and Testifying witness for Plaintiffs.

   b. *In re Paladin Energy Corp.*, Case No. 16-13590, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division — Consulting and Testifying witness for Debtor.

   c. *In re: Potential Complaint Against Larry Noble, Noble Operating, LLC, Noble Natural Resources, L.L.C. and Javier Urias to Avoid Transfers* — Testifying witness for Potential Defendants.

   d. *James D. Sallah, not individually but solely in his capacity as Corporate Monitor for OM Global Investment Fund LLC and OM Global LP, Plaintiff, v. BGT Consulting, LLC, d/b/a BGT Fund Administration, and Lara Goldberg, Defendants* — Testifying witness on behalf of Defendants BGT Consulting, LLC, d/b/a BGT Fund Administration and Lara Goldberg.

   e. *Kenneth A. Kristofek, Gruene Interests, LLC and Gruene Interests Services, LLC, Gran Toro Rojo, LLC, and Gruene USFC, LLC, v. David Gunderson, Horace Winchester, Stan*

*Bradshaw, and Jerry Williamson, Gruenepointe Holdings, LLC, Adora 8, LLC, Adora 9, LLC, Adora 10, LLC, Adora 14 Realty, LLC, Onpointe Healthcare Development, LLC, U.S. Freedom Capital Holdings, LLC, Lake Ohana, LLC, U.S. Freedom Capital, LLC, and Encantado Investments, LLC*, in the District Court of Dallas County, Texas, No. DC-16-07674 — Testifying witness on behalf of Plaintiffs.

f.  *In re SunEdison Securities Litigation,* in the U.S. District Court for the Southern District of New York, 16-md-2742-PKC  —  Testifying witness on behalf of Plaintiffs.

g.  *Avid Controls, Inc. v. GE Energy Power Conversion Technology, Ltd.; General Electric Company; and Current Power Solutions, Inc*., In the United States District Court for the Southern District of Texas  -  Houston Division,  Civil Action No. 4:19-CV-01076 — Testifying witness on behalf of Plaintiff.

h.  *Lumos Partners, LLC, Claimant v. VAC-TRON EQUIPMENT, L.L.C., Respondent,* In Arbitration before the American Arbitration Association — Testifying witness on behalf of Claimant.

i.  *Lord Abbett Affiliated Fund, Inc., et al., Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. Navient Corporation, et al., Defendants*, Case No. 1:16-cv-112-GMS, in the United States District Court for the District of Delaware, Case No. 1:16-cv-112-MN — Testifying witness on behalf of Plaintiff.

j.  *Southland National Insurance Corporation in Rehabilitation, Bankers Life Insurance Company in Rehabilitation, Colorado Bankers Life Insurance Company in Rehabilitation, and Southland National Reinsurance Corporation in Rehabilitation, Plaintiffs, v. Greg E. Lindberg, Academy Association, Inc., Edwards Mill Asset Management, LLC, New England Capital, LLC and Private Bankers Life and Annuity Co., Ltd., Defendants*, in the General Court of Justice Superior Court Division, 19 CV 13093 —Testifying witness on behalf of Defendants.

k.  *Baylor University and Southwestern Baptist Theological Seminary, Plaintiffs, v. Harold E. Riley Foundation and Mike C. Hughes, Defendants*, in the District Court of Tarrant County, Texas, 67th Judicial District — Testifying witness on behalf of Defendants.

l.  *Advsr, LLC, Plaintiff, v. Magisto, Ltd. And Yahal Zilka, Defendants,* in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:19-cv-2670  — Testifying witness on behalf of Defendants.

m.  *Lumos Partners, LLC, Claimant v. Altavian, Inc.,* In Arbitration before the American Arbitration Association —  Testifying witness on behalf of Claimant.

n.  *Fouad Saade; and Kobi Electric, LLC, Claimants, v. Woodbridge International LLC, f/k/a Woodbridge Group, LLC; and Texender "Tex" Sekhon, Respondents,* In Arbitration before the American Arbitration Association  -  Testifying witness on behalf of Claimant.

9.  I have attached a copy of my curriculum vitae as <u>Exhibit A</u> to this expert report ("Report").

## II. **ENGAGEMENT**

10. Highland Capital Management, L.P., is the debtor in the bankruptcy proceeding, *In re: Highland Capital Management, L.P., Debtor,* and is referred to herein as the "Debtor" or the "Plaintiff." I have been engaged in the matters related to the bankruptcy proceeding that are listed below (collectively referred to as the "Actions").

    a. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03005, as a consulting and testifying expert witness on behalf of NexPoint Advisors, L.P. ("NexPoint"), and James Dondero ("Dondero" and NexPoint are collectively referred to as the "NexPoint Defendants").

    b. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST, Defendants,* Adversary Proceeding No. 21-03006, as a consulting and testifying expert witness on behalf of Highland Capital Management Services, Inc. ("HCMS"), and Dondero (Dondero and HCMS are collectively referred to as the "HCMS Defendants").

    c. *HIGHLAND CAPITAL MANAGEMENT, L.P., Plaintiff, vs. HCRE PARTERS, LLC (N/K/A/ NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,* Defendants, Adversary Proceeding No. 21-03007, as a consulting and testifying expert witness on behalf of HCRE Partners, LLC ("HCRE"), and Dondero (Dondero and HCRE are collectively referred to as the "HCRE Defendants").

    d. The NexPoint Defendants, the HCMS Defendants, and the HCRE Defendants are collectively referred to as the "Defendants."

11. The Plaintiff has made claims against the Defendants for breach of contract, turnover of property, fraudulent transfer, and breach of fiduciary duty.

12. My engagement is through the law firms of Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") and Stinson LLP ("Stinson"), which are acting as counsel to the Defendants. I am being compensated for my time at the rate of $750.00 per hour. My compensation is not in any way contingent on (i) the opinions I express in this Report or any additional report, (ii) the content of any testimony I may give, or (iii) the outcome of the Action.

13. I have met with Dondero as well as D. J. Sauter, who is the General Counsel of NexPoint. I have also met with attorneys from counsel to the Defendants: Munsch Hardt, and Stinson.

14. I was asked to provide my opinion regarding whether it was appropriate for the Plaintiff to not pay the interest and principal on the Notes (as hereinafter defined) on behalf of NexPoint, HCMS and HCRE (collectively, the "Makers") by December 31, 2020.

### III. BRIEF SUMMARY OF OPINIONS

15. I believe that the Plaintiff did not act reasonably by failing to pay amounts due on the Notes on behalf of the Makers by December 31, 2020, and otherwise in how it comported itself with respect to the Notes. Section 6.01 of the NexPoint Services Agreement (as hereinafter defined) sets forth a standard of care that the Plaintiff was supposed to comply with in paying the NexPoint Term Note; I also believe that each of the services agreements between the Plaintiff and the Makers required the Plaintiff to act in a reasonable way.

16. In forming my opinions and preparing this Report, I relied on all the materials listed in Exhibit B or otherwise cited herein as well as my background and personal experiences.

17. In offering my opinions, I am not opining on the legal enforceability of any agreements between the parties to the Actions.

18. I reserve the right to amend my Report should new information become available, including any assertions of the parties, witnesses, or any experts made in response to this Report.

### IV. ASSUMPTIONS

19. The Debtor filed for bankruptcy on October 16, 2019. During the Debtor's bankruptcy, James Seery ("Seery") served as the Chief Executive Officer and/or Chief Restructuring Officer of the Debtor.

20. The Debtor was formerly managed by Dondero, who was the firm's co-founder and was its President until January 9, 2020, at which time he resigned all positions with the Debtor and also relinquished control of the Debtor.[3] As of October 9, 2020, Dondero ceased to have any involvement as an officer or director of the Debtor.[4] Dondero also testified that there was tension between Seery and him as well as Seery and others at Highland.[5]

21. During 2020, the relationship between Dondero and the Plaintiff became increasingly adversarial. For example, in addition to Dondero ceasing to have any involvement as an officer or director of the Plaintiff, there were various adversarial proceedings between the parties.[6]

22. NexPoint, HCMS and HCRE executed certain notes in favor of the Debtor as described below:

    a. NexPoint executed a promissory note in the original principal amount of $30,746,812.33, and payable in thirty annual installments beginning by December 31, 2017 (the "NexPoint Term Note").[7] The NexPoint Note was fully payable in

---

[3] Dondero Deposition, Volume 2, Page 291, lines 9 – 12.
[4] *Id.* at Page 374, lines 8 – 10.
[5] *Id.* at page 87, lines 8 – 14.
[6] *See, e.g., Id.* at page 374, lines 6 – 9.
[7] Amended Complaint dated August 27, 2021 (the "NexPoint Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, NexPoint Advisors, L.P., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

the event of default.[8]   As of December 31, 2020, $23,610,194.59 of principal remained outstanding on the NexPoint Term Note.[9]

    b.  HCMS executed a term note in the original principal amount of  $20,247,628.02 and payable in thirty annual installments beginning on December 31, 2017 (the "HCMS Term Note").[10]   The HCMS Term Note was fully payable in the event of default.[11]

    c.  HCRE executed a term note in the original principal amount of $6,059,831.51 and payable in thirty annual installments beginning on December 31, 2017 (the "HCRE Term Note").[12]   The HCRE Term Note was fully payable in the event of default.[13]

23.  The Debtor and the Makers were all involved in the investment management business, collectively managing billions of dollars on behalf of investors at various points over the course of their relationship with each other. At the time that the NexPoint Term Note, the HCMS Term Note, and the HCRE Term Note (collectively, the "Notes") were entered into, the Plaintiff, NexPoint, HCMS, and HCRE were all related parties as a result of overlapping equity ownership of the entities.  As of December 31, 2020, NexPoint, HCMS, and HCRE ceased to have any overlapping equity ownership with the Plaintiff but continued to have overlapping ownership with each other.

24.  The Plaintiff and NexPoint are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (the "NexPoint Services Agreement") pursuant to which Plaintiff provided a broad array of services to NexPoint.[14]   NexPoint operated its business with a small number of employees, relying on Plaintiff's much larger workforce to provide many key services for NexPoint to run its business.  The NexPoint Services Agreement details numerous areas where the Plaintiff was to provide services to NexPoint, with the Plaintiff essentially providing the entire workforce for most areas of NexPoint's business.  The areas that the Plaintiff provided services to NexPoint were detailed under the following headings in the NexPoint Services Agreement: Back- and Middle-Office, Legal Compliance/Risk Analysis, Tax, Management of Clients and Accounts, Valuation, Execution and Documentation, Marketing, Reporting, Administrative Services, Ancillary Services, and Other.[15]   The NexPoint Services Agreement essentially covered all functional areas of NexPoint's business other than the executive and investment functions.

---

[8] NexPoint Amended Complaint, Exhibit 3.  Additionally, I am informed that there was the potential for forgiveness of the Notes in certain circumstances that had also not occurred by December 31, 2020.

[9] D-NNI -074142.

[10] Amended Complaint dated August 27, 2021 ("HCMS Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, Highland Capital Management Services, Inc., James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[11] HCMS Amended Complaint, Exhibit 6.

[12] Amended Complaint dated August 27, 2021 ("HCRE Amended Complaint"), filed by Highland Capital Management, L.P. as plaintiff against defendants, HCRE Partners, LLC, James Dondero, Nancy Dondero, and The Dugaboy Investment Trust at 2.

[13] HCRE Amended Complaint, Exhibit 6.

[14] Amended and Restated Services Agreement dated January 1, 2018, Exhibit 9 to Seery Deposition.

[15] *Id.* at pages 3 – 5.

APP 839

25. The NexPoint Services Agreement contains several provisions relating to the Plaintiff's obligation to make interest and principal payments on the NexPoint Term Note, including the following:

    a. Section 2.02(a) details various "Back and Middle Office" tasks that the Plaintiff was responsible for performing on behalf of NexPoint.[16] Those services included "payments,"[17] which encompassed payments of interest and principal on the NexPoint Term Note.

    b. Section 2.02 (b) provided for the Plaintiff to provide "[a]ssistance and advice with respect to legal issues…".[18]

    c. Section 6.01 describes the standard of care that the Plaintiff was supposed to provide to NexPoint.[19] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

    d. Section 8.01 required that any amendments or modifications to the agreement were required to be in writing and signed by each party.[20]

    e. Section 8.07 provided that any "condition or obligation imposed upon any Party may be waived only upon the written consent of the Parties."[21]

26. The Plaintiff first sought to provide notice of termination of the NexPoint Services Agreement in November of 2020, however, the termination date was extended[22] and the NexPoint Services Agreement was still in effect as of December 31, 2020.

27. While there was no written agreement between either HCMS or HCRE, on the one hand, and the Plaintiff, on the other hand, relating to services that the Plaintiff was to supply to either party, the services that the Plaintiff provided to HCMS and HCRE were essentially the same services that the Plaintiff provided to NexPoint[23] and involved a comprehensive array of services that were necessary in the day-to-day operations of the business of HCMS and HCRE. Like with NexPoint, by December 31, 2020, there was a long history of the Plaintiff having provided services to HCMS and HCRE.[24]

---

[16] *Id*. at pages 3 - 4.

[17] *Id.,* Section 2.02(a) provided, "Back- and Middle Office. Assistance and advice with respect to back- and middle-office functions including, but not limited to . . . finance and accounting, payments, operation, bookkeeping, cash management . . . accounts payable . . ."

[18] *Id.* at page 4.

[19] *Id*. at 11.

[20] *Id.* at 14.

[21] *Id*. at 16.

[22] Dondero Deposition, Volume 2, page 375, lines 3-10.

[23] *See, e.g.,* Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13; Waterhouse Deposition, page 353, lines 6 – 10, and page 357, lines 19 – 24.

[24] Dondero Deposition, Volume 2, page 94, lines 20 – 22; page 95, lines 4 – 9.

28. When asked about whether the Plaintiff had a services agreement with HCMS, Dondero replied as follows during his deposition[25]:

> My answer would be the advisors like NexPoint and HFAM that had to have by law and regulatory statute have to have formal sub advisors and shared services agreements had formal shared services agreement. Entities that didn't need to have formal written shared services agreements were often serviced similarly or -- or exactly the same as those entities, but without a written agreement, but with a verbal shared services agreement providing, again, all the same similar services, and the entities that didn't have a written shared services agreement ·weren't getting shared services or support from any other entities other than Highland doing the same thing for them that it did for the mutual funds.

29. Dondero had a similar response with regard to there being an oral agreement for the Plaintiff to provide services to HCRE.[26]

30. There was extensive testimony about the services that the Plaintiff provided to HCMS and HCRE:

    a. Under the oral agreements to provide services to HCMS and HCRE, the Plaintiff was responsible for making payments of interest and principal on the HCMS Notes and the HCRE Notes, which had previously been made by December 31, 2017, 2018, and 2019.[27]

    b. HCMS and HCRE relied on the Plaintiff to provide services because HCMS and HCRE, like NexPoint, did not have the employees or infrastructure to run its business without the services provided by the Plaintiff.[28]

    c. According to Frank Waterhouse ("Waterhouse"), the Chief Financial Officer of the Plaintiff throughout 2020[29], the Plaintiff provided the same services to HCRE and HCMSS that it did for NexPoint.[30] He also specifically testified that Plaintiff's services included timely paying of bills and loan payments for HCMS[31] and the same bill paying for HCRE that it did for HCMS and NexPoint.[32]

31. Interest and principal were due on the Notes by December 31, 2020. Neither interest nor any principal payments were paid on any of the Notes by December 31, 2020. The Plaintiff was supposed to facilitate these payments even though the payments were supposed to be to itself.

---

[25] Dondero Deposition, Volume 2, page 335, line 19 to page 336, line 13.
[26] *Id*. at page 381, lines 10 – 23.
[27] Waterhouse Deposition, page 354, lines 2 – 23, page 357, lines 2 – 18.
[28] Dondero Deposition, Volume 2, page 371, lines 5-9.
[29] Waterhouse Deposition, page 28, lines 15-16.
[30] *Id.,* page 353, 6-10; 357: 19 – 24.
[31] *Id*. at page 354, lines 2 to page 357, line 18.
[32] *Id*. at page 358, lines 12 – 24.

APP 841

32. On January 7, 2021, the Debtor delivered a letter to each of the Makers (the "Acceleration Letters") indicating that a default had occurred on each of the Notes and demanding the immediate full payment of "all principal, interest, and any other amounts due on the Note…".[33] The effect of the Acceleration Letters was that millions of dollars of principal payments were suddenly due; had the Acceleration Letters not been sent, principal on the Notes would have amortized ratably through 2047.

33. In addition to being the Plaintiff's Chief Financial Officer, Waterhouse was also an officer of two of the three Makers as of December 31, 2020.

    a. He was the Treasurer of NexPoint, an officer-level role, during all periods relevant to my Report.  Waterhouse reported at his deposition, "I still manage the finance and accounting function for NexPoint."[34]

    b. He was the treasurer and acting treasurer of HCMS.[35]

34. Plaintiff alleges that Dondero orally instructed Waterhouse to not pay the interest and principal on the NexPoint Term Note that was due on December 31, 2021.[36]  No evidence has been presented that suggests that Dondero's alleged instructions for the Plaintiff to not pay interest and principal on the NexPoint Term Note was in writing. The apparent rational for the alleged instruction was that NexPoint believed that there had been substantial overcharges totaling in the millions of dollars by the Plaintiff under the NexPoint Services Agreement.  The overcharges related to charges for employees who were no longer working for the Plaintiff but that were still being charged to NexPoint, which was a violation of the NexPoint Services Agreement. Furthermore, Dondero denies that he instructed Waterhouse not to pay the NexPoint Term Note.[37]

    a. Dondero denies that he instructed that no interest and principal be paid on the NexPoint Term Note, testifying, "There is no logical reason, nor would I have ever authorized or suggested no payment to put us…in default due to a *deminimis* amount of money….even if I was highly annoyed with Seery, even if we knew that Seery and Highland had overcharged NexPoint by whatever it was, 14, 16, million bucks, I would not have let a small amount cause a…breach."[38]

    b. Dondero also testified that the Plaintiff made the payments due on the Notes by December 31 of 2017, 2018 and 2019 without any specific authorization from any of the Makers.[39]

35. No evidence was presented suggesting that Dondero, HCMS or HCRE instructed the Plaintiff not to make payments on the HCMS Term Note or the HCRE Term Note.  HCMS and HCRE had a reasonable expectation that interest and principal on the HCMS Notes and HCRE Notes

---

[33] Exhibit 6 to Seery Deposition taken on October 21, 2021.
[34] Waterhouse Deposition, page 28, lines 15-16.
[35] *Id*., at page 30, lines 9 – 16.
[36] *Id*., at page 390, lines 4 – 13.
[37] Dondero Deposition, Volume 2, page 391:18-25.
[38] *Id.*
[39] *Id*. at page 463, lines 10-25.

would be paid by December 31, 2020, given past practices and the Plaintiff's obligation to do so.

36. Mr. Waterhouse testified about his responsibility in connection with making the payments on the Notes that were due by December 21, 2020[40]:

> Q:  Did you approve of each payment that was made against principal and interest on the notes that were given by the affiliates of Mr. Dondero?
>
> A:  Did I approve the payments?  I approve  -  I approve  -  if there was cash  -  if there was cash being repaid on a note payment, yes, I approved in the general sense of being made aware of the payment and the amount."
>
> Q:  And are you the person who authorized Highland's employees to effectuate those payments?
>
> A:  Yes.

37. No evidence has been presented of any discussions that the Plaintiff had with Dondero or any of the Makers prior to December 31, 2020, with regard to payments on the Notes other than the alleged discussion between Dondero and Waterhouse described above relating to the NexPoint Term Note.  Specifically, the evidentiary record reflects that there was no follow-up by Waterhouse or anyone else at the Plaintiff confirming that it was Dondero's intent for there not to be any payments made on the NexPoint Term Note.[41]

   a.  A number of Plaintiff's employees knew about Dondero's alleged instructions prior to December 31, 2020, with respect to the NexPoint Term Note, yet no effort was undertaken to investigate Dondero's instructions by speaking with him or otherwise confirming what NexPoint's intent was regarding the NexPoint Term Note.

   b.  Deposition testimony by Kristin Hendrix ("Hendrix"), who was the assistant controller of the Plaintiff at the time, revealed that she knew by November 30, 2020, or December 1, 2020, that the Plaintiff was not going to pay the interest and principal on the NexPoint Term Note that was due by December 31, 2020.[42]

   c.  Waterhouse testified that he did not follow-up with Dondero about whether NexPoint should make the payments required by December 31, 2020.[43]

38. Waterhouse also testified that there had not been any instructions from anyone to the Plaintiff to not make the required payments on the HCMS Term Note or the HCRE Term Note by December 31, 2020.[44]  When asked about Dondero's tone when he talked to him about the fact that the payments had not been made on the HCMS Term Note and the HCRE Term Note,

---

[40] Waterhouse Deposition, page 56, line 21 to page 57, line 10.
[41] *Id.*, at page 391, lines 18 – 21.
[42] Hendrix Deposition, page 12, lines 4 – 7.
[43] Waterhouse deposition, pages 391: line 18 to page 392, line 2.
[44] Waterhouse Deposition, pages 393, line 21 – 25 to page 394, line 4.

Waterhouse said that the tone was very negative and that Dondero's reaction was consistent with the fact that Dondero was surprised that the payments had not been made.[45]

## V.   SERVICES AGREEMENTS GENERALLY

39. Companies seeking to conduct operations more efficiently frequently outsource various operational, accounting, treasury, and other functions to a service provider.  By outsourcing such functions, the customer of the services provider can avoid costly employee and infrastructure investments that would otherwise be required to conduct the outsourced functions.

40. The agreement between the party receiving the services and the party providing the services is often referred to as a "services agreement," an "outsourcing agreement," or a "shared services agreement."  These terms have the same meaning for purposes of this Report although the term "shared services" is often used in the context of a company sharing services with an affiliated party.

41. The parties to a services agreement are sometimes related and other times are completely separate with no prior business relationship.

42. The actual agreement that comprises the services to be provided under a services agreement varies in form.  Some services agreements are comprehensive, others provide limited written direction, and still others are oral.

43. Smaller companies are often more likely to outsource a broad set of business functions, typically because they are growing rapidly and do not have the financial resources or time to build out various important business functions.

44. Virtually every company outsources some type of business function to a third-party.  For example, many companies outsource limited functions such as payroll processing or IT services to various vendors.  There is a distinct difference, however, between outsourcing limited functions to a vendor that provides services for many clients versus the more fulsome relationship that is embodied by the typical services agreement involving the services provider managing major aspects of a company's operational and back-office functions.

    a. Providers of more fulsome services have additional duties relative to a provider that is responsible for limited services.  Those additional duties generally emanate from the level of responsibility that the services provider takes on and the services provider's more intimate knowledge of its customer's business.

    b. Said another way, a provider of a straightforward and often outsourced service such as payroll processing has no reason to understand the underlying business issues of its customers or the perspectives of the employees for which it processes payroll.  On the other hand, a provider of more fulsome services has an intimate knowledge

---

[45] *Id.* at page 394, lines 12 – 21.

of the goals, objectives, and capabilities of its customers and in discharging its obligations, cannot ignore that knowledge.

45. In the case of services agreements that cover a fulsome set of activities for the customer, even if there is a comprehensive agreement between the parties, it is difficult to enumerate with specificity each individual task that the services provider is expected to perform. Tasks are therefore often described in broad terms as opposed to specific detail (i.e., the service provider is required to handle accounting functions for its customer as opposed to saying that a trial balance is required 15 days after month-end, or the annual audit must be completed by a specified date).

    a. Despite the difficulty in describing each task with specificity that the services provider is required to perform, the specific tasks become apparent as the services provider performs functions on behalf of its customer. In the ordinary course, practices develop that inevitably are deemed acceptable to the services provider and its customer. Such practices are generally fully clarified within one year of the inception of the services agreement because that timeframe allows the parties to interact with each other over the course of a full accounting cycle.

    b. Following the initial cycle of activities, those previously performed practices are often referred to as "past practices" and such past practices become an important piece in gauging whether  the services provider has met it obligations in future periods. Having been affiliated with companies that are customers of services providers, I think of past practices as having virtually the same effect as a written document provided that the services agreement is not written in a way that prohibits such an interpretation.

46. Services agreements between related parties often present complicated issues, especially if the relationship changes between the parties during the term of the services agreement. For example, at the beginning of the term of the services agreement, two related parties might constructively work together, almost obviating the need for a detailed agreement between the parties. If there is a change in the relationship between the parties that leads to less cooperation, the original agreement may not be comprehensive enough to optimally deal with the change in circumstances.

    a. In such situations, past practices can become an even more important factor in determining the services provider's obligations and the reasonable expectations that the customer should have if the contract language is not explicit on the point.

    b. While the services provider and a customer that is related at the outset of an agreement may cease to be related at some point during the term of the agreement, the services provider's knowledge of the customer's business objectives does not necessarily become stale immediately upon the  change in affiliate status. Consequently, any higher duty that comes about from the knowledge that the services provider has about its customer is not necessarily impacted if the affiliate status of the services provider and its customer changes.

14

## VI. OPINIONS

> ***A. The Plaintiff was obligated to pay interest and principal on the NexPoint Term Note by December 31, 2021, on behalf of NexPoint. Despite the alleged instruction from Dondero that the Plaintiff should not make any payments on NexPoint's behalf, the Plaintiff's obligations to make the payments did not end. At a minimum, the Plaintiff had a duty to investigate whether the payments should have been made, which it did not do. In not making the payments on the NexPoint Term Note and not undertaking steps to further investigate whether the payments should have been made, the Plaintiff did not act reasonably.***

47. The payment terms of the NexPoint Term Note required that interest and principal was due to the Plaintiff from NexPoint on or before December 31, 2020. It is undisputed that interest and principal were not paid on the NexPoint Term Note by the required date.

48. The Plaintiff was obligated to make the payment of interest and principal on behalf of NexPoint on or before December 31, 2020, under the NexPoint Services Agreement.

49. The Plaintiff has taken the position that the interest and principal that was due on the NexPoint Term Note by December 31, 2020, was not paid because of Dondero's alleged directive to Waterhouse to not make the payments.[46]

50. The evidentiary record highlights several noteworthy facts:

    a. The Plaintiff had conflicting roles because it was the payee of the NexPoint Term Note and also had the obligation to cause the payments to be made on the NexPoint Term Note. The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

    b. The Plaintiff stood to benefit mightily if NexPoint defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of the NexPoint Term Note. Without a default, some of the principal of the Notes could have been outstanding until 2047.

    c. Waterhouse was an officer of the Plaintiff and was also an officer of NexPoint, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given his dual roles, he had knowledge of the business objectives and financial condition of NexPoint, which should have made it clear to him that NexPoint would not welcome a default on the NexPoint Term Note.

    d. NexPoint allegedly made overpayments to the Plaintiff that Dondero wanted to be offset against the required interest and principal payments on the NexPoint Term Loan.[47] The overpayments related to workers that the Plaintiff was charging to NexPoint that no longer worked for the Plaintiff, which violated the terms of the

---

[46] Waterhouse Deposition, page 390, lines 4 – 13.
[47] Seery Deposition, page 226, lines 2 – 4; Dondero Deposition, Volume 2, page 392, lines 3 – 7.

APP 846

NexPoint Services Agreement. There were ongoing discussions between Dondero and Seery leading up to the end of 2020 relating to the topic.

e. There is no evidentiary record describing any effort by the Plaintiff to warn NexPoint of the implications of Dondero's alleged request for the payments on the NexPoint Term Note to not be made. For example, despite the fact that the NexPoint Services Agreement required the Plaintiff to provide NexPoint with legal services, the Plaintiff failed to provide NexPoint with legal advice that failing to pay interest and principal could result in an acceleration of the NexPoint Term Loan.

51. In my opinion, Dondero's alleged statement to Waterhouse that the Plaintiff should not make payments on the NexPoint Term Note on December 31, 2020, did not provide a basis for the Plaintiff to not make the payments on the Notes given its obligations to NexPoint under the NexPoint Services Agreement. Several reasons support my opinion:

a. There is no evidence that the Plaintiff took any reasonable steps to address the myriad of conflicts that it faced.

i. The Plaintiff's obligations regarding the required payments of the Notes involved the conflict-ridden task of authorizing and making a payment to itself. Additionally, the Plaintiff stood to benefit significantly by putting the NexPoint Term Note into default given that a default would allow the Plaintiff to realize the proceeds from repayment of the note far earlier than it otherwise would have; had the NexPoint Term Loan not been accelerated, it would have remained outstanding until 2047. While the evidence is silent on whether the Plaintiff was considering the repayment benefit of the NexPoint Term Loan to itself, from an appearance standpoint, the conflict was glaring.

ii. The Plaintiff apparently took no steps to address these conflicts either by conferring with NexPoint or Dondero. Conferring with NexPoint or Dondero would have helped in establishing that NexPoint and Dondero really did not want the Plaintiff to transfer funds to pay interest and principal on the NexPoint Term Loan.

iii. The Plaintiff also has presented no evidentiary record reflecting how any internal steps were taken to address the conflict. Such steps might have included conducting meetings internally with minutes to reflect discussion regarding the conflict or any efforts to seek guidance from counsel to assist with the conflict.

iv. According to deposition testimony by Hendrix, who was the assistant controller of the Plaintiff at the time[48], she recalled receiving a phone call from Waterhouse on either November 30, 2020, or December 1, 2020, where Waterhouse indicated that no payments would made by the Plaintiff

---

[48] Hendrix Deposition, page 12, lines 4 – 7.

on behalf of NexPoint.[49]    Accordingly, it seems that Plaintiff decided as early November 30, 2020 or December 1, 2020, to not make the payments on the NexPoint Term Note.  Given the apparent time frame of the decision to not make the payment, the Plaintiff had ample time to confirm in writing with Dondero that the payments should not be made or to otherwise take reasonable steps to ensure that a mistake was not being made and that the Plaintiff was acting reasonably.

b.  The Plaintiff had an obligation to act reasonably in discharging its obligations to make the payments on the NexPoint Term Note on behalf of NexPoint.  In addition to not properly addressing conflicts as set forth above, the evidentiary record further reflects that the Plaintiff did not act reasonably.

  i.  No effort was undertaken to inform Dondero that the Plaintiff disagreed with his assumption that there were offsets to the required interest and principal payment requirements on the NexPoint Term Note. Absent any communication from the Plaintiff, Dondero simply had no way of knowing that the Plaintiff disagreed with his perspective that a right of offset did exist, so it was reasonable for him to think that discussion of an offset was on the table.

  ii.  Waterhouse had worked for or with Dondero for many years, making him very familiar with Dondero's management style.  Dondero is a decisionmaker who is willing and does change his mind when presented with new facts, something that Waterhouse should have been aware of yet did nothing to address.

  iii.  Given the massive implications of a default of the NexPoint Term Loan to NexPoint, which the Plaintiff should have understood given the robust services that it was providing to NexPoint and the dual financial responsibilities that Waterhouse had to both organizations, the Plaintiff should have acted more responsibly by engaging with NexPoint and Dondero to confirm NexPoint's intent.

  iv.  The NexPoint Services Agreement provides that the Plaintiff was supposed to provide NexPoint with legal advice. In effect, the Plaintiff was NexPoint's law firm.  Had the Plaintiff met its commitment, it would have had its internal counsel consult with NexPoint to point out the legal ramifications of the interest and principal payments not being made.  There is no evidence suggesting that the Plaintiff took any steps to meet its obligation to provide legal advice as required under the NexPoint Services Agreement.

c.  Waterhouse had a conflict separate from the conflicts that the Plaintiff otherwise had given that he was an officer of both the Plaintiff and the NexPoint.  Among

---

[49] *Id*. at 71, lines 4 – 7.

other things, Waterhouse's officer role for NexPoint must have provided him with insights into NexPoint's business objectives, which could not have included any appetite for having the Notes accelerated. Yet there is no evidence that Waterhouse's knowledge was utilized in Plaintiff's decision making regarding the required payments of the Notes. It is inapposite to argue that because Waterhouse had knowledge about NexPoint from a source other than the Plaintiff, that he was entitled to ignore that knowledge. In discharging its duties under the NexPoint Services Agreement, the Plaintiff should have been using all information that it had available in its work on behalf of NexPoint.

    d.  The NexPoint Services Agreement provided that any amendment to the agreement needed to be in writing[50] and any consent to a change in the agreement needed to be in writing.[51] No such effort to comply with the writing requirement was undertaken and highlights the fact that any oral statement by Dondero regarding the NexPoint Term Loan not being paid was insufficient under the express terms of the NexPoint Services Agreement.

    e.  Section 6.01 of the NexPoint Services Agreement also describes the standard of care that the Plaintiff was supposed to provide to NexPoint in the discharge of its obligations under the agreement.[52] The provision provides that the Plaintiff "shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." For reasons already described herein, the Plaintiff did not discharge its duties with such care.

52. For the foregoing reasons, any alleged default under the NexPoint Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to NexPoint.

    ***B. Based on the oral agreement that the Plaintiff had with HCMS and HCRE and consistent with the services that the Plaintiff had previously provided, HCMS and HCRE had a reasonable expectation that the Plaintiff would continue paying interest and principal on behalf of those entities absent explicit direction to the contrary. As there was no directive from anyone affiliated with HCMS or HCRE to relieve the Plaintiff of that responsibility, the Plaintiff did not act reasonably by not meeting its obligations to make payments of interest and principal on behalf of HCMS and HCRE.***

53. While the services agreements between Plaintiff, on the one hand, and HCMS and HCRE, on the other hand, were oral, the existence of an oral services agreement between affiliated parties involved in the investment management business is common and is something that I have regularly observed.

---

[50] Amended Services Agreement, Section 8.01.
[51] *Id.* at Section 8.07.
[52] *Id.* at Section 6.01.

APP 849

54. Like with NexPoint, the Plaintiff provided HCMS and HCRE with a comprehensive array of services that were necessary to the day-to-day operation of their businesses.  There was a lengthy history of the Plaintiff providing HCMS and HCRE with such services.  The broad array of services provided by the Plaintiff to NexPoint were the same as the scope of work performed by the Plaintiff for HCMS and HCRE.

55. The evidentiary record highlights several noteworthy facts:

    a. The evidentiary record reflects that the Plaintiff historically made payments on behalf of the HCMS Term Note and HCRE Term Note in addition to providing an array of other critical services to HCMS and HCRE not dissimilar from many of the services that the Plaintiff provided to NexPoint under the NexPoint Services Agreement.[53]

    b. No evidence has been presented suggesting that there was any communication from HCMS, HCRE, or Dondero suggesting that the payments on the HCMS Term Note and the HCRE Term Note should not continue.

    c. No evidence has been presented suggesting that on payment dates in years prior to 2020 HCMS or HCRE had to notify the Plaintiff that it wanted the Plaintiff to make the required payments on the HCMS Term Note or the HCRE Term Note.  Accordingly, it would not have been reasonable for the Plaintiff to expect that HCMS or HCRE were required to take any affirmative steps to have payments made on their notes.

    d. The Plaintiff had conflicting roles because it was the payee of the HCMS Term Note and the HCRE Term Note and also had the obligation to cause the payments to be made of those notes.  The conflicting roles were also heightened because of the increasingly adversarial role that had developed between the Plaintiff and Dondero.

    e. The Plaintiff stood to benefit mightily if HCMS and HCRE defaulted on the payment of interest or principal, given the Plaintiff's ability to immediately accelerate the payment of those notes.  Without a default, some of the principal of the HCMS Term Note and the HCRE Term Note could have been outstanding until 2047.

    f. Waterhouse was an officer of the Plaintiff and was also an officer of HCMS, creating a conflict beyond the conflicts that the Plaintiff had that are described above. Given Waterhouse's dual roles, he had knowledge of HCMS's business objectives and financial condition, which should have alerted him that HCMS would not welcome a default on the HCMS Term Note.

---

[53] *See, e.g.,* Dondero Deposition, Volume 2, pages 335:19 to 336:13; page 381, lines 10-23.

g. The Plaintiff made no effort to warn HCMS or HCRE of the implications of the Plaintiff not making payments on the HCMS Term Note or HCRE Term Note by December 31, 2020.

56. Dondero testified about the payments that were required on the HCMS Term Note by December 31, 2020, indicating that there was an expectation by HCMS that the payments were going to be made, regardless of whether there were specific instructions by HCMS to do so:[54]

> Q: Okay. Do you know whether anybody acting on behalf of HCMS ever instructed or authorized Highland to make a payment on account of HCMS's term note to Highland?
>
> A. Well, again, and maybe I didn't say it clearly enough. I think there was a reliance in the due course aspect, especially on small amounts, and it would have been done by Highland personnel on behalf of Services.
>
> * * * * *
>
> Q. And I'm going to ask you, Mr. Dondero, to be patient with me and to listen carefully to my question. Are you aware of anybody acting on behalf of HCMS, whoever instructed Highland to make a payment in satisfaction of any payment that was due at the year-end of 2020 under the term note?
>
> A. Not specifically, but I'm saying I don't think it needed to be made specifically.

57. The Plaintiff was required to act reasonably in the performance of its obligations to HCMS and HCRE given the record of past practices and the precedent created by similar work done by the Plaintiff for NexPoint. With respect to the payments required under the HCMS Term Note and the HCRE Term Note by the Plaintiff, HCMS and HCRE had a reasonable expectation that they would continue receiving such payment services absent a clear termination by Plaintiff of its obligations to HCMS and HCRE. Given that there is no evidence suggesting that any of the parties had terminated the Plaintiff's obligations to provide services to HCMS and HCRE as of December 31, 2020, especially given that the Plaintiff continued to perform other services on behalf of those entities as of such date, the Plaintiff did not act reasonably by not making the payments on the HCMS Term Note and the HCRE Term Note by December 31, 2021. Likewise, it was also not reasonable for the Plaintiff to not discuss with HCMS and HCRE that payments were not going to be made on the HCMS Term Note and the HCRE Term Note given that payments had been made in prior years without any request by HCMS or HCRE.

58. Hendrix testified that the instruction to her not to make the NexPoint Term Loan payment by December 31, 2020, did not apply to the payments required on the HCMS Term Note and the HCRE Term Note by December 31, 2020.[55] She also testified that she made no attempt or effort to determine whether Dondero wanted the payments required on the HCMS Term Note

---

[54] Dondero Deposition, Volume 2, pages 371:23 – 372:18.
[55] Hendrix Deposition, page 100, lines 20 – 23; page 101, lines 8 – 12.

APP 851

and the HCRE Term Note to be paid by December 31, 2020.[56]  Finally, Hendrix made no attempt to check with anyone whether the payments should be made.[57]  Hendrix's testimony underscores that Plaintiff did not act reasonably in discharging its obligations to HCMS and HCRE.

59. For the foregoing reasons, any alleged default under the HCMS Term Note and the HCRE Term Note was the result of the Plaintiff's own negligence and misconduct, which underscores that Plaintiff did not act reasonably in the discharge of its obligations to HCMS and HCRE.

## VII.   CONCLUSION

60. In summary, based on the evidence that I have reviewed and relied upon, as well as my training and experience, it is my opinion that the Plaintiff did not act reasonably in choosing not to pay the interest and principal due under the Notes. As a result of Plaintiff's failures to act reasonably, it should not have accelerated payment of the principal amount of the Notes.

Respectfully submitted,

_____

Steven J. Pully, CPA, CFA, ESQ.

---

[56] *Id*. at page 102, lines 10 – 13.
[57] *Id*. at page 105, lines 8 – 11.

APP 852

**Exhibit A**

## STEVEN J. PULLY
**4564 Meadowood Road, Dallas, Texas**
**(214) 587-6133**
**sjpully@yahoo.com**

---

### *Employment History*

---

| | |
|---|---|
| October 2014 – Present | **SPEYSIDE PARTNERS/INVESTMENT BANKER/CONSULTANT/BOARD DIRECTOR/CORPORATE EXECUTIVE**<br>• *Investment banker/consultant to companies, investors and creditors on matters including capital raising, distressed debt restructurings, asset dispositions, activist investing defense, strategic opportunities, and expert witness matters*<br>• *Chief Executive Officer and Chairman, Harvest Oil & Gas (post-reorg)* |
| January 2008 – Sept. 2014 | **CARLSON CAPITAL, L.P.,** General Counsel and Partner, Dallas, Texas<br>• *Responsible for legal affairs of hedge fund with over $9.0 B of AUM; worked closely with affiliated oil and gas private equity fund with $700 of AUM beginning in 2010*<br>• *Member of Management, Operating and Valuation Committees (Chair)* |
| Dec. 2001 – October 2007 | **NEWCASTLE CAPITAL MANAGEMENT, L.P.,** President, Dallas, Texas<br>• *Activist fund with $650 MM of assets under management*<br>• *Operating positions for portfolio companies: CEO of Pinnacle Frames, Jan. 2003 – June 2004 (largest domestic picture frame manufacturer with 600 employees; involved in multiple visits to Wal-Mart, visited China and identified new CEO for company); CEO of New Century Equity Holdings, June 2003 – Oct. 2007 (cash shell seeking to acquire business)* |
| May 2000 – Dec. 2001 | **BANC OF AMERICA SECURITIES**, Managing Director, Investment Banking - M&A/ Energy & Power Groups; Houston and Dallas, Texas |
| January 1997 – May 2000 | **BEAR STEARNS & CO. INC.,** Senior Managing Director - Investment Banking Department; Dallas, Texas |
| April 1996 – Dec. 1996 | **CONVERGENT ASSOCIATES, INC.,** President, Dallas, Texas.<br>• *Private equity firm that controlled three technology-oriented companies involved in travel, media and software; affiliated with EDS* |
| January 1996 - April 1996 | **WASSERSTEIN PERELLA & CO., INC.,** Vice President - Investment Banking Department; Dallas, Texas<br>• *Left after brief association because supervisor announced departure plans* |
| July 1989 - Dec. 1995 | **PAINEWEBBER INCORPORATED/ KIDDER, PEABODY & CO.,** First Vice President - Investment Banking Department; New York City and Houston, Texas |
| October 1985 - July 1989 | **BAKER & BOTTS, Attorneys,** Associate – Corporate Department; Houston, Texas |

APP 853

---

### *Board Experience*

---

**Board Leadership**  -  Experience as Lead Director, Chairman of the Board, Executive Committee member and Chairman of Audit, Compensation, Governance and Strategic Committees

**Accounting/Finance**  -  CPA and CFA certifications, significant experience with financial statements and analysis, member of several audit committees including chair role

**Strategic Transactions/Capital Raising**  -  Substantial history with successful strategic transactions and efficient capital raising, including debt restructurings

**Governance/Activist Investing Expertise**  -  Extensive experience with shareholder governance and activist investing/defense; positive reputation with shareholders as a value creator

**Legal/Regulatory**  -  Licensed attorney, extensive experience managing legal/compliance department

#### Public Company Directorships

**Previous:** Bellatrix Exploration, Energy XXI (Chair – Comp and Strategic), EPL Oil & Gas Inc. (Lead Director, Chair - Comp), Ember Resources, Cano Petroleum, Goodrich Petroleum, Harvest Oil and Gas (Chairman of the Board, Chair – Audit), Peerless Systems (Chair – Audit), New Century Equity Holdings, MaxWorldwide, Geoworks Corporation, Pizza Inn (Chair – Governance), Titan Energy, VAALCO Energy (Chair – Governance, Comp), Whitehall Jewelers (Chairman)

#### Private Company Directorships

**Current:** Harvest Oil & Gas (Chairman of the Board and Chief Executive Officer, formerly public company), Limetree Bay Energy, Heritage Power, Response Team 1, Wild Rivers, OWS, ExpressJet

**Previous:** Fox & Hound, GenCanna Global, Pinnacle Frames & Accents, Aspire Holdings (Chair – Comp), PermianLide, Tribune Resources (Chair – Audit), PGi, Southland Royalty, Greylock Energy, Karya Properties, PRIMEXX Energy, Titan Energy

---

### *Professional Certifications, Education and Other Interests*

---

**CHARTERED FINANCIAL ANALYST,** 2004 (Active member), **CERTIFIED PUBLIC ACCOUNTANT,** Texas, 1985 (Active member), **STATE BAR OF TEXAS,** 1985 (Active member), **FINRA** Series 7, 63 and 79 (Current)

**The University of Texas School of Law, 1985**
International Law Journal, Moot Court, Board of Advocates

**Georgetown University, BSBA with honors, 1982, Major in accounting with 3.90 GPA in major**
President of Student Government Senate, National Model U.N. Team
**Centre for Management Studies, Oxford University, England, Summer 1981**

Sailing, golf, writing, biking and travel; married with two adult daughters

Board of Advisors, Georgetown McDonough School of Business, 2015 - 2018

Exhibit B to
Expert Report of Steven J. Pully

## Documents Reviewed

Complaint for (I) Breach of Contract and (II) Turnover of Property of the Debtor's Estate (Dkt. No. 1, Adv. Proc. No. 21-03004)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03005)

Defendant NexPoint Advisors, L.P.'s Answer to Amended Complaint (Dkt. No. 64, Adv. Proc. No. 21-03005)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 68, Adv. Proc. No. 21-03006)

Highland Capital Management Services, Inc.'s Answer to Plaintiff's Complaint (Dkt. No. 6, Adv. Proc. No. 21-03006)

Defendant Highland Capital Management Services, Inc.'s Answer to Amended Complaint (Dkt. No. 73, Adv. Proc. No. 21-03006)

Amended Complaint for (I) Breach of Contract, (II) Turnover of Property, (III) Fraudulent Transfer, and (IV) Breach of Fiduciary Duty (Dkt. No. 63, Adv. Proc. No. 21-03007)

Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)'s Answer to Amended Complaint (Dkt. No. 68, Adv. Proc. No. 21-03007)

Defendant James Dondero's Answer to Amended Complaint (Dkt. No. 83, Adv. Proc. No. 21-03003)

Remote Videotaped Deposition of Frank Waterhouse, taken October 19, 2021 and Exhibits

Video Deposition of James P. Seery, Jr., taken October 21, 2021 and Exhibits

Deposition of Kristin Hendrix, taken October 27, 2021 and Exhibits

Deposition of David Klos, taken October 27, 2021

Remote Deposition of James Dondero, Volume II, taken October 29, 2021 (Rough draft) and Exhibits

Remote Deposition of James Dondero, Volume III, taken November 4, 2021 (Rough draft) and Exhibits

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION

                                       )   Case No. 19-34054-sgj-11
In Re:                                 )   Chapter 11
                                       )
HIGHLAND CAPITAL                       )   Dallas, Texas
MANAGEMENT, L.P.,                      )   Monday, December 13, 2021
                                       )   10:30 a.m. Docket
         Debtor.                       )
                                       )
_____        )
                                       )
HIGHLAND CAPITAL                       )   Adversary Proceeding 21-3005-sgj
MANAGEMENT, L.P.,                      )
                                       )   MOTION TO EXTEND EXPERT
         Plaintiff,                    )   DISCLOSURE AND DISCOVERY
                                       )   DEADLINES
v.                                     )
                                       )
NEXPOINT ADVISORS, L.P.,               )
et al.,                                )
                                       )
         Defendants.                   )
                                       )
_____        )
                                       )
HIGHLAND CAPITAL                       )   Adversary Proceeding 21-3006-sgj
MANAGEMENT, L.P.,                      )
                                       )   MOTION TO EXTEND EXPERT
         Plaintiff,                    )   DISCLOSURE AND DISCOVERY
                                       )   DEADLINES
v.                                     )
                                       )
HIGHLAND CAPITAL                       )
MANAGEMENT SERVICES, INC.,             )
et al.,                                )
                                       )
         Defendants.                   )
_____        )
```

```
1
2     HIGHLAND CAPITAL                )   Adversary Proceeding 21-3007-sgj
      MANAGEMENT, L.P.,               )
3                                     )   MOTION TO EXTEND EXPERT
            Plaintiff,                )   DISCLOSURE AND DISCOVERY
4                                     )   DEADLINES
      v.                              )
5                                     )
      HCRE PARTNERS, LLC              )
6     (n/k/a NEXPOINT REAL            )
      ESTATE PARTNERS, LLC),          )
7                                     )
            Defendant.                )
8     _____)

9                      TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                 UNITED STATES BANKRUPTCY JUDGE.

11    WEBEX APPEARANCES:

12    For the Debtor-Plaintiffs:  Hayley Winograd
                                  PACHULSKI STANG ZIEHL & JONES, LLP
13                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
14                                (212) 561-7700

15    For NexPoint Advisors,      Davor Rukavina
      LP:                         Julian Preston Vasek
16                                MUNSCH HARDT KOPF & HARR, P.C
                                  500 N. Akard Street, Suite 3800
17                                Dallas, TX  75201-6659
                                  (214) 855-7587

18    For HCMS and HCRE:          Michael P. Aigen
                                  Deborah Rose Deitsch-Perez
19                                STINSON LEONARD STREET
                                  3102 Oak Lawn Avenue, Suite 777
20                                Dallas, TX  75219
                                  (214) 560-2201

21
      Recorded by:                Michael F. Edmond, Sr.
22                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
23                                Dallas, TX  75242
                                  (214) 753-2062
24

25
```

3

Transcribed by:              Kathy Rehling
                             311 Paradise Cove
                             Shady Shores, TX   76208
                             (972) 786-3063

                   Proceedings recorded by electronic sound recording;
                     transcript produced by transcription service.

1            <u>DALLAS, TEXAS - DECEMBER 13, 2021 - 10:55 A.M.</u>

2         THE COURT:  I will now take up the Highland three

3 motions to extend expert deadlines.  So let me get appearances

4 from lawyers.  First, who do we have appearing for the Debtor

5 this morning?

6         MS. WINOGRAD:  Good morning, Your Honor.  My name is

7 Hayley Winograd of Pachulski Stang Ziehl & Jones appearing on

8 behalf of Highland.

9         THE COURT:  Okay.  Good morning.  For NexPoint

10 Advisors, who do we have appearing?

11         MR. RUKAVINA:  Your Honor, good morning.  Davor

12 Rukavina and Julian Vasek.

13         THE COURT:  Good morning.  All right.  For HCMS and

14 NPRE, who do we have appearing?

15    (No response.)

16         THE COURT:  Okay.  Maybe I should say these names in

17 full.

18         MS. DEITSCH-PEREZ:  I apologize, Your Honor.  This is

19 Deborah Deitsch-Perez.  I believe Michael Aigen will be

20 appearing for HCRE and HCMS.  And I wonder if he's having

21 technical difficulties.  I saw him on the line a few minutes

22 ago.  I'm going to go off and call to make sure that there

23 isn't a problem.

24         THE COURT:  Okay.

25         MR. RUKAVINA:  But Your Honor, I'll be handling the

1    bulk of the arguments, and Mr. Aigen will cover a much smaller

2    amount.

3              THE COURT:  Okay.  Well, we'll --

4              MR. AIGEN:  Your Honor, this is Michael Aigen.  Are

5    you able to hear me now?

6              THE COURT:  I can hear you now.

7              MR. AIGEN:  I apologize.  Michael Aigen for HCMS and

8    HCRE.

9              THE COURT:  All right.  I presume those are our only

10   formal appearances, but is there anyone else who wished to

11   appear?

12       (No response.)

13             THE COURT:  All right.  Well, Mr. Rukavina, I'll hear

14   your argument.

15             MR. RUKAVINA:  Thank you, Your Honor.

16        I'm sure that the Court has read our papers, and by this

17   motion we seek to extend the expert deadline so that we can

18   retain Steven Pully as our expert on the standard of care.

19   Mr. Pully is on the video.  I can see him right now.  So, good

20   morning, Mr. Pully.

21        And Your Honor, I'd like for you to be aware that Friday

22   evening I did file on the docket Mr. Pully's report.

23   Obviously, the Court hasn't granted this motion, but I wanted

24   the Court to know that we moved as rapidly as possible, and

25   Mr. Pully has now finalized his report.  So there's no future

1    need for additional time on my end if the Court grants this

2    motion.

3         Your Honor, before I get to the actual merits of this

4    motion, I feel it important to address a hearing that occurred

5    a few weeks ago that I was not present at because this motion

6    was discussed briefly at the end.  This was a hearing held on

7    Ms. Deitsch-Perez's motion to dismiss and compel arbitration.

8         And Mr. Vasek, if you could please pull up the transcript

9    of that and scroll down to near the end where this motion is

10   discussed.

11        Your Honor will maybe recall that we have the transcript

12   where Ms. Deitsch-Perez mentioned as a scheduling matter that

13   this motion had been filed.  And the Court says, What on earth

14   does that have to do with this litigation?  I don't mean to be

15   flippant and laugh, but what on earth does that have to do

16   with notes?

17        And if we scroll down some more, Your Honor, Ms. Deitsch-

18   Perez was attempting to explain to the Court the purpose of

19   this motion, and the Court notes that, It sounds like you're

20   talking about an affirmative defense that hasn't been

21   articulated yet.

22        And if we scroll down some more, Ms. Deitsch-Perez

23   attempts to tell the Court that, in fact, this is an

24   affirmative defense that has always been asserted.

25        And the Court notes there in her dialogue with Ms.

1   Deitsch-Perez that, I'm just letting you know you have a very

2   uphill battle convincing me that experts regarding shared

3   services agreements would be germane.

4        And the Court goes on to say that it has heard a lot about

5   shared services agreements during the past few years,

6   including experts on the witness stand in the *Acis* case.  And

7   the Court notes that, Under the pleadings as now in the

8   record, I just can't imagine why experts on shared services

9   agreements are going to be relevant evidence.

10        I think, Mr. Vasek, you can pull that down.

11        And I point this out only because, again, I know that the

12   Court has prepared for this hearing, but this is an

13   affirmative defense that has always been pled from the

14   beginning.  It does not involve the interpretation of the

15   contract.  We're not talking about the shared services

16   agreement.  We're not talking about the contract.  And recall,

17   Your Honor, that both Your Honor and the District Courts have

18   agreed that jury rights do attach here.  So the question

19   really is not the Court's familiarity with shared services

20   agreements but whether expert testimony will be relevant to

21   help the jury.

22        So, what is that expert evidence, Your Honor, and how did

23   this arise?  NexPoint is the obligor, the maker on a $30

24   million note -- I'm using round numbers -- and that note had

25   been paid down to some $24 million.

1      The note purports to require a payment every year on

2   December the 31st.  And in the year 2020, although we argued

3   that the payment was prepaid, that payment was not made

4   timely.  It was made a couple weeks later, when Mr. Dondero

5   realized what had happened.

6      Our version, NexPoint's version of why this payment did

7   not happen has until recently been that the Debtor dropped the

8   ball.  Under the shared services agreement, and as Mr. Dondero

9   and Mr. Frank Waterhouse, the Debtor's former CFO, confirmed,

10   the Debtor was for years responsible to facilitate the annual

11   payment.  The Debtor didn't pay from its own funds.  It would

12   pay it from our funds.  But that was both in the contract and

13   that was the practice.  Again, Mr. Waterhouse -- and Your

14   Honor has seen in my papers and in his transcript -- confirmed

15   that it was reasonable for NexPoint to rely on the Debtor to

16   ensure that this payment would be made.

17      So Mr. Vasek, if we can pull up the shared services

18   agreement here.

19      I know that the Court likes to look at contracts, so I

20   will briefly take Your Honor through some of the pertinent

21   provisions, because this relates to directly to Mr. Pully.

22      And Mr. Vasek, if you'll please scroll down to the

23   definitions of Covered Person.

24      And Your Honor can read it for herself.  This is just a

25   definitional that we need as we go forward.   But Covered

 1   Person means the staff and services provider.  That is

 2   Highland.  That is the Debtor.  And it includes managers,

 3   members, employees, et cetera.  Well, that would be Mr. Frank

 4   Waterhouse.  Mr. Waterhouse at that time was the Debtor' chief

 5   financial officer, and he was also an officer of NexPoint.  So

 6   he, like many people here, wore two hats.

 7        Mr. David Klos at that time was the controller for

 8   Highland, and Ms. Kristin Hendrix was a senior accountant at

 9   Highland.  Both Mr. Klos and Ms. Hendrix were providing the

10   services we're going to discuss.

11        If you'll scroll down, Mr. Vasek.

12        The next provision, Your Honor, relates to what services

13   were being provided.

14        Scroll up just a -- just a tad.

15        So you'll see under Section 2.02 the parties are now

16   agreeing here's the services that Highland will be provided.

17   And it's important to note, Your Honor, that at this time this

18   agreement was in place.  This agreement was terminated I want

19   to say at the end of February this year.  But in December and

20   November of 2020, this agreement was in place.

21        And if the Court looks at the services being provided, the

22   first one there is assistance and advice.  That word "advice"

23   is important.  Assistance and advice with respect to various

24   things.  And you see down there those things include finance

25   and accounting, payments, bookkeeping, cash management, cash

1   forecasting, accounts payable, et cetera.

2        Keep scrolling down, Mr. Vasek.  Obviously, as the Court

3   very well knows, the Debtor was also providing legal services.

4        And if you keep scrolling down, Mr. Vasek, to the next

5   page, there you go, to K and L.

6        These are more catch-all.  So if the language of what I

7   just showed you is not express or specific enough, here you

8   have these catch-alls, such as advice on all things ancillary

9   or incidental to the foregoing and advice relating to other

10  back- and middle-office services in connection with the day-

11  to-day business.

12       So, again, we're not here today, we're not asking the

13  Court to decide, nor do I think that it would be this Court to

14  decide, whether the Debtor had a duty to facilitate the

15  December payment.  I'm just pointing out that we have, I think

16  anyone would agree, at least a *prima facie* colorable argument

17  that the Debtor would have such duty.

18       And just to address an issue that the Debtor raised, Mr.

19  Vasek, if you'll scroll down to 6.01, and then if you'll zoom

20  in.

21       Here, now, Your Honor, is the language that is of

22  relevance, the direct relevance.  So we've seen that Covered

23  Person is defined, and we have seen that -- and we can now see

24  that this agreement requires Covered Person -- that includes

25  the Debtor; that includes Mr. Waterhouse; that includes Mr.

1    Klos -- to discharge its duties under this agreement.  We've

2    seen that there's certainly a colorable argument that the

3    duties under this agreement include facilitating payments and

4    advice with payments and accounts payable and the like, and

5    that the Debtor has to discharge its duties with the care,

6    skill, prudence, and diligence under the circumstances then

7    prevailing that a prudent person acting in a like capacity and

8    familiar with such matters would use in the conduct of an

9    enterprise of a like character and with like aims.

10       That, Your Honor, is what we need the expert on.  Not to

11   tell the jury what this contract says, not to tell the jury

12   that the Debtor had a duty, but to look at, under the facts,

13   did the Debtor's performance or lack thereof -- and I'll tell

14   you why that's important in a moment -- did that performance

15   or lack thereof comport with this standard of care?

16       This is a matter for an expert.  The average juror, the

17   average layperson, myself, I would not know what the care,

18   skill, prudence, and diligence of a reasonable prudent person

19   in this situation would be.  I can theorize on that.  I can

20   opine on that.  I'm not an expert on that.  This is a matter

21   for an expert, the same as with medical malpractice, legal

22   malpractice, breach of fiduciary duty.

23       While we're on this agreement, just to address another

24   argument that the Debtor makes, the Debtor says that this

25   agreement exculpates negligence.

1      Mr. Vasek, if you'll please scroll down to the

2  exculpation.

3      And there is an exculpation provision.  But if Your Honor

4  -- and it does exculpate negligence.  It doesn't exculpate

5  gross negligence, et cetera.  But it talks about that only

6  acts or omissions -- it's Romanette (i) -- acts or omissions

7  arising out of or in connection with the conduct of the

8  business of the management company that is exculpated.  Again,

9  we're not here today to decide what this means, but the

10  business of NexPoint is not note-making; the business of

11  NexPoint is advising thousands of investors and funds with

12  respect to a billion dollars of investments.

13      It is -- the Debtor does have an argument, and either the

14  Court or the jury will have to decide whether this exculpation

15  provision applies.  And then if -- and you can remove this,

16  Mr. Vasek -- the Debtor likewise says that the agreement's

17  indemnification provision prohibits this argument.  We pointed

18  out in our briefing, Your Honor, that, in fact,

19  indemnification under Texas law does not apply to the parties

20  to the contract.  It applies to claims made by third parties.

21  But, again, that's an argument that the Debtor has.

22      So we have this contract in place.  Late November/early

23  December rolls around, and both Mr. Dondero and Mr. Waterhouse

24  testify that they had a meeting.  What was said at that

25  meeting is in dispute.

1      Mr. Dondero believes that he told Mr. Waterhouse, stop

2  paying on the shared services agreement.  It's NexPoint's

3  position -- Your Honor knows we filed an administrative claim

4  -- it's NexPoint's position that it had overpaid millions of

5  dollars under the shared services agreement, in part because

6  many of the employees of the Debtor that we were supposed to

7  be paying our respective share of weren't there anymore.  So

8  Mr. Dondero says to Mr. Waterhouse, stop paying on this shared

9  services agreement.

10      Those are the facts as we knew them going into late

11  October.  Based on that fact, and based on the fact that the

12  Debtor did not facilitate the payment, we've always asserted

13  as an affirmative defense that our lender, who is also our

14  lawyer, who's also our accountant, who's also our treasury

15  management people, and who have always facilitated these

16  payments in the past, dropped the ball.  They committed simple

17  negligence, they dropped the ball, thereby causing the alleged

18  default.

19      We did not need an expert opinion on that at that time.

20  You've seen in my reply briefing, Your Honor, that, in fact,

21  the Fifth Circuit holds in multiple instances that when it's

22  simply a matter of missing a deadline -- a lawyer missing

23  limitations, if you will -- expert testimony is not required,

24  and in fact may be inappropriate because a lay person can

25  figure out that, a lay juror can figure out that, well, if you

1   just simply didn't do something, whether that's -- whether

2   that comports with the standard of care or not.

3       On October the 19th of this year, the Debtor and we

4   deposed Mr. Waterhouse.  And Mr. Waterhouse had a different

5   testimony.  He had a different recollection of that meeting.

6   Mr. Waterhouse said that Mr. Dondero told him in late November

7   or early December, don't make this NexPoint payment.  In other

8   words, that Mr. Dondero expressly said the payment that's

9   coming up for NexPoint, do not make this payment.

10      That was news to us.  I was so surprised by that testimony

11  that I actually asked Mr. Waterhouse that question four times.

12  And opposing counsel actually got angry at me, kept saying,

13  how many times are you going to keep asking this question?  I

14  was surprised.

15      I was not able to talk to Mr. Waterhouse meaningfully

16  before that.  Mr. Waterhouse has attorneys, Mr. Waterhouse is

17  in litigation with the Debtor, and those attorneys require

18  that I not communicate with him directly, I communicate only

19  through them.  I never took up the chance to ask them about

20  this meeting because the only information that I had and that

21  my client had was that there was no such instruction.  The

22  Debtor may or may not have been surprised as well.

23      Mr. Vasek, if you'll please pull up discovery.

24      Your Honor, we're sharing with you now certain of the

25  discovery in this case -- in particular, the Debtor's

1    responses.

2         And if you'll go to Interrogatory No. 1, Mr. Vasek.

3         So, Your Honor obviously can read this.  But I ask the

4    Debtor, if it contends that it was not responsible for making

5    payments under the note on NexPoint's behalf, please explain

6    the legal and factual basis for such contention.  I asked for

7    a factual basis as well.  And Your Honor can see in the

8    response that the Debtor objects, the Debtor says that it was

9    not required to make the payment, but nowhere here does the

10   Debtor say that it had received an instruction not to make the

11   payment.

12        Pardon me, Your Honor.

13        This was, I believe, from May or June.  In any event, it

14   was early in this litigation.  Nowhere here am I put on any

15   kind of notice that it's the Debtor's position that it

16   received an instruction not to make the payment.

17        If we scroll down to Request for Production, I believe

18   it's No. 1, Mr. Vasek.

19        Here, we -- I ask for all communications pursuant to which

20   the Debtor was advised or instructed not to make the payment

21   or to cause the payment to be made.  And the Debtor's answer

22   includes the following:  Any communications responsive to

23   Request for Production No. 1 were verbal.

24        Okay.  I had to await depositions.  That's fine.  I had

25   asked in an interrogatory, I didn't get a factual response,

1    and then I'm now being told that any communications were

2    verbal.

3        Now, the Debtor may not have known about Mr. Waterhouse's

4    instruction, it may not have, in which case I don't think it's

5    fair to accuse NexPoint or its counsel of dropping the ball.

6    Or the Debtor may have known of the instruction, in which case

7    the Debtor should have answered Interrogatory No. 1 factually

8    by saying, oh, wait, not only were we not required to make the

9    payment, et cetera, et cetera, but we received an instruction

10   from your boss, NexPoint, not to make the payment.

11       You can remove that.

12       So, here we go into October 19th.  We depose Mr.

13   Waterhouse.  We now see that, in fact, I guess it's -- I

14   forget who -- who the author is, but the plot has thickened.

15   The situation is now much more complicated.  Whereas

16   previously we argued that the Debtor had dropped the ball, the

17   question now is, okay, if in fact the jury believes that Mr.

18   Dondero went to Mr. Waterhouse and said, don't make this

19   payment, did that discharge the Debtor's duties as specified

20   by the contract or not?

21       It's our belief that it did not.  It's our belief that Mr.

22   Waterhouse should have, at a minimum, asked Mr. Dondero after

23   that, did I get you right, Jim?  Did I understand correctly?

24   Did you mean not to make this payment?  It's our belief that

25   the Debtor -- our legal advisers, our accountants, people that

1    are supposed to advise us -- should have called back and said,

2    Jim, you know that if you don't make this payment you're going

3    to have a note accelerated and it's going to be $24 million.

4    They should have advised Mr. Dondero of the potential

5    consequences, especially given their clear conflict of

6    interest.

7        At the same time, they're our lender to the tune of $24

8    million, and they're providing us all this assistance and

9    advice that we're paying millions and millions of dollars for.

10       And then also, if Mr. Dondero gave such an instruction,

11   did the Debtor have some duty to try to dissuade him by

12   saying, Jim, you're being a hothead, this is a very serious

13   matter, it's only $1.4 million, make the payment?  In fact, we

14   did make the payment in January, after this issue was learned

15   about.  But the Debtor didn't do any of those things.

16       So, again, the question now is, did the Debtor's lack of

17   any subsequent follow-up -- putting its head in the sand, so

18   to speak -- did that comport with the duties as specified,

19   what would a reasonable person discharging his or her duties

20   under the facts and circumstances in that industry then in

21   place, what should or would have such a reasonable person

22   done?  That's where Mr. Pully comes in.

23       I deposed Mr. Seery a few days after this deposition and I

24   asked him about this, and Mr. Seery said that no, in his view,

25   Mr. Waterhouse acted perfectly appropriately, that Mr.

1    Waterhouse had no duty to seek clarification or explain the

2    ramifications or anything else.  And it was clear to me that

3    Mr. Seery is going to testify to that effect.

4         So at that point in time, now that we knew Mr.

5    Waterhouse's testimony, we decided that it is not only

6    advisable but perhaps necessary to retain an expert.  And we

7    moved very quickly.  I have had the fortune of working with

8    Mr. Pully before, so I knew him.  I was able to rapidly retain

9    him because of our prior familiarity with each other.  Mr.

10   Pully reviewed all the transcripts.  He reviewed the

11   discovery.  He prepared a full and final report.  So, from

12   beginning to end, we were done in maybe five weeks, maybe six

13   weeks.

14        And we're not proposing, Your Honor, that the Debtor

15   doesn't have whatever time it needs to prepare a rebuttal.

16   We're not proposing that the Debtor can't depose Mr. Seery

17   [sic].  Of course it can.

18        So where this adversary proceeding now is is that

19   discovery is over.  The Debtor will be filing by December the

20   17th a motion for summary judgment.  Your Honor will recall

21   that Your Honor approved a scheduling order on that.  And

22   there will be hearings before this Court on summary judgment,

23   and perhaps opposing counsel can remind me, but it's going to

24   be in late January, or I'm going by memory here, maybe early

25   February.

1      So that is, Your Honor, what happened.  That is how it

2  happened.  It's the truth.  It's -- there's no laying behind

3  the log here.  There's no litigation decisions that are now

4  backfiring and we're trying to get out of them.  What happened

5  here is exactly what should happen in a lawsuit like this,

6  where discovery has illuminated various issues and now we have

7  to deal with the consequences of that discovery as we prepare

8  for trial.

9      October the 29th was the date in the scheduling order to

10  disclose experts and provide their reports.  Mr. Pully

11  couldn't even hypothetically do that in time since I had

12  retained him a few days before that.  But we moved very

13  quickly to file this motion, to file it before the deadline

14  actually expired, in hopes, again, of not -- not only of

15  showing Your Honor that we moved diligently and rapidly when

16  this issue unfolded, but also that we didn't need *nunc pro*

17  *tunc* relief.

18      So, Rule 16 does apply.  The good cause requirement does

19  apply.  But this is not some talismanic super-high burden to

20  meet.  Yes, there's a burden.  Yes, I must demonstrate to Your

21  Honor why leave based on good cause is required.  But we're

22  not trying to unscramble the eggs, and we're not seeking

23  something extraordinary or exotic here.

24      The Fifth Circuit has specified the four factors that the

25  Court should look at.  In the Fifth Circuit cases that we've

1    seen and that we've briefed, the deadline had already expired

2    and the people were seeking *nunc pro tunc* relief.  I don't

3    think we have that high of a burden here, but even if we do,

4    we've analyzed those four factors.

5        And the first factor is the explanation for the lateness.

6    Again, did NexPoint act diligently?  Did NexPoint hide behind

7    the log?  Is there some litigation strategy here that has

8    backfired?  None of that, Your Honor, is present.  There's

9    been no delay.  We deposed, pursuant to agreed deposition

10   schedules, we deposed all of the main witnesses in October.

11   When we deposed Mr. Waterhouse, this issue arose.  We moved as

12   rapidly as we could thereafter.  And you've seen, Your Honor,

13   in the interrogatory answer, that if the Debtor knew about

14   this instruction, then, really, the Debtor should have

15   answered its interrogatory to say, we got an instruction not

16   to pay and that's why we didn't pay.

17       Maybe the Debtor -- maybe the Debtor didn't know that.

18   But when we deposed Mr. Klos and Ms. Hendrix, who are still

19   employees of the Debtor, they testified that they heard Mr.

20   Waterhouse tell them that in late November last year.  So they

21   -- they testified that in late November last year Frank

22   Waterhouse told them, Jim Dondero told me, don't make this

23   payment.

24       So, even if the Debtor didn't know what Mr. Waterhouse

25   would testify to, Mr. Klos and Ms. Henderson [sic] did.

1        Again, I am not pointing the fingers here at the Debtor.

2   I'm not saying that their answer to Interrogatory No. 1 was

3   manipulative, that it was calculated to deceive.  I'm not

4   suggesting that.  I'm just suggesting that, had the Debtor

5   given a more fulsome answer, we would have immediately

6   investigated and immediately retained an expert back in May or

7   June of this year.

8        The next element, or the next factor, rather, is the

9   importance of this extension.  And Your Honor, we have quoted

10  at length Fifth Circuit opinions that say that when the

11  standard of care is involved, expert opinion is appropriate

12  and may be required.

13       It goes back to, again, if the Debtor just dropped the

14  ball and didn't facilitate the payment, that's easy.  That

15  doesn't need an expert.  But if the Debtor was instructed by

16  Mr. Dondero not to make the payment and there was a month left

17  before the payment was to be made, did the standard of care as

18  specified in the contract require the Debtor to do something

19  that it failed to do?

20       So we are talking about the standard of care.  That is

21  appropriate expert testimony.  It may be required.  And it is

22  not something that I can argue to a lay juror just based on a

23  deadline being missed.

24       So, yes, this -- the relief we're seeking is important,

25  especially given the jury nature of this trial.

1    The third factor is the potential prejudice.  So, the

2  Debtor says, well, this will increase costs.  Yes, it will.

3  But costs alone is not the legally -- the legal standard here.

4  Every litigation has costs.  Every litigation has burdens.

5  And if the Debtor prevails in this lawsuit, they will claim

6  attorneys' fees and costs.  They're entitled to that under the

7  note and under Texas law.

8    So there will be an incremental cost for the Debtor to

9  retain an expert, but that would have been present as of

10  October the 29th anyway.

11    Remember, I filed this motion on the deadline.  We're

12  seeking six weeks of delay here.  This is not late-stage

13  litigation where all the facts are known, all the witnesses

14  have been deposed, everyone's ready for trial, and suddenly a

15  party seeks to increase its opponent's litigation costs here

16  with a last-second expert.  This is not that case.

17    So, there is no prejudice, at least not in the legally

18  relevant way by way of costs, nor is there any prejudice by

19  delay.  And this also ties into the fourth factor, which

20  discusses a continuance.  There is no prejudice here because

21  we're not trial-set.  We don't know when we're going to be

22  trial-set.

23    Even if the Court denies summary judgment in whole or in

24  part at the end of January or early February -- which I don't

25  think that's very realistic because I think the Court is going

1    to want to think about it some, the Court is going to want to

2    prepare a report and recommendation -- this is not going to be

3    a straightforward summary judgment proceeding.

4        What is also out there is that the Debtor has filed a

5    motion to consolidate all these note cases in front of one

6    District Court judge.  That's going to have to be reviewed by

7    the District Court judges and ruled on.

8        So we are months, months away from being trial-ready, and

9    then we don't know how long it's going to be before we're up

10   for a week or two long jury trial.  No one knows that.  That

11   is plenty of time for the Debtor to get a rebuttal expert.

12   It's plenty of time for the Debtor to depose Mr. Pully.  It's

13   plenty of time for everything to come to play so that this

14   case will be certified trial-ready, irrespective of whether

15   there's an expert or not.  This is not going to delay the

16   process.  We're not seeking to delay the process.

17       Nor are we seeking to derail the summary judgment

18   proceedings.  If the Debtor wants to retain an expert for

19   summary judgment proceedings, that just proves that there is a

20   question of fact here that precludes summary judgment.

21       But as far as continuance or trial-setting, that's just

22   not present here.

23       And I've quoted Your Honor at length a District Court's

24   opinion from the Eastern District of Texas that talks about

25   prejudice, that talks about costs.  And that judge basically

1    said, look, when it's -- when it's an affirmative defense that

2    you've known that since the beginning, which the Debtor has

3    known here since the beginning, then, really, it's not a last-

4    second tactic.  It's not real prejudice.  Yeah.  Yeah, there's

5    a delay.  Yeah, there's an increased cost.  But the plaintiff

6    is now trying to fundamentally change this lawsuit, to

7    fundamentally interject something new here.  The plaintiff

8    just needs some more time.  And the question is, should the

9    plaintiff have more time?

10        Your Honor, those are the factors.  We have -- we have the

11   exhibits.  We have the record prepared.  It's a part of the

12   motion and the Debtor's response.  And Your Honor, we ask that

13   the Court grant this motion -- again, reminding the Court that

14   this does relate to an affirmative defense that's been around

15   since the beginning.  It does relate to one that was -- only

16   -- only really became the subject of expert testimony in late

17   October.  And it's only because discovery in this case worked

18   as it should.  No one laid behind the log.  No one made a

19   calculated decision that has backfired.  No one delayed

20   anything or was less than diligent.

21        Under these circumstances, Your Honor, because the point

22   of a trial in front of a jury is to get to the truth and it's

23   to enable the jury to have what it needs to make a true, full,

24   and informed decision, we believe that good cause exists, and

25   we'd ask -- NexPoint would ask that the Court grant this

1    motion.

2              THE COURT:  All right.  Thank you.

3        I'll ask Mr. Aigen, does he have anything he wants to

4    supplement with?

5              MR. AIGEN:  Yes, Your Honor.  I can make a very quick

6    argument here.

7        As you know, HCMS and HCRE have filed a joinder, asking

8    for the same relief.  The only thing I want to quickly point

9    out is that the only difference between our clients and Mr.

10   Rukavina's client is the lack of a written services agreement.

11   But I would point out, as the evidence we submitted in our

12   briefing shows, the undisputed testimony is that there was an

13   oral agreement to provide these services, that the Debtor did

14   provide these same exact services that they provided from --

15   for NexPoint to HCMS and HCRE, that they had done this for

16   years, and this included making loan payments.

17       So I just wanted to point that out, and I think what this

18   means is that, for the same reasons that Mr. Rukavina asked

19   for this relief, we believe we are entitled to the same

20   relief.  And I won't bother to go through all the same

21   arguments that Mr. Rukavina just made to the Court.  So that's

22   all I have, Your Honor.

23             THE COURT:  All right.  Thank you.  Ms. Winograd?

24             MS. WINOGRAD:  May it please the Court?

25             THE COURT:  You may proceed.

1        MS. WINOGRAD:  Your Honor, the motion should be

2   denied because there is no good cause for modifying the

3   scheduling order.  The motion is untimely.  The expert

4   testimony Defendants seek to gather is both improper and

5   irrelevant.  And if the motion is granted, Highland will be

6   prejudiced.

7        This is -- this adversary -- adversary proceeding is a

8   garden-variety collection action on a simple note, it has been

9   going on for roughly a year, and it continues to get delayed

10  due to unnecessary and costly motion practice.  Defendants'

11  latest motion is not only another delay tactic, but it is also

12  completely unsupported.

13       And before I tell you why it is unsupported, I want to

14  take a step back and just summarize the context of Defendants'

15  motion.  Defendants have always and continue to assert the

16  same affirmative defense, which is that their default under

17  the note was the result of Highland's negligence under the

18  shared services agreement.  It is Defendants' position that

19  before Mr. Waterhouse's deposition an expert was not needed to

20  testify regarding Highland's duties under the shared services

21  agreement.

22       Mr. Waterhouse then testified that Mr. Dondero gave him

23  instruction not to make a payment under the note.  It is now

24  Defendants' contention that, solely in light of this

25  testimony, all of a sudden an expert is needed to testify

1    regarding whether Highland owed an affirmative duty under that

2    same shared services agreement to ask Mr. Dondero if he

3    understood the implications of his instruction, and if so, if

4    Highland breached such a purported duty.

5         First of all, Your Honor, based on the clear terms of the

6    shared services agreement, there is no affirmative duty for

7    Highland to ask Mr. Dondero if he understood the implications

8    of his own instruction.

9         Moreover, Your Honor, the question of what Highland's

10   duties are is a legal issue reserved for the Court, and the

11   issue of whether Highland breached -- and Highland submits

12   there was no such breach -- but that issue is reserved for the

13   jury.

14        Your Honor, if expert testimony wasn't needed before, it

15   is not needed now.

16        This Court entered a scheduling order in September of

17   2021.  Under Rule 16(b) of the Federal Rules of Civil

18   Procedure, an existing scheduling order can only be modified

19   upon a showing of good cause.  The purpose of Rule 16 is for

20   the Court to prevent unforeseeable and never-ending litigation

21   expenditures.

22        So the critical question before Your Honor today is

23   whether there is good cause to modify the scheduling order.

24   And Highland submits there is not.

25        Courts consider four general factors to determine whether

1    there's good cause.  It's the party's explanation for failing
2    to previously identify the witness.  It's the importance of
3    the witness's testimony.  And it's the prejudice to the other
4    side in allowing the testimony.  All of these factors weigh in
5    favor of denying the motion.
6        Regarding the first factor, Defendants' explanation for
7    failing to previously identify the witness is entirely without
8    merit.  Again, NexPoint first raised its affirmative defense
9    that its default under the note was the result of Highland's
10   own negligence back in March of 2021.  In other words,
11   NexPoint had nine months to retain an expert to testify
12   regarding Highland's duties for nine months.
13       NexPoint seeks to create -- to distinguish between these
14   notions of Highland somehow, quote, dropping the ball versus
15   Highland not asking Mr. Dondero if he understood the
16   implications of his own instruction.  Defendants cite no
17   authority in support of the notion that one of these factual
18   circumstances would somehow require an expert but that the
19   other would not.
20       What this comes down to, Your Honor, is that Defendants
21   are using this testimony as an excuse to muddy the water, to
22   muddy the waters as to the critical issues in this case and as
23   a latch-ditch attempt to bolster their defense.
24       I don't want to bog you down with case law that's already
25   cited in our brief, but I want to flag a particularly on-point

 1   case, and that is *Reliance*, 110 F.3d at 257.  The Fifth

 2   Circuit affirmed the lower court's denial of a party's motion

 3   to modify the scheduling order when that -- when a deposition

 4   didn't go well, specifically holding District Courts have the

 5   power to control their dockets by refusing to give ineffective

 6   litigants a second chance to develop their case.

 7        The suggested expert testimony also is improper as a

 8   matter of law.  It is well-settled law in the Fifth Circuit

 9   that an expert cannot testify regarding the scope of a party's

10   contractual duties under an agreement and whether that party

11   fulfilled such duties.  And that is exactly what NexPoint and

12   Defendants are trying to do here.  It is trying to have its

13   expert interpret the terms of a shared services agreement and

14   testify regarding Highland's duties thereunder and ultimately

15   whether it thinks Highland breached those duties.

16        This is an improper subject for expert testimony and

17   precisely the type of expert testimony that the Northern

18   District of Texas rejected in *Panhandle* and which the Fifth

19   Circuit affirmed the rejection of in *Askanase*, two cases cited

20   in our papers.

21        Even if the suggested expert testimony were proper, which

22   it is not, it is also irrelevant.  In order to be relevant,

23   expert testimony must assist the trier of fact understand a

24   complex or distinct issue in a case.  Here, the critical issue

25   for Defendants is whether they can prove that their default

1   under the note was the result of Highland's negligence.  This

2   issue is well within the common understanding of a lay person.

3       Again, this is a garden-variety collection action.  All of

4   the cases NexPoint cites in its papers in support of the

5   notion that expert testimony is required, all of those cases

6   involve professional malpractice cases, whether legal or

7   medical.  And in those cases, an expert was required to

8   testify regarding the general standard of care in a particular

9   industry.

10      Here, NexPoint doesn't seek to have an expert testify

11  regarding the general standard of care in a particular

12  industry.  That is not an issue in this case.  And this

13  certainly is not a professional malpractice case.

14      NexPoint seeks to have its expert opine as to the scope of

15  Highland's legal duties in a shared services agreement and

16  ultimately whether Highland breached the purported duties,

17  which, again, we submit it did not.

18      The other case NexPoint cites to, *In re Schooler,* that

19  case also doesn't support Defendants' position, and in fact

20  supports Highland's position.  In that case, the Fifth Circuit

21  noted, and I quote, Expert testimony is not needed in many, if

22  not most, cases.

23      I also want to briefly address NexPoint's argument raised

24  for the first time in its reply that Highland was also acting

25  as an attorney to Defendants during this time.  As a

 1   procedural matter, this argument is entirely improper because

 2   it is not proper to raise an argument for the first time in a

 3   reply.

 4        And on the merits, again, this is not a professional

 5   malpractice case.  So for these reasons alone, such a

 6   contention should be summarily disregarded by the Court.

 7        Finally, Your Honor, Highland would suffer prejudice if

 8   the motion is granted because it would be forced to expend

 9   significant and costly resources responding to the testimony

10   in the form of retaining a rebuttal expert, taking and

11   defending additional depositions, and engaging in more motion

12   practice.  This would be a waste of resources for both parties

13   and for the Court because this testimony isn't ultimately

14   going to be needed at trial.

15        It is improper because it opines as to the ultimate legal

16   issues in this case that are reserved for the Court and then

17   for the jury.  And it is also irrelevant because all of the

18   issues in this case are well within the common understanding

19   of a lay person.

20        I also want to note that HCRE and HCMS's motions asking

21   for the same relief are equally if not more frivolous than

22   NexPoint's because HCMS and HCRE aren't even parties to the

23   shared services agreement.  To the extent HCMS and HCRE are

24   asking an expert to testify regarding Highland's alleged

25   duties under an oral agreement, the terms of which are

1   unknown, such a contention is frivolous on its face.

2       But even if such an alleged oral agreement exists, which

3   it does not, this does not change the Rule 16(b) analysis.

4   The Defendants fail to show good cause for modifying the

5   scheduling order.

6       In brief, Your Honor, this motion is simply a delay

7   tactic, the expert testimony is improper, and the motion

8   should be denied.  Thank you.

9           THE COURT:  Thank you.

10      All right.  Movants get the last word.  Mr. Rukavina,

11  anything further?

12          MR. RUKAVINA:  Yes, Your Honor.  Most of what

13  opposing counsel says is the topic of a *Daubert* issue.  We're

14  not seeking to prejudice *Daubert* today, and they have every

15  ability in the future to argue that Mr. Pully's testimony

16  should not be admissible.

17      Second, this is not a garden-variety case.  It is not.  It

18  is a case where, again, our lender was also our officer, was

19  providing all kinds of payment services, accounting services,

20  and legal services.  It may not be unique, it may not have

21  never happened before, but it is not a garden-variety.

22      I do take issue with the notion that there has been any

23  delay in this case.  That is not correct.  I just looked at

24  the docket again to refresh my memory.  We had a contested

25  hearing on my motion to withdraw the reference that the Debtor

1    objected to, arguing that 542 was a core matter.  Your Honor

2    rejected that argument, and Your Honor agreed with me, as did

3    the District Court, that the reference will be withdrawn when

4    this trial -- when this case is certified trial-ready.

5        So the notion that there has been delay, intentional delay

6    by us, that this is a matter of delay, is absolutely wrong.

7    In fact, this lawsuit has gone on quickly.  It's been handled

8    professionally.  Both sides have been cooperative, giving each

9    other various accommodations.  And I am proud, I think, of how

10   every lawyer has handled themselves in this lawsuit.  To

11   suggest delay or intentional delay is wrong.

12       On the law, Your Honor, *In re Schooler*, I heard counsel

13   argue that it's just illogical and wrong to argue that an

14   expert wasn't required in one situation but now is.  But

15   that's *In re Schooler*, the Fifth Circuit, Your Honor, 725 F.3d

16   498, that I quote at length from.  That's one where the

17   trustee dropped the ball, a Chapter 7 trustee failed to give

18   property of the estate.  And that's the one where the Fifth

19   Circuit does say, Accordingly, we have explained that, as a

20   general rule, expert testimony is not needed in many, if not

21   most, cases.  And then the Fifth Circuit says that, It

22   requires no technical or expert knowledge to recognize that

23   she -- the trustee -- affirmatively should have undertaken

24   some form of action to acquire for the bankruptcy estate the

25   assets to which it was entitled.

1          But, again, this is not that case.  This was that case

2     before Mr. Waterhouse testified, and now it's not.  This is

3     not a case anymore where the debtor simply dropped the ball,

4     as did that trustee, or as does the doctor who amputates the

5     wrong leg, or as does the lawyer who misses a limitations

6     deadline.  This is now a case where, if the jury believes Mr.

7     Waterhouse, the plot has thickened.

8          And finally, Your Honor, again, I'm not here to point

9     fingers, but look at the Debtor's response to Interrogatory

10    No. 1.  All that the Debtor needed to say six or seven months

11    ago to avoid this delay is that, oh, wait, we received an

12    instruction not to pay.  It would have taken ten words, one

13    sentence, by the Debtor to fully answer an interrogatory and

14    this motion would not have been necessary.

15         Thank you.

16             THE COURT:  All right.  Mr. Aigen, anything further

17    from you?

18             MR. AIGEN:  No, nothing further, Your Honor.  We just

19    join in Mr. Rukavina's reply points.

20             THE COURT:  All right.  As I understand it, the

21    deadline was October 29th for disclosure of experts, and the

22    record shows that at 5:22 p.m. on October 29th the Defendants

23    -- let me double-check that.  That was actually the

24    declaration of Mr. Rukavina.  No, 5:22 p.m. on the deadline,

25    the motion of the Defendant to extend the expert disclosure

1    and discovery deadlines was filed.

2        The legal authority that governs here is Rule 16(b).  As

3    everyone has acknowledged, it provides that deadlines in

4    scheduling orders may be modified for good cause.  I think the

5    standard does apply here.  While I guess a lot of the cases

6    analyze it in terms of a request after a deadline has expired,

7    I think a motion on the day of the deadline at 5:22 p.m. is

8    going to be governed by Rule 16(b).

9        So, as the parties have argued to the Court, the Fifth

10   Circuit has specified four factors in guiding a decision in

11   this situation:  the explanation for failure to timely move

12   for leave to amend; the importance of the amendment; potential

13   prejudice in allowing the amendment; and availability of a

14   continuance to cure such prejudice.

15       Here, as I think everyone readily acknowledges, these

16   Defendants have always asserted as a defense that the Debtor

17   dropped the ball, I think was one phrase used.  That, in any

18   event, it was the fault of the Debtor that the Defendants did

19   default on the payment of these notes.  I do not think the

20   sudden statement of Frank Waterhouse suddenly is a game-

21   changer that creates some new need for an expert.  So,

22   therefore, looking at the factors, I don't think the

23   explanation here to extend the deadlines has merit.

24       Moreover, as far as the importance of the amendment,

25   Factor No. 2, I think it is appropriate to look at the big

1    picture here a little bit, even though we're not in a *Daubert*

2    situation, and look at what the expert is argued to be needed

3    for.  And I do not think an expert can testify about

4    contractual duties and attempt to interpret its provisions.

5    That is the job of the Court, and I think it is improper

6    subject matter for an expert.

7        I don't buy into any notion that this is terribly unique

8    territory or exotic.  I mean, it was a contract.  Shared

9    services agreements are not all that unique, shall we say?

10   It's not a device that is used solely in the investment

11   advisor fund world.  It's in the corporate world generally.

12   Courts see these in all kinds of cases.  So, again, I don't

13   think contract interpretation needs an expert here or should

14   have an expert here.

15       And just because experts are sometimes -- often, I should

16   say -- appropriate in legal malpractice or medical malpractice

17   or other kinds of tort cases where duties might be needing of

18   elaboration, here, the contract spells out the duties, and I

19   just don't think any of those cases argued are applicable.

20       Prejudice, I do think there is potential prejudice in

21   allowing an extension of this deadline.  It will be costly,

22   add a layer of expense and delay to this litigation, when I

23   don't think it would be admissible at trial ultimately.

24       So the motions are denied.

25       Ms. Winograd, could you please prepare a form of order?

1   It can be a simple form of order.  Run it by opposing counsel

2   before you upload it, please.  All right?

3           MS. WINOGRAD:  Yes, Your Honor.

4           THE COURT:  Thank you.  We're adjourned.

5           MS. WINOGRAD:  Thank you.

6           THE CLERK:  All rise.

7       (Proceedings concluded at 11:47 a.m.)

8                           --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                       CERTIFICATE

21       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                        **12/13/2021**

24   _____      _____
    Kathy Rehling, CETD-444                         Date
25   Certified Electronic Court Transcriber

38

INDEX

PROCEEDINGS                                                          4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                            34

END OF PROCEEDINGS                                                 37

INDEX                                                              38



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed December 21, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § Case No. 19-34054-sgj11 |
| | § |
| Reorganized Debtor. | § |
| | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03005-sgj |
| | § |
| NEXPOINT ADVISORS, L.P., JAMES DONDERO, NANCY DONDERO AND THE DUGABOY INVESTMENT TRUST, | § |
| | § |
| | § |
| Defendants. | § |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § |
| | § |
| Plaintiff, | § Adversary Proceeding No. |
| | § |
| vs. | § 21-03006-sgj |
| | § |

---

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

| | |
|---|---|
| HIGHLAND CAPITAL MANAGEMENT SERVICES, INC., JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§ |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>HCRE PARTNERS, LLC (N/K/A NEXPOINT REAL ESTATE PARTNERS, LLC), JAMES DONDERO, NANCY DONDERO, AND THE DUGABOY INVESTMENT TRUST,<br><br>Defendants. | §<br>§<br>§<br>§ Adversary Proceeding No.<br>§<br>§ 21-03007-sgj<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## ORDER DENYING MOTIONS TO EXTEND EXPERT DISCLOSURE AND DISCOVERY DEADLINES

This matter having come before the Court on the (a) *Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosures and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 86] (the "NexPoint Motion") filed by NexPoint Advisors, L.P. ("NexPoint"); (b) *Defendant Highland Capital Management Services, Inc.'s Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 91] (the "HCMS Motion") filed by Highland Capital Management Services, Inc. ("HCMS"); and (c) *Defendant HCRE Partners, LLC's Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3007, Docket No. 86] (the "HCRE Motion," and collectively with the NexPoint Motion and the HCMS Motion, the "Motions") filed by HCRE Partners, LLC ("HCRE," and collectively with NexPoint and HCMS, "Defendants"); and this Court having considered (i) the Motions; (ii) *Highland's Objection to Motion of Defendant NexPoint Advisors, L.P. to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 104; Adv. Proc. 21-3006, Docket No. 109; Adv. Proc. 21-3007, Docket No. 104] (the "Objection") filed by Highland Capital Management, L.P. ("Highland"); (iii) the (a) *Reply of*

*Defendant NexPoint Advisors, L.P. in Support of Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3005, Docket No. 115] (the "NexPoint Reply") filed by NexPoint; and (b) *Highland Capital Management Services, Inc. and HCRE partners, LLC's Reply in Support of Defendants' Motion to Extend Expert Disclosure and Discovery Deadlines* [Adv. Proc. 21-3006, Docket No. 120, and Adv. Proc. 21-3007, Docket No. 115] (the "HCRE and HCMS Replies," and together with the NexPoint Reply, the "Replies") filed by HCRE and HCMS; and (iv) the arguments made during the hearing held on December 13, 2021 (the "Hearing"); and this Court having found that Defendants have not established "good cause" under Rule 16(b) of the Federal Rules of Civil Procedure for the relief requested in the Motions; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that venue of this proceeding and the Motions in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and upon all of the proceedings had before this Court, and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth during the Hearing on these Motions, **IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motions are **DENIED**.

2.      This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

### END OF ORDER ###

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on January 5, 2022, a true and correct copy of the foregoing document, including any exhibit(s) thereto, was served on the following recipients via the Court's CM/ECF system:

Case Admin Sup     txnb_appeals@txnb.uscourts.gov

Bryan Christopher Assink     bryan.assink@bondsellis.com

Clay M Taylor     clay.taylor@bondsellis.com

Daniel P Elms     elmsd@gtlaw.com, guerrak@gtlaw.com

Davor Rukavina     drukavina@munsch.com

Deborah Rose Deitsch-Perez     deborah.deitsch-perez@stinson.com, kinga.mccoy@stinson.com, patricia.tomasky@stinson.com

Douglas Draper     ddraper@hellerdraper.com, dhepting@hellerdraper.com, gbrouphy@hellerdraper.com, vgamble@hellerdraper.com

Gregory V Demo     gdemo@pszjlaw.com, hwinograd@pszjlaw.com, jfried@pszjlaw.com, lsc@pszjlaw.com

Jeffrey N Pomerantz     jpomerantz@pszjlaw.com

John A Morris     jmorris@pszjlaw.com, hwinograd@pszjlaw.com, lsc@pszjlaw.com

Julian Preston Vasek     jvasek@munsch.com

Leslie A Collins     lcollins@hellerdraper.com, dhepting@hellerdraper.com

Michael P Aigen     michael.aigen@stinson.com, stephanie.gratt@stinson.com

Stacey G Jernigan     sgj_settings@txnb.uscourts.gov, anna_saucier@txnb.uscourts.gov

Zachery Z. Annable     zannable@haywardfirm.com, zannable@franklinhayward.com

/s/ Davor Rukavina
Davor Rukavina